**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

**COUNTY OF ALBANY, TOWN OF**
**AMHERST, COUNTY OF**
**CATTARAUGUS, COUNTY OF**
**CHEMUNG, COUNTY OF CHENANGO,**
**COUNTY OF COLUMBIA, COUNTY OF**
**ERIE, COUNTY OF ESSEX, COUNTY OF**
**LIVINGSTON, MAGNACARE**
**INSURANCE, MEBCO, CITY OF**
**MOBILE, COUNTY OF MONROE,**
**COUNTY OF ONEIDA, COUNTY OF**
**ONONDAGA, COUNTY OF OSCEOLA,**
**COUNTY OF OTSEGO, CITY OF**
**POUGHKEEPSIE, COUNTY OF**
**SCHUYLER, COUNTY OF SHELBY,**
**WCA GROUP HEALTH TRUST,**
**COUNTY OF YATES,**

Plaintiffs,

v.

**ACTAVIS HOLDCO US, INC.;**
**ACTAVIS ELIZABETH LLC;**
**ACTAVIS PHARMA, INC.;**
**ALVOGEN INC.;**
**AMNEAL PHARMACEUTICALS, INC.;**
**AMNEAL PHARMACEUTICALS, LLC;**
**APOTEX CORP.;**
**AUROBINDO PHARMA USA, INC.;**
**BAUSCH HEALTH AMERICAS, INC.;**
**BAUSCH HEALTH US INC.;**

**Case No. 21-cv-01875**

**FIRST AMENDED**
**COMPLAINT**

**JURY TRIAL DEMANDED**

**BARR PHARMACEUTICALS, LLC;**
**BRECKENRIDGE PHARMACEUTICAL,**
**INC.;**
**CAMBER PHARMACEUTICALS, INC.;**
**CARACO PHARMACEUTICAL**
**LABORATORIES LTD.;**
**CITRON PHARMA LLC;**
**DAVA PHARMACEUTICALS, LLC;**
**DR. REDDY'S LABORATORIES, INC.;**
**ENDO INTERNATIONAL PLC;**
**FOUGERA PHARMACEUTICALS INC.;**
**G & W LABORATORIES;**
**GENERICS BIDCO I, LLC;**
**GLENMARK PHARMACEUTICALS,**
**INC.;**
**GREENSTONE LLC;**
**HERITAGE PHARMACEUTICALS, INC.;**
**HIKMA LABS, INC.,**
**HIKMA PHARMACEUTICALS, USA,**
**INC.,**
**IMPAX LABORATORIES, INC.;**
**JUBILANT CADISTA**
**PHARMACEUTICALS, INC.;**
**LANNETT COMPANY, INC.;**
**LUPIN PHARMACEUTICALS, INC.;**
**MAYNE PHARMA USA INC.;**
**MORTON GROVE**
**PHARMACEUTICALS, INC.,**
**MUTUAL PHARMACEUTICAL CO.,**
**INC.;**
**MYLAN INC.;**
**MYLAN PHARMACEUTICALS, INC.;**
**MYLAN N.V.;**

**OCEANSIDE PHARMACEUTICALS, INC.;**

**PAR PHARMACEUTICAL, INC.;**

**PERRIGO NEW YORK, INC.;**

**PFIZER, INC.;**

**SANDOZ, INC.;**

**SUN PHARMACEUTICAL INDUSTRIES, INC.;**

**TARO PHARMACEUTICALS USA, INC.;**

**TELIGENT INC.,**

**TEVA PHARMACEUTICALS USA, INC.;**

**TORRENT PHARMA INC.,**

**UDL LABORATORIES, INC.,**

**UPSHER-SMITH LABORATORIES, LLC;**

**URL PHARMA, INC.;**

**VALEANT PHARMACEUTICALS NORTH AMERICA, LLC;**

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.;**

**VERSAPHARM, INC;**

**WEST-WARD COLUMBUS, INC.,**

**WEST-WARD PHARMACEUTICALS CORP.;**

**WOCKHARDT USA LLC; and**

**ZYDUS PHARMACEUTICALS (USA), INC.,**

Defendants.

**Amended Complaint and Demand for Jury Trial**

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................... 12

II.   STATE AND FEDERAL INVESTIGATIONS ...................................... 21

III.  JURISDICTION AND VENUE ............................................................ 29

IV.   PLAINTIFFS ......................................................................................... 31
      Albany County ..................................................................................... 31
      Town of Amherst .................................................................................. 32
      Cattaraugus County ............................................................................. 33
      Chemung County .................................................................................. 34
      Chenango County ................................................................................. 36
      Columbia County .................................................................................. 37
      Erie County ........................................................................................... 38
      Essex County ......................................................................................... 39
      Livingston County ................................................................................ 40
      MagnaCare Insurance .......................................................................... 41
      MEBCO ................................................................................................. 42
      City of Mobile ....................................................................................... 43
      Monroe County ..................................................................................... 44
      Oneida County ...................................................................................... 45
      Onondaga County ................................................................................. 46
      Osceola County ..................................................................................... 47
      Otsego County ....................................................................................... 48
      City of Poughkeepsie ............................................................................ 49
      Schuyler County .................................................................................... 50
      Shelby County ....................................................................................... 51
      WCA Group Health Trust ................................................................... 52
      Yates County ......................................................................................... 53

V.    DEFENDANTS ..................................................................................... 54
      Actavis ................................................................................................... 55
      Alvogen .................................................................................................. 56
      Amneal ................................................................................................... 57
      Apotex .................................................................................................... 58
      Aurobindo .............................................................................................. 58
      Bausch Health/Valeant ......................................................................... 59
      Breckenridge Pharmaceutical, Inc. ..................................................... 60
      Camber ................................................................................................... 60
      Citron ..................................................................................................... 61
      Dr. Reddy's Laboratories, Inc. ............................................................ 61
      Fougera .................................................................................................. 62
      G & W Laboratories .............................................................................. 62

Glenmark Pharmaceuticals, Inc., USA..................................................................... 63
Greenstone, LLC ........................................................................................................ 63
Heritage Pharmaceuticals, Inc.................................................................................. 71
Hikma Labs, Inc. ....................................................................................................... 72
Impax Laboratories, Inc. ........................................................................................... 72
Jubilant Cadista Pharmaceuticals, Inc. .................................................................... 73
Lannett Company, Inc. .............................................................................................. 73
Lupin Pharmaceuticals, Inc. ..................................................................................... 74
Mayne Pharma USA, Inc. .......................................................................................... 74
Morton Grove Pharmaceuticals Inc., ....................................................................... 75
Mylan ........................................................................................................................ 766
Par............................................................................................................................. 77
Perrigo ...................................................................................................................... 78
Pfizer......................................................................................................................... 78
Sandoz ....................................................................................................................... 79
Sun/Mutual/Caraco ................................................................................................... 80
Teligent Inc. .............................................................................................................. 81
Teva .......................................................................................................................... 82
Torrent Pharma Inc................................................................................................... 83
UDL Laboratories, Inc. .............................................................................................. 83
Upsher ....................................................................................................................... 84
West-Ward Pharmaceuticals Corp. ........................................................................... 84
Wockhardt USA LLC ................................................................................................. 85
Zydus Pharmaceuticals (USA), Inc. .......................................................................... 86

VI.     CO-CONSPIRATORS .................................................................... 86
          Ascend ............................................................................................................. 86
          Unknown Co-Conspirators.............................................................................. 87

VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE ....87

VIII.   THE GENERIC DRUG INDUSTRY ............................................ 88
          A. Generic Drugs Are Commodity Products.................................................... 88
          B. Defendants' Cartel Agreement Includes All Generic Products ................. 90
          C. Pricing in the U.S. Prescription Drug Industry ........................................ 97

IX.     DEFENDANTS' CARTEL & OVERARCHING CONSPIRACY....... 101
          A. The Co-Operative Principle of "Fair Share" Governed Defendants' Cartel.................... 110
          B. Sales Managers Played a Key Role in Implementing the Conspiracy............................. 116
          C. Defendants Frequently Communicated Directly and Privately ........................................120

X.      ADDITIONAL DETAILS AND EXAMPLES OF, AS PART OF THEIR
        CARTEL, DEFENDANTS CONTINUING TO CONSPIRE TO FIX
        PRICES, ALLOCATE MARKETS, AND/OR RIG BIDS FOR THE
        DRUGS AT ISSUE.......................................................................... 136

A. Nystatin ................................................................................................ 160

B. Perphenazine Tablets ........................................................................... 179

C. Pentoxifylline Tablets .......................................................................... 181

D. Hydroxyurea Capsules ...................................................................... 16084

E. Imiquimod Cream .............................................................................. 186

F. Adapalene Cream ............................................................................... 200

G. Desonide Lotion ................................................................................. 210

H. Permethrin ........................................................................................ 214

I. Potassium Chloride ER Tablets .......................................................... 217

J. Triamcinolone Acetonide Cream and Ointment ................................. 221

K. Atropine Sulfate Tablets .................................................................... 223

L. Oxycodone HCL Tablets & Oral Solution ........................................... 225

M. Betamethasone Dipropionate, Betamethasone Dipropionate Augmented,
Betamethasone Dipropionate Clotrimazole, Betamethasone Valerate, and
Hydrocortisone Valerate ........................................................................ 227

N. Clindamycin ...................................................................................... 256

O. Methylprednisolone Tablets .............................................................. 274

P. Lidocaine-Prilocaine ......................................................................... 276

Q. Amantadine HCL ............................................................................... 282

R. Fluocinonide Solution ....................................................................... 285

S. Erythromycin Base/Ethyl Alcohol Solution ....................................... 290

T. Calcipotriene Solution ...................................................................... 298

U. Amiloride HCL/HCTZ Tabs, Cimetidine Tabs, Diltiazem HCL Tabs, Disopyramide
Phosphate Caps, Doxazosin Mesylate Tabs, Estradiol Tabs, Flurbiprofen Tabs, Hydroxyzine
Pamoate Caps, Ketorolac Tromethamine Tabs, Ketoprofen Caps, Methotrexate HCL Tabs,
Nadolol Tabs, Prazosin Caps, and Tolmetin Sodium Caps ...................... 301

V. Ciclopirox Cream .............................................................................. 315

W. Metronidazole .75% Gel .................................................................. 325

X. Metronidazole Cream and Lotion ...................................................... 332

Y. Chlorpromazine HCL Tablets ............................................................. 337

Z. Triamterene HCTZ ............................................................................. 340

AA. Lidocaine Ointment ......................................................................... 344

AB. Clonidine TTS Patch and Doxazosin Mesylate ................................. 351

AC. Fluocinolone Acetonide Cream, Ointment, and Solution .................. 360

AD. Irbesartan ....................................................................................... 366

AE. Isosorbide Dinitrate Tablets ............................................................ 368

AF. Amphetamine Salts .......................................................................... 371

AG. Lamivudine/Zidovudine Tablets ...................................................... 376

AH. Latanoprost Drops .......................................................................... 379

AI. Ethosuximide Capsules and Oral Solution ........................................ 387

AJ. Levonorgestrel/EE ........................................................................... 390

AK. Balsalazide Disodium Capsules ....................................................... 393

AL. Dextroamphetamine Sulphate ......................................................... 396

AM. Halobestasol Propionate Cream and Ointment ............................... 401

AN. Nimodipine ..................................................................................... 412

AO.  Cyroheptadine HCL ...................................................................................... 419

AP.  Ciclopirox Shampoo .................................................................................... 423

AQ.  Desoximetasone Ointment .......................................................................... 426

AR.  Fluticasone Propionate Lotion .................................................................... 433

AS.  Valsartan HCTZ ......................................................................................... 442

AT.  Buspirone, Estradiol, Labetalol, Loperamide, Mimvey (Estradiol/Norethindrone), Nadolol, Levothyroxine, Nitrofurantoin MAC, Tamoxifen Citrate, Clarithomycin, and Estazolam ................................................................................................................. 447

AU.  Promethazine HCL Suppositories .............................................................. 464

AV.  Nystatin Triamcinolone .............................................................................. 474

AW.  Doxycycline Hyclate.................................................................................. 484

AX.  Ethambutol HCL Tablets ............................................................................ 495

AY.  Oxacillin Sodium and Nafcillin Sodium Injectable Vials .........................501

AZ.  Doxycycline Monohydrate ........................................................................ 505

BA.  Ciclopirox Solution.....................................................................................513

BB.  Prochlorperazine Maleate Suppositories....................................................518

BC.  Spironolactone HCTZ Tablets.....................................................................521

BD.  Zoledronic Acid ......................................................................................... 524

BE.  Cefpodoxime Proxetil .................................................................................531

BF.  Budesonide Inhalation Suspension ............................................................. 536

BG.  Methylphenidate HCL Tablets and Methylphenidate HCL.........................541

BH.  Pioglitazone HCL Metformin HCL Tablets ............................................... 546

BI.  Tizanidine ................................................................................................... 552

BJ.  Oxaprozin Tablets ...................................................................................... 555

BK.  Meprobamate .............................................................................................. 562

BL.  Bromocriptine Mesylate ............................................................................. 567

BM.  Isotretinoin Capsules.................................................................................. 574

BN.  Medroxyprogesterone Tablet ...................................................................... 576

BO.  Cefaclor Tabs, Cefaclor ER Tabs, Cefadroxil Tabs, Cefdinir,  Cefprozil Tabs, Cephalexin Tabs, Cimetidine Tabs, Fluocinonide, Fluconazole Tabs, Isoniazid, Methotrexate Tabs, Moexipril HCL Tabs, Moexipril HCL/HCTZ Tabs, Nabumetone Tabs, Nadolol Tabs, Ondansetron, Oxybutynin CL Tabs, Pravastatin, Prazosin HCL Caps, Ranitidine HCL Tabs, and Adapalene Gel ................................................................................................................................... 577

BP.  Cholestyramine Oral Powder and Oral Solid ............................................ 607

BQ.  Drospirenone/EE.........................................................................................610

BR.  Lamotrigine ER Tablets ..............................................................................616

BS.  Acetazolamide..............................................................................................618

BT.  Alclometasone Dipropionate Cream & Ointment ...................................... 627

BU.  Clomipramine HCL Capsules .................................................................... 632

BV.  Desonide Ointment and Cream ................................................................... 638

BW.  Mometasone Furoate .................................................................................. 642

BX.  Amiloride  HCL/HCTZ  Tabs,  Benazepril  HCTZ,  Bupropion  HCL,  Cimetidine, Clomipramine, Diclofenac Tabs, Diltiazem HCL, Doxazosin Mesylate Tabs, Enalapril Tabs, Fluoxetine, Haloperidol, Ketoprofen, Keterolac, Levothyroxine, Loperamide, Metoprolol, Nadolol,

Nystatin, Perphenazine, Pravastatin, Prazosin, Sotalol, Tizanidine, Tolmetin Tabs, Trifluoperazine HCL, and Verapamil.................................................................................................................... 647

BY. Captopril...................................................................................................................... 658

BZ. Tizanidine HCL Tablets ..............................................................................................661

CA. Prednisone Tablets ...................................................................................................... 664

CB. Prednisolone Acetate .................................................................................................. 666

CC. Temozolomide ............................................................................................................ 669

CD. Benazepril HCTZ and Bumetanide Tablets ............................................................... 672

CE. Divalproex ER............................................................................................................. 677

CF. Enalapril Maleate ........................................................................................................ 682

CG. Etodolac and Etodolac ER .......................................................................................... 693

CH. Amiloride HCL/HCTZ Tabs, Clemastine Fumarate Oral Liquids, Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tabs, Doxazosin Mesylate Tabs, Etodolac Tabs, Etodolac ER Tabs, Ketoprofen Caps, Ketorolac Tabs, Pravastatin Tabs, and Tolmetin Sodium Caps – "Round 2" ...................................................................................................................... 706

CI. Hydrocortisone Acetate Suppositories (Anucort HC) Tablets .....................................714

CJ. Oxycodone/Acetaminophen ........................................................................................ 720

CK. Griseofulvin Microsize Tablets ................................................................................... 722

CL. Econazole Topical ...................................................................................................... 729

CM. Azithromycin Suspension and Oral Suspension, Bumetanide Tabs, Cephalexin Suspension, Clarithromycin ER Tabs, Cyproheptadine HCL Tabs, Dicloxacillin Sodium Caps, Diflunisal Tabs, Estazolam Tabs, Ethosuximide Caps and Oral Suspension, Hydroxyzine Pamoate Caps, Keto-conazole (Cream and Tablets), Medroxyprogesterone Tabs, Mimvey (Estradiol/Norethindrone Acetate Tabs), Nystatin Oral Tabs, Pentoxifylline Tabs, Tamoxifen Citrate Tabs, and Theophylline ER Tabs................................................................................... 738

CN. Digoxin ...................................................................................................................... 750

CO. Triamcinoline Acetonide Paste ................................................................................... 756

CP. Azithromycin Suspension........................................................................................... 757

CQ. Nortriptyline HCL ......................................................................................................761

CR. Propranolol ................................................................................................................. 766

CS. Cefuroxime Axetil ...................................................................................................... 779

CT. Timolol Maleate Ophthalmic Gel Forming Solution................................................... 782

CU. Butorphanol Tartrate .................................................................................................. 785

CV. Carisoprodol Tablets .................................................................................................. 787

CW. Tolterodine ER........................................................................................................... 789

CX. Tolterodine Tartrate .................................................................................................... 795

CY. Metoprolol Succinate ER ........................................................................................... 800

CZ. Norethindrone/EE ...................................................................................................... 801

DA. Capecitabine .............................................................................................................. 803

DB. Dexmethylphenidate HCL Extended Release ............................................................. 807

DC. Pilocarpine HCL Tablets .............................................................................................811

DD. Piroxicam ...................................................................................................................814

DE. Niacin ER....................................................................................................................817

DF. Baclofen...................................................................................................................... 826

DG. Fosinopril-HCTZ ........................................................................................................831

DH.  Glipizide-Metformin ................................................................................ 839
DI.  Glyburide................................................................................................... 843
DJ.  Glyburide-Metformin ............................................................................... 849
DK.  Leflunomide .............................................................................................. 853
DL.  Paromomycin ............................................................................................ 857
DM.  Theophylline Extended Release ............................................................... 860
DN.  Verapamil HCL ......................................................................................... 863
DO.  Fenofibrate ............................................................................................... 868
DP.  Diflunisal and Hydroxyzine Pamoate ...................................................... 879
DQ.  Ketoconazole ............................................................................................ 882
DR.  Calcipotriene Betamethasone Dipropionate Ointment............................. 886
DS.  Modafinil .................................................................................................. 894
DT.  Diphenoxylate Atropine HCL Tablets ...................................................... 896
DU.  Methazolamide Tablets ............................................................................. 899
DV.  Paricalcitol ............................................................................................... 902
DW.  Phenytoin Sodium Capsules ..................................................................... 912
DX.  Budesonide DR.......................................................................................... 916
DY.  Dicloxacillin Sodium................................................................................ 918
DZ.  Fluvastatin Sodium Capsules.................................................................... 919
EA.  Phenytoin Sodium ER Capsules................................................................ 921
EB.  Topiramate Sprinkle Capsules .................................................................. 926
EC.  Fluocinonide ............................................................................................. 928
ED.  Desogestrel and Ethinyl Estradiol............................................................. 936
EE.  Warfarin, Carbamazepine, and Clotrimazole............................................ 938
EF.  Allopurinol................................................................................................ 945
EG.  Eplerenone Tablets .................................................................................... 948
EH.  Atenolol Chlorthalidone ........................................................................... 950
EI.  Prochlorperazine Tablets ........................................................................... 953
EJ.  Ursodiol ..................................................................................................... 954
EK.  Clobetasol.................................................................................................. 958
EL.  Fluoxetine HCL Tablets ............................................................................ 966
EM.  Methadone HCL Tablets ........................................................................... 968
EN.  Omega-3 Acid Ethyl Esters....................................................................... 971
EO.  Econazole Nitrate Cream .......................................................................... 974
EP.  Tobramycin ............................................................................................... 977
EQ.  Disulfiram Tablets..................................................................................... 980
ER.  Glimepiride ............................................................................................... 981
ES.  Metronidazole 1% Gel............................................................................... 983
ET.  Amikacin Injection.................................................................................... 987
EU.  Amoxicillin/Clavulanate  Chewable  Tablets,  Amiloride  HCL/HCTZ  Tabs,
Carbamazepine Chewable Tabs, Cimetidine Tabs, Clemastine Fumarate Tabs, Clotrimazole
Topical Solution, Desmopressin Acetate Tabs, Diclofenac Potassium Tablets, Disopyramide
Phosphate Caps, Enalapril Maleate Tabs, Epitol Tabs, Flurbiprofen Tabs, Flutamide Caps,
Fluvastatin Sodium Caps, Hydroxyurea Caps, Loperamide HCL Caps, Penicillin VK Tablets,

Prazosin HCL Caps, Prochlorperazine Tabs, Topiramate Sprinkle Caps, and Warfarin Sodium Tabletse.................................................................................................................................... 989

    EV.  January 28, 2015 Price Increases:  Bethanechol Chloride Tablets, Ciprofloxacin HCL Tablets, Diltiazem HCL Tablets, Estradiol Tablets, Fluoxetine HCL Tablets, Glimepiride Tablets, Griseofulvin Suspension, Isoniazid, Ketoprofen Capsules, Ketorolac Tromethamine Tablets, Nortriptyline HCL Capsules, and Propranolol............................................................................ 1012

    EW.  Ciprofloxacin HCL Tablets.................................................................... 1016

    EX.  Flutamide Capsules............................................................................... 1019

    EY.  Hydralazine HCL Tablets...................................................................... 1020

    EZ.  Tacrolimus Ointment............................................................................ 1023

    FA.  Griseofulvin.......................................................................................... 1026

    FB.  Norethindrone Acetate Tablets............................................................. 1028

    FC.  Raloxifene HCL Tablets ....................................................................... 1030

    FD.  Gabapentin............................................................................................ 1033

    FE.  Celecoxib .............................................................................................. 1035

    FF.  Cabergoline........................................................................................... 1038

    FG.  Bethanechol HCL ................................................................................. 1042

    FH.  Valganciclovir ...................................................................................... 1044

    FI. Clotrimazole 1% Cream ......................................................................... 1047

    FJ.  Naproxen Sodium Tablets...................................................................... 1050

    FK.  Metformin ER (F) ................................................................................. 1053

    FL.  Buprenophine Tablets............................................................................ 1054

XI.    **GENERIC PHARMACEUTICAL MARKETS' HIGH SUSCEP-TIBILITY TO COLLUSION AND DEFENDANTS' CARTEL** ...... 1056

    A.  Fungible Products.................................................................................. 1056

    B.  Inter-Competitor Contacts and Communications.................................. 1058

XII.    **FACTS RELATING TO STATUTES OF LIMITATION** ................. 1060

XIII.    **CONTINUING VIOLATION**........................................................... 1067

XIV.    **DEFENDANTS' ANTITRUST VIOLATIONS**................................ 1068

XV.    **CAUSES OF ACTION** ....................................................................... 1070

    FIRST COUNT....................................................................................... 1070

    SECOND COUNT .................................................................................. 1072

    THIRD COUNT...................................................................................... 1075

    FOURTH COUNT .................................................................................. 1078

    FIFTH COUNT....................................................................................... 1081

    SIXTH COUNT....................................................................................... 1084

    SEVENTH COUNT................................................................................. 1087

    EIGHTH COUNT ................................................................................... 1090

    NINTH COUNT ..................................................................................... 1093

    TENTH COUNT ..................................................................................... 1096

ELEVENTH COUNT .................................................................................................1099

**XVI.  PRAYER FOR RELIEF** ..........................................................................1102

**XVII.  JURY DEMAND** ..................................................................................1104

## I.     NATURE OF THE ACTION

1.     This suit is brought by the County of Albany, Town of Amherst, County of Cattaraugus, County of Chemung, County of Chenango, County of Columbia, County of Eries, County of Essex, County of Livingston, MagnaCare, MEBCO, City of Mobile, County of Monroe, County of Oneida, County of Onondaga, County of Osceola, County of Otsego, City of Poughkeepsie, County of Schyuler, County of Shelby, WCA Group Health Trust, and County of Yates, (collectively, "Plaintiffs"), which is a Direct Purchaser and/or End-Payer Purchaser of generic pharmaceutical drugs, against Defendants Actavis Holdco US, Inc.; Actavis Elizabeth LLC; Actavis Pharma, Inc.; Alvogen, Inc.; Amneal Pharmaceuticals, Inc.; Amneal Pharmaceuticals, LLC; Apotex Corp.; Aurobindo Pharma USA, Inc.; Bausch Health Americas, Inc.; Bausch Health US Inc.; Barr Pharmaceuticals, LLC; Breckenridge Pharmaceutical, Inc.; Camber Pharmaceuticals, Inc; Caraco Pharmaceutical Laboratories Ltd.; Citron Pharma LLC; Dava Pharmaceuticals, LLC; Dr. Reddy's Laboratories, Inc.; Endo International PLC; Fougera Pharmaceuticals Inc.; G & W Laboratories; Generics Bidco I, LLC; Glenmark Pharmaceuticals, Inc.; Pfizer, Inc. and its *alter ego*, Greenstone LLC; Heritage Pharmaceuticals, Inc.; Hikma Labs, Inc.; Hikma Pharmaceuticals, USA, Inc.; Impax Laboratories, Inc.; Jubilant Cadista Pharmaceuticals, Inc.; Lannett Co., Inc.; Lupin Pharmaceuticals, Inc.; Mayne Pharma USA Inc.; Morton Grove Pharmaceuticals, Inc.; Mutual Pharmaceutical Co., Inc.; Mylan Inc.; Mylan Pharmaceuticals, Inc.; Mylan N.V.; Oceanside Pharmaceuticals,

Inc.; Par Pharmaceutical, Inc.; Perrigo New York, Inc.; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Taro Pharmaceuticals USA, Inc.; Teligent Inc.; Teva Pharmaceuticals USA, Inc.; Torrent Pharma Inc.; UDL Laboratories, Inc., Upsher-Smith Laboratories, LLC; URL Pharma, Inc.; Valeant Pharmaceuticals North America, LLC; Valeant Pharmaceuticals International, Inc.; Versapharm, Inc.; West-Ward Pharmaceuticals Corp.; West-Ward Columbus. Inc.; Wockhardt USA LLC; and Zydus Pharmaceuticals (USA), Inc. (collectively, "Defendants"), for violating the antitrust laws of New York and the United States, as set forth *infra*.

2.     Unless expressly stated otherwise, all allegations herein are made upon information and belief, including the fact that some Defendants have pled guilty to criminal charges alleging some of the conduct alleged herein, as to which conduct the Court should take judicial notice against those pleading-guilty Defendants.

3.     Plaintiffs seek injunctive relief, damages, and relief from harms that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise, maintain, and/or stabilize the prices of all of their generic pharmaceutical products, which are referred to collectively herein as the "Drugs at Issue" or "Price-Fixed Generic Drugs."

4.     Defendants organized and directed an overarching conspiracy, also referred to herein as a cartel, to raise prices and minimize competition in the generic drug industry.  This cartel encompassed an agreement amongst all Defendants and

covered all generic drugs that were manufactured and/or sold by Defendants at all times relevant to this Complaint. (the "Relevant Period")

5.      This cartel extended to all of Defendants' products because it meant they did not face competition, and did not need to worry about competition, because they knew their erstwhile competitors would co-operate in raising prices, rather than competing to gain market share beyond their allocated "fair share."

6.      Because Defendants were skilled manufacturers, able to get licenses under existing ANDA's and file new ones when necessary, they were constantly entering, exiting, and re-entering markets, but not because of competitive pressures, which were removed by their cartel.

7.      As a result, even in markets for drugs where only one Defendant was the manufacturer, Defendants were still able to – and, in fact, did, and will continue to do so indefinitely into the future unless enjoined from doing so by this Court – keep those prices above the competitive level because they knew that even if another Defendant were to enter the market, it would do so co-operatively at supra-competitive prices.

8.      And it is for this reason that there are examples throughout this Complaint of Defendants' routine practice of communicating about drugs that they do not make or sell – asking for pricing information, providing pricing information, and acting as middlemen to pass that information among Defendants – which are all

overt acts in furtherance of their cartel's goal of achieving and maintaining supracompetitive prices on all of its members' products.

9.      This cartel agreement further included multiple subsidiary agreements among certain Defendants, relating to individual Drugs at Issue.

10.     Defendants' conspiratorial conduct was widespread and has had a huge effect on the marketplace.  Indeed, numerous lawsuits alleging conspiratorial conduct involving many of these same Defendants are currently pending.

11.     In a competitive marketplace, each generic drug manufacturer prices its drug competitively relative to other manufacturers.  Accordingly, if any one company decided to raise prices, it would do so at the risk of losing customers and sales to its rivals with more competitive prices.  But, beginning at least as early as 2010, the generic pharmaceutical market throughout the United States, including within Plaintiffs' borders, has lacked such competition.

12.     Defendants engaged in pervasive conspiratorial conduct intended to, and which in fact did, maintain inflated prices and avoid competition with each other.  Defendants' illegal agreements raised prices, maintained artificially inflated prices, and thwarted Congress's goal of lowering drug prices.

13.     Throughout the conspiracy, Defendants communicated with each other to determine and agree on the amount of market share each would be allocated.  These shares were determined by the timing of each Defendant's entry into the market, with early entrants entitled to a larger share than later entrants.

14.     The purpose of Defendants' unlawful "fair share" allocation was to fix, maintain and stabilize prices; some of the sub-parts of the conspiracy related to just one particular generic drug, while other parts were related to multiple generic drugs, but each entrant benefited from this co-ordination as a whole, even if a manufacturer did not seek express agreement on market allocation for a particular drug.

15.     Defendants ALL participated in a mutually-established conspiracy that was intentionally developed to allow generic drug manufacturers to curtail or eliminate free and fair competition – and thus artificially maintain and inflate – generic drug prices.  Plaintiffs seek relief in this action because, *inter alia*, Plaintiffs have been forced to pay, and continues to pay, supracompetitive prices for the Drugs at Issue, including when Plaintiffs purchase these drugs to dispense at County hospitals and jails.

16.     A key component of Defendants' cartel was the "fair share" agreement among them all (which they sometimes abbreviated "FS"), which meant that Defendants would allocate customers among cartel members, jointly set prices, and co-ordinate bids by refusing to bid for a particular customer or by providing a sham bid high enough that Defendants knew it would not be successful, such that a different cartel member would get the business.

17.     Additionally, in conjunction with their market allocation agreement, Defendants also agreed to raise prices for the Drugs at Issue.  Defendants were able to raise, maintain, fix, and/or slow the decline of prices, which prices would have been lower in the absence of their conspiratorial agreements.

18.    Through this industry-wide market allocation agreement, Defendants implemented substantial price increases on a number of additional generic drugs. Generic drugs are pharmaceutically equivalent ("AB-rated") to a referenced name in dosage, form, route of administration, strength or concentration, and amount of active pharmaceutical ingredient ("API"), no matter which generic manufacturer made it – allowing for genuine competition.  And because the functional characteristics of the drug are all identical, price is the primary form of competition.

19.    As a result, profit margins in the generic drug industry have typically and historically been fairly low, since the manufacturers are making a commoditized product where innovation in features are not allowed under the law – but Defendants came up with a plan, and implemented it, to change all of this by forming a loose cartel of manufacturers.  Defendants' cartel thus denied Plaintiffs and the taxpayers the benefits of competition – particularly in the area of pricing.

20.    For example, during the conspiracy, Defendants' price increases included increases on: (1) acetazolamide of approximately 75%; (2) amitriptyline of more than 900%; (3) baclofen of more than 400%; (4) benazepril HCTZ of more than 300%; (6) clobetasol of more than 800%; (7) clomipramine of more than 2,700%; (8) desonide of more than 140%; (9) digoxin of more than 630%; (10) divalproex ER by as much as 361%; (11) econazole of more than 600%; (12) fluocinonide of more than 200%; (13) fosinopril HCTZ of approximately 200%; (14) levothyroxine of as much as 120%; (15) nystatin of approximately 100%; (16) paromomycin of approximately

100%; (17) pravastatin of more than 100%; (18) propranolol of more than 1700%; (19) theophylline ER of approximately 150%; and (20) ursodiol of more than 560%. All of these price increases were collusive, and nearly all of these abrupt and substantial price increases were carried out by two or more Defendants that are the subject of the pending state and federal actions.

21.     The generic drug pricing described in this Complaint cannot be explained by changes in supply, the costs of production, or demand, or any other competitive market feature.  Instead, the price levels were the result of an illegal agreement among Defendants to fix the prices of the Drugs at Issue and not the result of free and fair market competition.

22.     The generic pharmaceutical industry has a number of features that make it highly susceptible to collusion:

- the markets for the Drugs at Issue were controlled by Defendants;

- these markets are subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements;

- each generic drug in Defendants' cartel is a commodity product, for which demand is highly inelastic, because Federal regulations require generic products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another; and

- interchangeability of one generic form of a drug with another of the same drug facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

23. Because purchasers choose which generic pharmaceutical product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to raise its prices without assurance that its competitors either would also increase prices or at least not compete on pricing.

24. Moreover, due to the regulated nature of the industry, generic pharmaceutical manufacturers are typically able to determine in advance which manufacturers are coming in and out of the market for a particular generic drug. Armed with that knowledge, Defendants were able to reach a common understanding that each would be entitled to a "fair share," meaning that each Defendant would be entitled to a percentage of the market for each generic drug that it manufactures.

25. Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunity to agree on drug prices and allocate markets and customers.

26. As alleged in greater detail below, the sheer volume of industry meetings provided repeated opportunity for Defendants to implement and maintain their conspiracy, and evidence uncovered in the pending governmental investigations described below confirms that Defendants availed themselves of this opportunity.

27.     Defendants implemented their conspiracy through meetings and communications between and among their representatives, including at industry events such as the Generic Pharmaceutical Association ("GPhA") (now Association for Accessible Medicines), National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA") (now Healthcare Distribution Alliance) ("HDA"), Efficient Collaborative Retail Marketing ("ECRM"), and Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP").

28.     These examples and others of this type of routine, in-person meeting facilitated Defendants' ability to reach agreement on their "fair shares" of the market for any given drug and to limit the electronic evidence of the agreement and its terms.

29.     As just one example, zoledronic acid was the part of the price-fixing scheme between Heritage and Dr. Reddy's.

30.     Heritage was the first generic manufacturer of the drug and entered the market in the spring of 2013, but Dr. Reddy's was close behind.  Executives at the companies cut deals so each got a "fair share" of the market, while also fixing an inflated price.  Dr. Reddy's wound up with about 60 percent of the market and Heritage got 40 percent.

31.     Evidence demonstrates that Heritage and Dr. Reddy's executives knew they were acting illegally. For example, as the discussions with Dr. Reddy's took place,

a Heritage executive "sent a text message to his entire sales team reminding them not to put their pricing discussions with competitors in writing."[1]

32.     Extreme and unprecedented price increases in the generic drug industry have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants, such as Plaintiffs.

33.     The "Relevant Period" referred to throughout this Complaint is approximately 2010 continuing through the present and indefinitely into the future, at least until this Court enjoins Defendants from further participation in their cartel.

## II.     STATE AND FEDERAL INVESTIGATIONS

34.     The Office of the Attorney General for the State of Connecticut ("Connecticut AG") has been leading a multi-state attorney general investigation of the generic drug industry in parallel to that of DOJ and confirms there is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States….[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[2]

35.     The Connecticut AG began an investigation in July of 2014 into generic drugs' dramatic price increases.  This has now been joined by the AG's of 45 states,

---

[1] Thomas Sullivan, "300 Drugs Now Under Investigation in 'Generic Drug Cartel,'" February 11, 2019, https://www.policymed.com/2019/02/300-drugs-now-under-investigation-in-generic-drug-cartel.html.

[2] Press Release (Dec. 15, 2016), http://portal.ct.gov/AG/Press- Releases/2016-Press-Releases.

Puerto Rico and the District of Columbia.

36.     In 2018, the Connecticut AG filed a Consolidated Amended Complaint ("2018 State AG Complaint") in the U.S. District Court for the Eastern District of Pennsylvania alleging price-fixing and customer allocation.[3]

37.     The State AG Complaint describes the defendants' participation "in an overarching conspiracy, the effect of which was to minimize if not thwart competition across the generic drug industry."[4]

38.     The 2017 State AG Complaint focuses on the following generic drugs: Acetazolamide, Doxycycline Hyclate Delayed Release, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, Verapamil, and Zoledronic Acid.[5]

39.     More recently, the Connecticut AG noted the States' investigation has "exploded into wide-ranging conduct in all areas of the generic drug industry," the existing litigation "is essentially dwarfed by the conduct we're seeing in the rest of our investigation."

40.     Indeed, on May 10, 2019, a total of 43 states (including New York State), led by Connecticut Attorney General William Tong, brought a lawsuit against Teva

---

[3] Case 2:17-cv-03768-CMR, ECF 15.

[4] State AG Complaint ¶ 2.

[5] State AG Complaint ¶ 1.

Pharmaceuticals and 19 of the nation's largest generic drug manufacturers, alleging a broad conspiracy to artificially inflate and manipulate prices, reduce competition, and unreasonably restrain trade for more than 100 different generic drugs (the "2019 State AG Complaint"). The drugs at issue account for billions of dollars of sales in the United States.  The States allege that the Defendants' conduct artificially increased prices to health insurers, taxpayer-funded healthcare programs like Medicare and Medicaid, and individuals who paid and continue to pay inflated prices for their prescription drugs.

41.     The 2019 State AG Complaint alleges that Teva, Sandoz, Mylan, Pfizer and 16 other generic drug manufacturers engaged in a broad, co-ordinated, and systematic conspiracy to fix prices, allocate markets, and rig bids for more than 100 different generic drugs.  The drugs span all types, including, for example, tablets ("tabs"), capsules ("caps"), suspensions, creams, gels, and ointments; and classes, including, for example, statins, Angiotensin-Converting Enzyme ("ACE") inhibitors, beta-blockers, antibiotics, anti-depressants, contraceptives, and non-steroidal anti-inflammatory drugs.  They treat a range of diseases and conditions from basic infections to diabetes, cancer, epilepsy, multiple sclerosis, HIV, ADHD, and more.  In some instances, the co-ordinated price increases were over 1,000 percent.

42.     There is an interconnected web of industry executives where these competitors who met with each other during industry dinners, lunches, cocktail parties, golf outings and communicated via frequent telephone calls, e-mails, and text

messages, initiating their illegal agreements.  The allegations in this Complaint are based on, and supported by, information and evidence gleaned from, *inter alia*, documents produced by dozens of companies and individuals throughout the generic pharmaceutical industry and extracted information from an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of the Defendant companies and other generic manufacturers.

43.    In this internal correspondence, Defendants used terms such as "fair share," "playing nice in the sandbox," "rules of the road," "responsible competitor," and "High Quality Competitor" to describe how they unlawfully eliminated competition, raised prices, and enforced and reinforced their collusive agreement.

44.    In addition, an ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Defendant Heritage relating to the sale of Glyburide and Doxycycline Hyclate.  DOJ has made clear that its "investigation is ongoing"[6] and that the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant number of the Defendants…[and] a significant number of the drugs at issue" in the Multidistrict Litigation pending in the

---

[6] DOJ, Division Update Spring 2017 (Mar. 28, 2017), https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures- individual-and-corporate-guilty-pleas-collusion-industries-where-products.

Eastern District of Pennsylvania.[7]  In late April, 2018, Bloomberg reported that at least two companies were expected to be indicted, and that another company could plead guilty before then.[8]

45.     The DOJ convened a grand jury to investigate a number of the Defendants identified in this Complaint.  To empanel a grand jury, DOJ's Guidelines require senior executives in the Antitrust Division to conclude that sufficient credible evidence of collusion exists.  Nearly all of the Defendants identified in this Complaint were served with grand jury subpoenas.  Indeed, the following companies have publicly acknowledged receiving the grand jury subpoenas: Mylan, Teva, Actavis, the Sandoz Defendants, Endo, Par, Sun, Impax, Lannett, Mayne, Dr. Reddy's, Sandoz, Aurobindo, and Taro.  Privately-held companies are under no obligation to make this disclosure.).

46.     DOJ also executed search warrants at the corporate offices of Perrigo, Mylan, and ACETO (which purchased Citron in 2016).  For this to occur, DOJ had to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan, Perrigo, and ACETO.

---

[7] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

[8] David McLaughlin & Drew Armstrong, *Generic-Drug Companies to Face First Charges in U.S. Probe*, BLOOMBERG (Apr. 24, 2018), *available at* https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face- first-charges-in-u-s-probe.

47.     DOJ has granted conditional amnesty to one of the Defendants in this case.  Under DOJ Guidelines, in order for DOJ to grant a company conditional amnesty, the company had to confess to criminal violations of U.S. antitrust laws and inform upon its co-conspirators, based on information known to the amnesty applicant.  As DOJ's website notes, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter."  The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[9]

48.     Now in its sixth year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit.  On December 12 and 13, 2016, DOJ filed criminal informations accusing Heritage executives of conspiring with unidentified co-conspirators who "knowingly entered into and engaged in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products . . . the primary purpose of which was to allocate

---

[9] DOJ, Frequently Asked Questions About the Antitrust Division's Leniency Program (updated Jan. 26, 2017), available at https://www.justice.gov/atr/page/file/926521/download.

customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States."[10]

49.    On January 9, 2017, Heritage Chief Executive Officer ("CEO") Jeffrey Glazer ("Glazer") and President Jason Malek ("Malek") pled guilty to felony charges that they conspired with competitors to manipulate prices and allocate customers for Doxycycline Hyclate and Glyburide;[11] Malek admitted substantially the same facts.[12]

50.    As they awaited sentencing, Glazer and Malek co-operated with DOJ's investigation.  Moreover, according to Richard Vanderford in *Generic Pharma Investigation Still Broad*, Prosecutor Says, mLex (Feb. 21, 2017), as a further indication of criminal price-fixing in the generic drug industry, "It is understood that Heritage is co-operating with prosecutors in exchange for amnesty from criminal prosecution under the DOJ's leniency program[.]"  More criminal charges and guilty pleas are expected to follow.[13]

---

[10] Information ¶ 6, United States v. Glazer, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, United States v. Malek, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[11] Tr. of Plea Hearing at 19:16-20:4, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id.* at 22:4-11 (admitting facts).

[12] Tr. of Plea Hearing at 19:12-20:1, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id.* at 21:23-22:6 (admitting facts).

[13] *See*, *e.g.*, fn. 14, David McLaughlin & Drew Armstrong, *supra.*

51.    Press reports indicate that "[t]he Department of Justice believes price-fixing between makers of generic pharmaceuticals is widespread."[14]  DOJ has focused on at least 18 pharmaceutical companies, including at least 15 of the Defendants here.

52.    On May 31, 2019, DOJ announced that Heritage Pharmaceuticals agreed to plead guilty to a single felony charge alleging that from about April of 2014 until at least December of 2015, Heritage participated in a criminal antitrust conspiracy with other companies and individuals engaged in the production and sale of generic pharmaceuticals, one purpose of which was to fix prices, rig bids, and allocate customers for glyburide, a medicine used to treat diabetes.  Heritage also agreed to pay $7.1 million to resolve allegations under the False Claims Act related to the price-fixing conspiracy.  The government alleged that between 2012 and 2015, Heritage paid and received remuneration through arrangements on price, supply, and allocation of customers with other pharmaceutical manufacturers for certain generic drugs in violation of the Anti-Kickback Statute, and that its sale of such drugs resulted in claims submitted to or purchases by federal healthcare programs.  The drugs allegedly implicated in this scheme address a wide variety of health conditions, and include hydralazine, used to treat high blood pressure, theophylline, used to treat asthma and other respiratory problems, and glyburide.  As part of this settlement, Heritage agreed

---

[14] PaRR Report, DoJ Believes Collusion over Generic Drug Prices Widespread (June 26, 2015) ("PaRR Report"), http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

to co-operate fully in the criminal investigation of other generic pharmaceutical manufacturers, including most or all of the Defendants to this Complaint.

53.     Further, on March 2nd, 2020, Defendant Sandoz agreed to pay $195 million to get a deferred prosecution agreement from the United States Department of Justice regarding an indictment for bid rigging and price-fixing of over $500 million of generic drugs from 2013-15, including benazepril HCTZ, clobetasol, desonide, and tobramycin inhalation solution – all Drugs at Issue in this case.

54.     Based on all of these numerous investigations, allegations, guilty pleas, and other evidence, as well as their own experience with the Drugs at Issue, Plaintiffs bring this present Complaint.  The allegations herein are based on information and belief, such information and belief having been  informed by investigation by and under  the  supervision  of  Plaintiffs' counsel, as well as the investigations conducted by other parties, as outlined above.  Plaintiffs believe substantial additional evidentiary support exists for the allegations set forth herein and will be found in discovery.

### III.    JURISDICTION AND VENUE

55.     Plaintiffs bring this action under §1 of the Sherman Act, 15 U.S.C. § 1, and for treble damages and injunctive relief pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and for costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs herein by reason of the violations of §§1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

56.     Plaintiffs also bring this action pursuant to New York State's antitrust statute, the Donnelly Act, GBL § 340, and pursuant to common law.

57.     This action arises from Defendants' conduct in, or aimed at the States of New York, Alabama, Florida, Tenesee Wisconsin, and caused Plaintiffs' damages in the States of New York, Alabama, Florida, Tenesee, and Wisconsin.  During the Relevant Period, Defendants resided, transacted business, were found, or had agents in New York State and Suffolk County.

58.     Venue is also proper in this court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Suffolk County, a substantial portion of the affected interstate trade and commerce described below has been carried out in Suffolk County.

59.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in Suffolk County; (b) sold generic drugs throughout the United States, including in Suffolk; (c) had substantial contacts throughout the United States, including in Suffolk; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in Plaintiffs' Regions; and/or (e) took overt action in furtherance of the conspiracy in Suffolk or conspired with someone who did, and by doing so could

reasonably have expected to be sued in Suffolk.  In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act.

60.     Further, Defendants' cartel is an illegal conspiracy and general partnership.  As such, all Defendants may be sued where any acts in furtherance of Defendants' conspiracy occurred.  As set forth in additional detail, *infra*, Defendant Fougera was headquartered during the Relevant Period at 60 Baylis Road Melville, NY (which is in Suffolk County), and made numerous acts there in furtherance of Defendants' conspiracy.

61.     In addition, nationwide personal jurisdiction is authorized by Congress pursuant to the Clayton Act.

## IV.     PLAINTIFFS

### Albany County

1.     The County of Albany ("Albany" or "Albany County") is a County of the State of New York, located on the west bank of the Hudson River.  As of the 2018, the population of Albany was in excess of 97,000.

2.     Albany County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

3.     In addition, Albany County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Albany.

4.      Albany County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Albany County reimburses qualified medical costs, including pharmaceutical costs.

5.      In sum, from 2010 through the present, Albany County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

6.      From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Albany County has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Albany County was injured in its business or property by reason of the violations of law alleged herein.

**Town of Amherst**

7.      The Town of Amherst ("Amherst" or "Town of Amherst") is the most populous town in the western portion of New York.  As of the 2010 census, the population of the Town of Amherst was in excess of 122,300.

8.      The Town of Amherst provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

9.     The Town of Amherst also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, the Town of Amherst reimburses qualified medical costs, including pharmaceutical costs.

10.     In sum, from 2010 through the present, the Town of Amherst, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

11.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, the Town of Amherst has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, the Town of Amherst was injured in its business or property by reason of the violations of law alleged herein.

**Cattaraugus County**

12.     The County of Cattaraugus ("Cattaraugus" or "Cattaraugus County") is a County of the State of New York, located in the southwestern part of New York.  As of the 2010 census, the population of Cattaraugus was in excess of 80,000.

13.     Cattaraugus County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

14.     In addition, Cattaraugus County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Cattaraugus.

15.     Cattaraugus County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Cattaraugus County reimburses qualified medical costs, including pharmaceutical costs.

16.     In sum, from 2010 through the present, Cattaraugus County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

17.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Cattaraugus County has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Cattaraugus County was injured in its business or property by reason of the violations of law alleged herein.

**Chemung County**

18.     The County of Chemung ("Chemung" or "Chemung County") is a County of the State of New York, located in the southwestern part of the state, along the Pennsylvania border.  As of the 2010 census, the population of Chemung was in excess of 88,000.

19.     Chemung County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

20.     In addition, Chemung County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Chemung.

21.     Chemung County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Chemung County reimburses qualified medical costs, including pharmaceutical costs.

22.     In sum, from 2010 through the present, Chemung County, directly and/or indirectly, purchased and/or paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

23.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Chemung County has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Chemung County was injured in its business or property by reason of the violations of law alleged herein.

**Chenango County**

24.     The County of Chenango ("Chenango" or "Chenango County") is a County of the State of New York, located in the approximate center of the state.  As of the 2010 census, the population of Chenango was in excess of 50,400.

25.     Chenango County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

26.     In addition, Chenango County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Chenango.

27.     Chenango County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Chenango County reimburses qualified medical costs, including pharmaceutical costs.

28.     In sum, from 2010 through the present, Chenango County, directly and/or indirectly, purchased and/or paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

29.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Chenango County has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a

result of Defendants' conspiracy, Chenango County was injured in its business or property by reason of the violations of law alleged herein.

**Columbia County**

30.     The County of Columbia ("Columbia" or "Columbia County") is a County of the State of New York, located in the southeastern part of the state.  As of the 2010 census, the population of Columbia was in excess of 63,000.

31.     Columbia County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

32.     In addition, Columbia County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Columbia.

33.     Columbia County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Columbia County reimburses qualified medical costs, including pharmaceutical costs.

34.     In sum, from 2010 through the present, Columbia County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

35.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Columbia County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or

stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Columbia County was injured in its business or property by reason of the violations of law alleged herein.

**Erie County**

36.     The County of Erie ("Erie" or "Erie County") is a County of the State of New York, located on the western portion of upstate New York.  As of the 2010 census, the population of Erie was in excess of 919,000.

37.     Erie County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

38.     In addition, Erie County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Erie.

39.     Erie County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Erie County reimburses qualified medical costs, including pharmaceutical costs.

40.     In sum, from 2010 through the present, Erie County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

41.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Erie County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the

absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Erie County was injured in its business or property by reason of the violations of law alleged herein.

**Essex County**

42.     The County of Essex ("Essex" or "Essex County") is a County of the State of New York, located in the northeastern part of the state.  As of the 2010 census, the population of Essex was in excess of 39,300.

43.     Essex County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

44.     In addition, Essex County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Essex.

45.     Essex County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Essex County reimburses qualified medical costs, including pharmaceutical costs.

46.     In sum, from 2010 through the present, Essex County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

47.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Essex County has paid and reimbursed, and will

continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Essex County was injured in its business or property by reason of the violations of law alleged herein.

**Livingston County**

48.     The County of Livingston ("Livingston" or "Livingston County") is a County of the State of New York, located in the Finger Lakes region, south of Rochester and east of Buffalo.  As of the 2010 census, the population of Livingston was in excess of 65,000.

49.     Livingston County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

50.     In addition, Livingston County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Livingston.

51.     Livingston County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Livingston County reimburses qualified medical costs, including pharmaceutical costs.

52.     In sum, from 2010 through the present, Livingston County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

53.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Livingston County has paid and reimbursed, and will continue to pay and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Livingston County was injured in its business or property by reason of the violations of law alleged herein.

**MagnaCare Insurance**

54.     MagnaCare Insurance ("MagnaCare") is a national 3rd-party administrator, located in East Meadow, NY.  MagnaCare services a million members.

55.     MagnaCare provides medical benefits, including pharmaceutical benefits, to its members and beneficiaries.

56.     MagnaCare also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where a member suffers a covered injury or condition, MagnaCare reimburses qualified medical costs, including pharmaceutical costs.

57.     In sum, from 2010 through the present, MagnaCare, directly and/or indirectly, purchased and/or paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

58.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, MagnaCare has paid and/or reimbursed, and will

continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products. As a result of Defendants' conspiracy, MagnaCare was injured in its business or property by reason of the violations of law alleged herein.

**MEBCO**

59. The MEBCO ("MEBCO") is a Health Trust within the State of New York.

60. MEBCO provides medical benefits, including pharmaceutical benefits, to its members, and beneficiaries.

61. MEBCO also provides workers' compensation, including pharmaceutical benefits, to its employees. Where an employee suffers a covered injury or condition, MEBCO reimburses qualified medical costs, including pharmaceutical costs.

62. In sum, from 2010 through the present, MEBCO, directly and/or indirectly, purchased and/or paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

63. From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, MEBCO has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products. As a result of

Defendants' conspiracy, MEBCO was injured in its business or property by reason of the violations of law alleged herein.

**The City of Mobile**

64.     The City of Mobile ("Mobile" or "Mobile City") is a City of the State of Alabama, and the principal municipality for the Mobile metropolitan area.  As of the 2010 census, the population of Mobile was in excess of 195,000.

65.     The City of Mobile provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

66.     The City of Mobile also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, the City of Mobile reimburses qualified medical costs, including pharmaceutical costs.

67.     In sum, from 2010 through the present, the City of Mobile, directly and/or indirectly, purchased and/or paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

68.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, the City of Mobile has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a

result of Defendants' conspiracy, the City of Mobile was injured in its business or property by reason of the violations of law alleged herein.

**Monroe County**

69.     The County of Monroe ("Monroe" or "Monroe County") is a County of the State of New York, and is in the Western New York State's northern tier.  As of the 2010 census, the population of Monroe was in excess of 744,000.

70.     Monroe County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

71.     In addition, Monroe County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Monroe.

72.     Monroe County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Monroe County reimburses qualified medical costs, including pharmaceutical costs.

73.     In sum, from 2010 through the present, Monroe County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

74.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Monroe County has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or

stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Monroe County was injured in its business or property by reason of the violations of law alleged herein.

**Oneida County**

75.     The County of Oneida ("Oneida" or "Oneida County") is a County of the State of New York, located in the central portion of the state.  As of the 2010 census, the population of Oneida was in excess of 234,800.

76.     Oneida County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

77.     In addition, Oneida County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Oneida.

78.     Oneida County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Oneida County reimburses qualified medical costs, including pharmaceutical costs.

79.     In sum, from 2010 through the present, Oneida County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

80.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Oneida County has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in

the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products. As a result of Defendants' conspiracy, Oneida County was injured in its business or property by reason of the violations of law alleged herein.

**Onondaga County**

81. The County of Onondaga ("Onondaga" or "Onondaga County") is a County of the State of New York, located in the central portion of the state. As of the 2010 census, the population of Onondaga was in excess of 467,000.

82. Onondaga County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

83. In addition, Onondaga County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Onondaga.

84. Onondaga County also provides workers' compensation, including pharmaceutical benefits, to its employees. Where an employee suffers a covered injury or condition, Onondaga County reimburses qualified medical costs, including pharmaceutical costs.

85. In sum, from 2012 through the present, Onondaga County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

86. From 2012 through the present, and continuing into the future until this court enjoins the conduct at issue, Onondaga County has paid and/or reimbursed,

and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products. As a result of Defendants' conspiracy, Onondaga County was injured in its business or property by reason of the violations of law alleged herein.

**Osceola County**

87.     The County of Osceola ("Osceola" or "Osceola County") is a County of the State of Florida, located in the central portion of Florida. As of the 2010 census, the population of Osceola was in excess of 268,600.

88.     Osceola County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

89.     In addition, Osceola County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Osceola.

90.     Osceola County also provides workers' compensation, including pharmaceutical benefits, to its employees. Where an employee suffers a covered injury or condition, Osceola County reimburses qualified medical costs, including pharmaceutical costs.

91.     In sum, from 2010 through the present, Osceola County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants. For example, as a result of Defendants' conspiracy,

between 2013 and 2014, the price of a bottle of doxycycline shot up 8, 281% – from $20 to more than $1,800 per bottle, significantly damaging Plaintiffs.

92.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Osceola County has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Osceola County was injured in its business or property by reason of the violations of law alleged herein.

**Otsego County**

93.     The County of Otsego ("Otsego" or "Otsego County") is a County of the State of New York, located in the central portion of the state.  As of the 2010 census, the population of Otsego was in excess of 62,500.

94.     Otsego County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

95.     In addition, Otsego County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Otsego.

96.     Otsego County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Otsego County reimburses qualified medical costs, including pharmaceutical costs.

97.     In sum, from 2010 through the present, Otsego County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

98.     From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Otsego County has paid and/or reimbursed, and will continue to pay/or and reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Otsego County was injured in its business or property by reason of the violations of law alleged herein.

**City of Poughkeepsie**

99.     The City of Poughkeepsie ("Poughkeepsie" or "City of Poughkeepsie") is a City of the State of New York, located on the western edge of Duchess County, in Downstate New York's Hudson River Valley Area.  As of the 2010 census, the population of Poughkeepsie was in excess of 30,800.

100.    Poughkeepsie provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

101.    Poughkeepsie also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Poughkeepsie reimburses qualified medical costs, including pharmaceutical costs.

102.    In sum, from 2010 through the present, Poughkeepsie, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

103.    From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Poughkeepsie has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, the City of Poughkeepsie was injured in its business or property by reason of the violations of law alleged herein.

**Schuyler County**

104.    The County of Schuyler ("Schuyler" or "Schuyler County") is a County of the State of New York, located in the western part of the state.  As of the 2010 census, the population of Schuyler was in excess of 18,300.

105.    Schuyler County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

106.    In addition, Schuyler County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Schuyler.

107.    Schuyler County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered

injury or condition, Schuyler County reimburses qualified medical costs, including pharmaceutical costs.

108.    In sum, from 2010 through the present, Schuyler County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

109.    From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Schuyler County has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Schuyler County was injured in its business or property by reason of the violations of law alleged herein.

**Shelby County**

110.    The County of Shelby ("Shelby" or "Shelby County") is a County of the State of Tennessee, is located along and contains a port on the Mississippi River.  As of the 2010 census, the population of Shelby was in excess of 927,600.

111.    Shelby County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

112.    In addition, Shelby County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Shelby.

113.    Shelby County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Shelby County reimburses qualified medical costs, including pharmaceutical costs.

114.    In sum, from 2010 through the present, Shelby County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

115.    From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Shelby County has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Shelby County was injured in its business or property by reason of the violations of law alleged herein.

## WCA Group Health Trust

116.    WCA Group Health Trust ("Wisconsin Health Trust" or "WHT") is a Health Trust located in the State of Wisconsin.

117.    Wisconsin Health Trust provides medical benefits, including pharmaceutical benefits, to its members and beneficiaries.

118.    Wisconsin Health Trust also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where a member or beneficiary suffers a

covered injury or condition, Wisconsin Health Trust reimburses qualified medical costs, including pharmaceutical costs.

119. In sum, from 2010 through the present, Wisconsin Health Trust, directly and/or indirectly, purchased and/or paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

120. From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Wisconsin Health Trust has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products. As a result of Defendants' conspiracy, Wisconsin Health Trust was injured in its business or property by reason of the violations of law alleged herein

**Yates County**

121. The County of Yates ("Yates" or "Yates County") is a County of the State of New York, located in the western portion of the State. As of the 2010 census, the population of Yates was in excess of 25,300.

122. Yates County provides medical benefits, including pharmaceutical benefits, to its full-time employees, retirees, and their dependents.

123. In addition, Yates County provides medical and pharmaceutical benefits to the inmates of its county jails, at significant cost to Yates.

124.    Yates County also provides workers' compensation, including pharmaceutical benefits, to its employees.  Where an employee suffers a covered injury or condition, Yates County reimburses qualified medical costs, including pharmaceutical costs.

125.    In sum, from 2010 through the present, Yates County, directly and/or indirectly, purchased and paid some or all of the purchase price for Drugs at Issue manufactured by Defendants.

62.    From 2010 through the present, and continuing into the future until this court enjoins the conduct at issue, Yates County has paid and/or reimbursed, and will continue to pay and/or reimburse, more for these products than it would have in the absence of Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize prices and allocate markets and customers for those products.  As a result of Defendants' conspiracy, Yates County was injured in its business or property by reason of the violations of law alleged herein.

## V.    DEFENDANTS

63.    All of Defendants' actions described in this Complaint are part of, and in furtherance of, Defendants' anticompetitive cartel and unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and

scope of their duties and employment, or with Defendants' actual, apparent, or ostensible authority.

**Actavis**

64.     In or about October, 2012, Watson Pharmaceuticals, Inc. ("Watson"), acquired Actavis, Inc.  The two companies operated as a single entity, albeit under separate names, until January of 2013, when Watson announced that it had adopted Actavis, Inc. as its new global name.

65.     Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In March, 2015, Actavis, plc (the parent company of Actavis, Inc.) merged with Allergan, plc ("Allergan") and adopted Allergan's name.

66.     In August, 2016, Defendant Teva Pharmaceuticals USA, Inc. purchased Actavis's generics business, which included Actavis Inc., Actavis Elizabeth Inc., and Actavis Pharma Inc. from Allergan, plc.  All the assets of the entities were then transferred to the newly formed Actavis Holdco.  The acquisition cost Teva USA $33.43 billion in cash and approximately 100 million shares of Teva securities.

67.     Defendant Actavis Pharma, Inc. ("Actavis Pharma") is also a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Actavis Pharma is, however, a wholly-owned subsidiary of Actavis Holdco and is now a principal operating company in the U.S. for Teva's generic product lines acquired from Allergan plc.

68.     Actavis Elizabeth LLC ("Actavis Elizabeth") is also a Delaware limited liability company based in New Jersey, but its principal place of business is in Elizabeth.  It is a wholly-owned subsidiary of Actavis Holdco and is a research, development and manufacturing entity for Actavis's generic operations.

69.     Actavis Holdco (and its predecessors, including Watson and Allergan), Actavis Pharma, and Actavis Elizabeth are collectively referred to herein as "Actavis." Actavis is further defined to include its managers, officers, employees, and agents acting on its behalf.

70.     Throughout the Relevant Period, Actavis directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  clobetasol propionate, desonide, doxy hyclate, fluocinonide, glyburide-metformin, propranolol, verapamil, and ursodiol.

**Alvogen**

71.     Defendant Alvogen, Inc. ("Alvogen") is a Delaware corporation with its princidpal place of business in Pine Brook, New Jersey.  It is a privately held company that was founded in 2009 by a former CEO of Defendant Actavis. Alvogen is defined to include its managers, officers, employees, and agents acting on its behalf

72.     Through the Relevant Period, Alvogen directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price fixing, for at least one of the following drugs.

**Amneal**

73.     Defendant Amneal Pharmaceuticals LLC ("Amneal LLC") is another Delaware corporation with its principal place of business in Bridgewater, NJ.

74.     Defendant Amneal Pharmaceuticals, Inc. is another Delaware corporation with its principal place of business located in Bridgewater, New Jersey. The company was formed for the purpose of facilitating the merger between Amneal Pharmaceuticals LLC (also a Delaware limited liability company with its principal place of business located in Bridgewater, New Jersey) and Defendant Impax (defined below).  Accordingly, Amneal Pharmaceuticals Inc., is the predecessor in interest to Amneal Pharmaceuticals LLC, and both companies will be collectively referenced in this Complaint as "Amneal."  Amneal is defined to include its managers, officers, employees, and agents acting on its behalf.

75.     Throughout the Relevant Period, Amneal directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New

York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing.

**Apotex**

76.     Defendant Defendant Apotex Corp. ("Apotex") is a Florida corporation with its principal place of business in Weston, Florida.  Apotex is defined to include its managers, officers, employees, and agents acting on its behalf.

77.     Throughout the Relevant Period, Apotex directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  leflunomide and pravastatin.

**Aurobindo**

78.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is another Delaware corporation with its principal place of business in New Jersey, but Aurobindo's principal place of business is in Dayton, New Jersey.  Aurobindo is a subsidiary of Aurobindo Pharma Limited, a corporation based in Hyderabad, India. Aurobindo is defined to include its managers, officers, employees, and agents acting on its behalf.

79.     Throughout the Relevant Period, Aurobindo directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold

one or more Price-Fixed Generic Drugs in in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  fosinopril HCTZ, glyburide, and glyburide-metformin.

**Bausch Health/Valeant**

80.     Defendant Bausch Health Americas, Inc. (formerly Valeant Pharmaceuticals International, Inc.) is a Delaware corporation with its US headquarters located in Bridgewater, New Jersey.  Defendant Bausch Health US, LLC (formerly Valeant Pharmaceuticals Nother America LLC) is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Bausch Health US, LLC is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

81.     Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a whollyowned subsidiary of Bausch Health Americas, Inc. It is a Delware cproraiton with its principal place of business in Bridgewater, new Jersey. Unless addresseed individually, Bausch Health Americas, Inc., Bausch Health USA, LLC, Oceanside, Valeant Pharmaceuticals International, Inc., and Valeant Pharmaceuticals North America LLC are collectively referred to as "Bausch Health" or "Valeant."

82.     Through the Relevant Period, Bausch Health directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in in Westchester County and throughout

New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing.

**Breckenridge Pharmaceutical, Inc.**

83.    Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is yet another Delaware corporation with its principal place of business in New Jersey, but Breckenridge's principal place of business is in Fairfield, New Jersey.  Breckenridge is defined to include its managers, officers, employees, and agents acting on its behalf. Breckenridge is wholly-owned by Pensa Pharma S.A.

84.    Throughout the Relevant Period, Breckenridge directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least propranolol.

**Camber**

85.    Camber Pharmaceuticals, Inc., ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey.  Camber is a wholly-owned subsidiary of Hetero Drugs, an Indian pharmaceutical company.

86.    During the Relevant Period, Camber directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold Price-Fixed Generic Drugs in Westchester County and throughout New York State

and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least propranolol.

**Citron**

87.     Defendant Defendant Citron Pharma, LLC ("Citron") is yet another Delaware limited liability company with its principal place of business in New Jersey, but Citron's principal place of business is in East Brunswick.  Citron is defined to include its managers, officers, employees, and agents acting on its behalf.

88.     Throughout the Relevant Period, Citron directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least fosinopril HCTZ and glyburide.

**Dr. Reddy's Laboratories, Inc.**

89.     Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is yet another Delaware corporation with its principal place of business in New Jersey, but Dr. Reddy's principal place of business is in Princeton.  Dr. Reddy's is defined to include its managers, officers, employees, and agents acting on its behalf.

90.     Throughout the Relevant Period, Dr. Reddy's directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold

one or more Price-Fixed Generic Drugs in in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  divalproex ER, meprobamate, and zoledronic acid.

**Fougera**

91.    Defendant Fougera Pharmaceuticals, Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York.  In 2012, Novartis International AG acquired Fougera.  Fougera is defined to include its managers, officers, employees, and agents acting on its behalf.

92.    Throughout the Relevant Period, Fougera directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  clobetasol propionate, desonide, econazole, and lidocaine-prilocaine.

**G & W Laboratories**

93.     Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business in South Plainfield, New Jersey.

94.    Throughout the Relevant Period, Glenmark directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold

one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing.

**Glenmark Pharmaceuticals, Inc., USA**

95.     Defendant Glenmark Pharmaceuticals, Inc., USA ("Glenmark") is yet another Delaware corporation with its principal place of business in New Jersey, but Glenmark's principal place of business is in Mahwah.  Glenmark is defined to include its managers, officers, employees, and agents acting on its behalf.

96.     Throughout the Relevant Period, Glenmark directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least fosinopril HCTZ and pravastatin.

**"Greenstone, LLC" Equals Pfizer**

97.     Defendant Greenstone LLC ("Greenstone") is a limited liability corporation, whose principal place of business is Pfizer's New Jersey campus at 100 Route 206, in North Peapack.  Greenstone is a wholly-owned subsidiary of Defendant Pfizer Inc. ("Pfizer," described in more detail below), and has at all relevant times operated as the generic drug division of Pfizer.  Pfizer/Greenstone is defined to include the managers, officers, employees, and agents acting on its behalf.

98.     Greenstone operates as an *alter ego* of Pfizer:  as set forth in more detail below, Pfizer directly controls the operations of its wholly-owned subsidiary, which takes no significant action without the approval of Pfizer (including, for example, as also set forth in more detail below, increasing the price of the Azithromycin antibiotic) – an *alter ego* relationship that makes the two companies indistinguishable.

99.     There are other ways in which the operations of Pfizer and Greenstone are mixed, commingled, and in which Greenstone's lack of independence characterizes an *alter ego* relationship:  most of Greenstone's workers are actually employed by Pfizer's Essential Health Division, including Greenstone's General Manager. (as explained *infra*, and unlike Pfizer, "Greenstone" lacks a President)

100.    Throughout this Complaint, all references to Defendant Greenstone apply equally to Defendant Pfizer.  Indeed, the two companies operate as a single functioning entity, without regard to corporate formalities.  Pfizer is the sole owner and shareholder of Greenstone, but treats Greenstone as its generics division or an internal business unit rather than as a separate and independent entity, controlling and directing Greenstone's business activities, including Greenstone's marketing and sale of generic drugs.

101.    Both companies share the same office space at Pfizer's Peapack, New Jersey campus.  They also share common officers, managerial and supervisory personnel, and other employees.

102.    Pfizer also performs many of the important business functions of Greenstone that an independent corporate entity would typically perform on its own, including but not limited to:  (1) financial and sales analysis, (2) business technology, (3) customer service, (4) legal, (5) intellectual property, (6) supply chain, (7) human resources and (8) employee benefits.

103.    "Greenstone" – which as of 2017 was the 15th largest generic manufacturer in the country with annual gross sales of over a billion dollars – does not have its own Finance Department, Accounting Department, Legal Department, Customer Services Department, Human Resources Department, Operations Department or Information Technology Department, even though those are all essential functions for a legitimate business, particularly one of "Greenstone's" size and complexity.  Instead, all of those functions are performed by the **_real_** entity in charge:  Pfizer.  After all, if those Departments functioned separately – even under Pfizer's ultimate control – there would be a much greater risk of them taking actions that contradicted Pfizer's.  So rather than risk that happening, Pfizer simply performed those functions for its puppet.

104.    Through at least 2016, Greenstone has not had its own President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Commercial Officer or any Vice Presidents. The highest-ranking position at Greenstone has been the General Manager, a position held by a Pfizer employee who reports directly to other, higher-level executives at Pfizer.

105.    Throughout the Relevant Period, Pfizer has operated with multiple business units, one of which was always responsible for overseeing the marketing and sale of "established" products, including the generic drugs sold by Greenstone.  The name of this business unit has changed over time.  As of 2014, it was called the Global Established Pharmaceuticals Division. ("GEP")  Today, it is referred to as "Pfizer Essential Health" ("PEH").

106.    Within Pfizer, Greenstone has operated as part of GEP and/or PEH, and Greenstone "employees" were all included in Pfizer's organizational charts, further illustrating that Greenstone was acting as an internal division within Pfizer, rather than as a separate company.

107.    Indeed, most – if not all – of Greenstone's workers are actually employed by Pfizer.  For example, the two primary individuals identified throughout this Complaint as having conspired with competitors on behalf of Greenstone – Jill Nailor and Robin Hatosy – are Pfizer employees.  They are paid directly by Pfizer, and Pfizer is listed as their employer in W-2 Wage and Tax Statements submitted to the United States government.  In their business communications, both internally and with customers and others, both Nailor and Hatosy regularly used e-mail addresses from Pfizer's e-mail domain: "@pfizer.com."

108.    This is the case for most, if not all, of Greenstone's workers. Further, Plaintiffs are aware of no evidence to suggest that Pfizer is compensated by Greenstone for the services of these Pfizer employees.  Instead, Nailor and Hatosy

also both received shares of Pfizer stock as compensation for their work, in addition to their Pfizer-paid salaries.  They were reimbursed and/or compensated by Pfizer through its accounts payable system for membership in industry trade associations; they used Pfizer cell phones and/or iPads for their work at "Greenstone"; and they used Pfizer teleconference and webex services to conduct their work.  Likewise – because "Greenstone" lacks an HR Department – Hatosy and Nailor received regular performance evaluations directly from Pfizer.

109.    Similarly, as of 2017, Nailor and other Greenstone executives were prominently identified as PEH employees in certain Pfizer organizational charts .

110.    Likewise, as of 2014, these same people were considered part of GEP. In a presentation to "Greenstone" customers at the NACDS Annual Conference in Scottsdale, Arizona, in April of 2014, Jill Nailor gave a presentation where she discussed the new streamlined organization of Pfizer and Greenstone.  Nailor told customers that the General Manager of Greenstone – Jim Cannon – was now only a few levels away from the CEO of Pfizer, ***within Pfizer's overall corporate structure***.  She showed customers the organizational structure ***of Pfizer***, which included both Jim Cannon (General Manager of Greenstone) and herself as reports within the Pfizer corporate structure.

111.    Further, at least as recently as the States' 2020 Complaint, Greenstone also promoted itself publicly as a marketing or distribution wing of Pfizer, specifically adopting the Pfizer logo in its marketing materials.  For example, at that time,

Greenstone touted on its website that the authorized generic drugs it sells "are manufactured to the same standards **and at the same facilities** as Pfizer brand-name drugs" and that they carry the legacy of Pfizer's "years of clinical research, data and patient and physician experience."  Greenstone has consistently advertised its connection with Pfizer in order to benefit from Pfizer's name-recognition and respect, for purposes of increasing its own sales.

112.    In addition, while Pfizer appears to have removed some of that language after it featured in the States' Complaint (it cannot have been a decision by Greenstone's Legal Department, since Greenstone does not have one), what remains (and what remains absent) is, in many ways, even more damning.  Pfizer's website has a "Careers" section[15]; Greenstone's does not – because it has no careers.  Instead, most or all of its workers are employed by Pfizer.  Pfizer's website has a "Leadership" section[16]; Greenstones does not – because it is led by Pfizer employees.

113.    Likewise, the "News" section of Pfizer's website blares "PFIZER'S GREENSTONE AND DIGITAL MEN'S HEALTH CLINIC ROMAN COLLABORATE TO OFFER PATIENTS REMOTE ACCESS TO THE ONLY FDA-APPROVED AUTHORIZED GENERIC VERSION OF VIAGRA® (SILDENAFIL CITRATE)".[17]  Greenstone didn't report that "News" on its own

---

[15] https://careers.pfizer.com/en, last visited November 19, 2020.
[16] https://www.pfizer.com/people/leadership, last visited November 19, 2020.
[17] https://www.pfizer.com/news/press-release/press-release-detail/pfizers-greenstone-and-digital-mens-health-clinic-roman, last visited November 19, 2020.

website because there is no "News" section on Greenstone's website; instead, Pfizer announces any Greenstone news.

114.    Likewise, Greenstone cannot even announce its own product launches; instead, "PFIZER ANNOUNCES LAUNCH OF GENERIC AMLODIPINE BESYLATE PRODUCT BY GREENSTONE."  That article on Pfizer's website also notes that "In response to an announcement today by Mylan Laboratories that it has launched a generic competitor to Norvasc, **Pfizer said** it is making available **its own** generic amlodipine besylate product immediately through the company's Greenstone subsidiary. Norvasc also will remain available to patients."  (emphasis added)[18]  It is entirely accurate for Pfizer to refer to Greenstone's products as belonging directly to Pfizer – because "Greenstone" **is** Pfizer.

115.    Throughout the Relevant Period – at the direction and under the control of Pfizer, and acting as its *alter ego* – Greenstone directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least azithromycin, cabergoline, celecoxib, diclofenac, disopyramide phosphate, doxazosin mesyltate,

---

[18] https://www.pfizer.com/news/press-release/press-release-detail/pfizer_announces_launch_of_generic_amlodipine_besylate_product_by_greenstone, last visited November 19, 2020.

ethosuximide, fluconazole, gabapentin, medroxyprogesterone, nadolol, piroxicam, and tolterodine tartrate.

116.    Further, because Greenstone operates as part of Pfizer, Pfizer is directly involved in the generics business and extensively evaluates generic competitors, price erosion in the generic industry, and other strategic issues affecting Pfizer/Greenstone's generic business.  Greenstone and Pfizer management regularly co-ordinate on strategy, and communicated regularly about concepts such as "fair share," "responsible pricing" and following the price increases of fellow cartel members in particular generic drug markets.

117.    Pfizer employees also work directly with the FDA to obtain approval for the drugs that Greenstone sells.  There is no need for "Greenstone" to have the ability to communicate with the FDA, because "Greenstone" is Pfizer.

118.    Likewise, Pfizer dictates cost and pricing strategy to "Greenstone."  For new products, Pfizer's Global Supply unit ("PGS") makes the budget, defines the costs of goods sold, and then conveys that information to Greenstone without significant feedback.  PGS is also heavily involved in deciding which new molecules will be produced and/or sold by Greenstone.  Pfizer performs all financial analyses, sales reports, revenue projections, and other finance functions for Greenstone.  There is no need for "Greenstone" to have the ability to make pricing, budget, or other financial decisions, because "Greenstone" is Pfizer.

119.    In every important respect, including financially, Pfizer directly controls the decision-making of "Greenstone."  "Greenstone" does not even have the authority to implement its own price increases without first obtaining the approval of Pfizer.  This includes the price increases discussed in this Complaint. Not only does Pfizer have to approve Greenstone's price increases, but it also directs Greenstone's strategy regarding the increases, and Greenstone always acts at the direction of Pfizer, including at least as recently as a presentation to the President of PEH in May, 2017.

**Heritage Pharmaceuticals, Inc.**

120.    Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is another Delaware corporation with its principal place of business in Mahwah, New Jersey. Heritage is defined to include its managers, officers, employees, and agents acting on its behalf.  In April of 2011, Emcure (a pharmaceutical company based in India) acquired Heritage.

121.    Throughout the Relevant Period, Heritage directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  acetazolamide, doxy DR, fosinopril HCTZ, glipizide, glyburide, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, propranolol, theophylline ER, verapamil, and zoledronic acid.

**Hikma Labs, Inc.**

122.    Defendant Hikma Labs Inc. (formerly known as Roxane Laboratories, Inc.) ("Roxane") is a Nevada corporation with its principal place of business in the same Eatontown, New Jersey office as West-Ward Pharmaceuticals Corp., and West-Ward Columbus Inc.  Each of the three companies is a wholly-owned subsidiary of Hikma Pharmaceuticals plc, a multinational pharmaceutical company founded in Amman, Jordan and headquartered in London. Hikma Labs Inc., West-Ward Pharmaceuticals Corp., and West-Ward Columbus Inc. are collectively referred to in this Complaint as "West-Ward" for the period beginning March 2, 2016.

123.    Throughout the Relevant Period, West-Ward directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing. As noted above, Defendant Amneal acquired Impax in October, 2017.

**Impax Laboratories, Inc.**

124.    Defendant Impax Laboratories, Inc. ("Impax") is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania. Impax is defined to include its managers, officers, employees, and agents acting on its behalf.

125.    Throughout the Relevant Period, Impax directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing. As noted above, Defendant Amneal acquired Impax in October, 2017.

## Jubilant Cadista Pharmaceuticals, Inc.,

126.    Defendant Jubilant Cadista Pharmaceuticals, Inc. ("Cadista") is a Delaware corporation with its principal place of business in Salisbury, Maryland. Defendant Cadista is defined to include its managers, officers, employees, and agents acting on its behalf.

127.    Throughout the Relevant Period, Jubilant directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing. As noted above, Defendant Amneal acquired Impax in October, 2017.

## Lannett Company, Inc.

128.    Defendant Lannett Company, Inc. ("Lannett") is another Delaware corporation, but its principal place of business is in Philadelphia, Pennsylvania.

Lannett is defined to include its managers, officers, employees, and agents acting on its behalf.

129.    Throughout the Relevant Period, Lannett directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following drugs:  baclofen, digoxin, doxycycline, levothyroxine, and ursodiol.

**Lupin Pharmaceuticals, Inc.**

130.    Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is another Delaware corporation, but its principal place of business is in Baltimore, Maryland.  Lupin is defined to include its managers, officers, employees, and agents acting on its behalf.

131.    Throughout the Relevant Period, Lupin directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least pravastatin.

**Mayne Pharma USA, Inc.**

132.    Defendant Mayne Pharma USA, Inc. ("Mayne") is yet another Delaware corporation with its principal place of business in New Jersey, but Mayne's principal place of business is in Paramus.  Mayne is defined to include its managers, officers, employees, and agents acting on its behalf.

133.    Throughout the Relevant Period, Mayne directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least doxy hyclate DR.

**Morton Grove Pharmaceuticals Inc.**

134.    Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business located in Morton Grove, Illinois. Wockhardt, Ltd., an Indian company, is the parent company of Morton Grove. Defendant Morton Grove is defined to include its managers, officers, employees, and agents acting on its behalf.

135.    Throughout the Relevant Period, Morton Grove directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and

engaged in the unlawful conduct alleged in this Complaint, including price-fixing. As noted above, Defendant Amneal acquired Impax in October, 2017.

**Mylan**

136.   Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.  Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  It is a subsidiary of Mylan Inc.  Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

137.   Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan."  Mylan is defined to include its managers, officers, employees, and agents acting on its behalf.

138.   Throughout the Relevant Period, Mylan directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, further including, for example, at least the following:  amitriptyline, benazepril HCTZ,

clomipramine, digoxin, divalproex ER, doxy hyclate, doxy DR, glipizide, levothyroxine, propranolol, and verapamil.

**Par**

139.    Defendant Par Pharmaceutical, Inc. ("PPI") is a New York corporation with its principal place of business in Chestnut Ridge, New York.

140.    Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware company with its principal place of business in Huntsville, Alabama.  Generics Bidco formerly conducted business as Qualitest Pharmaceuticals ("Qualitest").

141.    Defendant DAVA Pharmaceuticals, LLC ("DAVA") is yet another Delaware corporation with its principal place of business in New Jersey, but DAVA's principal place of business is in Fort Lee.

142.    PPI, Generics Bidco and DAVA are wholly-owned subsidiaries of Endo International plc ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland, and its U.S. headquarters located in Malvern, Pennsylvania.

143.    PPI, Generics Bidco and DAVA collectively do business as Par Pharmaceutical. Unless addressed individually, Endo, PPI, Generics Bidco, DAVA and Qualitest are collectively referred to herein as "Par."  Par is defined to include its managers, officers, employees, and agents acting on its behalf.

144.    Throughout the Relevant Period, Par directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New

York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, further including, for example, at least the following drugs: amitriptyline, baclofen, digoxin, divalproex ER, doxy hyclate, and propranolol.

**Perrigo**

145. Defendant Perrigo New York, Inc. ("Perrigo") is another Delaware corporation, but its executive offices are in Allegan, Michigan, and its primary business location is in the Bronx, NY. Perrigo is a subsidiary of Perrigo Company, plc, an Irish company. Perrigo is defined to include its managers, officers, employees, and agents acting on its behalf.

146. Throughout the Relevant Period, Perrigo directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least clobetasol propionate, desonide, and econazole nitrate.

**Pfizer**

147. Defendant Pfizer, Inc. ("Pfizer") is another Delaware corporation, with its with its principal place of business at 235 East 42nd Street in New York, New York, and as described above, is the corporate parent of its wholly-owned subsidiary

and alter ego, Greenstone, whose activities it directs.  Pfizer is defined to include its managers, officers, employees, and agents acting on its behalf.

148.   Throughout the Relevant Period, Pfizer directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least azithromycin and fluconazole.

**Sandoz**

149.   Defendant Sandoz, Inc. is a Colorado corporation with its principal place of business in Princeton, New Jersey.  Sandoz, Inc. distributes the drugs that its parent, Sandoz Germany, develops and manufacturers.  In 2012, Sandoz, Inc. acquired and integrated Fougera into its US-based generic pharmaceutical business and Novartis International AG, based in Basel, Switzerland, acquired Sandoz, Inc. and Sandoz Germany.  Unless referred to individually, Fougera, Sandoz Inc., and Sandoz Germany are collectively referred to herein as "Sandoz."  Sandoz is further defined to include its managers, officers, employees, and agents acting on its behalf.

150.   Throughout the Relevant Period, Sandoz directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the

unlawful conduct alleged in this Complaint, including price-fixing, including, for example, at least the following: amitriptyline, benazepril HCTZ, clobetasol propionate, clomipramine, desonide, fosinopril-hydrochlorothiazide, lidocaine-prilocaine, levothyroxine sodium, and pravastatin.

**Sun/Mutual/Caraco**

151.    Defendant Sun Pharmaceutical Industries, Inc. ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey.  SPII is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd. ("Sun Pharma"), an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and its subsidiary, Taro Pharmaceutical USA, Inc.

152.    Beginning in 1997, Sun Pharma began a series of investments in Caraco Pharmaceutical Laboratories Ltd. ("Caraco") and in 2013 acquired 100% of Caraco and merged it into SPII to become Sun Pharma's U.S. operations for generic pharmaceutical products.

153.    In 2012, SPII acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia.  Until at least June of 2016, URL and Mutual operated a pharmaceutical manufacturing facility in Philadelphia.  On or about April 28, 2015, URL was merged with Mutual.

154.    Defendant Mutual is a Delaware corporation with its principal place of business located in Philadelphia, PA.  It is a wholly-owned subsidiary of SPII.  Many

of the pharmaceutical products sold and distributed throughout the United States during the Relevant Period by SPII, URL and Mutual were marked with the trade name "MUTUAL" on the pill or capsule.

155.    Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority-owned by Sun Pharma.  Unless referred to individually, Taro, SPII, URL, and Mutual are collectively referred to herein as "Sun."  Sun is defined to include its managers, officers, employees, and agents acting on its behalf.

156.    Throughout the Relevant Period, Sun directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least the following:  digoxin, doxy hyclate, nimodipine, nystatin, and paromomycin.

**Teligent Inc.**

157.    Defendant Teligent, Inc. (f/k/a IGI Laboratories, Inc.) ("Teligent") is a Delaware corporation with its principal place of business located in Buena, New Jersey. Teligent is defined to include its managers, officers, employees, and agents acting on its behalf.

158.     Throughout the Relevant Period, Teligent directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing. As noted above, Defendant Amneal acquired Impax in October, 2017.

**Teva**

159.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is another Delaware corporation, with its principal place of business in North Wales, Pa.  It is a subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.

160.     Defendant Barr Pharmaceuticals, LLC ("Barr") is a Delaware limited liability company with its principal place of business in North Wales, Pennsylvania. Barr is a wholly-owned subsidiary of Teva USA, which acquired Barr (then called Barr Pharmaceuticals, Inc.) in 2008.  Prior to its acquisition by Teva Industries, Barr was a holding company that operated through its principal subisidiaries: Barr Laboratories and Inc., Duramed Pharmaceuticals, Inc.

161.     PLIVA, Inc. is a New Jersey corporation with its principal place of business in East Hanover, New Jersey.  PLIVA is a wholly owned subsidiary of Teva USA, which acquired the PLIVA assets as part of the Barr acquisition.  Unless referred to individually, Teva USA and Barr are collectively referred to herein as

"Teva."  Teva is further defined to include its managers, officers, employees, and agents acting on its behalf.

162.    Throughout the Relevant Period, Teva directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least : acetazolamide, baclofen, fluocinonide, glipizide, glyburide, glyburide-metformin, leflunomide, nystatin, pravastatin, propranolol, and theophylline ER.

**Torrent Pharma Inc.**

163.    Defendant Torrent Pharma Inc. ("Torrent") is a Delaware corporation with its principal place of business in Basking Ridge, New Jersey. Torrent is defined to include its managers, officers, employees, and agents acting on its behalf.

164.    Throughout the Relevant Period, Torrent directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing. As noted above, Defendant Amneal acquired Impax in October, 2017.

**UDL Laboratories, Inc.**

165.    Defendant UDL Laboratories, Inc. ("UDL") is an Illinois corporation

with its principal place of business in Rockford, Illinois. UDL, n/k/a Mylan Institutional Inc., is a subsidiary of Defendant Mylan Inc. UDL is defined to include its managers, officers, employees, and agents acting on its behalf.

166.   Throughout the Relevant Period, UDL directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold one or more Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing.  As noted above, Defendant Amneal acquired Impax in October, 2017.

**Upsher**

167.   Defendant Upsher-Smith Laboratories, LLC (f/k/a Upsher-Smith Laboratories, Inc.) ("Upsher-Smith" or "Upsher") is a Minnesota limited liability company with its principal place of business in Maple Grove, Minnesota.  Upsher is defined to include its managers, officers, employees, and agents acting on its behalf.

168.   Throughout the Relevant Period, Upsher directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold Price-Fixed Generic Drugs in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least baclofen and propranolol.

**West-Ward Pharmaceuticals Corp.**

169.    Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") (now known as Pharmaceuticals USA, Inc.) is yet another Delaware corporation with its principal place of business in New Jersey, but West-Ward's principal place of business is in Eatontown.  West-Ward is defined to include its managers, officers, employees, and agents acting on its behalf.

170.    Throughout the Relevant Period, West-Ward directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least digoxin and doxy hyclate.

**Wockhardt USA LLC**

171.    Like Actavis, Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey, at 20 Waterview Boulevard.  Wockhardt is further defined to include its managers, officers, employees, and agents acting on its behalf.

172.    Throughout the Relevant Period, Wockhardt directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and

engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least clobetasol and enalapril maleate.

## Zydus Pharmaceuticals (USA), Inc.

173.    Defendant Zydus Pharmaceuticals (USA), Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, NJ.  Zydus is defined to include its managers, officers, employees, and agents acting on its behalf.

174.    Throughout the Relevant Period, Zydus directly participated in the conspiracy alleged in this Complaint, manufactured, produced, marketed, and/or sold at least one Price-Fixed Generic Drug in Westchester County and throughout New York State and the United States, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint, including price-fixing, for at least acetazolamide, divalproex ER, and pravastatin.

## VI.   CO-CONSPIRATORS

## Ascend

175.    Ascend Laboratories, LLC ("Ascend") is a New Jersey limited liability company  with its principal place of business, like Defendants Actavis and Wockhardt, in Parsippany, New Jersey.  During the Relevant period, Ascend marketed and sold generic pharmaceuticals in Westchester County and throughout New York State and the United States.

**Unknown Co-Conspirators**

176.    Various other persons, firms, corporations, and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs reserve all rights to amend this Complaint, including naming additional co-conspirators and adding additional allegations regarding them as they are discovered.

## VII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

177.    During the Relevant Period, Defendants sold and distributed generic drugs in a continuous and uninterrupted flow of interstate commerce to customers in Westchester County and throughout New York State and the United States.

178.    Defendants' and their co-conspirators' conduct, including the marketing and sale of generic drugs, took place within the United States and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States, and in particular between New York State, including Plaintiffs' Regions, and other States.

179.    Defendants' anticompetitive conduct occurred in part in trade and commerce as set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within New York State were foreclosed from offering less expensive

generic drugs to Plaintiffs.  The foreclosure of these less-expensive generic products directly impacted and disrupted commerce for Plaintiffs within New York and forced Plaintiffs to pay supra-competitive prices.

## VIII.  THE GENERIC DRUG INDUSTRY

### A.    Generic Drugs Are Commodity Products

180.    As alleged *supra*, while the filler(s) and other inactive ingredients may vary among different manufacturers, the identical active pharmaceutical ingredient ("API") molecule for any given generic drug is the same in dosage, safety, strength, how it is taken, quality, performance, and intended use, no matter which manufacturer makes it.  Thus, each generic version can be expected to have equal effect, such that one generic version of a given drug can readily be substituted for another generic version, making the generic pharmaceutical markets very price-sensitive – in the absence of collusion.

181.    Mature generic markets typically have multiple manufacturers that compete for sales, which – especially since their products are legally required to be interchangeable with those of their competitors – keeps prices down to the competitive level.

182.    In 2015, generic drug sales in the United States were approximately $74.5 billion; approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.

183.    Since passage of the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the "Hatch-Waxman Act," Pub. L. No. 98-417, 98 Stat. 1585, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents unless the prescribing physician orders otherwise by writing "dispense as written" or similar words on the prescription.

184.    This allows each of Defendants' generic products to be seamlessly substituted with any other Defendant's version of that same product.  As a result, generic drugs are commodity products, and price is the main metric through which competition is possible in these markets for these products.

185.    As a result of this legally-mandated fungibility, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[19]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

186.    It is well-established that competition among generic manufacturers drives down prices.  Normally, purchasers switch to the less expensive alternatives. As a result, the price of a generic drug tends to decrease as more generic drug

---

[19] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

manufacturers enter the market.  Thus, as the number of manufacturers increases, the price of a generic drug approaches the manufacturers' marginal cost.

187.   When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.

188.   A recent government report confirmed this phenomenon in interviews with generic manufacturers:  "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base.  Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[20]

189.   When there are multiple generic manufacturers in an established generic market, prices should remain low and stable, and should not increase absent a market disruption.  That, however, is not what has been happening in the United States, including within Plaintiffs' Regions, since at least 2010, because of the actions of Defendants' cartel for generic pharmaceuticals.

## B.     Defendants' Cartel Agreement Includes All Generic Products

---

[20] U.S. Government Accountability Office Report:  *Generic Drugs Under Medicare* ("GAO Report") at 23, (August 2016), *available at* https://www.gao.gov/assets/680/679022.pdf

190.   As discussed *supra*, generic drugs are commodities.  As a result, generic manufacturers – including Defendants here – are constantly making decisions to enter, leave and re-enter new and existing markets.

191.   In Defendants' cartel, these decisions are based in large part on who the competitors are and how co-operative these companies are with their co-conspirators.

192.   Because of this overarching agreement, all Defendants are co-conspirators with each other for ***every generic product*** that any one or more of them made or sold, these products are referred to herein as the "Drugs at Issue."

193.   At all relevant times, Defendants had substantial market power with respect to the Drugs at Issue.  Defendants exercised this power to maintain supracompetitive prices for these drugs without losing so many sales as to make the elevated price unprofitable.

194.   Defendants sold the Drugs at Issue at prices in excess of marginal costs, in excess of a competitive price, and as a result, enjoyed high profit margins on them.

195.   The products identified by name in this Complaint are merely exemplars of the products that are at issue in this Complaint; the full scope of Defendants' anti-competitive conspiracy appears to include every generic product that was manufactured by any Defendant and purchased or reimbursed by any Plaintiff during the Relevant Period.

196.   For example, in July of 2013, Defendant Sandoz was looking to implement a strategy that involved temporarily delisting (*i.e.*, to stop producing and

selling) ten products that they overlapped on with Defendant Taro. Their strategy was for Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price – a win-win for the supposed competitors, but a lose-lose for Plaintiffs and Plaintiffs' taxpayers.

197.   Another example is that, in August of 2015, Defendant Taro declined to bid on Etodolac Extended Release (ER) Tablets at a large supermarket chain where Defendant Zydus was the incumbent because, as Taro voiced internally, competing would have violated the rules of Defendants' cartel about "playing nice in the sandbox," so Zydus would likely retaliate and take share (*i.e.*, actually compete on price, albeit only temporarily and as a form of communication and punishment, in furtherance of Defendants' over-arching conspiracy) from them on another product, such as what C.L., an analyst at Taro, identified as Warfarin Sodium Tablets.

198.   In addition, this pricing instability would spread to other products. As C.L. explained in an internal e-mail, Zydus "could hit us [Taro] on Warfarin. Not worth a fight in the sandbox over 300 annual units for Etodolac."

199.   As discussed more fully below, both Etodolac ER and Warfarin were drugs where Taro had previously agreed with its competitors, including Teva and Zydus, to fix prices and allocate customers.

200.   As these examples illustrate, the inter-dependence among generic manufacturers transcends product markets, as these companies make decisions based

not only on what impact their actions will have in a given product market, but also on how those actions will impact *other* product markets where the competitors overlap.

201.   As a result of the actions by Defendants' cartel, for example, between July, 2013, and July, 2014, the prices of more than 1,200 generic medications increased an average of 448 percent.  A separate analysis conducted by Defendant Sandoz showed that during the calendar years 2013 and 2014, there were almost 1,500 examples of generic WAC prices more than doubling in that time, of which 178 increased by more than ten-fold.  During the year ending June 30, 2014, more than $500 million of Medicaid drug reimbursements were for *generic* drugs whose prices had increased by over 100% during that time – all of which were due to the actions of Defendants.  The cost of their cartel to American society, and particularly to Plaintiffs and Plaintiffs' taxpayers, is staggering.

202.   As described below, far more Defendants had the right (i.e., regulatory approval) to sell the Drugs at Issue than actually did so during the Relevant period. And all Defendants could have obtained approval or otherwise acquired rights (by, e.g., licensing) to sell the Drugs at Issue, if they had chosen to do so.

203.   Although the process for obtaining approval to sell a generic drug can be long, every Defendant possesses expertise in this area and has been through this process, successfully, multiple times.  Indeed, the core function of Defendants' businesses is to market and sell generic pharmaceuticals and, accordingly, Defendants

are highly adept at obtaining access to the markets for generic pharmaceuticals, including acquiring regulatory approval and further including for the Drugs at Issue.

204.    Defendants gain access to generic pharmaceutical markets through at least three methods, all of which were employed by Defendants during the Relevant Period:

First, Defendants can go through the Abbreviated New Drug Application ("ANDA") process to obtain approval from the FDA to sell a specific drug. Heritage and Dr. Reddy's, for example, applied for ANDA's relating to Zoledronic Acid (and, as described below, co-ordinated with each other while their applications were pending, to ensure that each would obtain a "fair share" of the market once the ANDA's were approved).

Secondly, Defendants can obtain existing ANDA's by purchasing them from companies that have ANDA's, or by acquiring the company that owns them. For example, in 2008, Teva acquired Barr, which had an ANDA for Acetazolamide capsules.

Thirdly, Defendants can license the use of an ANDA held by someone else. For example, during the Relevant Period, neither Glenmark nor Citron owned outright an ANDA for any Drug at Issue, yet both were able to obtain rights to market Drugs at Issue via licensing arrangements.

205.    Table 2 shows some of the ANDA's owned or licensed by Defendants for some of the Drugs at Issue:

## Table 1:  Some of Defendants' ANDA's

| | | |
|---|---|---|
| Acetazolamide | Capsules | **Heritage, Teva, Zydus** |
| | Tablets | Actavis\*, Heritage, **Lannett**, Sun, **Taro**, Teva\* |
| Doxycycline Hyclate | Regular Release | **Actavis**, Citron, **Mylan, Par, Sun**, Teva\*, **West-Ward**, Zydus |
| | Delayed Release | Actavis, **Heritage, Mayne, Mylan** |
| Doxycycline Monohydrate | | **Heritage, Lannett, Mylan, Par**, Sandoz\*, Sun, Zydus |
| Fosinopril-HCTZ | | Actavis\*, **Aurobindo, Citron, Glenmark, Heritage**, Mylan\*, **Sandoz**, Sun\*, Teva\* |
| Glipizide Metformin | | **Heritage, Mylan**, Sun, **Teva**, Zydus |
| Glyburide | | Actavis, **Aurobindo, Citron, Heritage, Teva**, Zydus |
| Glyburide Metformin | | **Actavis, Aurobindo, Citron**, Dr. Reddy's, **Heritage, Teva**\*, Zydus |
| Leflunomide | | **Apotex, Heritage**, Sandoz\*, **Teva** |
| Meprobamate | | Actavis, **Dr. Reddy's, Heritage**, Lannett\*, Mylan\*, Perrigo\*, Sandoz\*, Sun\*, Taro, Teva\*, West-Ward\* |
| Nimodipine | | **Heritage, Sun** |
| Nystatin | Tablets | Actavis\*, **Heritage**, Sandoz\*, **Sun, Teva** |
| | Ointment | **Actavis, Perrigo, Sandoz** |
| | Cream | **Actavis, Par, Perrigo, Sandoz, Taro** |
| Paromomycin | | **Heritage, Sun** |
| Theophylline | | Actavis\*, **Heritage, Teva** |
| Verapamil | | **Actavis, Heritage, Mylan**, Sun\*, Teva\* |
| Zoledronic Acid | | Actavis, Apotex, Aurobindo, **Dr. Reddy's, Heritage**, Mylan, **Par**, Sun, Teva, West-Ward |

\*       = Discontinued
**Bold** = Drug-specific agreement (see above Table 1)

Note that Table 2 includes "discontinued" ANDA's, which can be re-activated with relative ease.

206.    Table 2 shows some of the extent to which these Defendants can and do access the markets for Drugs at Issue. Defendants listed in bold type were the primary

manufacturers during the Relevant period, but many more Defendants had or later

obtained ANDA's for Drugs at Issue.  The competitive overlap of these Defendants

is indisputable, examples of which are mapped below:



As in the preceding figure of example agreements and communications, this figure

understates relationships between the Defendants in a number of ways:

First, the relationship map shows a single line between Defendants regardless of

how many drugs for which they have common ANDA's.  For example, Par, Mylan and

Sun have overlapping ANDA's for at least 3 formulations of Drugs at Issue

(Doxycycline Hyclate, Doxycycline Monohydrate, and Zoledronic Acid) but the

graphic shows only a single line between each of them; Mylan and Heritage have overlapping ANDA's for at least 7 formulations of Drugs at Issue, though the graphic shows only a single line between them;

Secondly, the graphic above is limited to ANDA's for formulations of just **some** of the Drugs at Issue. If it were expanded to include all of the drugs in the conspiracy, which is virtually all drugs in Defendants' portfolios of generic pharmaceuticals, the web of competitive overlap would be even denser.

Thirdly, the graphic does not capture Defendants' ability to seek out and license ANDA's, which essentially provides every Defendant with access to the markets for every generic drug for sale in the United States, including every Drug at Issue in this case.

### C.      Pricing in the U.S. Prescription Drug Industry

207.    In essence, the generic pharmaceutical supply chain is as follows: Manufacturers sell drugs to wholesalers.  Wholesalers – including certain Defendants – sell drugs to pharmacies, hospitals, and other entities, who in turn dispense the drugs to end users.  Plaintiffs purchase drugs and dispenses them to its prisoners and hospital patients, and Plaintiffs also reimburse purchases from beneficiaries, such as employees, retirees, and workers' compensation claimants.

208.    Sometimes, large corporations and/or government entities have their agreements and payments arranged and intermediated by middlemen known as

Pharmacy Benefit Managers, but still bear the economic loss of higher generic pharmaceutical prices resulting from the illegal conduct alleged herein.

209.    Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[21]

210.    NADAC is an average of the drug acquisition costs submitted by retail community pharmacies."[22]  In effect, NADAC is "a single national average."[23]  Thus, NADAC is a reliable way to track general price trends in the marketplace.

211.    Other reports are more easily manipulated by manufacturers to mislead purchasers and reimbursors who bear the ultimate economic burden of higher drug prices, such as Plaintiffs.  Drug manufacturers report benchmarks—such as Wholesale Acquisition Cost ("WAC"), Actual Wholesale Price ("AWP"), and

---

[21] CMS, *Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs* at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf

[22] *Id.* at 15.

[23] *Id.*

("NSP")—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry.  But despite the implications of their names, these price-points are not actual transaction costs; rather, they are the manufacturer's nominal sticker or "list" price, which does not take into account discounts that are almost invariably provided, and thus are sometimes an imperfect measure of the true economic cost of purchase to purchasers, such as Plaintiffs. Nevertheless, these benchmarks are directly related to the underlying net, "market," or "contract" price, and function as a good approximation thereof. .

212.    In addition, QuintilesIMS sells a measure of manufacturer-specific pricing, which it calls "National Sales Perspectives ("NSP's")".  IMS's NSP data captures sales at nominal transaction prices and includes sales by manufacturers into various outlets.

213.    The amount that an end-payer, also such as Plaintiffs, will pay for a generic drug is typically determined with reference to a list price, such as WAC.  The end-payer pays an amount based on the manufacturer's list price for the drug, plus a mark-up or dispensing fee.  While these other benchmarks are not a perfect measure of true economic cost of these drugs, they are nevertheless a good proxy for that true economic cost and move in the same direction, providing additional useful evidence of collusion and its anticompetitive effects.

214.    Nevertheless, over time, third-party payers and PBM's have learned that these list prices can be substantially higher than the actual economic cost incurred to

acquire the drugs, which meant that end-payers were paying more than simply the acquisition cost plus a small amount.

215.   To combat this, some third-party payers and PBM's have implemented their own proprietary benchmark prices—Maximum Allowable Costs ("MAC's")— that set the amounts they will pay pharmacies for some generic drugs.  An MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

216.   Third-party payers ("TPP's") and PBM's set the MAC of a drug based on several factors, one of which is believed to be the lowest actual cost of acquisition in the market for that generic drug.  So if, for example, there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices.

217.   A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

218.   Those who bear an economic cost of a purchase, such as Plaintiffs, have an incentive to buy the least expensive available drug.  MAC prices should incentivize middlemen, such as PBM's and pharmacies, to choose the lowest priced option, so a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price – especially since, as described *infra*, generic drugs are commodity products and highly fungible.

219.   Consequently, in the absence of co-ordinated pricing activity among generic manufacturers, an individual manufacturer would not be able to significantly increase its price (or maintain a higher price in the face of a competitor's lower price) without incurring the loss of a significant volume of sales.  A manufacturer can successfully raise prices only if it knows its competitors will raise their prices, too – as happened here, where they were and are co-conspirators.

## IX.   DEFENDANTS' CARTEL & OVERARCHING CONSPIRACY

220.   Defendants have participated in a long-running conspiracy to allocate market shares and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.  As detailed below, Defendants facilitated their conspiracy through personal connections formed through frequent movement within the industry, through frequent in-person meetings at various happy hours, dinners, lunches, golf outings, trade shows, and industry conferences (facilitated in part through most of the conspirators' location in or near New York, Philadelphia, and the parts of New Jersey and eastern Pennsylvania that are between them), and through frequent direct communications in person, via chat and e-mail, and on the telephone (voice and text).

221.   During the Relevant Period, inter-defendant communications were commonplace in the industry, and started at least as far back as 2006.  By at least 2010, if not before, every Defendant implemented anti-competitive agreements to increase prices and allocate the markets of the Drugs at Issue.

222.    The foundational agreement among all Defendants was premised on the understanding that they are current or future competitors with each other across numerous markets for generic drugs.  All Defendants market and sell multiple products, and they all understood that – especially because their agreements were illegal, and therefore unenforceable in court and enforceable only by using actual competition as a means of maintaining pricing discipline within Defendants' cartel – the effectiveness of an agreement on any one drug would be limited and less stable without a broader agreement that also encompassed all other drugs, as well.

223.    For example, an agreement between two Defendants to raise prices or to allocate market share on one drug might not hold if those same two Defendants were engaged  in vigorous price competition on another drug, or a third manufacturer – not party to that agreement – entered the market with an intent and ability to compete on price, since the two conspiring manufacturers' higher prices would simply have the effect of shifting most or all market share to the third manufacturer, with the competitive price.  Defendants understood that in order to be at its most effective, their agreement needed to extend to multiple manufacturers and all of their drugs – and it did.

224.    In addition, Defendants would sometimes swap one market (or a share of one market) in return for another (or a share in another), but always under the terms of the conspiracy set forth herein.

225.   In furtherance of their objective, Defendants developed the concept and language of "fair share" and – without any apparent sense of irony – being a "responsible competitor" who would "play nice[ly] in the sandbox," in which each market participant (within and across multiple drugs) was able to obtain an allocated share of market sales without resorting to, or experiencing, price competition.

226.   Besides using the "playing nice in the sandbox" phrasing, Defendants often referred to complying with their cartel's rules as being a "responsible" or "rational" competitor.  For instance, in May, 2013, R.T., a senior sales and marketing executive at Sandoz, sent an e-mail to Jeff George, Sandoz's then-CEO, stating:  "My sense is that Sandoz is viewed by customers and competition as a respectful/ responsible player in the market, which we should be proud of and has taken years to develop.  I would be very careful [not] to destroy this through behavior that is too aggressive or desperation."

227.   This language was so pervasive – and the terms of Defendants' anti-competitive conspiracy so deeply ingrained into the minds of its participants – that Defendants occasionally even used it in public to opaquely refer to their anti-competitive conduct and agreements.

228.   For example, the CEO of one Defendant, Lannett, used it publically, on a September 10, 2013, earnings call with Wall Street analysts, noting that "I'm always grateful to see **responsible** generic drug companies realize that our cost of doing business is going up as well…  So whenever [they] start **acting responsibly and**

***raise prices***, as opposed to the typical spiral down of generic drug prices, I'm grateful
. . . ." (emphasis added).

229.    However, such public lapeses were rare.  Because Defendants' cartel and
anticompetitive conduct are illegal, they typically took steps to avoid leaving
permanent electronic records of what they said to each other.

230.    For example, in May, 2014, a large customer received a bid on
Betamethasone Dipropionate Lotion (discussed in more detail, *infra*) and gave Taro an
opportunity to bid to keep the account.  A.L., a pricing executive at Taro, sent an
internal e-mail stating:  "FS ok, will not protect."  E.G., a Taro sales executive,
responded, "explain FS, (Fair Share)?"  Ara Aprahamian replied, "No emails please.
Phone call. . . . let's discuss."  Ara Aprahamian ("Aprahamian") worked at Defendant
Actavis as Director of Pricing and Contracts from August, 2010 – March, 2013.
From March, 2013 – August, 2018, Aprahamian was Vice President of Sales and
Marketing at Defendant Taro Pharmaceuticals USA, Inc.

231.    Because Defendants are repeat players who routinely enter new markets
but face the same ostensible competitors.  As a result, they developed a cartel to work
together co-operatively to allocate customers and set high prices, rather than
unrestrained competition with each other.

232.    And as a result of their cartel agreement, Defendants would generally
seek only approximately a *pro rata* share of the relevant market for each Drug at Issue,
generally with a small increase in market share for being first entrant to a given market

(where applicable) and some tendency towards leaving market shares where they were when Defendants started their cartel, so, *e.g.*, Actavis sometimes had a smaller-than-strictly *pro rata* share, while Teva and Mylan often had larger ones.

233.   Defendants often referred to this allocation as each Defendant getting its so-called "Fair Share" of the market, and would voluntarily cede customers to their co-conspirators (or present sham overbids to customers) to achieve Defendants' agreed distribution of market share.

234.   This pattern is typically followed even in the absence of explicit or direct communication among cartel members, demonstrating both the broad reach of Defendants' cartel agreement and the fact that explicit textual discussions of terms were not always necessary.

235.   Further, this understanding was so deeply ingrained that Defendant Taro went so far as to create a chart illustrating typical share amounts:



**Market Share - Fair Unit Share assumptions**
Order of Entry Grid
Number of Competitors

| | Number of Competitors | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Order of Entry | 1 | 100% | 60% | 45% | 35% | 30% | 30% | 30% |
| | 2 | | 40% | 35% | 30% | 25% | 25% | 25% |
| | 3 | | | 20% | 20% | 20% | 20% | 20% |
| | 4 | | | | 15% | 15% | 15% | 15% |
| | 5 | | | | | 10% | 10% | 10% |
| | 6 | | | | | | 10% | 10% |
| | 7 | | | | | | | 10% |
| | Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

236.   Likewise, in July, 2013, L.J., a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have its so-called "fair share" of the market.  After some back-and-forth comments among Sandoz executives, the response of Sandoz's Director of Pricing and Contracts, Armando Kellum ("Kellum"), emphasized the industry-wide nature of Defendants' cartel, with the rallying cry, "Fair Share for all!!!" – including three exclamation marks.

237.   This also illustrates the fungible, commoditized nature of the markets for generic pharmaceuticals:  every generic product is (by FDA regulation) so interchangeable that the cartel members did not generally expect much more (or less) than a *pro rata* share of each market.  As alleged *supra*, these rules were also sometimes called the "rules of the road" for Defendants' cartel, "being responsible," and, without limitation, doing so (and/or "playing nice") "in the sandbox."

238.   As also alleged *supra*, Defendants' cartel extended to all products that they manufactured or sold:  among many examples, in October, 2013, a senior pricing executive at Sandoz who will be referred to herein as SW-1, sent an internal e-mail, including to Kellum, stating that Sandoz had decided not to bid at a large retail customer on two products on which it overlapped with Mylan.  SW-1 explained his reasoning thusly: "We have been running up against Mylan a lot lately (Nadolol/ Benaz/Hctz) and fear blowback if we take any more products at this moment.  Trying to be responsible in the sandbox."

239. Further, the following year, in June, 2014, Sandoz again chose not to bid on a product at a Mylan customer out of concern that Mylan would retaliate.  As SW-1 explained, "I do not want to pursue, I believe this is due to a Mylan increase.  We have a lot of products crossing over with Mylan right now, I do not want to ruffle any feathers."

240. As described more fully below, Defendants' decisions whether and when to enter a market, how to price their drugs, and which customers to target, were made in accordance with their unlawful cartel agreement, and with the safety for high prices that that agreement provided, firmly in mind.

241. From this broad agreement among all Defendants (to market and sell the Drugs at Issue under this "fair share" understanding) sprang multiple subsidiary agreements among individual Defendants relating to each of the Drugs at Issue.  The higher prices and overcharges for the Drugs at Issue resulted from Defendants' anti-competitive conduct and are directly traceable through the pharmaceutical distribution chain to end-payers, such as Plaintiffs.

242. Table 1 lists a few examples of Defendants' very much larger universe of drug-specific agreements:

### Table 2:  Selected Examples of Defendants' Unlawful Drug-Specific Agreements

| Acetazolamide | Capsules | Heritage, Teva, Zydus |
| | Tablets | Lannett, Taro |
| | Regular Release | Actavis, Mylan, Par, Sun, West-Ward |

| Doxycycline Hyclate | Delayed Release | Heritage, Mayne, Mylan |
|---|---|---|
| Doxycycline Monohydrate | | Heritage, Lannett, Mylan, Par |
| Fosinopril-HCTZ | | Aurobindo, Citron, Glenmark, Heritage, Sandoz |
| Glipizide Metformin | | Heritage, Mylan, Teva |
| Glyburide | | Aurobindo, Citron, Heritage, Teva |
| Glyburide Metformin | | Actavis, Aurobindo, Citron, Heritage, Teva |
| Leflunomide | | Apotex, Heritage, Teva |
| Meprobamate | | Dr. Reddy's, Heritage |
| Nimodipine | | Heritage, Sun |
| Nystatin | Tablets | Heritage, Sun, Teva |
| | Ointment | Actavis, Perrigo, Sandoz |
| | Cream | Actavis, Par, Perrigo, Sandoz, Taro |
| Paromomycin | | Heritage, Sun |
| Theophylline | | Heritage, Teva |
| Verapamil | | Actavis, Heritage, Mylan |
| Zoledronic Acid | | Dr. Reddy's, Heritage, Par |

243.    Each Defendant, including the Defendants who did not manufacture the particular drug involved in each drug-specific sub-part of the conspiracy, was a party to the broad, overarching conspiracy to abide by the "fair share" agreement, which covered all Drugs at Issue.  The purpose and effect of these agreements was to lessen competition in the markets for each and all of the Drugs at Issue.

244.    The figure below shows some communications used to facilitate this conspiracy, illustrating its complex but integrated form:



245.    This graphic actually **_understates_** the web of communications that facilitated Defendants' overarching conspiracy by showing a single line between Defendants, regardless of how many communications or drug-specific agreements they have.  For example, Aurobindo and Citron entered into at least three drug-specific agreements (relating to Fosinopril-HCTZ, Glyburide, and Glyburide Metformin) but there is only a single line between them.

246.    Similarly, although Teva and Glenmark communicated at least 94 times in a 13-month period (Table 4, infra), this is depicted as a single dotted line in the graphic.  Teva and Zydus communicated at least 638 times in a 13-month period

(Table 4, infra), but there is no indication of this in the graphic, which instead shows a single solid line for the agreement between them relating to Acetazolamide.

247.    Moreover, the communications included here are likely incomplete; Plaintiffs do not yet have full access to discovery materials, which will likely reveal additional illegal conduct and communications in furtherance of the unlawful conspiracy.

248.    These communications (for example, between Teva and each of Dr. Reddy's, Glenmark, Lannett, Mayne, Par and Sandoz) underscore the overarching nature of the conspiracy: even Defendants that were not selling the same Drugs at Issue were communicating in furtherance of the conspiracy in order to lessen competition in the markets for all Drugs at Issue.

249.    Both the "fair share" agreement and the drug-specific agreements created a web of relationships and understandings among and between all Defendants that had the purpose and effect of lessening competition among Defendants for all the Drugs at Issue.

## A.    The Co-Operative Principle of "Fair Share" Governed Defendants' Cartel

250.    In a competitive generic drug market, new drug providers normally price their product below the incumbents' price, in order to gain market share.  As a result, each subsequent entry into a generic market decreases prices as manufacturers compete for market share. As discussed in detail below, this did not happen for the

Drugs at Issue because of Defendants' illegal conspiracy, including using their cartel's so-called "fair share" agreement to co-ordinate market share and pricing.

251.   Because entry into a generic market is ultimately a public process (*i.e.*, FDA notifies the public of successful ANDA applications), Defendants knew which manufacturers had approval to manufacture every generic drug sold.  This, in turn, enabled the cartel to monitor compliance with its terms and to punish defectors – just as the cartel was cheating Plaintiffs, so even the most co-operative cartel member faced the constant temptation to cheat its *compares* by grabbing market share at the expense of the cartel's pricing arrangement.

252.   In addition, with each of the Drugs at Issue, Defendants knew approximately when each of them would enter the market.  This created an incentive and opportunity to co-ordinate pricing and allocate these markets among themselves in order to raise or maintain prices and maximize profits, at the expense of Plaintiffs.

253.   The practice of contacting competitors to determine their market intentions (*via* in-person meetings, telephone communications, and/or other interactions) dates back to at least 2006.  For example, when Glazer began working at Heritage in early 2006, the then-head of sales, Konstantine Ostaficiuk, taught him the importance of speaking to competitors in order to figure out pricing and how to secure adequate customer volume without depressing prices market-wide.

254.   Since approximately 2010, all Defendants understood – and engaged in – the practice of contacting their competitors when they were preparing to enter a

particular generic market so that they could allocate the market according to their "fair

share" agreement.  Reaching out to competitors was part of the "tool kit" used in

manufacturer Defendants' ordinary course of business.

255.    The cartel's co-operation was not limited to pricing.  Going back to at

least 2010, Defendants co-ordinated on all aspects of the marketplace.  For example,

on August 4, 2010, SW-6 at Fougera (later Sandoz) conducted a round-robin of calls

among several cartel members, as set forth in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 9:55:28 | 0:01:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 10:27:49 | 0:00:06 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:30:30 | 0:07:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:40:34 | 0:03:31 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:18:51 | 0:00:16 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:25:37 | 0:00:00 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 11:34:56 | 0:03:29 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:39:05 | 0:26:34 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 12:10:54 | 0:00:05 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | V.M. (Core Pharma) | 12:38:57 | 0:00:24 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | V.M. (Core Pharma) | 12:41:09 | 0:12:30 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 12:58:48 | 0:04:08 |

256.    That evening, after the last call had been completed, SW-6 e-mailed his

boss at Fougera, Walter Kaczmarek ("Kaczmarek"), with extremely competitively

sensitive information from each co-conspirator to whom he had just spoken.

257.    "Fair shares" were allocated to manufacturer Defendants within a

particular drug market generally based upon the number of competitors in the market

and the timing of their entry into the market, although there were occasional

deviations from this distribution.  Traditionally, the first manufacturer to enter a

market received the largest share of the market, and each subsequent manufacturer entrant received a progressively smaller share.  This system aimed to allocate to each manufacturer Defendant a "fair share" of the market without depressing prices.  As detailed below, through this overarching conspiracy, Defendants were able to raise prices and/or enter the market at elevated prices.

258.   The "fair share" agreement was so ingrained that some of Defendants' account managers and sales teams viewed contacting their counterparts at other companies—including discussing market allocation and/or price increases—as part of the normal course of business.

259.   Defendants understood and agreed to the "rules of the road" and that they needed to "play nice in the sandbox" to participate in, maintain, and enforce the continued participation of others in their cartel.  This understanding meant that Defendants did not compete with each other on price and did not take advantage of another Defendant's price increase by providing a lower bid to "steal" the customer.

260.   Defendants often referred to their participation in this scheme, and keeping prices elevated, as "playing nice in the sandbox."  For example – as discussed more fully below – in December of 2014, Defendant Teva was approached by a large retail customer on behalf of Defendant Greenstone. The customer indicated that Greenstone was entering the market for Cabergoline and was seeking to target specific customers.  The customer specifically requested that Teva give up a large customer to the new entrant and indicated that "Greenstone has promised to play

nice in the sandbox."  After discussing the matter internally, a Teva representative responded to the customer:  "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the targeted customer.]."

261.   The concept of "fair share" was not limited to a specific drug. Rather, the concept of "fair share" extended across the Drugs at Issue. Defendants who "played fair" and maintained a "fair share" would benefit from the overarching conspiracy as a whole, even if an individual Defendant would lose market share on one specific drug.  Customers in one generic drug market were sometimes traded for customers in a different generic drug market, so that fair shares could be allocated across the larger market of generic competition generally.  Even though market share on any particular drug might have been less for a particular Defendant, where that Defendant was a market leader who voluntarily ceded customers and market share to its co-conspirators, the dollar value to every Defendant of its drug portfolio as a whole was much, much higher.

262.   In many instances, competitors would support a price increase for one drug with the understanding that their competitors would support a price increase for a different drug.  Defendants who undercut other Defendants' prices were seen as "not playing fair" and "punishing" a competitor – something that Defendants would deliberately do when they perceived that a competitor was taking more than its so-called "fair share."

263.    For instance, among the many examples discussed in this Complaint, and as discussed in more detail below, Defendant Sandoz's ongoing understanding with Defendants Taro and Perrigo that they would follow each other's price increases was predicated on the agreement that the follower would not poach the price-leader's customers after the increase.

264.    Aprahamian at Taro often spoke with SW-3 at Sandoz about co-ordinating price increases between the two companies.  Aprahamian routinely concluded the conversations with phrases like "don't take my fucking customers," "don't take my business," or "don't be stupid," which was an explicit statement of some of the principals of Defendants' cartel agreement.

265.    Defendants routinely and readily agreed to follow or not to compete on price increases for a number of generic drugs.  Generic drug manufacturers could not always follow a fellow cartel-member's price increase quickly.  Various business reasons – including contractual price protection terms with certain customers that would have resulted in the payment of significant penalties – could cause such delays. In those instances when a co-conspirator manufacturer delayed following a price increase, the cartel's so-called "fair share" principles operated to ensure that a lagging member would not seek to take advantage of the leader's price increase by taking market share.

266.    Additionally, when customers requested new bids in response to price increases instituted from other Defendants, the Defendants involved communicated

each other and devised strategies for responding without undermining pricing. Consequently, consistent with the interests of Defendants' cartel and in furtherance of its unlawful conspiracy, Defendants sometimes refused to bid or provided a cover bid that allowed a competitor's price increase to succeed, injuring Plaintiffs by forcing it to pay significantly more for the Drugs at Issue than Plaintiffs would have in the absence of the conspiracy.

267.   Further, because of this "fair share" understanding, it was not essential for cartel members to communicate with each other in advance of a price increase, although they often did, anyway.  So long as a cartel member knew (or found out, often from a co-conspirator) that the reason for the solicitation was due to a price increase by the incumbent supplier, the cartel member knew not to take the business; supply disruptions were a different situation, where taking the affected business was allowed by the cartel – but not, of course, cutting prices.

### B.    Sales Managers Played a Key Role in Implementing the Conspiracy

268.   National Account Managers ("NAM's") direct the sales force within the generic pharmaceutical industry.  Although Defendants' NAM's supposedly competed for the same customers, they also developed close relationships with each other. Defendants' NAM's frequently met with each other in various social settings, which made it easy to exchange competitive information.

269.    Moreover, many of the NAM's and other marketing and sales personnel employed by Defendants worked at multiple companies—including other Defendants—during their careers.  These employees maintained contact with people at their prior employers, which facilitated the conspiratorial agreements.

270.    For example, Susan Knoblauch worked at Defendant Sun for nearly a decade before moving to a different sales position at Defendant Citron.  Beth Hamilton worked at Defendant Apotex before moving to Defendant Mayne. Heritage's Daniel Lukasiewicz began his career at Defendant Aurobindo, moved to Defendant Zydus and then to Defendant Heritage.

271.    This familiarity encouraged further collusion.  For example, as discussed below, in the spring and summer of 2014, Heritage's Lukasiewicz—at the direction of CEO Glazer—reached out to Aurobindo, his former place of employment, to co-ordinate pricing on Glyburide, Glyburide-Metformin and Fosinopril-HCTZ.

272.    Similarly, Teva's Director of Strategic Customer Marketing, Nisha Patel ("Patel"), met Heritage's then-Sr. Vice President Malek when she worked at Amerisource Bergen, which was a Heritage customer whom Malek managed.

273.    When Patel moved to Defendant Teva in April of 2013, she contacted Malek to determine which generic drug products Teva sold that overlapped with generic drugs sold by Heritage so that they could co-ordinate pricing.  As detailed below, Malek and Patel used their relationship to orchestrate a number of price increases throughout the Relevant Period – some led by Teva, others led by Heritage.

274.    Malek and Patel's communications were valued and accepted by Malek's supervisors.  For example, in April of 2014, Malek and Glazer met with the CEO (Satish Mehta) and President Vikas Thapar) of Emcure, Heritage's parent, to discuss potential price increases for several drugs.  During that meeting, Heritage's Malek told Emcure's Mehta and Thapar about his contact at Teva, Nisha Patel.  Malek, who already had been discussing price increases for Nystatin with Patel since mid-2013, told them that Patel could be a vehicle for communicating with Teva about price increases and customer allocation. Mehta and Thapar approved of Malek's strategy to co-ordinate prices and allocate customers with Teva.

275.    Defendants' geographic proximity to each other – at least 41 different generic drug manufacturers are concentrated along the so-called "Acela Corridor" (named after Amtrak's express passenger train) between the New York City and Philadelphia metropolitan areas, including Defendants Actavis, Aurobindo, Citron, Dr. Reddy's, Glenmark, Greenstone/Pfizer, Heritage, Lannett, Par, Perrigo, Sandoz, Sun, Taro, Teva, West-Ward, Zydus and co-conspirator Ascend – facilitated Defendants' frequent in-person meetings at "industry dinners" and other social events.  These events provided Defendants with additional opportunities to collude.

276.    Just as Scottish professor and economist Adam Smith commented was inevitable over 200 years ago,[24] Defendants took advantage almost constant opportunities to interact with each other at trade shows and conferences to further their illegal conspiracy.  These contacts were at the behest of Defendants' management.  For example, Heritage's Malek expressly directed Heritage's NAM's to have pricing communications with competitors at trade association meetings.

277.    Trade shows and customer conferences were so abundant within the industry that during a 41-week period between February 20, 2013 and December 20, 2013, there were 44 different trade shows where Defendants had the opportunity to meet and collude with each other. See Exhibit 1 (Trade Association Attendance).

278.    Trade shows were not the only place where Defendant's personnel communicated with one another.  Defendants also had their own events and activities that presented numerous opportunities for sharing competitive information.  For instance, certain sales representatives, including those employed by Defendants, regularly met for what was referred to as "Girls Night Out" ("GNO") or "Women in the Industry" meetings or dinners which were used as a place to meet with competitors and discuss competitively sensitive information.  Some of these meetings were organized by Anne Sather, a Heritage NAM who resides in Minnesota. While

---

[24] "People of the same trade seldom meet together, even for merriment and diversion but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices."  Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations*.  London, 1776.

GNO participants were largely salespeople residing in the area, sales representatives from out of the area also were aware of these dinners and were included in GNO when they were in the area.

279.    The types of inter-competitor contacts that transpired at GNO's were consistent with the types of contacts salespeople at Defendants were expected to have.  For instance, since at least 2012, Heritage's Malek frequently instructed his NAM's to contact competitors to find out what they were doing.  This conduct was so common in the industry that Malek did not view inter-competitor communications as unusual.

280.    In addition to their regular meetings in person, Defendants used text messages, phone calls, and messages passed through third-party services such as LinkedIn to facilitate their conspiratorial communications.

## C.    Defendants Frequently Communicated Directly and Privately

281.    Between July 1, 2013 and July 30, 2014, senior sales executives and other individuals with pricing authority at Heritage and at Teva spoke with sales representatives of nearly every other U.S.-based corporate Defendant by telephone and/or text message on multiple occasions.

282.    During a one-year period, Heritage had at least 513 contacts with personnel at Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Teva, and Zydus.

283.   During that same one-year time period, Teva had at least 1,501 contacts with personnel at Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Teva, and Zydus.  Tables 3 and 4, below, tally some examples of these communications:

### Table 3: Heritage Phone/Text Conspiracy Communications July 1, 2013 - July 30, 2014

|  | July 2013 | Aug 2013 | Sep 2013 | Oct 2013 | Nov 2013 | Dec 2013 | Jan 2014 | Feb 2014 | Mar 2014 | Apr 2014 | May 2014 | Jun 2014 | Jul 2014 | Year TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Actavis** |  |  |  |  |  |  |  |  |  | 2 |  |  |  | 2 |
| **Apotex** |  |  |  |  |  |  |  |  |  |  | 17 | 2 | 1 | 20 |
| **Ascend** |  |  |  |  |  |  |  |  |  | 1 |  |  |  | 1 |
| **Aurobindo** |  |  |  |  | 1 | 1 |  | 1 |  | 5 | 2 | 1 | 3 | 14 |
| **Citron** |  |  |  | 6 | 1 | 12 |  | 7 | 1 |  | 2 | 29 | 52 | 110 |
| **DRL** | 1 | 6 | 3 | 2 |  |  |  |  | 1 | 5 | 3 |  |  | 21 |
| **Glenmark** |  |  |  |  |  |  |  |  | 1 |  |  |  | 3 | 4 |
| **Lannett** |  | 35 |  | 27 |  |  | 21 | 8 |  | 3 | 3 | 14 | 2 | 113 |
| **Mayne** |  |  |  |  |  | 1 |  |  | 2 | 7 | 3 |  |  | 13 |
| **Mylan** | 3 | 1 |  |  | 1 |  | 1 |  | 2 | 8 |  | 2 |  | 18 |
| **Par** |  |  |  |  |  |  |  |  |  |  | 3 | 6 |  | 9 |
| **Sandoz** |  |  |  |  |  |  |  |  |  |  | 4 | 3 |  | 7 |
| **Sun** | 1 | 2 |  | 1 |  |  |  | 3 |  | 3 | 10 | 32 | 7 | 59 |
| **Teva** | 7 | 9 |  |  |  |  |  | 5 | 5 | 3 |  | 1 | 5 | 35 |
| **Zydus** |  | 61 | 19 | 6 |  |  |  |  |  |  |  |  | 1 | 87 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  | 513 |

### Table 4: Teva Phone/Text Conspiracy Communications July 1, 2013-July 30, 2014

|  | July 2013 | Aug 2013 | Sep 2013 | Oct 2013 | Nov 2013 | Dec 2013 | Jan 2014 | Feb 2014 | Mar 2014 | Apr 2014 | May 2014 | Jun 2014 | Jul 2014 | Year TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Actavis** |  | 11 | 16 | 37 | 11 | 35 | 25 | 14 | 36 | 30 | 63 | 13 | 43 | 334 |
| **Apotex** | 3 | 4 |  |  |  |  |  |  |  |  |  |  |  | 7 |
| **Ascend** |  | 3 |  |  |  |  |  |  |  |  |  |  |  | 3 |
| **Aurobindo** | 17 | 5 | 3 | 15 | 8 | 10 | 7 | 7 | 6 | 6 |  |  | 5 | 89 |
| **Citron** |  |  |  | 3 | 3 | 3 |  | 1 |  | 1 |  | 1 |  | 12 |
| **DRL** | 2 |  |  |  |  |  |  |  |  | 2 | 1 | 3 | 6 | 14 |
| **Glenmark** | 7 | 8 | 1 | 17 | 18 | 21 | 5 | 4 | 2 |  | 3 |  | 8 | 94 |
| **Heritage** | 7 | 10 |  |  |  |  |  | 5 | 5 | 3 |  | 1 | 5 | 36 |
| **Lannett** |  |  |  |  |  |  |  |  | 16 | 13 |  | 1 | 13 | 43 |
| **Mayne** | 2 |  | 2 | 1 | 1 | 2 | 4 | 5 |  |  |  | 7 |  | 24 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mylan** | 28 | 22 | 2 | 7 | | 12 | 6 | 1 | 1 | 1 | 7 | 1 | | 88 |
| **Par** | | | 4 | 4 | 3 | 16 | 1 | 18 | 6 | 9 | 11 | 14 | 3 | 89 |
| **Sandoz** | 3 | 5 | 3 | | | | 7 | | 2 | 3 | | 1 | | 24 |
| **Sun** | | | | 2 | | 1 | | | | 1 | | | 2 | 6 |
| **Zydus** | 75 | 29 | 25 | 203 | 43 | 48 | 20 | 39 | 46 | 35 | 41 | 14 | 20 | 638 |
| | | | | | | | | | | | | | | 1,501 |

284.   These numbers are not, of course, the total volume of contacts between these Defendants during this period because they include only phone and text message records from some of Defendants' executives and salespeople.  It is clear, however, from the limited information adduced to date, that there was a widespread pattern of communications occurring simultaneously between Defendants that marketed and sold the Drugs at Issue.

285.   For example, and as detailed below, while Heritage's Associate Director of National Accounts Neal O'Mara was discussing pricing and market share of Zoledronic Acid with Vice President ("VP") of Sales and Marketing John Adams at Dr. Reddy's, O'Mara and Heritage's Sr. NAM Matthew Edelson were also discussing pricing for Meprobamate with Dr. Reddy's.  At the same time, Heritage's Sather was speaking with Director of National Accounts Tracy Sullivan at Lannett about pricing for Doxycycline Monohydrate ("Doxy Mono").  A month later, in April of 2013, Sun, Heritage, and Teva began discussing pricing for Nystatin.  Similarly, in May 2013, Malek, with the assistance of Emcure CEO Mehta, began talking about the pricing for Doxycycline DR ("Doxy DR") with Defendant Rajiv Malik, President of Mylan.

286.   Throughout the Relevant period, Defendants conspired to raise prices. For instance, among the many, many examples set forth in this Complaint, in the spring and summer of 2011, Defendants Taro and Perrigo imposed abrupt, large and nearly identical price increases for Nystatin external cream.  Par joined the price increase by late summer.  By October of that year, Actavis also joined the price increase. These Defendants maintained elevated prices thereafter. When Sandoz ramped up production two years later, in the summer of 2013, it imposed nearly identical prices for Nystatin cream.

287.   Not long after the price increases for Nystatin cream in the summer of 2011, Actavis, Perrigo and Sandoz began to impose similar increases to Nystatin ointment. The price increases were large, abrupt and nearly identical, but staggered by approximately 6-month increments.

288.   While the Nystatin cream and ointment increases were occurring, Defendants had the opportunity to meet and discuss pricing at the ECRM Retail Pharmaceutical Conferences and NACDS Annual Meetings in 2011 and 2012. All four of these meetings were attended by at least Actavis, Par, Perrigo, Sandoz and Taro.  *See* Exhibit 1.

289.   In the spring of 2012, Defendants Taro and Lannett tested the waters with a relatively small price increase for their Acetazolamide tablets. The increases were nearly simultaneous and nearly identical.

290.    In the summer of 2012, Heritage and Sun were discussing price increases for at least two more drugs: Nimodipine and Paromomycin.  Heritage and Sun were able to reach agreements through multiple emails, text messages and in-person communication at trade events, including at the 2012 ECRM  Retail Pharmaceutical Conference and the HDMA Business Leadership Conference. *See* Exhibit 1.  Actavis and West-Ward also attended 2012 conferences with Sun and Heritage, and in the following months joined Sun in dramatic Doxycycline Hyclate price increases.

291.    Heritage and Sun, as well as Actavis, Apotex, Aurobindo, Dr. Reddy's, Glenmark, Lannett, Mylan, Par, Perrigo, Sandoz, Taro, Teva, and Zydus, had the opportunity to discuss pricing and market share and otherwise further the conspiracy while attending the October 2012 GPhA meeting.

292.    By late 2012 and into early 2013, Sun increased list prices for Paromomycin consistent with Heritage's pricing, and Sun, Actavis and West-Ward all dramatically increased prices for regular release Doxycycline Hyclate.  Mylan increased prices for Verapamil tablets and allowed Heritage—a relative newcomer to the market—to gain market share.  By March 1, 2013, Heritage had increased its Nimodipine list prices consistent with its agreement with Sun.

293.    Between January and March of 2013, representatives from Heritage and Dr. Reddy's spoke or texted multiple times, and representatives of all U.S. Defendants except Citron had attended at least one trade association meeting where Defendants had the opportunity to meet and discuss pricing and market allocation of multiple

generic drugs.  *See* Exhibit 1.  During at least one of those trade association meetings,

Dr. Reddy's Adams and Heritage's O'Mara discussed the pricing of at least

Zoledronic Acid.

294.    On the heels of these communications and meetings, by April of 2013,

Defendants had increased the prices of three additional Drugs at Issue:  Meprobamate

(Dr.  Reddy's, Heritage), Nystatin tablets (Heritage, Sun), and Zoledronic Acid (Dr.

Reddy's, Heritage).

295.    Sun implemented price increases for Nystatin tablets in order to facilitate

Heritage obtaining a "fair share" of the market, just as Mylan had raised prices on

Verapamil tablets to allow Heritage to gain share.  Defendants also raised prices on an

additional Doxycycline Hyclate regular release product (Actavis, Sun, West-Ward).

296.    During this time-frame, Defendants also increased the prices of other

drugs as part of their overarching conspiracy, including, for example, Desonide

(Actavis, Sandoz, Perrigo, Taro), and Propranolol capsules (Actavis, Breckenridge,

and Upsher).

297.    Notably, even if a particular manufacturer was not directly involved in a

price increase, it nonetheless monitored the increases carefully. For example, even

though Heritage did not increase its price for Nystatin tablets in April 2013, it

maintained close contact with Sun in the lead up to and following Sun's price increase.

For example, the day after Sun increased its Nystatin prices, representatives for the

two companies spoke for nearly 40 minutes.

298.    Defendants' pattern of conspiratorial communications continued through April and June of 2013 and beyond.  During April-June, 2013, Heritage spoke with at least Mylan, Teva, Sun, Dr. Reddy's and Lannett.  After a series of communications with Sun, Heritage doubled the price of Nimodipine.  Lannett and Par also independently spoke with each other.  Every U.S. Defendant except Mayne also attended at least one trade association meeting where Defendants had the opportunity to meet and discuss market share and pricing.  *See* Exhibit 1.

299.    Electronic contacts between Defendants increased dramatically starting in July of 2013. Between July and September of 2013, Teva and Heritage contacted their competitors via text or phone call hundreds of times.  *See* Tables 3 & 4, *supra*.

300.    Teva had at least 144 separate contacts with nine Defendants in July, 2013; at least 97 contacts with nine Defendants that August; and at least 56 different contacts with eight Defendants that September.  These discussions involved at least Doxycycline Hyclate, Doxycycline Monohydrate, and Nystatin tablets.

301.    Further, in addition to their phone and text contacts, between July and September of 2013, representatives from every U.S. Defendant (except Mayne) attended at least a second trade association meeting (besides at least one in April-June) where Defendants had the opportunity to discuss pricing and market allocation. *See* Exhibit 1.

302.    At least one of these meetings, the NACDS Total Store Expo, was attended by a number of individuals that are directly implicated in anticompetitive

communications, including:  Heritage's Glazer, Malek, O'Mara, Sather and Edelson; Lannett's Sullivan; Mylan's VP of Sales, James Nesta ("Nesta" or "Jim Nesta") and Michael Aigner (Director, National Accounts); Sun's Susan Knoblauch (Sr. Manager of Sales); Aurobindo's Robert Cunard (CEO); and Apotex's Beth Hamilton (VP of Marketing).  Daniel Lukasiewicz, then employed by Zydus (and who would later join Heritage and assist in orchestrating various pricing agreements there), also attended. Sales representatives from Actavis, Dr. Reddy's, Glenmark, Par, Perrigo, Sandoz, Taro, Teva and West-Ward also attended the Expo.  As discussed below, at least Sather used this meeting as an opportunity to solidify agreements on pricing for multiple drugs.

303.    As was the case in prior months, price increases accompanied these inter-Defendant contacts.  By the end of the summer of 2013, Defendants Actavis and Mylan began to implement price increases for Verapamil capsules.  Defendants Heritage, Lannett, Mylan and Par were in frequent contact with each other and increased their Doxycycline Monohydrate prices.  During the same period, Heritage and Mylan were frequently communicating in order to work out agreements relating to customers and pricing for Doxycycline Hyclate delayed release.

304.    During this time-frame Defendants also increased the prices of various other drugs:  Clomipramine (Mylan, Sandoz, Taro); Divalproex (Dr. Reddy's, Mylan, Par, Zydus); Levothyroxine (Lannett, Mylan, Sandoz); and Pravastatin (Apotex, Glenmark, Sandoz, Teva, Zydus and MDL Defendant Lupin).  Concurrent with these

price increases, Actavis entered the Desonide cream market at the same elevated prices that had already been implemented by Taro and Perrigo. Actavis, Taro and Perrigo maintained their elevated prices of Nystatin cream and ointment during the period, as well.

305.    Defendants remained in frequent contact between October and December of 2013.  In that three-month period, Teva and Heritage exchanged 582 text messages or phone calls with other Defendants.  *See* Tables 3 & 4.  Additionally, all but two Defendants attended at least one trade association meeting in the last quarter of 2013 and thus had ample opportunity to further their conspiratorial plans in person, without leaving an electronic footprint.  *See* Exhibit 1.

306.    Following these communications, Defendants implemented another price increase:  Acetazolamide tablets (Taro, Lannett).  Shortly after meeting at the GPhA Fall Technical Conference at the end of October, Taro and Lannett implemented large, nearly identical and nearly simultaneous price increases for Acetazolamide tablets.

307.    Defendants also raised the prices of two additional drugs:  Benazepril (Mylan, Sandoz) and Digoxin (Lannett, Mylan, Par, West-Ward, and Impax).

308.    Continuing their conspiracy, Teva and Heritage contacted other Defendants by phone or text at least 348 times during the first quarter of 2014.  Teva was involved in the majority of the contacts.  *See* Tables 3 & 4.

309.   These communications were accompanied by many opportunities   for Defendants to meet in person and thereby exchange information without leaving electronic footprints.  Representatives from every U.S. Defendant (except Glenmark) attended at least one trade association meeting during the first quarter of 2014, including the ECRM Retail Pharmacy Conference, which was attended by a number of Defendant personnel directly implicated in anticompetitive communications, from Heritage, Sun, and Apotex.  Representatives from Defendants Actavis, Citron, Dr. Reddy's, Lannett, Mayne, Par, Perrigo, Sandoz, Taro, Teva, West-Ward and Zydus also attended the conference.  *See* Exhibit 1.

310.   Following the price increases at the end of 2013, in January 2014, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.  Executives from Defendants Actavis, Aurobindo, Dr. Reddy's, Lannett and Sun, among others, attended.

311.   During this time-frame (around the first quarter of 2014), Par also joined the Digoxin price and Sandoz joined the Desonide price increase, while Defendants Lannett, Par, Teva and Upsher-Smith imposed another price increase for Baclofen. Teva and Par's increases for Baclofen occurred after Teva and Par communicated at least 34 times during January and February.

312.   Between April and July of 2014, Teva and Heritage had 639 different phone or text contacts with their co-conspirators.  *See* Tables 3 & 4.  Teva, Actavis

and Zydus were involved in almost half of those interactions—speaking or texting

259 times over the course of four months. *See* Table 4. And as Citron prepared to

enter the market for numerous drugs, its contacts with Heritage greatly increased. *See*

Table 3. As discussed below, Heritage's communications involved at least 14 Drugs

at Issue: Acetazolamide, Doxycycline Hyclate, Doxycycline Monohydrate, Fosinopril-

HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide,

Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, and Verapamil.

    313.    Defendants likewise advanced their conspiracy through attendance at (at

least) four trade association meetings between April and July. *See* Exhibit 1. Several

of Defendants' personnel directly implicated in anticompetitive communications

attended at least one of these meetings, including: Heritage's Glazer, Sather and

O'Mara; Mylan's Nesta, Aigner and Jan Bell (Director National Accounts); Lannett's

Sullivan; Sun's Knoblauch; Teva's Patel; Apotex's Hamilton; and Aurobindo's

Cunard. *Id.* As discussed below, Heritage's Sather used the May, 2014, MMCAP

National Member Conference as an opportunity to confirm personally agreements on

pricing for Drugs at Issue with Aurobindo (Fosinopril/HCTZ, Glyburide and

Glyburide/Metformin), Sandoz (Fosinopril-HCTZ), and Lannett (Doxy Mono). Also

during this time, Heritage, Mylan and Mayne co-ordinated Mayne's entry into the

market for Doxycycline Hyclate (delayed release) so as not to erode pricing.

    314.    On June 1-4, 2014, Heritage's O'Mara and Sather, Teva's Patel, Mylan's

Aigner, and Lannett's Sullivan all attended the HDMA Business and Leadership

Conference. Nearly every Defendant had representatives attending this conference. *See* Exhibit 1.  On June 3, while at the conference, Heritage's Sather had dinner and drinks with a number of Heritage's competitors at the Sandbar Restaurant, including personnel from Sandoz, Par, and Lannett—likely Tracy Sullivan. In advance of the dinner, one of the attendees, likely Sather, exchanged text messages with someone at Sandoz, who also was attending the meeting, and invited him to the dinner.

315.    Following these trade association meetings, discussions among competitors picked up.  Between June 3 and 10, 2014, an Aurobindo employee had three phone calls with a Sandoz employee and five phone calls and multiple text messages with Glenmark, likely to discuss pricing on Fosinopril-HCTZ.

316.    On June 16, 2014, a different Glenmark employee called a different Aurobindo employee and they spoke for approximately 20 minutes. As discussed below, these discussions involved pricing agreements for generic drugs.

317.    On August 20, 2014, a Heritage employee exchanged text messages with a Sun employee, which described the pricing agreements reached with Actavis for Glyburide-Metformin and Verapamil.  Notably, Sun did not market or sell either drug at the time of this communication, thus highlighting the industry-wide nature of Defendants' conspiracy, regardless of whether a given Defendant was actually engaged in the manufacture or sale of a particular drug at issue, in this case, Glyburide-Metformin and Verapamil.  Sun needed to be kept apprised of drug-specific agreements between other Defendant co-conspirators—even for drugs Sun

did not sell—because the efforts of all Defendants to inflate the prices of all Drugs at Issue were inter-related.

318.   Days later, the 2014 NACDS Total Store Expo, which was held in Boston from August 23-26, was attended by representatives from every U.S. Defendant.  A number of individuals directly implicated in anticompetitive communications attended, including from Heritage (Glazer, Malek, O'Mara, Edelson and Sather), Lannett (Sullivan), Mylan (Aigner and Nesta), Sun (Knoblauch), Teva (Patel), Apotex (Hamilton), Aurobindo (Cunard) and Mayne (Gloria Peluso-Schmid).

319.   Following these meetings and communications, Heritage began to announce price increases.  By July, Heritage had announced increases for Fosinopril-HCTZ, Glyburide, Acetazolamide (capsules), Glipizide-Metformin, Glyburide-Metformin, Leflunomide, Nystatin (tablets), Paromomycin, Theophylline and Verapamil (tablets).

320.   Thereafter, multiple Defendants either led or followed price increases for at least five Drugs at Issue:  Fosinopril-HCTZ (Aurobindo, Citron, Heritage, Glenmark, Sandoz); Leflunomide (Apotex, Heritage, Teva); Nystatin tablets (Heritage, Sun); Paromomycin (Heritage, Sun); and Theophylline (Heritage, Teva).  Sandoz re-joined the Nystatin cream market at the elevated prices that already had been imposed by Actavis, Par, Perrigo, and Taro.

321.   In furtherance of their conspiracy, Defendants also increased the prices of other Drugs at Issue during the Relevant Period, including, for example:

Amitriptyline (Mylan, Par, Sandoz); Clobetasol (Actavis, Perrigo, Sandoz, Taro and Wockhardt); Econazole (Perrigo, Taro); Fluocinonide (Actavis, Teva, and Taro); Lidocaine-Prilocaine (Sandoz); and Ursodiol (Actavis, Lannett).  In addition, Lannett joined the Baclofen price increase during this period.

322.    For example, the market for Amitriptyline is mature.  It is not an innovative product and has been commercially available in this country since 1961.  Further, Amitriptiline has been commercially available in the United States in a generic form for decades.

323.    Throughout 2013 and most of the first half of 2014, Amitriptyline tablets sold for pennies per 100 count package – for example, the price of a 100-count package of 100 mg pills was approximately ten cents per pill.  In approximately mid-2014, Mylan, Par, and Sandoz co-ordinated on a price increase, jointly raising the price to over $1 for the same pills, an increase of approximately 1,000%.  Similarly, the list price for a 1,000 count package of 50 mg pills was approximately five cents per pill, and also went up ten-fold in price, to approximately 50 cents per pill.

324.    Sandoz's date of increase was May 23, 2014; Myalan's was 16 July, 2014; and Par's was September 26, 2014.

325.    No product shortages or other market changes can explain Defendants' abrupt and nearly identical price increases.

326.    The elevated prices of Amitriptyline that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and caused Plaintiffs to pay more than

they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

327.   The unlawful agreement between Mylan, Par, and Sandoz regarding Amitriptyline was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

328.   Further, the specific drug agreements almost always involved overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" rules of their cartel.

329.   To pick just a few examples from the interlocking, overlapping web of collusion formed by Defendants:  Teva, Taro and Wockhardt discussed amongst themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for Ketoconazole Cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ; and Teva, Mylan and Par all communicated with each other in the spring of 2014 concerning the market for Budesonide DR Capsules.

330.   These were not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling nature of Defendants' cartel.

331.   Further, Defendants communicated not only verbally, but also non-verbally, through, for example, drug prices, similar to bidding systems in card games

such as Bridge.[25]  Particularly because of the typically mature and highly price-sensitive nature of the commoditized markets for generic pharmaceuticals, every time Defendants charged a customer an elevated contract price based on this overarching conspiracy, they were signalling to their co-conspirators their own commitment to abiding by the rules of the conspiracy.

332.    Thus, overt acts in furtherance of Defendants' cartel continue through the present day, and will continue into the future indefinitely unless enjoined by this Court.

333.    As discussed in context *infra*, in the allegations focusing on, *inter alia*, Haloperidol and Trifluoperazine, there is an explicit, textual example of Defendants' recognition of the signalling aspect of sales prices was given by O.K., a senior executive responsible for business planning at Sandoz.  In an e-mail sent on October 15, 2013, he noted "We might be sending the wrong signal to Mylan by not following promptly [on price increases] . . ."  O.K. wrote this because Defendants regularly transmitted sensitive pricing information to each other and used it as a means of signalling their commitment to maintain cartel pricing, rather than cheating on price to try to gain market share.

334.    While it may be that not every Defendant had an explicitly verbal, textual statement of this understanding of pricing as a means of communication – which is an

---

[25] *See generally*, *e.g.*, Max Hardy, *Standard Bridge Bidding for the 21st Century*, MCA Netpub, Inc. (Oct., 2001).

extraordinary concession in light of the illegal conduct being undertaken – every member of Defendants' cartel shared that same understanding.

335. Defendants' frequent contacts and price increases continued in 2015. Defendants implemented additional price increases for Leflunomide and Verapamil capsules. Defendants also increased the prices of Propranolol tablets. Prices for the Drugs at Issue remained elevated above competitive levels thereafter.

336. The price increases implemented by Defendants during the Relevant Period were not the result of a free market. Rather, these price increases occurred because Defendants engaged in an overarching conspiracy to fix, raise, maintain, and/or stabilize prices of the Drugs at Issue. As a result of Defendants' conspiracy, Plaintiffs paid more for Drugs at Issue than it otherwise would have and was harmed by Defendants' anticompetitive conduct.

## X. ADDITIONAL DETAILS AND EXAMPLES OF, AS PART OF THEIR CARTEL, DEFENDANTS CONTINUING TO CONSPIRE TO FIX PRICES, ALLOCATE MARKETS, AND/OR RIG BIDS FOR THE DRUGS AT ISSUE

337. From at least as early as 2011 until the present, Defendants unlawfully agreed to raise, stabilize, and/or maintain the prices of – and allocate customers and markets for – the Drugs at Issue, which includes all generic drugs made or sold by all Defendants.

338.   Illustrative examples of Defendants' illegal conspiracy includes all formulations and doses of at least the following drugs, many of which have further details set forth elsewhere in this Complaint:

Acetaminophen, Codeine Phosphate

Acetaminophen, Dichloralphenazone, Isometheptene Mucate

Acetaminophen, Hydrocodone Bitartrate

Acetaminophen, Oxycodone Hydrochloride

Acetazolamide ER capsules ("caps")

Acetazolamide tablets ("tabs")

Acetic Acid, Hydrocortisone

Acyclovir tabs

Adapalene Cream

Adapalene Gel

Albuterol Sulfate

Albuterol Sulfate, Ipratropium Bromide

Albuterol

Alclomestasone Dipropionate Cream

Alclomestasone Dipropionate Ointment

Allopurinol Tabs

Amantadine HCL

Amikacin Sulfate injection

Amikacin Sulfate

Amiloride hydrochloride ("HCL")/hydrochlorothiazide ("HCTZ") tabs

Amiodarone Hydrochloride,

Amitriptyline Hydrochloride

Amitriptyline Hydrochloride, Chlordiazepoxide Hydrochloride

Amitriptyline Hydrochloride, Perphenazine

Amitriptyline tabs

Ammonium Lactate Cream

Ammonium Lactate Lotion

Amoxicillin

Amoxicillin, Clavulanate potassium chew tabs

Amphetamine-Dextroamphetamine ER caps

Amphetamine-Dextroamphetamine IR caps

Aspirin

Aspirin, Butalbital, Caffeine

Aspirin, Caffeine, Orphenadrine Citrate

Aspirin, Carisoprodol

Aspirin, Dipyridamole

Atenolol

Atenolol Chlorthalidone

Atorvastatin Calcium

Atropine Sulfate, Diphenoxylate Hydrochloride

Atropine Sulfate, Hyoscyamine Sulfate, Phenobarbital, Scopolamine

Hydrobromide

Atrophine Sulphate

Azatioprine

Azithromycin oral suspension

Baclofen tabs

Balsalazide Disodium

Benazepril-HCTZ tabs

Benzoyl Peroxide

Benzoyl Peroxide, Clindamycin Phosphate

Benztropine Mesylate

Betamethasone dipropionate, Calcipotriene

Betamethasone dipropionate augmented lotion

Betamethasone dipropionate-Clotrimazole cream

Betamethasone dipropionate-Clotrimazole lotion

Betamethasone dipropionate cream

Betamethasone dipropionate lotion

Betamethasone dipropionate ointment

Betamethasone valerate cream

Betamethasone valerate Lotion

Betamethasone valerate ointment

Bethanechol chloride ("CL") tabs

Bimatoprost

Bisoprolol Fumarate

Brimonidine Tartate

Bromocriptine Mesylate Tablets

Budesonide DR caps

Budesonide inhalation suspension

Bumetanide tabs

Buprenorphine Naloxone

Buprenorphine sublingual tabs

Bupropion HCL tabs

Buspirone HCL tabs

Cabergoline tabs

Calcipotriene Betamethasone Dipropionate Ointment

Calcipotriene Solution

Calitonin (salmon)

Calcium Acetate

Candesartan Cilexetil

Candesartan Cilexetil, Hydrochlorothiazide

Capecitabine tabs

Captopril

Captopril, Hydrochlorotriazide

Carbamazepine tabs

Carbamazepine chewable tabs

Carbamazepine ER tabs

Carbidopa/Levodopa tabs

Carisoprodol tabs (350 mg)

Cefaclor ER tabs

Cefaclor Monohydrate

Cefadroxil Tabs

Cefdinir caps

Cefdinir oral suspension

Cefpodoxime Proxetil Oral Suspension

Cefpodoxime Proxetil Tablets

Cefprozil tabs

Ceftriaxone Sodium

Cefuroxime Axetil

Celecoxib caps

Cephalexin Monohyrate

Cephalexin oral suspension

Cephalexin Tablets

Cetirizine Hydrocholoride

Chlorpromazine HCL Tablets

Chlorthalidone

Chlorzoxazone

Cholestyramine powder

Cholestyramine oral solid

Ciclopirox Cream

Ciclopirox Olamine Topical

Ciclopirox Shampoo

Ciclopirox Solution

Cidofovir

Cimetidine Hydrochloride

Cimetidine tabs

Ciprofloxacin Dextrose

Ciprofloxacin HCL tabs

Citalpram Hydrobromide

Clarithromycin ER tabs

Clemastine fumarate tabs

Clemastine fumarate oral liquid

Clindamycin Hydrochloride

Clindamycin Phosphate, Dextrose

Clindamycin Phosphate Cream

Clindamycin Phosphate Gel

Clindamycin Phosphate Lotion

Clindamycin Phosphate Solution

Clobetasol Propionate cream

Clobetasol Propionate emollient cream

Clobetasol Propionate gel

Clobetasol Propionate ointment

Clobetasol Propionate topical solution

Clomipramine caps

Clomipramine Hydrochloride

Clonidine Hydrochloride

Clonidine-TTS patch

Clotrimazole topical solution

Clotrimazole 1% Cream

Codeine Phosphate, Guaifenesin

Clochicine

Colestiptol Hydrochloride

Cyclosporine

Clyclosporine, Modified

Cyproheptadine HCL tabs

Danazol caps

Dantrolene Sodium

Demeclocycline Hydrochloride

Desipramine Hydrochloride

Desmopressin acetate tabs

Desogestrel-Ethinylestradiol tabs

Desogestrel-Ethinylestradiol, Inert

Desonide cream

Desonide Lotion

Desonide ointment

Desoximestasone ointment

Dexamethasone, Neomycin, Polymyxin

Dexamethasone, Tobramycin

Dexmethylphenidate HCL ER caps

Dextroamphetamine sulphate caps

Dextroamphetamine sulphate tabs

Dextroamphetamine-amphetimine caps

Dextroamphetamine-amphetimine tabs

Diclofenac potassium tabs

Diclofenac Sodium

Dicloxacillin sodium caps

Diflorasone Diacetate

Diflunisal tabs

Digoxin tabs

Dihydroergotamine Mesylate

Diltiazem HCL tabs

Diphenoxylate Atropine Tablets

Diphenoxylate Atropine HCL

Dipyridamole

Disopyramide phosphate caps

Disulfiram tabs

Divalproex ER tabs

Divalproex Sodium

Doxazosin mesylate tabs

Doxepin Hydrochloride

Doxycycline hyclate caps

Doxycycline hyclate tabs

Doxycycline hyclate DR tabs

Doxycycline monohydrate tabs

Drospirenone/ethinyl estradiol tabs

Drospirenone/ethinyl estradiol tabs, Inert

Econazole Topical

Econazole Nitrate cream

Enalapril maleate, Hydrochlorotriazide

Enalapril maleate tabs

Entecavir tabs

Epinephrine

Epitol tabs

Eplerenone tabs

Erythromycin Base/Ethyl Alcohol Solution

Estazolam tabs

Esterified Estrogens, Methyltestosterone

Estradiol tabs

Estropipate

Eszopiclone tabs

Ethambutol HCL Tablets

Ethinyl Estradiol, Norelgestromin

Ethinyl estradiol/levonorgestrel tabs

Ethosuximide caps

Ethosuximide oral solution

Etodolac Capsules

Etodolac tabs

Etodolac ER tabs

Exemestane

Famotidine

Fenofibrate tabs

Fenofibrate, Micronized

Fentanyl

Fluconazole tabs

Flunisolide

Fluocinolone acetonide cream

Fluocinolone acetonide ointment

Fluocinolone acetonide solution

Fluocinonide 1% Cream

Fluocinonide Acetonide Solution

Fluocinonide cream

Fluocinonide emollient cream

Fluocinonide ointment

Fluocinonide gel

Flourouracil

Fluoxetine HCL tabs

Fluphenazine Hydrochloride

Flurbiprofen Sodium

Flurbiprofen tabs

Flutamide caps

Fluticasone Propionate Lotion

Fluvastatin sodium caps

Folic Acid

Fosinopril-HCTZ tabs

Frovatriptan

Gabapentin tabs

Gentamicin Sulfate

Glimepiride tabs

Glipizide-metformin tabs

Glyburide tabs

Glyburide-metformin tabs

Glyburide Micronized

Glycopyrrolate

Griseofulvin Mircrosize tablets

Griseofulvin suspension

Griseofulvin, Ultramicrocrystalline

Halobetasol Propionate Cream

Halobetasol Propionate Ointment

Haloperidol tabs

Heparin Sodium (Porcine)

Homatropine Methylbromide Hydrocondone Bitartrate

Hydralazine

Hydralazine Hydrochloride

Hydrochlorothiazide, Moexipril Hydrochloride

Hydrochlorothiazide, Propranolol Hydrochloride

Hydrochlorothiazide, Spironolactone

Hydrochlorothiazide, Triamterene

Hydrochlorothiazide, Valsartan

Hydrocodone-acetaminophen Suppositories

Hydrocodone-acetaminophen Tabs

Hydrocortisone Acetate Suppositories

Hydrocortisone Acetate, Pramoxine Hydrochloride

Hydrocortisone Butyrate

Hydrocortisone valerate cream

Hydrocortisone, Neomycin, Polymyxin B

Hydroquinone

Hydroxychloroquine Sulfate

Hydroxyurea caps

Hydroxyzine Hydrochloride

Hydroxyzine pamoate caps

Hyoscyamine Sulfate

Ibuprofen

Imiquimod cream

Indapamide

Ipratropium Bromide

Irbesartan tabs

Isoniazid tabs

Isosorbide dinitrate tabs (5, 10, 20, 30 mg)

Isosorbide mononitrate IR tabs (30, 120 mg)

Isotretinoin caps

Ketoconazole cream

Ketoconazole tabs

Ketoprofen caps

Ketorolac tromethamine tabs

Labetalol HCL tabs

Lactulose

Lamivudine/Zidovudine (generic Combivir) tabs

Lamotrigine ER tabs

Lansoprazole

Latanoprost ophthalic liquid eye

Leflunomide tabs

Levalbuterol Hydrochloride

Levocetirizine Dihdrydochloride

Levofloxacin

Levothyroxine Sodium

Levothyroxine Sodium tabs

Lidocaine HCL ointment

Lidocaine-Prilocaine cream

Lisinopril

Loperamide HCL caps

Malathion

Meclizine Hydrochloride

Medroxyprogesterone Acetate Injectable

Medroxyprogesterone Acetate tabs

Meprobamate tabs

Mesalaminem Suppository

Metaxalone

Metformin (f) ER

Metformin Hydrochloride

Metformin Hydrochloride, Pioglitazone Hydrochloride

Methadone HCL

Methazolamide Tablets

Methenamine Hippurate

Methimazole tabs (5, 10 mg)

Methotrexate sodium tabs

Methyldopa tabs

Methylergonovine Maleate

Methylphenidate

Methylphenidate HCL Tablets

Methylphenidate HCL ER Tablets

Methylprednisolone tabs (4 mg)

Metoprolol succinate ER tabs

Metronidazole .75%

Metronidazole 1% Gel

Metronidazole Cream and Lotion

Mexiletine Hydrochloride

Midazolam Hydrochloride

Midodrine Hydrochloride

Minocycline Hydrochloride

Mirtazapine

Misoprostol

Modafinil tabs

Moexipril HCL tabs

Moexipril HCL/HCTZ tabs

Mometasone Furoate Cream

Mometasone Furoate Ointment

Mometasone Furoate Solution

Montelukast oral granules

Montelukast Sodium

Morphine Sulfate

Morphine, Anhydrous

Mupirocin Calcium

Mycophenolate Mofetil

Nabumetone tabs

Nadolol tabs

Nafcillin Injectable Vials

Nafcillin Sodium

Naloxone Hydrochloride, Pentazocine Hydrochloride

Naproxen Sodium

Nefazodone Hydrochloride

Neomycin Sulfate

Neomycin-polymixin-hydrocortisone solution

Niacin ER tabs

Nicardipine Hydrochloride

Nifedipine

Nimodipine caps

Nitrofurantoin macrocrystal caps

Nitroglycerin

Nizatidine

Norethindrone acetate tabs

Norethindrone/ethinyl estradiol tabs

Norethindrone/ethinyl estradiol tabs, Ferrous Fumarate

Norgestrel/Ethinyl Estradiol

Nortriptyline HCL caps

Nystatin cream

Nystatin ointment

Nystatin tabs

Nystatin-triamcinolone Acetonide

Nystatin-triamcinolone Acetonide cream

Nystatin-triamcinolone Acetonide ointment

Ofloxacin

Olmesartan Medoxomil

Olopatadine Hydrochloride

Omega-3-acid ethyl esters caps

Omeprazole-sodium bicarbonate caps

Ondansetron

Ondansetron Hydrochloride

Oxacillin Sodium (& Nafcillin Injectable Vials, also above)

Oxaprozin tabs

Oxazepam

Oxcarbazepine

Oxybutynin CL tabs

Oxybutynin HCL tabs

Oxycodone-acetaminophen tabs (5-325, 7.5-325 & 10-325 mg)

Oxycodone HCL tabs (15 mg & 30 mg) ß Par letter

Oxycodone HCL oral solution

Pantoprazole Sodium

Paricalcitol caps

Paricalcitol tabs

Paromomycin caps

Paromomycin Sulfate

Penicillin G Potassium

Penicillin V potassium tabs

Penicillin V potassium solution

Pentoxifylline tabs

Permethrin

Perindopril Erbumine

Perphenazine tabs (5-325, 7.5-325 & 10-325 mg)

Phenazopyridine Hydrochloride

Phenobarbital

Phenytoin Sodium ER Capsules

Pilocarpine HCL

Pindolol

Pioglitazone-Metformin HCL tabs

Piroxicam caps

Polyethylene Glycol 3350

Polyethylene Glycol 3350, Potassium Chloride, Sodium Bicarbonate, Sodium

Chloride

Potassium chloride ER tabs

Potassium Citrate

Pravastatin tabs

Pravastatin Sodium

Prazosin HCL caps

Prednisolone Acetate

Prednisolone Sodium Phosphate

Prednisone tabs

Probenecid

Prochlorperazine tabs

Prochlorperazine Maleate Suppositories

Progesterone tabs

Promethazine HCL Suppositories

Propranolol Hydrochloride

Propranolol tabs

Propylthiouracil

Quinapril Hydrochloride

Raloxifene HCL tabs

Ramipril

Ranitidine HCL tabs

Ribavirin

Rifampin

Riluzole

Rosuvastatin Calcium

Salsalate

Scopolamine

Selegiline Hydrochloride

Selenium Solfide

Sertraline Hydrochloride

Silver Sulfadiazine

Simvastatin

Sodium Chloride

Sodium Floride

Sodium Polystyrene Sulfonate

Sotalol HCL tabs

Spironolactone HCTZ

Sulfacetamide  Sodium

Sulfacetamide Sodium, Sulfur

Sulfamethoxazole, Trimethoprim

Sulfasalzine

Sumatriptan autoinjector

Tacrolimus Ointment

Tamoxifen citrate tabs

Temozolomide caps

Terconazole Cream

Testosterone Cypionate

Tetracycline Hydrochloride

Theophylline, Anhydrous

Theophylline ER tabs

Thioridazine Hydrochloride

Thiothixene

Timolol maleate ophthalmic gel-forming solution

Tizanidine HCL tabs

Tobramycin inhalation solution

Tobramycin dexamethasone ophthalmic liquid

Tolmetin sodium caps

Tolterodine Tartrate ER caps

Tolterodine tartrate caps

Topiramate sprinkle caps

Trazodone HCL tabs

Tretinoin

Triamcinolone acetonide cream

Triamcinolone acetonide ointment

Triamcinolone Acetonide Paste

Triamterene HCTZ

Triazolam

Trifluoperazine HCL tabs

Tropicamide

Ursodiol HCL caps

Valacyclovir Hydrochloride

Valganciclovir tabs

Valganciclovir Tablets

Valproic Acid

Valsartan-HCTZ tabs

Vancomycin HCL caps

Venlafaxine Hydrochloridide

Verapamil HCL

Verapamil DR caps

Verapamil ER caps

Warfarin sodium tabs

Zoledronic Acid injection.

Zonisamide

339.    Additional details relating to some of the Drugs at Issue follows.  While every effort has been made to discuss Defendants products separately, the overlapping web of relationships among drugs and cartel members in this case make that impossible.  As a result, a number of drugs are discussed in more than one part of the complaint, as they were part of conspiratorial discussions among different Defendants.

### A.    Nystatin

340.    Generic Nystatin is used to fight fungal infections.  It is produced in multiple formulations, including an external cream, an external ointment, and a tablet.

341.    Nystatin was first isolated from the *Streptomyces noursei* bacterium by by Elizabeth Lee Hazen and Rachel Fuller Brown in 1950 and named by its discoverers for the New York State Department of Health.

342. The market for generic Nystatin is mature.  Nystatin has been commercially available in the United States in a generic form for decades.

343. As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Nystatin ("Nystatin") at least as follows:

344. During the Relevant Period, Defendants Actavis, Par, Perrigo, Sandoz and Taro dominated the market for Nystatin external cream, while Defendants Actavis, Perrigo and Sandoz dominated the market for Nystatin ointment, and Teva, Heritage, and Sun (through Mutual) dominated the market for Nystatin tablets.

### 1.    Nystatin External Cream

345. In the second half of 2011, Taro, Perrigo, Par, and Actavis all raised the list prices of Nystatin cream.  Taro and Perrigo increased their prices in very close succession in the late spring of 2011.  Par and Actavis followed the price increase in August and November of that year, respectively.  Sandoz joined the price increase when it re-entered the market in 2013.

346. As late as 2009, Sandoz enjoyed approximately a 50% market share for Nystatin cream; but by the following summer (of 2010), Sandoz was effectively out of the market, and Taro was left with almost the entire market.  In 2009, Taro had approximately 40%, Perrigo had approximately 7% and Par and Actavis shared the remaining 3%.  Sandoz's market share declined through 2009 and into 2010; and Actavis and Par also were effectively out of the market.  While *de minimis* sales by

Sandoz, Actavis, and Par continued, each had a market share of less than 1% by the spring of 2011; Perrigo had approximately a 4% share; and by May of that year, Taro had captured 96% of the Nystatin cream market.

347.    In June of 2010, Taro initiated an enormous price increase:  over 600%. Yet rather than using this opportunity to compete in order to gain market share, Perrigo – enjoying, as mentioned above, barely 4% of the market – followed almost immediately Taro's increase and raised its own prices to nearly identical levels. Perrigo ramped up production and gained some market share over the next two years, but— as contemplated by the overarching "fair share" agreement—market prices remained elevated and stable.

348.    Further, there was no shortage of the raw materials or API in Nystatin cream, which is evidenced in part by Perrigo's increase in production.  Instead, this six-fold price increase was a direct result of the conspiracy at issue in this Complaint.

349.    In August, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to forego price-competition. Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

350.    In November, Actavis ramped up production of Nystatin cream and re-joined the market. It, too, immediately elevated its prices to match that of Taro,

Perrigo and Par, also choosing to forgo price competition and the prospect of winning a larger share of the market.

351.   Even a fourth entrant into the Nystatin cream market did not cause prices to erode. Defendants' agreement was working and held firm in the face of the entrants of multiple-co-conspirators into the marketplace.

352.   Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market. Like Perrigo, Par and Actavis, rather than compete on price in order to regain lost market share, Sandoz sold its Nystatin cream at the same price as its co-conspirators. The agreement was very much in effect:  with even a fifth seller in the market, prices remained artificially inflated to the same cartel price.

353.   As depicted in the graph on the next page, Defendants' list price increases for Nystatin external cream were virtually identical, and once in place the prices remained stable and elevated thereafter:

**Figure 3**



354.    It is indicative of the unlawfully collusive and conspiratorial nature Defendants' conduct that in 2009, prior to implementation of their anticompetitive scheme, Defendants had **_different_** prices for Nystatin cream; but once their anticompetitive pricing was in effect, their pricing was the same.

355.    At the start of 2009, prior to Defendants' implementation of their anticompetitive scheme, Defendants Sandoz, Taro, and Actavis both sold Nystatin cream for approximately 0.1 $/unit, while Defendant Par sold Nystatin at double that price (but only 10 cents per unit more), for $0.2/unit.  But once Defendants' conspiracy kicked in, **_all_** of the Defendants sold Nystatin price for $0.7/unit, merely tripling the cost of the product for Defendant Par, while Sandoz's, Actavis's, and Taro's cream septupled in price.

356.    Defendant Perrigo started at the same $0.1/unit price as Sandoz, Actavis, and Taro, but in early 2009, doubled its price to match Par – and then, in

early 2011, more than tripled that higher price to reach the same elevated level as its competitors.

357. Further, the graph shows that after a long period of relatively low and stable pricing for Nystatin external cream, Defendants implemented large, abrupt and nearly uniform price increases. The AWP prices for Defendants' products also were elevated to essentially identical levels.

358. AWP is useful as, *inter alia*, a reliable measure of relative cost. In other words, while Figure 3 may not reflect the true economic cost of Nystatin cream in absolute terms, it does reflect the movement of the underlying true economic cost to purchasers and end-reimbursers, such as Plaintiffs, of Nystatin cream over time.

359. As discussed above, no product shortages or other market changes can explain Defendants' price increases. In a competitive generic pharmaceutical market, prices decline as the number of sellers increases. Here, the elevated and stable pricing of Nystatin cream even as multiple sellers joined the market is consistent with anticompetitive conduct and inconsistent with competition.

360. Throughout this period, Defendants had numerous opportunities to co-ordinate their pricing for Nystatin cream. For example, Defendants had an opportunity to discuss pricing at the ECRM Retail Pharmacy Conference in March of 2011, which was attended by representatives from Actavis, Par, Perrigo, Sandoz, and Taro. *See* Exhibit 1.

361.    The next month, in April, right before the price increases began, all Defendant manufacturers of Nystatin cream again gathered at the NACDS Annual Meeting.  The Nystatin cream manufacturers continued to meet at trade shows thereafter.

362.    For example, leading into and following Sandoz's price increase for Nystatin external cream, Sandoz had multiple opportunities to meet with other Defendants.  In April 2013, Sandoz was joined by Actavis, Par, Perrigo and Taro at the NACDS Annual Meeting.  Then, in June of 2013, representatives from these same companies attended the GPhA/FDA CMC Workshop in Bethesda, Maryland.  In August, all five Nystatin cream manufacturers converged again at the NACDS Total Expo in Las Vegas. These meetings were also attended by many other Defendants.

363.    No shortages or other market features can explain Defendants' elevated pricing for Nystatin during the Relevant Period.

364.    The elevated prices of Nystatin cream that resulted from Defendants' anticompetitive conduct have injured Plaintiffs, caused Plaintiffs to pay more for Nystatin cream than it would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

365.    The unlawful agreement between Actavis, Par, Perrigo, Sandoz and Taro regarding Nystatin cream was part of Defendants' overarching conspiracy to restrain

trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### 2.  Nystatin External Ointment

366.   Defendants' conduct with respect to Nystatin external ointment followed the same pattern as their conduct with respect to Nystatin external cream. In 2009, Sandoz had approximately 75% of the market, while Perrigo had 20% and Actavis had the remaining 5%.  From that point through the summer of 2011, Actavis and Sandoz reduced production until they were effectively out of the market. By the summer of 2010, Actavis had approximately a 0% market share, though *de minimis* sales appear to have continued, and by the summer of 2011, Sandoz's share the market was reduced to approximately 5%, down from 75% two years earlier.

367.   In June 2011, after Sandoz and Actavis had all but ceded the Nystatin ointment market, Perrigo implemented a large price increase—more than 300%.

368.   Five months later, Actavis ramped up production of Nystatin ointment. Rather than undercut Perrigo's elevated price in order to gain market share, Actavis hiked its list prices to nearly identical levels as Perrigo.  As part of the overarching "fair share" agreement and conspiracy among Defendants (and in contrast to the normal behavior in a competitive marketplace), the list prices and AWP price for Nystatin ointment remained virtually unchanged, even with the addition of a new seller in the marketplace.

369.    In the summer of 2012, this pattern repeated itself.  Sandoz ramped up its production of Nystatin ointment in June.  But rather than compete to regain its lost market share, Sandoz raised its list prices to nearly identical levels as Perrigo and Actavis.  Even with a third market participant prices remained the same, just as envisioned by Defendants' agreement.

370.    As depicted in the graph below, Defendants' list price increases for Nystatin ointment were virtually identical, and once in place, the prices remained stable and elevated:

**Figure 4**



Nystatin External Ointment: WAC per Unit

371.    As with Figure 3 (Nystatin cream), Figure 4 (Nystatin ointment) shows Defendants raising the price of this product by ***different amounts and different multiples on a slightly-staggered schedule,*** but nevertheless quickly went to the

same final price and stayed there for years, which is consistent with collusion and inconsistent with the functioning of a competitive market.

372.    The graph shows that after a long period of relatively low and stable pricing for Nystatin ointment, Defendants implemented abrupt and virtually uniform price increases of approximately **300%** for Defendant Perrigo and by approximately **700%** for Defendants Actavis and Sandoz/Fougera.  AWP prices for these products also were elevated to nearly identical levels.

373.    No product shortages or other market changes can explain Defendants' price increases. The pricing conduct here is not consistent with competitive behavior. As multiple sellers enter the market, economic theory predicts that prices should decline. Yet, Nystatin ointment prices remained unchanged, which suggests an anticompetitive agreement among Defendants.

374.    Again, Defendants had the opportunity to discuss pricing of Nystatin external ointment at numerous industry events during the relevant period.  For example, in addition to other meetings, all Defendant manufacturers of Nystatin ointment attended the ECRM Retail Pharmacy Conferences and the NACDS Annual Meetings in 2011 and 2012.  *See* Exhibit 1.

375.    No shortages or other market features can explain Defendants' elevated pricing for Nystatin ointment during the Relevant Period.

376.    The elevated prices of Nystatin ointment that resulted from Defendants' anticompetitive conduct have injured Plaintiffs, caused Plaintiffs to pay more than

they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

377.    The unlawful agreement between Actavis, Perrigo and Sandoz regarding Nystatin ointment was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### 3.    Nystatin Tablets

378.    In 2010 and 2011, the Nystatin oral tablet market was split between Teva and Sun.  Teva held approximately 60% of the market, while Sun held 40%.  During that time, Teva and Sun had nearly identical list prices for their Nystatin tablets.  Sun marketed and sold Nystatin tablets during the relevant period at least in part through its subsidiary, Mutual.

379.    In the summer of 2012, Heritage entered the market.  Rather than price its Nystatin tablets below that of the incumbent sellers, Heritage identically matched the list prices of Teva and Sun, consistent with the "fair share" agreement between them.

380.    As Heritage ramped up production, it reached out to Teva and Sun, and in April of 2013, Sun, Heritage, and Teva began discussing pricing for Nystatin tablets. By this point in time, Sun had accumulated a larger share of the market. Defendants therefore devised a plan to reallocate the shares:  Sun would implement a

large price increase.  After Teva and Heritage obtained their "fair share" of the market, they would join Sun's price increase.

381.    On April 15, 2013, Defendants put their plan into action: Sun more than doubled its price for Nystatin tablets.  Sun, Teva, and Heritage had ongoing communications before, during, and after this increase. The day after Sun increased its Nystatin prices, Sun Sr. Sales Manager Knoblauch called Heritage's NAM Sather and they spoke for approximately 40 minutes.

382.    Knoblauch and Sather regularly communicated throughout the summer of 2013.  For example, both Sather and Knoblauch attended the NACDS Total Store Expo in August 2013.  This trade association meeting, which also was attended by representatives from most U.S. Defendants except Mayne, provided an opportunity to meet in person and exchange competitive information.  *See* Exhibit 1.

383.    In June of 2013, Teva began internally discussing price increases for Nystatin tablets, contemplating when would be the appropriate time to join Sun's elevated prices.  But Teva needed to co-ordinate with Heritage.  Accordingly, on July 9, 2013, Teva's Patel called Heritage's Malek and they spoke for approximately 21 minutes.  Malek knew Patel from her previous work at AmerisourceBergen. They spoke throughout July—with a nearly 10-minute call on July 23 and two calls on July 30. The second call on July 30 lasted almost a quarter of an hour.

384.    While Heritage's Malek was speaking with Patel at Teva, Heritage remained in contact with Sun. On July 30—the same day Malek spoke with Teva's

Patel twice—Malek also spoke to Sun, for approximately 11 minutes.

385.    As these conversations continued, in late July of 2013, Teva placed Nystatin tablets on its list of potential price increases.

386.    Similarly, throughout the next month (August, 2013), Malek sent internal Heritage e-mails discussing drugs targeted for a price increase.  Nystatin tablets were identified as one of those drugs.

387.    However, discussions between Heritage and Teva about a Nystatin price increase were temporarily tabled when Teva's Patel went on maternity leave on August 12, 2013.

388.    On February 4, 2014, Teva's Patel was back from maternity leave and contacted Heritage's Malek.  Malek returned her call the next day and the two spoke for more than an hour.  They discussed a price increase for at least the drugs Nystatin and Theophylline.  Teva had been considering price increases for both drugs since early 2014.

389.    Three days after that, on February 7, an unidentified employee of either Heritage or Teva created a spreadsheet identifying Nystatin and Theophylline as candidates for price increases.  Heritage's Malek and Teva's Patel continued discussing the possibility of such increases.

390.    Throughout February and March of 2014, Heritage's Malek and Teva's Patel had a series of phone calls discussing price increases for multiple drugs, including at least the pricing of Nystatin and Theophylline.

391. Following these discussions, Teva implemented a price increase for Nystatin tablets with an effective date of April 4, 2014. The increase more than doubled Teva's list price to a price nearly identical to Sun's. Concurrent with this increase, Teva also implemented price increases for Theophylline.

392. The early success in co-ordinating with Sun and Teva on Nystatin further encouraged Malek. During the week of April 14, 2014, he met with two Heritage employees and asked them to start analyzing the impact of price increases for numerous generic drugs, including at least thirteen Drugs at Issue: Acetazolamide, Doxycycline Monohydrate, Fosinopril-HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline and Verapamil.

393. In another example of the wide-ranging nature of Defendants' cartel agreement, where co-operation on one drug product was rewarded with co-operation on unrelated products (and, conversely, defection from the cartel's "rules of the road" on one product was punished with price-cuts on unrelated products), Heritage's Malek discussed all of this with Patel at Teva before introducing these market-wide price increases to the rest of his sales team. For example, on April 15, 2014, Malek had a 17-minute phone conversation with Patel, discussing at least seven different Drugs at Issue: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline.

394. As Malek and Patel had already agreed in February, Teva would lead the

price increases for Nystatin and Theophylline.

395.    During their conversation, Malek and Patel agreed that if Heritage increased prices for the other five Drugs at Issue—Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, and Leflunomide—Teva would increase its prices for these drugs, or at a minimum, would not offer lower prices to any of Heritage's customers.

396.    Heritage's Malek and Teva's Patel spoke several times over the next several months to confirm their agreements on Nystatin and other drugs. Malek also kept Patel updated on the progress of Heritage's proposed price increases.

397.    And, in addition to Heritage and Teva, these seven Drugs at Issue also were marketed and sold during the Relevant Period by Defendants Actavis, Apotex, Aurobindo, Citron, Mylan, Sun and Zydus, each of which was brought into the relevant drug-specific agreements. This agreement by multiple manufacturers across numerous drugs was typical of the overarching conspiracy among all Defendants. As demonstrated in the *quid pro quo* arrangements between Heritage and Teva, the various drug-specific agreements were interrelated and part of an overarching agreement to eliminate competition for the Drugs at Issue.

398.    On April 22, 2014, Heritage's Malek held a teleconference with his sales team. On the call, Malek dictated a price increase strategy for the 13 Drugs at Issue identified above to Heritage's NAM's. Prior to the conference call, Malek circulated a spreadsheet to his sales team, which identified each drug slated for a price increase,

the competitors for each drug, and their respective market shares.

399.   This call was the start of additional pricing and market allocation discussions among Defendants and helped co-ordinate additional drug-specific agreements.  Members of Heritage's sales team were assigned to specific competitors for whom they had primary, but not exclusive, responsibility for communicating about pricing and market share.  Malek took personal responsibility to communicate with Defendants Teva and Zydus, as well as co-conspirator Ascend.

400.   Anne Sather was assigned to Sun to reaffirm the agreement on Nystatin. Sather also spoke with Sun about Paromomycin and spoke with Actavis to confirm agreements on Glyburide-Metformin and Verapamil and with Lannett to confirm agreements on Doxy Mono.  She also was assigned Actavis and Lannett.  Her Heritage colleagues (Matt Edelson, Daniel Lukasiewicz, and Neal O'Mara), were responsible for pricing discussions with four other Defendants.

401.   On April 22, 2014, the same day Heritage held an internal meeting with its sales team to discuss a number of prices increases, Sather and Sun's Knoblauch spoke for more than 45 minutes and agreed to increase the prices of numerous drugs, including, Nystatin tablets.

402.   With respect to Nystatin, by this time, Sun already had raised its price and Teva had just announced that it was matching that price increase.  Sather and Knoblauch reaffirmed that Heritage, too, would follow the Nystatin price increase.

403.   Sather e-mailed Heritage's Glazer, Malek, Edelson, Rich Smith, and

O'Mara immediately after her conversation with Knoblauch to report the agreements with Sun.  Glazer immediately responded to Sather, instructing her not to put this type of information in writing.  He then contacted her using his cell phone.

404.    During this time-frame, Glazer directed Malek to call G.P. Singh, the President of Sun, to get further confirmation of Sun's pricing intentions. Ultimately, Malek decided not to reach out to Singh, whom he had never met.

405.    Four days later, however, on April 26-29, 2014, Glazer attended the NACDS Annual Meeting where he had the opportunity to meet in person with G.P. Singh from Sun, as well as with representatives from Teva and nearly every other U.S. Defendant.  *See* Exhibit 1.

406.    On or about May 8, Malek requested an update on the status of Sather's negotiations with competitors. Sather confirmed her agreement with Sun.  The next day, Heritage had an internal call to discuss the status of the proposed price increases. Nystatin tablets were slated for a 95% increase.

407.    On June 23, the Heritage sales team had a meeting where they discussed the specific percentage amounts they would seek to increase on certain Drugs at Issue and their strategy for doing so.  Malek proposed the increases listed below for at least the following drugs:

    (a)     Acetazolamide—75%.

    (b)     Fosinopril-HCTZ—200% effective July 1, 2014.

    (c)     Glipizide-Metformin—100% effective July 1, 2014.

(d)    Glyburide—200% effective July 1, 2014.

(e)    Nimodipine—48%.

(f)    Nystatin—95%.

(g)    Paromomycin—100%.

(h)    Theophylline—150%.

408.    One Heritage employee's notes about the June 23 call indicated that Heritage needed to promptly increase its Nystatin WAC price because Teva already had done so.

409.    Heritage had one final internal call to discuss price increases, including the price of Nystatin tablets, on June 25, 2014. While still participating in this internal call about pricing, Heritage's Sather exchanged text messages with Sun's Knoblauch, informing her of the details of Heritage's anticipated price increases.

410.    Similarly, on the same day, June 25, Malek had a 14-minute call with an individual—likely Teva's Patel—in which he reported that Heritage's price increase notices would be mailed on June 26 for Nystatin tablets and several other drugs for which Heritage and Teva had agreed to raise prices.

411.    On June 26, 2014, Heritage began telling its customers that it was increasing its prices for a variety of drugs, including Nystatin tablets.  Heritage issued prices increase letters for at least:

(1) Acetazolamide; (2) Fosinopril-HCTZ; (3) Glipizide-Metformin; (4) Glyburide; (5) Leflunomide; (6) Nimodipine; (7) Nystatin; (8) Paromomycin; and (9) Theophylline.

412.    By July, among the other price increases it implemented, Heritage increased its Nystatin oral tablet list prices to the identical level of Teva (and nearly identical to Sun). This affected Heritage's customers nationwide, including Plaintiffs.

413.    In accord with their agreement, Teva did not undercut Heritage's prices, even when approached by large potential customers. For example, on July 8, 2014, a large retail customer e-mailed a Teva representative, asking for a quote for Nystatin tablets because it recently was notified of a large price increase from its current supplier. Teva either did not provide a bid or provided a cover bid that allowed Teva and Heritage to maintain their anticompetitive agreement.

414.    The price increases of approximately 100% initiated by Sun and joined by Teva and Heritage occurred after a long period of relatively low and stable pricing for Nystatin tablets. The AWP prices for Defendants' products also were elevated to nearly identical levels. These prices remained stable and elevated above competitive levels thereafter.

415.    No product shortages or other market changes can explain Defendants' abrupt and nearly identical price increases.

416.    The elevated prices of Nystatin oral tablets that resulted from Defendants' anticompetitive conduct have injured Plaintiffs, caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

417.   The unlawful agreement among Teva, Sun and Heritage regarding Nystatin tablets was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**B.     Perphenazine Tablets**

418.   Generic Perphenazine is an anti-psychotic medication.

419.   The market for generic Perphenazine tablets ("Perphenazine") was mature and at all relevant times had multiple manufacturers.

420.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Perphenazine as follows, beginning at least as early as July, 2009:

421.   During the Relevant Period, Defendants Par and Sandoz dominated the market for Perphenazine.

422.   When Par experienced supply disruptions and temporarily left the market, Sandoz more than doubled its prices for Perphenazine tablets.

423.   When Par re-entered the market in the summer of 2009, rather than resume its formerly low pricing to compete with Sandoz to win back customers, it joined the market at Sandoz's elevated prices.  This was consistent with the Fair Share agreement between Sandoz, Par and all Defendants.

424.    Over the ensuing years, Par and Sandoz continued to dominate the market for Perphenazine.  Notably, Par and Sandoz prices for Perphenazine have not returned to the lower levels of 2008.

425.    Even when Par or Sandoz wanted to increase their market share of Perphenazine, they eschewed price competition and instead adhered to their Fair Share agreement. Par nonetheless maintained its prices well above competitive levels and endeavored to gain share without resorting to free and fair price competition.

426.    Throughout this period, Sandoz and Par met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Perphenazine and of their Fair Share agreement.

427.    For example, as Sandoz prepared to announce a list (WAC) price increase on Perphenazine, it spoke to Par both before and after the increase. On March 26, 2013, K.O, Par's Vice President of National Accounts, spoke with M.V., the Associate Director of Pricing at Sandoz for 25 minutes. Less than 10 days later, Sandoz announced its price increase. Par increased its price at approximately the same time.

428.    No shortages or other market features can explain Defendants' price increases for generic Perphenazine during the Relevant Period.

429.    The elevated prices of generic Perphenazine resulted from Defendants' anticompetitive conduct injured Plaintiffs, caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these

elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

430.    The unlawful agreements among Defendants Par and Sandoz, regarding generic Perphenazine were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## C.    Pentoxifylline Tablets

431.    Pentoxifylline is a medication used to reduce leg pain caused by poor blood circulation.

432.    The market for Pentoxifylline was mature and at all relevant times had multiple manufacturers.

433.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all doses of generic Pentoxifylline tablets as follows, beginning at least as early as August, 2009:

434.    During the Relevant Period, Defendants Teva, Mylan, Apotex and Bausch Health/Oceanside dominated the market for generic Pentoxifylline.

435.    Beginning at least as early as August 2009, Defendants Teva, Mylan, and Apotex agreed to impose significant price increases.

436.    When Apotex exited the market in late 2009, Mylan and Teva took the opportunity to raise prices significantly.  Consistent with the cartel's Fair Share

agreement, Teva and Mylan achieved nearly an equal split of dollar sales during 2010 and most of 2011.

437.    In October, 2011, Apotex re-joined the market.  But instead of competing for customers by lowering prices, as would be expected in a competitive generic market, the addition of another manufacturer had the opposite effect; all three manufactures increased prices.  By early 2012, Pentoxifylline effective prices had surpassed 2008 levels, and they remained elevated for years thereafter.

438.    This because Defendants' cartel "grows the pie" for its members:  by increasing pricing market-wide, Defendants do better overall, even with lowered individual shares of a more-valuable market – at Plaintiffs' expense.

439.    The pattern repeated in October, 2014, when Bausch/Oceanside entered the market.  Rather than offer lower prices to win customers, Bausch/Oceanside matched the market pricing of Teva, Mylan and Apotex.

440.    Pentoxifylline NSP prices followed the same general pattern, showing the co-ordinated increase by Teva and Mylan in late 2009, which was joined by Apotex when it re-entered the market in 2011.

441.    Throughout this period, Teva, Mylan, Apotex and Bausch/Oceanside met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Pentoxifylline and of their Fair Share agreement.

442.    For example, during 2010 and 2011, when Teva and Mylan imposed price increases and split the market for Pentoxifylline, the contacts between the two

manufacturers were extensive.  For example, Teva's David Reckenthaler was communicating by phone with Mylan employees at least as early as April 2010. Rekenthaler communicated with J.K., the Vice President Executive Director of Sales, in April and May 2010. Rekenthaler also communicated frequently with Mylan's Jim Nesta from 2012 until Rekenthaler departed Teva in the spring of 2015.

443.   Rekenthaler was not the only Teva employee to cultivate relationships with Mylan. R.C., a Teva Vice President of Sales, was, until he left Teva to become the CEO of Aurobindo, in contact with B.P., Mylan's Senior Vice President of National Accounts, as well as Nesta.

444.   Similarly, in 2014 when Teva wanted to increase its prices for Pentoxifylline, it reached out to co-ordinate with Mylan and Apotex in the days and weeks leading up to the increase.  For example, Teva's Rekenthaler spoke to J.H., a Senior Vice President and General Manager at Apotex, on March 20 for approximately four minutes and March 25, 2013 for approximately two minutes. Then, on the day that Teva imposed price increases, April 4, 2014, Rekenthaler spoke to Nesta of Mylan for six (6) minutes. A week after Teva increased its price – on April 11, 2014 – Rekenthaler followed-up with the SVP at Apotex and the two spoke again for five (5) minutes. During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to his Teva colleague, Nisha Patel.

445.   No shortages or other market features can explain Defendants' price increases for generic Pentoxifylline during the Relevant Period.

446.    The elevated prices of generic Pentoxifylline resulted from Defendants' anticompetitive conduct injured Plaintiffs, caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

447.    The unlawful agreements among Defendants Teva, Mylan, Apotex and Bausch Health/Oceanside, regarding generic Pentoxifylline were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**D.    Hydroxyurea Capsules**

448.    Hydroxyurea used to treat sickle cell anemia and cancer of the white blood cells (chronic myeloid leukemia).

449.    The market for generict Hydroxyurea capsules ("Hydroxyurea") was mature and had multiple manufacturers throughout the Relevant Period.  As a result, for years, Hydroxyurea had relatively low and stable prices.

450.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of Hydroxyurea as follows, beginning at least as early as March, 2010.

451.    During the Relevant Period, Defendants Teva and Par dominated the market for Hydroxyurea.

452.   Teva and Par agreed to, and in fact did, implement nearly simultaneous and identical price increases in the spring of 2010.  By summer, Par and Teva Hydroxyurea effective prices were higher and remained elevated for years thereafter.

453.   In late 2011, Teva experienced a supply disruption and briefly exited the market.  When Teva re-entered the market approximately 3 months later, rather than offer lower prices to win back market share, Teva matched the elevated prices to which it had previously raised prices in parallel with Par.

454.   Hydroxyurea NSP price likewise followed the co-ordinated increases by Teva and Par in the spring of 2010, and the later increase by Teva in 2014.

455.   Throughout this period, Teva and Par met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Hydroxyurea and of their Fair Share agreement.

456.   For example, between March and June 2010 (when Par and Teva imposed their first coordinated price increases) Teva's Rekenthaler spoke with G.B., Par's Vice President of National Accounts via telephone on at least 5 occasions.

457.   In 2014, Teva (again) raised its Hydroxyurea prices. This created a risk that Teva would lose customers and market share to Par. However, Defendants' Fair Share agreement allowed Teva to implement a significant price increase without a commensurate loss in sales. Before increasing prices in 2014, Teva again communicated directly with Par.  Teva's Rekenthaler again reached out to the VP of National Accounts at Par.  They spoke at least three times between August 24 and

August 28, 2014 in furtherance of the Hydroxyurea price-fixing agreement and the Fair Share agreement.

458.   No shortages or other market features can explain Defendants' price increases for generic Hydroxyurea capsules during the Relevant Period.

459.   The elevated prices of generic Hydroxyurea capsules resulted from Defendants' anticompetitive conduct injured Plaintiffs, caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

460.   The unlawful agreements among Defendants Teva and Par, regarding generic Hydroxyurea capsules were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### E.   Imiquimod Cream

461.   Generic Imiquimod Cream is a topical medication used to treat actinic keratosis, or precancerous skin growths.

462.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Imiquimod Cream, at least as follows:

463.   Imiquimod Cream was a high-priced, large volume drug that provided a significant source of revenue for its manufacturers.  In 2012, the annual market for Imiquimod Cream in the United States exceeded $200 million.

464.   On February 25, 2010, Fougera received FDA approval to market Imiquimod Cream.  At that time, Fougera was the only generic manufacturer in the market and it used that opportunity to set a high price for the product – based in part on Fougera's knowledge that, because of Defendants' cartel, Fougera would not face competition on price, even when other manufacturers entered the market.

465.   On April 13, 2010, less than two months after Fougera entered the Imiquimod Cream market, Perigo announced that it was launching the "Authorized Generic" version of the drug ("AG") – *i.e.,* a version made or licensed by the patentee, which is the only other entity allowed under the patent and Hatch-Waxman laws to market a drug during the 180-day Exclusivity Period provided under Hatch-Waxman.  This meant that Fougera and Perigo would be the only manufacturers of the generic version of the drug for the next four months. (since Fougera had already used roughly two months of the Exclusivity Period)

466.   That same day (April 13, 2010), D.K., a senior Fougera executive, sent an e-mail to Walter Kaczmarek ("Kaczmarek"), also a senior Fougera executive.[26]

---

[26] Kaczmarek worked for Defendant Fougera from November, 2004 – November, 2012, as Senior Director, National Accounts; Vice President, National Accounts; and Senior Vice President, Commercial Operations.

Later that day, Kaczmarek called SW-6 (also referred to in this Complaint as "CW-6"), a third senior sales executive at Fougera, and they spoke for nearly four minutes – whereupon SW-6 then called T.P., a sales executive at Perrigo (the ostensible competition, and fellow cartel member), and they spoke for approximately ten minutes.  After hanging up with T.P. from Perrigo, SW-6 then promptly called Kaczmarek back.

467.   Three days later, on Friday, April 16, SW-6 again called T.P., and immediately after hanging up, SW-6 called his boss at Fougera, Kaczmarek; then, immediately after hanging up with Kaczmarek, SW-6 called T.P. (at Perrigo) back – and the same day, Fougera increased its list prices for Imiquimod Cream.

468.   The very next business day, on Monday, April 19, 2010, there was a torrent of further calls, all within the space of an hour, between Fougera and Perrigo: John Wesolowski ("Wesolowski"), a senior executive at Perrigo, called T.P.; five minutes later, T.P. (at Perrigo) called SW-6 (at Fougera); then SW-6 called T.P. back. After speaking to T.P., SW-6 then called his boss at Fougera, Kaczmarek; then T.P. called SW-6 again; then T.P. called his boss, Wesolowski, at Perrigo; then SW-6 called *his* boss, Kaczmarek, at Fougera; and finally, Wesolowski called T.P. back.

469.   That week-end, from Saturday, April 24 – Tuesday, April 27, 2010, NACDS held its annual meeting in Palm Beach, Florida.  Several executives from Fougera and Perrigo were in attendance, including Kaczmarek, D.K., and SW-6 from Fougera; and Wesolowski and S.K., senior executives from Perrigo.

470. Fougera and Perrigo executives were speaking about Perrigo's launch throughout the conference. On April 26, 2010, T.P. and SW-6 spoke by phone for approximately seven minutes. Immediately after that call, SW-6 hung up and called Kaczmarek, speaking for approximately four minutes.

471. On Wednesday, April 28 – the day after the NACDS meeting ended - Perrigo officially entered the Imiquimod Cream market and published WAC prices that were even higher than the price that Fougera set two weeks previously, which in turn was higher than when Fougera was the sole legal generic manufacturer.

472. That same day, D.K. e-mailed fellow Fougera executives with an update regarding his conversations at the NACDS meeting, including that Fougera gave the McKesson and ABC Imiquimod Cream accounts to Perrigo.

473. Two days later (on April 30, 2010), L.B., another senior Fougera executive, demanded an urgent explanation from D.K. as to why Fougera was willing to give up both McKesson and ABC. D.K. reminded L.B. that it was inevitable that Perrigo would take some of the market. D.K. also explained that Perrigo's share would likely settle in the range of 30-40% of the (two-player) market.

474. When L.B. questioned why Perrigo would be satisfied with that range, D.K. explained (without, of course, explicitly naming Defendants' cartel as such), that their cartel's so-called "fair share" principles dictated Perrigo accept that amount.

475. Consistent with these so-called "fair share" principles and the prior discussions between the them, by the end of that week (Friday, April 30), Fougera had

given up more than ten of its Imiquimod customers to Perrigo, including the previously-mentioned ABC and McKesson accounts.

476. Two weeks later, on May 16, 2010, D.K. was preparing an internal Fougera presentation regarding Imiquimod Cream, which L.B. challenged, in part.

477. The next day, on May 17, 2010, SW-6 and T.P. exchanged at least six calls, likely to re-confirm (again) their companies' commitment to their agreement on Imiquimod Cream – because it was in the relatively early days of their cartel, Defendants needed more explicit assurances than they did later, that they could rely on fellow cartel members to follow the rules.

478. Several months later, on September 8, 2010, SW-6 circulated a press release to the Fougera sales team, announcing that Perrigo had received its own ANDA approval to market generic Imiquimod Cream. Previously, Perrigo had been selling the AG through a license with the branded manufacturer. That same day, SW-6 called T.P. at Perrigo. T.P. returned SW-6's call almost immediately, and they spoke briefly, for approximately two minutes.

479. A few weeks later, on September 27, 2010, SW-6 gave a presentation to Fougera's parent company, during which, with regard to the larger fair share understanding, he noted that Fougera had given up Imiquimod share to Perigo.

480. Cartel members continued to communicate and discuss their plans (or lack thereof) to enter the Imiquimod market. For example, on February 7, 2011, a Glenmark employee telephoned SW-6 and they spoke for approximately four

minutes.  Later that same day, SW-6 sent an e-mail to Kaczmarek and D.K. regarding Imiquimod Cream, letting them know that Fougera would not be facing any imminent competition from Glenmark, to which D.K. replied approvingly.

481.    Although Fougera was happy to hear that Glenmark would not be entering the Imiquimod Cream market in the near term, another competitor – Sandoz – was on its way.  Sandoz received FDA approval on February 28, 2011, to launch the product.  That same day, SW-6 at Fougera and T.P. at Perrigo exchanged at least five telephone calls.

482.    The next day, March 1, 2011, one of Fougera's customers, NC Mutual, also e-mailed SW-3, a sales executive at Fougera, to tell him that Sandoz was launching generic Imiquimod Cream.  SW-3 promptly forwarded the e-mail to Kaczmarek.  That same day, SW-6 (at Fougera) spoke to T.P. (at Perrigo).

483.    Shortly thereafter, as Sandoz entered the market, it did so seamlessly, taking accounts with roughly equal market-share from its co-conspirators (and incumbent suppliers), Fougera and Perrigo.

484.    For example, in late February and early March, Sandoz made offers to ABC, a Perrigo customer, and Rite Aid, a Fougera customer, who had approximately equal shares of the generic Imiquimod Cream market:  8% ABC and 5% at Rite Aid.

485.    On March 3, 2011, two days after NC Mutual's e-mail to SW-3,  Fougera declined to bid to retain the Rite Aid business, giving its primary position to Sandoz.

486.   Later that same day, SW-6 called T.P.  A few minutes later, Kaczmarek called SW-6, and they spoke, as well.

487.   Also that same day, Perrigo followed suit and also declined to bid to retain the ABC business.

488.   Around this same time, Taro was making plans to enter the market for generic Imiquimod Cream – and, as set forth below and per the cartel's usual practice, communicating with their co-conspirators to raise prices and allocate customers.

489.   Between March 6 and March 10, 2011, representatives from Fougera, Perrigo, Sandoz, and Taro were all in attendance together at the ECRM Retail Pharmacy Generic Pharmaceutical Conference in Champions Gate, Florida.  These representatives included SW-6 from Fougera, T.P. from Perrigo, SW-4 and Kellum from Sandoz, and H.M. and D.S., sales executives from Taro.

490.   On March 7, 2011, while at the ECRM conference, SW-4 (Sandoz) and D.S. (Taro) spoke on the phone.  Later that day, while still at ECRM, Kellum – SW-4's boss – sent an e-mail to their Sandoz colleagues, stating that Taro may be entering the Imiquimod Cream market.

491.   Also, while at the ECRM conference, SW-6 of Fougera and T.P. of Perrigo spoke at least once by phone on March 9, 2011.

492.   By this point, Sandoz had acquired approximately 13% of the generic Imiquimod Cream market and Kellum recommended that Sandoz take the Imiquimod Cream business of a consortium composed of HEB, Ahold, Schnucks, and Giant

Eagle – all Perrigo customers.  Those customers were the only additional customers whose business Sandoz was seeking; Kellum also recommended that after the consortium's business, Sandoz should only go after smaller Fougera accounts.

493.    The following week, on March 17, 2011, Perrigo conceded the consortium's Imiquimod Cream account to Sandoz.

494.    A month or so thereafter, on April 15, 2011, Taro received FDA approval to market Imiquimod Cream.

495.    Taro immediately began co-ordinating market entry with competitors, dividing up customers so as not to disrupt the market – which would have risked an outbreak of competition among cartel members, and consequent price reductions.

496.    For example, two days after the FDA's approval, D.S. at Taro and SW-4 at Sandoz exchanged two calls, with one call lasting approximately twelve minutes. Within an hour of ending the second call, SW-4 called her supervisor at Sandoz, Kellum, and they spoke for five minutes.  Two days leter, on April 19, D.S. (Taro) again called SW-4 (Sandoz).  On these calls, D.S. told SW-4 that Taro had FDA approval for Imiquimod Cream but that Taro would not actually launch until June.

497.    During these three calls, which totalled a little more than a quarter of an hour altogether, D.S. also told SW-4 that Taro had already received a purchase pre-commitment from Econdisc, a large GPO customer, and now would only go after smaller customers.

498.   All of this was done in furtherance of the cartel's objectives of dividing customers and getting and/or maintaining high, supracompetitive prices:  SW-4 understood that D.S. was giving this information to Sandoz so that it knew Taro would not attack Sandoz at large customers and, if Taro did compete for smaller customers, it was only to obtain its fair share of the market.  SW-4 also understood that D.S. was giving this information to Sandoz so that Sandoz would not compete for the Econdisc business, which Sandoz did not, in fact, do – although, as detailed below, additional communication was required to confirm that Sandoz, Perrigo, Fougera, and Taro were all on the same page.

499.   The next day, on April 20, SW-4 shared this competitive intelligence with R.T., a senior sales and marketing executive at Sandoz.

500.   Perrigo and Fougera were also simultaneously co-ordinating how they would react to Taro's entry.  For example, on April 18, Kaczmarek told the Fougera sales executives that Taro had received FDA approval to market Imiquimod Cream.

501.   Kaczmarek's e-mail set off a flurry of communications that same day between SW-6 (Fougera) and T.P. (Perrigo), who were both concurrently reporting to, and taking direction from, their supervisors, Kaczmarek and Wesolowski, as follows:

SW-6 telephoned T.P., who in turn called his boss, Wesolowski; then

T.P. called SW-6 back, and they spoke for a few minutes; then, immediately after hanging up with SW-6 (at Fougera),

T.P. called his own boss at Perrigo, Wesolowski; and, finally,

SW-6 (at Fougera) called his boss at Fougera, Kaczmarek.

502.    Three days later, on April 21, 2011, SW-6 decided to reach out to Taro directly and called H.M., a sales executive at Taro.  Upon hanging up with H.M. at Taro, SW-6 called his own boss at Fougera, Kaczmarek.

503.    Finally, first thing the next morning, April 22, SW-6 sent a text message to T.P. at Perrigo.

504.    245. By early July 2011, Taro was entering the generic Imiquimod Cream market.  Immediately after the July 4 holiday, on July 5, 2011, T.P. at Perrigo reached out to SW-6 Fougera. The call lasted only approximately two minutes, but it set off another flurry of communications among the three competitors – Perrigo, Fougera, and Taro – to make sure they were on the same page regarding Taro's entry.

505.    These calls all occurred within the span of a quarter-hour, as follows:

T.P. at Perrigo called SW-6 at Fougera; then, literally the next minute,

SW-6 (at Fougera) called H.M. at Taro; five minutes later,

H.M. (at Taro) called SW-6 (at Fougera) back; then, literally the next minute,

SW-6 (at Fougera) called back T.P. at Perrigo; and finally, the minute that call ended, closing the loop,

SW-6 (at Fougera) called back H.M. at Taro.

506.    The other cartel members in this market were also, of course, talking about this.  For example, two day later, on July 7, D.S. at Taro called SW-4 at Sandoz.

SW-4 returned the call and they spoke for approximately a quarter of an hour.  A few hours later, SW-4 called D.S. back again, and they spoke for a few more minutes.

507.   The following week, on July 14, 2011, SW-6 at Fougera (not SW-4, again illustrating the cartel's institutional relationship among Defendants, rather than merely personal relationships among employees) called H.M. at Taro again, and they spoke for nine minutes.  As soon as SW-6 hung up, he called his boss at Fougera, Kaczmarek, and the two spoke for approximately five minutes.

508.   Later that month, on July 26, 2011, a customer, Medco, informed Perrigo that it had received a competitive offer for Imiquimod Cream and asked if Perrigo could match the price. MedCo did not disclose who made the offer.  This sparked another fluny of phone communications, starting early the next morning, July 27, starting before 6:00 am, among Perrigo, Taro and Fougera, following much of the pattern above, as follows:

> H.M. at Taro called SW-6 at Fougera; then, a half-hour later,
>
> SW-6 (at Fougera) called H.M. at Taro back three times, speaking for a total of approximately 10 minutes; then,
>
> SW-6 (at Fougera) called T.P. at Perrigo (again illustrating the cartel's institutional relationship among Defendants, rather than merely personal relationships among employees); then, five minutes later,
>
> H.M. at Taro called SW-6 (at Fougera); then,
>
> SW-6 (at Fougera)  called back T.P. at Perrigo; then,

SW-6 (at Fougera) called back H.M. at Taro; and finally, a little after 8:00 am, SW-6 (at Fougera) called his boss at Fougera, Kaczmarek, likely to report the results of the preceding calls.

509.    The next day, on July 28, 2011, SW-6 at Fougera called T.P. at Perrigo; T.P. returned the call and they spoke for six minutes – and Perrigo declined to bid to retain the MedCo account.

510.    Two weeks later, over at Sandoz, on August 8, 2011, D.S. from Taro called SW-4 at Sandoz. They ultimately spoke for a little over a quarter-hour.  D.S. told SW-4 that Taro had been awarded the Econdisc business and the secondary position at Cardinal, and that Taro would not take on any more customers.  SW-4 understood this to mean that there would be no price erosion resulting from the entrance of the additional suppliers and Sandoz would not have to relinquish any additional customers to Taro.  Later that evening, on August 8, 2011, SW-4 passed this information about their co-conspirator on to others at Sandoz.

511.    The following week, on August 19, Hannaford – a retail pharmacy customer – told SW-6 that it had received a competitive offer for Imiquimod Cream.

512.    As with Medco, Hannaford similarly would not identify which manufacturer made the offer, but it was, in fact, made by Taro.

513.    As was becoming the usual practice in the cartel, this set off a flurry of communications among manufacturers in that market.  Later, as the cartel became more adept at adjusting market allocation and more confident that its members would

comply with its so-called "fair share" agreement, fewer or, at times, no direct

communications were needed, but 2011 was still in its relative infancy.

514.   That day, SW-6 spoke several times with T.P. at Perrigo and H.M. of

Taro, in an effort to find out which competitor made the offer, following much of the

pattern above:

> First, SW-6 (at Fougera) called T.P. at Perrigo; then, immediately after hanging
>
> up with T.P.,
>
> SW-6 (at Fougera) called H.M. at Taro; then, immediately called him back for
>
> another minute, and immediately after that, called H.M. one more time; they
>
> spoke for a total of approximately ten minutes.

515.   During these calls, SW-6 was able to determine that Taro had, in fact,

made the offer.  Later that same day, August 19, 2011, SW-6 e-mailed his boss at

Fougera, Walt Kaczmarek, asking to cede the Hannaford account to Taro so that

Taro could get its so-called "Fair Share."

516.   The goal of all of the communications just described among various

cartel members – Fougera, Perrigo, Sandoz, and Taro – was to avoid competition and

minimize the erosion in price for Imiquimod Cream that would typically come with

the entry of new manufacturers. The results were highly successful.

517.   Throughout September of that year, H.M. at Taro, SW-6 at Fougera, and

T.P. at Perrigo spoke several times by phone, during which they discussed, *inter alia*,

Taro's new capacity to take on additional market share for Imiquimod Cream and

how that should be accommodated in the market. As always, SW-6 and T.P. kept their supervisors, Kaczmarek and Wesolowski, informed of the content of those conversations.

518.    Some of those calls are detailed in the chart below:

| 9/21/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:22:00 | 0:01:00 |
|---|---|---|---|---|---|---|
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:24:00 | 0:04:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:49:00 | 0:02:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P.(Perrigo) | 6:46:00 | 0:03:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek,Walt (Fougera) | 11:31:14 | 0:12:10 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P.(Perrigo) | 12:23:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:29:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:39:00 | 0:03:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 12:46:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P.(Perrigo) | 12:49:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:12:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:19:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:26:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 5:48:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P.(Perrigo) | 5:50:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P.(Perrigo) | 6:16:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P.(Perrigo) | 6:16:00 | 0:04:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek,Walt (Fougera) | 8:46:35 | 0:05:01 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P.(Perrigo) | 9:05:00 | 0:03:00 |
| 9/27/2011 | Voice | T.P.(Perrigo) | Outgoing | Wesolowski John (Perrigo) | 8:42:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P.(Perrigo) | 12:24:00 | 0:01:00 |

519.    After this series of calls, on September 30, 2011, Kaczmarek e-mailed other Fougera sales executives, including D.K., to advise them that Taro had made an offer on the Imiquimod Cream account of Wal-Mart, a Fougera customer. Kaczmarek reluctantly recommended that Fougera give up Wal-Mart's business and Kaczmarek said that, if Fougera defended the Wal-Mart account, Taro would likely just go after other customers at lower and lower prices.  On the other hand, if

Fougera gave up Wal-Mart, Taro would hopefully walk away, allowing the market to remain stable.

520.   D.K. agreed with Kaczmarek's recommendation and Fougera ceded the business to Taro, which did, in fact, keep the market stable and prices high, where Defendants wanted them.

521.   No shortages or other market features can explain Defendants' elevated pricing for Imiquimod Cream during the Relevant Period.

522.   The elevated prices of Imiquimod Cream that resulted from Defendants' anticompetitive conduct injured Plaintiffs, caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

523.   The unlawful agreement among Fougera, Perrigo, Sandoz, and Taro for Imiquimod Cream was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### F.   Adapalene Cream

524.   Adapalene Cream is a retinoid used to treat severe acne.

525.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Adapalene Cream, as follows:

526.    From at least 2010 through at least 2013, Defendants Sandoz/Fougera and Perrigo dominated the market for Adapalene Cream.

527.    On July 6, 2010, Fougera received FDA approval as the first-to-file generic for Adapalene Cream.  Two weeks later, on July 20, 2010, Fougera entered the market and published WAC pricing.

528.    Fougera quickly realized, however, that it would not be alone in the market for long, and that Perrigo would soon enter, as well.  On August 9, 2010, Kaczmarek e-mailed D.K., a senior executive at Fougera.  Similarly, a few weeks later, on August 30, 2010, D.K. followed up with other Fougera executives.  Several Perrigo representatives attended NACDS, including T.P., Wesolowski, and S.K., a senior Perrigo executive.

529.    On September 27, 2010, SW-6 of Fougera called T.P. of Perrigo. The call lasted less than one minute.  Minutes later, T.P. called SW-6 back and they spoke for approximately three minutes.

530.    Two days later, on September 29, 2010, Kaczmarek informed D.K. that Perrigo would be shipping Adapalene Cream in two weeks and sending out offers to customers starting that day.  D.K. passed that information along to other senior Fougera executives.

531.    On October 1, 2010, M.A., a marketing executive at Fougera, e-mailed D.K. to inform him that there had been no publicly-reported changes in the Adapalene market.

532.   Between October 5 and October 7, 2010, SW-6 at Fougera and T.P. at Perrigo exchanged several calls.  Shortly after hanging up with T.P., SW-6 called his boss at Fougera, Walter Kaczmarek, to report on his conversations.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/5/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 15:52:49 | 0:00:04 |
| 10/5/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 15:53:18 | 0:03:26 |
| 10/5/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:07:16 | 0:00:05 |
| 10/7/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:44:57 | 0:00:40 |
| 10/7/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:53:16 | 0:00:57 |
| 10/7/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:56:59 | 0:10:40 |

533.   The next day, on October 8, D.K. e-mailed Kaczmarek.  That morning, Kaczmarek called SW-6 and they spoke for two minutes. After that call, SW-6 called T.P. at Perrigo at 10:53 am and they spoke for approximately 3 minutes.  After hanging up, SW-6 called again that afternoon, at 3:59, for 38 seconds, likely leaving a voice-mail.  A minute later, at 4:01 pm, T.P. called back, and they spoke for approximately five minutes.  At the conclusion of his call with SW-6, T.P. immediately called his supervisor, Wesolowski, at 4:07 pm.

534.   SW-6 at Fougera and T.P. at Perrigo continued to exchange calls in the days leading up to Perrigo's launch of Adapalene Cream.  As before, SW-6 and T.P. continued to keep their supervisors, Kaczmarek and Wesolowski, informed of their conversations.  These calls are detailed in the chain below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:53:56 | 0:01:00 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:16 | 0:00:08 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:46 | 0:05:04 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:01:36 | 0:00:03 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:33:46 | 0:00:36 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:46:18 | 0:15:02 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 15:58:59 | 0:01:40 |
| 10/19/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:37:08 | 0:00:58 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:49:32 | 0:12:42 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:10:46 | 0:04:14 |
| 10/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 13:03:06 | 0:02:35 |
| 10/21/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:05:59 | 0:00:00 |

535.   A few days later, on October 25, SW-6 and T.P. spoke again for approximately four minutes.  That same day, Perrigo entered the Adapalene Cream market and published WAC pricing that exactly matched Fougera's WAC pricing.

536.   From the outset, and consistent with the so-called "fair share" rules of Defendants' cartel, Fougera understood and agreed that it needed to give up 40% of its share of the market to Perrigo.  SW-6 at Fougera and T.P. at Perrigo also discussed which customers Fougera would give up.  For example, the day after Perrigo's entry, on October 26, 2010, SW-6 and T.P. spoke at least four times.  Shortly after the last of those calls, SW-6 sent an e-mail to Kaczmarek recommending ceding market share to Perrigo.

537.   Fougera wasted no time in acting on SW-6's recommendations and ceding significant share to the new entrant, Perrigo.  Perrigo, in turn, focused specifically on the list of customers provided by SW-6.  For example, on October 25,

2010, Publix informed Fougera that it had received a competitive offer for Adapalene Cream and offered Fougera the opportunity to retain the business.  The next day, on October 26, S.H., a Fougera sales executive, declined to bid.

538.    Also on October 25, 2010, NC Mutual informed Fougera that it had received a competitive offer for Adapalene Cream.  On October 28, SW-3 forwarded the request to Kaczmarek.  Kaczmarek indicated, by reply e-mail, that Fougera should not keep the account.  Later that day, SW-3 passed on the substance of that response to NC Mutual.

539.    On October 26, Rite Aid advised Fougera that it had received a competitive bid for Adapalene Cream.  The following week, consistent with their plan, Fougera ceded the account to Perrigo on November 2.

540.    On October 29, Kroger informed SW-3 that it had received a competitive offer from Perrigo for Adapalene Cream.  SW-3 forwarded the e-mail to Kaczmarek, who told SW-3 not to match Perrigo's offer.  SW-3 would later acknowledge in his monthly recap that the decision not to match Perrigo's offer was meant to cede market share to new entrant, Perrigo.

541.    Further, by the end of October, 2010, Fougera had also given up Cardinal's Adapalene Cream business to Perrigo.

542.    The agreement operated successfully for both Fougera and Perrigo, and Fougera was happy that Perrigo had followed their nascent cartel's rules by keeping

prices high and focusing on the agreed-upon customers as it entered the market for Adapalene Cream.

543.    Two years later, Sandoz (which by this time had acquired Fougera) left the Adapalene Cream market temporarily due to supply issues in November, 2012. This left Perrigo as the sole manufacturer of the product – but not for long.

544.    By early January, 2013, Sandoz was making plans for its re-entry into the market.  On January 14, 2013, SW-3 provided M.A., a Sandoz marketing executive, a list of potential targets for Adapalene Cream.  The list of potential targets was organized by historical volume of units purchased and Walgreens was the first name on that list.  Wal-Mart was not listed as a target.

545.    On June 24, 2013, approximately one month before Sandoz's re-launch, SW-3 (at Sandoz) and T.P. (at Perrigo) had a ten-minute phone call, during which T.P. shared Perrigo's nonpublic dead net pricing for Adapalene Cream for two customers – Walgreens and Optisource.

546.    Three weeks later, on July 15, Sandoz held a Commercial Operations call during which the discussed, among other things, the Adapalene Cream re-launch scheduled for later that month.  That same day, T.P. and SW-3 exchanged two more calls (likely voice-mails), both lasting one minute.  After exchanging a third call on July 16, the two connected on July 17, 2013 and spoke for approximately 20 minutes. During this call, T.P. provided SW-3 with Perrigo's non-public pricing for Adapalene

Cream for a list of customers. T.P. also told SW-3 that Perrigo was not willing to give Walgreens to Sandoz.

547. The purpose of conveying this information was so that Sandoz, when it re-entered the market, could target and obtain specific agreed-upon customers with the highest prices possible, to minimize price erosion.

548. Also, between July 16-18, SW-3 and A.F., a sales executive at Perrigo, exchanged at least nineteen text messages.

549. On July 26, 2013, the day of Sandoz's re-launch of Adapalene Cream, Sandoz colleagues SW-3 and SW-1 spoke for eight minutes. On this call, SW-3 provided SW-1 with the customer pricing for Adapalene Cream that T.P. (at Perrigo) had given to him. Within minutes of hanging up with SW-3, SW-1 then sent an internal e-mail, including to Kellum, regarding Adapalene Cream pricing.

550. Notably, the price points matched exactly with the price points T.P. had provided to SW-3. In his e-mail, CW-1 also stated that Sandoz would need to bid 30% lower than ABC's current price in order to win the business upon re-launch.

551. That same day, July 26, 2013, Sandoz prepared and sent offers for Adapalene Cream to the three customers SW-1 identified – ABC, McKesson, and Wal-Mart – as well as Rite Aid and Morris & Dickson. Consistent with the prior conversations between SW-3 and T.P., Sandoz did not submit a bid to Walgreens.

552. Later that day, July 26, 2013, Morris & Dickson accepted Sandoz's bid for Adapalene Cream.

553.    Also, that same day, Wal-Mart declined the opportunity – but for reasons other than price.

554.    The following Monday (the next business day), on July 29, T.P. (Perrigo) called SW-3 twice. Both calls lasted one minute.  The next day, on July 30, SW-3 called T.P. back and they spoke for thirteen 13 minutes.  SW-3 hung up and immediately called SW-1 to report about this conversation. That call lasted four minutes. That same day, Rite Aid accepted Sandoz's bid for Adapalene Cream.

555.    The day after that, Saturday, July 31, Sandoz sent an offer for Adapalene Cream to Econdisc.  The next morning, on Sunday, August 1, Econdisc notified Perrigo of the offer and gave them an opportunity to bid to retain the business. Within the hour, T.P. called SW-3; the call lasted one minute.  Ten minutes later, T.P. called SW-3 again and they spoke for five minutes. The same day, Sandoz colleagues SW-3 and SW-1 spoke for five minutes.

556.    The next day, Monday, August 2, ABC accepted Sandoz's bid for their Adapalene Cream account.

557.    Later that week, on Friday, August 6, T.P. and SW-3 exchanged two calls lasting four minutes and twelve minutes.  Later that day, T.P. and his colleagues at Perrigo, including his supervisor, Wesolowski, had a conference call to discuss Adapalene Cream.  That same afternoon, Perrigo notified Econdisc that it was declining to bid to retain their business.  Later that day, Econdisc accepted Sandoz's bid for Adapalene Cream.

558.   The next day, on August 7, 2013, McKesson accepted Sandoz's offer.

559.   T.P. of Perrigo and CW-3 continued to talk throughout August, 2013, to co-ordinate Sandoz's smooth entry into the market.  For example, between August 12 and August 15, the two competitors exchanged at least eight calls, including two calls on August 15, one of which lasted approximately a quarter-hour.  Later that day, M.A., a Sandoz marketing executive, e-mailed SW-1 regarding Adapalene Cream and stating that Sandoz's market share was now 25%.  As just detailed, Sandoz had stayed away from Walgreens because Perrigo said they would not give up the business.

560.   Respecting the agreement that the two co-conspirators had arranged, Sandoz stayed away from Walgreens and instead submitted another offer to Wal-Mart on August 27, 2013.  Wal-Mart, again, summarily refused the offer.  The next day, August 28, SW-3 called T.P. and they spoke for approximately a quarter-hour.  T.P. then hung up and spoke with his supervisor, Wesolowski, for seven minutes.

561.   As of December, 2013, and without the Wal-Mart business, Sandoz had only obtained approximately 30% share of the Adapalene Cream market.  This was well below its expected share in a two-player market and less than the 47% market share that Sandoz had maintained prior to leaving the market in November, 2012.

562.   This underperformance caught the attention of high-level executives at Sandoz.  So on January 8, 2014, R.A., a Sandoz finance executive, convened a meeting to discuss the Adapalene Cream re-launch and the issue of securing more market share on the product.  By that time, it had been decided internally by the sales team

that Sandoz would pursue Walgreens – representing approximately 19% share – to meet its fair share targets on Adapalene Cream.

563.    That same day, on January 8, SW-3 called T.P. at Perrigo.  The call lasted one minute. First thing the next morning, SW-3 called T.P. again and they spoke for approximately a quarter-hour.  T.P. and SW-3 exchanged two more calls the following week, on January 13 and January 16, lasting one minute and 10 minutes, respectively. Immediately upon hanging up from the ten-minute call on January 16, SW-3 called SW-1 and they spoke for eight minutes.

564.    Three weeks later, on January 28, 2014, Sandoz held a follow-up meeting to discuss the Adapalene Cream re-launch and Walgreens as Sandoz's next target. Two days after that, on January 30, Sandoz met with Walgreens to discuss new product opportunities, including Adapalene Cream.  The next day, on January 31, SW-3 called T.P. and they spoke for eight minutes.  Upon hanging up with T.P., SW-3 called SW-1.  The call lasted one minute.

565.    After this series of communications between SW-3 at Sandoz and T.P. at Perrigo, Sandoz submitted a bid to Walgreens for Adapalene on February 14, 2014. Perrigo promptly conceded the customer and Walgreens awarded the business to Sandoz on March 5, 2014.  This award brought Sandoz's share back to 47% – the same percentage it had before exiting the market in 2010.

566.    No shortages or other market features can explain Defendants' price prices for generic Adapalene Cream during the Relevant Period.

567.   The elevated prices of generic Adapalene Cream resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

568.   The unlawful agreements between Defendants Sandoz/Fougera and Perrigo regarding Adapalene Cream were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### G.   Desonide Lotion

569.   Generic Desonide Lotion ("Desonide Lotion") is a topical steroid that treats a variety of skin conditions, including eczema, dermatitis, allergies, and rash.

570.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Desonide Lotion, as follows:

571.   Between 2009 and 2011, Defendants Actavis and Fougera dominated the market for generic Desonide Lotion; in fact, they were the only two manufacturers of generic Desonide Lotion.  In those years, they instituted WAC price increases that were in lock step with one another. For example, on June 1, 2009, Fougera increased WAC pricing by roughly 90% and Actavis followed and matched on September 1,

2009.  Similarly, on July 22, Actavis increased WAC pricing by nearly 200% and Fougera followed three days later, on July 25, 2011.

572.    Following the increases, and consistent with fair share principles, the competitors declined opportunities to bid on each other's business so as not to take advantage of the price increases.

573.    As of August 2012, the market for Desonide Lotion was evenly split between the two competitors with Sandoz at 56% market share and Actavis at 44%.

574.    On August 23, 2012, Kellum circulated a list of Fougera products that he recommended taking price increases on, including Desonide Lotion.

575.    Between August 25 and August 28, 2012, the NACDS held its Pharmacy and Technology Conference in Denver, Colorado. Representatives from Defendants Actavis and Sandoz attended the conference, including CW-3 and Kellum of Sandoz and Aprahamian, then a senior pricing executive at Actavis.

576.    At the conference, Aprahamian approached CW-3 and told him that Actavis was having supply issues on Desonide Lotion and would be exiting the market for a period of time.  CW-3 then passed this information along to Kellum because he knew Kellum was interested in raising the price on Desonide Lotion and would view Actavis's temporary exit from the market as a positive development.

577.    J.P., a product manager at Sandoz, was tasked with putting together information for the potential price increases, including on Desonide Lotion. On

September 12, 2012, J.P. e-mailed CW-1, a senior pricing executive at Sandoz, and

Kellum asking for input on the rationale for the price increases.

578.   One month later, in October 2012, Kellum asked CW-3 to reach out to

Aprahamian to get more specific information regarding Actavis's supply issues on

Desonide Lotion. On October 17 and 18, 2012, CW-3 exchanged several calls with

Aprahamian. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 9:15:00 | 0:02:00 |
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 14:18:00 | 0:03:00 |
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 16:43:00 | 0:06:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:08:00 | 0:01:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:09:00 | 0:06:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 10:30:00 | 0:01:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:02:00 | 0:02:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 14:07:00 | 0:06:00 |

579.   Later that evening on October 18, 2012, CW-3 sent an e-mail to Kellum

and other Sandoz colleagues reporting what he had learned from Aprahamian.

580.   In accordance with the cartel's strategy of avoiding putting any

incriminating language in writing, CW-3 referred to his source as a customer. Further,

CW-3 knew that Kellum understood that his true source for the information was not

a customer, btu rather his contact at Actavis, Aprahamian.

581.   After confirming their own ability to supply, Sandoz decided to move

forward with a price increase on Desonide Lotion.  In November, 2012, Sandoz

generated a price increase analysis for the product.

582.    On December 5, 2012, Sandoz raised its WAC prices for Desonide Lotion by 75%. On the day before and the day of the price increase, CW-3 called Aprahamian twice, letting him know the details of the increase. The calls lasted approximately seven minutes and two minutes, respectively.  Several months later, on May 10, 2013, Sandoz again increased WAC pricing for Desonide Lotion – this time by 11%.

583.    On August 22, 2013, Actavis finally re-entered the Desonide Lotion market and matched Sandoz's increased pricing. That same day, CW-3 received a text message from A.G., a sales executive at Actavis.

584.    On August 26, 2013, CW-3 notified the rest of the Fougera sales team that Actavis had re-entered the market.  In response, CW-1 sarcastically recommended reducing all Desonide prices by 75%

585.    Sandoz proceeded to concede several of its Desonide Lotion customers to Actavis in order to allow Actavis to regain its market share without eroding the high market pricing.

586.    No shortages or other market features can explain Defendants' price increases for generic Desonide Lotion during the Relevant Period.

587.    The elevated prices of generic Desonide Lotion  resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

588.    The unlawful agreement among Defendants Actavis and Sandoz/Fougera regarding generic Desonide Lotion was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### H.    Permethrin

589.    Permethrin is an insecticide that is used, *inter alia*, to treat scabies and head lice.

590.    Permethrin was discovered in the 1970's and has been commercially available in the United States for decades.  The market for generic Permethrin is mature.  Permethrin has been commercially available in the United States in a generic form for decades.

591.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic external 5% Permethrin cream ("Permethrin") at least as follows:

592.    From at least 2008 until the 2013, Defendants Actavis and Perrigo dominated the market for Permethrin.  Defendant Mylan did not enter the Permethrin market until mid-2013, by which time it had become extremely profitable.

593.    From 2013 until at least mid-2019, the last period for which sales figures

were readily available, Actavis, Perrigo and Mylan and dominated the market for Permethrin, and maintained the 2013 prices – except for Perrigo, which temporarily increased its price above even that level, throughout 2016.

594.    Permethrin had had relatively low and stable prices for years.  For example, from 2008 through mid-2011, the list price for Permethrin was less than 50 cents per unit.

595.    But in the summer of 2010, in accordance with the schemes of Defendants' cartel, Actavis and Perrigo started talking, about, *inter alia*, Permethrin prices.  For example, on May 27, 2010 – right around the time that Actavis and Perrigo raised their contract net prices for Permethrin – Actavis's Director of National Accounts, M.D., spoke by phone with Perrigo's Director of National Accounts, T.P., for approximately 10 minutes.

596.    The two spoke again the following summer – and Actavis and Perrigo nearly doubled their Permethrin prices.

597.    In late July, 2011, Actavis announced the Permethrin list price increase. Shortly thereafter, on Wednesday, August 3, the same Perrigo Director of National Accounts and Actavis Director of National Accounts (M.D. and T.P., respectively) spoke for approximately three minutes.  Two days later, on Friday, August 5, 2011, Perrigo announced an identical list (WAC) price.  That day, the Perrigo Director called the Actavis Director and appears to have left a message.  The next business day, on Monday, August 8, they finally connected and spoke for approximately 9 minutes.

598.    This made Permethrin very profitable – since Perrigo's and Actavis's costs were unchanged, that doubling in price (an extra 50 cents per unit) was all profit.

599.    The pattern repeated in 2013, except this time, Perrigo led the price increases – and Mylan joined the market, but not, of course, at a lower price.

600.    First, on March 13, 2013, Perrigo announced its price increases.  The next day, the Actavis and Perrigo Directors spoke for more than 10 minutes.  Six weeks later, they spoke again, for nearly 25 minutes, on April 12.  And two weeks after that, on April 25, Actavis announced list prices identical to those of Perrigo.

601.    This market was too profitable for Mylan to ignore – but, in accordance with Defendant's anticompetitive overarching scheme and established practice, Mylan needed to work out pricing with the incumbent suppliers.

602.    So before Mylan could enter the market in late 2013, arrangements with competitors had to be made.  Perrigo's T.P. (Director of National Accounts) kept Actavis in the loop.  Just as in 2011, T.P. spoke with M.D., Actavis's Director of National Accounts on August 21 and Friday, August 23, 2013.

603.    Early the next week, Perrigo's T.P. communicated with Mylan's Jim Nesta.  On August 27, 2013, the two executives exchanged messages; the following day, they connected and spoke for approximately 10 minutes.

604.    Then, when Mylan entered the market in the late summer of 2013, rather than offer lower prices to gain market share (as would have happened in a competitive market), Mylan entered at contract prices that were at a premium to and announced

identical list prices, which was consistent with their price-fixing agreement on Permethrin in particular and Defendants' general cartel agreement.

605.     There were additional communications on September 11, 2013, when T.P. (Perrigo) spoke with M.D. (Actavis), and on November 15, when T.P. (Perrigo) spoke with Nesta (Mylan).

606.     No shortages or other market features can explain Defendants' elevated pricing for Permethrin during the Relevant Period.

607.     The elevated prices of Permethrin that resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

608.     The unlawful agreement among Actavis, Perrigo, and Mylan for Permethrin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## I.     Potassium Chloride ER Tablets

609.     Generic Potassium Chloride tablets ("Potassium Chloride") are used to treat low potassium, which is important for the heart, muscles, and nerves.

610.     The market for Potassium Chloride tablets is and was mature and had multiple manufacturers at all relevant times.  As a result, for years, the prices of Potassium Chloride tablets were relatively low and stable.

611.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Potassium Chloride tablets (8 mEq, 10 mEq, 20 mEq), beginning at least as early as July of 2010, as follows:

612.    During the Relevant Period, Defendants Upsher-Smith, Sandoz, Actavis, Zydus and Mylan dominated the markets for generic Potassium Chloride 8 MEQ, 10 MEQ, and 20 MEQ tablets.

613.    Upsher-Smith, Sandoz and Actavis were the dominant suppliers in the market in the early years.  Upsher-Smith manufactured tablets and marketed and sold them under the brand name Klor-Con.  Upsher-Smith also supplied tablets to Sandoz, which in turn marketed and sold them under a Sandoz label.

614.    In the summer of 2010, Upsher-Smith, Sandoz and Actavis imposed nearly simultaneous and very large price increases. In the space of approximately 6 weeks, all three manufacturers tripled their list (WAC) prices.

615.    In June, 2011, Zydus entered the market.  Rather than offer better prices to win market share, Zydus tracked the high prices of Upsher-Smith, Sandoz and Actavis.

616.    As of July 1, 2014, Upsher-Smith ceased to market and sell Klor-Con under the Upsher-Smith label, but instead licensed the Klor-Con name to Sandoz. Thus, after July 1, 2014, Sandoz sold Klor-Con Potassium Chloride tablets under the Sandoz label, though the tablets continued to be manufactured by Upsher-Smith.

617.    In the second half of 2014, Mylan entered the market for Potassium Chloride tablets. Like Zydus before it, Mylan entered at high prices that tracked the other manufacturers already in the market.

618.    The WAC price chart below shows the large, parallel and sustained price increases for Potassium Chloride tablets.[27]



619.    Throughout this period, Upsher-Smith, Sandoz, Actavis, Zydus and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Potassium Chloride tablets and of their Fair Share agreement.

---

[27] The pricing patterns for 8 MEQ, 10 MEQ and 20 MEQ dosages were very similar. Only the chart for the 10 MEQ dosage is included here.

620.    For example, during the summer of 2010, D.Z, the Senior National Account Manager at Upsher-Smith, and K.K., a Senior National Account Executive at Sandoz, communicated a number of times by telephone both before and after the August list (WAC) price increases imposed by Sandoz and Upsher-Smith.

621.    During the summer of 2011, before Zydus entered the Potassium Chloride ER market, it first communicated with the incumbent suppliers. K.R., Zydus's Assistant Vice President of National Accounts, communicated frequently that summer by phone, including voice and text messages, with D.L., a Director of National Accounts at Sandoz.

622.    In the fall of 2014, when Mylan was entering the Potassium Chloride ER market, Mylan's Jim Nesta spoke to Marc Falkin at Actavis twice on September 23, 2014.  They also had been communicating over the summer leading up to Mylan's entry. When Mylan finally joined the market it did so at elevated prices consistent with the Fair Share and price-fixing agreement.

623.    No shortages or other market features can explain Defendants' price increases for generic Potassium Chloride tablets during the Relevant Period.

624.    The elevated prices of generic Potassium Chloride tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

625.    The unlawful agreement among Defendants Upsher-Smith, Sandoz, Actavis, Zydus and Mylan, regarding generic Potassium Chloride tablets was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## J.    Triamcinolone Acetonide Cream and Ointment

626.    Generic Triamcinolone Acetonide ("Triamcinolone Acetonide") is a corticosteroid that is used to treat a variety of skin conditions, including eczema, dermatitis, allergies, and rashes.  Triamcinolone Acetonide is available as both a cream and an ointment.

627.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Triamcinolone Acetonide Cream and Ointment, as follows:

628.    As of July, 2010, Fougera and Perrigo were the only manufacturers in the generic markets for both Triamcinolone Acetonide Cream and Ointment. They took advantage of their already-ongoing collusive relationship to raise prices on both products.

629.    On July 1, 2010 and again on July 20, Fougera raised WAC prices for various sizes and formulations of both the cream and the ointment.  On July 21 and July 30, 2010, Perrigo increased its own WAC prices on the same products to comparable levels.

630.    In the days leading up to, and surrounding these increases, CW-6 of Fougera and T.P. of Perrigo exchanged at least eight calls, set forth in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/30/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:29:36 | 0:00:59 |
| 7/1/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:32:00 | 0:00:04 |
| 7/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:43:00 | 0:00:07 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:19:10 | 0:00:59 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:22:47 | 0:04:38 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:27:29 | 0:00:04 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:28:03 | 0:03:23 |
| 7/29/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:37:26 | 0:00:33 |

631.    After the price increases, both companies adhered to their understanding not to poach the others' customers or improperly take advantage of the price increase by seeking additional market share.

632.    For example, on July 30, 2010, a Perrigo customer, ABC, provided Fougera an opportunity to bid on its Triamcinolone Acetonide business because of Perrigo's price increase.

633.    That same day, Kaczmarek called CW-6.  The call lasted approximately two minutes. CW-6 then called T.P. of Perrigo and they spoke for a few minutes. CW-6 hung up with T.P., called Kaczmarek back, and they spoke for approximately five minutes.  Immediately upon hanging up, Kaczmarek responded to CW-3's e-mail, with a copy to CW-6.  At the same time, T.P. called his supervisor, Wesolowski, and they spoke for approximately five minutes.

634.    No shortages or other market features can explain Defendants' price increases for generic Triamcinolone Acetonide Cream and Ointment, during the Relevant Period.

635.    The elevated prices of generic Triamcinolone Acetonide Cream and Ointment resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

636.    The unlawful agreements among Defendants Fougera and Perrigo, regarding Triamcinolone Acetonide Cream and Ointment were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## K.    Atropine Sulfate Tablets

637.    Generic Atropine Sulfate 1% Ophthalmic Solution ("Atropine Sulfate") is an anticholinergic, used in eye examinations to dilate the pupil and to treat certain eye conditions.

638.    The market for Atropine Sulfate is mature.  At all relevant times, there have been multiple manufacturers.  It has been available in the United States in generic form for over a decade.

639.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Atropine Sulfate, as follows:

640.    Defendants Bausch and Fougera/Sandoz dominated the sales of Atropine Sulfate with close to an 80/20 market-share split for much of the Relevant Period.

641.    The GAO noted that Atropine Sulfate had "extraordinary price increases" in the years 2010-2011.

642.    The ability of Bausch and Fougera/Sandoz to reach agreements on Atropine Sulfate Ophthalmic Solution was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

643.    The agreement between Defendants Bausch and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Atropine Sulfate Ophthalmic Solution (1%).

644.    No shortages or other market features can explain Defendants' price increases for generic Atropine Sulfate during the Relevant Period.

645.    The elevated prices of generic Atropine Sulfate resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

646.   The unlawful agreement among Defendants Bausch and Fougera/ Sandoz, regarding generic Atropine Sulfate, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### L.   Oxycodone HCL Tablets & Oral Solution

647.   Generic Oxycodone HCL Tablets and Oral Solution ("Oxycodone" or "Oxycodone HCL") are an opioid agonist, indicated for the management of moderate to severe acute and chronic pain where the use of an opioid analgesic is appropriate.

648.   Oxycodone is available in several forms, including Tablet and Oral Solution, and has been available in the United States in generic form for over a decade.  The market for Oxycodone HCL is mature.  At all relevant times, there have been multiple manufacturers of Oxycodone HCL.

649.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Oxycodone HCL, as follows:

650.   The GAO noted that Oxycodone HCL had "extraordinary price increases" in the years 2010-2011.

651. The ability of Glenmark and Lannett to reach agreements on Oxycodone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

652. The agreement between Defendants Glenmark and Lannett was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Oxycodone HCL Oral Solution (20mg/ml).

653. The ability of Mallinckrodt, Par and Teva to reach agreements on Oxycodone HCL Tablets was aided by the prevalence of trade association meetings and conferences where their employees were able to meet in person.

654. The agreement between Defendants Mallinckrodt, Par, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Oxycodone HCL Tablets (15 mg and 30 mg).

655. No shortages or other market features can explain Defendants' price increases for generic Oxycodone HCL during the Relevant Period.

656. The elevated prices of generic Oxycodone HCL resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

657.    The unlawful agreements among Defendants Mallinckrodt, Par, and Teva, regarding generic Oxycodone HCL, were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## M.    Betamethasone Dipropionate, Betamethasone Dipropionate Augmented cream, Betamethasone Dipropionate Clotrimazole, Betamethasone Valerate, and Hydrocortisone Valerate

658.    As set forth in more detail below, Betamethasone Dipropionate, Betamethasone Dipropionate Augmented cream, Betamethasone Dipropionate Clotrimazole, Betamethasone Valerate, and Hydrocortisone Valerate are sold in a variety of formulations, including ointments, creams, and lotions, and are used in the treatment of skin conditions, such as eczema and fungal infections.

659.    Betamethasone Dipropionate ("Beta Dip"); Betamethasone Dipropionate Augmented cream ("Beta Dip Augmented cream"); Betamethasone Valerate ("Beta Val"); and Hydrocortisone Valerate are all corticosteroids and are used to help relieve redness, itching, swelling, and other symptoms of various skin conditions.

660.    Betamethasone Dipropionate Clotrimazole ("CBD") is a combination of clotrimazole (a synthetic antifungal agent) and betamethasone dipropionate that is used to treat fungal infections, including ringworm, athlete's foot, and jock itch.

661.    The markets for these products were mature and at all relevant times had multiple manufacturers.

662.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Betamethasone Dipropionate cream, ointment, and lotion; Betamethasone Dipropionate Augmented lotion; Betamethasone Dipropionate Clotrimazole cream and lotion; Betamethasone Valerate cream and ointment; and Hydrocortisone Valerate cream, at least as follows:

663.    Throughout the Relevant Period, Defendants dominated the markets for these products, as follows:

| Betamethasone Dipropionate | Cream | Actavis, Sandoz/Fougera, Taro |
|---|---|---|
| Betamethasone Dipropionate | Lotion | Sandoz/Fougera, Perrigo |
| Betamethasone Dipropionate | Ointment | Actavis, Sandoz/Fougera |
| Betamethasone Dipropionate Augmented | Lotion | Sandoz/Fougera, Taro |
| Hydrocortisone Valerate | Cream | Taro, Perrigo, G&W |
| Betamethasone Dipropionate Clotrimazole ("CBD") | Cream | Actavis, Sandoz/Fougera, Taro |
| | Lotion | Sandoz/Fougera, Taro |
| Betamethasone Valerate | Cream | Actavis, Sandoz/Fougera, Taro |
| Betamethasone Valerate | Ointment | Actavis, Sandoz/Fougera |
| Betamethasone Valerate | Lotion | Sandoz/Fougera, Teva, G&W |

664.    As illustrated in the chart, **Sandoz/Fougera**[28] made every formulation of all of these products, except for Hydrocortizone Valerate cream; conversely, of these products, **G&W** made only some of the Valerate creams and Lotions; and **Actavis, Perrigo, and Taro** participated at different times in some of these markets and not others.

665.    But **all** of these manufacturers imposed extraordinary, anticompetitive price increases across all formulations of these drugs, at similar times and amounts, increasing the prices of some by more than 2,000%.  Throughout, Defendants were scrupulous about monitoring and adhering to Fair Shares and maintaining high prices.

666.    Throughout this time-frame, Actavis, Sandoz/Fougera, Taro, Perrigo and G&W met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Betamethasone Dipropionate, Betamethasone Valerate, Betamethasone Dipropionate Clotrimazole, Hydrocortisone Valerate, and the cartel's so-called "Fair Share" agreements on these products and other Drugs at Issue.

667.    The result was, in addition to Defendants' overarching cartel agreement regarding all Drugs at issue, there was a revolving door and/or Round Robin of smaller conspiracies among the groups of Defendants participating in these individual

---

[28] Acquired by **Sandoz** in July, 2012, and collectively referred to herein as Fougera/Sandoz and/or Sandoz/Fougera.  Sandoz continues to operate Fougera after the acquisition.

product markets.  As a result, this Complaint describes these overlapping pairs or groups of conspirators in their individual product conspiracies:

**Perrigo-Fougera/Sandoz**

668.    For example, on December 16, 2010, Perrigo held an internal meeting to discuss increasing pricing on Betamethasone Dipropionate lotion – the only product in this group in which they overlapped with Fougera (which, as alleged *supra*, was later acquired by Sandoz).  That same day, T.P. at Perrigo and SW-6 at Fougera/Sandoz exchanged several calls.  After hanging up with T.P., SW-6 called Kaczmarek to update him on their discussions. These calls are detailed in the chart below:[29]

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/16/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 8:58:29 | 0:00:25 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:12:49 | 0:05:32 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:18:34 | 0:01:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:20:00 | 0:03:51 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:24:02 | 0:05:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 10:00:24 | 0:01:08 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:34:32 | 0:01:04 |

669.    After this series of phone calls, Perrigo raised its Betamethasone Dipropionate prices.  On January 4, 2011, Perrigo's WAC price for the lotion formulation skyrocketed, from approximately $6.50/unit to $37.50/unit – over 500%. That same day, T.P. called SW-6 and they spoke for seven minutes.  Just minutes after hanging up, SW-6 again called Kaczmarek to keep him in the loop.

---

[29] Throughout this Complaint, in the phone-usage charts, SW-6 is referred to as "CW-6" or "CW-6 (Fougera)."

670.   Three days later, on January 7, 2011, the Fougera sales team held a conference call, during which they discussed the upcoming increase on various products, including Betamethasone Dipropionate.  That same day, T.P. called SW-6 and they spoke for four minutes.  Over the comse of the day, the two exchanged several more calls and SW-6 kept Kaczmarek apprised of these discussions.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:02:00 | 0:04:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:48:35 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:21:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:22:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 11:17:00 | 0:02:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:45:31 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 14:56:11 | 0:00:14 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:00:53 | 0:20:39 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 16:00:36 | 0:04:27 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:05:31 | 0:01:57 |
| 1/7/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:17:40 | 0:01:15 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 17:09:52 | 0:00:00 |

671.   On January 12, 2011, Fougera followed Perrigo and increased its WAC pricing on Betamethasone Dipropionate to $39.99/unit – even higher than Perrigo's WAC pricing. The next day, on January 13, 2011, SW-6 called T.P. again and they spoke for approximately twelve minutes.

**Perrigo-Taro**

672.   In March, 2013, when Taro and Perrigo began to raise prices to customers for Hydrocortisone Valerate cream, the two companies were

communicating. D.S., the AVP of National Accounts at Taro, and A.F., Perrigo National Account Director, communicated by phone on March 13, 2013.

**Fougera/Sandoz-Taro**

673.    Similarly, D.L., Director of National Accounts at Fougera/Sandoz and D.S., AVP of National Accounts at Taro, communicated regularly at a number of separate intervals during the Relevant Period, as Fougera/Sandoz co-ordinated pricing with Taro.  For example, in April, 2011, when both companies raised prices on CBD lotion, the two spoke by phone.

674.    The two[30] spoke again in October, 2012, when Fougera/Sandoz announced another price increase on lotion formulations.

675.    It was also not a coincidence that the two spoke yet again in February, 2013, when Taro raised its lotion prices in conjunction Fougera/Sandoz.

676.    Other employees of both companies communicated around the time of these price increases, further illustrating the institutional (rather than merely personal) nature of the co-operation between the two companies.  For example, just before Actavis increased its prices on CBD cream in March, 2011, Taro and Sandoz/Fougera executives were talking to each other; *e.g.*, between February 1 and March 9 of that year, H.M. (a Taro sales executive) spoke with SW-6 at Sandoz/Fougera three times, for a total of approximately a quarter of an hour.

---

[30] D.L. (Sandoz/Fougera) and D.S. (Taro)

677.     Then, on March 17, 2011, H.M. called SW-6 and they spoke for approximately two minutes.  The following Monday, March 21, was a busy day for the co-conspirators, who called three times that day, and then again one each on March 22 and March 23 – not for long, but for long enough to co-ordinate the mutual price increases that occurred two days later, on that Friday March 25.

678.     The following Wednesday, March 30, 2011, Fougera/Sandoz sent out notices to its customers stating that it was raising prices for CBD Cream. Those increases, which took effect that same week, increased Fougera's WAC prices for CBD Cream by 54% and increased contract prices across the board, in some cases by over 1,200%.

679.     The day after Fougera announced those price increases, SW-6 at Fougera /Sandoz and H.M. at Taro spoke three separate times, for a total of eighteen minutes.

680.     Within days, on April 4, 2011, Taro implemented its own substantial price increases across the board for both CBD Cream and CBD Lotion.  For some customers, Taro raised prices for CBD Cream by approximately 1,350% and raised prices for CBD Lotion by approximately 960%.  The next day (April 5), H.M. called SW-6, and they spoke for approximately a quarter of an hour.

681.     The following week, on April 14, 2011, Fougera followed Taro with a price increase on CBD Lotion, raising its WAC by 71 % and increasing its contract prices across the board, in some cases by over 900%.  At the time, Fougera's gross profit margin on CBD Lotion was aheady 67%, and with this price increase, their

gross profit percentage soared to 96%.  Sandoz/Fougera estimated that these

increases accounted for an extra $1. 8 million in profit for the rest of 2011, alone.

682.   In addition, in furtherance of the conspiracy, Fougera/Sandoz refrained

multiple times from taking customers that approached it for bids.  For example, after

Taro's increase, Wal-Mart, a Taro customer for CBD Cream and Lotion, asked

Fougera to bid for that business.  Kaczmarek directed his subordinates not to make a

genuine bid for the business and instructed his colleagues to conceal the reason for

not bidding.  Likewise, when Rite-Aid approached Fougera, Fougera did not even

consider making a competitive offer.  Instead, when a Fougera employee asked what

to do, Kaczmarek directed that Fougera would not make a competitive offer.

**Actavis-Taro**

683.   During the same periods, described *supra*, that D.L (Sandoz/Fougera)

and D.S. (Taro) were communicating with each other, Taro's VP of Marketing

(Mitchell Blashinsky, "Blashinsky") and Actavis's VP of Sales and Marketing (Michael

Perfetto, "Perfetto") were also communicating; the two men communicated by phone

every month from February, 2011, through May, 2012.  For example, from February 1

to March 9, 2011, Perfetto and Blashinsky spoke eight times, for a total of just under

an hour. (approximately 52 minutes)

684.   On March 23, 2011, Perfetto called Blashinsky three times, for

approximately nine minutes at 12:44 pm, and then for another quarter-hour a few

minutes later, starting at 1:07 pm, and finally, again in the evening, for another quarter-hour.

685.   Two days after these Blashinsky (Taro)-Perfetto (Actavis) calls, on March 25, Actavis told its customers of the price increases for CBD Cream.  By happenstance, just days before the announcement, Actavis learned that its API costs for CBD Cream would also increase.  Actavis immediately saw that it could use this news to provide cover for its illegal price-fixing conspiracy and mislead its customers.

686.   Before the announcements went out on March 25, 2011, Perfetto e-mailed the Actavis sales executives, telling them to stick to the story that the price increase was the result of API cost issues.  The sales executives carried out their orders, including one sales executive telling Econdisc that the increase was necessary because of Actavis's API cost issues.  In reality, Actavis knew the the new pricing of API for its CBD Cream did not make Actavis's price increases necessary.

**Actavis-Perrigo-Fougera/Sandoz**

687.   By March 5, 2012, Taro reignited its desire to raise prices on CBD Cream.  Over the next several weeks, representatives of Taro spoke several times with their contacts at Actavis and Fougera.  During these calls, Taro conveyed to its competitors its intentions to increase prices and secured their commitments not to poach Taro's customers.  These calls are detailed in the chart below: [31]

---

[31] As with SW-6, throughout the telephone charts in this Complaint, SW-3 is referred to as "CW-3" and SW-4 is referred to as "CW-4."

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/7/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:29:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |
| 3/9/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 7:37:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 9:42:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 9:49:00 | 0:02:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 15:34:00 | 0:01:00 |
| 3/16/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 4:51:00 | 0:10:00 |
| 3/17/2012 | Voice | D.S. (Taro) | Outgoing | K.K. (Fougera) | 11:08:00 | 0:02:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:11:00 | 0:05:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:29:00 | 0:01:00 |
| 3/22/2012 | Voice | CW-3 (Fougera) | Outgoing | Aprahamian, Ara (Actavis) | 7:32:00 | 0:13:00 |
| 3/29/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 8:49:00 | 0:05:00 |
| 3/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 10:58:00 | 0:05:00 |

688.     As with the many other examples of communications among cartel members detailed in this complaint (among the many others that likely exist), the institutional (rather than merely personal) nature of the co-operation among members of Defendants' cartel is illustrated in part by the fact that multiple Fougera/Sandoz employees (K.K., SW-3, SW-6) are communicating with their multiple Taro counterparts (Blashinsky, D.S., and H.M.) and essentially-simultaneously with their multiple Actavis counterparts. (Aprahamian and Perfetto)

689.     On March 30, 2012 (the day after the last call detailed above), Taro increased its WAC prices for CBD Cream by a further 7% and its contract prices by 15% for most of its existing customers – on top of the dramatic increases of the previous spring.

690.    A month later, McKesson twice asked Taro to reduce its price based on comparable sales by competitors.  Both times, Taro declined, knowing that its co-conspirators would not poach its business.  Taro's confidence was well placed.

691.    Rebuffed by Taro, McKesson contacted L.P., an Actavis sales executive, on May 23, 2012, asking if Actavis's recent RFP bid still stood.  Actavis would not answer, of course, without first communicating with its co-conspirator.

692.    Thus, at 5:02 that evening, L.P. forwarded McKesson's request to his bosses at Actavis, Perfetto and Ara Aprahamian.  The very next day, May 24, Perfetto exchanged three calls with Blashinsky (at Taro), including one lasting approximately a quarter of an hour.  Following his calls with Blashinsky, Perfetto asked Aprahamian to call.  Aprahamian called Perfetto the next morning. After that call, an Actavis employee suggested that Actavis should stick by their RFP price and take the account, but Aprahamian decided instead to pass up the business, which was in accordance with Defendants' cartel agreements.

693.    Taro and Fougera/Sandoz found out that a competitor to Defendants' cartel, Prasco, would enter the market for CBD *cream* in Fall, 2012.  However, even then, Taro and Sandoz (which acquired Fougera in July, 2012) would still be[32] the only manufacturers in the market for CBD *lotion*.

---

[32] And, in fact, they remained the only manufacturers in the market for CBD lotion.

694.    Faced with the prospect of competition finally entering the market for the cream formulation and the possible loss of their cartel's monopoly profits there, Sandoz and Taro sought to maximize profits – by raising prices, in the lotion market, where there would be no competition with their cartel, regardless of what happened in the lotion market.  This way, Prasco might join Defendants' cartel agreement for the cream formulation, maintaining the cartel's outrageous profits; but even if Prasco followed the law and did not join Defendants' cartel, Taro and Fougera/Sandoz would replace the losses that Prasco's entry to the cream market might bring – with increased rents from their monopoly on the lotion formulation.

695.    Thus, starting in late August, 2012, Sandoz began planning a 100% price increase (*i.e.*, doubling the price) on CBD Lotion, to take place in October, which was predicted to bring in an estimated additional $3.9 million to Sandoz annually.

696.    In the weeks leading up to its planned increase, Sandoz repeatedly spoke to Taro, including at least the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/20/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:13:00 | 0:17:00 |
| 9/21/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 8:18:00 | 0:03:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 9:54:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:11:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:04:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:27:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:53:00 | 0:01:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:25:00 | 0:02:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:49:00 | 0:21:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:11:00 | 0:02:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:12:00 | 0:03:00 |
| 10/8/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 10:32:00 | 0:09:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:00:00 | 0:01:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/12/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:01:00 |

697.    As with the many other examples of communications among cartel members detailed in this complaint (among the many others that likely exist), the institutional (rather than merely personal) nature of the co-operation among members of Defendants' cartel is illustrated in part by the fact that multiple Fougera/Sandoz employees (both SW-3 and SW-4) are communicating with their multiple Taro counterparts, H.M. and D.S.

698.    On October 18, 2012, Sandoz increased prices for CBD Lotion, doubling its WAC price (from $61.90 to $123.80), as well as its contract prices.  As expected (and *per* Defendants' cartel agreement), Taro did not attempt to poach Sandoz's customers to get market share.  For example, when MMCAP e-mailed Taro

on October 26, 2012, to request a bid from Taro for a dual award, in light of Sandoz's

increase, Taro did not even respond to the customer's request.

699.    Taro also made plans to follow the Sandoz price increase.  On Friday,

January 4, 2013, J.J., a senior Taro sales executive, instructed Taro sales executives,

including H.M. and D.S., to gather information on CBD Lotion in anticipation of

Taro's planned price increase.  That same day, H.M. spoke with SW-3 at Sandoz for

approximately five minutes. The pair spoke again the following Monday (January 7),

for approximately a quarter of an hour.  Later that same week, on January 10, 2013,

D.S. (Taro) spoke with SW-4 ( Sandoz) for approximately 23 minutes.

700.    The next month, on February 12, 2013, Taro instituted its price increase

on CBD Lotion, raising its WAC by approximately 80% and contract prices by

approximately 60%.

701.    After Taro's increase was issued, news of it spread throughout Sandoz,

including at least one internal e-mail about it.  And just as Taro did not poach

Sandoz's customers when Sandoz raised CBD Lotion prices, Sandoz was careful not

to poach Taro's customers following Taro's increases.  In fact, SW-1, a Sandoz senior

pricing executive, gave written directions to Sandoz employees not to bid on CBD

lotion for Taro's customers.

**Actavis-Sandoz/Fougera**

702.    In early January, 2013, Actavis was the only generic manufacturer in the market for Betamethasone Valerate ointment.  Sandoz was making plans to re-enter that market and targeted February 15, 2013, as its re-launch date.

703.    On January 21, 2013, Sandoz held a Commercial Operations call during which the Betamethasone Valerate ointment re-launch was discussed.  During that call, SW-3 noted that Sandoz was seeking 40% of the market.  This was typical of, and consistent with, the market share that the so-called "fair share" rules of Defendants' cartel awarded to a second entrant in a two-player market.

704.    Accordingly, to facilitate its entry into the market and to avoid disrupting the market, Sandoz naturally turned to its co-conspirator and incumbent supplier, Actavis, to divide up the market and set prices.

705.    For example, on February 4, 2013, SW-3 called Ara Aprahamian, who was still then at Actavis.  The call lasted approximately one minute.  The next day, February 5, SW-3 spoke with Aprahamian twice more, with one call lasting approximately twenty-three minutes.  Immediately after each call with Aprahamian, SW-3 called Kellum or SW-1 to report back what he had learned. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 10:14:00 | 0:23:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 10:38:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 10:39:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 11:24:00 | 0:03:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:27:00 | 0:01:00 |

706.    During these calls, Aprahamian provided SW-3 with Actavis's non-public pricing information for Betamethasone Valerate ointment and the names of its largest customers, as well as the percentage of the market that each customer represented.  The purpose of providing this information was so that Sandoz would be able to price as high as possible while still obtaining business from the specific, agreed-upon customers that represented Sandoz's agreed-upon share.  SW-3 took notes in his Notebook contemporaneously, placing check marks next to Rite Aid and Walgreens, two of Actavis's customers that they agreed that Sandoz would get.

707.    Later in the evening on February 5, 2013, J.R., a senior Sandoz marketing executive, sent an internal e-mail, including to SW-3, addressing this issue. Two days later, on February 7, 2013, C.P., a pricing analyst at Sandoz, sent an internal e-mail, including to SW-3, stating that Sandoz planned to send an offer to Walgreens and would send offers to additional targets once they received Walgreens's feedback.

708.    On February 13, 2013, SW-3 called Aprahamian and they spoke for approximately a quarter-hour.  In an internal email that same day, Rick Rogerson, a senior pricing executive at Actavis, discussed giving the Walgreens account to Sandoz.

242

In response, Aprahamian confirmed that Actavis would be ceding the Walgreens account to Sandoz.

709.   Two days later, on Friday, February 15, Sandoz re-entered the market and published WAC pricing that matched Actavis's WAC pricing.  That same day, Sandoz received Walgreens's Betamethasone Valerate ointment account.

710.   The following Tuesday, February 19, 2013, Sandoz bid on the Betamethasone Valerate ointment account at Rite Aid.  That same day, SW-3 called Aprahamian to let him know; the call lasted less than one minute, but it was long enough to pass on that information.  The next week, on February 28, 2013, Rite Aid awarded that business to Sandoz.

711.   The following month, On March 15, 2013, Sandoz bid on the Betamethasone Valerate ointment business at Cardinal.  Less than two weeks later, on March 27, Cardinal awarded that account to Sandoz.  These three accounts – Walgreens, Rite Aid, and Cardinal – accounted for approximately 32% of the Betamethasone Valerate ointment market.

712.   The following Monday, April 1, 2013, Sandoz held a Commercial Operations call during which they discussed, among other items, the status of the Betamethasone Valerate ointment re-launch.  As SW-3's notes from that call reflected, they discussed that Sandoz had been able to secure three customers, but was short one additional customer, OptiSource, to reach their original 40% market share "goal," *i.e.*, their share under Defendants' cartel agreements.

713.     Later that week, on Thursday, April 4, 2013, Sandoz submitted an offer to Optisource for its Betamethasone Valerate ointment account.  On the next Monday, April 8, Optisource awarded that business to Sandoz.

**Fougera/Sandoz-Teva-G&W**

714.     Similar collusion was going in the Betamethasone Valerate lotion market.

715.     Betamethasone Valerate ("Beta Val") is a medium-strength, topical corticosteroid prescribed for the treatment of skin conditions, such as eczema and dermatitis, as well as allergies and rashes.  It is made in various formulations, including cream, lotion, and ointment.

716.     As of mid-2011, only two companies shared the market for Beta Val Lotion – Fougera/Sandoz, with 79% of the market, and Teva, with 21%.

717.     In early November, 2011, however, Jim Grauso ("Grauso,") then Sales and Marketing Vice President ("VP") at G&W, contacted SW-6 with some important news about G&W's plans to enter the Beta Val Lotion market. Grauso called SW-6 late in the afternoon of November 9, 2011.  They also spoke three times the next morning.  Later that day, SW-6 informed his Fougera colleagues, including his boss Kaczmarek, that G&W would be launching Beta Val Lotion and that he believed Teva had discontinued the product.  Teva was, in fact, exiting the market, leaving Fougera as the sole incumbent supplier.

718.     In accordance with Defendants' cartel's so-called "Fair Share" rules, this meant that as the now-second entrant, G&W could expect to receive approximately

40-45% of the market.  And with the price increases that would accompany that share (without fear of being undercut), G&W would go on to – and, in fact, did – put more money in its pocket than if it had captured 100% of the market at a competitive price. And the same was true of Fougera.

719.    Fougera promptly began preparing for an even larger price increase than SW-6 had recommended.  On December 13, 2011, SW-3, a Fougera sales executive, created a spreadsheet detailing Fougera's upcoming price increases, including a 200% increase in WAC pricing for Beta Val Lotion from $20.00 to $60.00 per 60ml bottle. Because WAC is a reflection of Net Sales Price, this meant that the average net sales price for the product went from $10.11 to $30.33.

720.    With the Fougera price increase details now firmed up, SW-6 began co-ordinating the price increase directly with G&W, initiating what became a series of twelve phone calls with Grauso at G&W from December 14 through December 21, 2011, in the days leading up to Fougera's price increase for Beta Val Lotion.

721.    Fougera's new $60.00 WAC price went into effect on the next day, December 22.

722.    SW-6 and Grauso remained in close contact in the days that followed the Fougera/Sandoz price increase, as G&W also finalized plans for its Beta Val Lotion launch, including a twenty minute call on December 28, 2011.

723.    During these calls, these co-conspirators' employees discussed G&W's market share goals and identified customers for G&W to target as it launched.

724.   December 28, 2011, was also Grauso's last day as a G&W employee – immediately after leaving Defendant G&W as a a Sales and Marketing VP, Grauso went to work at Defendant Aurobindo as Senior Vice President ("SVP"), Commercial Operations from December, 2011, through January, 2014.  Since February 2014, Grauso has been employed as the Executive Vice President, N.A. Commercial Operations, at Defendant Glenmark – illustrating the "revolving door" through which employees moved among the different Defendants.  This constant shuffling and re-shuffling of employees helping to reinforce the cartel's methods and the principle that it was in all Defendants' best interest to co-operate, rather than to go it alone – especially on price.  As C.L. explained in an internal Taro e-mail, Zydus "could hit us on Warfarin.  Not worth a fight in the sandbox over 300 annual units for Etodolac."  Failing to co-operate with Defendants' cartel on one product meant its members would be punished on other products.

725.   On January 9, 2012, Erika Vogel-Baylor ("Vogel-Baylor") at G&W (who had just taken over for Grauso as Sales & Marketing VP there) sent an e-mail to Wal-Mart, announcing the Beta Val Lotion launch.  She followed up with a quote on January 11, offering to supply the product for $10.40 – surprisingly, a number far below Fougera's newly increased average net sales price.

726.   Vogel-Baylor directed her colleagues at G&W to generate a nearly identical offer letter for another customer (Rite Aid) on January 10, priced $10.20.

727.   SW-6 (Fougera/Sandoz) was surprised at this breach of the cartel's agreement and wanted to find out what had happened, so that same afternoon – having already heard about the lowered prices from Fougera – SW-6 placed an urgent call to Grauso, who, as alleged *supra*, had recently started at Defendant Aurobindo.

728.   Grauso called him back quickly and the two spoke for five minutes. Immediately upon ending that call, Grauso, in turn, called his former colleague at G&W, Vogel-Baylor, to convey Fougera's concerns about G&W's drastically underbidding Fougera's price.  As soon as that call ended, Grauso called SW-6 at Fougera to confirm that he had addressed the problem.

729.   Unsurprisingly, SW-6's message was effective – now Vogel-Baylor knew she had to make things right with the cartel, and she lost no time in doing so.  At 10:02 p.m. that same day, Vogel-Baylor e-mailed her boss, G&W's then-President, Kurt Orlofski, with the news she had just received about Fougera.

730.   At 7:55 a.m. the following morning, January 11, Vogel-Baylor asked that the G&W team resubmit the Rite Aid proposal with a new price of $20.00, bringing it more in line with Fougera's new price.  That same day, G&W also issued a revised price proposal to Wal-Mart, quoting the new price of $20.00.

731.   Vogel-Baylor explained the sudden about-face to a colleague by saying that she had revised the G&W launch pricing for this product and that the modified schedule included $30.00 for large chains, $32-$75 for small chains, and $38.53 for wholesalers, closely paralleling the new Fougera prices.

732.    A week later, on January 19, Vogel-Baylor told her boss, G&W's President, Orlofski, that G&W had already reached its target market share for Beta Val Lotion:  45%.  As discussed elsewhere in this Complaint, that is approximately the share that a second entrant into a market would receive.  And as Orlofski explained in a February 17, 2012, e-mail exchange with a distributor, G&W would not seek additional market share on this product.

733.    Further, by sticking to the cartel's price increase, that 45% market share was worth $1.6 million in total annual gross sales for G&W.

734.    However, this experience led Orlofski to conclude that going forward, it would be prudent to cut out the middleman and communicate directly with SW-6. Accordingly, David Berthold, the Vice President of Sales at Defendant Lupin, introduced Orlofski to SW-6 and they set up a dinner meeting at an industry conference, which was also attended by Vogel-Baylor.

735.    At dinner, the co-conspirators engaged in a high-level discussion to ensure that both companies continued to "play nice in the sandbox" and minimize competition with each other.  No specific products were discussed at the meeting. The focus was to ensure that the competitors stayed the course and continued to co-ordinate customer allocation and price increases on products that G&W and Fougera overlapped on.

736.    After the dinner, Vogel-Baylor began to communicate directly with SW-6.  Indeed, in the year between May, 2012, and May, 2013, when SW-6 left the

industry, the two exchanged at least 133 phone calls and text messages.  During this time period, Vogel-Baylor was acting at all times at the direction of, or with approval from, Orlofski.

### Perrigo-G&W

737.    When G&W was preparing to enter the Hydrocortisone Valerate cream market in early 2015, T.P, Director of National Accounts at Perrigo, spoke a number of times to E.V., a VP of Sales at Marketing at G&W, between January and March 2015.  When G&W entered the market, it matched the prices of Perrigo and Taro.

738.    These are only direct communications among cartel members; as alleged elsewhere in this Complaint, cartel members regularly communicated with one another indirectly, passing messages *via* intermediaries, including other cartel members.  It is likely that such additional pass-through communications occurred as part of this drug-specific agreement, as well.

### Sandoz/Fougera Internal

739.    Internal documents at multiple Defendants likewise support these allegations.  For example, a Sandoz spreadsheet from August, 2012, addressing Sandoz's response to a Cardinal Request for Proposal (RFP) indicates that Sandoz did not intend to bid on Betamethasone Dipropionate Augmented Lotion.

740.    Likewise, a Sandoz spreadsheet from November, 2013, shows relative market shares for each manufacturer of betamethasone dipropionate cream, as well as

the implications for market share acquisition – including indicating that Sandoz would not pursue additional market share on Betamethasone Dipropionate Cream.  It said this because the Sandoz employee who made it knew that Sandoz had already reached the cartel's so-called Fair Share maximum.

**Taro Internal**

741.    Similarly, on May 22, 2015, D.S. at Taro wrote to another Taro colleague, A.L., about opportunities to pick up market share on various products, including Betamethasone Dipropionate Cream.  D.S. wrote that Taro should not compete for additional market share – and he did so because of Defendants' cartel agreement not to compete, including on Betamethasone Dipropionate Cream.

742.    The ability of Actavis, Perrigo, Sandoz, Taro, and G&W to reach agreement regarding these products was aided by the prevalence of trade association meetings and conferences, where the parties were able to meet in person..

743.    Pricing data also bears out the collusion just described.  The charts below show list prices for cream formulations of Betamethasone Dipropionate, Betamethasone Valerate, Betamethasone Dipropionate Clotrimazole and Hydrocortisone Valerate.  The charts illustrate the parallel pricing among Actavis, Sandoz/Fougera, Perrigo, Taro, and G&W, at the same times as the communications described *supra*.

744.   The charts further show that, as part of Defendants' cartel – even though G&W had (obviously) 0% market share prior to entering the Hydrocortisone Valerate market – when G&W entered that market, rather than offering lower prices to win customers, G&W charged the same approximately $5/unit as its co-conspirator, incumbent manufacturers charged.

745.   The charts also show that Defendants maintained their anticompetitive agreements and actions through at least early 2019, the last period for which pricing data was readily available, and support Plaintiffs' contention that this elevated pricing will continue indefinitely, unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

746.



747.



748.



749.



750.   Ointment pricing followed the same trajectory, likewise illustrating the parallel pricing between Actavis and Sandoz, Taro, and G&W.

751.   As with the cream prices, the ointment charts also show that Defendants maintained their anticompetitive agreements and actions through at least early 2019, the last period for which pricing data was readily available, and support Plaintiffs' contention that this elevated pricing will continue indefinitely, unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court:

752.



753.



754.  Likewise, lotion pricing provides the same illustrations:



755.   No shortages or other market features can explain Defendants' elevated pricing for Betamethasone Dipropionate cream, ointment, and lotion; Betamethasone Dipropionate Augmented lotion; Betamethasone Dipropionate Clotrimazole cream and lotion; Betamethasone Valerate cream and ointment; and Hydrocortisone Valerate cream, during the Relevant Period.

756.   The elevated prices of Betamethasone Dipropionate cream, ointment, and lotion; Betamethasone Dipropionate Augmented lotion; Betamethasone Dipropionate Clotrimazole cream and lotion; Betamethasone Valerate cream and ointment; and Hydrocortisone Valerate cream, which resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels

indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

757.   This unlawful agreements among Actavis, Sandoz/Fougera, Taro, Perrigo, and G&W for for: Betamethasone Dipropionate cream, ointment, and lotion; Betamethasone Dipropionate Augmented lotion; Betamethasone Dipropionate Clotrimazole cream and lotion; Betamethasone Valerate cream and ointment; and Hydrocortisone Valerate cream, were part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## N.   Clindamycin

758.   Clindamycin Phosphate ("Clindamycin") is a topical antibiotic used on the skin to stop the growth of certain bacteria that cause acne.  Clindamycin comes in several different formulations, including a cream, gel, lotion, and solution.

759.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Clindamycin, as follows:

760.   At all times relevant to the Complaint, Fougera (and later Sandoz, after its acquisition of Fougera) and Greenstone dominated the markets for the four different formulations of Clindamycin Phosphate.  In each of those markets, Fougera/Sandoz and and Greenstone adhered to their "fair share" understanding across all four product markets and co-ordinated several significant price increases.  In

only one of those markets – Clindamycin Solution – did any significant competition *ever* enter the market. And even there, as discussed more fully below, it was quashed by Defendants. Indeed, Taro and Perrigo entered the market for Clindamycin Solution in late 2013 and co-ordinated to avoid competition and minimize price erosion, in accordance with the cartel's "fair share" agreement.

761. In 2010, Defendants Fougera and Greenstone were the only suppliers in the market for Clindamycin 60ml solution. Fougera – a separate company that was subsequently acquired by Sandoz in 2012 – temporarily discontinued the product in September, 2010, leaving Greenstone as the sole supplier in the market.

762. By late 2010, however, Greenstone also began to experience production problems, although it did continue to supply certain select customers. Fougera immediately started preparing to re-enter the market and significantly raise price – in direct co-ordination with Greenstone.

763. On November 1, 2010, Fougera learned that it had Clindamycin 60ml solution in stock and that the product was available for shipping. In response, a Fougera sales executive suggested that Fougera double its WAC price from $7.50, to $15.00.

764. Fougera did get the price point, with help from Greenstone. The next day, Fougera scheduled an internal call with Kaczmarek, CW-3, and CW-6, among others. Before that conference call, CW-6 of Fougera called Jill Nailor of Greenstone

– someone he generally did not speak with on the phone for social reasons – and the two spoke for approximately six minutes.

765.   At some point that day, Fougera changed plans and decided to re-enter the market with a much more dramatic WAC price increase than originally suggested the day before, going from $7.50 to $31.50 – or a 320% increase. Customer contract prices increased even higher.  Within two days after the price increase, for example, during a conversation with a Fougera national account representative, a customer complained that it had only just recently taken Clindamycin off contract with Fougera. That same day, CW-6 and Nailor of Greenstone exchanged twenty-one text messages.

766.   Based on their communications, Fougera knew that Greenstone would follow its price increase – but it could not tell its customers that. For example, in January 2011, a large wholesaler customer, ABC, approached Fougera asking if it knew whether Greenstone would be following Fougera's price increase on Clindamycin Solution. In an internal Fougera e-mail exchange, CW-3 reached out to CW-6 (who, as stated above, had spoken with Nailor at Greenstone on the day of the Fougera price increase) for an update. CW-6 responded that he did not have any new information, other than that a Greenstone price increase. CW-3 pressed for more detail about how quickly it would be coming, and immediately before responding to CW-3's E-mail, CW-6 called Nailor at Greenstone and left a 43-second voice-mail.

767.   Over the ensuing months, Fougera was contacted by several customers requesting price reductions due to the fact that Greenstone had not yet followed.

Fougera continued to coordinate regularly with Greenstone and did not reduce its price, but grew frustrated when its competitor did not promptly follow as expected.

768.    Greenstone did ultimately follow Fougera's price increase with an increase of its own on Clindamycin Solution in July 2011, but it did not fully match Fougera's public WAC pricing. Nonetheless, Fougera refused to bid on any of Greenstone's accounts as it did not want to punish Greenstone for actually raising its prices.

769.    The anticompetitive understanding and co-ordination between Fougera and Greenstone applied to the other formulations of Clindamycin as well.  For example, in May 2012 Greenstone notified customers that it would be raising the price of Clindamycin Gel. Shortly after that, Fougera was approached by a customer asking for a bid on Clindamycin Gel.

770.    The next day, CW-6 exchanged five text messages with Nailor at Greenstone, likely to convey Fougera's decision not to challenge Greenstone's market share at that customer.

771.    Similarly, on June 27, 2012, CW-3 at Fougera learned that ABC had put Clindamycin Gel, Lotion and Cream out for bid.  That same day, CW-6 Fougera placed a call to Nailor at Greenstone and left a 31-second voicemail.

772.    In late July 2012, Defendant Sandoz formally acquired Fougera.  As discussed more fully below, even before the acquisition, Sandoz had been conspiring

separately with Greenstone to fix prices on Latanoprost Drops, and thus had its own relationships with Greenstone.

773.    After the merger, Sandoz began to scrutinize the Fougera business line and search for ways to maximize revenue for Fougera products in order to meet its pre-merger expectations.  Starting in or about August of 2012, Kellum (at Sandoz) and Kaczmarek (at Fougera, still with the company during the transition) – now co-workers – were tasked with discussing and identifying a list of price increase candidates from the Fougera drug portfolio.

774.    By August 1, 2012, Greenstone had identified Clindamycin Solution as a candidate.  On August 7, 2012, Kellum called Hatosy and they exchanged six text messages.  The next day, August 8, Kellum and Hatosy spoke for 10 minutes.

775.    Later that month, on August 22, 2012, Kellum identified Clindamycin, in all of its various formulations, as a price increase candidate.  In describing his reasoning, Kellum indicated that the only competitor for all four formulations was Greenstone.  Kellum was referring to his recent successful collusion with Greenstone on Latanoprost drops (discussed below) which had resulted in a significant price increase.  In response, Kaczmarek recalled his own experience of Greenstone's failure to follow Fougera's Clindamycin Solution price increase as quickly as he wanted.

776.    Kellum's confidence in Greenstone was based on his own relationship with Hatosy of  Greenstone, and his prior conversations with her. Kellum pushed forward with the planned price increases for Clindamycin.

777.    As Sandoz was planning for the Clindamycin price increase in August 2012, Kellum was co-ordinating with Hatosy.  For example, on August 29, 2012, a colleague at Sandoz sent Kellum a draft that included detailed information about the proposed Clindamycin price increase, after speaking with Hatosy at Greenstone that same day for approximately three minutes.

778.    Although others at Sandoz expressed some concern that Greenstone might not follow, Kellum remained confident in his agreement with Hatosy and Greenstone.

779.    On October 19, 2012, Defendant Sandoz imposed price increases on all four formulations of Clindamycin.

780.    In the days leading up to the price increases, Kellum continued his co-ordination – by phone and text message – with Hatosy at Greenstone:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/17/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 13:10:55 | 0:00:00 |
| 10/17/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 19:03:16 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 9:38:07 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 13:37:57 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 14:14:42 | 0:00:33 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 16:46:17 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 17:58:49 | 0:00:00 |
| 10/18/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 17:59:38 | 0:00:00 |
| 10/18/2012 | Text | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 18:24:33 | 0:00:00 |
| 10/19/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 8:23:59 | 0:03:56 |

As detailed in the table above, Kellum reached out repeatedly by phone and text message to Hatosy at Greenstone in the days leading up to Sandoz's announcement of the price increases. This culminated in a nearly four (4) minute call between the two

competitors on October 19, 2012 – the same day the Sandoz price increases became effective.

781.    During these communications, the competitors confirmed their understanding that Greenstone would follow the Sandoz price increases. With the agreement in hand and understood between the two competitors, Kellum and Hatosy would not need to speak again by phone or text message for nearly a year-and-a-half, until March 18, 2014 – as Sandoz was preparing for another large increase on Clindamycin (discussed below).

782.    Greenstone followed the price increases quickly this time, notifying its customers of a price increase on all of Clindamycin formulations on November 27, 2012 – although the WAC price increases did not become effective and publicly visible until December 27, 2012.  In the interim period before Greenstone publicly followed the Sandoz price increases, Sandoz made sure to not disrupt the market.

783.    When Greenstone's customers approached Sandoz looking for a lower price, Sandoz refused to bid.

784.    During that same time period, Sandoz's own customers also approached the company, seeing lower public prices from Greenstone and requesting that Sandoz reduce its pricing because they were not yet aware that Greenstone had followed. Knowing that Greenstone would follow, however, Sandoz refused.  For example, in early December of 2012, Sandoz was approached by its customer McKesson asking

Sandoz to reduce its pricing for Clindamycin because Greenstone was offering significantly lower pricing in the market. A Sandoz pricing employee initially responded to the customer by refusing to lower the price.

785.    When the customer challenged those responses and asked for additional details about what intelligence Sandoz was referring to, the pricing employee forwarded the e-mail string to Kellum and CW-1, asking for advice on how to avoid referring to the illegal understanding between the two companies.

786.    Kellum responded by instructing the employee to call McKesson.

787.    The Greenstone Clindamycin WAC price increases became effective and publicly visible on December 27, 2012. Greenstone followed Sandoz's WAC price increases to the penny on every formulation, with Greenstone's prices on Clindamycin Solution increasing by 416%.

788.    The coordinated price increases were a success, and by May of 2014, those price increases had resulted in an additional $61 million in net sales to Sandoz.

789.    The late-2012 Sandoz and Greenstone price increases got the attention of two competitors – Taro and Perrigo – that had previously obtained approval to market Clindamycin Solution but had not recently been active in the market.

790.    For example, in a January 2013 internal e-mail Perrigo employees noted that they had approval on Clindamycin Solution. They noted that Perrigo already

possessed ANDAs for the product. Perrigo began making plans to return to the market; and was in frequent communication with its competitors at every important step throughout the process.

791.    Taro similarly had approval to sell Clindamycin Solution; but had not been marketing the product.  As early as April of 2013, however, Taro began taking steps to bring the product back to market, which included reaching out to competitors.  For example, on April 17, 2013, Taro circulated an internal e-mail regarding Clindamycin Solution, requesting specific information about material availability in order to estimate an available launch date.  That same day, Aprahamian called his contact at Sandoz, CW-3, and the two spoke for a few minutes.

792.    Similarly, Aprahamian scheduled a meeting with colleagues at Taro on June 6, 2013, to discuss Taro's entry into the market for Clindamycin Solution.  The day before that meeting, he sent an internal e-mail.  The day after his internal meeting – June 7, 2013 – Aprahamian called CW-3 at Sandoz and the two competitors spoke for approximately ten minutes.

793.    Starting in July, 2013, Sandoz started having temporary supply problems for Clindamycin Solution, due to a change in the adhesive label which required additional testing.  The disruption was temporary, and Sandoz expected to be back in the market by the end of the year.  However, this left Greenstone as the only viable manufacturer while Taro and Perrigo were planning to enter the market.

794.    Because it well understood under the "fair share" principles of Defendants' cartel that Greenstone would have to concede market share and "play nice in the sandbox" as these new competitors entered the market (and as Sandoz subsequently re-entered the market), Taro, Perrigo and Sandoz carefully co-ordinated with each other in order to avoid the inefficiencies of communicating only *via* price signalling and to minimize price erosion as they re-entered the market.

795.    Perrigo started preparing in earnest to enter the market for Clindamycin Solution in August, 2013.  Over the next several weeks, executives at Perrigo, Taro and Sandoz were in almost constant communication, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:32:00 | 0:01:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:05:00 |
| 8/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 17:54:00 | 0:05:00 |
| 8/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 17:07:00 | 0:01:00 |
| 8/6/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:22:00 | 0:04:00 |
| 8/6/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:27:00 | 0:12:00 |
| 8/7/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:45:00 | 0:03:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 18:19:00 | 0:02:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:47:00 | 0:01:00 |
| 8/8/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 10:32:00 | 0:06:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 16:42:00 | 0:04:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:37:00 | 0:08:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 6:42:00 | 0:03:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:01:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:39:00 | 0:02:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:04:00 | 0:01:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 16:22:00 | 0:01:00 |
| 8/14/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:01:00 | 0:01:00 |
| 8/15/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 12:53:00 | 0:08:00 |
| 8/15/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:09:00 | 0:14:00 |
| 8/21/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:51:00 | 0:08:00 |
| 8/21/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 19:41:00 | 0:05:00 |
| 8/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:54:00 | 0:03:00 |

796.    On August 28, 2013, at 1 :30 p.m. ET, the Perrigo sales team held an internal launch meeting regarding Clindamycin Solution.  In advance of that meeting, a Perrigo executive circulated pricing and market share information to the team, including a pricing grid with proposed Perrigo pricing for different types of customers.  This led to several more phone calls between Perrigo, Taro, and Sandoz that same day, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/28/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 7:36:00 | 0:15:00 |
| 8/28/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 10:37:35 | 0:13:22 |
| 8/28/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Taro Pharmaceuticals | 14:36:00 | 0:13:00 |

As can be seen from the table above, Aprahamian of Taro and T.P. of Perrigo both spoke to CW-3 of Sandoz in the morning before the 1 :30 p.m. ET Perigo launch meeting.  Shortly after the meeting, at 2:36 p.m., Boothe at Perrigo called the Taro main line and spoke to someone at Taro – likely Perfetto – for approximately a quarter-hour.

797.    Perrigo formally launched and entered the market for Clindamycin Solution on Monday, September 9, 2013 - a week earlier than expected. The week before the launch, as Perrigo was deciding which customers to approach, executives at the company were again in frequent contact with competitors Taro and Sandoz. On Wednesday, September 4, 2013, a Perrigo executive sent an e-mail to the Perrigo sales team about Clindamycin Solution.  The next day, T.P. of Perrigo called his contact at

Sandoz, CW-3, and the two spoke for approximately ten (10) minutes. The day after that – on Friday, September 6, 2013 – Boothe at Perrigo spoke to Perfetto at Taro for approximately two minutes.

798.    Perrigo was quickly able to obtain ABC and Walmart as customers, allowing the company to even exceed its initial market share targets.

799.    Shortly after Perrigo entered the market, on September 12, 2013, Aprahamian of Taro sent an internal e-mail.  Over the next several weeks, executives at Taro communicated frequently with their counterparts at Perrigo and Sandoz to determine which customers to target, and how to avoid competing with each other. At least some of those communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/17/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:10:07 | 0:16:39 |
| 9/17/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 19:08:00 | 0:02:00 |
| 9/18/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 11:52:11 | 0:11:14 |
| 9/19/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:41:00 | 0:17:00 |
| 9/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 15:23:00 | 0:01:00 |
| 9/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:24:00 | 0:01:00 |
| 9/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:42:00 | 0:15:00 |
| 9/26/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:37:17 | 0:06:44 |
| 9/26/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 15:22:00 | 0:15:00 |
| 9/27/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 16:00:00 | 0:05:00 |
| 10/1/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 17:56:00 | 0:01:00 |
| 10/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:41:00 | 0:10:00 |
| 10/3/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 16:13:00 | 0:05:00 |
| 10/3/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 18:16:00 | 0:01:00 |
| 10/4/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:32:20 | 0:00:12 |
| 10/4/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:32:52 | 0:04:51 |
| 10/4/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 15:37:00 | 0:02:00 |

800.    As can be seen in the table above, Aprahamian called CW-3 at Sandoz on October 1, 2013, most likely leaving a voicemail. CW-3 called Aprahamian back the next day, and the two spoke for approximately ten minutes.  During that call, Aprahamian and CW-3 talked about specific pricing in the market and which customers Taro should approach as it entered the market.  That same day – October 2, 2013 – Aprahamian created a spreadsheet documenting some of the information he had received during that call.  In that document, Aprahamian created an initial pricing model for Taro's upcoming launch of Clindamycin Solution, based on his conversations with CW-3.  The spreadsheet included not only public WAC pricing for Sandoz, Greenstone and Perrigo, but also – in a separate tab of the spreadsheet – non-public price points for three potential customers: Rite Aid, Publix, and ABC.

801.    On October 8, 2013, Taro was busy preparing for the launch. Aprahamian sent an e-mail to the Taro sales team indicating that Taro was planning to launch Clindamycin Solution and asking those sales executives to reach out to customers.

802.    Consistent with the "fair share" understanding, Taro would only target Greenstone customers – not Perrigo – due to Greenstone's very high market share. That same day, Aprahamian called CW-3 at Sandoz and left a message.  CW-3 returned the call immediately and the two spoke for a few minutes.

803.    Taro also scheduled an internal meeting regarding the Clindamycin launch for October 11, 2013. The day before and the day of that meeting, Aprahamian was again busy communicating with CW-3 of Sandoz.  On October 10, 2013, Aprahamian called CW-3 twice – first on CW-3's office line, leaving a message, and then immediately after on his cell phone, leaving another message.  The next day – the day of the Taro internal launch meeting – the two competitors spoke three times, with calls lasting three-, one-, and five minutes, respectively.

804.    As Aprahamian kept speaking to CW-3 at Sandoz, who was in turn speaking with T.P. at Perrigo, he continued compiling competitively sensitive, non-public price points for various customers. For example, by October 25, 2013, tab of Aprahamian's Clindamycin Solution pricing spreadsheet had grown.

805.    Having this competitively sensitive, non-public information allowed Taro to price as high as possible while still obtaining new business – accomplishing one of the fundamental goals of the "fair share" understanding by minimizing price erosion as it entered the market.

806.    Taro entered the market for Clindamycin Solution on October 28, 2013, matching Sandoz, Greenstone and Perrigo's WAC pricing exactly. When launching, Taro quickly targeted and obtained Rite Aid – not ABC or Walmart – to avoid competing with Perrigo for market share. This gave Taro approximately 13% market share immediately, almost reaching its target goal with just one customer.

807.   When Sandoz subsequently re-entered the market for Clindamycin Solution in early 2014, it also did so in coordination with its competitors. For example, on Monday, February 10, 2014, members of the Sandoz sales team had a conversation about the company's upcoming re-launch of Clindamycin Solution.

808.   That same day, Kellum sent an internal e-mail to the Sandoz sales team reminding them of the important understanding already in place with Greenstone across all of the Clindamycin formulations, not just Clindamycin Solution.

809.   Two days later, on February 12, 2014, CW-3 of Sandoz called Aprahamian of Taro and the two spoke for approximately a quarter-hour and had a one-minute call the following day.  That same day – February 13, 2014 – CW-1 at Sandoz sent an internal e-mail, again stressing the broader relationship with Greenstone and the desire not to disrupt that relationship.

810.   Over the next several weeks until Sandoz re-launched, the four manufacturers of Clindamycin Solution – Sandoz, Taro, Perrigo and Greenstone – co-ordinated through numerous phone calls, in order to minimize any disruption that might be caused by Sandoz's re-entry:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/14/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 13:04:00 | 0:17:00 |
| 2/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 15:42:00 | 0:02:00 |
| 2/20/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 4:56:11 | 0:00:34 |
| 2/20/2014 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 9:21:00 | 0:03:00 |
| 2/20/2014 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 9:24:00 | 0:11:00 |
| 2/24/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:01:00 |
| 2/26/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 3/1/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 18:06:00 | 0:01:00 |
| 3/5/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 6:48:00 | 0:12:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 8:18:40 | 0:00:16 |
| 3/11/2014 | Text | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 8:23:15 | 0:00:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 9:02:21 | 0:00:09 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Wesolowski, John (Perrigo) | 11:51:57 | 0:00:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 11:53:16 | 0:02:38 |
| 3/13/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 4:05:00 | 0:01:00 |
| 3/13/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 9:42:00 | 0:12:00 |
| 3/18/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 11:43:38 | 0:00:31 |
| 3/18/2014 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 12:22:44 | 0:07:39 |

811.    Sandoz set its target market share at 25%, choosing to target 20% from Greenstone and 5% from Perrigo.  In an internal Sandoz presentation of May, 2014, Sandoz laid out its plan for re-entry.

812.    Ultimately, these co-ordinated efforts to minimize price erosion were very successful, to Plaintiffs' detriment.  Even after both Taro and Perrigo's entry, and Sandoz's re-entry, prices for Clindamycin Solution remained significantly higher than they had been prior to the first co-ordinated price increase.

813.    A presentation to Pfizer colleagues in 2017 summarized the lock-step price increases in the market for Clindamycin Solution, while also showing minimal price erosion even after two additional manufacturers had entered the market.

814.    Starting in April, 2014, Sandoz decided to raise prices on the three formulations of Clindamycin where Greenstone was still its only competitor.  This led

to a quick flurry of phone calls between Greenstone and Sandoz in early April, 2014, to confirm the understanding, as shown below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/2/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 13:49:38 | 0:06:59 |
| 4/2/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 14:52:52 | 0:03:05 |
| 4/4/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 10:50:27 | 0:00:25 |
| 4/4/2014 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 11:36:07 | 0:03:04 |

The phone call between Nailor and Kellum listed above was the first phone call ever between the two, according to phone records. As a result of these calls, Sandoz understood that Greenstone would follow its price increases. During these calls, the competitors also discussed a separate price increase on Eplerenone Tablets, discussed more fully below.

815. Sandoz moved quickly, raising its WAC prices on Clindamycin Gel, Clindamycin Lotion, and Clindamycin Cream by approximately 20%, effective April 18, 2014. Shortly after the Sandoz increase, on April 23, 2014, Nailor of Greenstone and Kellum spoke again for nearly a quarter-hour.

816. By now, Greenstone understood the need to follow the Sandoz price increases quickly – and did so. It followed the Sandoz WAC increases to the penny less than a month-and a-half later, with an effective date of June 2, 2014. Shortly before Greenstone followed the Sandoz Clindamycin increases – on May 22, 2014 – Hatosy of Greenstone called Kellum of Sandoz twice, leaving him a short voice-mail. They did not speak again for nearly three months. Similarly, three days before the

increases became effective, on May 29, 2014, Nailor of Greenstone called Kellum of Sandoz, leaving him a short voice-mail.  As part of that same price increase, Greenstone also raised its pricing on Eplerenone Tablets.

817.    Sandoz honored the "fair share" understanding with Greenstone and the agreement to raise prices on Clindamycin.  Omnicare approached Sandoz again in August, asking if Sandoz had enough supply to meet the customer's needs. The e-mail from Omnicare followed a flurry of phone calls between Kellum and Hatosy of Greenstone only a few days prior, on August 14, 2014 (their first calls since May 2014).  After receiving the e-mail from Omnicare, CW-3 of Sandoz informed the customer that Sandoz would not do anything that would disrupt the market.

818.    No shortages or other market features can explain Defendants' price increases for generic Clindamycin during the Relevant Period.

819.    The elevated prices of generic Clindamycin resulted from Defendants' anticompetitive conduct injured Plaintiffs, caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

820.    The unlawful agreements among Defendants Fougera/Sandoz, Greenstone, Taro, and Perrigo, regarding generic Clindamycin, were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### O.    Methylprednisolone Tablets

821.    Methylprednisolone is an adrenocortical steroid used to treat arthritis, lupus, psoriasis, and ulcerative colitis.

822.    The market for generic Methylprednisolone 4 mg tablets ("Methylprednisolone") market is and was mature and had multiple manufacturers at all relevant times.  As a result, for years, the prices of Methylprednisolone were relatively low and stable.

823.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of generic Methylprednisolone, beginning at least as early as February of 2011, as follows:

824.    Throughout the Relevant Period, Defendants Sandoz, Par, Greenstone, Breckenridge and Cadista dominated the market for generic Methylprednisolone.

825.    The relatively low and stable pricing of Methylprednisolone changed abruptly in early 2011.  When some manufacturers had supply disruptions, all manufacturers used it as pretext to increase prices. Although the supply disruption—which in any event did not affect all manufacturers—was resolved in few months, prices never returned to the prior, lower levels.

826.    Sandoz and Cadista announced identical list (WAC) prices in close succession, and when Greenstone entered the market in the fall of 2011, it matched the list prices of Sandoz and Cadista.

827.    Defendants's Fair Share agreement and agreement to fix the prices of Methylprednisolone enabled them to maintain elevated prices.

828.    For example, in late 2012, when Breckenridge and Greenstone were re-entering the market, R.T. and Armando Kellum at Sandoz were careful not to disrupt other manufacturers' Fair Shares.

829.    Throughout this period, Sandoz, Par, Greenstone, Breckenridge and Cadista met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Methylprednisolone and their Fair Share agreement.

830.    For example, as Breckenridge was entering the Methylprednisolone market in September 2011, D.N., the Director of Sales at Breckenridge, exchanged text messages with G.B., Par's Vice President of National Accounts, both before (August 14) and after (November 14) Breckenridge's entry.

831.    Similarly, as Greenstone entered the market and ramped up from the spring to the fall of 2012, Robin Hatosy, a Director of National Accounts at Greenstone, communicated by phone with M.S., Breckenridge Vice President of Sales, in February and again in November.

832.    In March 2013, during the time-frame (as described above) when Sandoz was considering whether to pursue business Sandoz, Par and Cadista were in contact. On March 21, 2013, K.O., Par's Vice President of National Accounts, spoke to M.D., Vice President of Sales at Cadista. A few days later, on March 26, 2013, the same Par

VP spoke to M.V., the Associate Director of Pricing at Sandoz. Open lines of communication ensured that each manufacturer maintained a Fair Share.

833.    No shortages or other market features can explain Defendants' price increases for generic Methylprednisolone tablets during the Relevant Period.

834.    The elevated prices of generic Methylprednisolone tablets resulted from Defendants' anticompetitive conduct injured Plaintiffs, caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

835.    The unlawful agreement among Defendants Sandoz, Par, Greenstone, Breckenridge and Cadista, regarding generic Methylprednisolone tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**P.    Lidocaine-Prilocaine**

836.    Lidocaine-Prilocaine is an anesthetic used to numb the skin or genital area to relieve pain during medical procedures, and is sold throughout the United States and its territories.

837.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Lidocaine-Prilocaine, as follows:

838.    At all relevant times, Defendants had substantial market power with respect to generic Lidocaine-Prilocaine.  Defendants exercised this power to maintain supracompetitive prices for Lidocaine-Prilocaine without losing so many sales as to make the elevated price unprofitable.

839.    Defendants sold generic Lidocaine-Prilocaine at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

840.    During the Relevant Period, Defendants dominated the Lidocaine-Prilocaine market.  Similarly, throughout the relevant period, the Defendants possessed a substantial amount of market power.

841.    In fact, the Federal Trade Commission ("FTC") has specifically asserted in recent years that the market for Lidocaine-Prilocaine is highly concentrated and subject to anticompetitive conduct. The HHI—or Herfindahl-Hirschman Index—is "a commonly accepted measure of market concentration." The FTC and the Department of Justice "generally consider markets in which the HHI is between 1,500 and 2,500 points to be moderately concentrated, and consider markets in which the HHI is in excess of 2,500 points to be highly concentrated."

842.    In July 2012, the FTC filed a complaint against Defendant Sandoz's parent, Novartis AG, seeking to enjoin Novartis AG's acquisition of Defendant Fougera. The FTC specifically alleged that the acquisition would create antitrust concerns in the market for "generic Lidocaine-Prilocaine cream." According to the FTC, "Lidocaine-Prilocaine is available in . . . 30 gram tubes …. [t]he 30 gram tubes

are prescribed directly to patients for home use. Fougera, Hi-Tech, and Novartis are the only U.S. suppliers of 30 gram tubes, with market shares of approximately 50 percent, 47 percent, and 3 percent, respectively. The Acquisition would increase the Herfindahl-Hirschman Index concentration in that market by 300 points to 5,018 points, and leave Hi-Tech as the only competitor to the combined Novartis/ Fougera." The FTC settled with Novartis AG by, in part, requiring Novartis to terminate its marketing agreement with Tolmar on Lidocaine-Prilocaine.

843.   Defendant Impax and Akorn entered the generic Lidocaine-Prilocaine market in late 2012.

844.   In 2014, the FTC sought to enjoin Akorn's acquisition of Hi-Tech and filed an administrative complaint alleging that the acquisition would have anticompetitive effects. In that complaint, the FTC specifically alleged that the acquisition would cause the number of competitors of "generic topical cream containing 2.5% Lidocaine with Prilocaine," which the FTC defined as generic EMLA cream, to drop from 4 to 3, "would increase the HHI by 1488, from 4481 to a post-merger total of 5969, and would create a merged entity having a market share in excess of 74%." The FTC alleged that Akorn had a market share of 12% and that Hi-Tech had a market share of 62%. After filing its administrative complaint, the FTC settled the matter by requiring the divestiture of portions of the Akorn/Hi-Tech Lidocaine-Prilocaine business to Watson Pharmaceuticals, Inc., which is now known as Actavis Holdco U.S., Inc. ("Actavis"). In conjunction with the divestiture, on April

17, 2014, Akorn and Actavis entered into a supply agreement under which Akorn would supply Lidocaine-Prilocaine cream to Actavis for a transitional period of either two years or until an alternative supplier is found.

845.    Akorn's settlement resolved the FTC action in April 2014 after it agreed to divest a part of its Lidocaine-Prilocaine business to Actavis. Despite its assurance tot the FTC, Defendants used their market dominance to undermine competition and facilitate a price-fixing conspiracy that caused Plaintiffs to pay supracompetitive prices for generic Lidocaine-Prilocaine.

846.    Until around March of 2014, generic Lidocaine-Prilocaine pricing was fairly stable. That stability is reflected in the following chart displaying NADAC data for generic Lidocaine-Prilocaine covering the years 2012 to 2015:



847.   Beginning on or around March of 2014 however—and without any explanation—the price of Defendants' generic Lidocaine-Prilocaine began to skyrocket. As shown in the NADAC chart above, the average price per unit of generic Lidocaine-Prilocaine sold across all Defendants was $0.49 in January of 2014, compared to $1.20 in January of 2015, a 145% increase.

848.   The sustained price elevation reflected in the NADAC chart was the result of a conspiracy among Defendants to artificially raise, fix, maintain, and/or stabilize the price of generic Lidocaine-Prilocaine sold in the United States.

849.   Defendants' price increases for Lidocaine-Prilocaine resulted in corresponding increases to the prices paid by Plaintiffs.

850.   Defendants were aware of and praised the lack of generic drug price competition and resulting higher prices. For example, during Akorn's August 5, 2014 earnings call, Akorn CEO Raj Rai stated, "we are seeing lot of price increases that are happening in the generic space and it affect some of our products as well.  So, I would say overall, there is a healthier pricing environment than it was there, I would say six to eight months ago."

851.   Beginning in March 2014, Defendants collectively caused the price of Lidocaine-Prilocaine to increase dramatically. Defendants' conduct cannot be explained by normal competitive forces. It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of generic Lidocaine-Prilocaine in the United States. The agreement was furthered by discussions

held at meetings and industry events hosted by the GPhA, HDMA, NACDS, and ECRM as well as other meetings and communications.

852.   To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through (1) trade association meetings and conferences; (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers; (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means; and (4) pricing information, which Defendants regularly shared amongst themselves, sometimes using third parties as an intermediary to convey the pricing information.

853.   These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price fixing, and market and customer allocation scheme.

854.   The industry intelligence-gathering reporting firm Policy and Regulatory Report has reportedly obtained information regarding the investigation of generic drug companies by DOJ, and has indicated that DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies. The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug

companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct e-mail, phone, and text message communications."

855.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Lidocaine-Prilocaine, rig bids, and engage in market and customer allocation concerning Lidocaine-Prilocaine, including, but not limited to, GPhA, the NACDS, and HDMA.

856.    No shortages or other market features can explain Defendants' price increases for generic Lidocaine-Prilocaine during the Relevant Period.

857.    The elevated prices of generic Lidocaine-Prilocaine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

858.    The unlawful agreement between Defendants Impax and Sandoz, regarding generic Lidocaine-Prilocaine, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**Q.    Amantadine HCL**

859.    Amantadine HCL is used in the treatment of Influenza Strain A and the symptoms of Parkinson's Disease.

860.    Amantadine HCL was first approved by the FDA in the 1960's and has been commercially available in the United States ever since.  The market for generic Amantadine is mature.  Amantadine has been commercially available in the United States in a generic form for decades.  As a result, Amantadine capsules had had relatively low and stable prices for years. For example, as with Permethrin, from 2009 through mid-2011, the list price for a 100 mg Amantadine capsule was only 40 cents.

861.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Amantadine HCL capsules ("Amantadine") at least as follows:

862.    From at least 2009-12, Defendants Sandoz and Upsher-Smith dominated the market for Amantadine capsules.  At that time, Defendant Lannett had a very small share of the market.

863.    In at least March, April, July, September, November and December of 2011 and January and February of 2012, Sandoz and Upsher-Smith – for all practical purposes, the only players in the game – were talking, *via* their employees, K.K., a Senior National Account Executive at Sandoz, and D.Z., a Senior National Account Manager at Upsher, with at least those telephone communications.  And what they were talking about included co-operatively increasing the price of Amantadine, in accordance with the "fair share" rules of Defendants' cartel.

864.    In October, 2011, Sandoz and Upsher-Smith implemented the next phase of the scheme:  Upsher quadrupled the price of Amantadine.  A few months later, in February, 2012, Sandoz followed suit.

865.    This dramatic increase in profitability was too much to ignore.  Lannett, formerly a bit player in the market, decided to ramp up to get its "fair share" of the profits.

866.    Accordingly, Lannet made a push into the market in early 2013.  But rather than offer lower prices to win market share, Lannett, careful not disturb market pricing, joined its fellow Defendants and cartel-members, Sandoz and Upsher, at the artificially-quadrupled WAC price of $1.60 per capsule, in accordance with the cartel's pricing rules.

867.    Although – while under State and federal antitrust investigation – Defendant Upsher eventually lowered its WAC price to a "mere" doubling (of 80 cents per unit), Sandoz and Lannett are sticking to their guns with a WAC of $1.60 per capsule through at least mid-2019, the last year for which figures were readily available.

868.    No shortages or other market features can explain Defendants' elevated pricing for Amantadine during the Relevant Period.

869.    The elevated prices of Amantadine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels

indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

870.    The unlawful agreement among Uphser-Smith, Sandoz, and Lannett for Amantadine was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### R.    Fluocinonide Solution

871.    Fluocinonide Solution is used in the treatment of a variety of skin conditions, such as eczema, dermatitis, allergies, and rash.

872.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of 20ml and 60ml bottles of generic Fluocinonide Solution ("Fluocinonide Solution") at least as follows:

873.    In early 2011, the market for Fluocinonide Solution was dominated by Teva, Taro, and Fougera.  All three produced Fluocinonide Solution in 60ml bottles, while only Taro produced the 20ml bottles.

874.    In the beginning of April 2011, Fougera's Fluocinonide Solution products had been on long-term backorder due to quality control issues with the tips of the bottles leaking.  As a result, the market was split between Teva (76% market share) and Taro (19% market share) until Fougera returned to production.  Fougera was working to re-launch its Fluocinonide Solution products by mid-May 2011.

875. On April 21, 2011, Walter Kaczmarek learned that Teva was dropping its Fluocinonide Solution product, *i.e.*, stopping production and leaving the market. This meant the only competitors in the market would now be Taro and "Fougera" – except that Fougera was currently still on backorder due to supply problems.

876. Nevertheless, Fougera also viewed Teva's exit as an opportunity to increase prices. In internal calculations of the expected benefit from the pricing action, Fougera assumed that they would split the market with Taro, 50/50. Fougera estimated that this would provide it with a yearly gain of $4.6 million.

877. On May 10, 2011, Fougera raised its WAC pricing for Fluocinonide Solution by 100% from – $12.50 to $25.00 – with the change effective the following day. That evening, Fougera also sent out contract price-change notifications to customers where it had existing contracts for Fluocinonide Solution. With those increases, the average net sales price jumped 800% from $2.50 to $20.

878. On May 13, 2011 – three days after Fougera sent out its price changes – SW-6 and H.M. at Taro exchanged two calls, with one call lasting five minutes.

879. One week later, on May 20, 2011, Taro followed Fougera's lead by substantially increasing its pricing for Fluocinonide Solution. Taro increased the WAC price for the 20ml and 60ml formulations by 200% and 400%, respectively. Taro also increased average net sales prices by 260% and by over 500% for the 20ml and 60ml formulations, respectively.

880.   Following their respective price increases, the market share between Taro and Fougera stabilized to rough parity.  By September 2011, Fougera and Taro each had approximately 50% market share.

881.   A few months later, on January 25, 2012, SW-6 and H.M. exchanged several calls, detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:36:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:37:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:38:00 | 0:04:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:19:00 | 0:02:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:32:00 | 0:02:00 |

882.   The very next day, on January 26, Kaczmarek sent an e-mail to his Fougera colleagues, proposing a price increase that nearly tripled Fougera's WAC and net sales prices, in just over two weeks.

883.   This price increase opportunity was viewed as so pressing by Kaczmarek that he asked A.R., a Fougera business analyst, to put together a pricing analysis that evening while flying on an airplane because she had a scheduled day off the next day.

884.   First thing the next morning, on January 27, 2012, Kaczmarek called SW-6 and they spoke for approximately 20 minutes.  SW-6 hung up and immediately called H.M. at Taro.  The call lasted approximately one minute.  A few minutes later, SW-6 called H.M. again and they spoke for approximately twenty minutes.  Later that day, SW-6 called Kaczmarek twice.  The calls lasted for several minutes each.

885.    Later that evening (January 27), Kaczmarek submitted his proposed price increase to Fougera's Pricing Committee, with even larger price increases.  The plan was now to raise Fougera's WAC price from $25 to $80.99 and increase its average net sales price from $18.08 to $58.57 – well more than tripling the price.  This increase was estimated to bring in an additional $10.1 million in gross profit for the rest of 2012.  Unsurprisingly, given the purpose of Defendants' cartel, members of the Fougera Pricing Committee enthusiastically embraced the massive price hike.

886.    On February 13, 2012, SW-6 called H.M. and they spoke for five minutes.  The next day, as planned, Fougera formally raised its WAC and contract prices for Fluocinonide Solution.

887.    The increases more than tripled Fougera's WAC price, as well as direct and indirect contract prices for its customers.  The increase was so dramatic that third party data vendor Medi-Span – which tracks WAC prices – reached out to Fougera to confirm that the new WAC amount was not an error.

888.    On February 15, 2012, the day after the increases, SW-6 called H.M. again and they spoke for approximately five minutes.  Later that day, Blashinsky, a senior Taro marketing executive, circulated an internal e-mail regarding Fluocinonide Solution pricing issues.

889.    In furtherance of their price increase conspiracy and Defendants' overarching cartel, Taro was careful not to use Fougera's price increase to poach customers and upset market share, even with very small customers.

890.   For example, Meijer requested that Taro submit a bid for Fluocinonide Solution, but wary of upsetting the apple cart, Taro declined to provide Meijer with a bid, instead falsely claiming it did not have sufficient inventory to supply them.

891.   Similarly, after the Fougera increase, HD Smith asked Taro to bid for its Fluocinonide Solution business.   S.B., a Taro sales executive, relayed this news to J.J., a senior Taro sales executive, who chastised him for even considering the offer.

892.   While Taro planned and implemented corresponding price increases, representatives of Taro and Fougera remained in contact, including but not limited to exchanging the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/15/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 7:39:00 | 0:02:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Incoming | CW-6 (Fougera) | 6:00:00 | 0:03:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 6:03:00 | 0:02:00 |
| 2/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:13:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |

893.   The day after the final calls detailed above, on March 9, 2012, Taro implemented its own price increase, which essentially doubled its WAC and contract prices for both the 60ml and 20ml formulations of Fluocinonide Solution.

894.   No shortages or other market features can explain Defendants' elevated pricing for Fluocinonide Solution during the Relevant Period.

895.   The elevated prices of Fluocinonide Solution resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they

would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

896.    The unlawful agreement between Taro and Fougera for Fluocinonide Solution was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### S.    Erythromycin Base/Ethyl Alcohol Solution

897.    Erythromycin Base/Ethyl Alcohol Solution ("Erythromycin Solution") is a topical medication used to treat acne.

898.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Erythromycin Solution, as follows:

899.    In mid-2011, Defendants Sandoz/Fougera and Wockhardt were the only two manufacturers of Erythromycin Solution.  However, both experienced supply issues that required their exit from the market for periods of time.  Accordingly, some co-ordination among the cartel members was helpful to maintain a stable market, as set forth *infra*:

900.    Between May 17-19, 2011, Perrigo discussed internally whether to re-enter the Erythromycin Solution market.  The next day, May 20, T.P. at Perrigo called SW-6 at Fougera and they spoke for approximately seven minutes.  Immediately after that call, T.P. called his boss, Wesolowski, and they spoke for approximately three

minutes.  The following Monday, on May 23, Wesolowski gave the green light to move forward with Perrigo's plans to re-launch the product within six months.

901.    Half-way through that six-month period, on Friday, August 5, 2011, SW-3 at Fougera e-mailed his supervisor, Kaczmarek.

902.    Following that week-end, on Tuesday, August 9, SW-6 at Fougera called M.C., a Wockhardt sales executive, three times, including one call lasting ten minutes. According to available records and illustrating the institutional, rather than merely personal, nature of the cartel relationship among Defendants, these were the first phone calls between the two.  SW-6 and M.C. were not friends and did not socialize together.  When they did speak, it was to co-ordinate anticompetitive conduct for their employers, relating to products on which Fougera and Wockhardt overlapped.

903.    Over the next week, SW-6 (Sandoz) exchanged several calls with M.C. (Wockhardt) and T.P. (Perrigo), the prospective new entrant.  CW-6 acted as a go-between, relaying information between Wockhardt and Perrigo.  After speaking with these co-conspirators of Fougera/Sandoz, SW-6 called his supervisor, Kaczmarek, to report back what he had learned.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |
| 8/15/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 7:31:00 | 0:02:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 7:39:00 | 0:06:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:50:00 | 0:01:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:11:37 | 0:11:55 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:53:00 | 0:09:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:58:18 | 0:10:00 |
| 8/17/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:48:00 | 0:05:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |

904.    On August 19, 2011, after the final, 6:00 am call listed above, between SW-6 at Fougera/Sandoz and T.P. at Perrigo, Fougera held an internal meeting to discuss Erythromycin Solution and the informationt that SW-6 had gained from phone calls with Fougera/Sandoz's co-conspirators.

905.    On November 15, 2011, Wesolowski of Perrigo sent an internal e-mail to the Perrigo sales team, including to T.P., stating that Perrigo planned to launch Erythromycin Solution the following month, in December. Beginning that day, and over the next few days, T.P. exchanged several calls with SW-6 of Fougera.  At the same time, SW-6 was speaking with M.C. at Wockhardt.  At least some of these calls are detailed in the chart below:

906.    The next day, on November 18, K.K. (another Wockhardt sales executive) called SW-3 **at** Fougera.  The call lasted **approximately** two minutes. Later, SW-3 sent an e-mail to his supervisor, Kaczmarek, **reflecting the information shared on the call and falsely attributing it to a customer**.

907.   In accordance with the cartel's usual practice, in order to minimize written evidence of Defendants' illegal conspiracies, whenever SW-3 learned confidential information from one of the cartel members, it was SW-3's customary practice, instead, to state falsely that he learned the information from a customer.

908.   Two weeks later, November 30, M.C. at Wockhardt called SW-6 and they spoke for approximately four minutes.  Later that same day, SW-6 sent an e-mail to Kaczmarek regarding Erythromycin Solution.

909.   Kaczmarek forwarded the e-mail along internally to A.R., a Fougera operations manager.  A.R. reminded Kaczmarek that Fougera was also having supply issues and had temporarily exited the market.

910.   A few weeks after that, on December 19, 2011, Perrigo entered the Erythromycin Solution market and set WAC pricing that was significantly higher – indeed, approximately 200% higher – than the market WAC pricing at that time.

911.   SW-6 at Fougera exchanged several calls with T.P. at Perrigo in the weeks leading up to, and surrounding, Perrigo's launch, including on the date of the launch itself.  On these calls, they discussed pricing and the allocation of market share to the new entrant, Perrigo.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 4:40:00 | 0:04:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:05:00 | 0:01:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:13:00 | 0:01:00 |
| 12/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:10:00 | 0:05:00 |
| 12/20/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:03:00 |
| 12/21/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |

912.    Several months later, between April 24 and April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida.  Representatives from Fougera, Perrigo, and Wockhardt attended, including SW-6 and SW-3 of Fougera, Wesolowski of Perrigo, and M.C. of Wockhardt.

913.    At that time, Fougera/Sandoz was readying to re-enter the Erythromycin Solution market.  Shortly after the NACDS annual meeting, on April 30, 2012, Kaczmarek e-mailed his sales team **and** SW-3 responded **back**.

914.    Fougera's re-launch caused a flurry of communications among the three cartel members on May 1 and May 2.  Following his consistent practice, SW-6 reported the conversations back to his boss at Fougera/Sandoz, Walter Kaczmarek. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 6:56:00 | 0:02:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Incoming | CW-3 (Fougera) | 10:04:00 | 0:03:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:07:00 | 0:02:00 |
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 13:12:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:20:00 | 0:04:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:24:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:25:00 | 0:01:00 |

915.    The next day, on May 3, 2012, Fougera re-entered the market and matched Perrigo's increased WAC pricing. That morning, Kaczmarek sent an e-mail to his sales team.

916.    That same day, SW-3 of Sandoz spoke with K.K. of Wockhardt for five minutes and called A.F., a sales executive at Perrigo.  Further, SW-6 called his contact at Perrigo, T.P., and they spoke for approximately a quarter-hour.  Immediately after hanging up with T.P., SW-6 again called his boss at Fougera/Sandoz, Kaczmarek, and they spoke for approximately five minutes.

917.    The following Monday, on May 7, 2012, Wesolowski at Perrigo sent an internal e-mail regarding Erythromycin Solution to other Perrigo executives.  On that same day, Kaczmarek circulated a proposed customer pricing grid for Erythromycin Solution to the Fougera sales team.

918.    Over the next several days, SW-3 and SW-6 exchanged calls with AF. and T.P., their contacts at Perrigo.  As was his practice, after hanging up with T.P., SW-6 immediately replied back to Kaczmarek what he had learned.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:06:00 | 0:01:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:08:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 7:10:41 | 0:01:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Incoming | CW-3 (Fougera) | 7:12:36 | 0:00:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 8:05:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 8:52:56 | 0:10:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 9:29:30 | 0:01:34 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:09:00 | 0:05:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 5:13:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 8:24:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:26:00 | 0:11:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:38:00 | 0:02:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:10:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 12:39:00 | 0:02:00 |
| 5/14/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 13:09:00 | 0:02:00 |

919.   On May 14, 2012, the date of the last calls detailed above, Kaczmarek sent an internal e-mail to his sales team.  In accordance with Defendants' cartel's usual practice, Kaczmarek lied about the source of his information to avoid putting evidence of illegal conduct into writing.

920.   Less than two months later, on June 7, 2012, Fougera recalled Erythromycin Solution and again placed the product on back order.  By that time, Fougera had approached and secured approximately 12% market share on the product, including several customers on its target list such as Rite Aid, Cardinal, Optisource, and SUPERVALU.

921.   By August, 2012, Fougera had resolved those supply issues.  Around this same time, Defendant Sandoz had completed its acquisition of Fougera.  As Fougera (now Sandoz) prepared to re-enter the Erythromycin Solution market, the company set an internal market share goal of 20% on the product.

922.    After the Fougera acquisition was completed, SW-6 left the company for another position.  But prior to leaving Fougera, SW-6 introduced SW-3 – who was going to, and in fact did, remain at Sandoz after the acquisition – to T.P. at Perrigo to continue supporting the cartel's conspiracies.

923.    The first ever phone calls between SW-3 and T.P., according to the available phone records, were on August 8, 2012. They spoke two times that day. They spoke again on August 21, 2012, as Sandoz was preparing to re-enter the market for Erythromycin Solution.

924.    On September 5, 2012, S.G., a Sandoz sales executive, e-mailed SW-3 and Kellum to advise them that Sandoz had an opportunity to bid on Erythromycin Solution at Walgreens.  Kellum answered that e-mail, and the next day, SW-3 called T.P. at Perrigo and they spoke for eleven minutes.

925.    The day after that, on September 7, SW-3 sent an internal e-mail including to SW-1 (the Sandoz senior pricing executive), recommending that Sandoz target the same customers that Fougera had targeted when it re-launched Erythromycin Solution in May, 2012.  Not wanting to have a discussion in writing, SW-1 responded to SW-3 directly.

926.    A week later, on September 13, 2012, SW-3 called T.P. at Perrigo and they spoke for approximately three minutes.  SW-3 hung up and called R.T., a senior sales and marketing executive at Sandoz.  The call lasted one minute.  Later that day, SW-3 called K.K. at Wockhardt. That call also lasted one minute.

927.   The following Monday, on September 17, 2012, SW-1 instructed SW-3 to put together offers for Cardinal and Wal-Mart and told him that they would be the only customers Sandoz would be bidding on at this time.  That same day, K.K. (Wockhardt) called SW-3 (Sandoz) and they spoke for four minutes.

928.   Between September 20 and September 21, 2012, SW-3 and T.P. at Perrigo exchanged six calls, including two calls lasting eight minutes and seven minutes.  By October 2012, Perrigo had conceded the Erythromycin Solution business at Cardinal and Wal-Mart to Sandoz.

929.   No shortages or other market features can explain Defendants' price increases for generic Erythromycin Base/Ethyl Alcohol Solution during the Relevant Period.

930.   The elevated prices of generic Erythromycin Base/Ethyl Alcohol Solution resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused it to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

931.   The unlawful agreement among Defendants Sandoz/Fougera, Wockhardt, and Perrigo, regarding Erythromycin Base/Ethyl Alcohol Solution, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

T.     **Calcipotriene Solution**

932.    Generic Calcipotriene Solution ("Calcipotriene") is a form of vitamin D that affects the growth of skin cells.  This topical medication is prescribed for the treatment of chronic plaque psoriasis of the scalp.

933.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Calcipotriene Solution, as follows:

934.    In early 2010, the market for generic Calcipotriene was dominated by Defendants Fougera, Hi-Tech, and Impax.

935.    On July 23, 2010, however, Hi-Tech received a warning letter from the FDA detailing numerous violations found during a recent manufacturing facility inspection.  Even though G&W was not in the Calcipotriene market at the time, Jim Grauso ("Grauso,") then Sales and Marketing Vice President ("VP") at G&W, knew Fougera would be interested in the information.  On July 28, 2010, he forwarded a copy of the FDA letter to SW-6 at Fougera.  Pleased to hear the news, SW-6 replied positively to Grauso's e-mail.

936.    By the end of July, 2010, Hi-Tech had discontinued the product, leaving its approximate 35% market share open for the other cartel members to claim – and G&W decided this was too lucrative a market to ignore.

937.    It ended up talking almost a year, but by early June, 2011, G&W was ready to enter the market – so, naturally, G&W started reaching out to fellow cartel member, Fougera.  Thus, on Thursday and Friday, June 6 and 7, 2011, SW-6 and

Grauso exchanged several phone calls, with one call lasting eight minutes.  During those calls, Grauso told SW-6 that G&W would soon be launching its own generic Calcipotriene.  Shortly after speaking with Grauso, SW-6 e-mailed Walter Kaczmarek and other colleagues at Fougera, sharing the news that Fougera had just learned from its co-conspirator:  G&W was launching that week.

938.    G&W did, indeed, launch Calcipotriene that week – on that Friday, June 10.  As G&W entered the market, SW-6 and Grauso continued to speak, including exchanging two calls on June 23 and one call on June 24, lasting approximately a quarter-hour.

939.    A few months later, between November 10 and November 17, 2011, SW-6 and Grauso exchanged at least seven separate phone calls.  The topic of conversation during these calls was a G&W price increase for Calcipotriene.

940.    At the end of this series of phone communications between Grauso and SW-6, G&W instituted a 54% price increase on Calcipotriene, effective Friday November 18.  Grauso sent an internal e-mail to his team, regarding this increase.

941.    That Monday, on November 21, SW-6 called his boss, Walter Kaczmarek.  Immediately upon hanging up with Kaczmarek, SW-6 then called Grauso at G&W, and they spoke for five minutes.  Within minutes of that call, SW-6 then called Kaczmarek again to report the results of his call with their co-conspirator.  Almost simultaneously, Grauso was also reporting the substance of his conversation with SW-6 to his colleagues, placing calls to Orlofski and Vogel-Baylor at G&W.

942.   Fougera acted quickly. Just two days later, it followed G&W's price increase.  Fougera's new WAC price on Calcipotriene went into effect on November 23, 2011.

943.   No shortages or other market features can explain Defendants' prices for generic Calcipotriene Solution during the Relevant Period.

944.   The elevated prices of generic Calcipotriene Solution resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

945.   The unlawful agreement between Defendants Fougera and G&W regarding generic Calcipotriene Solution was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**U.   Amiloride HCL/HCTZ Tabs, Cimetidine Tabs, Diltiazem HCL Tabs, Disopyramide Phosphate Caps, Doxazosin Mesylate Tabs, Estradiol Tabs, Flurbiprofen Tabs, Hydroxyzine Pamoate Caps, Ketorolac Tromethamine Tabs, Ketoprofen Caps, Methotrexate HCL Tabs, Nadolol Tabs, Prazosin Caps, and Tolmetin Sodium Caps**

946.   Amiloride HCL/HCTZ is used in the treatment of high blood pressure or swelling due to heart failure or cirrhosis of the liver.

947.    Amiloride was first developed by Merck Sharp & Dohme Corporation ("Merck") and has been commercially available in the United States since the early 1980's.  The market for generic Amiloride is mature.  Amiloride has been commercially available in the United States in a generic form for decades.  As a result, and as with Amantidine, Amiloride tablets had had relatively low and stable prices for years.  For example, as with Amantadine, from 2009 through mid-2011, the list price for a 50 mg tablet was stable; in the case of Amiloride, only 5 cents.

948.    As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic: Amiloride HCL/HCTZ Tablets ("Amiloride"); Cimetidine Tablets ("Cimetidine"); Diltiazem HCL Tablets ("Diltiazem"); Disopyramide Phosphate Caps ("Disopyramide"); Doxazosin Mesylate Tablets ("Doxazosin"); Methotrexate Tablets ("Methotrexate"); Estradiol Tablets ("Estradiol"); Flurbiprofen Tablets ("Flurbiprofen"); Hydroxyzine Pamoate caps ("Hydroxyzine Pamoate"); Ketorolac Tromethamine Tabs ("Ketorolac"); Ketoprofen Caps ("Ketoprofen"); Nadolol Tablets ("Nadolol"); and Tolmetin Sodium Capsules ("Tolmetin"), at least as follows:

949.    From at least 2009-18, Defendants Teva and Mylan dominated the market for Amiloride tablets.

950.    And – again, as with Amantadine – in mid-2011, the price of Amiloride tablets suddenly quadrupled to 20 cents per pill.

951.    And – again, as with Amantadine – prior to that increase, the cartel members who manufactured the drug were talking to each other.  Teva's Rekenthaler communicated consistently with Mylan at least as early as April, 2010, and continued thereafter with Mylan's VP and Executive Director of Sales, J.K., Senior VP of Sales, B.P., and Jim Nesta, over the following months and years, including in the lead-up to the mid-2011 price increase, about co-operatively increasing the price of at least Amiloride, in accordance with the "fair share" rules of Defendants' cartel.

952.    As part of this plan, in mid- 2012, Mylan raised the price of Amiloride, to a list price of almost 25 cents per unit.

953.    In the spring and summer of 2013, it was Teva's turn to follow Mylan's price increases.  Accordingly, Teva's Kevin Green and Mylan's Jim Nesta spoke numerous times via telephone to co-ordinate details of the price increase.  They spoke on at least on May 7-10; July 10, 11, and 23; and August 1, 2, 6, and 8, by which time both Mylan and Teva were selling Amiloride with a WAC of 25 cents per pill.

954.    In addition, Teva was looking into closer co-operation with Mylan for co-ordinated price increases on a wide range of products – including on Amiloride, which, as just described, was successful.

955.    The overlap of the drugs in this section and Patel's arrival at Teva in April, 2013, helps to illustrate the institutional, long-lasting nature of Defendants' cartel agreements and co-operation, irrespective of the personalities involved.

956.   For example, Defendants' additional conspiracies involving Doxazosin and Estradiol are described elsewhere in this Complaint.  Likewise, Defendants Watson/Actavis, Mylan, and Teva were already co-conspirators in the market for Estradiol tabs and communicated extensively and co-operatively on this subject throughout 2012.  Thus, Patel's work at Teva involved merely enhancing details on the cartel's framework, which was already in place.

957.   In any event, on Monday, May 6, 2013, as Patel was creating a list of "Immediate PI" candidates, Patel she sent Teva's then-Director of National Accounts, Kevin Green ("Green"), an e-mail with an attached spreadsheet, titled "Price Increase Candidate Competitive Landscape."

958.   Patel asked Green to "gather as much market intelligence as possible" for certain items that she had highlighted in blue, including nine Mylan drugs, one of which was Amiloride:  Tolmetin Sodium Capsules; Doxazosin Mesylate Tablets; Methotrexate Tablets; Diltiazem HCL Tablets; Flurbiprofen Tablets; Nadolol Tablets; Amiloride HCL/HCTZ Tablets; Cimetidine Tablets; and Estradiol Tablets.

959.   In accordance with this directive from Patel (and as alleged *supra*), Green then spoke to Nesta (at Mylan) **every single day for the rest of the week**, sometimes multiple times per day.  Green and Nesta spoke three times on Tuesday, (May 7), including one call lasting more than eleven minutes.

960.   Green also telephoned Patel twice that day to report what he had learned from Nesta.  Green and Nesta also spoke a number of times over the next several

days, including the following day (May 8) for approximately four minutes; the day after that (May 9), also for approximately four minutes; and they spoke at least twice they day after that (Friday, May 10), for approximately two and eleven minutes.

961.    This is extremely unusual behaviour for supposed "competitors" and was done solely to advance the plans and interests of Defendants' cartel.

962.    Early the next week, on Tuesday, May 14, Patel asked several Teva NAM's, including Green, to obtain price points on certain Mylan drugs, including Cimetidine and Nadolol, in preparation for a potential price increase.

963.    Patel indicated internally to another Teva colleague that she was expecting "additional Mylan intel" and that she was expecting Mylan "to take an additional increase" on those items.

964.    Later that same week, on Friday, May 17, 2013, Green spoke to Nesta six times, including calls lasting approximately twelve minutes, two minutes, four minutes, and a quarter-hour.

965.    Less than two weeks after that, on May 29, 2013, after a discussion with Maureen Cavanaugh, Patel added four Mylan drugs to the Teva price increase list: Nadolol, Cimetidine, Prazosin caps ("Prazosin"), and Methotrexate.

966.    Discussions between Kevin Green (Teva) and Jim Nesta (Mylan) about specific drugs continued into June, as Mylan was also preparing for its own major price increase on a number of drugs.  From June 24 through June 28, 2013, for example, Green and Nesta had at least the following telephone calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

967.   On June 26, 2013, in the midst of this flurry of communications between Teva and Mylan (and the same day that Defendants Green and Nesta had a one-hour phone call), one Patel's colleagues sent her a suggestion with the following list of potential drugs to add to the price increase list, along with the current market share of the other manufacturers:

| Product | Competitors (Mkt Share) |
|---------|-------------------------|
| Disopyramide Phosphate Capsules | Actavis (61%) |
| Ketorolac Tablets | Mylan (32%) |
| Ketoprofen Capsules | Mylan (63%) |
| Hydroxyzine Pamoate Capsules | Sandoz (39%); Actavis (9%) |
| Nystatin Tablets | Heritage (35%); Mutual (32%) |

"Hydorxyzine" Pamoate Capsules was a typographically erroneous reference to Hydroxyzine Pamoate Capsules.

968.   In response, Patel's supervisor at Teva, K.G., commented that "Ketoprofen would have a high likelihood of success."

969.   Although Nystatin and Hydroxyzine Pamoate caps are on this list, the Nystatin-specific and Hydroxyzine Pamoate -specific conspiracies and sub-

components of Defendants' overarching cartel agreement are discussed in more detail elsewhere in this Complaint.

970.    Not surprisingly, given what Patel referred to as the "rumors" (her code-word for information received from a fellow cartel member[33]), Mylan raised its price for both Ketorolac and Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2, 2013. Teva then quickly followed with its own price increase for both drugs (and others) on August 9, 2013.  As also discussed more fully below, those price increases were closely co-ordinated and agreed to between Teva and Mylan.

971.    On Friday, June 28, 2013, at the end of the flurry of phone communications between Teva and Mylan described above, Green (Teva) and Nesta (Mylan) had a four-minute phone call, starting at 10:59 am.

972.    Less than 20 minutes after the call, Patel sent the following e-mail internally at Teva:

---

[33] As alleged throughout the Complaint, because their collusion was illegal,  Defendants' cartel had a pattern and practice of Defendants' employees falsely ascribing competitively sensitive information (which was actually obtained from employees of other cartel members) as being from customers. One of Patel's preferred versions of this linguistic camouflage was the word "rumors."

From:    Nisha Patel02
Sent:    Fri 6/28/2013 11:22 AM (GMT-05:00)
To:      ███████████████████████████
Cc:      ███████████████████████████
Bcc:
Subject: Competitor Increase Items

All,

It is my understanding that Mylan is announcing a long list of price increases today, for a Monday effective date. As we confirm the items and overlap with Teva, we should add the items to the CM alert list and determine what our plan of response is based on various factors (WAC limitation, no WAC limitation, supply, etc).


███ ,

Hearing that Ketoprofen is on the list.

973.    Patel obtained the information in her e-mail directly from her Teva colleague, Kevin Green, but got one significant point wrong, which confirms that she had advance notice of the Mylan increase.  In actuality, rather than (as it says in the e-mail) "Mylan . . . announcing a long list of price increases *today*," emphasis added, Mylan did no such thing.  Instead, Mylan did not announce the price increases until that Monday, July 1, 2013 – with an effective date of the day after that, July 2, 2013 – so Patel knew about the increase *prior* to it being announced to any customers.

974.    "Rumors" was another term consistently used by Patel in e-mails to camouflage the fact that Teva was communicating with fellow cartel members about future price increases.  For example, Patel used the term when discussing Taro in the February 24, 2013 "Immediate PI" spreadsheet, after speaking with Aprahamian and before Taro raised its price on Adapalene Gel.  She used it again on June 26, 2013 -

after Green and Nesta spoke several times in advance of Mylan's price increase on Ketoprofen.

975.   Similarly, on July 2, 2013 – the day before Teva's price increases (including for Methotrexate) went into effect, a colleague asked Patel how Teva's competitors' pricing compared with regard to Methotrexate.  Patel responded that Mylan's pricing was a little low on that drug, "but we are hearing rumors of them taking another increase," so Teva felt comfortable that it would not lose market share when it increased the price of that drug on the following day.  These so-called "rumors" – which were not, in fact rumors at all, but instead were based on the direct communications between Green (Teva) and Nesta (Mylan) noted above – were, of course, accurate:  Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

976.   After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz sought to obtain a "list of items" with increased prices so that it would "not respond to something adversely" by inappropriately competing for market share on any of those drugs.  Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase.

977.   Obtaining the list of price increase drugs was an effort by Sandoz to ensure it was aware of every increase taken by both competitors so it could live up to its end of Defendants' anticompetitive bargain.

978.   On July 9, 2013, SW-l stated in an internal Sandoz e-mail that he would "call around to the [Sandoz directors of national accounts] to try and gather a comprehensive list of items."

979.   Pursuant to that direction, on July 15, 2013 SW-2 at Sandoz called Rekenthaler at Teva and left a message.  Rekenthaler called SW-2 back immediately, and they had a three-minute conversation during which SW-2 asked Rekenthaler to provide him with a list of Teva price increase drugs, including drugs where Teva did **not** overlap with Sandoz.  Rekenthaler, of course, complied, but knowing that it was improper to share this information with a supposed competitor (and actual fellow cartel member), and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work e-mail account to his personal e-mail account, and then, two minutes later, forwarded the list from his personal e-mail account on to SW-2's personal e-mail account.

980.   As will also be discussed in additional detail, *infra*, the list included, *inter alia*, all formulations of Adapalene Gel, Methotrexate Tabs, Nadolol Tabs, Prazosin HCL Caps, and Ranitidine HCL Tabs:

From:                          David Rekenthaler [daverek@verizon.net]
Sent:                          Monday, July 15, 2013 5:02 PM
To:                            ███████@icloud.com
Subject:                       Fwd:


Sent from my iPhone

Begin forwarded message:

> **From:** Dave Rekenthaler <Dave.Rekenthaler@tevapharm.com>
> **Date:** July 15, 2013, 4:59:27 PM EDT
> **To:** "daverek@verizon.net" <daverek@verizon.net>

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (net actual incl) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 127% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

Best regards,

981.    Thereafter, Sandoz employee SW-2 called Sandoz employee SW-1 and conveyed the information orally to SW-1, who transcribed the information into a spreadsheet.

982.    One of the many drugs that was the subject of the joint Teva-Mylan price increases of early July, 2013, was Nadolol. Sandoz was the only other manufacturer in that market.  Shortly after the Teva increase, SW-l sent Patel a congratulatory message on the increase.

983.    As discussed in more detail, *infra*, later that year, SW-2 left Sandoz to join Rising, which also anticompetitively co-ordinated with Teva on Hyroxyzine Pamoate, among other drugs.

984.    Maureen Cavanaugh ("Cavanaugh") was Senior Vice President and Commercial Officer, North America at Teva until April, 2018, when – continuing to illustrate the institutional close co-operation among members of Defendants' cartel – Ms. Cavanaugh transferred to Defendant Lannett, as Lannett's Senior Vice President and Chief Commercial Officer.

985.    In 2014, it was Mylan's turn to lead yet another price increase, and again, co-operated with Teva to do so.  Again, most of Mylan's communications were *via* Jim Nesta, but this time, Teva communicated were *via* Rekenthaler (rather than Patel, although Patel handled the information internally, once Teva received it), illustrating the institutional (rather than merely personal) nature of the co-operative, anti-competitive relationship among cartel members.  Nesta and Rekenthaler spoke by

phone at least on May 9, 20 and 27, and by the end of the year, both Mylan and Teva had WAC prices for Amiloride of 40 cents per tablet.

986.   Effective April 17, 2014, Mylan increased its WAC prices on a number of drugs, including several that overlapped with Teva – further including Amiloride.[34]

987.   Pursuant to the established understanding among cartel members, Mylan employees created at least two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan, and then passed this pricing data on to Teva. On April 21, a few days after the price increases, a national account executive at Teva ("T.S.") forwarded these spreadsheets to Patel.

988.   On May 9, 2014, at 11:15 am, Rekenthaler called Nesta at Mylan and left a message. Nesta returned the call a few minutes later , at ll:23 am, and the two spoke for approximately eight minutes.

989.   The next day, T.S. sent Patel an e-mail with another Mylan-created spreadsheet attached, listing the Mylan *contract* (not WAC/AWP) price points for all of the recent increases, including Amiloride – which Patel then listed in her own Price Increase spreadsheet, with the notation "Follow/Urgent."

990.   After additional calls between Rekenthaler and Nesta on August 4, 7, 11, 18, and 21, Teva implemented the Mylan price increases on August 28, 2014.

---

[34] Mylan also increased its contract prices, although some of those price increases did not come into effect until a few weeds later, in mid-May.

991.   No shortages or other market features can explain Defendants' price increases for Amiloride HCL/HCTZ Tabs, Cimetidine Tabs, Diltiazem HCL Tabs, Disopyramide Phosphate Caps, Doxazosin Mesylate Tab, Methotrexate Tabs, Estradiol Tabs, Flurbiprofen Tabs, Hydroxyzine Pamoate caps, Ketorolac Tromethamine Tabs, Ketoprofen Caps, Nadolol Tablets, or Tolmetin Sodium Caps during the Relevant Period.

992.   The elevated prices of Amiloride HCL/HCTZ Tabs, Cimetidine Tabs, Diltiazem HCL Tabs, Disopyramide Phosphate Caps, Doxazosin Mesylate Tab, Methotrexate Tabs, Estradiol Tabs, Flurbiprofen Tabs, Hydroxyzine Pamoate caps, Ketorolac Tromethamine Tabs, Ketoprofen Caps, Nadolol Tablets, and Tolmetin Sodium Caps resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than theyy would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

993.   The unlawful agreement between Teva and Mylan, regarding Amiloride HCL/HCTZ Tabs, Cimetidine Tabs, Diltiazem HCL Tabs, Disopyramide Phosphate Caps, Doxazosin Mesylate Tab, Methotrexate Tabs, Estradiol Tabs, Flurbiprofen Tabs, Hydroxyzine Pamoate caps, Ketorolac Tromethamine Tabs, Ketoprofen Caps, Nadolol Tablets, and Tolmetin Sodium Caps, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### V.     Ciclopirox Cream

994.     Ciclopirox Cream is an antifungal medicine that prevents fungus from growing on skin.  Ciclopirox Cream is used to treat skin infections such as athlete's foot and ringworm.

995.     As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Ciclopirox Cream, as follows:

996.     In the summer of 2011, the market for Ciclopirox Cream was dominated by, and approximately evenly split among, four cartel members:  Perrigo, with 26%; Paddock, with 30%; Fougera, with 21%; and Glenmark, also with 21%.  Defendant G&W was not in the market at that time.

997.     On September 21, 2011, however, Erica Vogel-Baylor (at G&W) learned that Fougera had temporarily discontinued Ciclopirox Cream.  She forwarded that information to her boss, Grauso, who then called SW-6 at Fougera, twice, to confirm the information.  Grauso and SW-6 also spoke again the next morning.

998.     G&W saw Fougera's exit as an opportunity to enter the market for Ciclopirox Cream.  After confirming Fougera's plans to exit, G&W began making plans to enter the market.

999.     On October 28, 2011, Vogel-Baylor e-mailed Grauso regarding a meeting she had with Rite Aid concerning G&W's upcoming launches.  Vogel-Baylor noted that Rite Aid's incumbent supplier of Ciclopirox Cream was Glenmark.

1000.  Throughout January, 2012, G&W began formalizing its strategy for the Ciclopirox Cream launch and reached out to various customers to obtain incumbent information, usage, and pricing intelligence.

1001.  On February 3, 2012, Vogel-Baylor e-mailed Kurt Orlofski, a senior G&W executive, notifying him that Ciclopirox Cream was now available in small quantities and that several additional batches would be ready for shipment in the next few weeks.  She further stated that she needed to sit down with him to discuss which customers G&W wanted to approach.

1002.  On February 20, Orlofksi e-mailed Vogel-Baylor with a list of the tasks that she was responsible for.  One of those tasks was to secure approximately 20% market share of Ciclopirox Cream, per G&W's launch plan.

1003.  The next day, Orlofski exchanged eight text messages with S.K., a high-level executive at Perrigo. Two days later, on February 23, they exchanged an additional ten text messages.

1004.  As of March, 2012, Glenmark had 60% share of the Ciclopirox Cream market, Perrigo had 25%, and Fougera had the remaining 15% share even as it was phasing out of the market.

1005.  But by March 19, G&W had secured the Ciclopirox Cream business at Walgreens.  Walgreens was a Glenmark customer that accounted for slightly less than G&W's goal of 20% of the market for Ciclopirox Cream.

1006.  On March 23, Vogel-Baylor asked C.M., a sales executive at G&W, to reach out to Publix to see if the customer would be interested in a bid for Ciclopirox Cream.  C.M. and Vogel-Baylor traded subsequent e-mails.

1007.  On March 27, 2012, C.M. advised Vogel-Baylor that G&W should put together a proposal for Publix and that the customer planned to award G&W the business before the upcoming RFP.  That same day, while they were both at a Rite Aid event in Las Vegas, Nevada, Vogel-Baylor met GW-5, a senior executive at Glenmark, for the first time.

1008.  Two days later, on March 29, Vogel-Baylor e-mailed GW-5 and asked the Glenmark executive to send his full contact information.  The next day, GW-5 responded to Vogel-Baylor's e-mail, providing his contact information.  After exchanging a few more e-mails, the two then also exchanged several text messages.

1009.  On April 2, 2012, GW-5 e-mailed Vogel-Baylor, stating that he had forgotten his cell phone at home.

1010.  Throughout the month of April 2012, Vogel-Baylor and GW-5 exchanged hundreds of text messages and phone calls. During these communications, and others over the next several months, G&W and Glenmark colluded to significantly raise, almost simultaneously, their contract pricing on Ciclopirox Cream.

1011.  For example, on April 11 and April 12, 2012, Vogel-Baylor and GW-5 exchanged more than fifty text messages and phone calls. In the early morning of April 12, Vogel-Baylor e-mailed her supervisor, Orlofski, recommending that G&W

increase contract pricing for Walgreens and Publix. She suggested a direct price increase for Publix between 57% and 82% and between 233% and 408% for Walgreens, depending on the dosage size.

1012.  On April 18, 2012, Vogel-Baylor e-mailed C.M. at G&W with specific pricing to submit for the upcoming Publix RFP.  Regarding Ciclopirox Cream, Vogel-Baylor advised that because G&W was doing a price increase on the product, she was including increased pricing on the bid.  Vogel-Baylor further stated that C.M. should discuss this with her before submitting the bid.  That same day, Vogel-Baylor exchanged at least twenty text messages and phone calls with GW-5 at Glenmark.

1013.  That same day, Glenmark also began sending out notices to its customers that it would be increasing its prices for Ciclopirox Cream.

1014.  From April 24 to April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Glenmark, G&W, and Perrigo all attended, including S.K. from Perrigo, Orlofksi and Vogel-Baylor from G&W, and GW-5 from Glenmark.

1015.  S.K. at Perrigo and Orlofski at G&W communicated several times by phone in advance of the conference, as well as on the day the conference began. Between April 19 and 24, Orlofski and S.K. exchanged at least fifteen text messages. Orlofski also called S.K. once on April 24. The call lasted less than one minute. Vogel-Baylor at G&W and GW-5 at Glenmark continued to communicate constantly

throughout this period. On April 24, alone, Vogel-Baylor exchanged eighty-eight text messages with GW-5.

1016.  That same day, April 24, 2012, Cardinal e-mailed G&W requesting a bid on Ciclopirox Cream.  C.M., a sales executive at G&W, forwarded the request to Vogel-Baylor.  G&W declined to bid on the opportunity.

1017.  The next day, on April 25, Vogel-Baylor e-mailed C.M.  Two days after that, on April 27, Vogel-Baylor requested that G&W prepare a price increase letter for Walgreens raising the prices for Ciclopirox Cream between 233% and 408%, depending on the formulation.

1018.  Two weeks later, on May 12, Kroger, a Glenmark customer, e-mailed Vogel-Baylor asking if G&W wanted to bid on Ciclopirox Cream.  Vogel-Baylor declined to bid on the opportunity, claiming that G&W could not handle the volume.

1019.  On May 24, Vogel-Baylor e-mailed C.M. asking if he had heard whether Publix would accept the price increase on Ciclopirox Cream.  C.M. responded that Perrigo had submitted low pricing on the RFP.

1020.  By this time, Vogel-Baylor had been introduced to SW-6 at Fougera and was communicating with him directly, instead of through Grauso, as she had done previously.  At 5:35 pm that day, Vogel-Baylor reached out to SW-6; at 5:39 pm, SW-6 returned Vogel-Baylor's call, and they spoke for approximately five minutes.  At 5:43 pm, immediately upon hanging up with Vogel-Baylor, SW-6 called T.P. at Perrigo.

After speaking with T.P., SW-6 hung up and immediately called Vogel-Baylor back, at 5:45 pm, and again at 5:46 pm.

1021.  Later that evening, Vogel-Baylor replied to her colleague C.M.  Vogel-Baylor forwarded Perrigo's pricing to her supervisor, Orlofski.

1022.  On June 4, 2012, G&W sent its price increase notice to Walgreens.  In an internal pricing spreadsheet, Perrigo listed its direct pricing at one of its customers on the 15gm, 30gm, and 90gm package sizes as $7.14, $11.22, and $19.39, respectively. Notably, this pricing was even higher than the increased pricing G&W sent to Walgreens on the same day.

1023.  On June 6, Vogel-Baylor and GW-5 of Glenmark exchanged eight phone calls.  All of the calls lasted less than one minute.

1024.  On June 11, C.M. at G&W e-mailed Vogel-Baylor stating that he had spoken with Walgreens.  C.M. and Vogel-Baylor subsequently traded e-mails. That same day, Vogel-Baylor and GW-5 of Glenmark exchanged more than 80 text messages.

1025.  Vogel-Baylor forwarded her exchange with C.M. to Orlofski.  The next day, on June 13, Vogel-Baylor exchanged eighteen text messages with GW-5 at Glenmark.  Also, on June 13, 2012, Orlofski sent a text message to S.R. of Walgreens. G&W ultimately retained the Walgreens business.

1026.  Between June 15 and June 26, 2012, Vogel-Baylor and GW-5 continued to exchange multiple text messages each day.  During that time period, the two exchanged 545 text messages.

1027.  On June 29, C.M. e-mailed Vogel-Baylor to advise her that MMCAP was requesting a bid on Ciclopirox Cream. Vogel-Baylor and C.M. then exchanged several e-mails.  Vogel-Baylor later concluded and recommended to C.M. that he bid on the MMCAP business.

1028.  As of May, 2013, Defendants Glenmark, Perrigo, and G&W dominated the market for generic Ciclopirox Cream:  Glenmark with 44% market share, Perrigo with 38%, and G&W with 16%.

1029.  At least as early as May 2, 2013, Glenmark began communicating with its co-conspirators, including G&W, to co-ordinate its May, 2013, price increases.  Over the next several weeks, CW-5 and Jim Brown, a senior sales executive at Glenmark, had multiple calls with Vogel-Baylor at G&W during which they discussed and agreed to increase prices on Ciclopirox Cream.  According to the available phone records, prior to these calls, Vogel-Baylor had not previously spoken to Brown.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/2/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 18:10:31 | 0:00:33 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 9:00:46 | 0:00:00 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 9:00:48 | 0:00:51 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 13:57:00 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 15:27:37 | 0:02:50 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:01:30 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:05:56 | 0:03:42 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:27:03 | 0:00:55 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:13 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:14 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 18:26:47 | 0:00:00 |
| 5/14/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 11:18:55 | 0:00:40 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:04:27 | 0:00:14 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:05:28 | 0:05:07 |
| 5/16/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:12:12 | 0:06:33 |

1030.  Similarly, Vogel-Baylor, as she had done in the past, used her contact,

CW-6 - then at Aurobindo - to communicate with T.P. of Perrigo regarding the

increases.  As discussed above, CW-6 had formerly worked at Fougera and developed

relationships with Vogel-Baylor and T.P. of Perrigo during his tenure there.  At this

time, G&W and Aurobindo had no products that overlapped and CW-6 and Vogel-

Baylor were not social friends.  These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:43:12 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:45:35 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:47:58 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:50:22 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:52:45 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:55:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:05:32 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:18:21 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:20:44 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:23:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:25:31 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:27:54 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:30:19 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:40:42 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:50:48 | 0:00:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:47:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:48:00 | 0:02:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:50:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 13:02:00 | 0:07:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:09:00 | 0:06:00 |

1031.  As a result of these conversations, Glenmark increased prices on Ciclopirox Cream on May 16, 2013.  Soon thereafter, G&W would follow with comparable increases of its own on Ciclopirox Cream and Perrigo would follow with an increase on Ciclopirox Cream.

1032.  On May 20, 2013, ANDA e-mailed C.M. asking if G&W was interested in bidding on Ciclopirox Cream.  At that time, G&W had slightly less than its so-called "fair share" of the Ciclopirox Cream market.  ANDA provided the usage information and, the next day, on May 22, 2013, C.M. forwarded the request to Vogel-Baylor, along with some additional bid requests it had received from other customers on other products.

1033.  On May 23, 2013, Vogel-Baylor e-mailed price increase analyses for Ciclopirox Cream and the Mometasone line to her supervisor, Orlofski. The next day,

May 24, 2013, Vogel-Baylor called CW-5 at Glenmark twice. The calls lasted less than one minute each.

1034.  On May 29, 2013, Vogel-Baylor exchanged five calls with CW-5 and Brown at Glenmark.  That same day, G&W finalized its price increase notifications for Ciclopirox Cream to send to its customers, including Publix and Wal-Mart.

1035.  Also, on May 29, 2013, Target e-mailed C.M. of G&W stating that the customer had received a 250% price increase on another drug, Halobetasol, and asking whether C.M. could provide any insight into why.

1036.  On May 30 and May 31, 2013, Brown called Vogel-Baylor twice. The calls lasted four minutes and less than one minute, respectively.

1037.  No shortages or other market features can explain Defendants' price increases for generic Ciclopirox Cream during the Relevant Period.

1038.  The elevated prices of generic Ciclopirox Cream resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1039.  The unlawful agreements among Defendants Fougera and G&W, regarding generic Ciclopirox Cream were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### W.   Metronidazole .75% Gel

1040.   Generic Metronidazole Topical .75% Gel ("Metro Gel .75%,") is a topical antibiotic prescribed for the treatment of skin lesions in patients with rosacea.

1041.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of Metro Gel .75%, as follows:

1042.   As of June, 2011, there were three manufactuers in the market for Metro Gel .75% – Fougera, Sandoz, and Taro.

1043.   In the summer of 2011, Sandoz was seeking opportunities to increase prices on its products.  In pursuit of that goal, on July 6, 2011, J.P., a product manager at Sandoz, sent an internal e-mail asking for information on any recent price increases instituted by Taro and Fougera on a list of products on which the companies overlapped.  The list included Metro Gel .75%.

1044.   That same day, July 6, 2011, CW-4, a senior sales executive at Sandoz, exchanged three calls with D.S. at Taro, including one call lasting approximately a quarter-hour.  During these calls, D.S. informed CW-4, among other things, that Taro would be raising prices on Metro Gel .75%.  Based on their prior conversations and understanding, CW-4 knew that Sandoz was expected to follow the price increase.

1045.   Later that day, CW-4 responded to J.P.'s e-mail.  She then listed out the competitive intelligence she had just gathered from D.S. regarding Metro Gel .75%.

1046.  Over the coming months, Sandoz kept watch on the market, waiting to follow Taro's expected price increase on Metro Gel .75%.

1047.  In the interim, on July 20, 2011, a fourth competitor, G&W, entered the Metro Gel .75% market.  Despite only recently entering the market, G&W quickly got to work co-ordinating a price increase on Metro Gel .75%.  For the increase to succeed, G&W would need to ensure that the other competitors in the market would follow – and follow they did.

1048.  From January 29 to February 1, 2012, the ECRM held its Retail Pharmacy Generic Pharmaceuticals Conference in Atlanta, Georgia.  Representatives from all four manufacturers in the Metro Gel .75% market – Fougera, Sandoz, Taro, and G&W – were in attendance.  These representatives included CW-6 and Kaczmarek at Fougera, CW-4 at Sandoz, D.S. at Taro, and Vogel-Baylor and Orlofski at G&W.  Grauso, then at Aurobindo, was also in attendance.

1049.  On February 2, 2012, the day after the conference concluded, G&W generated a price increase analysis for Metro Gel .75%, which included a 245% increase to the WAC price from $39.99 to $137.99. That same day, Vogel-Baylor used her former colleague Grauso (then at Aurobindo) to convey information to CW-6 at Fougera regarding the Metro Gel .75% price increase.

1050.  For example, on Febrna1y 2, 2012, Vogel-Baylor called Grauso and they spoke for eight minutes.  Grauso hung up and immediately called CW-6 of Fougera. The two men spoke for four minutes.  Immediately upon hanging up, Grauso called

Vogel-Baylor back and they spoke for 11 minutes.  Grauso then called CW-6 again and spoke to him for five minutes.  Grauso hung up, received a call from Orlofski at G&W, and the two men spoke for approximately a quarter-hour. These calls, which all occurred within the span of an hour, are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 9:29:00 | 0:08:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 9:36:00 | 0:04:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:40:00 | 0:11:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 10:14:00 | 0:05:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Orlofski, Kurt (G&W) | 10:19:00 | 0:13:00 |

1051.  Later that evening, CW-6 e-mailed his boss at Fougera, Kaczmarek, asking him to give him a call.  CW-6 and Kaczmarek spoke by phone three times the following day.

1052.  On February 7, 2012, Vogel-Baylor e-mailed Orlofski her latest price increase analysis for Metro Gel .75%. The next day, on February 8, 2012, Orlofski called Kaczmarek at Fougera. The two competitors exchanged two more calls over the next few days and finally connected on February 10, 2012 for a twenty-five (25) minute call.

1053.  The communications intensified on February 14, 2012 as G&W made final preparations for its price increase announcement.  As they had done previously, Vogel-Baylor and CW-6 used Grauso as the conduit to co-ordinate their plans on Metro Gel .75%.  These calls are detailed below:



| Date | Call Ty | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 8:42:00 | 0:25:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 11:34:00 | 0:02:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 11:56:00 | 0:13:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Orlofski, Kurt (G&W) | 12:09:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:10:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 12:19:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:04:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 12:26:30 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Grauso, Jim (Aurobindo) | 13:25:08 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 13:25:59 | 0:00:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:40:00 | 0:05:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 13:44:00 | 0:06:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:49:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 13:55:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 14:39:00 | 0:08:00 |

1054.  Similarly, the next day, on Febrna1y 15, 2012, Vogel-Baylor called

Grauso and they spoke for 11 minutes. Less than ten minutes later, Grauso called

Vogel-Baylor back and they spoke for 41 minutes.  Grauso hung up the phone and

immediately called CW-6 at Fougera.  That call lasted one minute.  The next day,

Vogel-Baylor instructed her team to generate price increase letters for Metro Gel

.75%, and to issue them by 1 :00 p.m. on February 17, 2012.

1055.  Even before G&W notified its customers of the increase, other co-

conspirators in the market knew that G&W would be increasing price and planned to

do the same.  For example, on February 15, 2012, two days before G&W sent its

notice letters to its customers, Blashinsky, then a senior marketing executive at Taro,

informed his colleagues that prices had risen for Metro Gel .75% and one other

product.

1056.  On February 17, 2012, Orlofski e-mailed Blashinsky of Taro asking if he was going to the annual GPhA industry conference the following week.  The next day, Orlofski e-mailed B.S., a senior Taro executive.

1057.  On February 17, 2012, G&W sent out letters notifying its customers of the Metro Gel .75% price increase.  That same day, Grauso called Vogel-Baylor and they spoke for approximately a quarter-hour.  Following the now normal pattern, Grauso hung up and called CW-6 at Fougera.  The two executives spoke for five minutes.  Immediately upon hanging up, Grauso called Vogel-Baylor again. That call lasted two minutes.

1058.  On February 18, 2012, a GPO customer e-mailed Vogel-Baylor after receiving the Metro Gel .75% notice.  Of course, Vogel-Baylor already knew that her employer's co-conspirators (and ostensible competitors) would follow G&W's price increase, but she could not tell the customer that.  Ultimately, the customer negotiated a 45-day notice period.

1059.  On February 20, 2012, Blashinsky reiterated to his colleagues that price increases were taking place in the Metro Gel .75% market.

1060.  From February 22 to February 24, 2012, the GPhA held its annual meeting in Orlando, Florida.  Senior executives from all four manufacturers (and co-conspirators) in the Metro Gel .75% market – Fougera, Sandoz, Taro, and G&W – were in attendance. These representatives included Kaczmarek and D.K., a senior executive at Fougera, R.T. of Sandoz, B.S. of Taro, and Orlofski of G&W. During the

conference, the competitors were actively discussing and agreeing on the details of the Metro Gel .75% price increase.

1061.  On February 22, 2012, the first day of the GPhA meeting, Orlofski and B.S. emailed again.

1062.  Immediately after meeting with Orlofski on February 22, B.S. e-mailed Blashinsky regarding Metro Gel .75%. Blashinsky and B.S. subsequently traded emails discussing Metro Gel .75%. Of course, Fougera and Sandoz had not increased their Metro Gel .75% pricing yet – but B.S. of Taro understood that they would based on his conversation with Orlofski.

1063.  Similarly, that same evening, on February 22, 2012, Kaczmarek of Fougera (who was also at the GPhA conference) sent an e-mail to the Fougera Pricing Committee.

1064.  On March 5, 2012, CW-3, then a sales executive at Fougera, e-mailed Kaczmarek regarding one customer that had already received a pre-increased price quote from Fougera. Kaczmarek was unsympathetic, responding that he was willing to lose the customer in the interest of maintaining the agreed-upon higher prices.

1065.  On March 9, 2012, Rite Aid e-mailed Sandoz asking for a bid on Metro Gel .75%. CW-4 of Sandoz forwarded the invitation to Kellum. Kellum wasted no time in telling his colleagues that Sandoz should stay clear of the Rite Aid bid, as Sandoz intended to follow the price increase that he believed spawned the opportunity.

1066.  One week later, when Rite Aid pressed again for a Sandoz bid, CW-4 contacted Kellum to verify that the decision was to decline, and Kellum confirmed.

1067.  Within the next several weeks, all three competitors followed G&W's increase on Metro Gel .75% as agreed and essentially matched G&W's WAC pricing. Fougera increased on March 16, 2012, Taro increased on March 23, 2012, and Sandoz increased on April 6, 2012.

1068.  On March 22, 2012, the day before Taro increased its price, Orlofski at G&W received two phone calls from a Taro employee1 lasting 12 minutes and two minutes, respectively.

1069.  Customers began to react immediately to the dramatic price hikes by seeking price quotes from other cartel members.  Defendants, however, refused to break ranks.

1070.  On April 3, 2012, for example, Fougera received a request from a Taro customer to bid on Metro Gel .75% in light of the Taro increase.  The following day, on April 4, 2012, CW-6 sent Kaczmarek an updated market share breakdown for the Metro Gel .75% market.  CW-6 expressed satisfaction that the market had arrived at an appropriate equilibrium in accordance with fair share principles.

1071.  No shortages or other market features can explain Defendants' price increases for generic Metro Cream or Metro Lotion during the Relevant Period.

1072.  The elevated prices of generic Metro Gel .75% resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay

more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their

conspiracies is enjoined by this Court.

1073.  The unlawful agreement among Defendants Aurobindo, Fougera, G&W,

Sandoz, and Taro, regarding Metro Gel .75%, was part of all Defendants' overarching

conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize

the prices of the Drugs at Issue.

**X.  Metronidazole Cream and Lotion**

1074.  Metronidazole 0.75% is also a topical antibiotic used to treat the skin

lesions that result from rosacea.  Among other formulations, it is manufactured as a

cream ("Metro Cream") and as a lotion. ("Metro Lotion")

1075.  As part of Defendants' overarching conspiracy with respect to the Drugs

at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all

formulations of generic Metro Cream and/or Metro Lotion, as follows:

1076.  In 2011, Actavis, Fougera, G&W, and Harris Pharmaceutical ("Harris")

each marketed a generic version of Metro Cream, and Actavis and Fougera shared the

market for generic Metro Lotion.

1077.  By 2013, the value of the combined annual market for Metro Cream and

Lotion in the United States had grown to exceed $70 million, which happened as

follows:

1078.  In early July 2011, Actavis initiated its plan to raise the prices of both products by reaching out to its co-conspirator, G&W.

1079.  On July 6, 2011, Mike Perfetto, then a senior sales and marketing executive at Actavis, called Grauso at G&W, once for approximately four minutes and once for approximately twenty minutes.

1080.  The next day, on July 7, 2011, the conversation continued, with Perfetto initiating a six-minute call to Grauso.

1081.  Confident that at least G&W was on board with the planned increase, Actavis raised the price of Metro Cream and Lotion effective July 22, 2011. The new WAC price for Metro Cream was $153.33 for a 45gm tube, an increase of 278%. The WAC price for Metro Lotion increased by 189% to $208.03 for a 59ml bottle.

1082.  That same day, M.A., a Fougera marketing executive, e-mailed several colleagues, including Kaczmarek, with the precise details of the Actavis increase. Kaczmarek began at once assessing how Fougera would follow, mindful of the fair share rules and the agreement among the competitors. He asked M.A. about G&W's current share of the market.

1083.  The next morning, on Saturday July 23, 2011, Fougera utilized one of its most reliable sources of information – the relationship between Fougera's CW-6 and Grauso at G&W.  CW-6 called Grauso and the two competitors spoke for four minutes. A few minutes later, CW-6 called Grauso again and they spoke for approximately a quarter-hour.

1084.  Just after 9:00 a.m. on Monday, July 25, 2011, Kaczmarek cautioned his team at Fougera to consult with management before quoting a price to any customer on Metro Cream or Metro Lotion.

1085.  By 10:31 that morning, Kaczmarek had already decided on the exact amount by which Fougera should increase its price on these products to stay in lockstep with Actavis.  By early afternoon, a price increase announcement letter had already been drafted and circulated for comment, incorporating Kaczmarek's formula.

1086.  Meanwhile, CW-6 and Grauso continued their discussions that same morning. CW-6 initiated calls to Grauso at 9:55 a.m. and 12:21 p.m.

1087.  Less than 20 minutes after the second call with Grauso ended, CW-6 called his boss, Kaczmarek, to report the information he had obtained. A total of eight calls were exchanged between CW-6 and Kaczmarek on the afternoon and early evening of July 25, 2011.

1088.  In the early afternoon of Monday, July 25, 2011, a large customer reached out to CW-6 at Fougera seeking a new source of supply for Metro Lotion and another product.  CW-6 asked whether the request was the result of supply issues or different issues.  The buyer, tongue-in-cheek, asked which answer would yield the better price.  CW-6 followed Kaczmarek's earlier instructions and replied to the buyer.

1089.  That same day, Fougera informed its customers that it was increasing its pricing for both Metro Cream and Metro Lotion effective July 26, 2011, closely

tracking Actavis's new prices. The new WAC price for Metro Cream was $151.80 for a 45gm tube. The new WAC price for Metro Lotion was $205.95 for a 59ml bottle.

1090.  Customers quickly began to complain to Fougera about the sharp price increase, prompting one Fougera customer service representative to ask Kaczmarek for help in framing a response to a disgruntled customer that e-mailed protesting against the roughly 150% price hike.

1091.  Undaunted by the obvious dissatisfaction of its customers, Fougera's singular focus was on ensuring that the competitors all followed the price increases. In response to yet another customer inquiry about the price spike, Kaczmarek virtually disregarded the news of the customer's displeasure.

1092.  Kaczmarek did not have to worry for long, however, as G&W's plans to follow the Actavis and Fougera price increases on Metro Cream were already in full swing.  On July 26, 2011 – the day of the Fougera increase – Grauso of G&W called CW-6 of Fougera. The call lasted one minute.  CW-6 hung up and immediately called Kaczmarek.

1093.  Meanwhile, less than ten minutes after ending his call with CW-6, Grauso brought Actavis into the conversation, initiating a two-minute call to Perfetto. Orlofski of G&W similarly followed up with a text message to Perfetto at Actavis roughly a half hour after that. Grauso called CW-6 at Fougera again a few hours later, and the resulting call lasted seven minutes.  Within minutes of the end of that call, Grauso had placed yet another call to Perfetto at Actavis, this one lasting 5 minutes.

1094.  By that evening, Grauso had spoken to Perfetto by phone for approximately a half-hour, and had sent him a text message, while CW-6 of Fougera had conferred twice more with his boss, Kaczmarek.

1095.  Over the next two days, July 27 and July 28, 2011, Grauso spoke to Perfetto at Actavis four more times and to CW-6 at Fougera six more times.

1096.  With its competitors fully apprised, G&W raised the price of Metro Cream on July 28, 2011, following close on the heels of the Actavis and Fougera increases.  As the news of yet another Metro Cream price increase hit the market, customers again scrambled to find more reasonably-priced sources of supply.  One large customer reached out to Fougera and Actavis on the same day as the G&W increase seeking quotes. Fougera sales executive K.K. contacted Kaczmarek about the request, surmising both that the customer was currently supplied by G&W and that G&W must be implementing a price increase.

1097.  Despite over a week of receiving nearly constant updates from G&W through CW-6, Kaczmarek remained coy about his knowledge of G&W's increase.

1098.  Finally, just four days later on August 1, 2011, the remaining competitor, Harris, fell in line with an increase of its own on Metro Cream.  The new Harris WAC price was $135.00, an increase of 437%.

1099.  On August 2, 2011, a customer informed G&W that its increase would bump G&W from its primary position on Metro Cream, but only by a small margin considering the market-wide increases.  Vogel-Baylor promised the customer a slight

price adjustment in order to maintain the primary position but asked who the other competitor was.  The customer responded that it was Harris.

1100.  The following day, the customer followed up with Vogel-Baylor to let her know that Harris would not be fighting G&W for the primary position.  The customer added that the Harris representative was upset about the outcome.

1101.  No shortages or other market features can explain Defendants' price increases for generic Metro Cream or Metro Lotion during the Relevant Period.

1102.  The elevated prices of generic Metro Cream and Metro Lotion resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1103.  The unlawful agreements among Defendants Fougera Actavis, G&W, and Harris, regarding Metro Cream and Metro Lotion, were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## Y.    Chlorpromazine HCL Tablets

1104.  Chlorpromazine HCL tablets are used to treat mood disorders such as schizophrenia or bipolar disorder.

1105.  The market for generic Chlorpromazine HCL tablets ("Chlorpromazine") was mature and at all relevant times had multiple manufacturers. As a result, for years, the prices for Chlorpromazine tablets were relatively low and stable.

1106.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of Chlorpromazine, as follows, beginning at least as early as July, 2011:

1107.  During the Relevant Period, Defendants Sandoz and Upsher-Smith dominated the market for generic Chlorpromazine.

1108.  After years of relatively low and stable prices for Chlorpromazine tablets, Sandoz and Upsher-Smith agreed to implement large price increases.  In the summer of 2011, Sandoz and Upsher-Smith began to implement nearly simultaneous and identical price increases.  By January, 2012, Sandoz's and Upsher-Smith's list prices had approximately quadrupled, and NSP prices increased nearly ten-fold. These incredibly large price-increases were followed by Sandoz and Upsher-Smith imposing even larger price increases after that.  Both manufacturers' WAC prices eventually exceeded $7.50 (compared to less than 50 cents before they agreed to raise prices) and their NSP prices peaked at over $6.00 (compared to approximately 15 cents before their agreement).

1109.  The following charts of list prices shows some of the large and parallel price increases by Sandoz and Upsher-Smith:



1110.  Throughout this period, Sandoz and Upsher-Smith met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Chlorpromazine HCL tablets and their Fair Share agreement.

1111.  For example, in October of 2011, as Sandoz and Upsher-Smith began their parallel and coordinated price increases, K.K., a Senior National Account Executive at Sandoz, and D.Z., Upsher-Smith Senior National Account Manager, were in contact throughout that year, with phone communications in (at least) March, April, July, September, November and December of 2011.

1112.  By October, 2014, when Upsher-Smith again increased prices, K.K. at Sandoz had moved on to Mallinckrodt.  So, illustrating the institutional, rather than merely personal, nature of Defendants' cartel, D.Z. at Upsher-Smith instead communicated with C.B., a Sandoz Director of National Accounts.  The two spoke

on September 16, 2014, for approximately 4 minutes. Upsher-Smith raised its Chlorpromazine prices (again) a few weeks later.

1113.  Sandoz didn't immediately follow Upsher-Smith's October, 2014, price increase – but it did so early the following year, announcing identical list (WAC) prices to Upsher-Smith on May 15, 2015.  The day before announcing, C.B. at Sandoz again spoke to D.Z. at Upsher-Smith.

1114.  No shortages or other market features can explain Defendants' price increases for generic Chlorpromazine during the Relevant Period.

1115.  The elevated prices of generic Chlorpromazine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1116.  The unlawful agreement among Defendants Sandoz/Fougera and Upshur-Smith, regarding generic Chlorpromazine, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### Z.    Triamterene HCTZ

1117.  Triamterene HCTZ is a medication used to treat water retention and high blood pressure.

1118. The markets for Triamterene HCTZ capsules and tablets were mature and had multiple manufacturers at all relevant times.

1119. As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Triamterene HCTZ, as follows, beginning at least as early as October, 2011:

1120. During the Relevant Period, Defendants Actavis, Mylan, Sandoz and Apotex dominated the market for Triamterene HCTZ tablets and Defendants Mylan, Sandoz and Lannett dominated the market for Triamterene HCTZ capsules.

1121. In 2011, Mylan, Sandoz and Actavis imposed large price increases, all close in time and amount. When Apotex joined the market in late 2012, rather than lower prices to win customers, it offered the same elevated prices of Mylan, Sandoz and Actavis. All four manufacturers eventually imposed identical list (WAC) prices.

1122. Prices also were low in the Triamterene HCTZ capsule market, but that also changed in 2011. Sandoz temporarily exited the market, which prompted Mylan to modify its price. When Lannett entered the market in December, 2011, it did so at elevated prices and was careful not to disturb market pricing. Sandoz eventually re-entered the market as well, but even with three suppliers, prices did not return to their prior, lower levels because Defendants' Fair Share agreement kept prices inflated above competitive levels.

1123.  The chart below shows the elevated and parallel pricing by Mylan, Sandoz, Actavis and Apotex for Triamterene tablets, and by Mylan, Lannett and Sandoz for capsules. (Triamterene HCTZ 75-50 mg tablets are not included in this chart but show a similar pricing pattern)



1124.  Throughout this period, Actavis, Mylan, Sandoz, Apotex and Lannett met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Triamterene HCTZ capsule and tablets and their Fair Share agreement.

1125.  For example, in November 2011—when Mylan announced list (WAC) price increases for Triamterene HCTZ tablets—M.W., Mylan Director of National Accounts, was communicating by phone with J.R., Sandoz Director of Institutional Marketing, and K.B., Sandoz National Account Manager.

1126.  On March 8, 2012, M.B., Actavis Director of National Accounts, communicated by phone with T.K., Apotex National Account Manager.  The next day, Actavis announced list (WAC) price increases for Triamterene-HCTZ.  M.B. (Actavis) and T.K. (Apotex) communicated by phone again the following week, on March 16.

1127.  The next month, in April, 2012, not long after Lannett entered the Triamterene-HCTZ capsule market, J.K., Mylan VP & Executive Director of Sales, communicated by phone with K.S., VP of Sales and Marketing at Lannett, on April 19, 20 and 23.

1128.  No shortages or other market features can explain Defendants' price increases for generic Triamterene HCTZ during the Relevant Period.

1129.  The elevated prices of generic Triamterene HCTZ resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1130.  The unlawful agreements among Defendants Actavis, Mylan, Sandoz and Apotex, regarding generic Triamterene HCTZ were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## AA.   Lidocaine Ointment

1131.  Lidocaine is a local anesthetic used on the skin to stop itching and pain from certain skin conditions.  Some forms of this medication are also used to decrease discomfort or pain during certain medical procedures.  It is available in many forms, including Topical formulations and Solutions for injection or infusion. lt is also available as a transdennal Patch applied directly to the skin.

1132.  The market for Lidocaine is mature.  Lidocaine has been available in the United States for decades in a generic form.  At all relevant times, there have been multiple manufacturers of Lidocaine.

1133.  Lidocaine Ointment ("Lidocaine" or "Lido") is an anesthetic used to temporarily numb and relieve pain from minor burns, skin abrasions, insect bites, and other painful conditions affecting mucous membranes.

1134.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Lidocaine at least as follows:

1135.  Defendants Fougera/Sandoz and Taro dominated sales of Lidocaine 5% Ointment during much of the Relevant Period.

1136.  In late 2011, Fougera/Sandoz totally dominated the market for generic Lidocaine Ointment – in fact, Fougera was the sole supplier, but Hi-Tech was making plans to launch in the generic Lidocaine Ointment market.

1137.  On November 21, 2011, A.R., a Fougera sales executive, forwarded an

invitation to SW-6, among others, for a conference call a week later to discuss, *inter aliaa*, Fluocinolone Acetonide – a product on which Fougera and G&W overlapped and where SW-6 was colluding with Grauso at G&W at the same time.  That anticompetitive conduct is discussed elsewhere in this Complaint.

1138.  The next day, on November 22, E.B. at Hi-Tech called SW-6 at Fougera and they spoke for approximately seven minutes.  According to available phone records, this was the first time that the two had ever spoken by phone.  Immediately after hanging up, SW-6 called his supervisor, Walter Kaczmarek, and they spoke for four minutes.  During these calls, the two cartel members discussed Hi-Tech's entry into the market and Fougera's plan to raise its prices before Hi-Tech entered.

1139.  A week later, Fougera held its internal strategy meeting, on November 28.  A few days after that, on December 2, and then again on December 5, SW-6 called E.B.  The calls lasted one minute each.

1140.  Later that same month, on December 22, 2011, and consistent with the conspirators' discussions, Fougera increased WAC pricing for Lidocaine Ointment by 200%.

1141.  Starting in February, 2012, as Hi-Tech began preparing in earnest to enter the market, E.B. and SW-6 began speaking more frequently.  On February 23, 2012, E.B. called SW-6 and they spoke for seven minutes.  Immediately upon hanging up, SW-6 called his boss, Kaczmarek, to report the conversation. That call lasted one minute, and likely was just a voice-mail message.  An hour later, Kaczmarek called

SW-6 back and they spoke for six minutes.

1142.  Two weeks later, on March 7, E.B. called SW-6 and they spoke for five minutes.  SW-6 called E.B. back a few minutes later.  The call lasted one minute. During these calls, they discussed which customers Hi-Tech should target as it entered the Lidocaine market, as well as pricing.

1143.  One week later, on March 13, 2012, Hi-Tech entered the Lidocaine Ointment market and matched Fougera's increased WAC pricing.  After Hi-Tech entered, and consistent with the so-called "fair share" principles of Defendants' cartel, Fougera gave up several of its Lidocaine Ointment customers to the new entrant.

1144.  For example, on March 22, 2012, ABC e-mailed Fougera to advise that it had received an offer for Lidocaine Ointment and asked whether Fougera wanted to bid to retain the business.  SW-3, then a sales executive at Fougera,[35] asked his boss, Kaczmarek, how to respond; he directed that SW-3 decline to supply the new entrant.

1145.  Similarly, on March 27, SW-6 advised Kaczmarek that Hi-Tech had made an offer to another customer, Ahold, for Lidocaine Ointment.  Again, Kaczmarek directed that Fougera would not retain that customer's Lidocaine account.

1146.  Wal-Mart's offer required more detailed co-ordination between the two co-conspirators:  on May 17, 2012, Wal-Mart e-mailed K.K., another Fougera sales executive, to advise that Fougera was not the lowest bidder on its RFP for Lidocaine

---

[35] Because this was before Sandoz acquired Fougera, in July of that same year.

Ointment and asked whether Fougera wanted to bid to retain the business.  K.K. forwarded Wal-Mart's request to Kaczmarek, asking how he should respond – and triggering a Round Robin of telephone calls among the co-conspirators.

1147.  First thing the next morning, Kaczmarek called SW-6 and they spoke for ten minutes.  A few hours later, Kaczmarek called SW-6 again and they spoke for three minutes.  Then, immediately after hanging up with Kaczmarek, SW-6 called E.B. at Hi-Tech; that call lasted one minute.  A half-hour later, SW-6 called E.B. again; that call also lasted one minute.  And finally, that same morning, Kaczmarek responded to K.K.'s e-mail – and Fougera did not ultimately retain the Wal-Mart business.

1148.  Later that day, Kaczmarek e-mailed the sales team regarding Lidocaine Ointment and stated that Fougera had already given up CVS, ABC, and Rite Aid, which accounted for 34% market share.  S.H., a Fougera sales executive, then reminded Kaczmarek that Fougera had also given up HD Smith and Anda to Hi-Tech.  The next day, on May 19, 2012, SW-6 called E.B., speaking for four minutes – likely letting him know that Fougera was now done conceding customers to Hi-Tech.

1149.  Over the following year, the co-conspirators maintained rough parity in market share.  By March, 2013, Taro began preparing to re-launch into the Lidocaine Ointment market.  At that time, Sandoz (which by then had acquired Fougera) had approximately 56% market share and Hi-Tech had 42%.

1150.  On March 18, 2013, the same day that Ara Aprahamian started at Taro, Michael Perfetto sent an internal e-mail, welcoming Aprahamian to the team and

listing topics for a Monday call.  One of those topics was Lidocaine.

1151.  Over the next several days, Aprahamian and SW-3 (now at Sandoz, after it purchased Fougera) exchanged several calls, including a call on March 19, 2013 lasting approximately a quarter of an hour and a call on March 21, of similar length.

1152.  Later in the day on March 21, 2013, after Aprahamian's conversations with SW-3, J.J., a senior Taro sales executive, sent an internal e-mail listing Lidocaine Ointment usage numbers by manufacturer at various customers.

1153.  The next day, on March 22, Aprahamian called SW-3 again.  SW-3 returned the call and the two spoke for approximately a quarter of an hour.

1154.  During these calls, Aprahamian told SW-3 that Taro would be re-entering the Lidocaine Ointment market.  SW-3, in turn, provided Aprahamian with non-public price points that Sandoz was charging to its customers for the product.

1155.  Armed with this competitively sensitive information, on or about March 23, 2013, Taro re-launched Lidocaine Ointment and matched Sandoz and Hi-Tech WAC pricing.  Over the next two weeks, Aprahamian and SW-3 exchanged numerous calls during which they discussed, among other things, the allocation of customers to the new entrant, Taro.  These calls are listed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/25/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:56:00 | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:15:00 | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:16:00 | 0:06:00 |

1156.  Although Aprahamian wanted SW-3 to tell him which customers to target, SW-3 had a difficult time obtaining that guidance from Kellum.  Aprahamian told SW-3 that Taro would be taking two customers from Sandoz, which SW-3 understood that to mean that Taro planned to take one wholesaler and one retailer.

1157.  On Friday, April 5, the day after the last call on the chart above, J.R., a senior Sandoz marketing executive, sent an internal e-mail asking Armando Kellum a question; Kellum answered by providing his understanding of the conversations between SW-3 and Taro.

1158.  Early the next week, on Tuesday, April 9, 2013, SW-3 called Aprahamian and they spoke for seven minutes.  The following Monday, April 15, Aprahamian and SW-3 exchanged three calls, including one lasting 18 minutes and another lasting 9 minutes.  Later that day, Aprahamian sent an internal e-mail attaching a Summary, that showed Sandoz and Taro market shares consistent with Defendants' cartel's so-called "Fair Share" principles.  For pricing, Taro matched – and Taro and Sandoz remained in contact:

1159.  The next day, on April 16, 2013, SW-3 called Aprahamian.  Aprahamian returned the call and the two spoke for eleven minutes.  At the same time, J.J. of Taro called E.B., a senior Hi-Tech sales and marketing executive, and they spoke for eight minutes.  Throughout the rest of April, SW-3 and Aprahamian exchanged at least ten more phone calls.

1160.  In June 2013, Taro circulated a spreadsheet detailing its gains and losses for May, 2013, for various products.  With respect to Lidocaine Ointment, Taro noted that it did not bid at the Omnicare account.

1161.  By January, 2014, Sandoz held a presentation which identified Taro's Lidocaine Ointment launch as a key launch for Taro.

1162.  Throughout 2014, Sandoz was careful not to disrupt the market balance it had achieved with Taro and Hi-Tech with regard to Lidocaine Ointment.  For example, in March, 2014, Sandoz created a list of products to target at Wal-Mart in the rest of 2014. With regard to Lidocaine Ointment, SW-3 responded that Sandoz should not take that business.

1163.  No shortages or other market features can explain Defendants' price increases for Lidocaine during the Relevant Period.

1164.  The elevated prices for Lidocaine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these

elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1165.  The unlawful agreement among Fougera/Sandoz, Taro, and Hi-Tech, regarding Lidocaine, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AB.    Clonidine TTS Patch and Doxazosin Mesylate**

1166.  Doxazosin mesylate ("Doxazosin") is a quinazoline compound used to treat high blood pressure and urinary retention associated with benign prostatic hyperplasia.

1167.  The Clonidine TTS Patch ("Clonidine-TTS") is a transdermal patch that administers such medicines to treat high blood pressure.

1168.  Teva began marketing Clonidine-TTS in 2010, after Boehringer Ingelheim's patent on Catapres-TTS had expired.

1169.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Doxazosin and the Clonidine TTS Patch at least as follows:

1170.  As of September, 2011, Mylan and Teva were at rough parity in the market for generic Clonidine-TTS, with Mylan having approximately 48% market share and Teva having approximately 44% market share.  At the end of 2011 and beginning of 2012, however, that relationship was changing.

1171.  In November of 2011, Walgreens solicited Teva to provide a bid for its Clonidine-TTS business.  Teva was successful and took the Clonidine-TTS account at Walgreens from Mylan.  Two months later, in January of 2012, Cardinal Health, Inc. ("Cardinal") solicited a bid from Teva for a one-time-buy to cover what Teva assumed was a short-term supply issue that Mylan was experiencing.  A few days after Teva submitted its offer to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for ClonidineTTS.  Because Teva believed that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine-TTS.  This would not have been a breach of the "rules of the road" of Defendants' cartel because Teva's bid did not erode prices and supplying a customer if their incumbent supplier was unable to do so was acceptable, so long as the cartel's prices were maintained.

1172.  With the Walgreens and Cardinal business, Teva now had 65-70% of the Clonidine-TTS market; on February 10, 2012, a senior sales and marketing executive at Teva, who will be referred to in this complaint as K.G., told his colleagues to find out the extent of Mylan's supply issues.  Following these orders, that same day, David Rekenthaler ("Rekenthaler"), then Vice President of Sales for US Generics at Teva, called a senior national accounts executive at Mylan, B.P., to find out about Mylan's supposed supply issues.

1173.  Later that day, Rekenthaler reported back to his Teva colleagues that Teva's assumptions were incorrect and cautioned that Mylan might retaliate against Teva for taking more than its "fair share."

1174.  Sure enough, shortly thereafter, Mylan challenged Teva's Clonidine-TTS business at McKesson Corp. ("McKesson")  To de-escalate the situation, Teva ultimately conceded the business – but this was not enough to bring Teva back into compliance with the "fair share" aspect of Defendants' overarching conspiracy, so in April, Mylan challenged Teva's Clonidine-TTS business at CVS to gain back additional market share and further signal its displeasure with Teva for taking the Cardinal business, a signal that Teva understood:  Teva backed off and conceded the CVS account to Mylan.

1175.  But as shown throughout this Complaint, Defendants' overarching conspiracy was not limited to any single drug; rather, it spanned Defendants' entire portfolio of generic products.  As a result, misconduct from Defendants' cartel in one product line could be punished – or atoned for – in another.

1176.  On May 4, 2012, just a few days after ceding CVS's Clonidine-TTS account to Mylan, Cardinal approached Teva about a different drug, Doxazosin Mesylate tabs. ("Doxazosin") At the time, Mylan was the primary supplier for Doxazosin at Cardinal.  Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June, but Cardinal wanted to move the entire Doxazosin line to Teva.

1177.  Further illustrating this aspect of Defendants' overarching conspiracy, K.G. cautioned his colleagues that doing so would be a bad idea.  Rather than underbidding Mylan and taking this business, and thus eroding Doxazosin pricing towards the competitive level, Teva left Cardinal's Doxazosin business with Mylan.

1178.  On the morning of September 28, 2012, Mylan's Jim Nesta and Teva's previously-mentioned, then-Director of National Accounts, Kevin Green, spoke by phone at least twice, once for four minutes and once for approximately a quarter of an hour.  On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine-TTS market.

1179.  As expected, later in the day, Teva began getting solicitations from Mylan customers, such as Wal-Mart and CVS, seeking a bid from Teva for Clonidine-TTS because Mylan had just issued a temporary discontinuation notice.

1180.  Mylan's temporary hiatus from the Clonidine-TTS market gave Teva the opportunity to raise prices and collusively reallocate the market at these inflated prices when Mylan re-entered the market.

1181.  For example, in April, 2012, before Mylan had challenged Teva's Clonidine-TTS account at CVS, Teva's direct invoice price to CVS for the 0.1mg, 0.2mg, and 0.3mg Clonidine TTS was $22.13, $37.81, and $54.41, respectively. Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17, and $26.51 for those dosages, respectively.  Because of Mylan's exit from the market, however, in October of 2012 when Teva took back the CVS business back,

Teva charged CVS a direct invoice price of $33.28, $56.08, and $80.76, respectively – significant increases not only above the competitive price, but above the original cartel pricing that Teva was charging at the start of the year.

1182.  Mylan and Teva maintained regular contact as former Mylan customers came to Teva because of Mylan's supply issues with Clonidine-TTS. For example, Teva submitted bids to CVS and Wal-Mart – which were ultimately accepted by those companies – on October 4 and 5, 2012, respectively.  In the days leading up to those bids, Teva and Mylan spoke repeatedly to ensure there were no misunderstandings that could lead to competition and price cuts (as had happened earlier in the year), including a one-minute call between Rekenthaler and B.P. and a five-minute call between Nesta and Green, both on Oct. 1, and then on October 4, the day Teva submitted its CVS bid, Nesta and Green spoke again, this time for 11 minutes.

1183.  This time, there were no misunderstandings or harmful (to Defendants' cartel) competitive bids for other cartel members' customers.  Instead, when, Mylan relaunched Clonidine-TTS early the following year and began seeking its former market share, Teva steered clear – of underbidding, but not of communicating with Mylan.  Instead, Teva remained in constant contact with its partner in crime.  In February and March of 2013 alone, Teva and Mylan representatives called each other at least 33 different times and spoke for a total of nearly 2 hours and 45 minutes.

1184.  For example, in early March of 2013, Mylan sought to secure the Clonidine-TTS business at Econdisc. Rather than competitively bid for the business,

Teva chose to cede the Econdisc account to Mylan. By April, Teva had also retroceded McKesson back to Mylan, as well – at Teva's increased pricing, of course.

1185.  A similar chain of events occurred with the CVS Clonidine-TTS account, as well.  While Teva ultimately retained the CVS account, there was no competitive bidding to lower the prices described above.

1186.  Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was higher than Mylan's previous pricing. CVS pushed Mylan to lower its bid in light of its prior prices, but Mylan, confident that its brinkmanship would work because it knew (through the constant communication just described) that Teva would co-operate with the cartel's agreement, Mylan refused to budge. Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior pricing.  Nonetheless, because Mylan's bid to CVS was not competitive – but rather an effort to allocate the market without eroding price – Teva was able to maintain its artificially higher prices at CVS.

1187.  The conspiracy did not stop there:  on April 8, 2013, J.L., a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices.  In addition, Green and Nesta spoke twice that day, for one minute and for nine minutes, and the next day, they spoke again for eleven minutes, reconfirming Teva's and Mylan's agreement to implement increased prices – which they did shortly thereafter.

1188.  Teva and Mylan were not the only members of Defendants' cartel who were involved with its Clonidine-TTS aspect.  Aptly illustrating Defendants' frequent entry and exit from various product markets, early the following year, on May 6, 2014, Actavis was granted FDA approval to market Clonidine-TTS.

1189.  That day, as was standard practice among members of Defendants' cartel, Teva and Actavis immediately discussed price and market share.  Rekenthaler spoke by phone three times (for fifteen minutes, one minute, and three minutes) with Marc Falkin, who was Actavis's Vice President of Marketing, Pricing and Contracts ("Falkin") until Actavis was acquired by Teva in August, 2016.

1190.  During his employment at Actavis, Falkin was a prolific communicator and had established relationships with executives at many of the Defendants. For example, between August, 2013 and July, 2016, Falkin exchanged at least 2,562 phone calls or text messages with his contacts at Defendants Zydus, Teva, Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Greenstone, Apotex, Taro, Amneal, Sandoz, and Wockhardt, including over 430 calls or text messages with Rekenthaler during that time period, at least 410 calls or text messages with Maureen Kavanaugh at Teva; 270 calls or text messages with Jim Brown at Glenmark; 78 calls or text messages with Jim Nesta at Mylan; 52 calls or text messages with David Berthold at Lupin; 41 calls or text messages with Jill Nailor at Greenstone; and at least 21 calls or text messages with Ara Aprahamian at Taro.

1191.  On May 7, 2014, the day after speaking to Falkin about Clonidine-TTS, Rekenthaler announced to his colleagues that Actavis was entering the market.  K.G. of Teva responded by requesting that Patel come up with a recommendation as to which customers Teva should concede to Actavis.  At the same time, Teva employees bemoaned Actavis's so-called "ridiculous[ly]" low pricing.

1192.  Teva personnel (successfully) worked to convince Actavis to increase its pricing for Clonidine-TTS in the cartel's usual way, by co-ordinating the incumbent supplier's (Teva) withdrawal from enough customers to give the newcomer its so-called "fair share" of the market.

1193.  The next day, May 8, Rekenthaler spoke to Falkin three more times (5-, 10-, and 8-minute calls), and Patel spoke with Rick Rogerson ("Rogerson"), Actavis's Executive Director of Pricing and Business Analytics.  Shortly after her last call with Rogerson, Patel instructed her Teva colleagues to "Please concede Ahold and HEB," two of Teva's then-current customers, and the following day, May 9, 2014, Patel called Rogerson three times.

1194.  Unsurprisingly, the agreement and inducements of Defendants' overarching conspiracy held, and Actavis raised its Clonidine-TTS pricing while Teva quietly surrendered market share:  shortly after those phone calls, Patel conveyed to her boss, K.G., that "I just found out that Actavis rescinded their offer."  Shortly after that, Patel also learned that Actavis had "resent all of their offer letters at pricing that is higher than our [*i.e.*, Teva's] current [prices]."  In addition, Patel informed her

colleagues that Actavis wanted 25% of the market and expected that 10-15% of that share to come from Teva.

1195.   Rekenthaler was concerned that Actavis might thereafter defect from Defendants' cartel agreement by competing for market share, but T.C., a senior sales executive at Teva, rebuked him, writing in an e-mail: "now, now Mr. Rekenthaler play nice in the sand box .... If history repeats itself[,] activist [*sic*] is going to be responsible in the market..." – "be responsible in the market" was a euphemism that meant Actavis would stand by the cartel's arrangement and, in return for the Clonidine-TTS market share that it was given, Actavis would not cut its pricing below the cartel level.

1196.   On May 14, 2014, for example, Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis, which Teva did a few days later.  On May 20, Patel again declined to bid at another customer due to the new entrant, Actavis, stating that "We are trying to be responsible with share and price."

1197.   Mylan's brief supply issues described above cannot explain Defendants' price increases for Clonidine-TTS during the Relevant Period, in whole or in part, and no other shortages or other market features can explain Defendants' elevated pricing and price increases for Doxazosin and Clonidine-TTS during the Relevant Period.

1198.   The elevated prices of Clonidine-TTS and Doxazosin resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at

these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1199.  The unlawful agreements among Teva, Mylan, and Actavis regarding Clonidine-TTS and Doxazosin were part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AC.   Fluocinolone Acetonide Cream, Ointment, and Solution

1200.  Fluocinolone Acetonide is a medication used to treat inflammation and itching caused by skin conditions.

1201.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Fluocinolone Acetonide creams, ointments and solutions ("Fluocinolone Acetonide") as follows, beginning at least as early as January, 2012:

1202.  During the Relevant Period, Defendants dominated the market for the following formulations of Fluocinolone Acetonide, as follows:

| | |
|---|---|
| Fluocinolone Acetonide Cream | Sandoz, G&W, Teligent |
| Fluocinolone Acetonide Ointment | Sandoz, G&W, Teligent |
| Fluocinolone Acetonide Solution | Sandoz, Taro, Teligent |

1203.  Before 2012, Sandoz was the sole supplier of Fluocinolone Acetonide cream, ointment and solution.  As the sole supplier, Sandoz's list prices for cream ointment and solution were well under $1 for each product.

1204.  Things changed in January, 2012, when G&W entered the cream and ointment markets.  Historically, adding a manufacturer (i.e., another source of supply) to a single source market normally drove prices down.  But Defendants' cartel agreement aimed to reverse this consequence of competition, and succeeded in doing so with Fluocinonide Acetonide products.  Rather than result in lower prices, G&W's entrance into the cream and ointment markets resulted in significantly *higher* prices.

1205.  In late December of 2011, in anticipation of G&W entering the cream and ointment market, Sandoz announced enormous price increases, raising its list prices on cream, ointment and solution by approximately 300%.  When G&W entered the market a few weeks later, it announced virtually identical WAC prices on its cream and ointment products, rather than offering lower prices to gain market share.

1206.  In the solution market, a highly similar pattern emerged. In late October, 2012, in anticipation of Teligent entering the market, Sandoz doubled the list prices of its solution – on top of the tripled prices it had imposed less than a year prior.  A few weeks later, rather than offering lower prices to gain market share, Teligent again announced virtually identical WAC prices for its new solution products.

1207.  In competitive generic markets, the addition of a third manufacturer (and yet another source of supply) normally acts to drive prices down even more.  Yet

even the entrance of a third manufacture to the Fluocinolone Acetonide markets did not have that effect.  When Teligent joined the ointment market in early 2013, and again when it joined the cream market in mid-2014, Teligent announced list prices nearly identical to those of its co-conspirators, Sandoz and G&W.  And when Taro entered the solution market in the spring of 2015, it matched the list prices of Sandoz and Teligent.

1208.  Throughout this period, Sandoz, G&W, Teligent and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Fluocinolone Acetonide and their Fair Share agreement.

1209.  For example, around the time that G&W was entering the Fluocinolone Acetonide cream and ointment markets, K.O., G&W President, communicated by phone with W.K., Sandoz Senior VP of Commercial Operations, on February 8, 9 and 10, 2012.

1210.  Similarly, when Teligent was entering the Fluocinolone Acetonide cream market in late spring/early summer of 2014, E.V., G&W VP of Sales and Marketing, communicated by phone with S.M., Teligent Director of National Accounts, on April 29 and May 1, 2014.  A few months before, E.V. (G&W) also had communicated by phone with J.G., Teligent President and CEO, in November, 2013 and January, 2014.

1211.  Below, the list price (WAC) charts for Fluocinolone Acetonide cream, ointment and solution show the large and parallel price increases imposed by Sandoz, G&W, Teligent and Taro:[36]



---

[36] The prices of other dosages of Fluocinolone Acetonide cream exhibit similar patterns and are not included here.





1212.  In addition, the charts show that all the Defendants involved in the

Fluocinolone Acetonide conspiracy maintained their prices above the competitive

level through at least mid-2019, the last year for which figures were readily available –

and all Defendants involved in the Fluocinolone Acetonide conspiracy except

Teligent maintained the cartel's highest prices, which were set in 2012-2013, thus

causing Plaintiffs close to a decade of paying cartel pricing on these products.

1213.  Further, although Teligent decreased its pricing somewhat in late 2016-

early 2017, following the filing of the first cases in what would become the *Generics

Antitrust* MDL in the second half of 2016, because of the continued operation of

Defendants' cartel, even the somewhat-less-outrageous Teligent pricing was not

widely available to customers – because that would have violated the Fair Share rules

of Defendants' cartel.  As a result, most of the market prices were paid at the prices

imposed by Sandoz, Taro, and G&W.

1214.  NSP pricing data confirm that the NSP prices approximately tracked the

WAC increases, and customers, in fact, paid significantly higher prices for these

products.

1215.  No shortages or other market features can explain Defendants' price

increases for generic Fluocinolone Acetonide during the Relevant Period.

1216.  The elevated prices of generic Fluocinolone Acetonide resulted from

Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay

more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their

conspiracies is enjoined by this Court.

1217.  The unlawful agreements among Defendants Sandoz/Fougera, G&W, and Teligent, regarding generic Fluocinolone Acetonide, were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AD.   Irbesartan

1218.  Irbesartan is an angiotensin II receptor antagonist used in, *inter alia*, the treatment of hypertension.  Teva received approval to manufacture generic Irbesartan in March, 2012.

1219.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Irbesartan at least as follows:

1220.  On March 6, 2012, Kevin Green's boss at Teva, K.G., polled the Teva sales team seeking information about possible competitors in the Irbesartan market. Later that morning, in response, Green called Berthold at Lupin and they spoke for over a quarter-hour; at 12:26 pm, within hours of K.G.'s request for sensitive commercial information ***from ostensible competitors***, Green sent an answer to the team, including Rekenthaler and Maureen Cavanaugh that "Lupin is looking for a 15% share.  They already have ABC [Amerisource Bergen Corp].  Confirmed Zydus is out," but was unable to get information on other players in the market.  A senior commercial operations executive at Teva responded via e-mail that afternoon, "Then work harder…." (ellipsis in original).

1221.  Because one of Defendants' cartel's usual procedures was to pass information indirectly from one member to another via intermediaries, who were sometimes cartel members and sometimes customers who were friendly to the cartel (as well as directly, from time to time), Green called Berthold next morning, March 7, to get the requested information.  The two spoke for just over seven minutes, around 10:54 am, but that was all the time that was needed for Berthold to pass on the requested sensitive competitive information, which he did.

1222.  A little over an hour later, at 12:20 pm, K.G., Green's boss at Teva shared with the sales team the competitively sensitive information he had obtained, including the details Berthold gave Green regarding who was and who was not launching the drug, and which customers had received offers.  K.G. stated that Teva was in a position to take up to a 40% market share when it launched Irbesartan a few weeks later, on March 30 – a comment that would make little sense in a competitive market, where a supplier would want to try to take as much of the market as it could supply, but a comment that was entirely sensible in the context of Defendants' overarching cartel agreement and scheme to provide market share to each market participant, in order to prevent price competition.

1223.  No shortages or other market features can explain Defendants' elevated prices for Irbesartan during the Relevant Period.

1224.  The elevated prices of Irbesartan resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more

than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1225.  The unlawful agreement between Teva and Lupin regarding Irbesartan was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue

### AE.   Isosorbide Dinitrate Tablets

1226.  Isosorbide Dinitrate treats chest pain (angina) by dilating blood vessels, making it easier for blood to flow through them and easier for the heart to pump.

1227.  At all relevant times, the market for Isosorbide Dinitrate tablets was mature and had multiple manufacturers.  As a result, for years, the prices of Isosorbide Dinitrate tablets were relatively low and stable.  For example, before the spring of 2012, Sandoz and West-Ward had list prices for 10 mg tablets of less than 10 cents.  Par, which had a negligible presence in the market during that time period, offered similarly low prices.

1228.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Isosorbide Dinitrate tablets ("Isosorbide Dinitrate" or "Isosorbide"), as follows, beginning at least as early as March, 2012:

1229.  Throughout the Relevant Period, Defendants Sandoz, Par and/or West-Ward dominated the market for Isosorbide Dinitrate.

1230.  A supply disruption between March and July, 2012, prompted Sandoz and West-Ward to impose enormous price increases on all tablets.  Although the supply disruption was mostly resolved within months, thereafter Sandoz and West-Ward relied on their Fair Share agreement to keep prices more than 10 times higher than they had been only months before.

1231.  In the spring of 2013, Par made a push into the Isosorbide Dinitrate market.  Rather than offer lower prices to customers in order to get market share, Par announced list prices that matched Sandoz. (and that were higher than West-Ward's) These Defendants continued to monitor their "fair share" of the Isosorbide Dinitrate market throughout this period.

1232.  The chart below shows the extreme and parallel price increases for Isosorbide Dinitrate tablets and that price remained elevated well above prior levels at least through mid-2019, the last period for which data were readily available; NSP pricing followed a similar trajectory.



1233.  Throughout this period, Sandoz, Par and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Isosorbide Dinitrate tablets and their Fair Share agreement.

1234.  For example, on June 6, 2012, C.B., Director of National Accounts at Sandoz, spoke for approximately 25 minutes to M.R., Director of National Accounts at West-Ward.  The next week, on June 15, Sandoz announced its large list (WAC) price increases on Isosorbide.  The two executives next spoke, for approximately 20 minutes, on October 11.  The next day, October 12, 2012, West-Ward announced its Isosorbide list (WAC) price increases.

1235.  Par announced its list (WAC) price increases on March 11, 2013.  Not long after, on March 26, K.O, VP of National Accounts at Par, spoke to M.V., Associate Director of Pricing at Sandoz, for approximately 25 minutes.

1236.  No shortages or other market features can explain Defendants' price increases for generic Isosorbide Dinitrate during the Relevant Period.

1237.  The elevated prices of generic Isosorbide Dinitrate resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1238.  The unlawful agreement among Defendants Fougera/Sandoz, Par and West-Ward regarding generic Isosorbide Dinitrate was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AF.   Amphetamine Salts**

1239.  The combination of Amphetamine/Dextroamphetamine salts is used in the treatment of attention deficit hyperactivity disorder (ADHD) and is comprised of a combination of dextroamphetamine salts and levoamphetamine salts, and is sometimes referred to as "Mixed Amphetamine Salts" or "MAS."  MAS comes in two formulations:  tablets ("Immediate Release," or "IR," in 5, 10, 20 and 30 mg dosages) and capsules. ("Extended Release," or "XR," in 5, 10, 15, 20, 25 and 30 mg dosages)

1240.  The market for generic MAS tablets is mature; the first generic version of MAS IR was introduced to market in 2002.  Barr and Shire later reached an agreement allowing Barr to offer a generic form of the capsule formulation beginning in April, 2009.

1241.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic MAS at least as follows:

1242.  During the Relevant Period, Defendants Teva, Impax and Actavis dominated the market for generic MAS XR capsules.

1243.  In the same period, Teva and Impax (through Corepharma, which Impax acquired in October, 2014), along with Sandoz, dominated the market for generic MAS IR tablets.  Defendants Aurobindo and Mallinckrodt did not enter that market until early 2014, by which time it had become extremely profitable.

1244.  Teva began marketing generic MAS XR capsules after the expiration of brand manufacturer Shire's patent on MAS XR expired.

1245.  The first impact of Defendants' cartel, however, was on the tablets.  For this, Teva wanted to increase its prices for the tablet – but first, it needed to co-ordinate with its co-conspirator and fellow dominant player in that market, Sandoz.

1246.  So Teva's Kevin Green spoke to P.K., Sandoz Director of National Accounts, on August 3, 9, and 16, 2011.  Immediately thereafter,  Teva announced its list price increase on August 17 – and Kevin Green spoke to P.K. that day, as well as

the day after. And the following week, on August 24, 2011, Sandoz followed suit and raised its own prices for generic MAS tablets.

1247. The same pattern of communications among cartel members played out in the capsule market, as well.

1248. For example, on April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in "all or some" of its generic MAS capsule business. A senior Teva sales director, T.C., insisted on knowing the identity of the competitor before deciding what Teva's response would be. The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug; Teva deferred its decision on pricing until Actavis was about to ship the product.

1249. As predicted, Actavis obtained FDA approval to manufacture various formulations of generic MAS capsules on Friday, June 22, 2012.

1250. Teva and Actavis immediately began co-ordinating market share. At 9:58 pm that evening, Rekenthaler instructed Teva employees to find out about Actavis's plans for this new product, including shipping and inventory details.

1251. The close co-operation among members of Defendants' cartel is illustrated by the fact that even though it was a week-end, less than 12 hours later, Teva had an answer.

1252. At 8:32 am the next day (Saturday, June 23), Teva employee T.S. responded that she had spoken to M.P., a senior Actavis sales and marketing

executive, and conveyed to Rekenthaler and Green the details of her conversation: "Spoke to [a person at Actavis]. Going after approx 15 share. 1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdisc. NOT Walgreens and CVS."

1253.  Upon learning which customers Actavis wanted, T.C. warned colleagues that this allocation of market share could be tricky.  She cautioned that if Teva decided to concede a particular wholesaler to Actavis, it needed to be "mindful" that the wholesaler also did product warehousing for a different customer, whose business Actavis was not soliciting.

1254.  Mallinckrodt's planned entry into the tablet market in January, 2014, caused a flurry of communications to streamline the cartel's pricing and customer-allocation processes.

1255.  For example, on January 24, K.K., the National Account Director at Mallinckrodt (who was a former National Account Executive at Sandoz) called C.B., her opposite number at Sandoz.  The two spoke for approximately a half-hour.  Two weeks later, they spoke again, for approximately a quarter-hour, on February 10. Mallinckrodt entered the market at high prices the following week.

1256.  Likewise, Aurobindo's planned entry into the tablet market later that year, in March, 2014, necessitated a burst of communications among at least Teva, Actavis, and Aurobindo.

1257.  Thus, on March 17, Teva's Patel spoke to Actavis's Director of Pricing, Rick Rogerson, three times, and Teva's Rekenthaler and Actavis's Falkin also spoke

on that day.  The next day, Rekenthaler and R.C., a C-suite executive at Aurobindo, had a 30-minute telephone conversation – and Teva's J.P. shared with her Teva colleagues Aurobindo's market share target for the impending launch (10%), and Teva's senior marketing operations executive, K.G., indicated that Teva was aware that both Aurobindo and Actavis were launching.

1258.  In addition, ABC had by that point communicated with both Aurobindo and Teva, passing on the Aurobindo market share target that J.P. shared internally.

1259.  Two days after that, Rekenthaler and Falkin telephoned each other, again, seven times.

1260.  Less than a month after that, on April 16, 2014, Teva received word from a customer that a new supplier in the market had offered a lower price than Teva's current price for the tablet formulation.  Patel informed K.G. that the challenge was coming from Actavis, and recommended that Teva concede that customer's account.  Then, at 1:43pm, Patel e-mailed another colleague that the decision had been made to concede.  Finally, closing the loop on the matter, Patel then called Actavis's Rogerson at 1:55pm.  They spoke for just over four minutes.

1261.  During the Relevant Period, Teva, Sandoz, Mallinckrodt, Impax, Actavis and Aurobindo met at trade conferences and communicated directly with each other in furtherance of their specific price-fixing agreement on generic MAS tablets and capsules and of Defendants' broader cartel agreement.

1262.  No shortages or other market features can explain Defendants' price increases for generic MAS tablets and capsules during the Relevant Period.

1263.  The elevated prices of generic MAS tablets and capsules resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1264.  The unlawful agreement among Defendants Teva, Impax (including through Corepharma), Actavis, Sandoz, Aurobindo, and Mallinckrodt, regarding generic MAS tablets and capsules, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## AG.   Lamivudine/Zidovudine Tablets

1265.  Lamivudine/Zidovudine is a combination of anti-retroviral mediations used in the treatment of human immunodeficiency virus (HIV) infection.

1266.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Lamivudine/Zidovudine tablets ("Lamivudine/Zidovudine") as follows, beginning at least as early as April, 2012:

1267.  During the Relevant Period, Defendants Teva, Lupin, Aurobindo, and Camber dominated the market for generic Lamivudine/Zidovudine.

1268.  Teva launched its generic Lamivudine/Zidovudine product in December, 2011.  By mid-May the following spring, two manufacturers – Lupin and Aurobindo – received FDA approval for generic Lamivudine/Zidovudine and were preparing to enter the market.

1269.  But before Lupin and Aurobindo obtained FDA approval, Teva was already communicating with both of these co-conspirators about how to divvy up the market.  For example, in late April, 2012, Teva's Rekenthaler was speaking to R.C., the CEO at Aurobindo. Meanwhile, Teva's Green was speaking to David Berthold, an executive at Lupin, and Jim Grauso, a sales and pricing executive at Aurobindo.

1270.  On April 24, 2012, T.C. at Teva sent an internal e-mail, asking whether other Teva employees had heard about new entrants to the market for generic Lamivudine/Zidovudine; Rekenthaler replied that same morning that Aurobindo was entering.  T.C. questioned the reliability of that information, and Rekenthaler replied, at 11:17 am, that "It was brought up to me last week by our good friend so I'm assuming it's accurate."  Knowing that Defendants' conspiracy was illegal, Rekenthaler attempted to conceal the conspiracy by not naming his source in writing, but the "good friend" was R.C. at Aurobindo, who had previously worked with both T.C. and Rekenthaler.

1271.  In addition, that same day, Kevin Green at Teva also called and spoke to Grauso for approximately twelve minutes and to Berthold at Lupin for four minutes.

1272.  After speaking with Berthold (and likely not knowing that Rekenthaler had already replied, since Green was not copied on Rekenthaler's e-mail), Green responded separately to T.C., providing specific information regarding Lupin's generic Lamivudine/Zidovudine plans, including commercially sensitive information about Lupin's anticipated bid at a large wholesaler.  Green and Berthold then spoke again the following day, April 25, 2012, for approximately seven minutes.

1273.  The following month, in early May, 2012, with the Lupin and Aurobindo launches just days away, communications among all three competitors accelerated. Between May 7 and 10, for example, the three companies spoke at least 32 times. Green (Teva), Berthold (Lupin) and Grauso (Aurobindo) discussed the specific customers that Teva would concede in order to ensure that Lupin and Aurobindo gained a Fair Share of the market without eroding prices.

1274.  Similarly, when Camber received approval to market a generic form of Lamivudine/Zidovudine, Teva, again, coordinated the entry. Konstantin Ostaficiuk, the President of Camber, communicated with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into the market. For example, on September 24, 2014, Ostaficiuk spoke to Rekenthaler three times and to Berthold twice. That same day, Berthold also spoke to a senior operations executive at Aurobindo, to close the loop on generic Lamivudine/Zidovudine communications.

1275.  By co-ordinating the entry of competitors into the generic Lamivudine/Zidovudine market, Teva, Lupin, Aurobindo and Camber were able to keep prices higher than they would have been in a competitive market.

1276.  No shortages or other market features can explain Defendants' price increases for generic Lamivudine/Zidovudine during the Relevant Period.

1277.  The elevated prices of generic Lamivudine/Zidovudine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1278.  The unlawful agreement among Defendants Teva, Lupin, Aurobindo, and Camber, regarding generic Lamivudine/Zidovudine, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## AH.  Latanoprost Drops

1279.  Generic Latanoprost Drops ("Latanoprost") are an ophthalmic solution, in the form of eye drops, used to treat high blood pressure inside the eye due to glaucoma and other eye diseases including but not limited to ocular hypertension.  In 2013, the annual market for Latanoprost in the United States exceeded $100 million.

1280.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Latanoprost, as follows:

1281.  As of March, 2012, Defendants Valeant (sometimes referred to as Bausch & Lomb ("B&L")), Sandoz, and Pfizer/Greenstone dominated the market for generic Latanoprost Drops.  Pfizer/Greenstone had the largest market share, with 42%, followed by Valeant with 30% and Sandoz with 19%.  In April, 2012, all three manufacturers raised their prices in direct co-ordination with each other.

1282.  The next month, in early April, Greenstone informed its customers that it would be imposing a price increase on Latanoprost Drops.  In the days and weeks leading up to the Greenstone price increase notice, Robin Hatosy at Greenstone was co-ordinating with both Kellum of Sandoz and B.P., a sales executive at Valeant, by phone and text message:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 12:35:30 | 0:00:00 |
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:38:54 | 0:00:29 |
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:39:39 | 0:00:46 |
| 3/5/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 9:30:16 | 0:05:18 |
| 3/16/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:26:02 | 0:00:00 |
| 3/16/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:27:11 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 16:21:54 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 20:13:55 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:08:36 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 11:07:59 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:03:57 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:07:02 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:11:17 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:15:28 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:49:42 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:51:14 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:52:14 | 0:00:00 |

1283.  Hatosy consistently acted as the conduit, sharing information between Sandoz and Valeant in order to secure an agreement from both to raise prices.

1284.  On the day that Greenstone sent out the price increase notices, April 3, 2012, both CVS and Walgreens approached Sandoz looking for a lower price on Latanoprost Drops.  That same day, Hatosy and Kellum exchanged five text messages while Kellum replied internally to his colleagues at Sandoz.  Later that evening, Kellum instructed his sales team not to make any bids for Latanoprost and to put the product on hold.  Kellum also instructed S.G., one of his sales executives, to lie to Walgreens about why Sandoz was unable to bid, instructing S.G. to stand down, even though Sandoz had plenty of supply.

1285.  Sandoz immediately began preparing an increase of its own.  On April 4, 2012, Kellum called Hatosy but was unable to connect.  He called her again on April 5, and the two spoke for nearly two minutes.

1286.  On April 6, 2012, Kellum requested a customer list from a colleague so that he could begin calculating the financial impact of a Sandoz price increase.  After some quick calculations, Kellum determined that a Sandoz increase on Latanoprost Drops could increase the company's revenues by $14.9 million per year.

1287.  In a presentation he created that same day to support the Latanoprost price increase, Kellum was intentionally opaque about why Sandoz should take the increase.  For example, certain information was omitted during the presentation, such as that Kellum had first learned of the Greenstone price increase directly from

Hatosy, not a customer.  In addition, the Valeant price increase had not even
happened yet.  In fact, it would not be effective until April 24, 2012, three weeks in
the future; Kellum's inside information instead came directly from his prior
conversations with his competitor, Greenstone.

1288.  While he was in the midst of planning the Sandoz price increase on April
6, 2012, Kellum also exchanged two more text messages and had a nearly seven-
minute call with Hatosy of Greenstone.  Hatosy, in turn, then called B.P. at Valeant
and the two spoke for approximately five minutes.

1289.  Things moved quickly from there.  On April 9, 2012, Kellum sent
around an agenda for the Pricing Committee meeting the next day.  He also called
Hatosy of Greenstone but was unable to reach her. Kellum quickly obtained approval
for the Latanoprost price increase; customers were notified of the increase on April
11, 2012, and it became effective on April 13, 2012. As a result of this quick action,
Sandoz's price increase became effective even before Greenstone's.

1290.  On April 12, 2012, a large retail pharmacy customer, Rite-Aid, sent
Greenstone a request for a bid on Latanoprost. Knowing that this was likely an
indication that Sandoz had followed Greenstone's price increase, Hatosy (then using a
different surname) forwarded the email directly to Kellum with an approving message.

1291.  That same day, a different customer, Optisource, approached Sandoz –
angry that it was not notified in advance of Sandoz's Latanoprost price increase.
Questioning Kellum's intel about the price increases, a senior sales and pricing

executive at Sandoz forwarded the e-mail string directly on Friday, April 13, 2012. Kellum's understanding, of course – based on his conversations with Hatosy – was that Valeant would be raising, or already had raised, its price.

1292.  The following Monday, April 16, 2012, Kellum called Hatosy.  She called him back the next day, but they were unable to connect. On April 18 and 19, 2012, Hatosy and B.P. of Valeant then communicated several times by phone and text message, including one call lasting approximately a quarter-hour.

1293.  On April 24, 2012, Valeant raised its WAC pricing on Latanoprost to a point even higher than Sandoz's.  That same day, B.P. at Valeant called Hatosy at Greenstone, likely to report the news.

1294.  Three price increases in the span of roughly three weeks caused a lot of customer activity and confusion – which in turn resulted in additional co-ordination among the three manufacturers to make sure prices stayed high and the market remained stable.  For the most part, Sandoz tried to avoid taking any of its competitors' customers after the price increases, but it did want to pick up one customer to get closer to its "fair share" of the market.

1295.  For example, on Friday May 4, 2012 – shortly after the Greenstone and Valeant price increases became effective – Cardinal approached Sandoz with an opportunity to bid and take the business with a lower price.  Kellum called Hatosy that day, but they were unable to connect.  He called her again on Monday and they spoke for approximately five minutes.  They spoke about Sandoz's desire to obtain

another customer, and which customer it should target.  Monday morning, before speaking to Hatosy, Kellum responded to the internal Sandoz e-mail. The next day, after speaking to Hatosy, Kellum followed up the e-mail, confirming that Sandoz should pass on Cardinal.  Consistent with the agreement reached with Greenstone, Sandoz retained its secondary position with Cardinal, instead of bidding for the primary position, and decided to wait until ABC put its Latanoprost business out to bid and let Greenstone concede that customer instead.

1296.  Around this same time, CW-1 started at Sandoz.  When some confusion arose later, in May, 2012, about the Cardinal business, Hatosy communicated with both CW-1 and Kellum from Sandoz, as well as B.P. of Valeant, in order to enforce the agreement already in place among the three manufacturers.

1297.  For example, on the morning of May 31, 2012, B.P. of Valeant and Hatosy of Greenstone exchanged one text message and had several phone calls of varying lengths.  In the midst of those communications with B.P., Hatosy was simultaneously communicating with CW-1 of Sandoz using iMessage, the iPhone's messaging feature/app.

1298.  iMessage is secure and end-to-end encrypted; not even Apple can read the contents of an iMessage without access to the iPhone from which it was sent or where it was received.

1299.  As Hatosy explained to CW-1, Valeant (B&L) had the Cardinal business, not Greenstone, but Cardinal was telling Valeant that Sandoz had a lower price in the

market.  Hatosy expressed the need to call Kellum because CW-1 had only recently

started at Sandoz and thus did not completely understand the scope of the prior

collusive communications between Hatosy and Kellum about the Latanoprost price

increases.

1300.  Immediately following this exchange, Hatosy did call Kellum, setting off

a flurry of calls between employees of the three co-conspirators that day:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:31:29 | 0:00:02 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:31:50 | 0:01:57 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 8:34:24 | 0:03:15 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 8:39:30 | 0:00:59 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 8:43:46 | 0:00:00 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 8:44:31 | 0:00:26 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:45:15 | 0:02:26 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 9:17:22 | 0:02:29 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 10:38:48 | 0:01:01 |

1301.  Over the next several weeks, Hatosy went to great lengths to make sure

that Sandoz and Valeant lived up to their agreement to keep prices high, across the

board, for Latanoprost.  For example, between June 26 and 28, 2012, Hatosy and B.P.

at Valeant exchanged at least twelve text messages.

1302.  After that series of communications, on June 29, 2012, Hatosy reached

out to CW-1, again *via* iMessage.  At the exact same time that Hatosy was exchanging

these iPhone chat messages with CW-1 at Sandoz, she was also exchanging separate

text messages with B.P. of Valeant.

1303.  Those efforts were successful.  On July 3, 2012, CW-1 followed up with

Hatosy *via* iMessage, confirming that Sandoz's pricing for Latanoprost was not low at

Cardinal – or any other customer, for that matter.  Again, shortly after receiving this information from CW-1 about Sandoz's pricing, Hatosy sent a text message to B.P. at Valeant.  They exchanged several other text messages that same day.

1304.  Greenstone similarly lived up to its agreement to concede the ABC business to Sandoz, allowing Sandoz to get closer to its "fair share" of the generic Latanoprost market.  On June 22, 2012, ABC requested a bid from Sandoz on Latanoprost, as expected, due to the Greenstone price increase.  Consistent with Defendants' cartel agreement, Greenstone quickly conceded the customer to Sandoz, allowing Sandoz to obtain the business.

1305.  As discussed above, this successful effort at price-fixing was followed by Sandoz's further efforts at price fixing with Greenstone on various formulations of Clindamycin beginning in August, 2012, and continuing through at least 2014.  That history also helped pave the way for yet another successful price fixing agreement between Sandoz and Greenstone on Eplerenone Tablets, discussed below.

1306.  No shortages or other market features can explain Defendants' price increases for generic Latanoprost during the Relevant Period.

1307.  The elevated prices of generic Latanoprost resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1308.  The unlawful agreement among Defendants Fougera/Sandoz, Pfizer/Greenstone, and Valeant, regarding generic Latanoprost, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AI.    Ethosuximide Capsules and Oral Solution

1309.  Ethosuximide is an anticonvulsant medication used to control *petit mal* seizures in the treatment of epilepsy.

1310.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Ethosuximide capsules and oral solution ("Ethosuximide"), as follows, beginning at least as early as July, 2012:

1311.  During much of the Relevant Period, Akorn/Versapharm and Teva dominated the market for generic Ethosuximide capsules and oral solution.

1312.  To co-ordinate market share and price increases on Ethosuximide, Teva and Akorn/Versapharm communicated directly with each other.

1313.  For example, on May 24, 2012, Rekenthaler at Teva called S.M., Versapharm's Chief Sales and Marketing Office, on his cell phone.  S.M. called back later that day and they spoke for approximately 8 minutes.

1314.  On July 31, 2012, Teva announced a large list (WAC) price increase for Ethosuxamide oral solution.  Less than one week later, Akorn/Versapharm

announced almost identical list (WAC) prices.  In a matter of days, both companies had more than tripled their list (WAC) prices.

1315.  In 2014, Teva co-ordinated another round of price increases with Akorn/Versapharm.  On January 22, 2014, Rekenthaler at Teva called J.J., a senior national account executive at Akorn/Versapharm.

1316.  On March 7, 2014, Rekenthaler spoke with the same senior national account executive at Akorn/Versapharm.  Less than a month later, on April 4, 2014, Teva imposed a price increase on both Ethosuximide capsules and oral solution.

1317.  Only five days after the Teva increase—on April 9, 2014—Akorn/Versapharm likewise increased its pricing on both Ethosuximide capsules and oral solution to a nearly identical price to Teva.

1318.  The list (WAC) price charts below show the large and nearly simultaneous price increases by Teva and Akorn/Versapharm on Ethosuxamide capsules and oral solution.





1319.  No shortages or other market features can explain Defendants' price increases for generic Ethosuximide capsules and oral solution during the Relevant Period.

1320.  The elevated prices of generic Ethosuximide capsules and oral solution resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1321.  The unlawful agreements between Defendants Versapharm and Teva, regarding generic Ethosuximide capsules and oral solution, were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AJ.    Levonorgestrel/EE

1322.  Tablets containing a combination of Levonorgestrel/Ethinyl Estradiol ("Levonorgestrel/EE") are a form of hormonal birth-control.  During the Relevant Period, both Teva and Sandoz marketed generic Levonorgestrel/EE under multiple names, including both Portia and Jolessa.

1323.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Levonorgestrel/EE, at least as follows:

1324.  In or around May of 2012, Teva had a much higher market share than Sandoz for both Portia and Jolessa.  Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

1325.  On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa.  T.C., a senior sales executive at Teva, asked who the new supplier was, and the customer responded that it was Sandoz.

1326.  On May 16, 2012, Teva sent an offer to Walmart for the sale of three drugs, including Portia and Jolessa, and sent an even better offer on May 18.

1327.  T.C. had initially been very reluctant to let Sandoz have the business, but there was the matter of Defendants' Fair Share agreement to consider.  So, on May 22, Teva's Green spoke on the phone with a sales and marketing executive at Sandoz, who will be referred to in this Complaint as SW-2, for approximately five minutes to discuss, *inter alia*, the Levonorgestrel/EE market.  Teva agreed to withdraw the offer to Walmart.  The decision to concede the Walmart business to Sandoz led to a more equal share split of the Levonorgestrel/EE market between Sandoz and Teva.  The next day, May 23, Teva abruptly backtracked and removed Portia and Jolessa from its Walmart offer.

1328.  Sandoz and Teva continued to co-operate so that Sandoz could achieve its so-called "fair share" of the markets for both Portia and Jolessa.  For example, over a year later, on July 2, 2013, another customer contacted Teva, stating that it had received bids on Portia and Jolessa and in order for Teva to retain the business, Teva would need to submit its best offer as a counter-proposal.

1329.  On July 9, 2013, a different sales and marketing executive, Sandoz's Associate Director of Pricing (who will be referred to in this Complaint as SW-1), called Patel and left a voicemail.  Shortly thereafter, they connected for a phone call that lasted approximately a quarter of an hour.

1330.  The next day, at 12:16 pm, Rekenthaler forwarded an e-mail to Patel, asking about this.  Due to the desire of all of Defendants' employees identified in this Complaint to minimize electronic records of their conspiracy and the close proximity of their offices in the same building, Patel likely told Rekenthaler orally about Patel's conversation with SW-l.

1331.  An hour later, at 1:26 pm that day, Rekenthaler called his own counterpart at Sandoz, SW-2, and they spoke for two minutes. SW-2 called Rekenthaler back a few minutes later and they spoke again for nine minutes.  SW-2 and Rekenthaler spoke a third time that day, at 4:48pm, for seven minutes, all to discuss, *inter alia*, allocating market share in the Levonorgestrel/EE market.

1332.  Later that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which was higher than Sandoz's bid. Teva intentionally submitted an inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award with the customer.

1333.  No shortages or other market features can explain Defendants' elevated pricing for Levonorgestrel/EE during the Relevant Period.

1334.  The elevated prices of Levonorgestrel/EE that resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1335.  The unlawful agreement between Teva and Sandoz regarding Levonorgestrel/EE was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AK.  Balsalazide Disodium Capsules

1336.  Balsalazide Disodium is an anti-inflammatory drug used in the treatment of inflammatory bowel disease.  The market for Balsalazide Disodium is and was mature and had multiple manufacturers at all relevant times.  As a result, for years, the prices for Balsalazide Disodium capsules were relatively low and stable.

1337.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Balsalazide Disodium, as follows:

1338.  During the Relevant Period, Defendants West-Ward, Mylan, and Apotex dominated the market for generic Balsalazide Disodium.

1339.  West-Ward and Mylan were the dominant manufacturers in the market during the earlier years.  Apotex joined the market in the spring of 2012, but remained

a small player. Then, in the early summer of 2013, Mylan exited the market. West-Ward gained most of Mylan's market share.

1340.  In January 2014, Apotex experienced a brief supply disruption and exited the market for approximately one month. West-Ward immediately increased prices. It raised list prices approximately 400%.

1341.  Apotex, which had only been out of the market briefly, could have offered lower prices to win market share. Instead, it immediately followed West-Ward's price increases. It announced an identical list prices and raised NSP prices.

1342.  Even with the higher prices, Apotex was able to build share. It quickly captured nearly twice the unit sales it had before the price increase, and owing to the much higher prices, its dollar sales increased more than five-fold. Meanwhile, although it had to cede some share to Apotex, West-Ward's dollar sales more than doubled as a result of the higher market prices. The Fair Share agreement was working exactly as it was intended.

1343.  The list (WAC) price chart below show the abrupt and nearly simultaneous price increases by West-Ward and Apotex; NSP prices followed a similar trajectory.



1344.  Throughout this period, West-Ward and Apotex met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Balsalazide Disodium and of their Fair Share agreement.

1345.  No shortages or other market features can explain Defendants' price increases for generic Balsalazide Disodium during the Relevant Period.

1346.  The elevated prices of generic Balsalazide Disodium resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1347.  The unlawful agreement between Defendants West-Ward and Apotex, regarding generic Balsalazide Disodium, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AL.   Dextroamphetamine Sulphate

1348.  Much like the Mixed Amphetamine Salts described *supra*, Dextroamphetamine Sulphate ("Dex Sulphate") is used to stimulate the central nervous system in the treatment of hyperactivity and impulse control.  Also like the Mixed Amphetamine Salts, Dextroamphetamine Sulphate is available in both an Extended Release ("Dex Sulphate XR") capsule formulation (5, 10, and 15 mg) and in a regular, immediate-release tablet formulation. (5 and 10 mg only)

1349.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Dex Sulphate, at least as follows:

1350.  During the Relevant Period, Defendants Teva, Impax, Mallinkrodt, Aurobindo, and Actavis dominated the markets for generic Dex Sulphate tablets and capsules, as follows:

1351.  For several years, Teva was effectively the sole supplier of Dextro-amphetamine Sulphate, in both capsules and tablet formultions.  Mallinckrodt had been a supplier of both products, but exited both markets in late 2008, leaving Teva as the sole supplier of Dex Sulphate.

1352.  With no pre-cartel competitive pressure to keep prices low, Teva steadily increased its Dex Sulphate prices.  As a result of this increased profitablity, however, both the capsule and tablet markets attracted additional entrants into the market.

1353.  Normally, adding such supply would have driven prices lower; the addition of suppliers tends to spur price competition which drives down prices. Here, however, because of Defendants' cartel agreement, adding suppliers actually resulted in prices skyrocketing, as set forth below.

1354.  Teva remained the industry's sole Dex Meth supplier until the second half of 2011.  Having been forewarned that its monopoly was about to end in the capsule market, Teva announced a large WAC price increase in August, 2011, in anticipation of Impax's entry into the market.

1355.  When Impax entered the market, however, rather than offer lower prices to win customers, it matched Teva's increased prices.  Impax did not announce its WAC prices until later, but when it did, they were even higher than Teva's.

1356.  Likewise, when Mallinckrodt re-entered the ER capsule market in the following summer (2012), it did so at the high prices that Teva and Impax already had coordinated.  Even before it began shipping product, Mallinckrodt announced WAC prices in April, 2012, that matched Teva's, and which were more than five times higher than Mallinckrodt's former prices for Dex Sulphate ER capsules.

1357.  Not long after Mallinckrodt entered the capsule market, it also re-launched its Dex Sulphate tablet products; the same pattern as the capsule market

followed:  in anticipation of Mallinckrodt's entry, Teva dramatically increased its prices on the tablet, as well.

1358.  Specifically, at the end of July, 2012, Teva increased its WAC prices on tablets by more than 800% – which would have been a wildly irrational move if there were even a small chance of Mallinckrodt competing on price.  But, of course, since Mallinckrodt was a member of Defendants' cartel, there was not even a small chance of competition happening.

1359.  Instead, within weeks, Mallinckrodt matched the price increase.  As it had done with capsules, rather than offer lower prices to win customers, Mallinckrodt co-ordinated with Teva to impose higher prices for Dex Sulphate tablets.

1360.  Throughout the Relevant Period, Defendants monitored their Fair Share agreement, and made sure to cede share where necessary to keep prices high.  For example, in January, 2013, Teva was confronted with a request for tablet prices from a large customer that had been approached by Mallinckrodt.

1361.  Per the rules of Defendant's cartel, this prompted Teva to assess so-called Fair Shares of the tablet market. Teva's David Rekenthaler pointed out that Teva was expecting to cede share to Mallinckrodt – and it did.

1362.  In a discussion among Teva's Director of Marketing, Teva's Senior Director of Sales, and Rekenthaler, it was agreed that Teva would, in fact, cede this customer to Mallinckrodt.  By doing so, Teva ensured that each manufacturer

obtained a so-called Fair Share of the market, and all manufacturers ensured that prices for Dex Sulphate remained high.

1363.  Similarly, in February, 2014, Teva again recognized the need to walk away from business in order to maintain the cartel's so-called "Fair Shares" and higher prices.  In an internal analysis describing the Dex Sulphate market, Teva noted the need to cede market share.  This was because of the underlying premise of Defendants' cartel:  fewer sales, but much more money because of vastly higher prices – a formula for success that continued to work throughout the Relevant Period.

1364.  Indeed, for many or all of the Drugs at Issue, the stability of these anti-competitive agreements is such that the higher prices are still in place today, years after the last drug-specific communications regarding them – and, persisting even in the midst of this lawsuit, will continue indefinitely unless Defendants' anti-competitive agreements and conduct are enjoined by this Court.

1365.  Later that year (2014), Aurobindo joined the tablet market and Actavis was planning to join the capsule market.  As with Mallinckrodt and Impax, Aurobindo and Actavis announced WAC prices identical to Teva's and Mallinckrodt's.

1366.  Thus, on June 19, 2014, Actavis was finalizing arrangements for its entrance into the Dex Sulphate XR the market, which included Actavis's Falkin speaking to Teva's Rekenthaler twice by phone that morning – once for approximately eleven minutes, and then again for approximately nine minutes.

1367.  Later that day, Patel reviewed a profitability analysis for Dex Sulphate XR and asked Rekenthaler what share of the market Actavis was targeting – something that Rekenthaler could not possibly have known in the absence of Defendants' cartel arrangements.

1368.  Rekenthaler responded "20-25%."  Rekenthaler knew Actavis's intended market share because he and Falkin had spoken that morning.

1369.  Five days later, on June 24, 2014, Teva employee S.B. confirmed to her colleagues in an e-mail that Actavis had entered the market for Dex Sulphate XR. She also said that Teva had a72.2% share of this "multi-player market," and thus – in accordance with the provisions of both Defendants' overarching cartel agreement and their specific agreement as to Dex Sulphate XR – S.B. recommended giving up a large customer to Actavis to reduce Teva's market share to a more-appropriate 58.3%.

1370.  Later internal e-mails confirmed Teva's decision to concede that customer to Actavis was because "Actavis is entering the market and seeking share."

1371.  Further, throughout this period, Teva, Mallinckrodt, Impax, Actavis and Aurobindo met at trade conferences and communicated directly with each other, in furtherance of their price-fixing agreement on Dext Sulphate in particular, and of Defendants' overarching cartel agreement, in general.

1372.  For example, representatives from Teva and Impax attended the NACDS 2011 Pharmacy & Technology Meeting in Boston on August 27 to 30, 2011,

shortly before Impax entered the Dex Sulphate capsule market that September – at the inflated, supra-competitive prices that Teva had recently imposed.

1373.  Similarly, representatives of Mallinckrodt and Teva attended the HDMA 2012 Business and Leadership Conference in San Antonio on June 13, 2012, not long before Teva announced WAC price increases on Dex Sulphate tablets that July – which Mallinckrodt quickly followed.

1374.  Further, no shortages or other market features can explain Defendants' price increases for Dex Sulphate tablets and capsules during the Relevant Period.

1375.  The elevated prices of Dex Sulphate tablets and capsules resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1376.  The unlawful agreement among Defendants Teva, Impax, Mallinkrodt, Aurobindo, and Actavis, regarding Dex Sulphate tablets and capsules, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AM.   Halobestasol Propionate Cream and Ointment

1377.  Halobetasol Propionate is a corticosteroid used to treat a variety of skin conditions, including eczema, dermatitis, psoriasis, and rash.  Halobetasol comes in both cream and ointment formulations.

1378.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Halobetasol Propionate cream and ointment ("Halobetasol"), as follows:

1379.  As of June, 2012, the cream and ointment markets were split between Perrigo, with 60% share, and G&W, with 40%.

1380.  On September 25, 2012, both G&W and Perrigo announced price increases for Halobetasol Cream and Ointment.  G&W's price increases took effect on September 28, and Perrigo's price increases took effect one month later, on October 28, 2012.

1381.  In the days leading up to the price increases, both Vogel-Baylor of G&W and T.P. at Perrigo had numerous discussions with CW-6 at Aurobindo concerning Halobetasol.  Although Aurobindo did not manufacture either form of Halobetasol, Vogel-Baylor and T.P. used CW-6 as a conduit to convey information between them about the price increases.

1382.  For instance, on September 19, less than one week before the price increases, Vogel-Baylor exchanged three text messages with CW-6.  Then, CW-6 called Vogel-Baylor, hung up, and immediately called T.P.  After speaking with T.P., CW-6 hung up and immediately called Vogel-Baylor back, relaying the information he had learned from T.P.  Indeed, within a twenty-minute period, CW-6 had exchanged

at least eight calls with Vogel-Baylor and T.P. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

1383. After speaking with CW-6 for the final time depicted in the chart above, on September 19, 2012, Vogel-Baylor immediately called her boss, Orlofski and spoke to him for approximately a quarter-hour. Similarly, T.P. also reported back to his boss, Wesolowski, a senior executive at Perrigo, exchanging two calls with him totaling approximately five minutes.

1384. Further, two days later, on September 21, 2012, and then again on September 27, the day before the G&W price increase went into effect, the same call pattern occurred. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |

1385.  In early November, 2012, a customer reached out to G&W, asking it to submit a bid for Halobetasol Cream and Ointment because the customer believed its prices were inconsistent with the market.

1386.  After receiving the request, Vogel-Baylor had several calls with CW-6 who, again, served as a conduit between Vogel-Baylor and T.P. to discuss Halobetasol. These calls are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duratio |
|------|----------|-------------|-----------|--------------|------|---------|
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:03:00 | 0:03:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:05:00 | 0:05:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:09:00 | 0:04:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:13:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:38:00 | 0:02:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 6:41:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:42:00 | 0:03:00 |

1387.  After this call exchange, Vogel-Baylor sent the following directive to C.M., a sales executive at G&W, instructing him to submit a cover bid to the customer in order to create a false appearance of competition between G&W and Perrigo.

1388.  The co-conspirators colluded to raise the price of Halobetasol again in 2013.  This time, there were multiple channels of communication between the cartel members, involving multiple employees.  For example, on March 26, 2013, Boothe at Perrigo called Orlofski at G&W and they spoke for seven minutes.  That same day, T.P. at Perrigo once again called CW-6.  The call lasted two minutes. Right after that call, CW-6 called Vogel-Baylor.  That call lasted one minute.

1389.  The next day, on March 27, 2013, Perrigo increased its WAC pricing for Halobetasol Cream and Ointment by over 250%.

1390.  Roughly two weeks later, on April 11, G&W also increased its contract and WAC pricing for the two formulations. G&W's contract price was now double what it had been just the year before.

1391.  G&W told one of its customers, Morris & Dickson, that G&W increased prices. In  the days leading up to the G&W price increase, Vogel-Baylor and T.P. had again engaged in a game of telephone with CW-6 to coordinate their pricing actions. After speaking with T.P. for four minutes on April 8, CW-6 immediately called Vogel-Baylor. The call lasted one minute. CW-6 then called Vogel-Baylor a short while later and they spoke for four minutes. Immediately after that call, Vogel-Baylor called her boss, Orlofski.  The call lasted a little over a minute.

1392.  In December of that year, Sandoz began preparing to re-launch Halobetasol Cream.  At that time, G&W had 63% of the market and Perrigo had 36%. Sandoz was targeting 20% market share.

1393.  On December 11, A.S., a senior Sandoz launch executive, instructed Sandoz employees to reach out to Rite-Aid and Walgreens to learn who their suppliers were for Halobetasol Cream and what their pricing was.  Upon learning that both customers were with G&W – the market share leader – Sandoz decided to target those customers.

1394.  The next day, on December 12, 2013, Walgreens reached out to G&W to advise that Sandoz had expressed interest in its Halobetasol Cream business. Although Sandoz submitted a bid for Halobetasol on December 16, 2013, Walgreens declined to move the business because the price was slightly higher than G&W's price.

1395.  On December 17, another one of G&W's customers, Ahold, informed G&W that it had received a bid from Sandoz and was now seeking a lower price from G&W.  Later that day, Rite Aid also e-mailed Vogel-Baylor stating that Sandoz had submitted a bid for Halobetasol Cream and requested that G&W lower its price to retain the business.

1396.  Vogel-Baylor tried calling Orlofski three times that same day. After the third call, Vogel-Baylor called T.P. of Perrigo and they spoke for more than seven minutes.[37]  Vogel-Baylor hung up with T.P. and called Orlofski again.  Orlofski returned her call later that day and they spoke for five minutes.

1397.  After speaking with Orlofski, Vogel-Baylor e-mailed Rite-Aid with an offer, and Sandoz accepted the offer the next day.

1398.  At the same time that Sandoz was going after G&W's Halobetasol customers, it was also approaching some Perrigo customers as well, in co-ordination with Perrigo.  So also on December 17, 2013, CW-1, a senior Sandoz pricing

---

[37] As detailed above, by this time, CW-6 had left the industry and Vogel-Baylor had begun communicating with T.P. at Perrigo directly with regard to products on which G&W and Perrigo overlapped.

executive, e-mailed CW-3, a senior Sandoz sales executive, asking him to inquire whether Wal-Mart, a Perrigo customer, was interested in receiving a bid from Sandoz for Halobetasol Cream.  CW-3 happened to be meeting with Wal-Mart at that time at its offices in Bentonville, Arkansas.

1399.  Wal-Mart told CW-3 that it was interested in receiving an offer. Thereafter, CW-3 called T.P. of Perrigo. During that call, T.P. provided CW-3 with Perrigo's price points for Halobetasol Cream at Wal-Mart and Omnicare and agreed to give up Wal-Mart to Sandoz.

1400.  Additionally, on that day, CW-3 responded to an e-mail exchange with CW-1 and Kellum regarding Halobetasol Cream.

1401.  Two days later, on December 19, CW-3 called T.P. again. The call lasted one minute. After hanging up, CW-3 called CW-1, and they spoke for four minutes. That same day, Sandoz sent offers to Wal-Mart and Omnicare.  The next day, on December 20, 2013, K.K., a senior Sandoz launch executive, followed up with CW-3 regarding the Wal-Mart offer.

1402.  That same day, Boothe of Perrigo called Orlofski of G&W. The call lasted two minutes. Orlofski returned the call a half hour later and they spoke for 11 minutes. Later that day, Orlofski called Vogel-Baylor and they spoke for approximately a quarter-hour.

1403.  A little more than two weeks later, after the holidays, on January 8, 2014, CW-3 called T.P. at Perrigo.  The call lasted one minute.  Later that day, Wal-Mart

accepted Sandoz's bid for Halobetasol Cream.  CW-3 forwarded the acceptance to his supervisor, CW-1.

1404.  The next day, CW-3 called T.P. and they spoke for a quarter-hour.

1405.  In early February 2014, K.K. joined G&W as a Director of Sales & Marketing.[38]  Once at G&W, K.K. wasted no time to co-ordinate with contacts at Sandoz – CW-3 and CW-4 – to regarding Halobetasol.

1406.  On February 18, K.K. at G&W e-mailed Vogel-Baylor (also at G&W), telling her that Sandoz had bid on Halobetasol at Walgreens again, and that the customer was providing G&W with an opportunity to bid to retain the business.  Less than an hour later, Vogel-Baylor called T.P. at Perrigo and K.K. called CW-3 at Sandoz to co-ordinate a response. The calls lasted one minute and two minutes, respectively.  Immediately after hanging up, K.K. sent Vogel- Baylor an e-mail.

1407.  After receiving the e-mail, Vogel-Baylor called K.K.  He returned the call and they spoke for approximately a quarter-hour.  Immediately after hanging up with K.K., Vogel-Baylor sent a text message to T.P. at Perrigo.  Later that day, K.K. sent another e-mail to Vogel-Baylor on this issue.

1408.  Two days later, on February 20, 2014, K.K. had still not heard back from CW-3, so he reached out to CW-4 at Sandoz and they spoke for four minutes. Immediately after hanging up, K.K. called Vogel-Baylor and they also spoke for four

---

[38] The K.K. referenced in this Complaint that joined G&W in February, 2014, is a different person from the K.K. of Sandoz identified previously in this Section.

minutes.  Later that morning, Vogel-Baylor and K.K. exchanged two more calls,

lasting 13 minutes and three minutes, respectively.  Upon hanging up with Vogel-

Baylor, K.K. sent an internal e-mail, including to Vogel-Baylor.

1409.  A few minutes after receiving K.K.'s e-mail, Vogel-Baylor sent a text

message to T.P. of Perrigo. A half hour later, she called T.P. and they spoke for seven

minutes.  At around the same time, CW-3 of Sandoz called K.K. and they spoke for 8

minutes.  Immediately after hanging up with CW-3, K.K. called Vogel-Baylor to

report back what he had learned. That call lasted over a quarter-hour.

1410.  Later that afternoon, Vogel-Baylor called her supervisor, Orlofski, to

apprise him of the situation and they spoke for 21 minutes.  Upon hanging up, Vogel-

Baylor called K.K. and they spoke for nearly twelve minutes.  Immediately after

talking to K.K., Vogel-Baylor called T.P. of Perrigo one more time that day.  The call

lasted less than a minute.

1411.  That evening, after his conversation with G&W, CW-3 also sent an

email to CW-1.  Within a half hour of receiving the e-mail, CW-1 called CW-3 and

they spoke for 20 minutes.

1412.  The next morning, on February 21, 2014, CW-3 and CW-1 spoke again

for approximately a quarter-hour.  CW-3 hung up and immediately called K.K. at

G&W.  That call lasted one minute.  Immediately after that call, K.K. called Vogel-

Baylor; that call also lasted one minute.  That same day, K.K. responded to Walgreens.

Walgreens had accounted for over one third of G&W's total market share for Halobetasol Cream.

1413.  In mid-March 2014, Taro was making plans to re-launch Halobetasol Cream and Ointment.  Although its launch was ultimately delayed until May, 2014, due to issues relating to the FDA, Aprahamian called Vogel-Baylor on March 27, 2014 and they spoke for approximately a quarter-hour.  According to the available phone records, this was the first phone call ever between the two.  Four days later, on March 31, 2014, Vogel-Baylor called Aprahamian and they spoke for over five minutes.

1414.  On May 13, 2014, Taro re-entered the Halobetasol Cream and Ointment markets and published WAC pricing that matched its competitors.  In the days leading up to the relaunch, all four competitors were speaking frequently by phone.  At least some of those calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/7/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:28:00 | 0:04:00 |
| 5/7/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Vogel-Baylor, Erika (G&W) | 7:57:00 | 0:14:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:23:00 | 0:05:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 8:28:00 | 0:02:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:30:00 | 0:01:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:31:00 | 0:01:00 |
| 5/8/2014 | Voice | K.K. (G&W) | Outgoing | CW-3 (Sandoz) | 8:39:00 | 0:01:00 |
| 5/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Wesolowski, John (Perrigo) | 7:18:00 | 0:01:00 |
| 5/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Wesolowski, John (Perrigo) | 7:24:00 | 0:02:00 |

1415.  After the phone calls detailed above, in May, 2014, Aprahamian did not speak to Vogel-Baylor again for over a year, in the following September, 2015.  Similarly, according to the available phone records, the two calls between Aprahamian and Wesolowski at Perrigo are the only calls ever exchanged between the two.

1416.  On May 11, 2014, Aprahamian circulated a Fact Sheet including details regarding the Halobetasol re-launch.  The Fact Sheet detailed the following market share breakdown and set Taro's target market share goal at 15%

1417.  On June 10, 2014, Aprahamian instructed a colleague to put together offers for Halobetasol at Publix (a G&W and Perrigo customer) and HD Smith (a Perrigo customer).  That same day, Perfetto at Taro exchanged three text messages with Orlofski at G&W.

1418.  On June 11, 2014, Vogel-Baylor called T.P. at Perrigo. The call lasted one minute.  The next day, on June 12, 2014, HD Smith informed Taro that Perrigo had proactively revised its pricing shortly after Taro submitted the bid and asked Taro to lower its bid to win the business.

1419.  On June 17, 2014, Boothe at Perrigo called a Taro employee *via* the company's Westchester headquarters.[39]  The call lasted ¾ of an hour.  Later that day, A.L., a Taro pricing executive, sent an internal e-mail regarding pricing.  The next day, June 18, Perfetto called Boothe. That call lasted two minutes.

1420.  Starting the very same day (June 17, 2014), G&W employees began having a similar exchange *via* e-mail, starting with an internal e-mail from K.K. to Orlofski.  The next day, on June 18, Orlofski sent a text message to Perfetto and also

---

[39] As detailed above, Taro employees do not have their own individual extensions and calls from their office lines appear in the phone records as the Taro main company number.  Given the history of conduct between the two, this Taro employee was likely Perfetto.

called him, for two minutes. The next morning, on June 19, Orlofski replied to K.K.'s e-mail.  K.K. then sent an internal e-mail directing that G&W should cede the Publix and Morris & Dickson accounts to Taro.

1421.  The day after that, on June 20, 2014, Orlofski exchanged two text messages and two calls with Perfetto, including one call lasting nearly 38 minutes.

1422.  At the same time, G&W was also careful not to take any steps that would throw off its market share balance with Perrigo.  For example, on June 18, 2014, HEB, a Perrigo customer, asked G&W to bid on their Halobetasol business; G&W did not make a successful bid on it.

1423.  No shortages or other market features can explain Defendants' price increases for generic Halobetasol Propionate during the Relevant Period.

1424.  The elevated prices of generic Halobetasol Propionate resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1425.  The unlawful agreement among Defendants G&W, Fougera/Sandoz, Taro, and Perrigo, regarding generic Halobetasol Propionate, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AN.   Nimodipine

1426.  Nimodipine is a calcium channel-blocker that reduces problems caused by bleeding blood vessels in the brain.

1427.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Nimodipine at least as follows:

1428.  Teva marketed and sold Nimodipine during the Relevant Period at least in part through its subsidiary, Barr.

1429.  Sun marketed and sold Nimodipine during the Relevant Period at least in part through its subsidiary, Caraco.

1430.  In June of 2012, Teva was preparing to exit the market for Nimodipine. This exit would leave Heritage and Sun as the only manufacturers of Nimodipine. Heritage wanted to use Teva's exit as a cover to raise Nimodipine prices.

1431.  Pricing discussions with nominal competitors were part of Defendants' "toolkit" for achieving and maintaining elevated prices on Drugs at Issue, and Defendants understood that to maintain market share and increase prices, they needed to "play fair."  With this in mind, Heritage devised a plan to approach Sun.

1432.  Heritage's Malek wanted to "socialize" increased Nimodipine prices, by which he meant direct outreach to other Defendants to co-ordinate and implement a market-wide price increase.  To do so, Malek instructed his NAM Sather to reach out to Sun to discuss raising prices.

1433.  At Malek's direction, Ann Sather contacted someone at Sun, likely

Knoblauch.  Heritage's Sather exchanged numerous text messages and had multiple phone calls with her contact at Sun throughout June, 2012. These conversations between Heritage and Sun were successful.  The ostensible competitors reached an agreement not to compete; their goal was to raise prices.

1434.  Ultimately, Teva never completely exited the market for Nimodipine, yet it did reduce sales to a very small share, ceding the market to Sun and Heritage.

1435.  Sather kept Malek apprised of her negotiations with Sun, including through a June 28, 2012, e-mail discussing the status of the agreement on Nimodipine between Heritage and Sun.

1436.  That same day, Sather sent an analysis of a Cardinal RFP to Malek, Glazer, and other Heritage employees.  Sather noted that Heritage would submit a bid at an artificially high price, which would allow Sun to retain Cardinal's business.  Heritage informed Sun about the pricing before submitting to Cardinal.  This information allowed Sun to retain Cardinal's business at a price that was significantly higher than it would have been in a competitive market.

1437.  On July 20, 2012, another employee at Heritage circulated proposed pricing in response to the Cardinal RFP, which, upon information and belief, quoted pricing at a level lower than Sun.  Malek responded the same day and exchanged emails with a Heritage employee (possibly Keith Fleming) about Heritage's pricing on Nimodipine and Heritage's agreement on pricing with Sun.  Around the same time, Sather and her contact at Sun were also discussing at least Nimodipine.

1438.  Heritage's Sather and Sun's Knoblauch communicated by text and phone over the next few weeks. They also met in person at an industry event. Through these communications, at the end of July, Heritage and Sun reaffirmed their agreement to raise prices and allocate the market for Nimodipine. As part of this understanding, as it had in June, Heritage again agreed to provide a cover bid to Cardinal.

1439.  As a result of Heritage's cover bid, Sun retained its business with Cardinal, and both Heritage and Sun were able to maintain Nimodipine prices above the competitive level.

1440.  In September, 2012, after Cardinal awarded Sun its Nimodipine business, Sun began to experience supply issues with its Nimodipine.

1441.  In October of 2012, Cardinal approached Heritage, asking for a new bid because it was concerned about Sun's supply chain. Although Sun never fully exited the market, its sales of Nimodipine declined to a small share.

1442.  Sather immediately e-mailed Heritage's Malek, Glazer and Fleming to apprise them of Cardinal's request.  Given the circumstances, Sather felt responding to Cardinal's request for an RFP did not violate Heritage's agreement with Sun because Cardinal was coming directly to Heritage, because of Sun's supply issues – and most importantly, because Heritage was not going to underbid Sun on price.

1443.  Consistent with a price increase Heritage had recently imposed on a different wholesaler, Sather proposed that Heritage respond to Cardinal's request.

Sather believed that Heritage could offer a higher price and still win the business from Cardinal because she had received Sun's Cardinal pricing from her contact at Sun. Sather also shared information she had learned at the earlier trade conference, which, consistent with Defendants' cartel agreement and industry practice, likely involved competitive market information.

1444.  When she spoke with Sun's Knoblauch for 38 minutes the next day, Sather confirmed her understanding that Heritage could submit a bid to Cardinal without violating its agreement with Sun.

1445.  Heritage continued to communicate with Sun to monitor when Sun would re-enter the Nimodipine market.  Malek e-mailed Sather on December 17, 2012, about Sun's supply issues.  In response to Malek's e-mail, Sather reached out to her contact at Sun and kept Malek informed about her conversations.  During this same time period, Sun (along with Actavis and West-Ward) increased prices on Doxycycline.

1446.  On April 16, 2013, Sather reported to Malek that Sun was not pursuing Nimodipine customers because it did not know when its product would be available. Heritage's Malek responded to this information by expressing his willingness to continue Heritage's pricing and market allocation agreement with Sun when Sun re-entered the Nimodipine market.

1447.  Heritage's Sather continued speaking with Sun's Knoblauch to assess when Sun might re-enter the Nimodipine market.  When they spoke on May 23, 2013,

Sather learned that Sun might be returning to the Nimodipine market in June or July. Sather immediately reported this development to Malek, and the two exchanged e-mails about pricing for Nimodipine.

1448.  Ultimately, Sun decided not to re-enter the Nimodipine market. In the spring of 2013, Heritage more than doubled the price of Nimodipine capsules and maintained this inflated price for at least years thereafter.

1449.  When Heritage's Malek learned that Ascend was planning to enter the Nimodipine market in April of 2014, he immediately began the process of trying to contact Ascend and bring them into the "fair share" agreement.

1450.  On April 8, 2014, Malek informed his staff that Ascend would be entering the Nimodipine market and personally took responsibility for co-ordinating with Ascend.  Malek had met John Dillaway, the Executive Vice President of Ascend, in February of 2013, and he used that connection as a way to reach out to Dillaway through LinkedIn.  The two executives communicated frequently through LinkedIn in the weeks leading up to April 22, 2014.

1451.  During an internal Heritage teleconference on April 22, 2014, Malek identified numerous drugs that were slated for a price increase, including Nimodipine. That same day, Dillaway and Malek spoke on the phone about Ascend's entry into the Nimodipine market for almost 20 minutes.

1452.  Concurrently with Malek's discussions with Ascend, Malek and the rest of Heritage's sales teams were involved in large-scale outreach to Defendants to increase prices for numerous generic drugs.

1453.  As part of an internal Heritage conference call on May 9, 2014, about industry-wide price increases for at least nine drugs (including Verapamil, Theophylline, Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin, Fosinopril-HCTZ, and Glyburide), the Heritage team discussed allocating customers to co-conspirators as part of their agreement, including, but not limited to, the potential allocation of certain customers to Ascend as part of the efforts to raise and/or maintain prices on Nimodipine.

1454.  On June 6, 2014, Heritage's Malek e-mailed Ascend's Dillaway, trying to arrange a phone call to discuss Nimodipine.  They were unable to connect by phone but agreed to meet in person several weeks later, at the NACDS Total Store Expo in Boston, to solidify their agreements.

1455.  As discussed above, during an internal conference call on June 23 with the Heritage sales team, the targeted percentage price increases for eight drugs were discussed, including Nimodipine, which was slated for a 48% increase.

1456.  Three days later, on June 26, Heritage began telling customers that it was increasing prices for nine different drugs, including Nimodipine. Price increase notices were issued on the same date.

1457.  Although Ascend ultimately did not enter the Nimodipine market, because of Defendants' cartel agreement, Heritage and Sun did not have to lower their prices to defend against Ascend's threatened market entry.

1458.  Sun's supply issues cannot explain Defendants' price increases for Nimodipine during the Relevant Period, and no other shortages or other market features can explain Defendants' elevated pricing and price increases for Nimodipine during the Relevant Period.

1459.  The elevated prices of Nimodipine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1460.  The unlawful agreement between Heritage and Sun on Nimodipine was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AO.   Cyproheptadine HCL

1461.  Cyproheptadine HCL is a medication used to relieve allergy symptoms such as watery eyes, runny nose, itching eyes/nose, sneezing, hives, and itching.

1462.  The market for generic Cyproheptadine HCL tablets ("Cyproheptadine") is and was mature and at all relevant times had multiple manufacturers.  As a result, for years, the prices for Cyproheptadine HCL tablets were relatively low and stable.

1463.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Cyproheptadine HCL tablets as follows, beginning at least as early as June, 2012:

1464.  During the Relevant Period, Defendants Teva and Breckenridge dominated the markets for generic Cyproheptadine HCL tablets until August, 2015, when Defendant Impax joined them in dominating those markets.

1465.  In the summer of 2012, the relatively low and stable pricing of Cyproheptadine suddenly changed.  Teva announced a 50% increase to its list (WAC) prices, and likewise increased its NSP prices.

1466.  In November of 2013, it was Breckenridge's turn to lead; Breckenridge's announced a 150% increase to its list prices, and likewise increased its NSP prices. This time Teva did not immediately announce a list price increase, but its NSP prices rose.  And when Teva announce its list price increase less than six months later, in April, 2014, it matched Breckenridge's price.

1467.  In late summer of 2015, Impax entered the market.  Rather than compete for customers by offering better prices, Impax announced a higher list price than either Teva or Breckenridge, and charged its customers more.

1468.  Even with higher prices, Impax was able to gain market share, as contemplated by the Fair Share agreement between Teva, Breckenridge and Impax.

1469.  The chart below shows the list (WAC) price increases for Teva and Breckenridge, and the entry of Impax into the market at even higher prices.



1470.  Throughout this period, Teva, Breckenridge and Impax met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Cyproheptadine HCL tablets and their Fair Share agreement.

1471.  For example, in the weeks before Breckenridge announced enormous list price increases for Cyproheptadine HCL tablets in November, 2013, Breckenridge and Teva communicated directly with each other.  Teva's Rekenthaler had several phone calls with D.N., Director of Sales at Breckenridge.  The two executives spoke again in mid-January, 2014, during the time-frame when Teva was preparing its own list price increase for Cyproheptadine HCL.

1472.  Breckenridge's large price increase created an opportunity for Teva to win new customers with better prices.  But, because of its agreement with Breckenridge, Teva did not do so.  For example, when a potential new customer for Cyproheptadine HCL contacted Teva in February, 2014, Teva's Patel promptly called S.C., National Director of Sales, at Breckenridge, after which, Teva declined to submit a bid until after Teva had increased its price

1473.  In the summer of 2015, Impax was preparing to enter the Cyproheptadine market.  On July 20, S.C., Breckenridge's National Director of Sales, and M.G., Impax's Senior National Account Manager, exchanged text messages. On July 31, 2015, Impax announced list (WAC) prices even higher than those of Teva or Breckenridge.

1474.  No shortages or other market features can explain Defendants' price increases for generic Cyproheptadine HCL during the Relevant Period.

1475.  The elevated prices of generic Cyproheptadine HCL resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1476.  The unlawful agreement among Defendants Teva, Breckenridge, and Impax, regarding Cyproheptadine, was part of all Defendants' overarching conspiracy

to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AP.    Ciclopirox Shampoo

1477.   Ciclopirox Shampoo is used to treat seborrheic dermatitis, an inflammatory skin condition of the scalp.

1478.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Ciclopirox Shampoo, as follows:

1479.   As of the summer of 2012, the market for Ciclopirox Shampoo was dominated by Defendants Perrigo, Actavis, and Taro.

1480.   After the Sandoz acquisition of Fougera was finalized in July, 2012, Sandoz engaged in a review of the Fougera product line to determine whether there were any Fougera products for which Sandoz should considering re-entering the market.   One such product was Ciclopirox Shampoo.

1481.   To that end, on September 4, 2012, J.P., a product manager at Sandoz, e-mailed the sales team, including SW-3, asking for market pricing on Ciclopirox Shampoo, among other products.   The next day, on September 5, 2012, S.G. a Sandoz sales executive, also followed up with SW-3 and asked him to provide J.P. with the requested information.

1482.   The following morning, on September 6, 2012, SW-3 reached out to his contacts at both Taro and Perrigo to discuss Ciclopirox Shampoo.   He then reported

the results of those conversations to both J.P. and S.G. at Sandoz, either that same

day or the next day.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 10:32:00 | 0:11:00 |
| 9/6/2012 | Voice | H.M. (Taro) | Outgoing | CW-3 (Sandoz) | 10:57:15 | 0:02:49 |
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | S.G. (Sandoz) | 11:27:00 | 0:01:00 |
| 9/7/2012 | Voice | CW-3 (Sandoz) | Outgoing | J.P. (Sandoz) | 8:58:00 | 0:01:00 |
| 9/7/2012 | Voice | CW-3 (Sandoz) | Outgoing | S.G. (Sandoz) | 8:59:00 | 0:02:00 |

1483.  On November 26, 2012, J.R., a marketing executive at Sandoz, e-mailed

SW-3 and others at Sandoz regarding the Ciclopirox Shampoo re-launch. J.R. stated

that Sandoz planned to re-launch the (former Fougera) product on December 3, 2012,

and planned to target 12% market share due to limited supply.  J.R. asked SW-3 about

current pricing and told him that they should discuss which customers to target to

achieve Sandoz's market share goal.

1484.  The next day, on November 27, 2012, J.R. sent another e-mail about the

re-launch reiterating that Sandoz was targeting 12% share.

1485.  Thereafter, SW-3 set out to coordinate Sandoz's entry with Aprahamian

of Actavis.  The next day, November 28, 2012, SW-3 called Aprahamian and they

spoke for nine minutes.  First thing the following morning, on November 29, 2012,

SW-3 called Aprahamian again and they spoke for ten minutes.  A few hours later,

Aprahamian called SW-3 back and they spoke for three minutes.

1486.  That same day, J.R. e-mailed SW-3, copying SW-1, asking for pricing

information on Ciclopirox Shampoo.  Not wanting to put anything in writing, on the

following morning SW-3 exchanged two calls with SW-1, with one lasting five minutes and the other lasting 12 minutes, during which SW-3 conveyed the requested pricing information he had received from other manufacturers.

1487.  Later that evening, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail asking if Sandoz had sent out offers for Ciclopirox Shampoo.  The next day, on November 30, 2012, J.R. responded that offers had been sent to Wal-Mart and HD Smith – both Actavis customers – and that Sandoz was considering approaching McKesson, a Perrigo customer.

1488.  That same morning, SW-3 called T.P. of Perrigo twice to alert him to the fact that Sandoz would be approaching McKesson.  The calls lasted two minutes and one minute, respectively.  Later in the day, SW-1 confirmed that Sandoz had sent an offer to McKesson for Ciclopirox Shampoo.

1489.  On December 3, 2012, Sandoz officially re-launched Ciclopirox Shampoo.

1490.  On December 4 and December 5, 2012, SW-3 called Aprahamian twice. The calls lasted seven minutes and two minutes, respectively.  Also, to close the loop, on December 5, 2012, M.D., an Actavis sales executive, called T.P. of Perrigo and the two executives spoke for approximately a quarter-hour.

1491.  Within three days of its entry, by December 6, 2012, Sandoz had already secured the Ciclopirox Shampoo business at HD Smith (from Actavis) and McKesson (from Perrigo).

1492.  No shortages or other market features can explain Defendants' price increases for generic Ciclopirox Shampoo during the Relevant Period.

1493.  The elevated prices of generic Ciclopirox Shampoo resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1494.  The unlawful agreement among Defendants Perrigo, Actavis, Sandoz, and Taro, regarding generic Ciclopirox Shampoo, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AQ.   Desoximetasone Ointment**

1495.  Generic Desoximetasone Ointment ("Desoximetasone") is a corticosteroid used to treat a variety of skin conditions, including eczema.

1496.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Desoximetasone, as follows:

1497.  As of the summer of 2012, Defendant Taro was the only manufacturer of Desoximetasone Ointment.

1498.  Starting in August of that year, Sandoz began making plans to enter the generic Desoximetasone market.  Because it would become a 2-player market upon

Sandoz's entry, and because Sandoz was the second manufacturer to enter the market, Sandoz initially decided – consistent with the "fair share" rules of Defendants' cartel, outlined above – to target 40% market share.

1499.  On the evening of August 21, 2012, Sandoz held an internal meeting to discuss its Desoximetasone launch.  Shortly after the meeting, a Sandoz executive sent an initial list of eight customers that Sandoz should consider approaching.  The executive indicated that Sandoz's success would depend on several factors, and that more research was necessary regarding one of the larger customers, because approaching such a large customer could cause a stir.

1500.  First thing the next morning, Sandoz began to co-ordinate with Taro. K.K., a national account executive at Sandoz, called D.S., a senior sales executive at Taro, and the two spoke for nine minutes.

1501.  On August 30, 2012, Sandoz held another internal meeting to discuss its Desoximetasone launch.  That same day, K.K. of Sandoz spoke again to D.S. at Taro, this time for two minutes.  The day after this internal Sandoz meeting and the phone conversation with Taro, on August 31, 2012, CW-1 contacted Kellum regarding Desoximestasone, including specific pricing and a more refined list of customers that would provide Sandoz with its target market share.

1502.  As the Sandoz launch date approached, CW-3 of Sandoz also began speaking to H.M., an account executive at Taro, to co-ordinate Sandoz's entry into the market.  The two executives were not friends, and most or all their conversations

were regarding implementation of Defendants' cartel.  According to phone records, the first ever call between the two executives was on September 6, 2012.  They spoke again on September 21, as Sandoz was finalizing its launch plan.  During these calls, H.M. provided CW-3 with Taro price points for various customers so that Sandoz could bid as high as possible and avoid price erosion, while still obtaining new customers as it entered the market.  CW-3 passed that pricing information and list of customer targets on to CW-1 and Kellum at Sandoz.  That same day, H.M. also sent an e-mail to J.M., a sales executive at Taro, relaying a message that Sandoz would be entering the Desoximetasone market, and suggesting six accounts as possible targets.

1503.  Sandoz received FDA approval and formally launched Desoximetasone on September 28, 2012, matching Taro's WAC pricing exactly.  That same day, CW-3 at Sandoz also called H.M. at Taro and left a message; H.M. returned the call almost immediately, leaving CW-3 a voicemail.

1504.  Based on the conversations with Taro, Sandoz decided to take a specific approach in targeting customers with its co-conspirator.  In an internal Sandoz e-mail on October 1, CW-1 indicated that Sandoz's initial pricing for this product had now been slightly lower.

1505.  Shortly after receiving approval, on October 1, 2012, Sandoz began approaching a limited set of customers, per its agreement with Taro. That same day, CW-4 at Sandoz reached out to D.S. at Taro – someone with whom CW-4 had colluded in the past – and spoke twice, including one call lasting 21 minutes.

1506.  Consistent with the understanding in place between the two supposed competitors, Taro immediately started conceding customers to Sandoz.  For example, on October 11, 2012, a high-ranking Taro executive sent an internal e-mail discussing Sandoz's launch of Desoximetasone.  In the e-mail, the executive indicated that Taro had been aware of Sandoz's launch, and that Taro had just conceded two large customers to Sandoz, with the expectation of receiving a similar benefit going forward.  That same day, H.M. at Taro called CW-3 at Sandoz, likely to let him know that the customers had been conceded and confirm the plan moving forward.  They spoke twice that day, including one call lasting approximately five minutes.

1507.  Sandoz was able to obtain most of its targeted market share quickly, without any market disruption.  By October 12, 2012, for example, R.T., a senior sales and marketing executive at Sandoz, provided a summary of the Desoximetasone launch.

1508.  At that point, Sandoz needed at least one more customer to get its "fair share."  Internally, Sandoz discussed sending a message to Taro.  On October 23, 2012, CW-1, CW-3 and Kellum scheduled a conference call to discuss which customers to approach.  That same day, CW-3 called H.M. at Taro and the two executives spoke several times, including two separate calls, each lasting a quarter-hour.

1509.  As a result of these conversations, Taro agreed to relinquish additional customers to Sandoz.  By February, 2013, Sandoz had captured its original goal of 40% of the Desoximetasone market, without any significant disruption.

1510.  In the days and weeks leading up to the Glenmark launch, Glenmark, Taro and Sandoz were speaking frequently to coordinate Glenmark's entry, including at least the following calls and text messages:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/15/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahamian, Ara (Taro) | 13:33:00 | 0:08:00 |
| 8/20/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahamian, Ara (Taro) | 9:40:00 | 0:02:00 |
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:45:00 | 0:01:00 |
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:56:00 | 0:02:00 |
| 8/21/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahamian, Ara (Taro) | 11:37:00 | 0:07:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:54:00 | 0:03:00 |
| 8/27/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 17:48:00 | 0:03:00 |
| 8/28/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 13:29:00 | 0:01:00 |
| 8/28/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:36:00 | 0:15:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:08:00 | 0:01:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:26:00 | 0:01:00 |
| 9/5/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 15:29:00 | 0:03:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 11:05:00 | 0:01:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 11:07:00 | 0:10:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 11:24:00 | 0:01:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 12:35:00 | 0:01:00 |

At the same time, Perfetto of Taro was also communicating with T.C., a senior-most executive at Glenmark, through e-mail.

1511.  Glenmark's approval came on Friday, September 20, 2013, three days after the last call on the chart above.  The following Monday, there was a flurry of additional communications between the three to co-ordinate Glenmark's entry:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/23/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 9:15:00 | 0:02:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:40:00 | 0:01:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 11:41:00 | 0:01:00 |
| 9/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:24:00 | 0:01:00 |
| 9/23/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 13:50:00 | 0:04:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 13:55:00 | 0:01:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 14:22:00 | 0:03:00 |

The day after that, September 24, CW-3 of Sandoz spoke to Aprahamian at Taro again for approximately a quarter-hour.  CW-3 then sent an e-mail to his superiors, including CW-1 and Kellum, alerting them to the situation

1512.  On September 26th, there was another burst of phone calls between Defendants Glenmark, Taro, and Sandoz:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:45:00 | 0:04:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:35:00 | 0:06:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:22:00 | 0:15:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:32:00 | 0:02:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:44:00 | 0:01:00 |

1513.  During these calls, the cartel members reached an understanding about which customers Glenmark would target and what prices it would offer in order to avoid price erosion.

1514.  Because Taro still had a majority of the market share, it understood that, pursuant to the cartel's "fair share" agreement, Taro would have to relinquish market share to Glenmark as Glenmark entered the Desoximetasone market.  Accordingly, Taro began to concede customers to Glenmark immediately.  By October 17, 2013, CW-5 reported internally that Glenmark had already been able to obtain 30% market share for Desoximetasone.

1515.  Because of the discussions between the two cartel members (and supposed competitors) in advance, prices remained high and Taro was not upset about conceding this business to Glenmark.

1516.  In early November, 2013, Taro was approached by a customer to bid on Desoximetasone as part of an RFP.  In deciding whether to provide a bid, Taro executives noted that the company had already taken action so that Glenmark could obtain market share.  Nonetheless, Taro still decided not to bid.

1517.  As a result of Sandoz's acquisition of Fougera, CW-6 left his job at Fougera in August, 2012, and took a position as a sales executive at Aurobindo.  CW-6 followed his former friend and colleague, Grauso, who moved to Aurobindo in December, 2011, to assume a senior executive role.

1518.  During this time-frame, Grauso had also served as a conduit to communicate messages between his former G&W colleagues, Orlofski and Vogel-Baylor, and CW-6 at Fougera.

1519.  Because many of CW-6's contacts worked at generic manufacturers that focused primarily on topical products, his move to Aurobindo – a company focused on oral solids – was a difficult transition, without many of those prior relationships.  Indeed, CW-3 at Sandoz was one of the few people whom CW-6 knew, who worked for a company that also manufactured a significant number of oral solids.

1520.  Although CW-6 and CW-3 were former colleagues, they were not social friends, but when Aurobindo sold a product that overlapped with Sandoz, CW-6 and CW-3 colluded on that product.  When CW-6 called CW-3 during this time period, they were engaging in anticompetitive conduct.  Between August, 2012, when CW-6 began at Aurobindo, and the following May, when CW-6 left the industry, he

exchanged at least 109 phone calls with CW-3, implementing their employers' anticompetitive agreements.

1521.  During this time period, CW-6 was acting at all relevant times at the direction of, and/or with approval from, his superiors, including Grauso.

1522.  No shortages or other market features can explain Defendants' price increases for generic Desoximetasone during the Relevant Period.

1523.  The elevated prices of generic Desoximetasone resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1524.  The unlawful agreement among Defendants Sandoz/Fougera, Aurobindo, Glenmark, and Taro, regarding generic Desoximetasone, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AR.   Fluticasone Propionate Lotion

1525.  Generic Fluticasone Propionate Lotion ("Fluticasone") is a topical corticosteroid used to treat swelling and itching that result from various chronic skin disorders, including atopic dermatitis.

1526.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Fluticasone Propionate Lotion, as follows:

1527.  Glenmark was the first manufacturer to enter the market for generic Fluticasone on March 26, 2012.  As the first generic manufacturer to file an approved ANDA, Glenmark enjoyed a 180-day period of exclusivity during which time no other competitors could sell the product, except for an "Authorized Generic." (or "AG," which are discussed *supra*)  Even before Glenmark launched, Fougera/Sandoz was planning to enter the Fluticasone market after Glenmark's exclusivity period ended in September, 2012, and understood that Perrigo was also planning to enter at the same time.  Over the course of several months, Fougera – in particular CW-6, at the direction of Kaczmarek – co-ordinated with Glenmark frequently about Fluticasone, including market share targets and pricing, to prepare for its eventual Fluticasone launch.

1528.  After the Sandoz acquisition of Fougera in July, 2012, as the end of Glenmark's 180-day exclusivity period approached, Sandoz continued to stay in communication with Glenmark and Perrigo about Fluticasone.  As part of its launch strategy, Sandoz planned to obtain 33% of the market. Perrigo planned to take about one-quarter of the market.

1529.  By mid-August, 2012, Sandoz learned that its launch of Fluticasone would be delayed until the end of November because of certain production problems.

1530.  As a result of this delay, Kellum was concerned that Perrigo would be able to launch earlier than Sandoz and wanted to learn more about Perrigo's launch strategy.  On August 21, 2012, Kellum sent an e-mail to his sales team.  Within minutes of receiving the e-mail, SW-3 telephoned T.P., his contact at Perrigo.

1531.  SW-3 also sent a message to Perrigo through a customer.  That same day, the customer sent an e-mail to a Perrigo sales executive.  The Perrigo sales executive informed the customer that Perrigo's Fluticasone launch had now been delayed to the first quarter of 2013.  The customer then forwarded that e-mail directly to SW-3 at Sandoz, who reported the information directly to Kellum and others at Sandoz the next day.

1532.  Around this same time, Sandoz also began preparing to have conversations with "customers" about its Fluticasone launch while at the NACDS Conference in Denver in late August, 2012.  It was at that same conference where SW-3 first spoke to Blashinsky at Glenmark.  In an internal e-mail to the Sandoz sales team on August 25, 2012, in advance of the NACDS Conference, R.T., a senior Sandoz sales and marketing executive, instructed his team on the current strategy which aligned with the larger "fair share" understanding.

1533.  As its launch date for Fluticasone approached, Sandoz began to think began to communicate directly with Glenmark about which customers to target.  On November 26, 2012, Sandoz scheduled an internal meeting to discuss which customers it should approach as part of its Fluticasone launch.  That same day, SW-3

at Sandoz spoke to Blashinsky at Glenmark twice, with one call lasting five minutes.
After the second call with Blashinsky, SW-3 e-mailed his Sandoz colleagues a list of
six customers he thought Sandoz should target. That list would later grow to eight
customers. SW-3 also made it known to his Sandoz colleagues that Glenmark was
planning a potential price increase on Fluticasone at some point in the future.

1534. The next day, November 27, 2012, a senior Sandoz marketing executive
inquired with SW-3 regarding Fluticasone and the customers Sandoz had agreed to
target, and SW-3 responded.

1535. As promised, the next morning, SW-3 called Blashinsky at Glenmark.
They had four calls that day, including one lasting eight minutes.

1536. The next morning, SW-3 sent an updated list of nine customers that
Sandoz should target for Fluticasone – based on his conversations with Blashinsky –
but he did not include the pricing information that had been requested. The senior
Sandoz marketing executive responded immediately. SW-3 countered by referring to
one of the biggest pop songs of 2012, suggesting that his boss should call him instead
of asking for the information in writing.

1537. As Sandoz continued to prepare for its imminent launch, it also began to
evaluate the usage expected from the nine customers that it had agreed with
Glenmark to target. Sandoz found that those nine customers would not be enough to
reach its desired market share goals. As a result, on November 30, 2012 a senior
Sandoz marketing executive suggested that Sandoz approach two large wholesaler

customers, instead of one as originally agreed.  SW-3 responded immediately.  A few hours later, SW-3 called Blashinsky at Glenmark and left a message.  Blashinsky promptly returned the call and the two spoke for a few minutes.  Later that day, SW-3 also called and spoke to his contact at Perrigo, T.P., twice.

1538.  Sandoz officially entered the market for Fluticasone on December 3, 2012, matching Glenmark's WAC pricing exactly.  That same day, CW-3 at Sandoz called Blashinsky at Glenmark and they had a two-minute call.  Also that day, Blashinsky directed Glenmark's sales team to relinquish the Publix and Optisource accounts to Sandoz, two of the nine customers that Glenmark had agreed to give up to the new entrant.

1539.  Sandoz continued to co-ordinate with Glenmark to make sure that it was targeting the appropriate customers and minimizing price erosion as it entered the Fluticasone market.  For example, on December 13, 2012, a large wholesaler that Sandoz had agreed not to target approached Sandoz looking for an offer on Fluticasone.  That same day, SW-3 spoke to Blashinsky twice.  When Sandoz refused to respond to the customer, the customer followed up again on December 21, 2012.  Again, following the same pattern, SW-3 called Blashinsky twice that day, including one call lasting four minutes.

1540.  Although Sandoz made sure to co-ordinate extensively with Glenmark, it had initial difficulty meeting its market share goal, in part because some of the customers already had a significant amount of inventory on hand.  On January 9,

2013, SW-3 had a conversation with Blashinsky where they walked through a list of customers, identifying those that Sandoz should target and those which it should not. SW-3 took detailed contemporaneous notes of the conversation. Later in the day, after reviewing the list, SW-3 at Sandoz indicated in an e-mail that he began to suspect that Glenmark may have oversold to certain customers in advance of Sandoz's entry – in effect, cheating (a bit) on the cartel's Fair Share rules and (temporarily) arrogating some of Sandoz's share to itself, for a few extra months.

1541.  By January 11, 2013, SW-1 at Sandoz sent around a market share summary.  In response, R.T. at Sandoz indicated that 21.8% market share was not enough and that Sandoz should continue to press for its original market share goal.

1542.  During an internal Commercial Operations meeting on January 21, 2013, Sandoz decided to approach another customer, CVS, in order to obtain additional market share.  But before doing so, Sandoz wanted to confirm that this was acceptable to Glenmark.

1543.  Sandoz subsequently learned why Glenmark was reluctant to give up more market share to Sandoz.  There was a discrepancy between the two co-conspirators about how much market share Sandoz had already obtained.  Two days later, on January 31, SW-3 and Blashinsky spoke twice more, for five minutes each.

1544.  Over the next several months, Sandoz and Glenmark continued to co-ordinate about Fluticasone, including about a Glenmark price increase on that dose. For example, on April 16, 2013, as Glenmark was preparing for a large-scale price

increase on several different drugs (also in co-ordination with several other cartel members), SW-3 at Sandoz had two separate calls with Blashinsky at Glenmark, with one call lasting approximately a quarter-hour. They talked about several things, including Glenmark's potential entry and market share targets on Alclometasone (discussed elsewhere in this Complaint), as well as a price increase on Fluticasone.

1545. Throughout this time-frame, Sandoz also kept in close communication with Perrigo about the details of Perrigo's anticipated entry into the Fluticasone market. For example, in early April, 2013, SW-3 at Sandoz spoke to T.P. at Perrigo multiple times, including calls lasting approximately a quarter-hour and five minutes, respectively. SW-3 subsequently reported to his colleagues at Sandoz that Perrigo would be delayed in entering the Fluticasone market. On April 9, 2013, a colleague at Sandoz followed up, asking SW-3 for additional information about whether Perrigo planned to enter. The next day, SW-3 communicated directly with Perrigo to obtain the answer, calling and speaking with T.P. twice.

1546. Blashinsky (Glenmark) called SW-3 (Sandoz) again on May 6, 2013, in advance of the Glenmark price increase. He also called SW-3 on May 17, 2013 – the day after the Glenmark price increase on Fluticasone became effective. In all, they spoke three times on May 17, including two separate five-minute calls.

1547. On May 21, 2013, as Perrigo was beginning to plan its entry into the market, a Perrigo executive asked T.P. to obtain information for Fluticasone Lotion. Two days later, on May 23, 2013, T.P. called SW-3 at Sandoz. They ended up

speaking twice that day, for a few minutes each time.  Immediately after their second call, SW-3 called Blashinsky at Glenmark – the other manufacturer of Fluticasone – and they spoke for four minutes.

1548.  Similarly, on May 28, 2013 a senior Sandoz executive requested additional information about Perrigo's entry timing on Fluticasone.  That same day, SW-3 called T.P. at Perrigo and they spoke for four minutes.  The next day, T.P. called SW-3 back and they spoke again for two minutes.

1549.  By July, 2013, Perrigo finally began preparing in earnest to enter the Fluticasone market.  As of that time Sandoz had been able to obtain 30% market share, reaching its initial target goal for a 3-player market with Glenmark and Perrigo.  Sandoz understood that, because Glenmark still had a significant majority of the market share, Perrigo would target Glenmark customers as it entered.

1550.  In the days and weeks leading up to Perrigo's launch, Perrigo was in frequent communication with Sandoz, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 11:13:00 | 0:01:00 |
| 7/10/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:14:00 | 0:01:00 |
| 7/15/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:06:00 | 0:01:00 |
| 7/16/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 9:22:00 | 0:01:00 |
| 7/17/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 11:22:00 | 0:19:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 10:27:00 | 0:01:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:11:00 | 0:01:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 10:09:00 | 0:13:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:32:00 | 0:01:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:05:00 |

1551.  Perrigo held an internal meeting to discuss its Fluticasone launch on July 16, 2013. As can be seen in the table above, on the day of the meeting T.P. of Perrigo called SW-3 at Sandoz and left a message.  He called SW-3 again the next day, and they were able to speak for approximately 20 minutes.  During these conversations, T.P. informed SW-3 that, consistent with the "fair share" understanding, Perrigo was targeting specific Glenmark customers and looking for approximately 25% market share.

1552.  On July 30, 2013, Perrigo received FDA approval to begin selling Fluticasone.  That same day, T.P. of Perrigo spoke to SW-3 at Sandoz for approximately a quarter-hour.  Perrigo then formally launched the product on August 1, 2013, with the same exact WAC pricing as Glenmark and Sandoz.  T.P. and SW-3 also had two short calls that day.

1553.  As Perrigo entered the market it planned only a "limited launch," targeting only $1 million per year in sales.  In accordance with the fair share understanding and previous communications between the co-conspirators' employees, Perrigo targeted – and Glenmark conceded – multiple customers immediately.

1554.  No shortages or other market features can explain Defendants' price increases for generic Fluticasone Propionate Lotion during the Relevant Period.

1555.  The elevated prices of generic Fluticasone Propionate Lotion resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1556.  The unlawful agreement among Defendants Glenmark, Sandoz/ Fougera, and Perrigo, regarding generic Fluticasone Propionate Lotion, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AS.    Valsartan HCTZ

1557.  Generic Valsartan HCTZ tablets ("Valsartan") are used to treat high blood pressure.

1558.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Valsartan, at least as follows:

1559.  Mylan was the first to file an abbreviated new drug application (ANDA) to market generic Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity.  Sandoz manufactured the Authorized Generic.  This meant that once Mylan entered the market, Sandoz and Mylan would be the only manufacturers of the generic version of the drug for the next six months.

1560.  Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21, 2012.  Over the preceding three weeks, leading up to the launch, employees of Defendants Mylan and Sandoz spoke multiple times by phone during which they discussed, *inter alia*, allocating market share for this product.

1561.  In August and September of 2012, a senior sales executive at Sandoz, who will be referred to in this Complaint as CW-4/SW-4, was concerned about her job security there and sought to network with executives at competing companies in the hope of obtaining new employment.  SW-4 contacted Mylan's Jim Nesta in part because she was interested in potentially working at Mylan.

1562.  On September 6, the Thursday immediately following the Labor Day holiday that year, Nesta called SW-4, but it was not to discuss employment.  Instead, Nesta – representing the incoming generic – wanted to, and did, discuss market allocation with his opposite number at Sandoz.  They spoke for 20 minutes; then, SW-4 called him back but missed him; then Nesta called SW-4 back, but missed her; then SW-4 called Nesta back and they spoke for just over one minute; then Nesta returned SW-4's call, and they spoke for five minutes.

1563.  This is just one of the many examples of Defendant's employees playing telephone tag and calling each other multiple times back and forth in the same day. The reason their communications followed this unusual pattern is that they did not want to leave permanent records of their communications – even of communications simply setting up telephone calls – in part because Nesta and SW-4 were not friends; their only connection was implementing Defendants' cartel.

1564.  As a result, virtually all of their communications were via telephone. Rather than leave an e-mail or voice-mail with a permanent record of the substance of their communications (which could be found in, for example, a document production

of Defendants' e-mail servers), Defendants employees, including both Nesta and SW-4, would repeatedly telephone each other, often on the same day, until they connected by phone.  They did this because it meant the substance of their communications would not be retained, and the only way to trace the fact that they communicated at all was via obtaining records from telephone companies, which is significantly more challenging, including requiring matching telephone number(s) to the corresponding participant in the scheme.

1565.  To help hide Defendants' overarching conspiracy (and because they knew what they were doing was illegal), even when Defendants' employees e-mailed each other within the same company, they were circumspect about what was occurring and transmitted much information orally; e-mail was often used simply to alert the recipient that there was news to communicate.

1566.  For example, among the many other illustrations in the complaint, one occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on the drug Labetalol HCL Tablets. Rather than spell out in detail that she wanted T.S. to ask Par about the details, Patel simply forwarded the e-mail to T.S. with three question marks:  "???"

1567.  T.S. responded shortly thereafter:  "left message."  The message that T.S. had left was for R.K. at Par, and the two executives played phone tag five times that same day.  After the last of these calls with R.K., T.S. responded back to Patel in writing an e-mail, transmitting the need to communicate but not actual, substantive

information:  "Let's speak on Monday.  Just received call back with more information."

1568.  Similarly, on Friday, September 7, 2012, Nesta called SW-4 for less than a minute; then Nesta called SW-4 and they spoke for approximately 11 minutes; then SW-4 called Nesta back for one more minute.

1569.  The following week, Nesta called SW-4 back and they spoke for approximately 20 minutes on September 12; then, the same day, SW-4 called Nesta back for a minute and a half.  The next day, September 13, there were five calls between them, including one for approximately eleven minutes; finally, the week ended with a seven-minute call on Friday, September 14.

1570.  The next week was the week of both companies' Valsartan launch, and Nesta and SW-4 spoke multiple times on that Monday and Wednesday, September 17 and 19.

1571.  Via these phone calls, Sandoz and Mylan – through SW-4 and Jim Nesta – agreed to divide up the market for at least Valsartan without cutting prices, so that each "competitor" obtained a roughly 50% market share.

1572.  Throughout this time, SW-4 also kept her boss (Sandoz's Director of Pricing and Contracts, Armando Kellum) up to date on her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14.

1573.  A week later, on September 21, 2012, Valsartan HCTZ launched.  An internal Sandoz e-mail authored by R.T., a senior sales and marketing executive at Sandoz, noted that Sandoz had approximately 52% market share.  What the e-mail failed to mention, even though it is true, is that this division was reached as a result of Defendants' cartel agreement.

1574.  Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ. In an internal series of e-mails reacting to this news, a Sandoz employee remarked:  "Fyi, good news, Mylan has 180 days as expected."  H.F., a senior-most executive of Sandoz Germany responded, "...some-times a little help from our competition is welcome as well."  D.D., a senior-most executive of Sandoz North America, replied: "I guess this is what they call 'co-opetition."

1575.  In addition, on September 25 – only four days after the Valsartan HCTZ launch – since there was a new entrant to the market, who in a competitive market would have sought increased market share via price compeition, Amerisource Bergen Corp ("ABC") contacted Sandoz seeking a price reduction.  S.G. forwarded the request to SW-1 and Kellum, asking for guidance.  Kellum replied, "No price change."

1576.  In November, 2012, Sandoz employees were e-mailing regarding the possibility of seeking additional busines.  R.T. sent an internal e-mail in advance of the meeting, asking "Are there opportunities with non-Sandoz customers that we should

evaluate?"  After a colleague responded with a list of potential Mylan customers, Kellum, following the rules of the road for Defendants' overarching conspiracy, responded, "I'm concerned we are going to disrupt the market.  I understand the need for additional sales but we need to be thoughtful here."  R.T. then directed the Sandoz team, "Do not approach new customers, with[out] me or Armando [Kellum]'s consent."  R.T. did this to ensure that Mylan retained its so-called fair share without competition for market share between Sandoz and Mylan.

1577.  No shortages or other market features can explain Defendants' elevated pricing for Valsartan during the Relevant Period.

1578.  The elevated prices of Valsartan resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1579.  The unlawful agreement between Mylan and Sandoz on Valsartan was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AT.  Buspirone, Estradiol, Labetalol, Loperamide, Mimvey (Estradiol/ Norethindrone), Nadolol, Levothyroxine, Nitrofurantoin MAC, Tamoxifen Citrate, Clarithromycin, and/or Estazolam**

1580.   Buspirone HCL tablets ("Buspirone"), Estradiol tablets, in 0.5 mg, 1 mg, and 2 mg doses ("Estradiol"), Labetalol HCL tablets in 100 mg, 200 mg, and 300 mg doses ("Labetalol"), Loperamide HCL capsules ("Loperamide"), Estradiol/ Norethindrone tablets ("Mimvey"), Nadolol tablets ("Nadolol"), Levothyroxine, Nitrofurantoin macro-crystal capsules ("Nitrofurantoin" or "Nitrofurantoin MAC"), Tamoxifen Citrate tablets ("Tamoxifen"), Clarithromycin ER tablets ("Clarithro-mycin"), and Estazolam tablets ("Estazolam") are all generic drugs.

1581.   These drugs are not generally related to each other by structure or function:  Buspirone is a psychiatric medication used to treat anxiety.  Estradiol is a synthetic hormone used to treat symptoms of menopause.  Tamoxifen is a chemotherapeutic agent used to treat cancer.  Levothyroxine – the oldest drug in the group, with usage dating back to the 1920's – is a synthetic hormone used to treat the symptoms of thyroid failure.  Mimvey is an oral contraceptive.  Labetalol and Nadolol are beta-blockers used to treat high blood pressure.  Nitrofurantoin is an antibiotic used to treat bladder and urinary tract infections.

1582.   But these drugs do share one common attribute:  all of them were the subject of Defendants' anticompetitive conspiracy.  Their lack of other relationship also illustrates, both here and throughout this Complaint, the vast breadth and otherwise-unrelated variety of exemplar drugs illustrates the breadth of Defendants' cartel agreements and the interchangeability of different drug markets within their overarching cartel agreement.

1583.  The market for generic versions of these drugs is mature; these products have been commercially available for decades.

1584.  Further, generic equivalents to these products have also been commercially available in the United States for a decade or more – from the 1920's or 1930's (Levothyroxine – so long ago that it was grandfathered and avoided FDA review under the first Food, Drug, and Cosmetics Act (of 1938)), 1960's (Nitrofurantoin), 1970's (Labetalol, Loperamide, Nadolol), 1980's (Buspirone, Estradiol, Estazolam), 1990's (Activella/Mimvey), and early 2000's (Tamoxifen, Clarithromycin).

1585.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Buspirone, Estradiol, Labetalol, Loperamide, Mimvey, Nadolol, Levothyroxine, Nitrofurantoin, Tamoxifen Citrate, Clarithromycin, and Estazolam, at least as follows:

1586.  During the Relevant Period, the markets for each of these drugs were dominated by the following Defendant Manufacturers, approximately as follows:

1587.  The market for generic **Buspirone** was dominated by Mylan (30% market share), Actavis (Watson) (25%), and Teva (45%).

1588.  The market for generic **Estradiol** was dominated by Mylan (25%), Actavis (Watson) (15%), and Teva (60%).

1589.  The market for generic **Labetalol** was dominated by **Sandoz (60%)**, Actavis (Watson) (10%), and Teva (30%).

1590.  The market for generic **Loperamide** was dominated by Mylan (67%) and Teva (33%).

1591.  The market for **Mimvey** (generic Activella) was dominated by Breckenridge (67%) and Teva (33%).

1592.  The market for generic **Nadolol** was dominated by Mylan (50%), **Sandoz (10%)**, and Teva (40%).

1593.  Since approximately December, 2010, the market for generic **Levothyroxine** was dominated by Lannett, Mylan (25%), and Sandoz.

1594.  The market for generic **Nitrofurantoin** was dominated by Mylan (45%), Alvogen (10%), and Teva (45%).

1595.  The market for generic Tamoxifen was dominated by Mylan (25%), Actavis (Watson) (10%), and Teva (65%).

1596.  The market for generic Clarithromycin was dominated by Mylan (25%) and Teva (33%).

1597.  The market for generic Estazolam was dominated by Mylan (25%) and Teva (33%).

**Price Increases of July-August, 2012 (Teva-Mylan-Actavis-Sandoz)**

1598.  Leading up to a significant price increase in mid-2012, Defendants had myriad co-conspirator communications, starting with the lower-share members of Defendant's cartel:

1599.  Actavis's A.S., a senior sales executive, had two calls with Teva's Rekenthaler on July 11, for 1 and 9 minutes.

1600.  The following week, Breckenridge's D.N., a senior sales executive, spoke with Teva's Rekenthaler on July 17, for 4 minutes.

1601.  Then **Mylan's** Jim Nesta had calls with **Teva's** Rekenthaler and/or Green on July 23 (7 minutes), July 24 (2 calls:  4 and 8 minutes); July 25 (4 minutes); July 26 (4 minutes); and July 30 (2 calls, including one 8 minutes); and **Sandoz's** SW-2 spoke with Teva's Green twice (for 2 and 4 minutes) on Sunday, July 29.

1602.  After all of this co-ordination, effective July 31, 2012, Teva increased its prices on Buspirone, Estradiol, Labetalol, Loperamide, Mimvey, Nadolol, Nitrofurantoin, and Tamoxifen Citrate – and Mylan's Nesta had five calls with Teva's Green that day, for 6, 2, 4, 7, and 2 minutes, and at least one call with B.H., a senior sales and marketing executive at Alvogen.

1603.  At all relevant times, Teva did not make or sell levothyroxine.

1604.  Anticompetitive communications among Defendants did not end with Teva's price increases of July 31, 2012 – in part because Teva needed to know that its fellow cartel-members would stick to their anticompetitive agreement.  Illustrative examples include Estradiol, Nadolol, Labetalol, and Nitrofurantoin.

**<u>Estradiol</u>**

1605.  Teva's Green spoke to Mylan's Nesta on August 1, 2, 6, 7, 8, 10, 13, 15, 16, 17, and 28, 2012.

1606.  Teva was also communicating with Actavis (Watson).  T.C., Teva's Senior Director of Sales, spoke twice (once for 10 minutes and another time for 15 minutes) with L.P., a Senior Director of National Accounts at Actavis (Watson), on August 6, 2012.  By the end of the year, Actavis (Watson), Mylan, and Teva had all increased their Estradiol prices significantly, together.

### Nadolol and Levothyroxine

1607.  Also in August, 2012, Armando Kellum, then the Senior Director of Pricing and Contracts at Sandoz, spoke with Green at Teva.

1608.  Even though Sandoz had only 10% of the Nadolol market, Sandoz did not try to gain market share by lowering its price in the wake of Teva's increase (or even by keeping its prices fixed) – instead, Sandoz followed Teva's price increases in the Nadolol market with increases of its own.

1609.  A couple of weeks after that call between Kellum and Teva (and illustrating the institutional, rather than merely personal co-operation between members of Defendants' cartel), the next communication between Sandoz and Teva was not *via* Kellum.  Instead, it was SW-2 who spoke with Green, twice, on August 21 – the same day that approval was internally requested from Sandoz's Pricing Committee to raise the price of Nadolol.

1610.  A few days thereafter, on Sunday, August 26, the day before the Sandoz increase, Kellum called Green at Teva.

1611.  The next day, on Monday, August 27, 2012, Sandoz raised its Nadolol prices – dramatically.  The increases were staggering –from 746% to 2,762 %, depending on the dose.

1612.  The day after the Sandoz increase, Teva's Green – acting as the conduit of information between Sandoz and Mylan – called Nesta at Mylan twice, with one call lasting approximately a quarter-hour.

1613.  Mylan, which returned to the Nadolol market after a brief supply disruption, followed and matched the Teva and Sandoz increases on January 4, 2013.

1614.  In 2013 and 2014, Mylan, Sandoz, and Lannett co-ordinated significantly to raise the price of Levothyroxine.  Jim Nesta at Mylan discussioned this issue with K.S., a senior sales executive at Lannett, and with SW-4 at Sandoz.  In addition to communicating directly with CW-4 on this drug, Nesta also communicated indirectly with Sandoz *via* Defendant Teva, even though Levothyroxine was not a drug that Teva sold.

1615.  Mylan increased prices on a number of drugs on January 4, 2013, including Levothyroxine.  In what had become a routine component of the scheme, the day before the Mylan increase, Nesta spoke to Green at Teva four times.  The next day, Green conveyed the information he had learned from Nesta directly to his counterpart at Sandoz.

1616.  On the morning of Friday, January 4, 2013 – the day of the Mylan increase – Green called Kellum twice, including a six-minute call at 9:43 am.  Shortly

after hanging up with Green after the second call, at 11:28 am, Kellum reported internally on what he had learned – but concealed the true source of the infornation, using the "market intel" or "just heard from a customer" convention that was frequently employed by many of Defendants' executives to avoid documenting their anticompetitive communications with their co-conspirators:  "**_Just heard from a customer_** that [] Teva and Mylan . . . have now raised price on Nadolol to our levels and Mylan took a significant price increase on Levothryoxine.  Let's please be cautious on both of these products.  Thanks." (emphasis added).

1617.  But phone records show that Kellum did not speak with **_any_** customer during that morning (January 4, 2013) – but he did speak with Green from Teva.

1618.  This was one major flaw in Defendants' many and repeated attempts to hide evidence of their cartel, however:  while they made attempts to camouflage its source, they often wrote down the actual information that they had learned in internal e-mails, which, combined with call records, left clear tracks of these frequent intra-cartel communications.

1619.  Defendants knew that price-fixing was illegal, and that e-mails between their executives and competitors would be hard evidence of their conspiracy, so as alleged *supra* and throughout this complaint, Defendants (including their executives and other employees) went to great lengths to avoid such e-mails, instead preferring to telephone, where a permanent record would not be made of what was said.

1620.  But, having made the phone calls, Defendants' executives would then type the substance of what was said (again, camouflaging it with references to "a customer said" or "market intel), leaving compelling evidence of their conspiracy.

1621.  In any event – shortly after Kellum sent the internal Sandoz e-mail above, about what he'd "heard from a customer" at 11:28 am – at 11:50 the same morning, Green also called SW-2 at Sandoz and they spoke for fifteen minutes – but not **only** about Nadolol.

1622.  Instead – illustrating both Defendants' penchant for communicating via intermediaries and the fungible nature, not only of Defendants' products within a given market for a particular pharmaceutical product, but of the individual drug markets themselves, to be swapped among cartel members like chips in a co-operative game of high-stakes poker (paid for by Plaintiffs) – Teva's communications with its contacts at Sandoz also included discussion of Mylan's price increase on Levothyroxine, which Teva did not make or sell.

1623.  That same morning (January 4, 2013), K.S. at Lannett called Nesta at Mylan.  The phone call lasted 44 seconds.  The following week, on January 10, Nesta called K.S. back and they spoke for approximately six minutes.  That same day, McKesson e-mailed Sandoz and requested a price reduction on Levothyroxine. Kellum responded internally, "This is a no. We just learned that Mylan look a large price increase."

1624.  The following Monday – January 14, 2013 – Lannett raised its WAC pricing for Levothyroxine to match Mylan.  Notably, after these phone calls, phone records show no calls between Nesta (Mylan) and K.S. (Lannett) until August 6 of that year – three days before Mylan's next increase in Levothyroxine prices.

1625.  On July 16, 2013 – as detailed *infra* and *supra* – SW-4 spoke with Nesta and sent the July 2013 E-mail, identifying the Mylan price increases.  The price list included Levothyroxine and noted that Lannett had followed.

1626.  On August 6, 2013, Nesta called SW-4 two times.  Both calls lasted less than a minute.  A few minutes after the second call, Nesta called K.S. at Lannett.  That call also lasted less than a minute.  Three days later, on August 9, Mylan increased WAC pricing on Levothyroxine for a second time that year.

1627.  On August 10, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail that stated:  "Mylan took a 300% price increase on Levothyroxine!!!  Based on my intelligence (we will need to confirm), please lock down inventory (strict allocation per AK) and no new product offers until we can clarify the situation."  SW-4 replied to S.G.'s e-mail, stating, "This is correct based on my info as well."

1628.  Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14.

1629.  That same day, S.G. sent an e-mail to Kellum, copying SW-1, regarding "Levothyroxine Mylan" and asked "We taking the pricing up?"  SW-1 responded:  "Working on it."  In response, S.G. replied, using the cartel's argot for price increases,

"rationalizing": "Thx.  I believe Lannett rationalized the market earlier this week."
SW-1 answered, "We just noticed that as well."

1630.  On September 5, 2013, Cigna – a Mylan customer – contacted Lannett
and requested a bid on Levothyroxine.  J.M., a national account manager at Lannett,
forwarded the request to K.S., stating "due to Mylan's across the board price increases
on a number of products, they are looking for new suppliers wherever there is
crossover."  J.M. explained that "[t]he volume isn't gigantic on the 1000s so it
wouldn't attract much attention from Mylan if it went to us ...."

1631.  Nonetheless, on September 12, Lannett declined the opportunity and
blamed supply issues, stating "[a]s much as we'd love to take on the business, we are
not in a position to do so at this time."

1632.  During a September 10, 2013, earnings call, Lannett's CEO, Arthur
Bedrosian, was asked for his reaction to Mylan's Levothyroxine price increase.
Bedrosian responded, "You mean after I sent them a thank you note?  I'm just
kidding. . . . I'm always grateful to see responsible generic drug companies realize that
our cost of doing business is going up as well. . . . So whenever people start acting
responsibly and raise prices as opposed to the typical spiral down of generic drug
prices, I'm grateful."

1633.  And three days later, on September 13, Sandoz did indeed "act[]
responsibly" and – consistent with the understanding it had with its co-conspirators –
raised Levothyroxine WAC pricing to match Mylan and Lannett.

1634.  The three co-conspirators did not stop there.  Mylan, Lannett, and Sandoz co-ordinated again to raise prices on Levothyroxine the following spring, in April/May, 2014.

1635.  As with the 2013 increases, so with the 2014 increase:  Mylan was the first to raise its WAC pricing on Levothyroxine, and did so on April 25, 2014.  In the two days leading up to the increase, Defendants' employees Jim Nesta at Mylan and K.S. at Lannett spoke by phone.  These calls are listed as follows, all of which occurred in the evening of April 23:  first, at 6:31 pm, Nesta called K.S., but likely missed him and left no voice mail, as the call lasted only 3 seconds.  A half-hour later, at 6:59 pm, K.S. returned Nesta's calls, but likely missed him and left a voice-mail, as the call lasted 34 seconds.  An hour after that, at 7:57 pm, Nesta called K.S. again, likely leaving a longer voice-mail in reply, as the call was approximately 50 seconds long.  Finally, an hour after that, and indicating the urgency with which Defendants' employees felt the need to speak rather than merely exchanging messages, the two had a five-minute phone call, beginning at 9:04 pm.

1636.  Notably, that 5-minute call was the last documented telephone call between these two executives through at least early 2016.  This is because their communications were made in furtherance of Defendants' conspiracy, rather than being merely social or friendly in nature.

1637.  Less than 48 hours after those evening phone calls, on April 25 (the day that Mylan increased its pricing for Levothyroxine), P.C., a sourcing manager at

Cardinal Health, sent a text message to Director, National Accounts, Tracy Sullivan at Lannett, stating: "Not sure if you knew already. . . Mylan increasing levos." Sullivan responded: "Thanks for the heads up . . . We heard 55% on contract price, can you confirm?", but, in fact, Sullivan had "heard" about the Mylan increase from her supervisor, K.S., who, as just alleged, had communicated with Nesta less than 48 hours prior. P.C. replied, "Yes ~50-55%."

1638. Three days later, Lannett quickly followed with a price increase of its own – raising its WAC pricing to match Mylan's on April 28, 2014. In accordance with Defendants' ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014, and matched the WAC pricing of its co-conspirators.

**Labetelol**

1639. Throughout the Relevant Period, Defendants were also pursuing similar communications regarding the other Drugs at Issue, including the other drugs in this particular price-increase group. For example, after **Sandoz's** Nadolol price increase, but before **Mylan's** Nadolol price increase, Teva was talking to Sandoz about Labetalol.

1640. In October, 2012, Teva learned that Sandoz was "no longer having supply issues" with labetalol, but Actavis (Watson) was "on allocation," *i.e.*, did not have enough supply to meet all of its demand. As a result, in an internal e-mail sent on October 16, 2012, J.L., a Teva analyst, questioned whether Teva should consider

lowering "strategic customer pricing" on Labetalol in order to retain its market share – which would have violated the rules of Defendants' cartel.

1641.  That same day, Green spoke twice with SW-2 at Sandoz.  After the calls with SW-2, Green responded to the Teva analyst's question:  "Sandoz is back in good supply.  They took a 500% price increase several months back, and they are holding firm with their prices.  Stay the course and maintain our higher price."  T.C. at Teva agreed:  "We need to stay the TEVA course."

1642.  Teva's Rekenthaler followed up with an exchange of four phone calls two days later with A.S., a senior sales executive at Actavis (Watson).

1643.  By 2014, lured by its co-conspirators' *supra*-competitive profits, Par had also entered the Labetalol market.

1644.  As alleged *supra*, on Friday, February 7, 2014, Teva received notice from a customer that it had received a bid from Par on Labetalol.  Teva's Patel forwarded the e-mail to her Teva colleague T.S., but in an attempt to minimize evidence of Defendants' (regular) communications with their co-conspirators, Patel's only comment was, "???".

1645.  T.S. responded immediately, with "left message" – deliberately concealing the fact that the message T.S. that had left was for R.K. at Par.  T.S. and R.K. spoke five times that day.

1646.  After these calls with R.K., T.S. e-mailed back to Patel, saying "Let's speak on Monday.  Just received call back with more information" – again, obfuscating both the substance and source of the "more information."

1647.  That Monday, February 10, Patel forwarded the original e-mail (about Par trying to steal market share in Labetalol) to Rekenthaler, saying "Need to make a decision quickly."  Immediately after receiving that e-mail, Rekenthaler called M.B. at Par and the two spoke approximately a quarter-hour.

1648.  Shortly after that, Rekenthaler replied *via* e-mail to Patel, saying:  "Hold off on this until I get back with you."  Rekenthaler spoke to M.B. again that afternoon, for approximately three minutes.

1649.  After these discussions among Teva and Par executives – and knowing it would likely cause this Labetalol account to go to Par – Teva ultimately offered only a nominal price reduction to the customer.

**Nitrofurantoin**

1650.  Teva's July 31, 2012 price increase on Nitrofurantoin was between 90-95%, depending on the dosage and formulation. After that increase, Teva continued to co-ordinate with Mylan and Alvogen to maintain those high prices.

1651.  For example, on October 10, 2012, a customer approached Teva, requesting a lower price for Nitrofurantoin.  That same morning, at the direction of his superiors at Teva, Green reached out to both Nesta at Mylan and B.H., his counterpart at Alvogen.  He called Nesta at 10:01 and they spoke for 10 minutes.  At

10:11, immediately after hanging up with Nesta, Green called B.H. at Alvogen.  Nesta and B.H. then spoke twice that day (once for approximately a quarter-hour), and Nesta and Green also spoke twice more.

1652.  Teva did not change its price for the customer.

**Price Increases of July, 2013**

1653.  Following Watson's purchase of Actavis in October, 2012, and unification of operations under the Actavis name in January, 2013, the same pattern of co-operative increases repeated itself.

1654.  For example, Teva and Mylan imposed another co-ordinated set of price increases on July 2 and July 3, 2013, in co-operation with Sandoz, in accordance with Defendants' overarching cartel agreement.

1655.  Shortly after the Teva increase, illustrating both the broad reach of Defendants' cartel and its institutional nature, Sandoz asked Teva for a "comprehensive list" of price increases so that it would "not respond to something adversely," *i.e.* by inappropriately competing for market share on any of those drugs.

1656.  Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase.  Obtaining the comprehensive list of price increase drugs was an effort by Sandoz to ensure it was aware of every increase taken by both competitors so that it could live up to the agreement.

1657.  Illustrating the broad reach of Defendants' cartel – including to products manufactured by only one Defendant, not just those drugs that Sandoz also manufactured – on July 15, 2013, SW-2 at Sandoz asked Teva's Rekenthaler to give Sandoz a complete list of **all** the drugs where Teva increased its prices.

1658.  As discussed again, *infra*, Rekenthaler did so.  However, because he knew it was illegal, and in an effort to conceal his employers' anticompetitive conduct, Rekenthaler did not e-mail SW-2 directly.  Instead, Rekenthaler sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to SW-2's personal e-mail account.

1659.  Then, in early 2015, when Mylan, Teva, and Actavis imposed another round of price increases, they again orchestrated these price increases *via* direct communication. For example, Teva's Rekenthaler spoke to Nesta of Mylan on January 14 (two calls) and January 20, 2015.

1660.  In addition, Rekenthaler spoke to Falkin at Actavis on January 13, 14 (twice), and 16, 2015.  Over the following months, all three manufacturers again imposed price increases on their customers, including on Estradiol.

1661.  No shortages or other market features can explain Defendants' elevated pricing for Buspirone, Estradiol, Labetalol, Loperamide, Mimvey (Estradiol/ Norethindrone), Nadolol, Levothyroxine, Nitrofurantoin, Tamoxifen Citrate, Clarithromycin, or Estazolam during the Relevant Period.

1662.  The elevated prices of Buspirone, Estradiol, Labetalol, Loperamide, Mimvey (Estradiol/Norethindrone), Nadolol, Levothyroxine, Nitrofurantoin, Tamoxifen Citrate, Clarithromycin, and Estazolam resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1663.  The unlawful agreements among Mylan, Actavis (Watson), Breckenridge, Lannett, Teva, Alvogen, and Sandoz on Buspirone, Estradiol, Labetalol, Loperamide, Mimvey (Estradiol/Norethindrone), Nadolol, Levothyroxine, Nitrofurantoin MAC, Tamoxifen Citrate, Clarithromycin, and/or Estazolam were part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**AU.   Promethazine HCL**

1664.  Generic Promethazine HCL ("Promethazine") is an antihistamine that is used to treat some allergies, nausea, and vomiting.  In late 2012 and early 2013, the suppliers in the market for Promethazine were Actavis, Perrigo, and G&W.

1665.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Promethazine HCL, as follows:

1666.  Starting in late August of 2012 – around the same time that Vogel-Baylor first met Rogerson at Actavis – G&W began planning a price increase for Promethazine HCL.  Prior to implementing that increase, and as it had done on other products, G&W reached out to its competitors to coordinate plans.

1667.  On September 18, 2012, Vogel-Baylor sent an internal e-mail to M.S., a sales analyst at G&W, asking her to prepare a spreadsheet containing Promethazine sales data for the price increase. That same day, Vogel-Baylor also responded to a request from her boss, Orlofski, asking who the incumbent manufacturers were for the major wholesalers. Vogel-Baylor stated that G&W was the incumbent at ABC and Cardinal and Actavis supplied McKesson. The next day, on September 19, 2012, Orlofski replied.

1668.  Meanwhile, Vogel-Baylor was actively communicating with Rogerson of Actavis regarding the increases.  Indeed, on September 18, 2012 alone, Vogel-Baylor exchanged 34 text messages with Rogerson.

1669.  Similarly, on September 19, 2012, Vogel-Baylor used her contact at Aurobindo, CW-6, as a conduit to communicate with T.P. of Perrigo, the other competitor on Promethazine HCL.  This call pattern is detailed in the chart below. Notably, these are the same calls that Vogel-Baylor used to convey information

regarding the price increase on Halobetasol, another product on which Perrigo and

G&W overlapped, which was happening at the same time.[40]

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

1670.  After speaking with CW-6 for the final time on September 19, 2012,

Vogel-Baylor immediately called her boss, Orlofski, and spoke to him for

approximately a quarter-hour.

1671.  While Vogel-Baylor was communicating with T.P. of Perrigo through

her contact CW-6, T.P. was also communicating directly with M.D., a sales executive

at Actavis, and reporting that information back to his superior, Wesolowski. This call

pattern, including the calls between T.P. and CW-6, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:38:00 | 0:11:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:58:00 | 0:02:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:59:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Aurobindo) | 13:02:00 | 0:02:00 |

---

[40] The collusion on Halobetasol is discussed in detail in an earlier Section, *supra*.

1672.  Over the next week, G&W worked to finalize its price increase for Promethazine HCL. On September 21 , 2012, Vogel-Baylor forwarded her initial price increase analysis to Orlofski and scheduled a one-on-one meeting to discuss it on September 24, 2012. Two days later, on September 26, 2012, Vogel-Baylor e-mailed a revised price increase analysis to Orlofski and, after obtaining his approval, e-mailed that analysis to the team on September 28, 2012.  In her e-mail, Vogel-Baylor informed the team that they were to send out their price increase notices to customers on October 5, 2013.

1673.  Throughout this time period, Vogel-Baylor stayed in constant communication with Rogerson at Actavis. For example, between September 25, 2012 and October 5, 2012 – the day the price increase notices were sent – Vogel-Baylor exchanged 38 text messages with Rogerson.  Similarly, Vogel-Baylor continued to keep T.P. of Perrigo informed of G&W's plans through her conduit, CW-6.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |
| 10/5/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 5:30:01 | 0:01:41 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 5:38:00 | 0:02:00 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 5:39:00 | 0:06:00 |

1674.  On October 8, 2012, G&W published increased WAC pricing for Promethazine HCL, which included an 18% increase on the 25 mg dosage and a 35% increase on the 12.5 mg dosage.

1675.  Perrigo followed suit on December 4, 2012, when it notified customers that it would be increasing contract pricing on Promethazine HCL effective January 5, 2013.  Similarly, on February 12, 2013 and April 3, 2013, Actavis also followed and increased its WAC pricing to match G&W on the 12.5 mg and 25 mg dosages, respectively. On February 12, 2013, Rogerson called Vogel-Baylor and they spoke for nearly 22 minutes.

1676.  The co-conspirators were not satisfied to stop there, however. Knowing now that all three were on board to increase prices, they began contemplating a second increase on Promethazine HCL – and this time, it would be much larger.

1677.  On March 25 , 2013, M.S., a sales analyst at G&W, forwarded Vogel-Baylor updated sales data for Promethazine HCL.  That same day, Orlofski at G&W sent a text message to Boothe, an executive at Perrigo.  The next day, on March 26, 2013, Boothe called Orlofski back and they spoke for approximately five minutes. Similarly, Vogel-Baylor continued to communicate with T.P. of Perrigo through her conduit, CW-6, about Promethazine HCL.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:59:51 | 0:00:15 |
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:21:57 | 0:06:46 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:28:00 | 0:01:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 17:33:00 | 0:02:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:36:00 | 0:01:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 20:04:10 | 0:00:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 20:05:10 | 0:01:37 |
| 3/28/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 18:19:55 | 0:00:03 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 18:41:00 | 0:05:00 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 18:46:00 | 0:01:00 |

1678.  On March 28, 2013, the same day as the last calls listed above, Vogel-Baylor finalized a price increase analysis for Promethazine HCL and, on April 1, 2013, she forwarded that information to Orlofski.  Vogel-Baylor and Orlofski discussed some revisions to the analysis, and on April 10, 2013, Vogel-Baylor sent the revised analysis to Orlofski.  G&W planned to implement the price increase on April 15, 2013, but ultimately sent the notices on April 16, 2013.

1679.  Meanwhile, the three Defendants continued to co-ordinate their plans on Promethazine HCL.  Vogel-Baylor at G&W was speaking with Rogerson at Actavis, while T.P. at Perrigo was speaking to M.D. at Actavis, as detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/1/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 15:11:49 | 0:00:26 |
| 4/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:41 | 0:00:00 |
| 4/4/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:55:41 | 0:01:30 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 17:33:07 | 0:00:00 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 19:32:16 | 0:00:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 7:35:00 | 0:01:00 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:12:00 | 0:25:00 |

1680.  At the same time, Vogel-Baylor continued to use CW-6 as a conduit to communicate with T.P. of Perrigo regarding Promethazine HCL, as detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/4/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:37:55 | 0:07:00 |
| 4/5/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:25:00 | 0:01:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:30:28 | 0:00:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:36:07 | 0:00:00 |
| 4/5/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 16:44:00 | 0:01:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 11:59:40 | 0:00:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:00:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:03:00 | 0:01:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:18:02 | 0:00:03 |
| 4/8/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:23:18 | 0:00:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:36:24 | 0:00:03 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:53:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:26:00 | 0:02:00 |
| 4/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 11:08:00 | 0:04:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:50:56 | 0:00:29 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:00:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 14:09:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 16:52:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 16:59:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 17:05:00 | 0:02:00 |

1681.  In accordance with their plan, on April 17, 2013 G&W published new WAC pricing for Promethazine HCL, increasing WAC from $38.99 to $116.97 – an approximately 200% increase.

1682.  Around the time of the increase, G&W received an e-mail from a potential new customer seeking pricing on a list of products, including Promethazine HCL.  M.S. forwarded the request to Vogel-Baylor.

1683.  A few weeks later, Actavis followed G&W's price increase on Promethazine HCL and, on June 5, 2013, published WAC pricing that matched G&W's.  Prior to increasing its price, and as it had now done several times before, Actavis spoke with both G&W and Perrigo. These calls are detailed below:

470

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/29/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 9:09:00 | 0:01:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:12:00 | 0:02:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:14:00 | 0:05:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:19:00 | 0:02:00 |
| 5/31/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 4:04:00 | 0:09:00 |
| 5/31/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 8:38:00 | 0:07:00 |
| 6/3/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 12:00:52 | 0:14:17 |
| 6/4/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 11:10:30 | 0:12:16 |

1684.  On June 26, 2013, Vogel-Baylor e-mailed Orlofski to advise him that G&W had received Cardinal's 2013 RFP.  The next day, Vogel-Baylor received a short phone call from S.S., a sales executive at Perrigo.  Several hours later, Vogel-Baylor placed a phone call to Orlofski.

1685.  G&W had no need to worry because a few weeks later, on July 30, 2013, Perrigo notified its customers that it was increasing price on a list of products, including Promethazine HCL, with an effective date of August 1, 2013.  This included an increase to its WAC pricing that matched G&W and Actavis.  In the days leading up to Perrigo's price increase, the three again spoke several times by phone.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 7/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 0:01:11 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 0:03:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Outgoing | Vogel-Baylor, Erika (G&W) | 0:01:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:02:33 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | T.P. (Perrigo) | 0:00:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:09:06 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 0:21:00 |

1686.  Several months later, the collusion continued on Promethazine HCL. On March 5, 2014, K.K., a G&W sales executive, told Vogel-Baylor that Walgreens

had received an offer from Actavis for a one time buy on the 25mg dosage at a significantly discounted price of $42.08.  G&W would later learn that Actavis had made the offer because it had an excess of short-dated inventory on the 25mg dosage.

1687.  To make good on her promise, Vogel-Baylor placed a call to Rogerson 15 minutes later.  The two continued to trade phone calls over the next several days, including a call on March 6, 2014, that lasted approximately 10 minutes.

1688.  Vogel-Baylor's communications with Rogerson yielded a solution to the problem.  On March 18, 2014, she e-mailed Walgreens to advise the customer that G&W lowered its price on Promethazine HCL.  Aware that the details of her interactions with Rogerson would be incriminating if reduced to writing, Vogel-Baylor offered only a vague statement to the customer.

1689.  Over the next several months, G&W would continue to decline to bid on new opportunities for Promethazine HCL so as not to upset the market share balance it had achieved with its competitors.

1690.  For example, on May 5, 2014, L.C., a sales executive at G&W, summed up G&W's commitment to playing nice in the sandbox when she told a customer, PBA Health, that she wanted to identify opportunities for Promethazine HCL (and other drugs) only if she could do so.  Similarly, on May 30, 2014, Vogel-Baylor instructed M.S. not to bid on the Promethazine HCL business at another customer, IPC. Further, on August 8, 2014, Vogel-Baylor told K.K. that prior to bidding on

Promethazine HCL at Humana, G&W would need to know who the incumbent was and whether there was a right of first refusal.

1691.  Lastly, on August 25, 2014, McKesson – an Actavis customer – e-mailed K.K. asking if G&W would like to bid on Promethazine HCL. K.K. knew that G&W would not bid, but in an effort to get the story straight, asked Vogel-Baylor if he should provide the pre-textual justification that G&W was at capacity.  Vogel-Baylor approved that messaging in a response on August 28, 2014.

1692.  As detailed above in an earlier Section, as part of G&W's relationship with Glenmark, Vogel-Baylor of G&W had a long-standing relationship with GW-5, a senior executive at Defendant Glenmark.  Those Defendants also fixed prices on Ciclopirox Cream, beginning at least as early as April, 2012.

1693.  One year after that, on May 16, 2013, Glenmark increased pricing on at least 18 different products, including Ciclopirox Cream and various formulations of Mometasone Furoate that were also manufactured by G&W.[41]  The anticompetitive conduct relating to those products is discussed in further detail below.

---

[41] Notably, while Glenmark was colluding with G&W on these products, GW-5 and his colleagues were also colluding with competitors on other products on its price increase list.  For example, several of the products – Moexipril HCL Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, Pravastatin Sodium Tablets, and Ranitidine Tablets – overlapped with Teva.  Nisha Patel, a Teva sales executive, colluded with GW-5 and J.C., sales and pricing executives at Glenmark, to significantly raise prices on those products.  Similarly, Glenmark's list included Alclometasone Dipropionate Cream – a product that Glenmark overlapped on with Taro that is discussed earlier in this Complaint.  As **also** discussed above, Blashinsky, a sales executive at Glenmark, colluded with Aprahamian and D.S., a sales executive at Taro, to raise prices on that product.

1694.  No shortages or other market features can explain Defendants' price increases for generic Promethazine HCL during the Relevant Period.

1695.  The elevated prices of generic Promethazine HCL resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1696.  The unlawful agreement among Defendants Actavis, Aurobindo, Perrigo, Glenmark and G&W, regarding generic Promethazine HCL was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## AV.   Nystatin Triamcinolone

1697.  Generic Nystatin Triamcinolone ("NT") is used for the treatment of cutaneous candidiasis, such as yeast infections and thrush.

1698.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic NT Cream and Ointment, as follows:

1699.  Sandoz and Taro dominated the markets for all formulations of generic NT Cream and Ointment.

1700.  By 2011, however, Sandoz had discontinued NT Cream and Ointment, which left Taro as the only generic manufacturer of these products at that time.

1701.  Capitalizing on this exclusivity, Taro took several significant price increases on NT Cream and Ointment in 2011 and 2012, which resulted in significant price increases across all formulations, including total WAC increases of more than 700% on certain formulations.

1702.  Not surprisingly, during this period, NT Cream and Ointment were Taro's highest grossing products, collectively representing approximately 14.1% of the company's consolidated net sales for the year ended March 31, 2013.

1703.  Enticed by the high pricing, Sandoz began making plans to re-enter the NT Cream and Ointment markets in late 2012 – and, naturally, as set forth *infra*, that meant co-ordination with Taro.

1704.  On November 12, 2012, SW-3 of Sandoz called H.M., a Taro sales executive, three times, with one call lasting four minutes, and told him that Sandoz might be entering the market.  That same day, SW-3 e-mailed M.A., a Sandoz marketing executive, asking about NT Ointment.  M.A. responded that Sandoz planned to launch all three package sizes.

1705.  Two days later, on November 14, 2012, B.S., a senior Taro executive, sent an internal e-mail to other senior executives at Taro and Sun recommending price increases on several products where Taro was exclusive, including NT Cream and Ointment.

1706.  Sandoz's launch dates for NT Cream and Ointment ended up getting pushed back, and SW-3 continued to keep H.M informed.  On January 4 and 7, 2013,

SW-3 called H.M., once for approximately five minutes and the other for approximately a quarter of an hour, respectively.

1707.  A week after that, on January 14, 2013, Taro held a Sales and Marketing conference call addressing at least NT Cream issues.  By this time, after spending almost a decade at Actavis as VP, Sales & Marketing, Michael Perfetto had left Actavis in January, 2013, and transitionted to working for Defendant Taro Pharmaceuticals USA, Inc. as its Chief Commercial Officer.

1708.  Two days later, on January 16, 2013, Perfetto e-mailed J.J., a senior Taro sales executive, asked J.J. to put together a list of Taro's top 10 customers.

1709.  A month later, on February 12, 2013, Taro increased its WAC prices on NT Cream by 25%.  Two weeks after that, on February 28, SW-3 e-mailed his Sandoz colleague, M.A., asking for an updated target launch date for NT Ointment, which M.A. provided.  Later that day, in a phone call that lasted approximately 10 minutes, SW-3 then provided this confidential business information to H.M. at Taro to keep him updated on Sandoz's plans.  That week-end, on March 2, H.M. and SW-3 exchanged text messages.

1710.  The following Monday, March 4, Taro held a Sales and Marketing conference call, during which Perfetto informed the team about Sandoz's plans regarding NT Cream and/or Ointment.

1711.  On March 13, 2013, D.P., a senior sales executive at Sandoz, sent an internal email to the sales team, including to SW-3, requesting regarding pricing for

certain products that Sandoz was planning to re-launch, including NT Cream and
Ointment.

1712.  A week after that, on March 18, Aprahamian started working at Taro.

1713.  Literally the very next day, on March 19, 2013, D.P. sent an e-mail to his
Sandoz colleague, SW-3, which SW-3 correctly understood to mean that D.P. was
asking him to call his contact at Taro to obtain pricing.  SW-3 responded that he
would obtain the information  – and, illustrating the institutional nature of the co-
operation among Defendants, Aprahamian took over H.M.'s role of liaison to Sandoz.

1714.  Over the next several days, Aprahamian and SW-3 exchanged at least the
calls detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:16:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/21/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:12:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:18:00 |

1715.  After the last call on March 22, SW-3 e-mailed his boss at Sandoz,
Armando Kellum, and SW-1, a senior pricing executive at Sandoz, including an
attachment that had Taro's non-public, contract pricing information at several
customers for several products, including specific price points for NT Cream and
Ointment at Cardinal and Rite Aid.  Although SW-3 put in the e-mail that this

information came from customer(s), that was false; in fact, SW-3 had obtained this information directly from Taro, which Kellum and SW-1 were aware of.

1716.  Notably, SW-3 did not have responsibility for the Cardinal or Rite Aid accounts, which was a clear signal to his superiors that SW-3 had received the information from a fellow cartel member, rather than from a customer.

1717.  In fact, the pricing information had been provided by Aprahamian for the express purpose of allowing Sandoz to entering the market with as high a price as possible, which Taro would not then undercut.

1718.  A few weeks later, on the morning of April 15, Aprahamian called SW-3 and they spoke for approximately a quarter-hour.  A few minutes after hanging up, SW-3 called Aprahamian back.  The call lasted only a minute, but during these calls, SW-3 told Aprahamian that Sandoz would be entering the market for NT Cream shortly.  Later that day, Taro held a Sales and Marketing conference call.  At least NT cream was discussed, as the minutes from the conference call noted.

1719.  On that same day, April 15, 2013, Sandoz held its own Commercial Operations call, during which NT Cream was (not coincidentally) also discussed. During that call, Sandoz identified ABC, Walgreens, Rite Aid, Wal-Mart, and Omnicare as potential targets for the re-launch.

1720.  Later that same day, April 15, SW-3 called Aprahamian to further discuss the NT Cream launch.  Even though they spoke for only approximately nine minutes, on the call, Aprahamian provided SW-3 with Taro's non-public pricing at ABC,

Walgreens, Rite Aid, and Omnicare. Aprahamian also told SW-3 that Taro would not defend these customers. SW-3 noted that by drawing arrows pointing at those customer names in his Notebook.

1721. After hanging up with Aprahamian, SW-3 immediately called Kellum to report his conversation with their co-conspirator. The call lasted approximately one minute. First thing the next morning, on April 16, 2013, SW-3 called Kellum again and they spoke for approximately five minutes.

1722. That week-end through the coming Tuesday, from April 20 to April 23, NACDS held its annual meeting in Palm Beach, Florida. Representatives from Taro, (including Aprahamian and Perfetto) and Sandoz, including D.P. and R.T., a senior sales and marketing executive, attended.

1723. Regardless of whether they spoke at the NACDS exposition, the day after it ended, on April 24, 2013, Aprahamian called SW-3 twice, for one and five minutes, respectively. The day after that, SW-3 called Aprahamian. The call lasted one minute. That same day, Sandoz re-entered the NT Cream market and matched Taro's increased WAC pricing.

1724. On the day of Sandoz's re-entry, Rite Aid e-mailed Taro stating that it had received a competitive bid on NT Cream and asked whether Taro planned to bid to retain the business. H.M. (at Taro) forwarded the request to his colleagues, J.J., Perfetto, and Aprahamian.

1725.  The next day, on April 26, 2013, Aprahamian called SW-3 and they spoke for eight minutes.  Aprahamian e-mailed H.M. on Saturday, April 27, 2013 asking him to call him Monday morning; and consistent with Taro's agreement to cede that customer to Sandoz (and with Defendants' cartel's so-called "Fair Share" rules), Taro ultimately did concede the Rite Aid account to Sandoz.

1726.  Also on April 26, 2013, Omnicare e-mailed Taro, indicating that it had received an offer for NT Cream and gave Taro the opportunity to match the pricing. D.S. forwarded the request to Aprahamian who responded.

1727.  That same day, Perfetto sent an internal e-mail to J.K. and M.K., two senior Taro executives, and others, including Aprahamian, reporting that over the last two days, Sandoz had approached several of Taro's customers, including ABC, Rite Aid and Omnicare.  Taro ultimately conceded all three accounts to Sandoz.

1728.  That same day, Aprahamian called SW-3 and they spoke for eight minutes.  SW-3 called Aprahamian back later that day and they spoke for another nine minutes.

1729.  On May 28, 2013, NC Mutual e-mailed Taro, stating that it had received an offer from Sandoz and asked whether Taro planned to lower its price to retain the business.  E.G., a Taro sales executive, suggested that Taro defend the account, but Aprahamian disagreed.

1730.  Two days after the e-mail, on May 30, Aprahamian called SW-3 again. The call lasted approximately one minute.

1731.  On June 4, 2013, Taro circulated an internal spreadsheet tracking its customer additions and deletions for May for various products.  With respect to Nystatin Triamcinolone Cream, Taro noted that it no longer had the Omnicare, ABC, Rite Aid, and Walgreens accounts.

1732.  Despite Sandoz's entry, prices for NT Cream remained extremely high. Around this same time, K.S., a policy executive at Taro, sent an internal e-mail to J.J., Perfetto, and Aprahamian asking about the situation.  J.J. replied that Kaiser had begun to provide some financial relief to its patients because of the high cost.

1733.  Following Sandoz's re-entry into the NT Cream market, Sandoz executives began discussing a larger scheme which involved Sandoz leaving various markets, temporarily, while Taro would raise prices.[42]

1734.  The rationale was simple – allow Taro to grow the profits in these markets by increasing prices, and then Sandoz could re-enter later at the higher prices, in co-ordination with Taro.  Sandoz referred to the example of NT Cream, in particular, as the suggested approach, and further noted that this would help Taro increase its profitability on other products, in repayment for Taro's willingness to give up market share to Sandoz on its most lucrative product.

---

[42] This also camouflaged the scheme, such that prices went up while there was an apparently-legal monopoly, and customers were less likely to notice that they just didn't go back down once Sandoz came back into the market.

1735.  Indeed, a chart from a Credit Suisse Investor report graphically illustrates the success of such an approach, showing the price increases taken by Taro on NT Cream while Sandoz was out of the market, and then Sandoz's re-entry at the higher price.

1736.  After its resounding success with NT Cream, Sandoz began readying to re-enter the NT Ointment market in November, 2013.  Sandoz executives, including Kellum, wanted to model the NT Ointment launch after the NT Cream launch by targeting the same customers as it had for NT Cream.  Kellum specifically discussed this approach with SW-1.

1737.  On November 13 and 15, 2013, Aprahamian and SW-3 exchanged several calls, during which they discussed the NT Cream and Ointment markets and co-ordination for Sandoz's upcoming entry into the the NT Ointment market.  SW-3 then reported what he discussed on those calls to SW-1, as detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duratio |
|---|---|---|---|---|---|---|
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 8:00:00 | 0:01:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:15:00 | 0:02:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:32:00 | 0:08:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:33:00 | 0:08:00 |
| 11/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:41:00 | 0:11:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:55:00 | 0:01:00 |

1738.  During his calls with Aprahamian, SW-3 took contemporaneous notes in his Notebook regarding both NT Cream and Ointment.

1739.  On these calls, SW-3 and Aprahamian discussed Sandoz's plan to target the same customers that it had targeted on NT Cream – ABC, Walgreens, Rite Aid, and Omnicare.  SW-3 drew an arrow from the customers listed under NT Cream to the NT Ointment pricing to illustrate this.  As he had done before, Aprahamian agreed that Taro would not defend those customers and provided SW-3 with Taro's pricing at those accounts.

1740.  On November 22, 2013, Aprahamian called SW-3 and they spoke for approximately five minutes.  That same day, Sandoz re-entered the NT Ointment market and matched Taro's increased WAC pricing.

1741.  The next day, on November 23, 2013, P.G., a senior Sandoz executive, e-mailed Kellum and D.P. regarding the NT Ointment re-launch.  P.G. asked who the other competitors were in the market and how much share Sandoz planned to target.

1742.  Per their cartel agreement, Sandoz submitted offers to ABC, Walgreens, Rite Aid, and Omnicare.  Within five weeks' time (*i.e.*, by the end of that December), Sandoz had – as agreed – targeted and secured the NT Ointment business at ABC, Walgreens, Rite Aid, and Omnicare.

1743.  No shortages or other market features can explain Defendants' price increases for generic NT Cream and Ointment during the Relevant Period.

1744.  The elevated prices of generic NT Cream and Ointment resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1745. The unlawful agreements between Defendants Taro and Sandoz regarding NT Cream and Ointment were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AW. Doxycycline Hyclate

1746. Doxycycline Hyclate is a tetracycline-class antibiotic used to treat a variety of bacterial infections. This medication is also used to prevent malaria. Generic Doxycycline Hyclate is produced in a regular-release formulation ("Doxy RR") and in a delayed-release formulation ("Doxy DR").

1747. As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Doxycycline Hyclate as follows:

### 1. Doxy RR

1748. Sun, Actavis, and West-Ward, as well as late entrants Mylan and Par, dominated the market for Doxy RR during the Relevant Period.

1749. Throughout 2012, Sun, Actavis, West-Ward, Par, and Mylan attended a number of trade events where they met and discussed the pricing of Doxycycline Hyclate.

1750.  In late 2012, a period during which Heritage and Sun were intensely communicating and co-ordinating pricing for Nimodipine (as discussed *supra*, including at trade events), Sun imposed dramatic price increases on its Doxy RR products.  West-Ward and Actavis quickly followed suit.

1751.  These price increases were abrupt, very substantial, nearly identical, and nearly simultaneous. Within a two-week period, Sun, West-Ward and Actavis raised the list (WAC) prices on their Doxy RR products by more than 2000%.

1752.  The dramatic price increases followed a period of relatively low and stable pricing for Doxy RR.  No shortages or other market changes can explain the extraordinary price increases imposed by Sun, West-Ward and Actavis.

1753.  Defendant manufacturers of Doxycycline Hyclate continued to meet regularly at trade events after the initial price hikes.  *See* Exhibit 1.

1754.  When Defendants Par (through DAVA) and Mylan entered the market, rather than trying to gain market share by undercutting the pricing of the incumbent manufacturers (as would have happened in a competitive market), they priced their Doxy RR at similarly elevated prices because of Defendants' "fair share" agreement.

1755.  No shortages or other market features can explain Defendants' price increases for Doxy RR during the Relevant Period.

1756.  The elevated prices of Doxy RR resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at

these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1757.  The unlawful agreement between Sun, Actavis, West-Ward, Mylan, and Par regarding Doxy RR was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## 2.    Doxy DR

1758.  Mylan and Heritage dominated the market for generic Doxy DR during much of the Relevant Period.  Heritage began selling Doxy DR on July 2, 2013.  At that time, Mylan was the only other seller of generic Doxy DR.  Mayne entered the Doxy DR market in 2014.

1759.  Even before entering the market, Heritage contacted Mylan about refraining from price competition.  Heritage did not want Doxy DR prices to erode when it entered the market. Mylan also wanted to maintain its prices.  Consistent with their overarching "fair share" agreement, both Heritage and Mylan understood that co-operation and co-ordination was required to maintain Doxy DR prices.

1760.  In April of 2013, Heritage's Malek and its CEO Glazer traveled to India to meet their bosses at Heritage's Indian-based corporate parent, Emcure:  Emcure CEO Mehta and Emcure President Thapar.  The purpose of the trip was to discuss the workings of Heritage's plans to enter the Doxy DR market.  These meetings

included discussions about how to co-ordinate with Mylan so as to minimize the competition between the two companies for Doxy DR.

1761.   During these discussions, it was decided that in order to work out an agreement between Heritage and Mylan relating to (at least) Doxy DR, Mehta would reach out to Rajiv Malik, a high-level counterpart at Defendant Mylan, in order to facilitate communication between Glazer, Malek and their Mylan counterparts.

1762.   After returning to the U.S., on or about May 3, 2013, Heritage's Malek tried to set up a call with the Vice-President of Sales at Mylan.  Malek learned, however, that the Vice-President of Sales had little to do with National Accounts and was instead directed to the person at Mylan who did have responsibility for such accounts.  On information and belief, that person was Jan Bell, who was a Senior Key Account Manager at Mylan from September of 2010, to January, 2013, and served thereafter as Director of National Accounts at Mylan.

1763.   Malek promptly contacted Bell through LinkedIn.  Malek and Bell communicated by phone on multiple occasions and continued to communicate about various drugs, including Doxy DR.

1764.   While Malek was in contact with Bell, other Heritage employees began reaching out to their counterparts at Mylan to discuss Doxy DR and other drugs. For example, beginning on or about May 7, 2013, Glazer e-mailed Mylan's President and Executive Director, Malik. He copied both Mehta and Thapar at Emcure on the e-mail.  Malik responded to Glazer's e-mail with a phone number where he could be

reached in England, and the two spoke the next day, when they confirmed their agreement to refrain from competing in the Doxy DR market.

1765.  Glazer told Malik that Heritage intended to pursue two of Mylan's large Doxy DR customers (wholesaler McKesson and retail pharmacy CVS), who collectively made up 30% of the market.  Glazer further told Malik that Heritage wanted to gain market share without lowering the pricing of Doxy DR.

1766.  In accordance with the terms of Defendants' overarching conspiracy, Malik agreed with Glazer that Mylan would give up its accounts with McKesson and CVS, while Heritage would work with Mylan to keep the prices of Doxy DR elevated. In the course of these communications with Glazer, Malik made clear that Mylan was willing to enter into this agreement relating to Doxy DR because Heritage had, in the past, abided by its "fair share" agreements with Mylan on other drugs.

1767.  Malik told Glazer that he would inform others at Mylan about their agreement.  Glazer also kept Heritage's Malek informed about his conversations with Mylan.  In the months following Malik and Glazer's agreement, Mylan surrendered the McKesson and CVS accounts to Heritage.

1768.  By allocating the McKesson and CVS accounts in the Doxy DR market, Mylan and Heritage were able to artificially maintain Doxy DR prices across the market.  In a competitive market, Heritage's entry would have spurred price competition across all customers, which would have lowered market prices.  By

foregoing this competition, Mylan and Heritage kept Doxy DR prices higher than they otherwise would have been.

1769.  As discussed above, beginning in July of 2013 and continuing through July of 2014, Heritage had at least 513 different contacts with various generic drug manufacturers about the pricing of Drugs at Issue, including Doxycycline Hyclate.  In addition, Defendants had the opportunity to discuss Doxy DR and other drugs while attending industry meetings.  *See* Exhibit 1.

1770.  Following a number of spring and summer trade meetings in 2013, a series of inter-competitor communications led to anticompetitive agreements relating to multiple Drugs at Issue.

1771.  For example, on June 11, 2013, an employee from Mylan (possibly Aigner or Nesta) called an employee at Heritage (likely O'Mara).  They spoke for about 10 minutes.  Immediately after the telephone call, the Heritage employee called Malek and left a voicemail providing a report.  Malek called the employee back fifteen minutes later and they spoke for approximately seven minutes.

1772.  That same day, Heritage was also in contact with other generic drug manufacturers, who in turn communicated with other Defendants, including Par and Mylan.  The next day, June 12, 2013, while Defendants were also discussing pricing for at least Doxy DR, Defendant Lannett increased the prices for Doxy Mono, consistent with Defendants' conspiracy to raise and maintain prices.

1773.  On June 18, 2013, a senior manager at Wholesaler A (likely McKesson) contacted a Mylan employee to inform him that Wholesaler A received an unsolicited bid for Doxy DR from a new entrant (Heritage). Mylan was asked to submit a bid by the close of business on June 21, 2013, to retain the business with the wholesaler. Consistent with its agreement to cede its Doxy DR business to Heritage, Mylan failed to submit a counterbid.

1774.  On June 27, 2013, following Mylan's failure to bid, Heritage entered into a distribution agreement with Wholesaler A for Doxy DR.

1775.  The conversations among Defendants continued throughout 2013.  A few weeks later, in July, when Heritage began selling Doxy DR, Heritage contacted Mylan three times and Sun once.  Heritage spoke with Mylan once and Sun twice in August; spoke with Sun once in October; and with Mylan once in November.

1776.  On July 8, 2013, Heritage submitted a proposal to a pharmacy (likely CVS) to obtain Doxy DR business.  The next day, the pharmacy rejected the proposal as being too high.  Heritage submitted a revised bid to the pharmacy on July 11, 2013. During this time, Heritage and its parent, Emcure, continued to communicate with Mylan to make sure Mylan was committed to their Doxy DR agreement.

1777.  As part of this effort, Heritage CEO Glazer's boss at Emcure, CEO Mehta, spoke to Malik, Mylan's President and Executive Director, on July 18, 2013. Information about the call was communicated to Glazer by an Emcure employee shortly after Mehta and Malik spoke.

1778.  In response, Glazer e-mailed Mylan President and Executive Director Malik trying to schedule a phone call that day.  Malik told Glazer they could speak in the evening, and later that evening, Malik left Glazer a voice-mail.  Fifteen minutes later, Glazer returned Malik's call and they spoke for approximately four minutes. During the call, Glazer informed Malik of Heritage's strategy with respect to at least Doxy DR and its bid to the pharmacy.

1779.  In response to this conversation, Malik immediately spoke to certain Mylan employees, and ultimately, Mylan walked away from the pharmacy customer in order to avoid price erosion.

1780.  The following month, in August, 2013, Mylan was contacted by an executive at the pharmacy and was told that the pharmacy had received an unsolicited bid for Doxy DR. Mylan was given a chance to submit a counterbid.  In response, Mylan submitted a bid with pricing that it knew would be too high to retain the business.  When Mylan was given a second opportunity to lower its pricing, Mylan failed to submit a revised bid, consistent with its agreement with Heritage.  A month later, in September of that year, the pharmacy gave its Doxy DR business to Heritage.

1781.  The business obtained from Wholesaler A and the pharmacy accounted for more than 80% of Heritage's Doxy DR business.  Heritage maintained that business for years afterwards.

1782.  After Heritage obtained the pharmacy's business, on several occasions Heritage walked away from other Mylan customers in accordance with their agreement with Mylan and the terms of Defendants' overarching conspiracy.

1783.  For example, in November of that year (2013), Heritage did not pursue a certain large account (likely Walmart) because the large account was Mylan's customer and was not allocated to Heritage.

1784.  The anticompetitive conversations and agreements continued, including when Mayne prepared to enter the Doxy DR market a couple of months later.  On January 7, 2014, about a month before Mayne's entry into the Doxy DR market, a Heritage employee (likely Sather) and an employee at Mayne had a 12-minute telephone conversation about agreeing not to compete in the market for Doxy DR.

1785.  These conversations continued throughout 2014, with the Heritage employee, likely Sather, continuing to communicate with the Mayne employee, likely Gloria Peluso-Schmid (Mayne's Director of National Accounts at that time), via text messages, e-mail, and including telephone conversations on March 13 and 17.  The Heritage employee e-mailed and texted Malek, providing him with the information on Mayne's market share and strategy that she had obtained.  The shared goal of Heritage and Mayne was to maintain pricing within the Doxy DR market.

1786.  After Mayne entered the market, it initially avoided competing with Heritage and instead targeted customers of Mylan.  In one such instance, Mayne made a bid to a large wholesaler where Mylan was the incumbent provider and the

wholesaler asked Heritage to also submit a bid.  Heritage declined, honoring its on-going agreement with Mylan, and provided a false, pretextual reason (inadequate supply) to the wholesaler.  Malek knew Heritage had sufficient supply of Doxy DR to fulfill a bid, but instructed Heritage not to submit a bid in order to honor Heritage's agreement with Mylan.

1787.  Two months later, in March of 2014, Sather continued to communicate with her contact at Mayne about Doxy DR, communicating via telephone on March 13, briefly, and on March 17 for 17 minutes.

1788.  At the end of March, Mayne presented a bid to one of Heritage's nationwide pharmacy accounts.  This led to telephonic, e-mail and text discussions between Mayne and Heritage over the next several months, including on April 1, 2014, when Heritage's Sather and a Mayne employee spoke for approximately 27 minutes. After the call, Sather and Malek exchanged text messages, likely about the substance of the conversation.

1789.  Sather and a Mayne employee spoke again the next day for 11 minutes. The same day, Malek e-mailed CEO Glazer to provide an update on negotiations with Mayne.  Sather and a Mayne employee spoke for three minutes on April 9, 2014, and the next day exchanged multiple text messages. Sather reported these conversations to employees of Heritage, including at least Malek.

1790.  Ultimately, because of the agreement between Heritage and Mayne not to compete in the market for Doxy DR, Heritage was able to retain the pharmacy

customer at prices that were significantly higher than they would have been in a competitive market.

1791.  In May, 2014, it was Mayne's turn.  Instead of competing on price, Heritage walked away from a customer being pursued by Mayne.

1792.  Likewise, in August, 2014, consistent with its agreement with Mylan, Heritage again refused to bid on an RFP issued by a Mylan customer.

1793.  In November of 2014, Mayne made offers to the One Stop Program of McKesson Corporation ("McKesson") (a wholesaler) and Econdisc Contracting Solutions ("Econdisc") (a group purchasing organization ("GPO") that includes Express Scripts, Kroger, and Supervalu).  Malek contacted personnel at Mayne to discuss the situation and raised the idea that Heritage and Mayne could allocate customers by having Mayne withdraw its offer to McKesson.  Malek worked out an agreement with Mayne by November 25, 2014, which Glazer subsequently confirmed. Follow up communications occurred in December of 2014 by text message and an in-person meeting at a conference of the American Society of Health-System Pharmacists held on December 9, 2014.

1794.  The agreement resulted in higher prices for Doxy DR.  When Econdisc put its business out for bid again in January, 2015, Heritage deliberately bid a higher price than Mayne, fulfilling its agreement to walk away from the Econdisc business. Likewise, when Heritage was requested to submit a bid by a large nationwide

pharmacy chain in September of 2015, it declined to do so after learning that Mayne was the incumbent supplier.

1795.  The agreements between Mylan, Heritage and Mayne described herein caused prices for Doxy DR to be higher than they would have been in a competitive market and prevented price erosion that would have occurred in such a market.

1796.  No shortages or other market features can explain Defendants' elevated pricing for Doxy DR during the Relevant Period.

1797.  The elevated prices of Doxy DR resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1798.  The unlawful agreement between Heritage, Mayne, and Mylan regarding Doxy DR was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## AX.   Ethambutol HCL Tablets

1799.  Generic Ethambutol HCL Tablets ("Ethambutol") are used to treat tuberculosis.  In 2012, Lupin, VersaPharm, G&W and Teva sold generic Ethambutol.

1800.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Ethambutol, as follows:

1801.  By late 2012 and early 2013, both VersaPharm and Teva were experiencing supply issues on Ethambutol.  Viewing this as an opportunity, Lupin and G&W colluded to significantly raise price on the product while their fellow cartel members were out of the market.

1802.  In November and December of 2012, Orlofski and Vogel-Baylor at G&W exchanged several calls with David Berthold at Lupin to discuss Ethambutol. At the same time, Berthold was keeping Kevin Green, a sales executive at Teva, apprised of his discussions with G&W.

1803.  For example, on November 15, 2012, Orlofski exchanged at least eight text messages with Berthold.  The next day, on November 16, 2012, Orlofski and Berthold spoke for nearly 12 minutes.  Shortly thereafter, Berthold spoke three separate times with Green, with the calls lasting five minutes, ten minutes, and five minutes, respectively.

1804.  That same day, G&W reached out to several VersaPharm customers, including Econdisc, HealthTrust, and FW Kerr, to inquire whether they were interested in a new supplier for Ethambutol due to VersaPharm's supply issues.

1805.  Over the next month, Berthold continued to exchange numerous calls and text messages with Vogel-Baylor and Orlofski during which they discussed a co-ordinated price increase on Ethambutol.  These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:29 | 0:00:00 |
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:33 | 0:00:00 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 12:55:26 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:24:13 | 0:07:55 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:31:57 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:57:55 | 0:03:11 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:34 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:36 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:04 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:08 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:15 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:19 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:46 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:48 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:28 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:33 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:44 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:45 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:03 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:08 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:21:48 | 0:00:00 |
| 12/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:22:36 | 0:00:03 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:57:26 | 0:00:00 |

1806.  On December 9, 2012, the day after the final call listed above, J.G., a finance executive at Lupin, e-mailed Berthold at 3:41 p.m.  Three minutes later, at 3:44 p.m., Berthold called Orlofski.  The call lasted less than one minute.  The next day, on December 11, 2012, Berthold called Vogel-Baylor and they spoke for approximately five minutes.  A short time later, Orlofski sent a text message to Berthold and they exchanged two more calls that day, including another one lasting approximately five minutes.

1807.  On December 17, 2012, K.W., a Lupin sales executive, sent an internal e-mail including to Berthold, attaching the price increase letters for Ethambutol that Lupin planned to send on December 18, 2012.  Between December 17 and December

19, Berthold again exchanged several calls and text messages with Orlofski and Vogel-Baylor.  These are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 12/17/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:32:53 | 0:00:14 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:48:43 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:51:13 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:44 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:48 | 0:00:00 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 8:19:40 | 0:00:02 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:54:06 | 0:00:25 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 11:56:05 | 0:00:58 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:12:46 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 15:13:09 | 0:00:07 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:56:16 | 0:13:10 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 16:56:44 | 0:04:12 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:06:52 | 0:04:52 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:25:24 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:30:08 | 0:04:19 |

1808.  Immediately after the turn of the year, on January 2, 2013, Orlofski e-mailed Vogel-Baylor suggesting that they discuss the Ethambutol price increase during their meeting scheduled for the next day.  That same day, Vogel-Baylor called Berthold and they spoke for approximately ten minutes.  Later that evening, Vogel-Baylor e-mailed Orlofski a price increase analysis for Ethambutol.

1809.  The next day, January 3, 2013, a customer, HEB, e-mailed C.M., a sales executive at G&W, to advise him that VersaPhaim was out of the market.  C.M. responded that he was aware.  The same day, Vogel-Baylor exchanged at least four calls with Berthold, including one lasting approximately four minutes.

1810.  On January 14, 2013, another customer, Morris & Dickson, e-mailed Lupin asking for a bid on Ethambutol.  The customer explained that both VersaPhaim and Teva were having supply issues.  That same day, Orlofski sent a text

message to Berthold.  Berthold also called Green at Teva and they spoke for nine minutes.

1811.  On January 28, 2013, the manufacturer of G&W's authorized generic, STI, e-mailed Vogel-Baylor to tell her that it would be shipping Ethambutol to G&W the following day. Vogel-Baylor then forwarded the e-mail to Orlofski. Later that day, Vogel-Baylor sent her Ethambutol price increase analysis to the sales team and asked them to draft letters to their customers advising them of the increases.  The next day, on January 29, 2014, Orlofski sent a text message to Berthold and Berthold spoke two times with Green of Teva by phone; both calls lasted a few minutes.

1812.  On January 31, 2013, Vogel-Baylor called Berthold and they spoke for three minutes.  The next day, on February 1, 2013, Vogel-Baylor called Berthold again.  Berthold returned the call and they spoke for five minutes.  The following Monday, on February 4, 2013, Vogel-Baylor e-mailed Orlofski to inform him that G&W planned to send the Ethambutol price increase letters on February 7, 2013 and would call customers in advance to advise that they would be coming.

1813.  Consistent with the plan, on February 6, 2013, G&W reached out to its customers to advise them of the Ethambutol increases. As Vogel-Baylor explained in her e-mail to Wal-Mart.

1814.  Berthold continued to communicate with Orlofski and Vogel-Baylor over the next several weeks. For example, on February 19, 2013, Vogel-Baylor and

Berthold had a joint dinner with representatives from two customers – ABC and Kroger.

1815.  On April 1, 2013, STI began notifying customers that it was terminating its relationship with G&W regarding Ethambutol.  STI advised that it would be taking over the marketing and distribution of the product effective April 15, 2013.  Between April 2, 2013 and April 15, 2013, Berthold exchanged several calls with Orlofski and Vogel-Baylor. The calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 10:38:29 | 0:00:03 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 10:38:57 | 0:03:49 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:48:27 | 0:00:07 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:19 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:18 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 20:47:56 | 0:00:04 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:04:58 | 0:03:24 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:24:05 | 0:00:08 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:24:29 | 0:02:27 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:33:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:35:51 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:48:32 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:49:08 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:49:40 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:50:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:50:42 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:51:24 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:37:55 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:38:21 | 0:00:00 |

1816.  Notably, after April 15, 2013, the date of the last two text messages listed above, Berthold and Vogel-Baylor would never communicate by phone again, according to available phone records.

1817.  No shortages or other market features can explain Defendants' price increases for generic Ethambutol during the Relevant Period.

1818.  The elevated prices of generic Ethambutol resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1819.  The unlawful agreement among Defendants G&W, and Lupin, regarding generic Ethambutol, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## AY.   Oxacillin Sodium and Nafcillin Sodium Injectable Vials

1820.  Generic Oxacillin Sodium ("Oxacillin") and generic Nafcillin Sodium ("Nafcillin") are separately marketed antibiotics used to treat infections caused by penicillin-resistant staphylococci, among other bacteria.

1821.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Oxacillin and Nafcillin, as follows:

1822.  In 2012, Sagent Pharmaceuticals and Sandoz dominated the markets for Oxacillin and Nafcillin.  However, in December, 2012, Aurobindo began making plans to enter the Nafcillin and Oxacillin markets as a third entrant.

1823.  In advance of Aurobindo's entry into those markets, on December 26, 2012, for Nafcillin and January 22, 2013, for Oxacillin, CW-6 and CW-3 spoke several

times to discuss pricing and the allocation of market share to the new entrant, Aurobindo.  All the while, CW-6 kept his supervisor, Grauso, informed of his conversations with CW-3.

1824.  For example, on December 12, 2012, CW-6 called Grauso and they spoke for five minutes. That set off a flurry of phone calls between CW-6 and CW-3, with nearly constant reporting back by CW-6 to his supervisor, Grauso, as the two orchestrated how to avoid competition upon Aurobindo's entry:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:21:00 | 0:05:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:25:00 | 0:01:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:26:00 | 0:03:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:28:00 | 0:02:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 11:41:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:05:00 |

1825.  Two weeks later, on December 26, 2012, Aurobindo received FDA approval to market Nafcillin and published WAC pricing that essentially matched Sandoz's WAC pricing.  On the date that Aurobindo received approval, and in the days surrounding the launch, CW-6 spoke several more times with CW-3 during which they discussed the launch.  As he had done before, CW-6 reported back to Grauso what they had discussed.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 9:29:00 | 0:03:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:46:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 12:26:00 | 0:08:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:49:00 | 0:02:00 |
| 12/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 16:49:00 | 0:02:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Aurobindo Pharma | 3:19:00 | 0:13:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:39:00 | 0:11:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:24:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:51:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:32:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 8:01:00 | 0:04:00 |

1826.  The calls between Sandoz and Aurobindo continued into January.  On January 3, 2013, CW-6 spoke with Grauso three times for a total of 25 minutes.  Twenty minutes later, CW-3 called CW-6.  The call lasted two minutes.  The next morning, CW-6 spoke with Grauso for four minutes.  That same morning, CW-6 called CW-3 (Sandoz) twice, with one call lasting three minutes.

1827.  Two days later, on January 6, 2013, Sandoz put together a Monthly Business review regarding its key products, including Nafcillin and Oxacillin.  Regarding Oxacillin, Sandoz noted that Aurobindo was going to be entering the market.

1828.  Over the next several days, between January 7, 2013 and January 11, 2013, CW-6 and CW-3 spoke several more times by phone.  After those calls, CW-6 promptly called Grauso to keep him apprised of his discussions.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:44:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:06:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:00:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:11:00 | 0:14:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:37:00 | 0:06:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:32:00 | 0:08:00 |

1829.  Two weeks later, on January 22, 2013, Aurobindo entered the Oxacillin market and again published WAC pricing that essentially matched Sandoz's WAC pricing.  That same day, CW-6 spoke with Grauso for ten minutes.  Ten minutes after hanging up, CW-6 called CW-3 of Sandoz.  The call lasted one minute.  Over the next two days, CW-6 and CW-3 shared five more phone calls.

1830.  In an e-mail dated January 30, 2013, Sandoz noted that it had conceded its Oxacillin contract at Walgreens to the new entrant, Aurobindo. That same day, CW-3 and CW-6 spoke by phone for four minutes.

1831.  No shortages or other market features can explain Defendants' price increases for generic Oxacillin and Nafcillin during the Relevant Period.

1832.  The elevated prices of generic Oxacillin and Nafcillin resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1833.  The unlawful agreement among Defendants Sandoz and Aurobindo, regarding generic Oxacillin and Nafcillin, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### AZ.   Doxycycline Monohydrate

1834.  Like Doxy RR and Doxy DR, Doxycycline Monohydrate ("Doxy Mono") is an antibiotic and is used in treating a variety of bacterial infections, and also to prevent malaria.

1835.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Doxycycline Monohydrate at least as follows:

1836.  During the Relevant Period, Heritage, Lannett, Mylan, and Par dominated the market for Doxy Mono tablets.

1837.  In February, 2013, Heritage believed that demand for some doxycycline products was increasing, and wanted to use this as a pretext to raise the price of Doxy Mono.  In accordance with Defendants' cartel agreement, Heritage began reaching out to Lannett, Mylan, and Par to co-ordinate a price increase for Doxy Mono.  As discussed elsewhere in this Complaint, these pricing discussions occurred at the same

time as Heritage and Dr. Reddy's were discussing pricing and market share for at least Zoledronic Acid and Meprobamate, as well.

1838.  Starting in March of 2013, Heritage's Sather began communicating with Lannett about pricing for at least Doxy Mono.  On March 7, 2013, Heritage's Sather spoke to Lannett's Sullivan for approximately a quarter-hour about an opportunity Heritage had at Cardinal. (a large purchaser)

1839.  Six days later, on March 13, 2013, Sather sent an e-mail to Sullivan (at Lannett) about pricing for at least Doxy Mono.  They spoke for five minutes later the same day, again about pricing.

1840.  On March 21, 2013—the same day that Malek instructed O'Mara and Edelson to seek a price increase on Meprobamate from Dr. Reddy's (discussed below)—Malek decided he also wanted to increase the price of Doxy Mono by four times the current price. He consulted with Glazer about the price increase.

1841.  On March 25, 2013, a Lannett employee – likely Tracy Sullivan – sent an e-mail to her boss at Lannett to provide an update on her conversations with Heritage about price increases for certain drugs, including Doxy Mono.  Lannett's Sullivan and Heritage's Sather communicated about Doxy Mono by phone, text message, and in-person meetings over the next several months.

1842.  That same day, March 25, 2013, Malek sent an email to his sales team discussing Heritage's price increases for at least Doxy Mono and another drug—likely Meprobamate or Zoledronic Acid.

1843.  Heritage's Sather continued to "socialize" the idea of a Doxy Mono price increase; for example, she called Lannett's Sullivan and left a message on April 25, 2013.  Sullivan returned her call the next day; they spoke for about eight minutes.

1844.  As discussed above, while Heritage's NAM's were speaking with competitors about Doxy Mono, in April of 2013, Heritage's Malek and CEO Glazer were in India meeting with their bosses at Heritage's corporate parent, Emcure: Emcure's CEO Mehta and President Thapar discussing, among other things, how Heritage and Mylan could minimize competition and avoid price erosion when Heritage entered the Doxy DR market.  And as discussed above, Emcure's CEO Mehta decided to reach out to Mylan's President and Executive Director ("ED") Malik to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

1845.  Consistent with how the overarching conspiracy operated, throughout the rest of 2013, Heritage spoke with its competitors about pricing for a number of drugs, including Doxy Mono.  These communications often overlapped with trade association meetings.  For example, on May 14, 2013, the day after Lannett's Sullivan and Heritage's Sather spoke for a few minutes, the two attended a conference together where they spoke in person and exchanged text messages discussing at least Doxy Mono.

1846.  On June 4, 2013, Sather called and texted an employee at Lannett, likely Sullivan.  While Sather was exchanging text messages with this Lannett employee, she

was attending the HDMA's June 2-5, 2013, Business and Leadership Conference in Orlando, Florida.  That conference was attended by key executives for generic sales and pricing from at least Actavis, Apotex (including Hamilton), Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage (including O'Mara and Sather), Lannett (including Sullivan), Mylan (including Bell, Nesta and Aigner) Par, Sandoz, Sun, Teva, West-Ward and Zydus.  *See* Exhibit 1.

1847.  Defendants agreed to implement price increases for Doxy Mono in the late spring and summer of 2013.  In the lead up to the price increases, the four competitors selling Doxy Mono—Par, Lannett, Heritage, and Mylan—were in frequent communication.

1848.  For example, on June 11, 2013, the day before Lannett's price increase, a Heritage employee (likely O'Mara) spoke with a Mylan employee (believed to be either Aigner or Nesta) for nearly ten minutes. During this same time period, a Lannett employee was communicating with an employee at Par. In turn, this Par employee frequently communicated with a Mylan employee. The Lannett and Par employees were friendly with each other, and frequently spoke in person at trade association conferences, including about competitive information.

1849.  In fact, these employees from Mylan and Par spoke numerous times between June and July 2013.  They had several calls on June 7, 2013 and June 13, 2013—the day after Lannett confirmed that it would increase its prices for Doxy

Mono.  Mylan and Par both increased their prices of Divalproex shortly after these calls, on June 14 and June 26, respectively.

1850.  Further, an employee at Lannett exchanged 9 text messages with a competitor on June 11-12, 2013.

1851.  Heritage was concerned about supply issues for Doxy Mono in 2013, and thus was cautious about the Doxy Mono price increases.  In a competitive market, supply challenges for one supplier create competitive opportunities for other suppliers.  But Defendants' "fair share" agreement aimed to mitigate these risks of competition and disruption.  Accordingly, Sather kept in frequent communication with Lannett during this period to stay abreast of any developments, and to reaffirm Heritage's commitment to their agreement.

1852.  Sather also met with a Par employee while at a conference in Arizona on August 1 and 2. Following Sather's meeting with Par in Arizona, there was a flurry of communications between Par, Mylan, Lannett, and Heritage about at least the pricing of Doxy Mono.

1853.  The NACDS Total Store Expo in Las Vegas, Nevada, on August 10-13, 2013, was attended by numerous Defendants, including those known to have exchanged pricing and customer information throughout the Relevant Period, including:  Apotex (Hamilton), Aurobindo (Cunard), Citron, Dr. Reddy's, Glenmark, Heritage (Glazer, Malek, O'Mara, and Sather), Lannett (Sullivan), Mylan (Nesta,

Aigner), Par, Perrigo, Sandoz, Sun (Knoblauch), Taro, Teva, West-Ward and Zydus (Lukasiewicz).

1854.  Just as their convergence at the HDMA trade show in June led to many anticompetitive, inter-competitor communications, Defendants' attendance at the Total Store Expo facilitated discussions about market allocation and pricing for the Drugs at Issue.

1855.  For example, when Malek asked Sather to obtain specific information about Lannett's price increase for Doxy Mono, Sather used the Total Store Expo as an opportunity to meet in person with Lannett's Sullivan.

1856.  On August 12, 2013, after meeting in person at the conference, and in response to a directive from her boss Malek, Heritage's Sather sent a text message to Lannett's Sullivan.

1857.  The next day, August 13, 2013, while still at the Total Store Expo, Sather and Sullivan texted again.  Sather also exchanged several text messages and phone calls with another employee at Lannett.  In addition, a Lannett employee also sent a text message to an employee at Par.

1858.  Later in the evening of August 13, an employee at Par sent an internal e-mail, which was then circulated at Par.  The e-mail included information about pricing agreements on the prices of Doxy Mono and other drugs.

1859.  A week after Par's internal discussion, on August 20, 2013, Heritage's Sather e-mailed Malek and confirmed Lannett's agreement related to the pricing of Doxy Mono.

1860.  By March of 2014, Heritage increased its Doxy Mono price to at least one customer and was working on a much larger across-the-board price increase on Doxy Mono, as well as price increases on several other drugs.

1861.  As discussed above, on April 22, 2014, Malek held a teleconference with Heritage's sales team to discuss the strategy for implementing price increases for numerous drugs, including Doxy Mono.

1862.  Malek and the Heritage NAM's took responsibility for communicating with specific Defendants about specific drugs, including Sather, who, among her other assignments, was responsible for communicating with Lannett about Doxy Mono.

1863.  Right after the Heritage conference call on April 22, Sather had a half-hour phone conversation with Lannett's Sullivan about pricing for Doxy Mono and calls with two other competitors on the same topic.  Through these discussions, Sather reached a number of pricing agreements covering Doxy Mono and at least four other drugs, including Glyburide-Metformin, Verapamil, Nystatin, and Paromomycin.

1864.  Similarly, on April 23, O'Mara, the employee at Heritage who was primarily responsible for communicating with Mylan, contacted a counterpart at Mylan (likely either Aigner or Nesta) and obtained an agreement to raise prices on Doxy Mono (as well as Glipizide-Metformin and Verapamil).  Immediately after

speaking with Mylan, O'Mara sent an e-mail to Malek, advising Malek of O'Mara's discussions with Mylan.

1865.  On May 8, 2014, Malek requested an update on discussions with competitors.  Sather responded to Malek's e-mail, providing an update on her communications with three Defendants about five drugs, including her conversations with Sullivan at Lannett about Doxy Mono.

1866.  Shortly thereafter, on May 14, 2014, Sather attended the MMCAP National Member Conference where she was able to confirm, among other agreements, an agreement with Lannett on Doxy Mono pricing.  Sather also secured agreements with at least Aurobindo on Glyburide, Glyburide- Metformin, and Fosinopril-HCTZ, and with Sandoz on Fosinopril-HCTZ.

1867.  No shortages or other market features can explain Defendants' price increases for Doxy Mono during the Relevant Period.

1868.  The elevated prices of Doxy Mono resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1869.  The unlawful agreement between Heritage, Lannett, Mylan and Par regarding Doxy Mono was part of Defendants' overarching conspiracy to

unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**BA.   Ciclopirox Solution**

1870.  Ciclopirox Solution is an antifungal medication used to treat fungal infections of the fingernails and toenails.

1871.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Ciclopirox Solution, as follows:

1872.  As of January 2013, Perrigo and G&W were the two dominant suppliers of Ciclopirox Solution, with 46% and 41 % share of the market, respectively. Sandoz had 7% share and the remaining 5% of the market was split among Hi-Tech, Harris Pharmaceutical, and Versapharm.

1873.  Between April 20 and April 23, 2013, representatives from Perrigo, G&W, and Sandoz attended the NACDS 2013 Annual Meeting in Palm Beach, Florida ("NACDS 2013").  During the conference, the attendees had many opportunities to interact with each other at various programming and social events.

1874.  Vogel-Baylor was among the attendees at NACDS 2013.  Immediately upon returning from the conference, on April 24, 2013, Vogel-Baylor prepared a price increase analysis for Ciclopirox Solution and e-mailed it to Orlofski and R.G., a senior G&W executive.  Vogel-Baylor proposed increasing WAC pricing by 132% – from $16.00 to $37.15.  According to the analysis, the increase would result in over $7.6

million in additional sales revenue to G&W annually.  As noted by his e-mail, R.G. was excited at the prospect of this large price increase.

1875.  The following Monday, April 29, Vogel-Baylor co-ordinated on the price increase with competitors Perrigo and Sandoz.  Vogel-Baylor used CW-6 (then at Aurobindo) as a messenger to communicate with both T.P. of Perrigo and CW-3 of Sandoz.  As discussed above, Vogel-Baylor often used GW-6 as a conduit to convey competitively sensitive information to competitors – even on products that Aurobindo did not sell.

1876.  As detailed further in the chart below, Vogel-Baylor had an early morning phone call with CW-6 onthat day,  April 29, 2013, that lasted four minutes. After that call ended, CW-6 immediately called T.P. and then SW-3.  The phone calls between CW-6 and Vogel-Baylor, T.P., and SW-3 continued throughout the day, and included at least the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:09:00 | 0:04:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 9:13:00 | 0:01:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:14:00 | 0:03:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:17:00 | 0:02:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:29:00 | 0:03:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 9:56:00 | 0:03:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:58:00 | 0:02:00 |
| 4/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:10:19 | 0:00:36 |
| 4/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:19:58 | 1:08:00 |

1877.  After the flurry of calls on April 29, Vogel-Baylor e-mailed J.G., an operations manager at G&W, advising him that she would know the next day whether G&W was going to be able to increase price on Ciclopirox Solution.

1878.  The phone calls between the competitors continued throughout the next day and on May 1, 2013, and included at least the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/30/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:36:00 | 0:01:00 |
| 4/30/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:38:00 | 0:03:00 |
| 4/30/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:45:00 | 0:02:00 |
| 5/1/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:13:36 | 0:00:03 |
| 5/1/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:20:00 | 0:02:00 |
| 5/1/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:22:00 | 0:01:00 |

1879.  On April 30, while speaking with CW-6, SW-3 noted details regarding the amount of the proposed G&W price increase in his Notebook.

1880.  Also on April 30, 2013 SW-3 called his superior at Sandoz, Kellum, five times.

1881.  After her calls with CW-6 on May 1, Vogel-Baylor confirmed to J.G. that G&W would increase the price of Ciclopirox Solution and directed her sales team to start drafting price increase letters to customers.

1882.  The following Tuesday, May 7, 2013, Vogel-Baylor and G&W sales representatives began informing customers about the price increases.  Several customers noted that although the product was available from other manufacturers for a lower price, the customer would wait to see what the market did before making

G&W a secondary supplier.  One customer said pricing had gotten too low and hoped that more manufacturers would increase pricing.

1883.  On May 8, 2013, Vogel-Baylor e-mailed L.S., an account manager at the customer Ahold, to tell her that G&W was implementing a price increase on Ciclopirox Solution.  Ahold was not G&W's customer for the product.

1884.  By the end of the day on May 9, 2013, G&W's customer Rite Aid had sought a bid from Sandoz for Ciclopirox Solution as a result of the G&W price increase.

1885.  CW-4, a Sandoz senior sales executive, received Rite Aid's bid request and forwarded it to Kellum with a short message.  Kellum responded that the bid request was due to a price increase.  C.P., a pricing analyst at Sandoz, asked whether Sandoz should bid for the business.  In accordance with Kellum's reply, Sandoz did not submit a bid for this business.

1886.  While G&W was in the midst of its price increase on Ciclopirox Solution, CW-6 left the industry and was no longer available to serve as a conduit between the co-conspirators.  Going forward, Vogel-Baylor communicated with T.P. directly and use him as a conduit to collude with Sandoz, *via* SW-3.

1887.  On July 30, 2013, T.P. had a 13-minute call with SW-3 at Sandoz and exchanged five phone calls with Vogel-Baylor.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 3:38:00 | 0:03:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:19:00 | 0:01:00 |
| 7/30/2013 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 7:09:00 | 0:13:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 8:58:06 | 0:02:33 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 9:29:00 | 0:10:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 14:29:07 | 0:09:05 |

1888.  That same day, Perrigo prepared price increase letters for Ciclopirox Solution.  Two days later, on Friday, August 1, 2013, Perrigo raised its WAC pricing by 60% -- from $15.00 to $24.00.

1889.  The next Monday, August 5, Perrigo's customer (Kroger) reached out to G&W and asked if would like to bid on Ciclopirox Solution.  In accordance with Defendants' cartel agreement, G&W declined.

1890.  Later in August, Versapharm, a small player with under 1% of the Ciclopirox Solution market, submitted a bid to Cardinal, a G&W customer.  Cardinal reached out to Vogel-Baylor to ask G&W to lower its price.  Vogel-Baylor wanted to keep the business but also thought, consistent with fair share principles, that she may need to give it up to VersaPharm because of its low share.  Vogel-Baylor asked Orlofski, her supervisor, for his direction on this.  Orlofski decided G&W should retain the business, but should use the customer to convey a message to its competitor VersaPharm explaining the fair share understanding and the rules of engagement between generic manufacturers.

1891.  Consistent with Orlofski's recommendation, Vogel-Baylor lowered Cardinal's price on Ciclopirox Solution and sent Cardinal an e-mail.

1892.  No shortages or other market features can explain Defendants' price increases for generic Ciclopirox Solution during the Relevant Period.

1893.  The elevated prices of generic Ciclopirox Solution resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1894.  The unlawful agreement among Defendants Aurobindo, G&W, Perrigo, and Sandoz regarding generic Ciclopirox Solution was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BB. Prochlorperazine Maleate Suppositories

1895.  Generic Prochlorperazine Maleate Suppositories ("Prochlorperazine") are used to treat nausea and vomiting.

1896.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Prochlorperazine, as follows:

1897.  Since at least 2011, G&W and Perrigo have been the only suppliers of generic Prochlorperazine.  Throughout 2011 and 2012, G&W and Perrigo priced Prochlorperazine similarly and maintained a virtually even split of the market.

1898.  In mid-January 2013, Perrigo hired Boothe as an executive.  On January 25, , Orlofski called Boothe for the first time, according to available phone records.

1899.  A little over one month later, on Friday, March 1, 2013, Boothe and Orlofski met for lunch at an Italian restaurant, Al Dente Ristorante, in Piscataway, New Jersey.

1900.  The next business day, on Monday, March 4, 2013, Orlofski met with Vogel-Baylor in his office at 1:00 p.m.  Later that same day, Vogel-Baylor sent an internal e-mail to M.S., a sales analyst at G&W, asking her to run sales reports on Prochlorperazine in anticipation of a price increase. M.S. provided the requested information to Vogel-Baylor on March 5, 2013.

1901.  On March 7, 2013, Vogel-Baylor e-mailed Orlofski a price increase analysis for Prochlorperazine. Vogel-Baylor recommended increasing WAC pricing by 200% from $35.66 to $106.98.

1902.  On March 19, 2013, G&W implemented the 200% increase. That same day, Orlofski called Boothe. The two exchanged two more phone calls later that day, including one call lasting six minutes.  According to available phone records, these were the first calls exchanged between Orlofksi and Boothe since their lunch on March 1.  Orlofski and Boothe exchanged one text message and one more phone call in March 2013 and did not communicate by phone again until six months later, on August 30, 2013.

1903.  On April 11, 2013, Perrigo announced it would also be increasing its WAC price for Prochlorperazine by 200% from $34.85 to $104.55. However, Perrigo waited to notify its customers of the specific changes to its contract pricing until after attending the NACDS 2013 annual meeting.

1904.  The NACDS 2013 annual meeting was held at the Sands Expo Convention Center in Palm Beach, Florida between April 20 and April 23, 2013. Boothe, Orlofksi, and Vogel-Baylor attended the conference and had many opportunities to meet in person to discuss the Prochlorperazine increases at various programming and social events.

1905.  For example, on Sunday, April 21, 2013, Boothe and Orlofski had dinner together with W.S., a representative of Defendant Pfizer.  That same evening, Boothe and Orlofski also attended a wine tasting hosted by Upsher-Smith.  Also on Sunday, Vogel-Baylor told a potential GPO customer that G&W would need to understand who its incumbent supplier for Prochlorperazine was, among other things, before participating in a bid for new business.

1906.  Over the next several days, Perrigo sent out price increase notices to its customers for Prochlorperazine specifying its new contract pricing.

1907.  On May 7, 2013, Associated Pharmacies, a Perrigo customer, e-mailed C.M., a sales executive at G&W, asking for a bid on Prochlorperazine.  C.M. declined to bid on the new business.

1908.  Although G&W turned away this business, a few months later it would take the customer back in retaliation against Perrigo for taking its Target business through McKesson's One Stop program. After trading these accounts, the competitors fell back in line with the agreement. By the fall of 2013, the Prochlorperazine Suppositories market was again virtually evenly split between Perrigo and G&W.

1909.  No shortages or other market features can explain Defendants' price increases for generic Prochlorperazine during the Relevant Period.

1910.  The elevated prices of generic Prochlorperazine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1911.  The unlawful agreement among Defendants G&W and Perrigo, regarding generic Prochlorperazine, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## BC.   Spironolactone HCTZ Tablets

1912.  Generic Spironolactone HCTZ is used to treat high blood pressure.

1913.  At all relevant times, the market for generic Spironolactone HCTZ tablets ("Spironolactone HCTZ") was mature and had multiple manufacturers.  As a result, for years, Spironolactone HCTZ had relatively low and stable pricing.

1914.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain and/or stabilize the prices of all formulations of generic Spironolactone HCTZ tablets as follows, beginning at least as early as January, 2013:

1915.  During the Relevant Period, Defendants Mylan, Sun, and Pfizer/Greenstone dominated the market for generic Spironolactone HCTZ.

1916.  In early 2013, the price of Spironolactone HCTZ radically increased. Within approximately one month, Mylan, Sun and Greenstone each announced list price increases of approximately 400%.

1917.  A little more than a year later, in the summer of 2014, all three manufacturers again raised prices.

1918.  The price chart below shows the very large and parallel price increases for Spironolactone HCTZ by Mylan, Sun and Greenstone.



1919.  Throughout this period, Mylan, Sun and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Spironolactone HCTZ tablets and Defendants' over-arching Fair Share agreement.

1920.  For example, Greenstone, Mylan and Sun all sent representatives to the GPhA Annual Meeting in Orlando, Florida on February 20 to 22, 2013.  All three companies also attended the NACDS 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida, on April 20 to 23, 2013.  During this time-frame, all three cartel members imposed list price increases of more than 400%.

1921.  These companies also communicated directly with each other.  For example, Mylan's Nesta was in frequent contact with Greenstone during the period in

which the two companies coordinated pricing on Spironolactone HCTZ. He exchanged hundreds of telephone calls or text messages with Greenstone's Robin Hatosy from 2011 through 2014, and dozens of phone calls or texts with Greenstone's Nailor between December, 2012, and November, 2015.

1922.  No shortages or other market features can explain Defendants' price increases for generic Spironolactone HCTZ tablets during the Relevant Period.

1923.  The elevated prices of generic Spironolactone HCTZ tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1924.  The unlawful agreement among Defendants Mylan, Sun and Greenstone, regarding generic Spironolactone HCTZ tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BD.   Zoledronic Acid

1925.  Generic Zoledronic Acid belongs to a class of drugs known as bisphosphonates.  It is used to treat high blood calcium levels (hypercalcemia) that may occur with cancer.  Generic Zoledronic Acid is also used with cancer chemotherapy to treat bone problems that may occur with multiple myeloma and

other types of cancer (such as breast, lung) that have spread to the bones.  It is sold in two formulations:  a 5mg injection and a 4mg injection.

1926.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of both formulations of generic Zoledronic Acid injection ("Zoledronic Acid"), at least as follows:

1927.  In early 2013, Heritage began preparing to launch a generic version of the 5mg injection.  It planned to be the first generic entrant in the Zoledronic Acid market.

1928.  Dr. Reddy's was positioned to enter the Zoledronic Acid market shortly after Heritage.

1929.  Par, which did not have an ANDA for Zoledronic Acid, eventually was able to obtain the rights to market and sell Zoledronic Acid using an ANDA obtained by MDL Defendant Breckenridge Pharmaceutical, Inc.  Par entered the market approximately 8 months after Heritage and Dr. Reddy's.

1930.  Being the first generic to the market was atypical for Heritage, and Heritage wanted to work with its competitors so that it could enter the market at a price that would not be challenged by subsequent market entrants.  For that reason, on January 21, 2013, Heritage's Malek instructed O'Mara to reach out to his contact at Dr. Reddy's, VP of Sales and Marketing John Adams, to discuss market strategy and to "socialize" the idea of keeping prices elevated above a competitive level.

1931.  O'Mara attempted to call Dr. Reddy's Adams the next day, but Adams was on a conference call.  When O'Mara informed Malek that Adams was going to call him back later that morning, Malek outlined exactly what he wanted O'Mara to say when he did speak with Adams, including providing O'Mara with a list of questions to ask.

1932.  Dr. Reddy's Adams called Heritage's O'Mara after his conference call on January 22, 2013, and they spoke for ten minutes.

1933.  After the call, O'Mara reported to Malek the substance of the call: O'Mara had learned that Dr. Reddy's would launch a 4mg product on the first day it could produce a generic, but it was not certain if it would launch on the 5mg formulation.  Dr. Reddy's ultimately did launch the 5mg formulation.  O'Mara also reported that Dr. Reddy's wanted its "fair share" of the market. As discussed above, "fair shares" were allocated to Defendants across Drugs at Issue and within a particular drug market based upon the number of competitors in the market and the timing of their entry into the market.  If Dr. Reddy's entered the Zoledronic Acid market first—consistent with fair share agreements that had long existed in the generic pharmaceuticals market—it expected a 60% share of the market. If Heritage entered the market at the same time as Dr. Reddy's, the expectation was that the market share would be split evenly.

1934.  Less than an hour after they first spoke on January 22, 2013, Heritage's O'Mara and Dr. Reddy's Adams spoke again for approximately ten minutes and

discussed a plan to keep the pricing of Zoledronic Acid elevated above competitive levels. O'Mara and Adams spoke for approximately 24 minutes again on January 24.

1935.  While these conversations with Dr. Reddy's were occurring, Heritage, Lannett, Mylan, and Par were also discussing pricing for Doxy Mono.

1936.  Heritage knew that Dr. Reddy's was going to enter the market, but Heritage's Malek did not want to take any chance of other competitors disrupting Heritage's cozy relationship with Dr. Reddy's, and in March of 2013, Malek set out to confirm that there would be no other entrants to the market.

1937.  Malek instructed another Heritage employee (likely Sather) to reach out to competitors and large customers in an effort to confirm that no other manufacturers were planning on entering the generic Zoledronic Acid market.  In his instructions to this employee, Malek provided the same list of questions he had provided to O'Mara for contacting Dr. Reddy's Adams.

1938.  Prior to the launch, Heritage continued communicating with Dr. Reddy's to refine their agreement on market share and pricing.  For example, Heritage's O'Mara called his counterpart at Dr. Reddy's, Adams, on March 3, 2013, and left a message.  Adams (or another individual from Dr. Reddy's) returned the call two days later and spoke with Heritage's O'Mara for approximately 15 minutes.

1939.  While these conversations were occurring, Heritage's CEO Malek learned that Dr. Reddy's was threatening to disrupt Defendants' agreement by quoting

low prices on Zoledronic Acid to customers, including Cardinal. Malek e-mailed Sather and O'Mara on March 6 to express this concern and to ask about pricing.

1940. Malek also instructed O'Mara to speak with Dr. Reddy's Adams about Zoledronic Acid when they were both attending the same customer conference in March of that year. On March 12, 2013, the two spoke by phone twice and exchanged numerous text messages.

1941. The next day, Heritage's CEO Malek asked O'Mara for an update on Dr. Reddy's. O'Mara responded with information about his conversation with Adams.

1942. A few weeks later, on April 3, 2013, Heritage's O'Mara spoke with Adams at Dr. Reddy's, and confirmed that Dr. Reddy's had just begun shipping the 5mg product. Adams also provided information about its pricing. O'Mara and Adams spoke numerous times throughout the rest of April about customers and pricing for both Zoledronic Acid and Meprobamate. At the same time, as discussed above, Sun and Heritage's Sather were discussing Nimodipine pricing and market share.

1943. Consistent with their agreement, in April of 2013, both Heritage and Dr. Reddy's entered the Zoledronic Acid market at a higher price than they otherwise would have absent their collusive pricing agreement. Heritage and Dr. Reddy's announced list prices that were within a few percentage points of each other. They maintained these list prices through at least early 2016. These list prices remained stable at this elevated, anticompetitive level even when a third manufacturer entered the market.

1944.  Any disagreements about the allocation of customers between Heritage and Dr. Reddy's were resolved through direct communications between the two companies.

1945.  Heritage's ability to contact Dr. Reddy's and obtain an agreement on the allocation of the market and the price of Zoledronic Acid would not have been possible absent the existing "fair share" agreement among Defendants.  The discussions between Dr. Reddy's and Heritage make clear that they were not starting from zero in working out the details of their agreement on Zoledronic Acid, but were building on an existing understanding about "fair share" and the avoidance of competition across numerous drugs.

1946.  Defendants were aware that their conversations were anticompetitive and illegal. For example, on April 19, 2013, Malek sent a text message to his entire sales team reminding them not to put their pricing discussions with competitors in writing.

1947.  Defendants' ability to exchange information and negotiate pricing agreements was aided by the near constant ability of Defendants to meet in person at trade association meetings and conferences, *see* Exhibit 1, where they had the opportunity to, and in fact did, discuss and come to pricing agreements and discuss enforcing their agreements without leaving lasting electronic records of their illegal collusion.

1948.  For example, shortly before Dr. Reddy's and Heritage's conversations in March of 2013, both Defendants attended two trade association meetings where they also had the opportunity to exchange information:  the GPhA Annual Meeting, held from Feb. 20-22, 2013, in Orlando, FL; and the ECRM Retail Pharmacy Generic Pharmaceuticals Conference, held from Feb. 24-27, 2013, in Dallas, TX.  Both of those trade shows were attended by most Defendants, including Dr. Reddy's and Heritage.

1949.  Similarly, shortly before Par entered the market for Zoledronic Acid, its sales employees attended the NACDS Total Store Expo in Las Vegas, which also was attended by numerous Defendants (including people directly implicated  in  anti-competitive communications):  Apotex (Hamilton), Aurobindo (Cunard), Citron, Dr. Reddy's, Glenmark, Heritage (Glazer, Malek, O'Mara, and Sather), Lannett (Sullivan), Mylan (Nesta, Aigner), Sandoz, Sun (Knoblauch), Taro, Teva, West-Ward and Zydus (Lukasiewicz).

1950.  When Par finally entered the market in late 2013, it announced list prices **_even higher_** than those of Heritage and Dr. Reddy's.  List prices for Dr. Reddy's, Heritage and Par remained elevated thereafter.  As it had done in the Doxy Mono market discussed above, Par sought to avoid price competition. Although it was the third generic manufacturer into the market, Par did not undercut the prices of Heritage and Dr. Reddy's in an effort to gain market share, as normally happens in a

competitive market for a generic pharmaceutical product and would have happened here, but for Defendants' anticompetitive agreement.

1951.  Instead, Par complied with the terms of Defendants' overarching conspiracy and imposed higher prices than a competitive market would have allowed and prevented price erosion in the market for Zoledronic Acid.

1952.  No shortages or other market features can explain Defendants' elevated prices for Zoledronic Acid during the Relevant Period.

1953.  The elevated prices of Zoledronic Acid resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1954.  The unlawful agreement among Dr. Reddy's, Heritage, and Par, regarding Zoledronic Acid, was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BE.   Cefpodoxime Proxetil

1955.  Generic Cefpodoxime Proxetil ("Cefpodoxime") is an antibiotic used to treat a wide variety of bacterial infections. It is sold in both oral suspension and tablet form, both of which are subjects of this Complaint.

1956.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Cefpodoxime, as follows:

1957.  On January 3, 2013, SW-3 at Sandoz called SW-6, who by that time had left Fougera/Sandoz and worked at Aurobindo. The call lasted two minutes.  The next day, on Friday, January 4, SW-6 called SW-3 twice, with one call lasting three minutes.  A few minutes after hanging up, SW-3 then called his boss, Kellum, and they spoke for nine minutes.  After that call, Kellum sent an e-mail to R.T., a senior sales and marketing executive at Sandoz.

1958.  The following business day, on Monday, January 7, 2013, SW-6 at Aurobindo and SW-3 at Sandoz exchanged three calls, including one lasting six minutes.  During these calls, SW-6 confirmed that Aurobindo planned to launch both formulations of Cefpodoxime that week.  SW-3 also told SW-6 that Sandoz planned to increase pricing on both formulations by 20%.  SW-6 advised that Aurobindo was looking for 40% share and would start by targeting Cardinal and CVS.  In turn, SW-3 gave Sandoz's co-conspirator specific, non-public, contract price points that Sandoz was charging those customers, and SW-3 noted this in his notes.

1959.  In addition, on these calls, the two men also discussed Aurobindo's impending launch of Cefdinir Capsules and Cefdinir Oral Suspension, among other products, which are discussed elsewhere in this Complaint.

1960.  Shortly after speaking with each other, SW-6 called Grauso and SW-3 called Kellum to report back what they had discussed.  Those calls, all of which occurred in the space of less than an hour on January 7, 2013, are detailed as follows:

at 4:44 pm, SW-6 at Aurobindo called SW-3 at Sandoz for two minutes;

at 4:47 pm, SW-3 called SW-6 back and they spoke for six minutes;

at 4:53 pm, SW-6 called his boss, Grauso, for one minute, likely a voice-mail; and at the same time, SW-3 called his boss, Kellum, for seven minutes, at the conclusion of which call,

at 5:00 pm, SW-3 called back SW-6 for two minutes; and, finally, at 5:11 pm, Grauso returned SW-6's call, and they spoke for approximately a quarter-hour.

1961.  Two days later, on January 9 and 11, the day that Sandoz increased WAC pricing on Cefpodoxime, SW-3 and SW-6 exchanged three more calls.  After speaking with each other, SW-3 called Kellum and SW-6 called Grauso to report back what they had discussed.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:47:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:38:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |

1962.  Due to an issue at its manufacturing facility, Aurobindo's launch of Cefpodoxime was delayed and the company was unable to launch in January, 2013, as planned.

1963.  The following month, on February 24-27, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas.  Representatives from Aurobindo and Sandoz were in attendance, including SW-6 and Grauso from Aurobindo and Kellum, SW-3, and SW-2 from Sandoz.

1964.  Two months after that, on April 17, 2013, SW-6 (Aurobindo) called SW-3 at Sandoz.  The call lasted two minutes.  Less than an hour later, SW-3 called SW-6 back and they spoke for six minutes.  The next day, on April 18, SW-6 called SW-3 and they spoke for ten minutes.  That same day, Aurobindo launched both formulations of Cefpodoxime and matched Sandoz's increased WAC pricing.

1965.  On April 30, SW-3 and SW-6 exchanged three phone calls, including one call lasting three minutes.  On these calls, they again discussed Aurobindo's launch of Cefpodoxime Tablets, including that Aurobindo was looking for 40-50% market share.  They also discussed specific customers that Aurobindo was targeting.  SW-3 's took contemporaneous notes from these calls.

1966.  Three weeks later, in accordance with the plan, on May 22, 2013, Aurobindo made an offer to CVS for Cefpodoxime Tablets, which CVS accepted the very next day.

1967.  Similarly, at the end of that summer, on August 29, 2013, Aurobindo made an offer to ABC for Cefpodoxime Tablets.  The next day, on August 30, ABC e-mailed Sandoz to advise that it had received a competitive offer and asked whether Sandoz wanted to bid to retain the business.  On September 4, S.G., a Sandoz sales executive, responded to ABC and declined the opportunity.  Later that same day, ABC awarded the business to Aurobindo.

1968.  Aurobindo would also win awards for Cefpodoxime Tablets at McKesson and several other smaller customers, without substantially eroding the high pricing in the market.

1969.  On September 9, P.S., an Aurobindo sales and marketing executive, asked Grauso to submit a bid for Wal-Mart's Cefpodoxime business.  Given the market share breakdown, Grauso gave his approval to submit a bid to Wal-Mart. Thereafter, on September 30, 2013, the customer accepted the bid and awarded Aurobindo its indirect business.

1970.  No shortages or other market features can explain Defendants' price increases for generic Cefpodoxime during the Relevant Period.

1971.  The elevated prices of generic Cefpodoxime resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1972.  The unlawful agreement between Defendants Fougera/Sandoz and Aurobindo, regarding generic Cefpodoxime, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**BF.**   **Budesonide Inhalation Suspension**

1973.  Generic Budesonide Inhalation Suspension ("Budesonide Inhalation") is an anti-inflammatory corticosteroid, administered through inhalers or similar devices, and is used to prevent asthma attacks.  Budesonide Inhalation works directly in the lungs to make breathing easier by reducing the irritation and swelling of the airways. There are other, non-inhalation uses of the Budesonide molecule, which are described elsewhere in this Complaint.

1974.  Budesonide Inhalation has been commercially available in the United States since the 1980's.  At all relevant times, the market for generic Budesonide Inhalation Suspension is and was mature.  Budesonide Inhalation Suspension has been commercially available in the United States in a generic form for decades.

1975.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Budesonide Inhalation, at least as follows:

1976.  During the Relevant Period, Defendants Actavis and Teva dominated the market for Budesonide Inhalation – but, initially, only Teva did.  Teva obtained

approval to market Budesonide Inhalation in November, 2008.  Prior to February of

2015, Teva controlled almost the entire market for generic Budesonide Inhalation.

1977.  Thus, for years, Teva was the only company in the market for generic

Budesonide Inhalation – Teva was "the only game in town," as Defendants

sometimes referred to a single-player market.

1978.  Teva knew, however, that Actavis had filed a legal action challenging the

validity of the patent on the brand drug and that it likely would allow additional

competition into the generic market shortly.

1979.  By February, 2013, that litigation had progressed to the point that a

ruling on whether Actavis was likely to issue on whether Actavis would be allowed to

market the drug.  Teva knew it needed to address this potential competitive threat

immediately – but, because the potential so-called "competitor," Actavis, and Teva

were both members of Defendants' cartel, Teva was not worried about competition,

*per se*.  Teva knew, however, that in accordance with Defendants' cartel agreement,

Teva would have to cede market share to the new entrant.

1980.  So rather than seeking to gain market share before any additional

competition could enter the market, Teva instead ***raised*** its prices, so that when Teva

did cede share, it would not lose as much dollar revenue.

1981.  Thus, effective February 8, 2013, Teva raised the WAC price for its

Budesonide Inhalation by 9%.  This was a relatively modest increase compared to

many of the other cartel price increases alleged in this complaint, but that was because

as the only player in the generic market, Teva's price was already high – so high that that 9% price increase added $51 million to Teva's annual revenues.

1982.  Teva's concerns about facing competition in this lucrative market were well-founded:  less than two months later, on Monday, April 1, Actavis won a legal challenge in federal district court against the brand manufacturer, declaring the patent for the brand drug, Pulmicort Respules, invalid.

1983.  Actavis had been planning to launch the product "at risk," *i.e.* when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are resolved (or in this case, even filed) and there is still a risk that the new generic entrant might ultimately be found to violate the patent.  This is a concern in almost every patent case, especially given the Court of Appeals for the Federal Circuit's notorious unpredictability on patent challenges and high reversal rate.

1984.  Actavis immediately put its "at-risk" launch plan into action – including talking to Teva.  That day, David Rekenthaler of Teva called A.B., his counterpart at Actavis – a senior sales and marketing executive – and they spoke for approximately two minutes.

1985.  The next day, Tuesday, April 2, 2013, April 2, 2013 , Rekenthaler spoke to A.B two more times, including one call lasting a little under ten minutes.  Actavis then immediately began shipping the product.

1986.  As with Teva, however, instead of competing to obtain market share as a new entrant, however, Actavis entered the market with the exact same WAC price as

Teva.  Indeed, when Teva inquired of a customer that same day to confirm Actavis's pricing, Teva was informed by the customer that Actavis's pricing was "in line with [Teva's] current wholesale pricing."

1987.  Later, further legal action from the brand manufacturer prevented Actavis's entry into the market from being permanent, but in the interim, Teva and Actavis we able to obtain supra-competitive profits, which Teva continued to rake in after Actavis's departure.

1988.  Actavis's re-entry into the Budensonide Inhalation market was likewise co-ordinated with Teva:  on Tuesday, February 10, 2015, Rekenthaler (at Teva) and Falkin (at Actavis) spoke by phone.

1989.  Again, that the 2013 Actavis-Teva communications were *via* A.B. at Actavis, but the 2015 Actavis-Teva communications were *via* Falkin at Actavis, illustrates the institutional, rather than merely personal, nature of the companies' co-operation.

1990.  Later that week, on Friday, February 13, 2015, Rekenthaler informed other Teva employees of Actavis's plans to enter the market, telling them that "Actavis is intending on shipping" Budesonide Inhalation.

1991.  The next business day, on Monday, February 16, 2015, Rekenthaler and Falkin spoke again, this time for a bit more than twenty minutes.

1992.  The following day, Teva's T.C. confirmed to her colleagues that Teva had conceded the Budesonide Inhalation accounts of two major customers to Actavis.

She explained that the urgency for these accounts was Actavis's concerns about getting product into market before it faced legal action from the brand manufacturer. Thus, she explained, she was working on an "exit strategy" to get Teva's product out of the supply channel, so as to facilitate Actavis's entry into this market.

1993.  A few months later, Sandoz was the next to enter the market; the same pattern held.  Rather than compete for customers with better prices, Sandoz launched with the same WAC prices as Teva and Actavis.  In return, per Defendants' cartel agreement, Teva gave some of its customers to Sandoz.  As a result, none of them had to – or, in fact, did – compete for market share.

1994.  Further, no shortages or other market features can explain Defendants' price increases for Budesonide Inhalation during the Relevant Period.

1995.  The elevated prices of Budesonide Inhalation resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

1996.  The unlawful agreement between Defendants Teva and Actavis, regarding Budesonide Inhalation, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**BG.   Methylphenidate HCL Tablets and Methylphenidate HCL ER Tablets**

1997.  Generic Methylphenidate HCL is used to treat attention deficit disorder and attention deficit hyperactivity disorder, as well as some sleep disorders. There are two formulations of generic Methylphenidate HCL – Immediate Release ("Methylphenidate IR") and Extended Release ("Methylphenidate ER").

1998.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Methylphenidate IR and Methylphenidate ER, as follows:

1999.  As of November, 2012, the Methylphenidate IR market had three suppliers:  Mallinckrodt with 43% share, Watson (Actavis) with 37%, and Sandoz with 16%.  For Methylphenidate ER, there were only two suppliers – Mallinckrodt with 54% share and Sandoz with 16%.

2000.  On February 13, 2013, L.J., a Sandoz sales executive, sent an internal e-mail stating that he had heard that Mallinckrodt was experiencing supply issues on Methylphenidate.

2001.  A few minutes later, D.P., a senior Sandoz sales executive, forwarded L.J.'s email to his sales team, including to CW-3.

2002.  That same day, on February 13, 2013, CW-3 called K.K., a senior Mallinckrodt sales executive, and they spoke for approximately a quarter-hour. Immediately upon hanging up, CW-3 called Aprahamian, then a sales executive at

Actavis, and they also spoke for approximately a quarter-hour.  A few hours later, CW-3 called D.P. of Sandoz to report back what he had learned.  That call lasted ten minutes.

2003.  Later that day, CW-3 also sent an e-mail conveying the information he had obtained from his employer's co-conspirators.

2004.  As was his customary practice, CW-3 falsely stated in the e-mail that the sources of his information were other sources, to keep out of writing the fact that he obtained the information directly from Sandoz's co-conspirators (and ostensible competitors) – Mallinckrodt and Actavis (Watson).  But CW-3's superiors were aware that the information was coming directly from Mallinckrodt and Actavis, not a customer.

2005.  Having confirmed Mallinckrodt's supply issues (and the fact that the market share leader would be out of the market for a period of time), Sandoz immediately set to work on implementing a price increase on Methylphenidate.

2006.  Indeed, less than one week later, on February 19, 2013, Sandoz prepared a price increase analysis for Methylphenidate to send to its internal Pricing Committee for approval.  In the analysis, it recommended increasing price by 340% on Methylphenidate IR and 125% on Methylphenidate ER.  Sandoz estimated that these increases would result in the accrual of an additional $12.9 to $36.0 million in profits.

2007.  On March 1, CW-3 at Sandoz exchanged at least nine text messages with Kaczmarek, then a senior executive at Mallinckrodt.  Through those text messages,

they discussed Sandoz's price increase on Methylphenidate and specific customer

accounts.

2008.  Further, in the days leading up to the Sandoz price increase on

Methylphenidate, CW-3 exchanged at least 23 calls and text messages with Kaczmarek

and K.K., which are listed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/4/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 12:08:02 | 0:00:00 |
| 3/4/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 12:08:35 | 0:03:14 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 12:50:02 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 15:25:08 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 15:25:40 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 16:50:58 | 0:00:00 |
| 3/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 17:27:43 | 0:01:02 |
| 3/6/2013 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (Mallinckrodt) | 6:53:00 | 0:01:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Outgoing | CW-3 (Sandoz) | 8:06:00 | 0:01:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Incoming | CW-3 (Sandoz) | 8:20:00 | 0:03:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Incoming | CW-3 (Sandoz) | 8:23:00 | 0:02:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 17:46:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:08:09 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:08:43 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:10:26 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:11:07 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:11:55 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:12:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:15:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:17:06 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:18:30 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:20:17 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:21:08 | 0:00:00 |

During this same time period, CW-3 was also in frequent contact with Aprahamian at

Actavis, as detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:05:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:07:00 | 0:11:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 10:50:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 15:49:40 | 0:00:23 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:20:06 | 0:00:30 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:27:00 | 0:04:00 |

2009.  After this series of communications with both Mallinckrodt and Actavis, on March 8, 2013, Sandoz followed through with its plans and increased WAC pricing on Methylphenidate IR between 293% and 449%, depending on the formulation, and on Methylphenidate ER by 125%.

2010.  Three days later, on March 11, 2013, Aprahamian of Actavis called Perfetto, at that point a senior executive at Taro, and they spoke for almost an hour. The two competitors exchanged two more calls that day, lasting one minute and three minutes.  Immediately upon hanging up with Perfetto, Aprahamian called CW-3 of Sandoz.  The call lasted one minute. A few minutes later, Aprahamian called CW-3 again and they spoke for five minutes.

2011.  The next day, on March 12, 2013, Perfetto e-mailed J.K., a senior Taro executive, and G.S., a senior executive at Taro's parent company, Sun, regarding Methylphenidate. Perfetto referenced to one of Taro's sister companies, which was also a subsidiary of Sun. When G.S. of Sun expressed some confusion over what product Perfetto was referring to, he sent an e-mail to clarify.

2012.  Between March 13 and April 2, 2013, CW-3 of Sandoz and Kaczmarek exchanged at least 29 text messages.  During that same time period, CW-3 was also

communicating frequently with his contact at Actavis (Aprahamian), who was in the process of transitioning to a position at Taro.  Aprahamian's first day at Taro was March 18, 2013, but he continued to speak frequently with Actavis colleagues after his departure.  Those calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 11:42:00 | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 8:07:00 | 0:16:00 |
| 3/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 11:28:00 | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 14:44:00 | 0:01:00 |
| 3/21/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:33:00 | 0:01:00 |
| 3/21/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:34:00 | 0:12:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 8:31:00 | 0:01:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Incoming | CW-3 (Sandoz) | 12:36:00 | 0:18:00 |
| 3/25/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:26:00 | 0:01:00 |

During his calls with Aprahamian on April 2, 2013, CW-3 took contemporaneous notes in his Notebook regarding Methylphenidate.

2013.  Notably, as of April 2, 2013, Actavis had not yet published increased WAV pricing for Methylphenidate IR and would not do so for another several weeks.

2014.  Between April 20 and April 23, 2013, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Sandoz, Mallinckrodt, Actavis, Sun, and Taro were all in attendance. These included senior executives -- D.P. of Sandoz, Kaczmarek of Mallinckrodt, G.S. of Sun, and Perfetto and J.K. of Taro.

2015.  The day after the NACDS annual meeting had concluded, Actavis published increased WAC pricing for Methylphenidate IR that matched Sandoz's

WAC pricing. Two days later, on April 26, 2013, Sun entered the Methylphenidate IR market and matched its competitors' WAC pricing. And, one week later, on May 1, 2013, Mallinckrodt reentered the market and matched competitor WAC pricing on both formulations. That same day, Kaczmarek sent a text message to CW-3 of Sandoz.

2016.  No shortages or other market features can explain Defendants' price increases for generic Methylphenidate IR and Methylphenidate ER during the Relevant Period.

2017.  The elevated prices of generic Methylphenidate IR and Methylphenidate ER resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2018.  The unlawful agreements among Defendants Fougera/Sandoz, Mallinckrodt, and Actavis/Taro, regarding generic Methylphenidate IR and Methylphenidate ER, were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BH.   Pioglitazone HCL Metformin HCL Tablets

2019.  Generic Pioglitazone HCL Metformin HCL ("Pioglitazone Metformin"), is used to control high blood sugar in patients with type 2 diabetes mellitus.

2020.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Pioglitazone Metformin, as follows:

2021.  Prior to February, 2013, Mylan and Teva were the only suppliers to the market for Pioglitazone Metformin.  As a result of settling patent litigation with the brand manufacturer, Mylan was entitled to 180 days of exclusivity as the first-to-file generic and Teva acquired the right to market the authorized generic.  During that period, Mylan and Teva split the market roughly equally, with Teva controlling 48% share and Mylan controlling 52%.

2022.  Mylan and Teva's 180-day exclusivity period expired on February 13, 2013, and Aurobindo and Torrent Pharmaceuticals entered the market on that date. Although Sandoz also planned to enter at that time, the company ran into regulatory obstacles that delayed its launch until April 16.

2023.  In advance of Aurobindo's entry, CW-6 and Grauso were in frequent communication with their contacts at Mylan and Teva to discuss, among other things, Aurobindo's entry into the Pioglitazone Metformin market. On these calls, the competitors spoke about pricing and the allocation of market share to the new entrant.

2024.  For example, in the week leading up to Aurobindo's entry on February 13, CW-6 exchanged at least nine calls with Jim Nesta, a senior sales executive at Mylan. At the same time, Grauso was communicating with his contacts at Teva,

exchanging at least twenty-one calls with sales executives Kevin Green and T.S. These calls are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 9:23:00 | 0:06:00 |
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 14:25:00 | 0:02:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:33:00 | 0:22:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 12:12:00 | 0:07:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 15:20:00 | 0:03:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:04:00 | 0:05:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:41:00 | 0:21:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:56:00 | 0:08:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 10:34:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 10:40:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 10:41:00 | 0:02:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 11:21:00 | 0:11:00 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 13:55:05 | 0:00:19 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 14:04:28 | 0:02:17 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:38:09 | 0:00:04 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 15:41:26 | 0:00:03 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:58:28 | 0:00:27 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 16:09:54 | 0:03:40 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 16:19:22 | 0:00:04 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 13:01:14 | 0:00:29 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 14:06:26 | 0:00:52 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:52:00 | 0:12:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 6:26:00 | 0:39:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:35:00 | 0:45:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:53:00 | 0:09:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 11:11:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 12:19:00 | 0:02:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 12:42:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:58:00 | 0:01:00 |

2025.  Illustrating the substance of these calls, on February 12, 2013, T.S., a Teva sales executive, spoke to Grauso at Aurobindo for approximately ¾ hour. Shortly after that call, T.S. sent an internal e-mail.

2026.  At the same time, Mylan and Teva were communicating with each other. In the week leading up to Aurobindo's entity on February 13, 2013, Green at Teva

exchanged at least 17 calls with Nesta at Mylan.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:19:51 | 0:00:13 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:29:54 | 0:00:05 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:01:05 | 0:00:07 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:17:07 | 0:00:06 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:53:33 | 0:08:47 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:16:25 | 0:00:10 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 17:19:23 | 0:00:10 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 8:26:12 | 0:00:05 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:08:59 | 0:29:51 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:44:04 | 0:11:18 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:14:42 | 0:06:03 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:31:39 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:45:09 | 0:12:58 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:09:47 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:18:15 | 0:08:38 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:44:01 | 0:03:25 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 19:17:42 | 0:04:15 |

2027.  Similarly, Green of Teva exchanged several calls with his contacts at Sandoz, Kellum and CW-2.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | CW-2 (Sandoz) | 4:24:00 | 0:05:00 |
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | Kellum, Armando (Sandoz) | 11:04:00 | 0:01:00 |
| 2/7/2013 | Voice | CW-2 (Sandoz) | Outgoing | Green, Kevin (Teva) | 12:29:00 | 0:02:00 |
| 2/10/2013 | Voice | Green, Kevin (Teva) | Incoming | Kellum, Armando (Sandoz) | 9:09:00 | 0:06:00 |
| 2/12/2013 | Voice | Kellum, Armando (Sandoz) | Outgoing | Green, Kevin (Teva) | 7:15:00 | 0:08:00 |

2028.  On February 7, 2013, the same day that Green talked to both Kellum and CW-2, both of those Sandoz employees participated in a conference call in which they discussed Pioglitazone Metformin.

2029.  Finally, the new entrants, Sandoz and Aurobindo, were also communicating directly with each other regarding Pioglitazone Metformin.  For

example, CW-3 at Sandoz and CW-6 at Aurobindo exchanged at least six calls between February 13-19, 2013, as detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/13/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:51:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:36:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:16:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:03:00 | 0:01:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:06:00 | 0:04:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:52:00 | 0:01:00 |

During their calls on February 19, 2013, CW-6 and CW-3 discussed specific customers and price-points for Pioglitazone Metformin, and the fact that Aurobindo had already picked up Cardinal as a customer.

2030.  By mid-April, Aurobindo had secured approximately 20% of the Pioglitazone Metformin market, including Cardinal, a portion of the CVS business, Costco, and several other smaller customers.

2031.  Between February 24 and February 27, 2013, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas. Representatives from Aurobindo and Sandoz attended, including CW-6 and Grauso from Aurobindo and CW-3 and Kellum from Sandoz.

2032.  A month and a half later, on April 16, 2013, Sandoz finally received FDA approval to market Pioglitazone Metformin. The next day, CW-1, a Sandoz senior pricing executive, e-mailed the sales team.

2033.  That same day, CW-3 exchanged two calls with CW-6 of Aurobindo lasting two minutes and six minutes.  The next day, on April 18, 2013, the two

competitors spoke again for ten minutes.  During that call, CW-6 provided CW-3 with Aurobindo's dead net prices at several customers, including Cardinal and CVS.

2034.  At the same time, Sandoz was speaking with Teva.  On April 18 and April 19, 2013, CW-2, a Sandoz senior sales executive, spoke three times with Green of Teva, including two calls lasting four minutes and one call lasting eight minutes.

2035.  Later in the evening, CW-1 e-mailed Kellum and others at Sandoz regarding Pioglitazone Metformin.  Sandoz subsequently submitted an offer to ABC on April 22, 2013.

2036.  The next day, on April 23, 2013, ABC e-mailed Teva to inform it that Sandoz had made an offer for Pioglitazone Metformin and asked whether Teva intended to bid to retain the business.

2037.  Three days later, on April 26, 2013, Teva declined to bid to retain the business and noted in Delphi, Teva's internal tracking database.  That same day, ABC awarded the business to Sandoz.

2038.  Also, that same day, on April 26, 2013, Sandoz officially entered the market and published WAC pricing that matched its co-conspirators.

2039.  No shortages or other market features can explain Defendants' price increases for generic Pioglitazone Metformin during the Relevant Period.

2040.  The elevated prices of generic Pioglitazone Metformin resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2041.  The unlawful agreement among Defendants Sandoz, Teva, Mylan, and Aurobindo, regarding generic Pioglitazone Metformin, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BI.   Tizanidine

2042.  Aptly illustrating the overlapping rings of the different subparts of Defendants' overarching conspiracy, in the same timeframe as Defendants Dr. Reddy's, Heritage, and Par were implementing the Zoledronic Acid part of Defendants' overarching conspiracy, Dr. Reddy's was simultaneously working with Defendants Sandoz and Mylan on a different drug that was also part of Defendants' overarching conspiracy:  Tizanidine.

2043.  Generic Tizanidine is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

2044.  Tizanidine had been on the market for years and its price had eroded signficantly.

2045.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Tizanidine ("Tizanidine"), as follows:

2046.  As of May, 2013, Defendants Sandoz, Mylan, and Dr. Reddy's were sellers in the Tizanidine market.  At that time, Dr. Reddy's was dominant in the market with 59% market share – because it had the lowest prices and in a commodity market, such as generic pharmaceuticals generally and Tizanidine in particular, market share follows pricing – while Mylan had 24% and Sandoz had 17%.

2047.  Dr. Reddy's led the increase on this product on Monday, May 13, 2013, increasing its Tizanidine WAC price and contract pricing ***by a factor of ten.***

2048.  Sandoz was thrilled when it learned that Dr. Reddy's was going to increase its price on Tizanidine by such a large multiple. On May 10, the Friday before the price increase, a national account executive at Sandoz ("S.G."), sent an internal e-mail noting this achievement by their nominal competitor.

2049.  On the day Dr. Reddy's published its new WAC pricing for Tizanidine (Monday, May 13, 2013), Jim Nesta of Mylan called SW-4 at Sandoz and they spoke for 4 minutes.  Two days later, a senior sales executive at Sandoz, who will be referred to in this Complaint as SW-l, sent an internal e-mail to Kellum regarding this.

2050.  Meanwhile, Mylan's Nesta and Sandoz's SW-4 continued their discussions regarding Tizanidine price increases, and Nesta brought a national account executive at Dr. Reddy's ("J.A.") into the loop on the discussions, as follows: on Monday, May 20, SW-4 (the one who was supposedly worried about her job security at Sandoz and had called Nesta the previous August and/or September under the guise of seeking employment at Sandoz) called Nesta for a few seconds, but to talk

about Tizanidine pricing, not her resume or employment.  The next day, J.A. from Reddy's also called Nesta twice, but speaking for less than a minute each time, and perhaps not speaking at all the first time.

2051.  On Thursday, May 23, Sandoz's price increase was imminent, and SW-4 called Mylan's Nesta again, also for less than a minute; Nesta returned that call, the two spoke for a minute and a half, and then Nesta sent two text messages to J.A. at Dr. Reddy's.

2052.  The next day, Friday, May 24 – less than two weeks after Dr. Reddy's astronomical price increase – Sandoz matched Dr. Reddy's increased Tizanidine pricing, and in one formulation, actually exceeded it.  Nesta called J.A. one more time that day, and then they did not speak again until August.

2053.  Notably, however, while the resulting pricing was the same as Dr. Reddy's, because Sandoz's pre-increase pricing was higher than Dr. Reddy's, Sandoz's increases had to be by lower amount, and lower percentages, as Dr. Reddy's, to get to the same final price.

2054.  As a result, Sandoz's increases were "merely" between 248% and 344% – still outrageous and significant, but noticeably less than Dr. Reddy's 900% increase. The reason the price increases were sudden, dramatic, almost simultaneous, but by very materially different amounts and percentages, is because they were the result of Defendants' overarching conspiracy, rather than from external market conditions – and Defendants wanted identical, inflated prices on their products.

2055.  Mylan followed with similar pricing a month later, on July 2.

2056.  No shortages or other market features can explain Defendants' price increases for Tizanidine during the Relevant Period.

2057.  The elevated prices of Tizanidine resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2058.  The unlawful agreement between Mylan, Dr. Reddy's, and Sandoz regarding Tizanidine was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BJ.   Oxaprozin Tablets

2059.  Generic Oxaprozin tablets ("Oxaprozin") are a non-steroidal anti-inflammatory drug (NSAID) indicated for the treatment of signs and symptoms of osteoarthritis and rheumatoid arthritis.

2060.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Oxaprozin as follows:

2061.  In the days and weeks leading up to Greenstone's entry into the Oxaprozin market, Kevin Green at Teva and Robin Hatosy ("Hatosy" or "R.H."), a

Greenstone account executive, were in frequent communication by phone and text to co-ordinate the entry, as set forth in more detail below, beginning on March 6, with a 10-minute call:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/6/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:47:46 | 0:10:57 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 15:24:26 | 0:01:30 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 19:25:44 | 0:02:38 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 18:03:08 | 0:00:36 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 18:44:27 | 0:04:51 |
| 3/20/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 7:59:16 | 0:02:22 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:31:40 | 0:00:00 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 16:42:27 | 0:00:27 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:43:56 | 0:04:04 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:20:36 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:45:41 | 0:00:10 |
| 3/22/2013 | Text | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:51:04 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:56:51 | 0:02:13 |
| 3/27/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 17:26:41 | 0:00:00 |

2062.  During these communications, Teva agreed with Greenstone to concede certain, specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

2063.  Part of the understanding between the companies was that Teva would concede at least two large customers – CVS and Cardinal – to Greenstone, and that Teva would retain Walmart as a customer.

2064.  Greenstone entered the market for Oxaprozin 600mg Tablets on March 27, 2013.  It entered with the exact same WAC pricing as Teva.  The same day, however, Teva learned that Greenstone was trying to cheat on the agreement by approaching Walmart:  that day, T.C. (at Teva) forwarded to his colleagues, Green and

Rekenthaler, an e-mail that T.C. had received from Walmart that day.  The e-mail was asking for a price reduction on Oxaprozin 600mg tablets because Walmart had received a new bid from a competitor, which T.C. and Rekenthaler knew (or found out) to be Greenstone.  Rekenthaler's immediate reaction to T.C.'s e-mail was "Great. More idiots in the market..."

2065.  In subsequent e-mails between T.C. and Rekenthaler, T.C. reminded Rekenthaler that, pursuant to the agreement with Greenstone, "[w]e just conceded at cardinal . . . remember[?]"  Rekenthaler corrected her, noting Teva had conceded both Cardinal **and CVS** to Greenstone.  Rekenthaler remarked that "[t]hey should not have gone to Walmart.  Poor strategy on their part for sure."  In her reply, T.C. made it clear that there was an understanding between Teva and Greenstone, writing in an e-mail entitled "RE:  Oxaprozin 600mg Tab," at 4:36 that afternoon, "I thought they said they were done after cardainl.. [*i.e.*, Cardinal] I am pissed."

2066.  Within an hour, Green called Robin Hatosy at Greenstone, but she did not answer.  The next morning, March 28, at 8:06 am, T.C. sent an e-mail to Walmart stating:  "Addressing this morning..."  Less than a half hour later, she sent an e-mail to Green, stating: "CALL ME IN MY OFFICE when you get a chance."  After Green spoke to T.C., he immediately called Hatosy at Greenstone.  Hatosy (identified as "R.H." in the chart below), in turn, and illustrating the institutional, rather than merely inter-personal, nature of Defendants' collusion, relayed the information from Green

to her boss at Greenstone, Jill Nailor, in a series of conversations and text messages over the course of that morning, and later in the day, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:57:21 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:09:50 | 0:04:52 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:18 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:39 | 0:01:23 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:22:04 | 0:00:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 12:15:08 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 12:18:28 | 0:04:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 13:38:50 | 0:03:15 |

2067.  During those conversations, Greenstone agreed to withdraw its offer to Walmart, and instead honor its agreement with Teva.  As a result, shortly before the final phone-call illustrated above, at 1:22 pm that day, after several of the communications outlined above, Walmart sent an e-mail to T.C. at Teva, confirming that Greenstone had in fact withdrawn its offer:  "FYI – I just received word from Greenstone that they have met their market share and the proposal has expired. Please see what you can do with pricing."  T.C. forwarded the e-mail to her Teva colleague, Green, with a one-word response making it clear that Teva would not be reducing its price for Oxaprozin:  "FUNNY."

2068.  Pursuant to the agreement between Greenstone and Teva, there was very little price erosion as a result of Greenstone's entry.

2069.  A couple of months later, as Defendant Dr. Reddy's was preparing to enter the market for Oxaprozin (discussed next), a Dr. Reddy's employee commented positively that "[p]ricing [is] still high" on Oxaprozin.  That same employee also talked

to wholesaler Cardinal about the drug, and explained that "Cardinal switched to Greenstone.  Teva was 'fine' with it!"

2070.  Dr. Reddy's had also been having internal discussions about re-launching Oxaprozin in June of that year.  In March, 2013 , the plan was to target one large chain and one large wholesaler in order to obtain at least 30% market share.  Two months later, in May, Dr. Reddy's adjusted its market share expectations down to 20%, after Greenstone and Sandoz both launched Oxaprozin.

2071.  The following month, on June 13, 2013, members of the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to "discuss launch targets based on the market intelligence gained by the sales team."

2072.  Shortly thereafter, on June 27, Dr. Reddy's re-launched Oxaprozin with the same WAC price as Teva.  At the time, Teva had 60% market share.  Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier.  Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that customer.

2073.  Wanting to obtain a large account, Dr. Reddy's turned its sights to Walgreens.  At a July 1 sales and marketing meeting, there was an internal discussion among Dr. Reddy's employees about "asking to see if Teva would walk away from the business" at Walgreens – while Defendants' cartel had rules about what generally constituted a so-called "fair share," it did not dictate which accounts were to be

retained or dropped to obtain that share, resulting in some friction between cartel members, particularly during the cartel's earlier years of operation.

2074.  As a result, within a week, Dr. Reddy's had learned that Teva would defend the Walgreens account and recognized that Dr. Reddy's would have to "bid aggressively" to obtain that customer.

2075.  Dr. Reddy's did bid aggressively for the Walgreens Oxaprozin account. On or around July 14, 2013, Walgreens informed Green, a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price.  Green wrote that Walgreens did not "want to move but obviously want[s] the price."

2076.  A week and a half later, on July 23, while the Dr. Reddy's offer to Walgreens was still pending, J.A. at Dr. Reddy's telephoned Green.  Illustrating the institutional (rather than merely personal), nature of the relationship among members of Defendants' cartel, that is the only phone call ever between these two individuals that Plaintiffs is aware of.  It lasted for approximately five minutes.

2077.  This is the key tenet of Defendants' cartel:  rather than compete for customers (and thereby drive prices down), instead co-operate and allocate customers among cartel members, thus keeping prices high.  But in the earlier years, more communication was used to avoid the frictions in figuring out which accounts for which products went with which cartel members.

2078.  Thus, wo days after the singular call between J.A. and Green, Green wrote that "[i]f we give D[r. Reddy's] this business, they may be satisfied.  I will see if I can find this out."  Green also warned, however, that if Teva decided to defend and keep the Walgreens account, Dr. Reddy's would "just go elsewhere" – meaning that Dr. Reddy's would continue to offer unsolicited bids to Teva customers, thereby driving prices down.

2079.  While deciding whether to match the Dr. Reddy's offer at Walgreens or concede the business to Dr. Reddy's, Teva engaged in internal discussions about strategy.  On July 29, K.G. – Green's and Patel's boss at Teva – suggested keeping the Walgreens account, but conceding Econdisc (Teva's next largest Oxaprozin customer) to Dr. Reddy's.

2080.  Eager to avoid any further price erosion from Dr. Reddy's, Rekenthaler asked Patel to "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry."  Rekenthaler's goal was for Teva employees to identify customers (other than Walgreens) that Teva could concede to Dr. Reddy's, in order to satisfy Dr. Reddy's' market share goals, but without sacrificing price to get there.

2081.  At 12:33 pm that day (July 29, 2013), Patel in turn asked a colleague to "run the customer volume and profitability analysis for Oxaprozin."  It was typical at Teva to run this type of report before negotiating market share with a fellow conspirator.  At 2:20 pm, that colleague provided the information to Patel, copying Rekenthaler and K.G.  With this information now in hand, less than an hour later,

Rekenthaler called T.W., a Senior Director of National Accounts at Dr. Reddy's.  The call lasted two minutes, and was their only telephone conversation in 2013.

2082.  After this conversation with Dr. Reddy's, Teva decided to maintain the Walgreens business, but concede the Econdisc business.  The following week, on August 7, Teva conceded the Econdisc Oxaprozin business to Dr. Reddy's.  Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason.

2083.  By September, Dr. Reddy's achieved its goal of obtaining 20% of the market for generic Oxaprozin. At that time, Dr. Reddy's customers included Econdisc, Keysource, and Premier.

2084.  No shortages or other legitimate market features can explain Defendants' pricing for Oxaprozin during the Relevant Period.

2085.  The elevated prices of Oxaprozin resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2086.  The unlawful agreement among Teva, Dr. Reddy's, and Sandoz on generic Oxaprozin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**BK.   Meprobamate**

2087.  Generic Meprobamate ("Meprobamate") is used to treat short-term anxiety, tension, and insomnia.

2088.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Meprobamate as follows:

2089.  Early in the Relevant Period, the market for generic Meprobamate was dominated by its sole suppliers:  Heritage, Dr. Reddy's, and Actavis.  In 2013, Actavis exited the Meprobamate market, which left Heritage and Dr. Reddy's as the two remaining suppliers in the market.  Heritage wanted to use Actavis's exit from the market as a pretext for price increases.

2090.  While Dr. Reddy's and Heritage were negotiating pricing and market share for Zoledronic Acid (as discussed above), they also were discussing pricing for Meprobamate.

2091.  By March 21, 2013, O'Mara had already been discussing the pricing of Zoledronic Acid with Dr. Reddy's Adams for several months.  But on that day, Heritage's CEO Malek e-mailed O'Mara and Edelson, instructing them to communicate to Dr. Reddy's—the only remaining competitor in the Meprobamate market—that Heritage wanted to increase the price on Meprobamate.  Malek's proposed price increase was approximately four times the current price.

2092.  On March 22, during the same time they were exchanging price information for Zoledronic Acid with Dr. Reddy's, Heritage's O'Mara spoke to Dr.

Reddy's Adams for nine minutes about at least Meprobamate, and likely also Zoledronic Acid.  During that conversation, Dr. Reddy's and Heritage reached an agreement to, at a minimum, raise the price of Meprobamate. O'Mara confirmed the agreement in an e-mail to Malek that same day, stating, "Dr. Reddy's is on board."

2093.  Three days later, on March 25, Malek emailed O'Mara about the agreement, and O'Mara responded again confirming that Dr. Reddy's would "follow suit" if Heritage raised the price on Meprobamate.

2094.  In a competitive market, a supplier risks losing market share if it raises price, but Dr. Reddy's assurance to Heritage that it would "follow suit" eliminated that risk—and eliminated price competition in the market for Meprobamate.

2095.  During this period, Dr. Reddy's was having supply issues with Meprobamate, and Heritage's O'Mara reported that this "lack of inventory" kept Dr. Reddy's prices "stationary."  As a result of these supply issues, on March 27, 2013, ABC asked Heritage to give a bid on both formulations of Meprobamate.

2096.  Malek immediately forwarded the RFP internally and discussed Heritage's proposed response.  Malek's response to this internal discussion reflected a clear understanding and an intention to abide by the agreement between Heritage and Dr. Reddy's on pricing for Meprobamate. This agreement was confirmed in a short conversation between Heritage and Dr. Reddy's on March 29, 2013.

2097.  A few weeks later, in April of 2013, Dr. Reddy's approached Heritage to discuss obtaining additional Meprobamate market share and asked Heritage to give up

a specific large pharmacy chain.  Because of their agreement, Heritage gave up some of its market share to Dr. Reddy's.

2098.  Heritage sent an e-mail to the large pharmacy chain on April 24, 2013, and on May 17, Heritage's Malek provided Dr. Reddy's with clarifying information about precisely which business Heritage had agreed to give up to Dr. Reddy's.

2099.  Heritage's O'Mara called Adams, his counterpart at Dr. Reddy's, on May 17, 2013.  The two subsequently spoke on May 21, 2013 for nearly seven minutes.

2100.  As a result of Heritage and Dr. Reddy's agreement, both raised Meprobamate prices across the board. Their price increases were nearly simultaneous. Heritage's price increase became effective in late April, 2013, and Dr. Reddy's price increases became effective in early May.  Heritage and Dr. Reddy's imposed identical list prices for 200mg Meprobamate tablets (an increase of nearly 400%) and 400mg Meprobamate tablets (an increase of approximately 350%).  AWP prices for both products were also elevated.  Both list and AWP prices remained elevated above competitive levels thereafter.

2101.  Dr. Reddy's supply issues with Meprobamate do not explain Defendants' abrupt, simultaneous, and identical price increases, in whole or in part, and no other product shortages or other market changes can explain Defendants' abrupt, simultaneous, and identical price increases.

2102.  Dr. Reddy's and Heritage's Meprobamate pricing discussions happened nearly simultaneously with their pricing and market share discussions about Zoledronic Acid.

2103.  Further, as discussed above, Defendants' ability to quickly reach agreement on market share and price increases was a function of their overarching conspiracy to fix prices across the markets for generic pharmaceuticals and was further aided by the prevalence of trade association meetings and conferences where the parties met in person.  Heritage, Dr. Reddy's, and representatives of other Defendants attended at least three such meetings when these price increases were being discussed.

2104.  Heritage and Dr. Reddy's continued to discuss pricing for Meprobamate throughout the Relevant period.  For example, Meprobamate was identified during the April 22, 2014 Heritage teleconference as one of the numerous drugs targeted for a price increase.

2105.  On April 24, 2014, a Heritage employee—likely Matt Edelson—exchanged six text messages with his contact at Dr. Reddy's about pricing for Meprobamate, and likely other drugs, as well.  The two spoke briefly on May 6, 2014.

2106.  On May 8, 2014, Malek e-mailed the Heritage sales team requesting an update on the status of agreements with competitors so that Heritage could move forward with the price increases discussed on April 22, 2014.  A Heritage employee

(likely Edelson) responded to Malek that he was awaiting feedback from one competitor (believed to be Dr. Reddy's) about the drug Meprobamate.

2107.  No shortages or other market features can explain Defendants' price increases for Meprobamate during the Relevant Period.

2108.  The elevated prices of Meprobamate resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2109.  The unlawful agreement between Dr.  Reddy's and Heritage regarding Meprobamate was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## BL.   Bromocriptine Mesylate

2110.  Generic Bromocriptine Mesylate Tablets ("Bromocriptine") are used in the treatment of Parkinson's disease, hyperprolactinemia (abnormally high levels of prolactin in the blood), and acromegaly, a syndrome where the pituitary gland produces excess growth hormones.

2111.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Bromocriptine, at least as follows:

2112.  As of December, 2012, the three manufacturers dominating the market for Bromocriptine were Sandoz (with 65% share), Perrigo (with 30%), and Mylan (with 5%).

2113.  On March 1, 2013, Walgreens reached out to Sandoz, asking for a one-time buy for Bromocriptine because Mylan was having supply issues and would be out of the market for two months.  On March 4, S.G. responded to Walgreens stating that Sandoz could not fill the request.

2114.  Viewing Mylan's supply issues as an opportunity, S.G. forwarded his exchange with Walgreens to Armando Kellum, and Kellum responded within the hour. That same day, March 4, SW-4, a Sandoz senior sales executive, spoke with Jim Nesta, a senior sales executive at Mylan, for approximately four minutes.  The two spoke again on March 11 for approximately ten minutes.

2115.  On March 22, 2013, Kellum e-mailed Sandoz's Pricing Committee, recommending that Sandoz increase prices on Bromocriptine, among other products. In particular, Kellum sought a 200% increase to Sandoz's WAC pricing for Bromocriptine.

2116.  By March 31, all members of the Sandoz Pricing Committee (which included Kellum and SW-1, among others) had approved the increase.  The very next day, on April 1, SW-3, another Sandoz senior sales executive, called T.P. at Perrigo – the other competitor on Bromocriptine – and they spoke for approximately seventeen minutes.  The next morning, on April 2, SW-3 called T.P. again and they spoke for

five minutes.  On this call, SW-3 conveyed to Perrigo a list of products that Sandoz

planned to increase pricing on that month (April, 2013), including Bromocriptine, as

well as the amount of those increases.

2117.  After hanging up with T.P., SW-3 called his boss at Sandoz, Kellum.

The call lasted one minute.  A few hours later, SW-3 called SW-1, a senior pricing

executive at Sandoz, and they spoke for approximately 10 minutes.

2118.  The next day, on April 3, Sandoz held an internal meeting attended by

sales and pricing personnel, including SW-3, SW-4, SW-1, and Kellum, to discuss the

upcoming Sandoz price increases, including Bromocriptine.

2119.  Two days later, on April 5, Sandoz implemented the Bromocriptine

increase and raised WAC pricing on the product by 205%.

2120.  Mylan and Sandoz were in regular communication throughout this

process through their employees, SW-4 and Jim Nesta.  For example, during the first

three weeks of May, 2013, SW-4 (at Sandoz) spoke with Nesta (at Mylan) regularly:

on May 8, Nesta called SW-4 at 7:51 am and they for approximately three minutes.  At

the start of the following week, on Monday, May 13, Nesta again called SW-4, this

time at 8:40 am, and they spoke for four minutes.  At the start of the week after that,

on Monday, May 20, SW-4 called Nesta at 10:42 am.

2121.  By late May, 2013, Mylan had resolved its supply issues and was readying

to increase its Bromocriptine prices.  To that end, on May 22, Mylan held an internal

meeting to discuss Bromocriptine pricing.

2122.  That same day, on May 22, 2013, ABC e-mailed Sandoz to request a bid on Bromocriptine, citing supply issues with its incumbent manufacturer.  S.G., a Sandoz sales executive, who had a better understanding of Mylan's plans, forwarded the request to Kellum.

2123.  Sandoz quickly set out to confirm the reason for ABC's request.  First thing the next morning, on May 23, 2013, Kellum called L.W., a sales executive at Mylan.  The call lasted two minutes.  Notably, this was the only call ever between the two, according to the available phone records – usually, rather than speaking directly to Kellum, L.W. sent and received messages with Sandoz via others, such as SW-3.  That same morning, SW-3 spoke twice with T.P. at Perrigo and SW-4 exchanged two calls with Nesta at Mylan, while each kept their respective bosses informed of the communications and progress in the discussion among the three cartel members.

2124.  These calls, all on May 23,  2013, are detailed as follows:

at 8:04 am, T.P. at Perrigo called SW-3 at Sandoz at for five minutes;

at 8:33 am, SW-3's boss, Kellum, called L.W. at Mylan for two minutes;

at 9:13 am, SW-3 called SW-1, for seven minutes, at the conclusion of which,

at 9:20 am, SW-3 called Kellum;

at 10:26, T.P. at Perrigo called his boss, Wesolowski;

then, at 10:49 am, SW-4 called Nesta at Mylan, but only for 37 seconds, likely leaving a voice-mail.

2125.  Then, at lunch-time, Nesta returned SW-4's call at 12:40 pm and they spoke for a minute and a half, and, at 2:48 pm, T.P. at Perrigo called SW-3 at Sandoz and they spoke for three minutes.

2126.  Immediately upon hanging up from speaking to Sandoz at 2:48 pm, T.P. at Perrigo then called his own boss, Wesolowski, at 2:51 pm to give a brief report on the Sandoz discussions, and finally, at 4:14 pm, Wesolowski returned T.P.'s call and they spoke for approximately a quarter-hour.

2127.  During these calls, Sandoz learned that ABC was Perrigo's customer and that Perrigo might be leaving the market for Bromocriptine due to supply problems.

2128.  After this series of calls, Kellum called S.G. (both at Sandoz) and they spoke for approximately twenty minutes.  While on the phone with Kellum, S.G. sent an internal e-mail, with a copy to Kellum, regarding the reason for ABC's bid request on Bromocriptine.

2129.  Not wanting to upset the market balance with its fellow cartel members, Sandoz ultimately decided to submit an offer to ABC for a one-time buy.  However, the customer declined the offer because Sandoz's pricing was too high.

2130.  Just one week later, on May 31, 2013, Mylan re-entered the market and published WAC pricing for Bromocriptine that matched Sandoz's increased pricing. In the days leading up to, and on the day of, Mylan's price increase, the co-conspirators' employees again exchanged several calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/28/2013 | Voice | L.W. (Mylan) | Outgoing | CW-3 (Sandoz) | 7:58:00 | 0:07:00 |
| 5/29/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 9:46:30 | 0:12:51 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 11:46:43 | 0:08:32 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:45:59 | 0:00:06 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:54:01 | 0:00:04 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 13:54:45 | 0:03:01 |
| 5/28/2013 | Voice | L.W. (Mylan) | Outgoing | CW-3 (Sandoz) | 14:23:00 | 0:03:00 |
| 5/28/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:29:00 | 0:04:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:21:00 | 0:02:00 |

2131.  As of June, 2013, Sandoz decided not to pursue additional market share on Bromocriptine.

2132.  Perrigo did not quickly follow the price increases taken by Sandoz and Mylan, in part due to their intermittent supply issues. As a result, Sandoz received several complaints from its customers that Perrigo was selling the product at a cheaper price.

2133.  For example, on July 22, McKesson e-mailed Sandoz requesting a price reduction for Bromocriptine because a competitor was selling the product. The next day, on July 23, SW-3 called L.W. at Mylan and they spoke for eight minutes. Within minutes of hanging up, SW-3 called SW-1. The call lasted two minutes. Two days later, Sandoz responded to McKesson and declined to lower its price.

2134. Then, on July 29, 2013, McKesson asked Sandoz to reconsider its decision because otherwise it would need to request a bid from Perrigo. That same day, T.P. of Perrigo called SW-3, twice. Both calls lasted only a minute and were likely voice-mails or missed calls. The next morning, SW-3 called T.P. and they spoke for

approximately a quarter-hour.  During these calls, they discussed the fact that Perrigo had not followed the Sandoz and Mylan price increases on Bromocriptine.  However, T.P. assured SW-3 that Perrigo would not take Sandoz's business at McKesson.  SW-3's contemporaneous notes reflects the conversation between him and T.P.

2135.  After hanging up with T.P., SW-3 then called SW-1 and they spoke for four minutes.  On this call, SW-3 conveyed to SW-1 what T.P. had told him about Bromocriptine. According to SW-3, it was not a question of whether Perrigo would follow, but of when they would  follow.  Armed with this assurance from Perrigo, Sandoz responded to McKesson's request by declining to lower its pricing.

2136.  Similarly, a month later, on August 23, Omnicare, a Sandoz customer, e-mailed Perrigo, stating that they noticed Perrigo's price for Bromocriptine was significantly lower than the other manufacturers.  P.H., a sales executive at Perrigo, forwarded the e-mail to T.P. and T.P responded.  Perrigo ultimately declined to bid on the business.  On September 5, 2013, P.H. e-mailed Omnicare, letting them know.

2137.  Sandoz and Mylan generated a substantial amount of money from Bromocriptine sales in 2013.  For example, on February 4, 2014, Sandoz released a business review report that detailed how the 2013 price increases for certain drugs delivered upwards of $197 million of revenue for Sandoz, after price protection.  Among the drugs mentioned, Bromocriptine realized incremental net sales of $3.2 million after price protection.

2138.  Perrigo ultimately followed its competitors and implemented a price increase on Bromocriptine in October, 2014.

2139.  As usual, the relevant cartel members were in contact with each other: on Friday, October 2, T.P. at Perrigo called SW-3 and they spoke for seven minutes. Immediately upon hanging up with SW-3, T.P. called his supervisor, Wesolowski. And less than a week later, on Tuesday, October 7, Perrigo sent letters to its customers, notifying them of the Bromocriptine increase.  The next day, October 8, 2014, SW-3 called T.P. and they spoke for four minutes.

2140.  No shortages or other market features can explain Defendants' price increases for generic Bromocriptine during the Relevant Period.

2141.  The elevated prices of generic Bromocriptine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2142.  The unlawful agreement among Defendants Sandoz, Perrigo, and Mylan, regarding generic Bromocriptine, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BM.  Isotretinoin Capsules

2143.  Generic Isotretinoin is used to treat skin cancers and severe acne.

2144.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Isotretinoin ("Isotretinoin"), as follows:

2145.  Teva and Dr. Reddy's co-ordinated to allocate the market for Isotretinoin, using WBAD and ABC as intermediaries to pass the co-conspirators' anticompetitive messages.

2146.  For example, in August, 2014, Dr. Reddy's added the drug to its "wish list" to WBAD, asking to be given the ABC business along with other drugs.

2147.  Within nine months, by April 9, 2015, Teva had conceded CVS, Cardinal and ABC to Dr. Reddy's, although Teva was internally divided on whether to concede ABC. Although a Teva Senior Director was upset over the concession, she was nevertheless overruled due to Teva's earlier concessions that proceeding with the transaction would increase DRL's share, which was considered fair in what appeared at the time to be a three-player market.

2148.  A Teva Senior Director wrote to WBAD and ABC executives regarding the ABC formulary with the intent that Dr. Reddy's would understand that this concession signified the end of Teva's giving up of market share.

2149.  No shortages or other market features can explain Defendants' price increases for generic Isotretinoin during the Relevant Period.

2150.  The elevated prices of generic Isotretinoin resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they

would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2151.  The unlawful agreement between Defendants Dr. Reddy's and Teva regarding generic Isotretinoin was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BN.   Medroxyprogesterone Tablets

2152.  Generic Medroxyprogesterone is used to treat amenorrhea (unusual stopping of menstrual periods) and abnormal uterine bleeding.

2153.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Medroxyprogesterone tablets ("Medroxyprogesterone"), as follows, beginning at least as early as March, 2013:

2154.  During the Relevant Period, Teva and Pfizer's *alter ego*, Greenstone, dominated the market for generic Medroxyprogesterone tablets.

2155.  In 2013, Teva and Pfizer/Greenstone began planning to increase the prices of Medroxyprogesterone tablets.  Patel at Teva and Robin Hatosy, Director of National Accounts at Greenstone, communicated frequently to orchestrate the price increases.  For example, they exchanged six text messages on November 16 and spoke by phone on November 23.

2156.  Not long after Greenstone had been communicating with Teva, a Greenstone executive informed a Pfizer employee about the price increase proposal. The Pfizer employee granted approval for the price increases on November 22, 2013, and the next day, Patel communicated with Robin Hatosy at Greenstone.  Patel also spoke to Hatosy three times on December 2, 2013, the day Greenstone planned to send price increase notices to its customers.

2157.  After the price increases, Teva and Greenstone were careful to maintain Fair Shares of the market.

2158.  No shortages or other market features can explain Defendants' price increases for generic Medroxyprogesterone tablets during the Relevant Period.

2159.  The elevated prices of generic Medroxyprogesterone tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2160.  The unlawful agreement between Defendants Teva and Pfizer/ Greenstone, regarding generic Medroxyprogesterone tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**BO.  Cefaclor Tabs, Cefaclor ER Tabs, Cefadroxil Tabs, Cefdinir, Cefprozil Tabs, Cephalexin Tabs, Cimetidine Tabs, Fluocinonide, Fluconazole Tabs, Isoniazid, Methotrexate**

**Tabs, Moexipril HCL Tabs, Moexipril HCL/HCTZ Tabs, Nabumetone Tabs, Nadolol Tabs, Ondansetron, Oxybutynin CL Tabs, Pravastatin, Prazosin HCL Caps, Ranitidine HCL Tabs, and Adapalene Gel**

2161.  Generic Adapalene Gel is a topical retinoid used primarily in treatmenting mild-to-moderate acne.

2162.  Generic Nabumetone tablets ("Nabumetone") are a non-selective, Non-Steroidal Anti-Inflammatory Drug (NSAID) used to treat pain and inflammation.

2163.  Generic Oxybutynin Chloride tablets ("Oxybutynin," "Oxybutynin CL," or "Oxybutynin Chloride") are used to treat certain bladder and urinary conditions. Belonging to a class of drugs called antispasmodics, Oxybutynin Chloride relaxes the muscles in the bladder to help decrease urgency and frequent urination.

2164.  Generic Pravastatin tablets ("Pravastatin") are used to lower blood levels of lipids, including triglycerides and cholesterol.

2165.  Generic Ranitidine HCL tablets ("Ranitidine") decreases stomach acid production, and is commonly used in treatment of peptic ulcer disease, gastroesophageal reflux disease, and Zollinger–Ellison syndrome.

2166.  As part[43] of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of

---

[43] A number of drugs are discussed in more than one section in this Complaint.  For example, some facts relating the solution formulation of Fluocinonide have already been set forth, *supra*, as have a variety of Mylan products, including Amiloride Tabs and Methotrexate Tabs.  As discussed elsewhere, the web-like nature of cartel relationships makes linear description almost impossible.  This section focuses on

generic:  Adapalene Gel, Cefaclor ER Tabs, Cefadroxil Tabs, Cefdinir Caps, Cefdinir

Oral Solution,  Cefprozil Tabs, Cephalexin Tabs, Cimetidine Tabs, Fluocinonide

Cream, Fluocinonide Emolient Cream, Fluocinonide Gel, Fluocinonide Ointment,

Fluconazole Tabs, Isoniazid Tabs, Methotrexate Tabs, Moexipril HCL Tabs,

Moexipril HCL/HCTZ Tabs, Nabumetone Tabs, Nadolol Tabs, Ondansetron,

Oxybutynin CL Tabs, Pravastatin tabs, Prazosin HCL Caps, and Ranitidine HCL

Tabs, at least in part, as follows:

2167.  In April of 2013, Teva took a further step toward even greater co-

operation with its fellow cartel members in implementing more significant price

increases in part by, as alleged *supra*, Teva hiring Nisha Patel from ABC as Teva's new

Director of Strategic Customer Marketing.  Teva hired Patel specifically to identify

generic drugs for which Teva could raise prices and then conspire with the other

cartel members to maintain those increased prices, which Patel did.  This was a

significant factor in Patel's performance evaluations and bonus calculations and, as

discussed more fully below, she was rewarded by Teva for doing it, including a bonus

of over $30,000 – on almost $1 billion per quarter in additional revenue and profits

that Teva was able to unlawfully extract from the victims of Defendants' cartel,

including Plaintiffs.

---

some of the cartel's more Teva-focused conduct with relation to various formulations
of Fluocinonide, which are then also discussed, with less focus on Teva, *infra*, in
another section.

2168.  In her position as Director of "Strategic" Customer Marketing, in addition to her other responsibilities, Patel would and did implement "strategic" decisions not to vie for certain customers' business because doing so would violate Defendants' overarching conspiracy.

2169.  Among other things, Patel's job responsibilities included serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs; establishing pricing strategies for new product launches and in-line product opportunities; and, most importantly, identifying suitable generic drugs for significant price increases, which included  overseeing the customer bid process and product pricing administration at Teva.  Patel had approximately 9-10 direct reports in the pricing department at Teva.

2170.  Prior to joining Teva, Patel had worked for eight years at a large drug wholesaler, ABC, working her way up to Director of Global Generic Sourcing. During her time at ABC, Patel had routine interaction with representatives from every major generic drug manufacturer, and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

2171.  Once Patel began her employment at Teva, her communications with competitors became more systematic – and clustered around market events such as price increases, market entry, customer challenges, and loss of exclusivity.

2172.  Patel also looked very closely at Teva's relationships with its competitors to ensure co-ordination as part of Defendants' overarching conspiracy.  Patel

understood – and stressed internally at Teva – that it was important to work with manufacturers who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly.  Conversely, it was equally important for Patel to be able to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly.

2173.  For example, during her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to B.L. on April 29, 2013, for nearly twenty minutes. During these initial communications, Teva and Upsher-Smith confirmed their agreement that the two cartel members would follow each other's price increases.

2174.  Likewise, in one of her earliest conversations after joining Teva with a senior sales executive at Sandoz, who will be referred to in this Complaint as SW-1, Patel told SW-1 that Patel had been hired by Teva to identify drugs where Teva could increase its prices.  She asked SW-l how Sandoz handled price increases. SW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after any price increase by Teva.

2175.  Patel had multiple means of communicating with employees of Teva's co-conspirators, including telephone, text, message functions on Facebook and LinkedIn, encrypted communication services like Snapchat, and, of course, in person.

2176.  Through her communications with employees of other Defendants, Patel learned about their planned price increases, which Teva agreed to follow with

increases of its own, rather than gaining increased market share at Defendants' expense.

2177.  For example, on May 2, 2013, Patel had phone calls with a senior sales executive at Glenmark, who will be referred to in this Complaint as GW-5/CW-5, with SW-1 at Sandoz for a quarter-hour, and for a half hour with Actavis's Rogerson.

2178.  Like Falkin, Rogerson stayed in his role at Actavis until it was acquired by Teva, in August of 2016.  Shortly thereafter, Rogerson moved on to Defendant Amneal as a Senior Director of Marketing and Business Analytics.  Between February, 2010, and July, 2016, Rogerson exchanged at least 635 phone calls or text messages with his contacts at Defendants Wockhardt, Teva, Dr. Reddy's, Sandoz, Lannett, Glenmark, Taro, and Zydus, including over 300 phone calls or text messages with K.A. at Wockhardt and over 150 phone calls or text messages with Nisha Patel at Teva.

2179.  As of May, 2013, the market for Pravastatin was dominated by five members of Defendants' cartel:  Glenmark, Teva, Lupin, Zydus and Apotex.

2180.  In the early morning of May 2 (a little before 7:00 am), Patel replied to a colleague's e-mail titled "Price increases – will you be scheduling time next week to discuss?" by writing "When you get in, let's touch base on the high priority items below. . . . I also expect to have some high priority items to add to this list.  I should have them shortly."

2181.  Patel (Teva) and GW-5 at Glenmark had four calls on May 2, 2013, and two short calls and a text message the next day.  The total time for the May 2 calls was a little under a half hour; the first of those calls was for approximately five minutes and occurred a little after 7:00 am.

2182.  Shortly after that call, at 7:44 am, Patel sent a follow-up to the e-mail above, where she identified six different "high priority" drugs to add to the price increase list, including:  Adapalene Gel; Nabumetone; Pravastatin; Ranitidine; Moexipril; and MoexiprilHCTZ.  And all were made by Glenmark.

2183.  But Glenmark was not the only cartel member with whom Teva was communicating in that timeframe.  Zydus was another Pravastatin supplier, and Teva was talking to them, as well.  Thus, on May 3, 2013, Green called M.K. (a senior executive at Zydus), twice, with one call lasting four minutes.  Over the next several weeks, Green communicated numerous times with both M.K. and K.R., a senior sales executive at Zydus, to co-ordinate a Zydus price increase on Pravastatin.

2184.  Meanwhile, on May 6 and 7, Patel communicated with Lupin and J.C., a national account executive at Glenmark, multiple times.  Those calls are detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:06:45 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:20:44 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:08:39 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 0:08:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:01:03 |

2185.  During one or more of her calls with J.C. and/or GW-5 at Glenmark in early May, 2013, Patel obtained specific price points from Glenmark for its Pravastatin (and other) price increases – well before the Glenmark increases became public – and documented those price points in her price increase spreadsheet.

2186.  By May 8, Teva executives clearly understood that Glenmark would be leading the Pravastatin price increase, and were comfortable enough with the situation that one marketing executive at Teva indicated in an e-mail to Patel that he was hoping to raise price on Pravastatin "if/when Glenmark does."

2187.  Then, on May 14, J.P., an Associate Director of National Accounts at Teva, exchanged multiple text-messages with Zydus's Vice President of Sales, K.R. – again, illustrating the institutional nature of Defendants' co-operation among themselves, rather than merely personal relationships among their employees.

2188.  Likewise, in the week leading up to Patel's decision to revise her price increase list to include Pravastatin, K.R. also spoke to Green (at Teva), as did M.K., another senior executive at Zydus.

2189.  Glenmark had, at that time, not yet increased prices on any of those drugs, nor had it sent any notices to customers indicating that it would be doing so, and did not send such notices until May 15, 2013.

2190.  As the Glenmark increase for Pravastatin was approaching, Teva continued preparing.  In accordance with the so-called "fair share" agreement of Defendants' cartel, Teva wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

2191.  Thus, as the Glenmark price increases were approaching, Teva took steps to make sure that it did nothing to undermine its co-conspirator' price increases. Early in the morning of May 15 (before 8:00 am), anticipating the Glenmark price increases that were announced later that day, Patel e-mailed her Teva colleagues and told them to alert her to any requests by customers for pricing relating to eight different Glenmark drugs, at least six of which were ultimately included in the "Immediate PI File":  "Adapalene Nabumetone Fluconazole Tabs Ranitidine Moexipril Moexipril HCTZ Pavastatin" and "Ondansetron."

2192.  A Teva executive also sent an e-mail out to the pricing team stating that "Nisha would like to be made aware of any requests (including in-house RFPs) that include" several of the Glenmark product families, including Pravastatin.  The Teva executive concluded: "In the event you are reviewing these products for any request, please make her aware and as a group we can discuss where to price based on market intelligence she has collected."

2193.  Later that same day, May 15, 2013, Patel had a 25-minute conversation with SW-1 at Sandoz.

2194.  Also that same day, Glenmark notified its customers that it would substantially raise the price of Pravastatin, effective the next day:  May 16, 2013.

2195.  As was now the practice among co-conspirators, the day before and the day of the Glenmark increase brought a flurry of phone calls among several of the co-conspirators, including Teva executives. At least some of those calls are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:05:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Incoming | M.K. (Zydus) | 0:03:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:16:00 |
| 5/16/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:04:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:05:57 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |

2196.  Continuing to follow Defendants' pattern and practice, Patel also spoke to GW-5 at Glenmark for nearly six minutes the next day, May 16, 2013 – the day the Glenmark price increases became effective.  Glenmark increased its prices on the following drugs where there was an overlap with Teva:  Adapalene Gel; Nabumetone;

Fluconazole Tablets; Ranitidine; Moexipril; Moexipril HCTZ; Pravastatin; and Ondansetron.

2197.  The day after that, May 17, Patel continued to co-ordinate price increases with both Glenmark and Lupin. For example, at 12:08pm, Patel called Berthold at Lupin for an eleven minute call.  While she was on the phone with Berthold, GW-5 at Glenmark called Patel (at 12:09pm) and left a 23-second voice-mail.  Immediately after she hung up the phone with Berthold, Patel returned the call to GW-5; they ultimately connected for approximately eight minutes.

2198.  Patel also spoke to J.C. at Glenmark multiple times, and Teva followed not long thereafter with increases of its own on those products – after further communications with its co-conspirators.

2199.  But first, after the implementation of the Glenmark price increases on May 16, and before Teva had the opportunity to follow those increases, Teva was approached by several customers looking for a lower price.  Teva refused to bid on most of these solicitations in order to maintain market stability.  When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business.  As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark increase drugs:  "IF we bid, we need to bid high, or we will disturb the market."

2200.  Patel did not immediately include, on Teva's list, every drug where Glenmark increased prices – but that soon changed.  For example, the market for

Fluconazole Tablets included Defendant Greenstone as a manufacturer (albeit with relatively low market share), in addition to Teva and Glenmark.

2201.  As of Friday, May 17, 2013 – heading into the week-end – Patel had not yet added Fluconazole to her "Immediate PI File."  In an internal e-mail that day, Patel indicated to colleagues - including her boss at Teva, K.G. – that she was "[g]athering some revised intel" about Fluconazole in order to determine next steps. The following Monday, May 20, Patel called Robin Hatosy, the national account manager at Greenstone, but was unable to connect.  As a result, even though they were added later, Fluconazole Tabs were not included in the "Immediate PI File" as it existed on that date.[44]

2202.  But that Monday, May 20, 2013, Patel was able to speak to SW-1 at Sandoz for approximately 18 minutes.  Between this call and the one the previous week, Patel was able to confirm that Sandoz would provide cover bids for at least Nabumetone (and likely its other products, as well) that would be too high to be successful, so that Sandoz would not accidentally take its co-conspirators' market share in advance of Sandoz's own price increases.

2203.  As a result, at the same time, Sandoz was internally discussing its "bidding high" strategy on multiple items.  On the afternoon of Wednesday, May 22,

---

[44] Patel was ultimately not able to communicate with Hatosy until a week later, on May 28 – by which time, she had transmitted the "Immediate PI File" up Teva's chain of command for initial approval.  But the next day, Fluconazole tabs were added to the list and were ultimately included in Teva's price increases.

a Sandoz pricing analyst sent the following e-mail to Kellum and SW-1, explicitly

confirming the strategy with respect to both "Nabumetone" and other "price increase

items":

| From: | ███████████ |
| Sent: | Wednesday, May 22, 2013 4:14 PM |
| To: | Kellum, Armando; ███████████ |
| Subject: | Target RFP Question |

AK,

I know we agreed not to bid on potential price increase items, but we bid Nabumetone at a high price.  Are you okay with us bidding on this one?  McKesson does not purchase this product from us.

2204.  Also, on Wednesday, May 22, the same day that Sandoz was e-mailing

internally about bidding high on Nabumetone and not bidding at all on other generic

price increase items, Teva was speaking to Taro regarding fixing the market for

generic Adapalene Gel.  In addition to Teva and Glenmark, Taro was the only other

manufacturer in the market for generic Adapalene Gel at that time. During an

approximately ten-minute phone conversation between Patel at Teva and Ara

Aprahamian, the Vice President of Sales and Marketing at Taro, on May 22, 2013, the

cartel members agreed to follow the Glenmark increase, which Patel referred to in the

"Immediate PI File" spreadsheet by the word "rumors," which Patel used – in

accordance with Defendants' cartel's regular pattern and practice – to camouflage the

true source of this information, *viz.* an employee of a fellow cartel member.

2205.  Further evidence of Defendants' use of this pattern and practice in particular, and also of Defendants' broader culpability, is that shortly after his phone call with Patel, Aprahamian made an internal Taro request for a report with specific information about Adapalene Gel, including volume and pricing, in order to evaluate a potential Taro increase on the drug.

2206.  As with Patel's "Immediate PI File," Aprahamian indicated that the reason for his request was that the "Rumor mill has some price changes in the market."

2207.  The next day, Thursday, May 23, Aprahamian directed a Taro employee to implement an immediate ("if you can do today fine, otherwise early next week") price increase on Adapalene Gel on most accounts, except for Target:  "please co-ordinate price adjustment for Adapalene gel for all the highlighted accounts (distributor price only – most specifically keep Target net price the same but Anda distributor price needs to be raised) to a new net of $97.25….."

2208.  Meanwhile, with regard to Pravastatin, Teva executives had spoken to all of the relevant cartel members about Pravastatin except Apotex.  And while all of these other communications were going on during the week of May 20-24, Patel had the following series of phone calls with B.H., a senior sales executive at Apotex, during which Apotex agreed to raise its price for Pravastatin:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:21:56 |
| 5/21/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:11:28 |
| 5/23/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:06:13 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:00:39 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Outgoing | B.H. (Apotex) | 0:12:07 |

2209.  And that Friday, May 24, 2013, Patel completed and sent her initial list of recommended price increases to K.G., her Teva colleague – Pravastatin was not yet included, but it soon would be.  She sent the list via e-mail, with an attached spreadsheet, titled "Immediate PI File."  This file included at least twelve drugs: Nabumetone tabs, Ranitidine HCL tabs, Moexipril HCL tabs, Moexipril HCL/HCTZ tabs, Adapalene Gel, Cefdinir oral suspension, Cefprozil tabs, Cefdinir caps, Fluocinonide ointment, Fluocinonide emolient cream, Fluocinonide gel, Fluocinonide cream, Cefaclor ER tabs, Cephalexin tabs, and Cefadroxil tabs.[45]

2210.  The spreadsheet also contained columns directed to fellow cartel members and their market shares (along with those of a competitor who may not have been a member of Defendants' cartel) and a column directed to competitively sensitive information about future pricing for those cartel members – information that Patel could have learned (and did, in fact, learn) only through Teva's discussions

---

[45] While Fluconazole tabs were not included in that iteration of the list, they were, as discussed *infra*, soon added, once Teva and Greenstone connected.

Pravastatin would be added to that group shortly, once price-increase confirmation had been received from ***both*** the other suppliers of that market – who were also, not coincidentally, members of Defendants' cartel:  Glenmark and Zydus.

with and among its co-conspirators.  These columns from that spreadsheet are set

forth below:

| Product Category | Competitors | Reason for Increase |
|---|---|---|
| NABUMETONE TABLETS Total | Watson 26, Glenmark 25, Sandoz 5 | Follow 10% below Glenmark. Sandoz also bidding high. |
| RANITIDINE HCL TABLETS Total | Glenmark 1, Amneal 35, Wockhardt 10? | Follow Glenmark and Amneal increase. 3% below Glenmark. |
| MOEXIPRIL HCL TABLETS Total | Glenmark 18, Paddock 16 | Follow Glenmark increase.  5% lower |
| MOEXIPRIL HCL/HCTZ TABLETS Total | Glenmark 78, Paddock 2 | Follow Glenmark increase.  5% lower |
| ADAPALENE GEL Total | Glenmark 13, Taro 45 | Follow Glenmark increase. 5% lower. Rumors of Taro increase |
| CEFDINIR ORAL SUSPENSION Total | Lupin 35, Northstar 5, Sandoz 3 | Follow Lupin. 8-10% lower |
| CEFPROZIL TABLETS Total | Lupin 42, Northstar 10, Sandoz 18 | Follow Lupin. 8-10% lower |
| CEFDINIR CAPSULES Total | Lupin 49, Sandoz 16, Northstar 7 | Follow Lupin. 8-10% lower |
| FLUOCINONIDE OINTMENT Total | Taro 44, Sandoz 1 | Raise to follow Taro |
| FLUOCINONIDE CREAM E Total | Taro 62, Sandoz 10 | Raise to follow Taro |
| FLUOCINONIDE GEL Total | Taro 63, Sandoz 9 | Raise to follow Taro |
| FLUOCINONIDE CREAM Total | Taro 68, Sandoz 1 | Raise to follow Taro |
| CEFACLOR ER TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEPHALEXIN TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEFADROXIL TABLETS Total | Westward 41 | EXCLUDE; ERROR IN SOURCE DATA |

2211.  As just discussed (and as further annotated on that image in the chart

below), ***prior*** to sending this file to K.G. on Friday, May 24, Patel or another

executive at Teva spoke with Teva's fellow cartel members for every drug on the list

except for Cefadroxil tablets and the Teva Exclusive drugs, Cefaclor ER tablets and

Cephalexin tablets.  But even those drugs are part of this case because Teva was able

to, and did, price its exclusive products higher than it would have if there had been

any significant risk of Teva's co-conspirators entering those markets and competing

for market share and/or on price – which, of course, there wasn't, because of

Defendants' cartel's overarching agreement.

2212.  During these communications, and as part of the cartel's overarching

agreement, Teva and its co-conspirators agreed to fix prices and avoid competing with

each other in the markets for these drugs, as set forth in certain examples below:



2213.  The graphic above actually understates Defendants' communications, since, for clarity, it only shows one dialog box per cartel member, with only some of the relevant conversations and people involved.

2214.  On Monday, May 27, the preceding (non-annotated) version of that file, including its competitively sensitive information (which Patel had obtained from Teva's fellow cartel members), was sent by K.G. to his and Patel's boss, Maureen Cavanaugh ("Cavanaugh") – at that time, the Senior Vice President of Sales and Marketing at Teva.  Cavanaugh adopted and approved Patel's price increase recommendations the very next day:  Tuesday, May 28, 2013.

2215.  As it turned out, Teva's efforts to co-ordinate details on additional products also bore fruit on that Tuesday.  That day, Tuesday, May 28, Hatosy at Greenstone and Patel at Teva finally connected by telephone and had an approximately twenty-minute call – a conversation not reflected on the graphic above. But the very next day, Patel added Fluconazole tabs to the Teva price increase list, and later Teva (in co-ordination with Sandoz and Glenmark) raised its own prices on them, on July 3.

2216.  Also on May 28, Apotex raised its price for Pravastatin. That same day, Defendant Green also exchanged six text messages with K.R. at Zydus.

2217.  The next day, May 29, after a conversation with Maureen Cavanaugh, Patel added Pravastatin to the Teva price increase list.  That same day, Green spoke to K.R. at Zydus twice more, and exchanged a further four text messages.  Two weeks later, Zydus followed with a price increase of its own on June 14, 2013.

2218.  In the days leading up to the Zydus increase, Green spoke to K.R. and M.K. at Zydus several times, including at least the following calls and text messages:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Incoming | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |
| 6/13/2013 | Voice | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:07:11 |

2219.  Teva ultimately followed Glenmark, Apotex and Zydus with a significant (653%) price increase of its own on Pravastatin on August 9, 2013. As described in more detail *infra*, in the days and weeks leading up to the August 9 increase, Patel and Green were communicating with Teva's co-conspirators on Pravastatin to co-ordinate its implementation.

2220.  And leading up to its July 3 multi-drug price increase, Teva continued to co-ordinate with Sandoz and other cartel members – and to expand its list.  For example, Sandoz was also in the market for Ranitidine, along with Teva and Glenmark.

2221.  Meanwhile, during in the week of May 27, as promised, Taro raised its prices on Adapalene gel – on May 29.

2222.  The next day, on May 30, 2013, starting at approximately 8:15 am, Patel spoke to GW-5 at Glenmark, for a little less than a quarter-hour.  Immediately after

hanging up the phone, Patel called SW-1 at Sandoz and left him a voicemail.  SW-1 called her back promptly and they discussed Glenmark's price increase on Ranitidine and Teva's plans to follow that increase.  Patel and SW-l then had several short but substantive calls, over the next half-hour.

2223.  Later that same morning (but after his conversations with Patel), SW-l then sent an internal Sandoz e-mail at 10:02 am to Kellum, indicating that SW-1 believed there would be price increases in the pipeline with respect to Ranitidine, and suggesting a substantial increase in Sandoz's price:

From: ▓▓▓▓▓
Sent: Thursday, May 30, 2013 10:02 AM
To: Kellum, Armando
Cc: ▓▓▓▓▓
Subject: Ranitidine tabs

I think there might be some price increases in the pipeline.

Per analysource Glenmark just took a WAC increase to $9.53 from $2.70(we are at 4.98) on the 150mg on 5/16.  I wonder if Teva and Amneal will follow?  They are the two dominant players on this molecule

We just bid and I think we are getting the award at a contract price of $1.77.  This contract is negative gross margins but 15% above variable costs.  RAD was at $0.95.  Looking at the competition of Amneal, Teva and Glenmark I thought that this was the best way to go to get into this product, we are currently sitting with a 1.8% share.

RAD is also buying up a lot of our short dated product.

Wonder if there is any way to work with them to revise the cost at a future date if Teva and Amneal go up as well.  I'm thinking we can go from $1.77 to $5 maybe

2224.  The communications among cartel members about competitively sensitive information were constant and unrelenting during this period.  For example, in the Pravastatin market, Green had numerous conversations with Zydus executives in the week prior to that company's Pravastatin increase, as shown in the table below, starting on Sunday, June 9, 2013:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:12:00 |
| 6/10/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:02:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |

2225.  On June 14, the day after the last of these calls, Zydus increased its price

on Pravastin by over 150%.  Teva ultimately raised its prices on Pravastatin two

months later, on August 9, 2013.  At that time, Patel recommended that Teva follow

the cartel members who had already raised their prices – including Zydus.  Prior to

Teva raising its prices on August 9, Green (Teva) spoke to K.R. at Zydus three times

– twice on August 4, and once on August 5.

2226.  Likewise, back in June, Teva was "attempting to understand how [its]

pricing for Isoniazid compares to the rest of the market."  On June 11, 2013, L.R., a

Teva marketing representative, asked Patel whether she was "aware of any

competitive market intel for this family?"  By "family," the representative was

referring to (and Patel understood her to mean) the Isoniazid group of products,

including all formulations that included this molecule – and "molecule" was another

way that Defendants' employees would refer to all formulations that contained a particular API.

2227.   The marketing representative explained that Sandoz was also in the market for Isoniazid and had "drastically increased their pricing" in January, 2013. Patel responded:  "I will try to get the scoop on Sandoz pricing tomorrow."

2228.   And by "get the scoop," of course, Patel meant that she would reach out to Teva's fellow cartel member (*i.e.*, Teva's co-conspirator), Sandoz, to find out its prices – which is exactly what Patel did, when she spoke to SW-1 at Sandoz at least five times the next day, on June 12, 2013.

2229.   Patel called SW-1 early in the morning and the two spoke for approximately 20 minutes.  Subsequently, SW-1 called Patel back and they spoke for a few minutes more, and then Patel began writing the following e-mail, which she sent at 8:27 am and which reflected some of the discussion she was having with SW-1 about pricing, market share, and customer allocation, including that Sandoz had 62% of the Isoniazid market, that Teva had about 36%, and that West-Ward was likely out of the picture altogether, due to supply limitations – and, of course, included the suggestion to have additional discussions in a way that would not leave any electronic record:  "come by to chat."  The e-mail is pictured below:

**From:** Nisha Patel02
**Sent:** Wednesday, June 12, 2013 8:27 AM
**To:** ▮▮▮▮▮▮▮▮
**Cc:** ▮
**Subject:** RE: Isoniazid market pricing



I hope to get intel later today. In the meantime, I am hearing about IMS info that contradicts what we have. I am being told that as of quarter ending March 2013, Sandoz has 62% share, with Teva having about 36% share. The data also indicates that Westward has less than 1% share, which implies that they are not back. I have also heard that Westward makes the product for Versa, so they are out for now as well. You may want to request more current share data from Market Research to verify?

It is my opinion that we could have raised pricing to a higher level, but I also understand that there are several factors to consider in these decisions. Depending on what you plan to include in your response, I would also have supply info handy. I imagine that we could easily have picked up more share at this very low price, but were probably limited by supply...which is why Sandoz is able to maintain business at their high price.

I'll pass on additional info as I receive it. If you have any questions, please feel free to come by to chat.

2230.  Later that day, at 3:21 pm, Patel passed along additional information with specific price points she had received from SW-1 at Sandoz, including the 300 mg tablet and the 100 mg tablet:



**From:** Nisha Patel02
**Sent:** Wed 6/12/2013 3:21 PM (GMT-05:00)
**To:** ▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮
**Bcc:**
**Subject:** RE: Isoniazid market pricing



Wholesaler nets for Sandoz product are around $100 for the 300mg 100s and $80 for 100mg 100s. Our WACs are very low. Let me know if you need anything else.

2231.  As discussed more fully below, Teva ultimately increased its Isoniazid prices on a year and a half later, on January 28, 2015 – in co-ordination and co-

operation with Sandoz, of course.  Just about a week before that increase, Patel spoke to SW-1 for approximately a quarter-hour, on January 22, 2015.

2232.  Meanwhile, on June 13, 2013, K.G. at Teva sent an e-mail to several Teva employees, including Patel, directing them to "share any competitive intelligence you may have or receive" regarding Oxybutynin Chloride.  At that time, Teva had been considering whether to delete the drug from its inventory, due to low supply and profitability.

2233.  But one factor that could – and, thanks to Defendants' cartel, in fact did – change that calculus for Teva was the ability to implement a significant price increase.  As a result, the next day – Friday, June 14, 2013 – while considering whether to change Teva's plan to delete the drug, a Teva employee asked Patel whether she could "provide an estimate of the pricing we might secure business at?".

2234.  Patel did not wait until Monday to reach out to the employee of a fellow cartel member, Upsher-Smith.  Instead, the very next day, Saturday, June 15, Patel exchanged six text messages with B.L., a senior national account executive at Upsher-Smith – a cartel member that manufactured Oxybutynin.

2235.  And on Wednesday, June 19, Teva learned that the other manufacturer in the market for Oxybutynin Chloride had increased its price for that drug.  As a result, Teva did not exit that market.  Instead, a national account executive at Teva sent an e-mail to Patel, asking "Did you know about the Oxybutynin? We have small share, but huge increase there!"  Of course, this was not news to Patel.  Instead, she

humble-bragged that she'd already heard the news: "Yes, heard late last week. The train is moving so fast, I'm worried we won't get on!" The second sentence was not a statement of fact; in fact, Patel knew that Teva absolutely would be getting on board the Oxybutinin price-increase train, which it did less in two weeks' time.

2236.  As part of that price-increase process, that same day, Patel instructed a colleague to add Oxybutynin Chloride to the Teva price increase list and began taking steps to implement the increase.

2237.  And in less than two weeks' time, Teva convened a meeting on Tuesday, July 2, 2013, to discuss its price increases that were going into effect (and, in fact, did go into effect) the next day on at least the following 20 product families (*i.e.*, all doses/strengths/sizes of a given formulation):

Adapalene Gel

Cefaclor ER Tablets

Cefadroxil Tablets

Cefdinir Capsules

Cefdinir Oral Suspension

Cephalexin Tablets

Cimetidine Tablets

Fluconazole Tablets

Fluocinonide Emollient Cream

Fluocinonide Cream

Fluocinonide Gel

Fluocinonide Ointment

Methotrexate Tablets

Moexipril HCL Tablets

Moexipril HCL/HCTZ Tablets

Nabumetone Tablets

Nadolol Tablets

Oxybutynin CL Tablets

Prazosin HCL Capsules

Ranitidine HCL Tablets.

2238.  A picture of that invitation follows:

| Price Increase -- Agenda | |
|---|---|
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler; |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

1) Price increase effective Wednesday, 7/3/2013

2) List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

2239.  As previously discussed, Teva co-ordinated with manufacturers for all of those products.  And because of the cartel's so-called "Fair Share" guidelines, even for the products where Teva was exclusive (Cefaclor ER, Cefadroxil, and Cephalexin), Teva was able to raise its prices significantly – from 25% to 95% – because it did not

need to worry about significant competitors coming in and undercutting these increased prices to obtain market share.

2240.  The graphic below is a marked-up version of the agenda, illustrating some of the contacts among cartel members regarding these products, leading up to the price increases, including, for example, communications between Mylan and Teva discussed *supra*, with respect to the Amiloride Tabs group of products:

2241.  The next day, July 3, Teva implemented the promised price increases on the wide range of products identified above.  That same day, Patel spoke to Robin Hatosy (Greenstone) for approximately a quarter-hour; she also spoke with GW-5 at Glenmark for approximately five minutes.  The Teva price increases were staggering – for example, for Fluconazole Tablets, from 875% - 1,570%, depending on the dosage strength.  (Greenstone then followed with its own increase on that product on August 16, 2013.  Teva co-ordinated those increases with both Glenmark and Greenstone).

2242.  Similarly, Teva's price increases ranged between 1,100 - l,500 % on Oxybutynin Chloride, depending on dosage strength.  Like the other drugs on the list, Teva would not have increased its price without first obtaining agreement from its co-conspirators that they would not compete with Teva or steal market share after the price increase.

2243.  Further evidence of the widespread knowledge and acceptance of Defendants' cartel's existence and central agreement is that, in January 2015, Defendant Teva was in discussions with a large retail customer about the possibility of becoming its supplier for Moexipril HCL HCTZ Tablets. The customer stated "Yes, I would like a OTB [One Time Buy]. Can you provide pricing? And yes, we should discuss an ongoing offer as well.  I think you are way under your 'fair share' on this one if I remember correctly."

2244.  No shortages or other market features can explain Defendants' price increases for generic Adapalene Gel, Cefaclor ER Tabs, Cefadroxil Tabs, Cefdinir

Caps, Cefdinir Oral Solution,  Cefprozil Tabs, Cephalexin Tabs, Cimetidine Tabs, Fluocinonide Cream, Fluocinonide Emolient Cream, Fluocinonide Gel, Fluocinonide Ointment, Fluconazole Tabs, Isoniazid Tabs, Methotrexate Tabs, Moexipril HCL Tabs, Moexipril HCL/HCTZ Tabs, Nabumetone Tabs, Nadolol Tabs, Ondansetron, Oxybutynin CL Tabs, Pravastatin Tabs, Prazosin HCL Caps, or Ranitidine HCL Tabs during the Relevant Period.

2245.  The elevated prices of generic Adapalene Gel, Cefaclor ER Tabs, Cefadroxil Tabs, Cefdinir Caps, Cefdinir Oral Solution,  Cefprozil Tabs, Cephalexin Tabs, Cimetidine Tabs, Fluocinonide Cream, Fluocinonide Emolient Cream, Fluocinonide Gel, Fluocinonide Ointment, Fluconazole Tabs, Isoniazid Tabs, Methotrexate Tabs, Moexipril HCL Tabs, Moexipril HCL/HCTZ Tabs, Nabumetone Tabs, Nadolol Tabs, Ondansetron, Oxybutynin CL Tabs, Pravastatin Tabs, Prazosin HCL Caps, and Ranitidine HCL Tabs resulted from Defendants' anticompetitive conduct, have injured Plaintiffs, and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2246.  The unlawful agreements among Teva, Sandoz, Glenmark, Lupin, Mylan, Taro, Upsher, Apotex, Zydus, Glenmark, Amneal, Paddock, Westward, and Watson/Actavis, regarding generic Adapalene Gel, Cefaclor Tabs, Cefaclor ER Tabs, Cefadroxil Tabs, Cefdinir Caps, Cefdinir Oral Solution,  Cefprozil Tabs, Cephalexin

Tabs, Cimetidine Tabs, Fluocinonide Cream, Fluocinonide Emolient Cream, Fluocinonide Gel, Fluocinonide Ointment, Fluconazole Tabs, Isoniazid Tabs, Methotrexate Tabs, Moexipril HCL Tabs, Moexipril HCL/HCTZ Tabs, Nabumetone Tabs, Nadolol Tabs, Ondansetron, Oxybutynin CL Tabs, Pravastatin Tabs, Prazosin HCL Caps, and Ranitidine HCL Tabs, were part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BP.  Cholestyramine Oral Powder and Oral Solid

2247.  Generic Cholestyramine is used to lower high cholesterol levels.

2248.  The market for generic Cholestyramine oral powder and oral solid ("Cholestyramine") was mature and at all relevant times had multiple manufacturers. As a result, for years, the prices for Cholestyramine were relatively low and stable.

2249.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of Cholestyramine, as follows, beginning at least as early as April, 2013:

2250.  During the Relevant Period, Defendants Sandoz, Par, and Upsher-Smith dominated the market for Cholestyramine.

2251.  In the space of a few months during the summer of 2013, Upsher-Smith, Sandoz and Par all implemented large and very similar price increases in close succession.  The co-conspirators all had different list prices for Cholestyramine before

the summer, but by its end, they all had identical list prices, and all of which were much higher than before.

2252.  The list (WAC) price charts below show the sudden, steep, large and sustained price increases imposed by Par, Sandoz and Upsher-Smith on Cholestyramine.  NSP prices followed a similar pattern.





2253.  Throughout this period, Par, Sandoz and Upsher-Smith met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Cholestyramine and of their Fair Share agreement.

2254.  For example, D.Z., Upsher-Smith Senior National Account Manager, and C.B., Sandoz Director of National Accounts, spoke briefly on May 29, 2013. Upsher-Smith announced its list (WAC) price increase at the end of the very next week, on June 7, 2013.

2255.  Shortly after raising prices, Upsher-Smith reached out directly to Par. On June 20, C.O., Upsher-Smith's Director of Strategic Generic Portfolio and Marketing, spoke twice to K.O., Par's VP of National Accounts.  They spoke again the following week, on Tuesday, June 25.

2256.  On July 16, Upsher-Smith's M.M., National Account Manager, spoke to Sandoz's C.B. for approximately a quarter-hour.  Ten days later, on July 26, 2013, Sandoz announced its list (WAC) price increase on Cholestyramine.  A few days later, on July 29, Upsher-Smith's C.O. and Par's K.O. spoke again for nearly 20 minutes.

2257.  Par followed the list (WAC) price increase on August 27, 2013.  On September 5, K.O. at Par again spoke to C.O. at Upsher-Smith for over 20 minutes.

2258.  No shortages or other market features can explain Defendants' price increases for generic Cholestyramine during the Relevant Period.

2259.  The elevated prices of generic Cholestyramine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2260.  The unlawful agreements among Defendants Par, Sandoz, and Upshur-Smith, regarding generic Cholestyramine were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## BQ.  Drospirenone/EE

2261.  Generic tablets containing Ethinyl Estradiol and Drospirenone ("Drospirenone/ EE") are used to provide hormonal birth-control.

2262.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of generic Drospirenone/EE as follows:

2263.  Barr Pharmaceuticals received approval to market generic Drospirenone/EE in 2008, and Teva continued to market the drug after the acquisition of Barr in 2011 under the name Gianvi.

2264.  In late 2012, Lupin received approval to market a generic Drospirenone/ EE product.  By April 2013, Lupin was making plans for a summer 2013 entry into the market, so, in accordance with the established practices of Defendants' cartel, Lupin contacted Teva to initiate discussions on how the competitors would allocate fair share among themselves.  On April 24, 2013, Teva's Green received a call from David Berthold ("Berthold"), Lupin's Vice President of Sales.  The two spoke for over three minutes.

2265.  This was far from Berthold's only communication advancing the conspiracy; as Lupin's Vice President of Sales, Berthold has relationships with individuals at many of the Defendants and is one of the most prolific communicators of all the conspirators identified herein.

2266.  For example, between March, 2011 – October, 2018, Berthold exchanged at least 4,185 phone calls or text messages with his contacts at Defendants Aurobindo, Glenmark, Greenstone, Actavis, Wockhardt, Zydus, Teva, Breckenridge, Mylan, Sandoz, Dr. Reddy's, Amneal, and Lannet, including over 1,900 calls or texts

with Jim Grauso during Grauso's time at Aurobindo and Glenmark, at least 791 calls or texts with Robin Hatosy at Greenstone, over 300 calls or texts with A.G. at Actavis, over 75 calls or texts with Nisha Patel at Teva, and over 240 calls or texts with Kevin Green during his tenure at Teva and, later, Zydus – including the three minute call just mentioned, which was followed by two additional calls the following day, April 25.

2267.  Discussions intensified the following week among Teva, Lupin, and a third supplier, Actavis.  In preparation, on April 29, 2013, K.G. of Teva asked a colleague for current market share figures along with a list of Teva's generic Ocella customers.  The colleague responded with a customer list, estimating Teva's current market share at 70-75%.

2268.  The next day, April 30, A.B., a senior sales and marketing executive at Actavis, and Teva's Rekenthaler spoke twice by phone.  That same day, Teva's Patel also called A.B.

2269.  The competitors' communications continued into early May.  On May 1, 2013, Patel sent A.B. four text messages.  On May 6, Patel and Berthold spoke twice by phone; the second call lasted twenty-two minutes. Green and Berthold also spoke that same day.  The next day, May 7, Patel and Berthold discussed Drospirenone/EE market share again, this time speaking for over 10 minutes. Patel also placed a call to Rogerson at Actavis.

2270.  The day after that, May 8, Teva learned that Actavis had bid for one of Teva's customer's generic Ocella business – which, of course, as a new entrant, Actavis was entitled to do under the terms of Defendants' cartel, so long as each supplier ended up with its appropriate "fair share," but to reach that "fair share" without the sort of miscommunication that had marred Mylan's entry into the Clonidine-TTS market, co-ordination was important, so on the same day, Patel also spoke to Rogerson for approximately 20 minutes, and the following day, May 9, Green and Berthold also spoke for at least approximately 12 minutes.

2271.  The day after that, on May 10, Rekenthaler received his requested analysis for how much it would cost to concede two of its major accounts, which he passed on to Patel.  With that information in hand, Patel then spoke to Berthold and Rogerson, for approximately a quarter of an hour and five minutes, respectively, to discuss Clonidine-TTS market share.

2272.  A few days later, on May 14, 2013, Teva's K.G. recommended conceding those accounts; Rekenthaler agreed.

2273.  On July 10, 2013, Green spoke to Berthold twice (for approximately than eight and two minutes); after the first of those calls, Green requested "the normal profitability analysis on all customers with pricing and market share.  Lupin is entering the market" from a colleague to help him continue to negotiate with Lupin.

2274.  Later that day, Green called and spoke to Patel for more than seven minutes, conveying what he had learned from Berthold.  During that call, the two

decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin.  Patel called Berthold shortly after and the two spoke for more than four minutes. They spoke again first thing the next morning, for nearly one minute.

2275.  The next day, Patel e-mailed Green, saying:  "BTW, Ocella.  Check!"  Green, confused by the e-mail, responded:  "Huh... you are calling.... correct?"  Patel confirmed that she had, in fact, called her counterpart at Lupin: "Yes.  I was saying it's all done."

2276.  Discussions between Teva and Lupin continued on July 17, 2013 with a call between Green and Berthold that lasted twenty minutes.

2277.  On July 29, 2013, Defendant Green announced to his colleagues: "Lupin has entered and we need to evaluate."

2278.  The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take which generic Ocella accounts.  On September 5, 2013, for example, Rekenthaler conveyed to a colleague the importance of retaining a particular customer's account, along with his understanding of Green's discussions with Berthold about Lupin's desired market share.  Green spoke to Berthold by phone twice the following day to re-confirm the understanding between the two companies.

2279.  On September 9, 2013, Teva's K.G. sent an internal e-mail to his colleagues, conveying his thoughts about Lupin's bid for a portion of another

customer's generic Ocella business.  He informed them that because Teva had secured two other significant customers, "we will likely need to give up some of our formulary position to this new market entrant."

2280.  In mid-October of 2013, as Teva and Lupin finalized allocating customer accounts between them, K.G. reminded one of his colleagues to be careful before conceding large customers on a "bucket basis," rather than drug-by-drug, in order to "make sure we are not giving up volume on products where we do not have our fair share."

2281.  No shortages or other market features can explain Defendants' elevated prices for Drospirenone/EE during the Relevant Period.

2282.  The elevated prices of EE/ Drospirenone resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2283.  The unlawful agreement among Teva, Sandoz, and Glenmark, regarding Drospirenone/EE, was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

BR.   **Lamotrigine ER Tablets**

2284.   Generic Lamotrigine ER tablets ("Lamotrigine") is an anticonvulsant drug that treats epileptic seizures.

2285.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Lamotrigine ER tablets, as follows:

2286.   In June, 2013, Dr. Reddy's was planning to enter the Lamotrigine market in July or August of that year.  The only other suppliers at the time were Defendants Par and Wockhardt, although the latter had supply problems.

2287.   On June 17, 2013 a member of the Dr. Reddy's sales team wrote an internal e-mail about a customer that wanted a bid on Lamotrigine.  If Par was unwilling to concede the business, an aggressive offer would only have the result of driving down prices. Thus, it was important for Dr. Reddy's to know which accounts Par would defend or concede.

2288.   The same day, Dr. Reddy's Director of National Accounts told colleagues that he had spoken to McKesson Senior Director Victor Borelli and that ABC had communicated to him that Par wanted to keep the ABC account.

2289.   McKesson then communicated with Dr. Reddy's and Par to help co-ordinate a market allocation between the two manufacturers.  Dr. Reddy's remained concerned that Par might confuse Reddy's transaction as an attempt to obtain additional market share, in violation of Defendants' cartel agreement.  That would

then risk that Par would lower prices to retain the account, which in turn would disrupt the market and drive prices lower, to the detriment of Defendants' cartel.

2290.  Collusive communications regarding Lamotrigine did not end in 2013. In October, 2015, WBAD co-ordinated with Dr. Reddy's and a manufacturer not named as a defendant in this complaint (Wilshire) in order to allocate fair share for the drug Lamotrigine ER, as follows:

2291.  On October 28, 2015, Dr. Reddy's executives had dinner with WBAD's Director of Generic Pharmaceutical Sourcing.  The next morning, he told them he had received a bid for 25% of the Walgreens business from a competitor and encouraged Reddy's to give it up in exchange for no further competition.

2292.  WBAD continued to co-ordinate allocation of share through 2016.  By this time, Defendant Actavis had entered the Lamotrigine market.

2293.  No shortages or other market features can explain Defendants' price increases for generic Lamotrigine ER tablets during the Relevant Period.

2294.  The elevated prices of generic Lamotrigine ER tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2295.  The unlawful agreement among Defendants Dr. Reddy's, Par, and Actavis, regarding generic Lamotrigine ER tablets, was part of all Defendants'

overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## BS.    Acetazolamide

2296.  Generic Acetazolamide is used to treat, *inter alia*, glaucoma, epilepsy, periodic paralysis, and heart failure.  Generic Acetazolamide is sold in two formulations:  tablets, manufactured by Taro and Lannett; and sustained release capsules, manufactured by Heritage, Zydus, and Teva.

2297.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of generic Acetazolamide tablets and capsules (collectively, "Acetazolamide") as follows:

### 1.    Acetazolamide Tablets

2298.  During the Relevant Period, Taro and Lannett dominated the market for Acetazolamide tablets.  Starting at least as recently the spring of 2012, Taro and Lannett co-ordinated pricing and market share in this market.

2299.  Acetazolamide tablets come in two dosages:  125mg and 250mg.  Both Taro and Lannett make the 250mg dosage, which is the predominant form.  Only Taro makes the 125mg dosage, but it was included in the agreement between Taro and Lannett to elevate the prices of Acetazolamide.

2300.  Prior to the spring of 2012, Taro and Lannett priced their Acetazolamide tablets similarly, but to hide their co-operation, not identically.  Small price increases

in 2009 were implemented by both manufacturers, but were not identical, nor were they simultaneous.

2301.  For example, when Taro implemented a price increase at the end of 2009, Lannett kept its prices unchanged for a year before following Taro's price increase.  Market share between Taro and Lannett also shifted during this period.

2302.  This changed, however, beginning in April-May of 2012.

2303.  In April-May of 2012, Taro and Lannett imposed 40% to 50% list price increases, and brought their list prices for Acetazolamide 250mg tablets to identical levels.  Taro also increased the list price of 125mg tablets around this time.

2304.  Thereafter, in early 2013, Taro made slight price increases to both of its tablets.  By the middle of 2013, Taro and Lannett appear to have worked out an extremely stable split of the market, accounting for both 125mg and 250mg tablets.

2305.  By the end of 2013, Taro and Lannett were ready to impose a large price increase.  Within weeks of each other, in November and December, Taro and Lannett imposed identical list prices for Acetazolamide 250mg tablets.  The increases were well over 200%.  Taro imposed a similarly large list price increase on 125mg tablets around this time.  AWP prices for both products also increased significantly.

2306.  This graph shows Taro and Lannett's lockstep AWP pricing:

**Figure 5**



2307.  The list prices for Acetazolamide tablets remained elevated above competitive levels thereafter.

2308.  Throughout their co-ordinated price increases, Taro and Lannett captured remarkably stable shares of the 250mg tablet market, with Lannett claiming approximately 56% and Taro claiming 44%.

2309.  The actual agreement, however, was an even split of the market, 50% to each manufacturer, because Taro (the only one to manufacture the 125mg tablets) had 100% of sales of that dosage.  As a result, the total dollar of sales across both products was virtually even, and remained remarkably stable. Lannett's larger share of 250mg tablets was offset by Taro's sales of 125mg tablets.  The graph on the following page shows the total value of combined market share (*i.e.*, total dollar sales) for Acetazolamide tablets:

**Figure 6**



2310.  The lockstep price increases and nearly perfect market share split across multiple dosages by Taro and Lannett was a part of, and is consistent with, all Defendants' overarching "fair share" agreement.

2311.  The pricing conduct of Taro and Lannett is not consistent with a competitive market.  Manufacturers would not impose a large price increase absent some assurance that their competitor would do the same, lest they lose market share.

2312.  No shortages or other market changes can explain the abrupt, simultaneous and large price increases by Taro and Lannett.

2313.  The ability of Taro and Lannett to reach agreement on market share and price increases was a function of their overarching conspiracy to fix prices across the markets for generic pharmaceuticals and was further aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

2314.  For example, in August, 2013, not long before the large price increases imposed by Taro and Lannett, employees of both Defendants (including Tracy Sullivan) attended the NACDS Total Store Expo.  *See* Exhibit 1.

2315.  Two months later, in October, representatives from Taro and Lannett, among other Defendants, attended the GPhA Fall Tech Conference in Bethesda, Maryland, which provided another opportunity to discuss price increases for Acetazolamide.

2316.  No shortages or other market features can explain Defendants' price increases for Acetazolamide tablets during the Relevant Period.

2317.  The elevated prices of Acetazolamide tablets resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2318.  The unlawful agreement between Taro and Lannett regarding Acetazolamide tablets was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## 2.    Acetazolamide Capsules

2319.  In 2014, the Acetazolamide capsule market was dominated by Heritage, Teva and Zydus.  Heritage and Teva had approximately 78% of sales and Zydus had

the rest.  Teva marketed and sold Acetazolamide capsules during the Relevant Period at least in part through its subsidiary, Barr.

2320.  As discussed *supra*, during the week of April 14, 2014, Heritage's Malek met with two employees and asked them to start analyzing the impact of price increases for numerous generic drugs, including Acetazolamide.

2321.  Before introducing the market-wide price increases to the rest of his sales team, Malek was communicating with Patel at Teva, the competitor on seven Drugs at Issue on Malek's initial list.  On April 15, 2014, Heritage's Malek spoke with Patel of Teva for approximately a quarter-hour.  During that phone call, Patel agreed to support Heritage's price increase for Acetazolamide and a series of other drugs.  She and Malek also agreed the when Heritage raised the price of Acetozolamide capsules and the other drugs, Teva would not challenge Heritage's price increases by underbidding and taking those accounts.  As also discussed *supra*, Patel had already secured Heritage's agreement to support Teva's price increases for Nystatin and Theophylline.

2322.  Malek and Patel spoke several more times over the next several months to confirm their agreement to raise prices and to keep abreast of the progress of Heritage's price increases.

2323.  On April 16, 2014, the day after Malek spoke to Patel, Patel then called a Zydus Director of National Accounts, referred to herein as K.G., to discuss the pricing of at least Acetazolamide.  The two spoke for approximately 20 minutes and

spoke again the next day for approximately 12 minutes.  Over the next several months, the two communicated often, and, because the relationship between the two co-conspirator Defendants was institutional (rather than based merely on Patel and K.G.), so did other Teva and Zydus employees.  For example, on May 14, J.P., an Associate Director of National Accounts at Teva, exchanged multiple text messages with Zydus's Vice President of Sales, K.R.

2324.  As noted above, on April 22, 2014, Heritage's Malek held a telephone conference with the sales team and dictated a pricing strategy that targeted numerous drugs for a price increase. This list included Acetazolamide.

2325.  As with the other drugs he targeted, Malek believed it was important to "socialize" the idea of an Acetazolamide price increase with competitors before implementing it.  To that end, he and the Heritage NAM's contacted Teva and Zydus to discuss pricing and customers either via phone, text, e-mail, or in person, often through industry trade association meetings and conferences.

2326.  Malek personally took responsibility to communicate with Defendants Teva and Zydus. Anne Sather was responsible for Lannett, as well as two other Defendants.  Matt Edelson, Daniel Lukasiewicz, and Neal O'Mara were responsible for contacting four other Defendants about pricing for various drugs.

2327.  Four days after this phone call, on April 26-29, CEO Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with

representatives from numerous Defendants, including the other manufacturers of Acetazolamide capsules, Teva and Zydus.  *See* Exhibit 1.

2328.  While Teva's Patel and Heritage's Malek were discussing increasing prices for at least the seven Drugs at Issue discussed above, on April 24, 2014, Malek contacted a Zydus employee through the website LinkedIn to discuss at least Acetazolamide.  The Zydus employee responded later the same day.

2329.  In an e-mail exchange May 6-7, 2014, Malek explained that he had obtained agreements to raise the price of Acetazolamide.  Malek had previously told a Heritage salesperson to hold off on responding to a large customer's request for a price reduction.  After confirming his agreement with Teva and Zydus to raise the price of Acetazolamide, he informed his salesperson that Heritage would not agree to reduce its price.

2330.  Malek also confirmed an agreement with another competitor – likely Zydus – on Acetazolamide pricing on May 7, 2014.

2331.  During this time, Heritage avoided bidding on any potential customers where Zydus was already supplying Acetazolamide.  Heritage did this in furtherance of Defendants' agreement not to compete on Drugs at Issue.  During this time, employees at Teva and Zydus were also in close contact with each other about Acetazolamide.  On May 14, 2014, employees of Teva and Zydus exchanged numerous text messages.

2332.  All Defendants had plentiful opportunities to speak in person about these agreements without leaving electronic records of their communications. Between April and October 2014, all U.S. Defendants attended at least one of the many trade events organized by NACDS, MMCAP, HDMA, or GPhA, in addition to several customer conferences.  *See* Exhibit 1.

2333.  Defendants used these meetings as an opportunity to reconfirm their agreements on pricing and otherwise engage in anticompetitive conduct related to the Drugs at Issue.

2334.  For example, on June 3, 2014 at the HDMA Business and Leadership Conference, Heritage's Sather had dinner and drinks with salespeople from Sandoz, Par, and Lannett.  Three weeks later, on June 23, the Heritage sales team had a meeting where they discussed the specific percentages by which they would increase prices on the identified drugs and their strategy for doing so.  The slated increase for Acetazolamide capsules was 75%.

2335.  On June 26, 2014, Heritage began sending out price increase notices to its customers for nine different drugs, including Acetazolamide.  By July 9, Heritage had raised the price of Acetazolamide to at least 17 different customers nationwide.

2336.  No shortages or other market features can explain Defendants' price increases for Acetazolamide capsules during the Relevant Period.

2337.  The elevated prices of Acetazolamide capsules resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay

more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2338.  The unlawful agreement between Heritage, Teva and Zydus regarding Acetazolamide capsules was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BT.   Alclometasone Dipropionate Cream & Ointment

2339.  Alclometasone Dipropionate is a commonly-prescribed corticosteroid. It is used to treat a variety of skin conditions, including eczema, dermatitis, allergies, and rashes.  It has been commercially available for decades and is available in several formulations, including Ointment and Cream, both at 0.05% strength, and is a mature product market.

2340.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of generic Alclometasone Dipropionate ("Alclometasone Dipropionate") as follows:

2341.  At all relevant times, Defendants Glenmark, Sandoz, and Taro dominated the market for Alclometasone Dipropionate.  After years of relatively stable and consistent pricing, Defendants' Alclometasone Dipropionate suddenly tripled in price, as follows:

2342.  In the spring of 2013, senior employees of Glenmark, Sandoz, and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Alclometasone Dipropionate cream and ointment and Defendants' over-arching cartel agreement.

2343.  As a direct result of these anti-competitive agreements and discussions, Defendants' NSP and WAC pricing rose, collectively, in tandem.

2344.  Defendant Taro had only 25% of the market, but fired the opening salvo on Wednesday, May 1, 2013.

2345.  On that day, Taro announced new Alclometasone Dipropionate Cream pricing, doubling their previous WAC prices – an extremely unusual move for a "competitor" with only 25% of the market, as Taro had at the time, and a fact that was noted in contemporaneous internal correspondence at Sandoz.

2346.  In a functioning competitive generic drug market, a manufacturer with that relatively low share would not be leading price increases – but Defendants' overarching cartel meant that this market was not, in fact, experiencing competition; instead, there was only collusion.

2347.  As Sandoz, Taro and Glenmark raised prices in May and continuing through the summer, all three companies were in regular, repeated contact.  As Defendant Teva had commented internally, Sandoz, Taro, and Glenmark were all "quality competitors," the euphemism used at Teva to refer to the cartel's most enthusiastic, reliable members.

2348.  For example, that very week-end, on Sunday, May 5, the members of Taro's and Glenmark sales teams were hard at work – colluding with each other. D.S., AVP of Sales at Taro, and M.B., VP of Sales and Marketing at Glenmark (and a former Taro employee), spoke on May 5 for approximately 21 minutes.

2349.  Also, for example, Taro's Aprahamian exchanged 190 phone calls and texts with Sandoz's C.B. between March 19, 2013, and August 8, 2016, and eleven times with Glenmark's employee M.B., beginning on May 7, 2013.

2350.  By the end of the week of May 5, Sandoz had also announced new price increases (on May 10, 2013), which tripled their prior WAC prices for Alclometasone Dipropionate Cream.

2351.  The following week, on May 16, Glenmark announced its own price increase, a week after Sandoz's increase, while D.S. at Taro also communicated with D.L., a Director of National Accounts at Sandoz, for approximately 22 minutes.  The two communicated by phone the next day as well.

2352.  But Defendants weren't satisfied with merely a 100% increase in prices. Instead, in what has become a familiar pattern in this case, less than a month after this price increase, Glenmark and Taro were speaking again, about how badly they could gouge purchasers:  on May 31, D.S. (Taro Sales AVP) and M.B. (Glenmark Sales and Marketing VP) spoke twice, once for three minutes and once for approximately 19 minutes.

2353.  A little bit more than a week after that conversation, on June 10, 2013, Glenmark announced *yet another* price increase for Alclometasone Dipropionate Ointment, which far exceeded its initial (raised price) and, likewise, far exceeded its co-Defendants' (and fellow cartel members) existing WAC prices.

2354.  In a normal market, these moves would have driven off Glenmark's customers; but because of the cartel's agreement, Glenmark knew its customers had nowhere to go – and they needed the drugs, so they paid the cartel's prices for them.

2355.  Glenmark went ahead with this dramatic price increase because Taro would essentially match Glenmark's increased prices, and Glenmark knew this pricing support because of their regular communications.

2356.  In fact, in late May, after Glenmark raised its prices, one of Glenmark's large customers solicited bids on Alclometasone Dipropionate, seeking to avoid the increased prices – and ran right into the waiting arms of fellow-Defendant and -cartel member, Taro.  As part of the cartel agreement, Taro refused to undercut Glenmark's increased prices, falsely telling this customer that supply issues prevented Taro from being able to fill the customer's needs, in an effort to cover the cartel's tracks and prevent the customer from suspecting Defendants' collusion.

2357.  Indeed, Glenmark's faith in the cohesion of Defendants' cartel was justified two days later, when Taro moved to a WAC price that more than tripled Taro's prior WAC price for Alclometasone Dipropionate Ointment – a pricing move

that Sandoz knew about in advance, and, according to internal e-mails, a move that its executives approved of.

2358.  In what has also become a familiar pattern in this case, Glenmark's M.B. also communicated by phone with Taro's Aprahamian on August 15, 20 and 21, and D.S. (Taro Sales AVP) and M.B. (Glenmark Sales and Marketing VP) spoke in both July and August.

2359.  By the end of the summer, and after the series of communications between Sandoz, Taro and Glenmark, each manufacturer had at least approximately tripled their prices for Alclometasone Dipropionate.

2360.  No shortages or other market features can explain Defendants' price increases for Alclometasone Dipropionate cream and ointment during the Relevant Period.

2361.  The elevated prices of Alclometasone Dipropionate cream and ointment resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2362.  The unlawful agreement between Glenmark, Taro, and Sandoz, regarding all formulations of Alclometasone Dipropionate cream and ointment, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**BU.   Clomipramine HCL Capsules**

2363.  Generic Clomipramine HCL ("Clomipramine") is used for the treatment of obsessive-compulsive disorder, panic disorder, major depressive disorder, and chronic pain.

2364.  The World Health Organization ("WHO") includes Clomipramine on its list of essential medicines.  During the Relevant Period, Mylan sold Clomipramine pursuant to ANDA's approved by the FDA in or around January, 1998.  Sandoz sells Clomipramine pursuant to ANDA's that were approved by the FDA in 1997 and 1998. Taro sells Clomipramine to purchasers pursuant to ANDA's approved by the FDA in December, 1996.

2365.  The market for Clomipramine is mature; Clomipramine has been available in the United States for over 20 years.  At all relevant times, there has been more than one manufacturer of generic Clomipramine; as a result, for more than two years prior to the sudden rise in Clomipramine prices, Defendants' average price in the U.S. for Clomipramine was relatively stable.

2366.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Clomipramine, as follows:

2367.  Beginning in approximately May of 2013, Mylan, Sandoz, and Taro increased their prices abruptly and, for the most part, in unison.

2368.  In addition to Defendants Sandoz and Mylan, Taro also manufactured Clomipramine.  Indeed, it was Taro that led a price increase on this product on May 1, 2013.  The price increase was striking – more than a 3,440% increase to Taro's WAC pricing on certain formulations.

2369.  In the weeks leading up to the Taro price increase on Clomipramine, Aprahamian at Taro spoke several times with both CW-3 at Sandoz and Michael Aigner, a national account manager at Mylan.  In fact, on several occasions during this time period, Aprahamian hung up the phone with one competitor and immediately called the next.  At the same time, SW-4 at Sandoz was also speaking with Doug Statler, a senior sales and national account executive at Taro.  During these conversations, Defendants Taro, Sandoz, and Mylan agreed to raise the price of Clomipramine.

2370.  SW-3 at Sandoz also took contemporaneous notes of some of his conversations with employees of Sandoz's co-conspirators.  For example, after speaking with Aprahamian of Taro twice on April 30, SW-3 made notes identifying Clomipramine as one of the products that Taro planned to increase the next day, on May 1, 2013.  Indeed, notations in CW-3's notebook show he began communicating with Aprahamian about Taro's May 1 increase at least as early as April 2, 2013.

2371.  As part of the agreement to raise prices and not poach each other's customers on Clomipramine, Defendant Sandoz consistently refused to bid for Taro's customers after Taro raised its price. For example, on April 30, 2013, Publix e-mailed

Sandoz stating that it had received a price increase letter from Taro regarding several Sandoz overlap products, including Clomipramine, and asked whether Sandoz wanted to bid for the business.  Kellum e-mailed CW-4.

2372.  Taro agreed to concede one customer to Sandoz so that the competitor could achieve its fair share of the market.  On May 1, 2013, Rite Aid e-mailed Sandoz asking for a bid on Clomipramine.

2373.  The next day, on May 2, Aprahamian (at Taro) called SW-3 (at Sandoz) and they spoke for five minutes.  SW-3 hung up the phone and then immediately called Kellum.  They then spoke for eight minutes.  First thing the next morning – on May 3, 2013 – SW-3 called Aprahamian back and they spoke for another five minutes. Within a half hour, SW-3 again contacted Kellum and spoke for two minutes.  Later that day, CW-4 at Sandoz e-mailed Kellum regarding an upcoming call with Rite Aid.

2374.  Ultimately, Sandoz was awarded the Clomipramine business at Rite Aid.

2375.  Mylan was the next to increase price on Clomipramine HCL. On May 16, 2013, Mylan increased to the same WAC per unit cost as Taro.  In the days leading up to the Mylan price increase, executive employees of all three co-conspirators were in contact with each other by telephone to co-ordinate.

2376.  On July 3, 2013, HEB informed Taro that Mylan was on back order for Clomipramine HCL and asked Taro to bid for the business.

2377.  On July 16, 2013, SW-4 at Sandoz sent the July 2013 E-mail identifying Clomipramine HCL as a Mylan price increase product.  By this time, Sandoz knew that Mylan had increased its price on this product.

2378.  On July 20, 2013, Taro received notification that Sandoz was increasing price on Clomipramine HCL.

2379.  Two days later – on July 22, 2013 – Sandoz increased its WAC pricing to match the per unit cost of Taro and Mylan.

2380.  On August 5, 2013, Walgreens – a Mylan customer – e-mailed Sandoz and requested a bid on Clomipramine HCL.

2381.  In October, 2013, CW-4 and Nesta spoke by phone several times, including multiple calls on October 3rd and 4th.

2382.  After this series of calls, during the morning of October 15, 2013, SW-4 of Sandoz called Kellum.  The call lasted one minute.  Approximately a half-hour later, Kellum e-mailed McKesson and asked if Sandoz could submit a bid for Clomipramine HCL.

2383.  On October 23, 2013, Sandoz submitted a bid to McKesson and the customer responded that a reduction was needed to bring the pricing in line with their current supplier, Taro.  CW-1 was surprised and forwarded the request to SW-4, copying Kellum.

2384.  Two months later, in December, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz

had taken in recent months on a whole host of drugs, including Clomipramine HCL. Kellum prepared a response claiming that Sandoz had simply followed the market price increase after learning of it through public sources.

2385.  As is clear from the above, Kellum's statements was a lie.  In reality, Sandoz has raised its prices after coordinating the increases with Taro and Mylan in adcance, and stayed true to its commitments to keep those prices high.

2386.  By way of example, beginning in May, 2013, Mylan, Sandoz, and Taro set their WAC's in lockstep on their 25 mg product, reflecting increases from previous WACs of, more than 2,700%:

| Product 25 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 30 ct | Taro | 51672401106 | $0.25 | $8.99 | 1-May-13 | 3441% |
| 90 ct | Taro | 51672401105 | $0.25 | $8.99 | 1-May-13 | 3441% |
| 100 ct | Mylan | 378302501 | $0.30 | $8.99 | 16-May-13 | 2853% |
| 100 ct | Sandoz | 781202701 | $0.31 | $8.99 | 22-Jul-13 | 2778% |

2387.  In Fall, 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Clomipramine, which had experienced extraordinary price increases. In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner in August 2016, the GAO issued a report in which Clomipramine was identified as experienced an "extraordinary price increase."

2388.  The price increases on Clomipramine were the results of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Clomipramine in the United States.

2389.  These collusive agreements were also furthered at least in part, through in-person meetings at industry events hosted by GPhA and HDMA.

2390.  For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.

2391.  On February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida. GPhA's 2013 Annual Meeting was attended by representatives of Taro, Sandoz, and Mylan.

2392.  On April 20-23, 2013 NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida. NACDS's Annual Meeting was attended by representatives from Taro, Sandoz, and Mylan.

2393.  On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida. HDMA's June 2013 BLC was attended by representatives from Sandoz and Mylan.

2394.  On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.

2395.  On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by representatives from Taro, Sandoz, and Mylan.

2396.  On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.

2397.  On December 3, 2013, NACDS held its 2013 NACDS Foundation Reception and Dinner, which was attended by representatives from Defendants Mylan and Sandoz.

2398.  No shortages or other market features can explain Defendants' price increases for generic Clomipramine during the Relevant Period.

2399.  The elevated prices of generic Clomipramine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2400.  The unlawful agreement among Defendants Mylan, Sandoz/Fougera, and Taro regarding generic Clomipramine were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## BV.   Desonide Ointment and Cream

2401.  The market for Desonide is mature; both the ointment and cream form of the drug have been available in the United States since the 1970's, and generic Desonide has been available in the United States since 1994.

2402.  At all relevant times, there has been more than one manufacturer of Desonide on the market.  As a result, for several years prior to 2013, Defendants' prices for Desonide in the United States remained relatively low and stable.

2403.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Desonide ointment and cream ("Desonide"), as follows:

2404.  During the Relevant Period, Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro dominated the market for Desonide.

2405.  In May, 2013, however, Defendants abruptly began implementing substantial price increases.

2406.  By way of example, Defendants all set the same WAC's for their ointment products beginning in May, 2013, reflecting increases from previous WAC's of more than 140%.

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 15 GM | Taro | 51672128101 | $0.84 | $3.21 | 1-May-13 | 282% |
| 60 GM | Taro | 51672128103 | $0.53 | $3.21 | 1-May-13 | 501% |
| 15 GM | Perrigo | 45802042335 | $1.30 | $3.21 | 21-May-13 | 146% |
| 60 GM | Perrigo | 45802042337 | $0.31 | $3.21 | 21-May-13 | 932% |
| 15 GM | Sandoz | 00168030915 | * | $3.21 | 17-Jan-14 | * |
| 60 GM | Sandoz | 00168030960 | * | $3.21 | 17-Jan-14 | * |

2407.  In August, 2013, Actavis entered the market for Desonide and implemented the supracompetitive prices as well.  Just as the Defendants did with

Glyburide and Doxy DR, Actavis communicated its intention to enter the market to Perrigo, Sandoz, Fougera, and Taro well in advance of its actual entry, and the Defendants reached an agreement on the supracompetitive pricing that each would charge its customers.  This agreement on Desonide was facilitated by the overarching market allocation (or "fair share") agreement that was followed by all Defendants and conspirators and it prevented Actavis' entry into the market from eroding the conspiratorial pricing on Desonide.

2408.  Desonide was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase."

2409.  No competitive justifications explain the abrupt increase in price. Changes in ingredient costs do not explain Defendants' price increase. The gel and lotion formulations of Desonide did not experience the same co-ordinated and extraordinary price increases in May, 2013m that the cream and ointment formulations did, even though all formulations have the same active ingredient.

2410.  These abrupt price increases were not due to supply disruptions.

2411.  Instead, the price increases on Desonide were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Desonide in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are described below.

2412.  For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Md. that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.

2413.  On February 20-22, 2013, GPhA held its Annual Meeting at the JW Marriott Orlando Grand Lake in Orlando, Florida that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.

2414.  On April 20-23, 2013, shortly before the drastic May 2013 price increases, NACDS held its annual meeting at The Breakers, Palm Beach, Florida. This event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.

2415.  On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida. HDMA's June 2013 BLC was attended by representatives from Actavis and Sandoz.

2416.  On June 4-5, 2013, GPhA held a CMC Workshop meeting at Bethesda North Marriott Hotel, Bethesda, Maryland, that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.

2417.  On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center. NACDS's August 2013 event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.

2418.  On October 28-30, 2013, GPhA held its 2013 Fall Technical Conference in Bethesda, Maryland that was attended by representatives from all Defendants.

2419.  On December 3, 2013, NACDS held its 2013 NACDS Foundation Reception and Dinner, which was attended by representatives from Actavis, Sandoz, and Perrigo.

2420.  On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. This event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.

2421.  These Defendants continued to attend trade associaition meetings and events between at least 2014 and 2016.

2422.  No shortages or other market features can explain Defendants' price increases for generic Desonide during the Relevant Period.

2423.  The elevated prices of generic Desonide resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2424.  The unlawful agreement among Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro, regarding generic Desonide, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BW.  Mometasone Furoate

2425.  Generic Mometasone Furoate ("Mometasone") is a medium-strength corticosteroid used to treat skin conditions such as eczema, psoriasis, allergies, and rashes. Mometasone is available in several forms, including cream, ointment, and solution.

2426.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Mometasone, as follows:

2427.  As of May 2013, three suppliers – Glenmark, Perrigo, and G&W – controlled a majority of the market share on the various formulations of Mometasone.

2428.  Beginning as early as May 2, 2013, Glenmark began communicating with its ostensible competitors, including G&W, to co-ordinate its May, 2013, price increases.  Over the next several weeks, CW-5 and Jim Brown, a senior sales executive at Glenmark, had multiple calls with Vogel-Baylor of G&W during which they discussed and agreed to increase prices on the various formulations of Mometasone. Notably, prior to these calls, Vogel-Baylor had never spoken to Brown before, according to the available phone records.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/2/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 18:10:31 | 0:00:33 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 9:00:46 | 0:00:00 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 9:00:48 | 0:00:51 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 13:57:00 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 15:27:37 | 0:02:50 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:01:30 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:05:56 | 0:03:42 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:27:03 | 0:00:55 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:13 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:14 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 18:26:47 | 0:00:00 |
| 5/14/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 11:18:55 | 0:00:40 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:04:27 | 0:00:14 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:05:28 | 0:05:07 |
| 5/16/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:12:12 | 0:06:33 |

2429.  Similarly, Vogel-Baylor, as she had done in the past, used her contact, CW-6 – then at Aurobindo – to communicate with T.P. of Perrigo regarding the

increases. As discussed above, CW-6 had formerly worked at Fougera.  At this time, G&W and Aurobindo had no products that overlapped and CW-6 and Vogel-Baylor were not social friends.  These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:43:12 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:45:35 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:47:58 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:50:22 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:52:45 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:55:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:05:32 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:18:21 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:20:44 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:23:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:25:31 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:27:54 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:30:19 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:40:42 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:50:48 | 0:00:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:47:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:48:00 | 0:02:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:50:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 13:02:00 | 0:07:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:09:00 | 0:06:00 |

2430.  Based on these conversations, Glenmark increased prices on Mometasone Cream, Ointment, and Solution on May 16, 2013.  Soon thereafter, G&W would follow with comparable increases of its own on the various formulations of Mometasone.

2431.  Over the next several weeks, G&W consistently declined opportunities to reduce pricing on the various formulations of Mometasone so as not to take advantage of the Glenmark price increases.

2432.  For example, on May 15, 2013 – the day before the Glenmark price increases would become effective and publicly visible – C.M., a G&W sales executive,

e-mailed Vogel-Baylor to tell her that ANDA was requesting decreased pricing on several products because the prices were higher than their competitors. The list included Mometasone Solution and listed Glenmark's pre-increase Cardinal pricing as the comparison price point. Knowing that Glenmark was increasing pricing on this product, Vogel-Baylor advised C.M. that G&W would not lower its pricing.

2433. Similarly, on May 17, 2013, the day after the Glenmark increases became effective, McKesson sent G&W a request for a bid on Mometasone Ointment. Vogel-Baylor asked the customer who its incumbent was, and McKesson responded that it was Glenmark. Immediately upon receiving this response, Vogel-Baylor called CW-5 of Glenmark. The call lasted less than one minute. She then hung up and called Brown of Glenmark. That call lasted less than one minute. Fifteen minutes later, Brown called Vogel-Baylor back and they spoke for twelve minutes. Later that day, Vogel-Baylor responded to McKesson and declined the opportunity.

2434. The next business day, on May 20, 2013, C.M. e-mailed Vogel-Baylor. Vogel-Baylor responded by sending the following e-mail to C.M. and others on the sales team.

2435. On May 23, 2013, Vogel-Baylor e-mailed price increase analyses for the Mometasone line to her supervisor, Orlofski. The next day, May 24, 2013, Vogel-Baylor called CW-5 at Glenmark twice. The calls lasted less than one minute each.

2436.  On June 4, 2013, G&W sent price increase notifications to its customers regarding the various Mometasone formulations.  That same day, Vogel-Baylor called Brown.  The call lasted less than one minute.

2437.  On June 5, 2013, Pharmacy Select e-mailed C.M. regarding the notification and asked him to provide new WAC pricing for the Mometasone line of products.  C.M. forwarded the request to Vogel-Baylor.

2438.  G&W and Glenmark continued to coordinate even after their price increases.  For example, on June 5, 2013, Rite Aid, a G&W customer for Mometasone, asked Glenmark whether it wanted to bid for the business because G&W had increased price.  The next day, on June 6, 2013, Brown of Glenmark called Vogel-Baylor and they spoke for six minutes.  On June 7, 2013, Vogel-Baylor called Brown back. The call lasted less than one minute.  That same day, CW-5 e-mailed his colleagues Brown and Blashinsky regarding the Rite Aid opportunity.

2439.  After preparing the bid for Rite Aid, Brown e-mailed CW-5 and Blashinsky on Saturday, June 8, 2013.  The following Monday, on June 10, 2013, Brown called Vogel-Baylor.  Vogel-Baylor returned the call and they spoke for more than six minutes.  Within ten minutes of hanging up, and having confirmed the pricing with his competitor, Brown e-mailed his colleagues with specific price points that Glenmark should use to bid high and not take the Rite Aid business from G&W.

2440.  No shortages or other market features can explain Defendants' price increases for generic Mometasone during the Relevant Period.

2441.  The elevated prices of generic Mometasone resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2442.  The unlawful agreements among Defendants Aurobindo, Glenmark, G&W,  and Perrigo, regarding generic Mometasone were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BX.   Amiloride HCL/HCTZ Tabs, Benazepril HCTZ, Bupropion HCL, Cimetidine, Clomipramine, Diclofenac Tabs, Diltiazem HCL, Doxazosin Mesylate Tabs, Enalapril Tabs, Fluoxetine, Haloperidol, Ketoprofen, Keterolac, Levothyroxine, Loperamide, Metoprolol, Nadolol, Nystatin, Perphenazine, Pravastatin, Prazosin, Sotalol, Tizanidine, Tolmetin Tabs, Trifluoperazine HCL, and Verapamil

2443.  Generic Haloperidol tablets ("Haloperidol") and generic Trifluoperazine HCL tablets ("Trifluoperazine") are antipsychotic drugs that are used to treat disorders such as schizophrenia and Tourette's Syndrome.

2444.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic: Amiloride HCL/HCTZ Tabs, Benazepril HCTZ, Bupropion HCL, Cimetidine, Clomipramine, Diclofenac Tabs, Diltiazem HCL, Doxazosin Mesylate Tabs, Enalapril

Tabs, Fluoxetine, Haloperidol, Ketoprofen, Keterolac, Levothyroxine, Loperamide, Metoprolol, Nadolol, Nystatin, Perphenazine, Pravastatin, Prazosin, Sotalol, Tizanidine, Tolmetin Tabs, Trifluoperazine HCL, and Verapamil, at least as follows:

2445.  As alleged throughout this Complaint, as part of their cartel agreement, Defendants' regular practice was to divide up markets and customers, so as to avoid "disrupting the market" through competition.  As part of these procedures, Defendants routinely shared competitively-sensitive pricing information, including on products they did not presently manufacture.

2446.  Thus, Defendant Sandoz sought to obtain a "comprehensive list" of both Teva's and Mylan's price increases from the Spring & Summer of 2013.

2447.  To that end, on July 15, 2013, Sandoz executives held an internal meeting during which SW-1 instructed members of the Sandoz sales team, including SW-2 and SW-4, "to investigate [the] list of Mylan and Teva increase items."

2448.  That same day, as detailed *supra*, SW-2 contacted his counterpart at Teva, Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along with the percentage increases for each.  Similarly, on July 16, SW-4 called her contact at Mylan, Jim Nesta.  The call lasted two-and-a-half (2.5) minutes.  A half hour later, Nesta returned the call and the two spoke for approximately 20 minutes.

2449.  During those two calls, SW-4 asked Nesta to identify the drugs Mylan had increased prices on so that Sandoz could follow with its own price increase. Nesta provided SW-4 with a list of drugs, highlighting that the price increases would

be large.  Nesta also emphasized that Mylan did not appreciate having its prices

challenged and that prices should be kept high.  After the phone call ended, SW-4

sent the following e-mail to her superiors, including Kellum, at 6:31 pm on Tuesday,

July 16, 2013:

> Here are some of the pricing inreases from Mylan [that] I was able to garner.
> These are reportedly to be BIG increases[:]
> Bupropion HCL
> Diltiazem HCL
> Haloperidol
> Clomipramine
> Sotalol
> Tizanidine
> Peprhenazine [*sic*, Perphenazine]
> Levothyroxine (Lanette followed)
> Nadolol
>
> There were others but ones we don't have.  There may be others we have, but
> this is all I was able to get.  Pretty well anything we get from a customer that
> isn't supply obviously is due to pricing increase.
>
> If a specific product is questionable, let me know and I'll find out about it."

2450.  For at least one drug on that list – Haloperidol – Mylan had yet to raise

its price as of July 16, 2013, the date of the e-mail.  Indeed, Mylan would not raise its

pricing on this product until August of that year, at which point Mylan also raised its

pricing on Levothyroxine (a drug which was on Mylan's January, 2013, price-increase

list) and at least two other drugs not on the the list, Trifluoperazine HCL and

Benazepril HCTZ – both of which were also manufactured by Sandoz.

2451.  As alleged *supra* and throughout this Complaint, at the same time that

Mylan was co-ordinating with Sandoz, it was also co-ordinating with Teva.

2452.  For example, on July 22, 2013, Patel sent Green an e-mail with an attached spreadsheet of "Round 2" price-increase items, which are also discussed *infra*. Patel indicated that she was "seeking intel" for a group of drugs in the attached spreadsheet with an "x" on a highlighted yellow field, and included in a column titled "Follow Mylan/Other":

| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | x |
| Diclofenac Tab | Mylan increase; On historical PI list | x | x |
| Doxazosin Mesylate Tabs | Mylan increase; On historical PI list | | x |
| Enalapril Tab | Mylan increase; On historical PI list--COMPLETED | | x |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | x |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | x |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | x |
| Nystatin | Heritage involved  follow Mutual  deletion candidate  PM related | x | x |
| Pravastatin | Carried over from round 1 | | x |
| Sotalol | Mylan increase; On historical PI list | | x |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | x |
| Verapamil  (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | | x |

2453.  Many of these were Mylan drugs.

2454.  The next day – July 23, 2013 – at 4:30pm, Green and Nesta spoke for approximately six minutes.  Immediately after hanging up the phone, Green called Patel to convey the intel he had obtained from Mylan.  That call lasted approximately three minutes.

2455.  A week later, on Monday, July 29, Green at Teva was approached by a large retail pharmacy asking for bids on several of the drugs that Mylan had increased

its prices on, earlier that month.  Rather than inquiring about Teva's production capacity, Green's first step was to request market share information for those drugs. That was because Teva's decision on how to respond to the customer's inquiry was based, not on Teva's ability to supply the requested products, but on the so-called "fair share" rules of Defendants' cartel.  Thus, at 9:49 that morning, Green sent an internal e-mail with the subject, "Walgreens:  Items for discussion."  In it, he wrote: "From the list of items below, can you pull in current market share.  These are new opportunities at Walgreens, and I want to see what the current market looks like."

2456.  The next day, July 30, Patel sent Green the "latest" price increase file as an attachment, saying that she "Figured it would help since I've changed a few things on you."  Patel asked Green to obtain additional "market intel" for a group of seven Mylan drugs, some of which varied slightly from the prior spreadsheet.

2457.  Following the same consistent pattern, Green and Nesta spoke six times over the next two days.  After hanging up from the last call between the two on August 1, Green called Patel and conveyed the results of his conversations.

2458.  This series of phone calls is detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:10:33 | 0:04:52 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:50:57 | 0:01:09 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:54:39 | 0:03:21 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:59:57 | 0:06:53 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:46:59 | 0:01:27 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:23:47 | 0:05:48 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:21:43 | 0:00:59 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 12:29:55 | 0:02:36 |

2459.  In the midst of the phone calls between Green and Nesta on July 31, Patel sent the following e-mail with "commentary" about the customer request, with a particular focus on balancing Teva's desire to increase prices against its commitment to adhere to the fair share agreement and how that might have affected its market share for certain products sold by Mylan, at 3:23 pm on Wednesday, July 31, 2013, to, *inter alia*, Kevin Green and Dave Rekenthaler, with the subject "RE: DELPHI 9429 Walgreens:  Items for discussion":

My initial commentary…

If we can tak on the supply, we can bid on items we have already taken our increase on (bold).

**Enalapril:  seeking share**

**Cimetidine:  shared with Mylan, but do not have our fair share**

**Prazosin:  shared with Mylan, but do not have our fair share**

**Nadolol:  can pursue additional share (Mylan) for 3-player market**

Loperamide:  consider it added to the PI candidates list

Fluoxetine:  no plans to follow Mylan increase, but have high share in a 7 player market

Diltiazem IR:  consider it added to the PI candidates list

There are plans to follow Mylan on the rest.  Need to determine how we want to respond on these if we haven't implemented an increase by the time we respond.  From what I understand, we have some time."

2460.  Based on these communications between Teva and Mylan (and at times other cartel members), Teva was able to successfully increase price on at least seven different Mylan drugs on August 9, 2013, as also set forth *supra* and *infra*.

2461.  Over the next several months, and consistent with the so-called "fair share" rules of Defendants' cartel, Sandoz declined to bid or take business from Mylan customers (except in one instance, where Mylan had more than its so-called fair share) and raised prices to match Mylan on a number of products, including Haloperidol and Trifluoperazine.  Some examples of this conduct are detailed below, and elsewhere in this Complaint.

2462.  Thus, three weeks later, on August 6, Jim Nesta at Mylan called SW-4 at Sandoz, twice.  Both calls were less than a minute long.

2463.  The following day, August 7, Patel sent the "Price Increase Overview" to her supervisor, K.G., two days in advance of Teva's price increase, she included one piece of very telling information about the agreement they had in place with Lupin:  specifically, that Lupin was "waiting on Teva" before implementing its own

increase.  Accordingly, Teva went ahead with its increase on Pravastatin and other drugs on August 9.

2464.  A couple of days after Teva implemented its increase, a colleague at Teva asked Patel when Zydus and Apotex implemented their price increases.  In her response, Patel confirmed that it was Kevin Green ("KGn") who had co-ordinated the Pravastatin price increase with Zydus, writing "Assuming we're talking Prava. Glenmark [did] theirs 5/15.  Zydus followed right before/after hdma i think.  apotex i think was early to mid june?  KGn go the Zydus intel…he might know off the top if his head."

2465.  Pursuant to Defendants' agreement, shortly after Teva's increase – on August 28, 2013 – Lupin raised its Pravachol price to follow its co-conspirators Glenmark, Apotex, Zydus, and Teva.

2466.  The extra work required to implement the Pravastatin price increase was well worth it to Defendants.  For example, on August 8, 2013 – the day before the Teva increase – Patel sent her supervisor K.G. an estimate of the "net upside" to Teva as a result of the price increases.  The Teva estimate was that, for Pravastatin, the "net upside after credits" to Teva alone was $674,670,548 ***per quarter***.

2467.  The same day as Teva's Pravastatin increase, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine.  For Haloperidol, Mylan increased the WAC price by 250% on several formulations.  For Trifluoperazine, Mylan increased the WAC price by 80% on all formulations.

2468.  Two weeks later, on August 19, Steve G. ("S.G."), a national account executive at Sandoz, sent an internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine and that Sandoz needed to "rationalize the market."

2469.  Later that week, on August 22, SW-2 e-mailed Kellum, stating that CVS "wanted to know if we will be raising price on Haloperidol and Trifluoperazine. Mylan took substantial increases."  Kellum forwarded the request to SW-1 and F.R., a pricing manager at Sandoz.  F.R. responded, "I believe the answer is yes??  We bid at curent price in RFP and did not go after this business.  I would answer yes. Thoughts?"  SW-l replied that he would obtain the pricing data, "but I would imagine we will be fast followers."

2470.  On September 18, 2013, SW-l e-mailed Kellum with his price increase analyses for Haloperidol and Trifluoperazine.  For Haloperidol, SW-l indicated that Mylan had 72% market share, Sandoz had l5%, and Zydus had l0%.  For Trifluo-perazine, SW-l stated that "Mylan has 73% and we have 24%.  This is a no brainer."

2471.  On September 25, Walgreens – a Mylan customer – e-mailed Sandoz, asking for bids on Haloperidol and Trifluoperazine.  SW-l sent an internal e-mail, explaining that "Mylan took a price increase on this product.  That's why he is asking. We are currently evaluating tak[ing] one ourselves."

2472.  The following week, on October 2, SW-l e-mailed S.G., the Sandoz national account executive assigned to Walgreens, at 6:45 pm, directing S.G. not only to decline to bid at Walgreens, but also to lie about the reason for doing so:  "Steve,

We discussed internally and decided not to pursue WAGS on these at this point. We have been running up against Mylan a lot lately (Nadolol, Benaz/Hctz), and fear blowback if we take on any more products at this moment.  Trying to be responsible in the sandbox.  I recommend you blame supply."

2473.  Over the next several days, SW-4 and Nesta spoke by phone several times.  These communications are detailed in the table below.  Prior to these calls, SW-4 and Nesta had not communicated by phone since August 6.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:11:19 |

2474.  On October 15 (the day after the last of the phone calls noted above), SW- 1 e-mailed the Sandoz Pricing Committee, recommending that Sandoz increase pricing on Haloperidol and Trifluoperazine.  After reviewing the e-mail, O.K., a senior executive responsible for business planning at Sandoz, recommended approval of increasing Haloperidol pricing, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January (in 2014) because $1.6 million in price protection penalties would be triggered if Sandoz implemented the increase in October, 2013.  As O.K. explained, "I understand that both price increases have been

taken by Mylan in August and we are the followers.  We might be sending the wrong signal to Mylan by not following promptly however 1.6m top/bottom-line hit with no upside is too big to swallow."

2475.  Ultimately, Sandoz followed O.K.'s recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013, and waited until January 31, 2014, to follow on Trifluoperazine HCL.

2476.  No shortages or other market features can explain Defendants' price increases for Amiloride HCL/HCTZ Tabs, Benazepril HCTZ, Bupropion HCL, Cimetidine, Clomipramine, Diclofenac Tabs, Diltiazem HCL, Doxazosin Mesylate Tabs, Enalapril Tabs, Fluoxetine, Haloperidol, Ketoprofen, Keterolac, Levothyroxine, Loperamide, Metoprolol, Nadolol, Nystatin, Perphenazine, Pravastatin, Prazosin, Sotalol, Tizanidine, Tolmetin Tabs, Trifluoperazine HCL, or Verapamil during the Relevant Period.

2477.  The elevated prices of generic Amiloride HCL/HCTZ Tabs, Benazepril HCTZ, Bupropion HCL, Cimetidine, Clomipramine, Diclofenac Tabs, Diltiazem HCL, Doxazosin Mesylate Tabs, Enalapril Tabs, Fluoxetine, Haloperidol, Ketoprofen, Keterolac, Levothyroxine, Loperamide, Metoprolol, Nadolol, Nystatin, Perphenazine, Pravastatin, Prazosin, Sotalol, Tizanidine, Tolmetin Tabs, Trifluoperazine HCL, and Verapamil resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated

levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2478.  The unlawful agreements among Defendants Sandoz, Mylan, Lupin, Glenmark, Apotex, Zydus, Heritage and Teva, regarding generic Amiloride, Benazepril HCTZ, Bupropion HCL, Cimetidine, Clomipramine, Diclofenac Tabs, Diltiazem HCL, Doxazosin Mesylate Tabs, Enalapril Tabs, Fluoxetine, Haloperidol, Ketoprofen, Keterolac, Levothyroxine, Loperamide, Metoprolol, Nadolol, Nystatin, Perphenazine, Pravastatin, Prazosin, Sotalol, Tizanidine, Tolmetin Tabs, Trifluoperazine HCL, and Verapamil, were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## BY.   Captopril

2479.  Captopril is an angiotensin-converting enzyme (ACE) inhibitor and is used for the treatment of hypertension and some types of congestive heart failure.

2480.  The market for Captopril was mature and at all relevant times had multiple manufacturers.  As a result, for years, the prices for generic Captopril tablets ("Captopril") were relatively low and stable.

2481.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Captopril, as follows:

2482.  During the Relevant Period, Defendants Mylan, West-Ward and Wockhardt dominated the market for generic Captopril.  West-Ward was the dominant manufacturer in the market up until 2013, when it experienced supply disruptions and essentially exited the market.

2483.  In the spring of 2013, as West-Ward exited the market, Mylan and Wockhardt imposed very large price increases.  At first, only Mylan raised its list (WAC) prices, but NSP prices soon followed.

2484.  By spring of 2014, West-Ward was ready to re-enter the market. At the same time, Wockhardt was exiting the market, leaving only Mylan and West-Ward as the main Captopril suppliers. Rather than offer lower prices than Mylan to win back all of the market share it used to have, West-Ward instead announced—virtually simultaneously with Mylan—a large list (WAC) price increase.  West-Ward's new list prices were identical to Mylan's and, for the 12.5 mg dosage, approximately 100 times higher than they were before it had exited the market.  Other dosages were "only" 35 to 45 times higher.  Mylan and West-Ward list (WAC) and NSP prices remained elevated for years afterward.

2485.  Even with the higher prices, West-Ward quickly was able to build share. Although West-Ward had a smaller share of the market than it did before exiting, it was making a lot more money, albeit on a smaller volume of sales.

2486.  The Fair Share agreement facilitated higher prices, which allowed each manufacturer to sell less, but make more money doing so, and the Fair Share

agreement worked as planned,  as illustrated below.



2487.  Throughout this period, Mylan, Wockhardt and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Captopril and of their Fair Share agreement.

2488.  For example, Mylan's M.W., Director of National Accounts, communicated by phone with K.B., West-Ward National Account Manager, in March, April, June and July 2013, including on July 1, 2013. Mylan announced its first list (WAC) price increase for Captopril on July 2, 2013.

2489.  Representatives from Wockhardt and West-Ward convened at the ECRM Retail Pharmacy Efficient Program Planning Session at the Omni Amelia

Island Plantation Resort, in Amelia Island, Florida on February 23 to 26, 2014. In April, both companies announced large list (WAC) price increases on the heels of Mylan's second list price increase.

2490.  No shortages or other market features can explain Defendants' price increases for generic Captopril during the Relevant Period.

2491.  The elevated prices of generic Captopril resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2492.  The unlawful agreement among Defendants Mylan, West-Ward and Wockhardt, regarding generic Captopril, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### BZ.    Tizanidine HCL Tablets

2493.  Generic Tizanidine is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

2494.  At all relevant times, the market for generic Tizanidine HCL tablets was mature and had multiple manufacturers.

2495.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all

formulations of generic Tizanidine HCL tablets ("Tizanidine") as follows, beginning at least as early as April, 2013:

2496.  During the Relevant Period, Defendants Apotex, Dr. Reddy's, Mylan, Sandoz and Sun dominated the market for Tizanidine.

2497.  For years, the prices of Tizanidine HCL tablets were relatively low and stable.  In the spring of 2013, however, all manufacturers began to impose very large price increases within weeks of each other.  Between May 13 and July 2, 2013, Apotex, Dr. Reddy's, Mylan, Sandoz and Sun each announced a list (WAC) price increase. They each also began to increase NSP prices.  Over the ensuing few months, each of these Defendants imposed multi-fold increases in their NSP prices.

2498.  In addition, throughout this time-frame, Defendants Apotex, Dr. Reddy's, Mylan, Sandoz and Sun met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Tizanidine HCL and of their larger cartel agreement.

2499.  For example, On May 13, 2013—the day that Dr. Reddy's announced its new list (WAC) prices for Tizanidine—Mylan's Nesta called D.L., the Director of National Accounts at Sandoz, and they spoke for approximately four minutes.

2500.  On May 24, 2013, Sandoz followed Dr. Reddy's list (WAC) price increases. In the days leading up to the Sandoz increase, Nesta (Mylan) exchanged phone calls with D.L. (Sandoz) and J.A., a Director of National Accounts at Dr. Reddy's, to co-ordinate the Tizanidine price increase.

2501.  On May 29, 2013, a large customer called Sandoz and asked whether it wanted to submit a bid for Tizanidine.  After D.L., Director of National Accounts at Sandoz, spoke to Nesta (Mylan) again, Sandoz decided not to submit a bid.

2502.  On June 11, 2013, V.B., Dr. Reddy Director of National Accounts, spoke to T.B., Apotex National Account Manager, for approximately 13 minutes.

2503.  On June 14, 2013, a large wholesale customer e-mailed J.A., the Director of National Accounts at Dr. Reddy's asking "[d]id mylan follow your increase?" He responded, "We've heard they did." The Dr. Reddy's Director had learned of Mylan's intent to follow the price increase through his prior communications with Nesta. However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry.

2504.  On June 26, 2013, a large supermarket chain customer e-mailed Dr. Reddy's requesting a bid for Tizanidine. Dr. Reddy's decided not to go after additional market share. J.A. (Dr. Reddy's) and S.G., Sun Director of Marketing, communicated by phone two days later, on June 28.  A few weeks later, the supermarket forwarded the same request to Sandoz, and Sandoz declined to submit a bid.

2505.  No shortages or other market features can explain Defendants' price increases for generic Tizanidine HCL tablets during the Relevant Period.

2506.  The elevated prices of generic Tizanidine HCL tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2507.  The unlawful agreement among Defendants Apotex, Dr. Reddy's, Mylan, Sandoz and Sun, regarding generic Tizanidine HCL tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## CA.   Prednisone Tablets

2508.  Generic Prednisone is a corticosteroid that is used to treat conditions such as arthritis, blood disorders, breathing problems, severe allergies, skin diseases, cancer, eye problems, and immune system disorders.

2509.  At all relevant times, the market for generic Prednisone tablets (including at least 1, 2.5, 5, 10 and 20 mg doses) was mature and had multiple manufacturers.  As a result, for years, the prices of Prednisone were relatively low and stable.

2510.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Prednisone tablets ("Prednisone," including at least 1, 2.5, 5, 10 and 20 mg doses) as follows, beginning at least as early as May, 2013:

2511.  During the Relevant Period, Defendants Actavis, Cadista, Par and West-Ward dominated the market for Prednisone.

2512.  There were limited supply disruptions in 2012 and early 2013, but market supply recovered and, for some dosages, increased in 2014.  Nonetheless, in

the spring of 2013, all manufacturers shifted their prices significantly higher. By the end of 2013, Prednisone prices were more than triple the prices at the beginning of the year, and prices remained higher than former levels through the present.

2513. Throughout this period, Actavis, Cadista, Par and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Prednisone tablets and their Fair Share agreement.

2514. For example, Cadista, which had exited the market but then re-entered in late 2013 at the elevated prices already imposed by West-Ward and Actavis, communicated with its co-conspirators around the time of its re-entry. Shortly before re-entering the market, Cadista's M.D., VP of Sales, spoke with Falkin (Actavis) on July 31, 2013 for six minutes. Shortly after re-joining the market, on November 1, 2013, M.D. at Cadista spoke for nearly 40 minutes with S.G., VP of Sales and Marketing at West-Ward.

2515. D.S., who began as Head of Sales at West-Ward in January, 2014, after leaving Taro, called K.O., VP of National Accounts at Par, during his first weeks on the job. The two had communicated when D.S. was at Taro, and the practice continued when D.S. moved to West-Ward. D.S. communicated by phone with K.O. throughout 2014. They communicated in January, February, April, May, June, July, October, November and December. And prices for Prednisone remained high throughout this time-frame.

2516.  J.H., Par Regional VP of Sales, began communicating with Falkin shortly after Falkin joined Actavis.  The two communicated by phone in September, 2013, then throughout 2014, including (at least) in February, March, April, May, June, July, August and October.

2517.  Throughout the period of these communications, Actavis, West-Ward, Par and Cadista raised and maintained elevated prices for Prednisone.

2518.  No shortages or other market features can explain Defendants' price increases for generic Prednisone tablets (including at least 1, 2.5, 5, 10 and 20 mg doses) during the Relevant Period.

2519.  The elevated prices of generic Prednisone tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2520.  The unlawful agreement among Actavis, Cadista, Par and West-Ward, regarding generic Prednisone tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**CB.   Prednisolone Acetate**

2521.  Generic Prednisolone Acetate ophthalmic suspension is a medication used to treat swelling, redness, itching, and allergic reactions in the eye.

2522.  At all relevant times, the market for generic Prednisolone Acetate ophthalmic suspension ("Prednisolone Acetate") was mature and had multiple manufacturers.  As a result, for years, prices for Prednisolone Acetate were relatively low and stable.

2523.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Prednisolone Acetate ophthalmic suspension as follows, beginning at least as early as July, 2013:

2524.  During the Relevant Period, Defendants Sandoz and Pfizer's *alter ego*, Greenstone, dominated the market for generic Prednisolone Acetate.

2525.  Between August and November, 2013, however, Sandoz and Greenstone co-ordinated enormous price increases.  List prices for Prednisolone Acetate jumped more than 500% and to identical levels.

2526.  During this time-frame, Sandoz and Greenstone market shares remained relatively stable owing to their Fair Share agreement, to which they closely adhered. For example, in early 2014 (after the large price increases in late 2013), a large customer approached Sandoz to see if it was interested in a new account for Prednisolone Acetate.

2527.  The list (WAC) price chart below shows the large and parallel price increases by Sandoz and Greenstone on Prednisolone Acetate:



2528.  Throughout this period, Sandoz and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Prednisolone Acetate and of their Fair Share agreement.

2529.  For example, representatives from Greenstone and Sandoz convened at the NACDS 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada, on August 10-13, 2013.  Less than two weeks later, Sandoz announced a large list (WAC) price increase, which Greenstone promptly followed.

2530.  No shortages or other market features can explain Defendants' price increases for generic Prednisolone Acetate during the Relevant Period.

2531.  The elevated prices of generic Prednisolone Acetate resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2532.  The unlawful agreement among Defendants Sandoz and Greenstone, regarding generic Prednisolone Acetate, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## CC.   Temozolomide

2533.  Generic Temozolomide is an alkylating agent used to treat brain cancers, including glioblastoma multiforme and anaplastic astrocytoma.

2534.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Temozolomide, as follows:

2535.  The patent on Temozolomide was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August of 2013 – six months prior to the patent's expiration.  Leading up to the launch of the generic, Teva co-ordinated with Sandoz to divide up the generic Temozolomide market.

2536.  On July 18, 2013, a large retail pharmacy customer submitted an RFP to Sandoz for Temozolomide.  Playing by their cartel's Fair Share rules, Sandoz waited to see what Teva was going to do before submitting their own bid.  That same day, SW-1 received a telephone call from Patel.  Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide.

2537.  On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out Teva's plans with regard to this customer.  As directed, the next morning, S.G., a national account executive at Sandoz, spoke with the pharmacy and asked about Teva's plans for this customer's Temozolomide business.

2538.  At the same time, SW-1 was reaching out to Teva directly to get more information.  SW-1 called Patel at approximately 1:45pm on July 23, 2013. After exchanging voicemails, they spoke for a quarter of an hour.  On that same afternoon, the pharmacy replied to Sandoz and delivered Teva's message regarding its plans for the Temozolomide business, telling Sandoz the timing of Teva's Temozolomide launch, that Teva had sufficient Temozolomide stock for the 50% market share that the "rules of the road provided," but would not seek more than that, and wanted to reconfirm Sandoz's intentions.  Although the message was coded, Sandoz received and understood it.

2539.  Just under a week later, on July 29, Patel called SW-l at Sandoz and they spoke for nine minutes, discussing how to carve up the market for Temozolomide, on which they were exclusive manufacturers.

2540.  Teva and Sandoz were also co-ordinating through other channels. On July 29, after receiving the RFP from the pharmacy, Sandoz's S.G., spoke with a senior account executive at Teva, T.S., for seven minutes; and the same day, there were two phone calls exchanged between Teva's then-Director of National Accounts,

Kevin Green ("Green"), and SW-2 at Sandoz, regarding the pharmacy and its Temozolomide business.

2541.  The next day, on July 30, a different retail pharmacy, CVS Caremark, contacted Teva to ask for a Temozolomide bid.  A senior sales executive at Teva, T.C., discussed the matter with her boss, Rekenthaler.  Rekenthaler responded by alluding to the arrangement they had with Sandoz.

2542.  The day after that, July 31, arrangements were finalized:  Green and SW-2 discussed the pharmacy and its Temozolomide business, speaking for approximately six minutes.  In addition, T.S. and S.G. spoke for approximately eleven minutes, after which S.G. suggested internally that Sandoz submit a cover bid and cede the pharmacy's Temozolomide business to Teva, which Sandoz ultimately did.

2543.  On August 12, 2013, the same day as Teva's Temozolomide launch, SW-2 met in person with Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference. There, Rekenthaler discussed, among other things, Temozolomide and informed SW-2 that Teva had officially launched and shipped all formulations of the drug.

2544.  Although Teva initially obtained the CVS account in August, 2013, due to Sandoz's inability to supply the 250mg dose of Temozolomide, the companies had agreed that the account would revert back to Sandoz once Sandoz could supply that dosage strength.  In addition, SW-1 spoke to Patel both before and after Sandoz sent

out any offers regarding Temozolomide in an effort to develop and ensure there was an appropriate between the two under Defendants' overarching conspiracy.

2545.  Sandoz's inability to supply the 250mg dose of Temozolomide cannot explain Defendants' elevated prices for Temozolomide during the Relevant Period. Indeed, no other shortages or other market features can explain Defendants' elevated prices for Temozolomide during the Relevant Period.

2546.  The elevated prices of Temozolomide resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2547.  The unlawful agreement between Sandoz and Teva regarding Temozolomide was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## CD.   Benazepril HCTZ and Bumetanide Tablets

2548.   Generic Benazepril HCTZ or Benazepril hydrochlorothiazide tablets ("Benazepril" or "Benaz," including 10-12.5 mg, 20-12.5 mg and 20-25 mg tablets) are an ACE-inhibitor and are used to control hypertension.

2549.  Benazepril was first approved for marketing in the United States in the early 1990's.  The market for generic Benazepril is mature; generic Benazepril has

been commercially available in the United States since 2004 and there are multiple

manufacturers.

2550.  Generic Bumetanide is a loop diuretic available as 0.5 mg, 1 mg and 2

mg tablets.  ("Bumetanide")

2551.  Bumetanide has been commercially available in the United States since

the 1970's.  The market for generic Bumetanide is mature.  Bumetanide has been

commercially available in the United States in a generic form for decades.

2552.  As part of Defendants' overarching conspiracy with respect to the Drugs

at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic

Benazepril and Bumetanide tablets, at least as follows:

2553.  While Sandoz was, as just described, conspiring with Teva on

Temozolomide (and, *inter alia*, as set forth below, on Bumetanide), it was also

conspiring with Mylan on Benazepril – and also with Rising Pharmaceuticals.

2554.  During the Relevant Period, Defendants Sandoz and Mylan dominated

the market for generic Benazepril – particularly Mylan, because Sandoz had exited the

market for a while.

2555.  During the Relevant Period, Defendants Sandoz and Teva dominated

the market for generic Bumetanide.

2556.  For years, the price of Benazepril had remained stable, even after Sandoz

exited the market.  However, in the summer of 2013, all of that changed.  In June,

2013, Defendants Sandoz and Mylan both attended the GPhA CMC Workshop in

Bethesda, Md.  Shortly thereafter, as set forth below, Mylan's pricing for Benazepril skyrocketed and, in concert, Sandoz entered the market at Mylan's elevated pricing.

2557.  The month after the GPhA CMC Workshop, in July, 2013, Sandoz had finalized its plan to re-launch Benazepril HCTZ.  However, because Sandoz executives knew – likely from speaking to Mylan personal at the GPhA CMC Workshop – that Mylan planned to increase price on this product, Sandoz chose to wait to re-enter the market until after Mylan increased its price so that Sandoz could enter at the higher price without arousing suspicion about collusion in the marketplace.

2558.  For example, on July 12, 2013, a marketing executive at Sandoz sent an internal e-mail regarding "Benazepril Orders for Cardinal," noting that "[b]efore any release, we are expecting Mylan to raise their price."  Similarly, during a Commercial Operations meeting on July 15, it was confirmed that Sandoz was just waiting for the coming Mylan price increase before it re-entered the market.

2559.  The next day, on July 16, SW-4 spoke with Jim Nesta at Mylan and then internally forwarded an earlier e-mail outlining the Mylan price increase drugs that Nesta had provided to her.  SW-1 then sent it to her boss (Sandoz's Director of Pricing and Contracts, Armando Kellum, stating "See [SW-4's] note below for Mylan increases. . . . I'm surprised benazepril hctz isn't on the list below for Mylan?"

2560.  SW-l then e-mailed back to SW-4, asking, "Benazepril hctz?  Was hoping to see that one."

2561.  SW-1 needn't have worried.  As set forth, *supra*, Defendants' cartel agreement extended to Benazepril, Bumetanide, and all the Drugs at Issue.

2562.  Two days later, on July 18-19, 2013, SW-4 (at Sandoz) and Nesta (at Mylan) exchanged multiple phone calls, each of only a few minutes' duration.

2563.  Two weeks after that, on Friday, August 2, SW-1 sent a spreadsheet to Kellum entitled, "Teva increases July 2013."  In the e-mail, SW-1 stated:  "Mylan is also in there.  Be on the lookout for bumetanide and Benazepril/hctz."

2564.  And the week after that – on Friday, August 9, 2013, a scant two months after Mylan and Sandoz executives attended the GPhA CMC Workshop in Bethesda – Mylan's prices increased dramatically.  And two weeks after that, on Tuesday, August 20, Sandoz re-entered the market – at Mylan's prices.

2565.  For example, the price of Mylan's 20-12.5 and 20-25 mg. tablets soared from 38 cents per unit to $1.62 per unit, a staggering increase of over 300%.  Mylan imposed similar increases, from the 38-cents range to the $1.60 range, on its 10-12.5 mg dose.  Sandoz's prices were also in the $1.60 range.

2566.  A third Defendant and cartel member – Rising Pharmaceuticals - entered the BenazeprilHCTZ market on April 2, 2014 as the authorized generic.  When Rising entered, it essentially matched the WAC pricing of Sandoz and Mylan.  Both before and after entering the market, SW -2 – by then at Rising – communicated with his former colleagues at Sandoz (SW- l, SW-3, and L.J.) about obtaining market share on Benazepril.  Through those communications, Sandoz ultimately agreed to relinquish

ABC to Rising so that, in accordance with Defendants' cartel's rules, the new entrant could achieve its so-called "fair share" of the market.

2567.  In addition, Bumetanide was among the drugs subject to Teva's April 4, 2014 price increases.  As with other drugs on Teva's list, Teva actively planned and coordinated the price increase for Bumetanide.

2568.  For example, a few days before the price increase, Teva's Patel and Sandoz's Associate Director of Pricing spoke at length.  They spoke again for approximately a half-hour on the day of the increase.  Ultimately, Teva increased prices dramatically on Bumetanide, as well, and Sandoz later followed that increase, also as well.

2569.  No shortages or other market features can explain Defendants' elevated pricing for Benazepril or Bumetanide during the Relevant Period.

2570.  The elevated prices of Benazepril and Bumetanide resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2571.  The unlawful agreements among Sandoz, Mylan, and Rising for Benazepril, and between Sandoz and Teva for Bumetanide, were part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

CE.   **Divalproex ER**

2572.  The market for generic Divalproex ER is mature, as generic versions of the drug have been available in the United States for a decade or more.  Valproate, the base compound in Divalproex ER, has been in use for more than a century and is recognized as an essential medicine by the World Health Organization.

2573.  At all relevant times, there has been more than one manufacturer of generic Divalproex ER ("Divalproex ER") on the market.

2574.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Divalproex ER, as follows:

2575.  Between January and May of 2009, Mylan, Zydus, and Par (through Anchen Pharmaceuticals, its predecessor-in-interest) all received ANDA's that authorized them to market Divalproex ER.  Defendant Dr. Reddy's sells Divalproex ER pursuant to ANDA's approved by the FDA in March of 2012.

2576.  During the Relevant Period, Defendants Mylan, Zydus, Dr. Reddy's and Par sold Divalproex ER in the United States at supracompetitive prices, inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

2577.  Defendants Mylan, Zydus, Dr. Reddy's and Par dominated the market for Divalproex ER.

2578.  Between 2009 and June 2013, Defendants' prices for Divalproex ER remained relatively stable. However, in early July 2013, Defendants implemented in

unison abrupt and substantial price increase on Divalproex ER.  For example, Defendants increased the price for a bottle of 500 pills at 250 mg strength from approximately $30 to more then $200 per bottle.  Bottles of 500 mg strength pills increased even greater rates, increasing from approximately $130 per bottle to more than $1,600 per bottle, an increase of more than 1100%.

2579.  For example, with respect to WAC pricing, Mylan and Par set identical WAC prices within a couple weeks of each other in June 2013; and Dr. Reddy's and Zydus matched those WAC's in August, 2013, around the time they each entered the market.  As noted below, the new WAC's for 100 and 500 count bottle of 500 mg pills reflected increases of more than 300%.

| Product 500 mg ER | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378047301 | $0.74 | $3.26 | 14-Jun-13 | 338% |
| 500 ct | Mylan | 00378047305 | $0.71 | $3.26 | 14-Jun-13 | 361% |
| 100 ct | Par | 10370051110 | $0.74 | $3.26 | 26-Jun-13 | 338% |

| Product 500 mg ER | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 500 ct | Par | 10370051150 | $0.71 | $3.26 | 26-Jun-13 | 361% |
| 100 ct | Zydus | 68382031501 | * | $3.26 | 14-Aug-13 | * |
| 500 ct | Zydus | 68382031505 | * | $3.26 | 14-Aug-13 | * |
| 100 ct | Dr. Reddy's | 55111053401 | * | $3.26 | 19-Aug-13 | * |
| 500 ct | Dr. Reddy's | 55111053405 | * | $3.26 | 19-Aug-13 | * |

2580.  In the Fall of 2014, U.S. Senator Bernie Sanders and the late U.S. Representative Elijah Cummings requested information from manufactures of ten drugs, including Divalproex ER, which experienced extraordinary price incrases.  In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark warner, in August 2016, the GAO issued a report in which Divalproex ER was identified as experiencing an "extraordinary price increase."

2581.  There are no legitimate justifications for the abrupt increases in 2013. Divalproex ER was not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to the FDA. Furthermore, the large price spike cannot be attributed to an increase in demand.  If anything, in defiance of the rational economical behavior, demand for Divalproex ER was actually decreasing when prices were increasing.

2582.  The price increases on Divalproex ER were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Divalproex ER in the United States.  These collusive agreements were furthered, at least in part, through in-person discussion conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

2583.  For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland which was attended by representative from Dr. Reddy's and Mylan.

2584.  On February 20-22, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA Annual Meeting in Orlando, Florida.

2585.  On April 20-23, 2013, representatives of Dr. Reddy's, Mylan, Par, and Zydus, attended the NACDS 2013 Annual Meeting in Palm Beach, Florida.

2586.  Shortly before Mylan's and Par's Divalproex ER prices increased, Dr. Reddy's, Mylan, Par, and Zydus, attended the HDMA 2013 BLC in Orlando, Florida on June 2-5, 2013.

2587.  On June 4-5, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA CMC Workshop in Bethesda, Maryland.

2588.  On August 10-13, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus, attended the NACDS 2013 Total Store Expo in Las Vegas, Nevada.

2589.  On October 28-30, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA Fall Technical Conference in Bethesda, Maryland.

2590.  On February 19-21, 2014 representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2014 GPhA Annual Meeting in Orlando, Florida.

2591.  On April 26-29, 2014, NACDS held its 2014 Annual Meeting in Scottsdale, Arizona. NACDS's 2014 Annual Meeting was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.

2592.  On June 1-4, 2014, the HDMA held a BLC in Arizona. This event was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.

2593.  On June 3-4, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA CMC Workshop in Bethesda, Maryland.

2594.  On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center. This Expo was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.

2595.  On October 27-29, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Fall Technical Conference.

2596.  On October 27-29, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Fall Technical Conference.

2597.  On February 9-11, 2015, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Annual Meeting in Miami, Beach, Florida.

2598.  On June 9-10, 2015, representatives from Dr. Reddy's, Mylan, Par, and Zydus, attended the GPhA CMC Workshop.

2599.  On November 2-4, 2015, representatives of Dr. Reddy's, Mylan, Par, and Zydus, attended the 2015 GPhA Fall Technical Conference in North Bethesda, Maryland.

2600.  No shortages or other market features can explain Defendants' price increases for generic Divalproex ER during the Relevant Period.

2601.  The elevated prices of generic Divalproex ER resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these

elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2602.  The unlawful agreement among Defendants Dr. Reddy's, Mylan, Par, and Zydus, regarding generic Divalproex ER was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### CF.  Enalapril Maleate

2603.  Generic Enalapril Maleate tablets ("Enalapril") are another ACE-inhibitor, used to treat high blood pressure.

2604.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Enalapril, as follows:

2605.  During the Relevant Period, Defendants Mylan, Teva, Wockhardt, and Taro dominated the market for generic Enalapril tablets.  But in 2009, Taro discontinued its sales of Enalapril under its own label and effectively exited the commercial market.  Thereafter, Taro continued supplying Enalapril only to certain U.S. Government purchasers under their "TPLI" label – until it heard about the enormous profits its co-conspirators were making, as alleged in more detail, *infra*.

2606.  Thus, at the time of the price increases in mid-2013, the Enalapril market had only three manufacturers:  Mylan with approximately 60%, Wockhardt with approximately 28%, and Teva with approximately 11 %.

2607.  Mylan increased its price for Enalapril effective July 2, 2013.  Enalapril was on the list of drugs slated for a price increase that Teva had received from Mylan in June, 2013, before those price increases were put into effect.

2608.  On July 10, 2013, K.G. at Teva confirmed that Enalapril "was on the Mylan increase communicated last week. They took a ~75% increase to WAC."

2609.  Teva also received a request from a customer for a lower price on Enalapril.  Remarkably, the customer (falsely) said that the request was due to Wockhardt having supply problems, not because of the Mylan increase.

2610.  That comment from the customer sparked some confusion at Teva, which Teva quickly sought to clarify – with a phone call to the apparent source of the problem (and Teva's fellow cartel-member), Mylan:  Kevin Green (from Teva) and Jim Nesta (at Mylan) had two phone calls that day, one of which lasted approximately a quarter-hour.  The next day, July 11, Green and Nesta spoke two more times. During these conversations, Nesta explained to Green that Wockhardt had agreed to follow the Mylan price increase on Enalapril.  This information sparked an e-mail exchange that evening, between Green and Patel:  Green wrote that "This is all a result of a wockhardt price increase following a Mylan increase."  Shortly thereafter, Patel replied, "Wockhardt took an increase before Mylan?  Then had their supply issue?  It thought it was their supply issue plus Mylan increase."  At 1:12 am, Green replied, "Wockhardt followed Mylan.  They are not having supply issues.  Just allocating based on the Mylan increase.  They make their own API."  As it turned out,

there must have been a miscommunication between Green and Nesta, because although Wockhardt did in fact *plan* to follow Mylan's price increase, it had not actually done so as of that evening.

2611.  Meanwhile, the next day, on or about July 12, the Vice President of Sales and Marketing at Taro, Ara Aprahamian, was considering whether to renew or adjust Taro's price on Enalapril for its national contract (for U.S. Government purchasers), which was slated to expire that September.

2612.  That same Friday (July 12, 2013), Teva was busy with its own aspects of Defendants' cartel.  J.P., a national account executive at Teva, asked Patel whether Teva was "planning on increasing [its price for Enalapril]?"  Patel responded:  "I hope to increase, but we're gathering all the facts before making a determination."  J.P. then inquired whether Teva would make an offer to the customer, and Patel answered: "Not sure yet.  Need some time.  We're exploring the possibility of an increase just on this item . . . in the near future.  Maybe next week."

2613.  And sure enough, later that same day, Patel and Green started "exploring the possibility" and "gathering the facts" by reaching out to Teva's fellow cartel-members that manufactured Enalapril:  Mylan and Wockhardt.

2614.  Illustrating the institutional, rather than merely personal, nature of the relationship among cartel members, Patel (rather than Green) at Teva called Jim Nesta at Mylan and they spoke three times, including calls lasting six and five minutes.

2615.  Meanwhile, Green was attending the PBA Health3 Conference at the Sheraton Overland Park in Overland Park, Kansas, where he participated in a golf outing.  K.K. – a senior national account executive at Wockhardt – attended the same conference, and likely spoke directly to Green either at the trade show at night, because at 12:40 am that evening (*i.e.* the very early Saturday morning of July 13), K.K. created a contact on his cell phone with Green's cell phone number in it.

2616.  The next day, Sunday, July 14, after Green returned home from the conference, he and Patel spoke three times, including one call lasting approximately twenty minutes.  During these calls, Green conveyed to Patel what he had learned from K.K.:  that Wockhardt planned to follow the Mylan price increase.

2617.  First thing the next morning, on Monday, July 15, 2013, Patel sent an e-mail to a Teva executive stating, "new developments…heard that Wockhardt is taking an increase today or tomorrow."

2618.  At the same time, Wockhardt was planning to raise the price of Enalapril and sought to conltrm specific price points for the increase.  Internally, Wockhardt employees understood that K.K. would try to obtain price points from a competitor. That morning, K.K. of Wockhardt called Green for a one-minute call; shortly thereafter, Green returned the call and they spoke for two more minutes.  At 9:57 am, K.K. reported internally the specific price ranges that he had obtained from Green.

2619.  Armed with this competitively sensitive information, and the knowledge that Wockhardt intended to follow the Mylan increase, Teva began to plan its own

price increase.  So the next day, on Tuesday, July 16, 2013, Patel sent the following

internal e-mail to her boss at Teva, K.G., at 11:08 am, with the subject "Enalapril

Increase Overview," again using the word "rumors" to obfuscate the true source of

her information:

> As you are aware, we are currently preparing the information to hopefully be
> able to implement a price increase on Enalapril.
>
> This is a 3-player market that we share with Mylan and Wockhardt.  Mylan
> announced a price increase last week.  We are hearing rumors that Wockhardt
> will follow or exceed Mylan sometime this week.  It would be ideal if we could
> follow very soon at a slightly more competitive price, with the intent of picking
> up some additional share in the market.  Current share make up is as follows:
>
> 1. Mylan:  44%
> 2. Wockardt:  43%
> 3. Teva:  13%
>
> At this time, we are holding off on responding to a couple of bids in-house
> since a WAC increase would be required to follow the market.  It would be a
> great opportunity to win this share and hopefully additional business as
> customers request bids going forward. (I think it would be ideal to capture an
> additional 10%).

2620.  This e-mail was then forwarded to Maureen Cavanaugh at Teva, who

promptly approved the price increase.  Also that same day, July 16, 2013, Jim Nesta at

Mylan called Patel (at Teva) and left her a voice-mail.

2621.  Patel then scheduled a "Price Increase Discussion" with members of

Teva's sales and pricing teams, and sent the following agenda for Wednesday, July 17:

| Subject | **Price Increase Discussion** |
|---|---|
| Date and Location | Wednesday, July 17, 2013 10:30 AM - 11:00 AM, Dial In Below/Dave's Office |
| Attendees | Nisha Patel02, ██████████████████████ ██████Dave Rekenthaler██████████████████████████████; Kevin Green; ██████████████████████ |
| Message | Sorry for the re-schedules!<br><br>We are planning to announce an increase on Enalapril Tablets effective Friday. I would like to do a quick review of the changes and answer any questions you may have. A summary will be sent prior to the meeting.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

**Notes**

1) Price increase effective 7/19/2013

2) List of items affected:

| NDC | Generic Name | Strength | Form | Package Size |
|---|---|---|---|---|
| 00093-0026-01 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 100 |
| 00093-0026-10 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 1000 |
| 00093-0027-01 | ENALAPRIL MALEATE | 5 mg | TABLET | 100 |
| 00093-0027-50 | ENALAPRIL MALEATE | 5 mg | TABLET | 5000 |
| 00093-0028-01 | ENALAPRIL MALEATE | 10 mg | TABLET | 100 |
| 00093-0028-10 | ENALAPRIL MALEATE | 10 mg | TABLET | 1000 |
| 00093-0028-50 | ENALAPRIL MALEATE | 10 mg | TABLET | 5000 |
| 00093-0029-01 | ENALAPRIL MALEATE | 20 mg | TABLET | 100 |
| 00093-0029-10 | ENALAPRIL MALEATE | 20 mg | TABLET | 1000 |
| 00093-0029-50 | ENALAPRIL MALEATE | 20 mg | TABLET | 5000 |

- Pricing Overview
  - 400-650% increase in invoice/contract pricing
  - 350-450% increase in WAC
  - 10% increase in SWP

- All customers are affected  (Top Customers: CVS, Rite Aid and Medco)

- Expecting Wockhardt to increase. Please pass on any intelligence you are able to get.

- Additional share target of 10%

2622.  While Teva had an ample supply chain to supply more than a total of 23% of the market, it was seeking to capture only "an additional 10%" because more than that increase would have put Teva in violation of the cartel's so-called "fair share" rules for a three-player market.

2623.  Teva and Wockhardt simultaneously implemented the contemplated enalapril price increases that Friday:  July 19, 2013.

2624.  Within a few days after the increases, a customer complained to K.K. at Wockhardt, asking:  "What is going on in the market that justifies your price increases?"  K.K. answered by placing the blame on Mylan:  "Mylan took up first we are just following."

2625.  Similarly, in early August, a different customer asked Wockhardt to reconsider its increase, suggesting that Wockhardt's supposed competitors were offering a lower price point.  Knowing this to be untrue, K.K. again shifted the blame: "we followed Mylan and Teva for the increase."

2626.  At the same time that all of this was going on with Teva, Mylan, and Wockhardt, Aprahamian at Taro was *also* communicating about Enalapril with both Patel at Teva and M.C., a senior sales and marketing executive at Wockhardt.  And, as a result of those conversations, Taro's plans changed – which serves to illustrate both what should have been the effect of a competitive threat from Taro (keeping prices for Enalapril low, even when Taro was not in the market) and also the opposite effect

that Defendants' cartel **actually had** on those same prices, by eliminating the competitive threat from Taro and others.

2627.  So on Wednesday, July 17, 2013 – the same day as the Enalapril price-increase meeting just described, *supra* – Patel called Aprahamian and left a message. He returned the call and the two spoke for approximately a quarter-hour.  Then, on Friday, July 19 – the day that both Teva and Wockhardt's price increases for Enalapril became effective – Aprahamian called M.C. at Wockhardt on his office phone and left a message.  He then immediately called M.C.'s cell phone, which M.C. answered. They spoke for approximately eleven minutes.

2628.  That same morning (July 19), Aprahamian sent an internal e-mail to Taro colleagues, including to M.P., a senior Taro executive, signaling a change in plans. The subject was "Taro Enalapril" and the e-mail read:  "There has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast)."  By "back in Taro label," Aprahamian meant selling in the commercial market – and Taro did move fast.

2629.  In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its so-called "fair" share of the market.

2630.  On July 31, 2013, for example, Patel provided her analysis of the drugs that Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets.

Enalapril was one of the drugs where Teva was "seeking share," so Patel authorized submission of a bid.  But prior to sending the e-mail, Patel had spoken to Aprahamian on July 30 (11-minute call) and July 31 (4-minute call).  Based on the agreement between the two companies, and in accordance with Defendants' cartel's so-called "fair share" regime, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share (on the order of 10%) compared to others in the market, such as Mylan's roughly 60% share.

2631.  In early December, 2013, Taro was making its final preparations to re-enter the Enalapril market – including, of course, reaching out to its co-conspirators.

2632.  So, on December 3, Aprahamian consulted twice by phone with M.A., a senior account executive at Mylan, for approximately two and ten minutes.

2633.  The next day, a customer who had recently switched from Wockhardt to Teva expressed an interest in moving its primary business to Taro for the 2.5 mg, 5 mg, 10 mg, and 20 mg strength tablets.  At 4:30 that afternoon, Aprahamian directed a Taro employee to prepare a price proposal for that customer for all four products.

2634.  But before actually sending the proposal to the customer, however, Taro sought the input of Taro's co-conspirator, Teva.  So the next day, on December 5, Aprahamian and Patel spoke by phone for approximately five minutes.

2635.  Taro's fact sheet for the Enalapril launch, from December 5, the day of Aprahamian's call with Teva, showed a "Target market share goal" of 15%, with prices identical to Teva's and nearly identical to Wockhardt's and Mylan's.

2636.  Taro began submitting offers on Enalapril the following day, December 6, 2013.  But even with the bidding process underway, Aprahamian made certain to communicate with M.A. at Mylan during a brief phone conversation that afternoon; since Mylan was the market share leader with approximately 60% of the market, Taro was targeting more of Mylan's customers than those of other competitors.

2637.  Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril market.  Aprahamian and M.A. talked for ten minutes on December 11 and for seven minutes on December 12.

2638.  Thereafter, and with the likely consent of Mylan, Aprahamian reported on an internal Taro Sales and Marketing call on December 7 that Taro's prior target Enalapril market share goal of 15% had been raised to 20%.

2639.  Taro continued to gain share from both Mylan and Wockhardt, and to co-ordinate with both.  For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer.  This caused M.C. (Wockhardt) to call Aprahamian (Taro) on December 31, 2013, to discuss the situation.  During the call, M.C. agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to Taro.  On January 2, 2014, S.K. at Wockhardt replied to an e-mail with the subject, "Competitive Offer for Enalapril" by conveying the details of M.C.'s New Year's Eve discussion with Aprahamian to his colleagues:  "I spoke to [M.C.] on NYE.  Once we confirm we are keeping McKesson, let's yield MoDick."  As was the standard practice among employees of

cartel members, the e-mail ended with an attempt to minimize further written communications on the subject: "Call to discuss."

2640.  By May, 2014, the market had stabilized, and market share for Enalapril was distributed among the companies in line with their so-called "Fair Share" conspiracy.  As Teva was considering whether to bid on specific drugs for an RFP sent out by a large wholesaler customer, Patel provided the following caution with regard to Enalapril:  "no bid due to potential market/customer disruption, aka strategic reasons."  The same day she sent that e-mail – May 14 – Patel spoke to Aprahamian for approximately four minutes and they exchanged eight text messages.

2641.  By the end of the next month, Taro had obtained 25% market share for Enalapril in a 4-player market.  Mylan and Teva each had approximately 28 % market share, and Wockhard had the remainder.

2642.  No shortages or other market features can explain Defendants' elevated pricing for Enalapril during the Relevant Period.

2643.  The elevated prices of Enalapril resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2644.  The unlawful agreement among Mylan, Taro, Teva, and Wockhardt for Enalapril was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**CG.   Etodolac and Etodolac ER**

2645.  Generic Etodolac is a non-steroidal anti-inflammatory drug (NSAID) and is available in tablet form. ("Etodolac") It is used to reduce pain, swelling and joint stiffness from arthritis.  A generic extended-release version of Etodolac (Etodolac ER) is also available, in capsule form.  ("Etodolac ER")

2646.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Etodolac, as follows:

2647.  During the Relevant Period, Defendants Apotex, Taro, Teva and Sandoz dominated the market for generic Etodolac tablets; Taro, Teva, and Zydus dominated the market for generic Etodolac ER tablets; and Apotex, Teva, and Taro dominated the market for generic Etodolac capsules.

2648.  In early 2012, Apotex (which had received an ANDA to market Etodolac capsules in 2000) was planning to re-enter the market for the drug while Teva was planning to exit the market.  Although the number of competitors in the market remained the same, Apotex and Taro were able to co-ordinate a large price increase due to of Defendants' overarching, so-called "fair share" cartel agreement.

2649.  As a result of this co-ordination, Taro led a price increase that more than tripled its previous price for Etodolac capsules from early 2012, while Apotex entered the market at the higher price and gained its "fair share." As a result, between May and August of 2012, Taro and Apotex were able to co-ordinate to increase prices by more 200%.

2650.  This co-ordination paved the way for a subsequent price increase on the tablet formulation of the drug.  One year later, when Patel first began planning for another round Teva's price increases, Etodolac and Etodolac ER were not slated for increases.  For example, when she circulated a long list of potential increases on July 11, 2013, neither of those formulations were on the list.

2651.  Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July.  Etodolac was on the list, in part because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

2652.  On July 16, 2013, SW-3, a senior executive at Sandoz, reached out to Aprahamian – who was, by this point, now at Taro – and they spoke for approximately a quarter of an hour.  Aprahamian called SW-3 back the next day and the two spoke again, but for half that time. After hanging up the phone with SW-3, Aprahamian immediately called Patel.  They exchanged voicemails until they were able to connect later in the day, again for approximately a quarter of an hour.  On July 18, 2013, Patel called SW-1 at Sandoz and the two spoke for approximately ten minutes.

2653.  During the flurry of phone calls, Defendants Sandoz, Taro, and Teva agreed to raise prices for both Etodolac teblets and Etodolac ER.

2654.  On July 22, 2013, before any price increases took effect or were made public, Patel added both Etodolac tablets and Etodolac ER to her price increase spreadsheet for the first time, with the following on it:

| Etodolac | Sandoz* (All strong competitors) |
|---|---|
| Etodolac ER | Could follow IR (Shared with Taro) |

2655.  Based on her conversations with SW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac tablets, and that Taro would follow suit and raise its price for Etodolac ER. During those conversations, Teva agreed to follow both price increases.

2656.  That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases, including for Etodolac tablets.  Prior to the conference call on July 23, SW-1 called Patel at Teva.  After exchanging voice mails, the two were able to connect for approximately a quarter of an hour that day.  During that call, SW-1 confirmed the details of the Sandoz price increase on Etodolac tablets.  Similarly, SW-3 of Sandoz called Aprahamian (Taro) the same day and they spoke for a few minutes.

2657.  The Sandoz price increase for Etodolac tablets became effective on July 26, 2013.  That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets. After learning of the request, Aprahamian responded

swiftly internally, in accordance with Defendants' overarching cartel agreement:  "Not so fast. Why the request? Market just changed on this and not apt to undercut."

2658.  When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally swift, and likewise followed Defendants' cartel's "rules of the road":

| Message | |
| --- | --- |
| From: | ara.aprahamian@taro.com [ara.aprahamian@taro.com] |
| Sent: | 7/30/2013 11:14:49 PM |
| To: | ███████████████████████████████ |
| CC: | ███████████████████████████████ |
| Subject: | Re: Fw: Bid Request - Etodolac |
| Attachments: | _.gif; _.; _ |

recent market changes, not taking on additional share...

2659.  There was no legitimate, pro-competitive reason to Taro to decline to "tak[e] on additional share…"  Instead, Taro did so in accordance with Defendants' cartel agreements.

2660.  Also on July 26, Patel sent an e-mail to others at Teva – including her supervisor K.G., Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR (immediate release).  She instructed them to "[p]lease watch ordering activity for both, IR and ER.  The intent is that we will follow in the near future, but a date has not been determined."

2661.  Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac tablet and Etodolac ER price increases (among other things).  Between July 29 and August 2, 2013, for example, Patel engaged in the following series of calls with SW-1 of Sandoz and Aprahamian at Taro:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

2662.  Aprahamian was also speaking to his contact at Sandoz – SW-3 – during this time, including a one-minute call at 7:56 am on July 30; an approximately quarter-hour call at 12:43 pm on August 1; and a six-minute call the next day, August 2.

2663.  On August 1, 2013 - shortly after speaking with Patel – Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac tablets and Etodolac ER. Aprahamian stated:  "[w]e need to get these out next week." Not wanting to provide the details in writing, Aprahamian concluded: "Will come over and discuss with you."

2664.  By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac tablets and Etodolac ER.  The minutes from a Teva "Marketing Ops" meeting on August 5, 2013 – which Patel attended – include the notation "4.  Etodolac – Sandoz did take price increase on IR, Taro taking price increase on IR and ER this week.  CIM still monitoring to 100% forecast for all customers."

2665.  Two days later, Patel sent the "Price Increase Overview" spreadsheet to her boss, K.G., summarizing Teva's upcoming August 9 price increases.  The e-mail is illustrated here (on the next page) and the spreadsheet is illustrated and discussed in further detail *infra*, in the context of that August, 2013, group price-raise.  In the spreadsheet, Patel had again made it clear that the reason Teva was increasing its prices for Etodolac tablets and Etodolac ER was because Taro ***would, in the future,*** also be raising its prices on both drugs "this week," even though they had not done so at the time of Patel's e-mail – information that was not public at that time, and which Patel had learned from Teva's co-conspirators at Taro.

2666.  K.G. immediately recognized that having such explicit evidence of a supposed competitor's (but, in fact, fellow cartel member's) price increase plans, in writing, could be problematic for Teva.  So the same day, in response to Patel's e-mail, K.G. told Patel to remove some of the incriminating information:

From: ███████████
Sent: Wed 8/07/2013 11:00 AM (GMT-05:00)
To: Nisha Patel02
Cc:
Bcc:
Subject: RE: PI Overview-MC

Nisha,

Please add Teva share to the competitors commentary and change header to Market Share.

Under reasons, I would change to the following:

1. Etodolac ER : Follow Taro
2. Etodolac : Follow Sandoz; Taro increase anticipated.
3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

2667.  As ordered, Patel deleted the information.

2668.  K.G. did not, of course, direct Patel to stop co-operating with the fellow cartel members identified in her e-mail.

2669.  Teva and Taro raised prices for Etodolac tablets and Etodolac ER simultaneously, with the price increases effective on August 9, 2013.  Both their AWP and their WAC prices were increased to the exact same price points. The increases were substantial.  For Etodolac tablets, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

2670.  The astronomical profitablility of this substantial price increase, further discussed *infra*, also resulted in Zydus entering the market for Etodolac ER.

2671.  This, in turn, should have led to price competition.  Instead, what happened was that Defendants continued to allocate customers in accordance with their cartel agreements.

2672.  For example, Teva and Taro willingly gave up customers to Zydus so that it could get its "fair share" of the market.  Nisha Patel, Ara Aprahamian, and Kevin Green discussed a plan to cede a large wholesale client to Zydus in May, 2014, and Teva then ceded a second customer to Zydus a few months later.  Some of these conversations are reflected in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:08:00 |
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:12 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:36 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:16:45 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Incoming | Patel, Nisha (Teva) | 0:13:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:07:00 |

2673.  On May 14, 2014, Anda, a wholesaler customer of Teva, notified Teva that Zydus had submitted a bid for its Etodolac ER business.  That same day, Patel

exchanged eight text messages and had a four-minute call with Aprahamian.  The next day, Green called Patel and they spoke for twenty minutes.

2674.  A week later, on May 20, 2014, Green called Patel and they spoke for a few minutes.  That same day, K.R., a senior sales executive at Zydus, also exchanged two text messages and had a short call with Maureen Cavanaugh at Teva.  The next day (May 21) Green called Patel again, and they spoke for approximately a half-hour; the same day, K.R. at Zydus and Cavanaugh (Teva) exchanged four text messages.

2675.  The next day, on May 22, 2014, T.S., Senior Analyst, Strategic Support at Teva, sent an internal e-mail to certain Teva employees, including Patel, stating:  "I have proposed we concede Anda as they are a small percent of market share and we will have to give up some share with a new market entrant.  Anda is looking for a response today."  Patel responded:  "agree with concede."

2676.  There was no legitimate, pro-competitive reason for Teva to agree to concede any customer, including Anda, nor was there any legitimate, pro-competitive reason for Teva to "have to give up some share [to] a new market entrant."

2677.  Instead, Teva did so in accordance with Defendants' cartel agreements.

2678.  Similarly, on June 27, 2014, Econdisc, a Teva GPO customer, notified Teva that it had received a competitive offer for its Etodolac ER business.  Later that day, Patel spoke with Aprahamian at Taro for approximately a quarter of an hour.

2679.  The next week, on July 2, Patel called Green and left a short voice-mail. The next day, on July 3, 2014, Patel sent an internal e-mail advising that:  "We will

concede." Later that same day, Teva told Econdisc that it was unable to lower its pricing to retain the business.

2680. When Patel's boss at Teva, K.G., learned that Teva no longer had the Econdisc account, he sent an internal e-mail asking, "Did we choose not to match this?" Patel answered: "Yes. New market entrant – Zydus." K.G. replied: "Okay good. Thank you."

2681. In conjunction with Apotex's entry into the market, Taro and Apotex announced identical and nearly simultaneous list price increases. The increases were very large. For example, on 300 mg capsules, both manufacturers raised prices more than 250%. Rather than stimulate price competition, Apotex's entry into the market resulted in much higher prices. Apotex quickly gained market share, all while it and Taro maintained high prices, in accordance with Defendants' overarching cartel agreement – which is also what made this abnormal pricing behavior possible.

2682. The charts below show the effects of Defendants' continuing agreement not to compete in the markets for Etodolac tablets and capsules, including Etodolac ER, during the Relevant Period, through and including at least early 2019, the most recent period for which pricing figures were readily available:[46]

---

[46] The price charts on the following page show the lockstep list pricing of Etodolac capsules by Taro and Aptoex. Etodolac capsules come in 200 mg and 300 mg dosages, both of which exhibited similar pricing patterns. Charts are provided here only for the 300 mg dosage. NSP pricing followed a similar trajectory.



2683.  Also illustrated are list (WAC) prices for Etodolac regular and ER

tablets:[47]



[47] Note, regular tablets come in 400 mg and 500 mg dosages and ER tablets come in 400 mg, 500 mg and 600 mg dosages. The pricing patterns across all dosages are similar. Charts for only the 500 mg dosages are included here.

2684.



2685.  As she was preparing to implement Teva's August 9, 2013, price increases, Patel calculated the quarterly increase in sales revenues resulting from the price increases taken by Teva on July 3, 2013.  The analysis also included the financial impact of the recent Pravastatin increase. As would be expected from the graphs above, the results are staggering:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

2686.  According to her analysis, the "Total Net Upside after Credits" as a result of the July 3 price increases, plus Pravastatin and one other drug, was a staggering 5937,079,079 (nearly $1 billion) to Teva per quarter, as shown in the chart.

2687.  For this anticompetitive increase in sales of almost $4 billion annually, Patel received a bonus of approximately $30,000.

2688.  No shortages or other market features can explain Defendants' price increases for generic Etodolac tablets and capsules, including Etodolac ER, during the Relevant Period.

2689.  The elevated prices of generic Etodolac tablets and capsules, including Etodolac ER, resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2690.  The unlawful agreements among Defendants Apotex, Taro, Teva Sandoz, and Zydus, regarding generic Etodolac tablets and capsules, including generic Etodolac ER, were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**CH. Amiloride HCL/HCTZ Tabs, Clemastine Fumarate Oral Liquids, Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tabs, Doxazosin Mesylate Tabs, Etodolac Tabs, Etodolac ER Tabs, Ketoprofen Caps, Ketorolac Tabs, Pravastatin Tabs, and Tolmetin Sodium Caps – "Round 2"**

2691.  While many of these drugs are described in additional detail elsewhere in this Complaint, it is helpful to consider them in the context of their group price-raise of August, 2013, as well.

2692.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic formulations of:  Amiloride HCL/HCTZ Tabs, Clemastine Fumarate Oral Liquids, Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tabs, Doxazosin Mesylate Tabs, Etodolac Tabs, Etodolac ER Tabs, Ketoprofen Caps, Ketorolac Tabs, Pravastatin Tabs, and Tolmetin Sodium Caps, at least as follows:

2693.  As alleged *supra*, on Wednesday, July 3, 2013, Teva implemented a massive price increase on generic Adapalene Gel, Cefaclor ER Tabs, Cefadroxil Tabs, Cefdinir Caps, Cefdinir Oral Suspension, Cefprozil Tabs, Cephalexin Tabs, Cimetidine Tabs, Fluconazole Tabs, Fluocinonide Cream, Fluocinonide Emollient Cream, Fluocinonide Gel, Fluocinonide Ointment, Methotrexate Tabs, Moexipril HCL Tabs, Moexipril HCL/HCTZ Tabs, Nabumetone Tabs, Nadolol Tabs, Oxybutynin CL Tabs, Prazosin HCL Caps, and Ranitidine HCL Tabs.

2694.  The day after those massive price increases was Thursday, July 4, and the Monday after that (July 8), Nisha Patel at Teva was back on the telephone, making the rounds with other cartel members.  On that day, Patel called executives at four other cartel members: GW-5 at Glenmark (they spoke for approximately 10 minutes), David Berthold at Lupin (same), Jim Grauso at Aurobindo (same), and Rick Rogerson at Actavis.

2695.  The following day, Tuesday, July 9, Patel called Jason Malek at Heritage (they spoke for approximately 20 minutes) and exchanged calls with SW-1, at Sandoz, ultimately connecting for approximately a quarter-hour.

2696.  The day after that, Wednesday, July 10, Kevin Green (Teva) and Jim Nesta (Mylan) had two telephone calls and spoke for approximately a quarter of an hour, after which Green called Patel, and they spoke for seven minutes; and the same day, Patel spoke with Berthold at Lupin, again, for approximately four minutes, and called, but apparently missed, GW-5 at Glenmark – so she followed up with a text.

2697.  The next day, Thursday, July 11, Nesta and Green exchanged five phone calls between noon and 1:20 pm, speaking for a total of approximately five minutes; and Patel called Berthold – again – and GW-5 at Glenmark returned Patel's text from the previous day with a seven-minute telephone call.

2698.  In addition, the same day, Patel sent a preliminary draft list of price increase candidates to a colleague for what she referred to as "Round 2."  For the drugs on the preliminary list, Patel stated that "this does not guarantee that [they] will

end up getting an increase, but at the very least, it will be put through the review process."  Initially, the list included a number of drugs involving the following competitors, primarily:  Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan and Sandoz.  This process ultimately led to Teva raised prices on another twelve different drugs on August 9, 2013. These increases were again co-ordinated with a number of Teva's co-conspirators, including Defendants Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex.

2699.  Patel and other Teva executives continued to co-ordinate with Teva's co-conspirators over the next several weeks, refining the list and preparing for the next large Teva price increase.

2700.  By August 7, 2013, Patel had finalized the list.  That day she sent an e-mail to her supervisor, K.G., with a "Price Increase Overview" spreadsheet which she had prepared for Maureen Cavanaugh, summarizing the increases.  As shown below, the spreadsheet included competitively sensitive information about certain cartel members' plans, including *future* price increases, that Teva could have only learned from directly colluding with those co-conspirators:

Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase | Reason for Increase | Competitors |
|---|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | 53% | Follow Mylan | Mylan, 95.7% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% | Teva Exclusive, Lead | |
| CLEMASTINE FUMARATE TABLETS | 76% | Lead | Sandoz/Fougera, 30.8% |
| DICLOFENAC TABLETS | 102% | Follow Mylan; Teva share leader | Mylan, 19.4% - Sandoz/Fougera, 19.4% - Apotex, 0.1% |
| DILTIAZEM HCL TABLETS | 90% | Follow Mylan | Mylan, 61.3% |
| DOXAZOSIN MESYLATE TABLETS | 1031% | Follow Mylan and Apotex; Teva share leader | Mylan, 28.1% - Apotex, 2.2% - Dava, 0.4% |
| ETODOLAC ER TABLETS | 138% | Follow Taro (likely to be this week with it) | Taro, 56.9% |
| ETODOLAC TABLETS | 434% | Follow Sandoz; Taro likely to follow this week | Taro, 56.6% - Sandoz/Fougera, 30.8% - Watson/Actavis, 0.5% - Apotex, 0.2% |
| KETOPROFEN CAPSULES | 146% | Follow Mylan | Mylan, 63.4% |
| KETOROLAC TABLETS | 258% | Follow Mylan | Mylan, 61.7% |
| PRAVASTATIN TABLETS | 633% | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. | Glenmark, 21.2% - Apotex, 7.1% - Zydus, 3.8% - Lupin, 1.8% - Dr Reddy, 0.9% |
| TOLMETIN SODIUM CAPSULES | 80% | Follow Mylan; Teva almost exclusive | Mylan, 6.5% |

2701.  Under "Reason for Increase," and likely reflecting Patel's recent conversations with Teva's co-conspirators, the Etodolac ER Tablets entry said "***Follow Taro (likely to be this week…)***"; the Etodolac Tablets entry said "Follow Sandoz; ***Taro likely to follow this week***"; and the Pravastatin Tablets entry said "Follow Glenmark, Zydus and Apotex.  ***Lupin waiting on Taro***." (emphases added).

2702.  As discussed *supra* (in the section focused just on Etodolac and Etodolac ER), K.G. immediately recognized that having such explicit commentary regarding fellow cartel members' (particularly as they were supposedly competitors) future price increase plans, in writing, would be problematic for Teva.  This is particularly so, since the Pravastatin entry doesn't merely say that Lupin is likely to follow, but rather explains the motivations behind Lupin's (in-)action, *viz.* that it is "waiting on Taro."

2703.  In response to the e-mail, as alleged and illustrated, *supra*, K.G. told Patel to remove the incriminating information, and replace the details above with the bland notation that these increases were simply "anticipated," which Patel did.

2704.  Following Defendants' cartel's common and systematic pattern, Patel and Green co-ordinated the increases listed above with every important competitor in the days and weeks leading up to the increase.

2705.  The following graphic annotates the spreadsheet illustration above with details some of the calls with competitors in the days and weeks leading up to the increases:



2706.  The only drug on the list that Patel and/or Green were not co-ordinating with Teva's co-conspirators on (Clemastine Fumarate Oral Liquids) was a drug where Teva was exclusive, and thus had no pricing details to exchange with its fellow cartel members, who would – and did – simply stay out of the market.

2707.  Further, Teva knew that, in accordance with the so-called "Fair Share" rules of Defendants' cartel, if any fellow cartel members did choose to enter this

market, they would co-ordinate with Teva and enter the market at Teva's higher price, rather than competing with Teva.

2708.  On August 8, 2013, the day before the price increase went into effect, Patel was particularly busy, spending most of her morning reaching out and communicating with several key cartel members, including Lupin, Sandoz, Taro, and Mylan:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

2709.  The next day, on August 9, 2013, Teva raised prices on at least twelve different drugs[48], at least seven of which overlapped with Mylan.  As just discussed, these increases were co-ordinated with Teva's co-conspirators, including Defendants Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus, and Apotex.

2710.  No shortages or other market features can explain Defendants' price increases for Amiloride HCL/HCTZ Tabs, Clemastine Fumarate Oral Liquids,

---

[48] Amiloride HCL/HCTZ Tabs, Clemastine Fumarate Oral Liquids, Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tabs, Doxazosin Mesylate Tabs, Etodolac Tabs, Etodolac ER Tabs, Ketoprofen Caps, Ketorolac Tabs, Pravastatin Tabs, and Tolmetin Sodium Caps.

Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tabs, Doxazosin Mesylate Tabs, Etodolac Tabs, Etodolac ER Tabs, Ketoprofen Caps, Ketorolac Tabs, Pravastatin Tabs, or Tolmetin Sodium Caps during the Relevant Period.

2711.  The elevated prices of generic Amiloride HCL/HCTZ Tabs, Clemastine Fumarate Oral Liquids, Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tabs, Doxazosin Mesylate Tabs, Etodolac Tabs, Etodolac ER Tabs, Ketoprofen Caps, Ketorolac Tabs, Pravastatin Tabs, and Tolmetin Sodium Caps resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2712.  The unlawful agreements among Defendants Mylan, Sandoz/Fougera, Taro, Lupin, Glenmark, Zydus, Watson/Actavis, Dr. Reedy Apotex, and Teva regarding Amiloride HCL/HCTZ Tabs, Clemastine Fumarate Oral Liquids, Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tabs, Doxazosin Mesylate Tabs, Etodolac Tabs, Etodolac ER Tabs, Ketoprofen Caps, Ketorolac Tabs, Pravastatin Tabs, and Tolmetin Sodium Caps, were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### CI.    Hydrocortisone Acetate Suppositories (Anucort HC) Tablets

2713.  Generic Hydrocortisone Acetate is a corticosteroid.   Generic Hydrocortisone Acetate Suppositories ("Hydrocortisone Acetate"), also known by the G&W brand name Anucort-HC, are used to treat itching or swelling caused by hemorrhoids as well as ulcerative colitis, proctitis, and other inflammatory conditions of the intestines, rectum, or anus.

2714.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Hydrocortisone Acetate, as follows:

2715.  During the time period relevant to this Complaint, Hydrocortisone Acetate was G&W's top-selling product.  As of January, 2016, the 25mg formulation of Hydrocortisone Acetate accounted for nearly half of all of G& W's moving annual sales, totaling more than $119.7 million.  Similarly, Hydrocortisone Acetate was Perrigo's second-best selling product.  During that same time period, Perrigo's annual sales for the 25mg and 30mg formulations accounted for approximately $78.3 million.

2716.  In 2013, the generic Hydrocortisone Acetate market was split between G&W, with 41% market share; Perrigo, with 32%; and non-Defendant, County Line Pharmaceuticals ("County Line"), with 25%.  However, by late June, 2013, County Line decided to exit the market for Hydrocortisone Acetate.

2717.  County Line's exit created an opportunity for Perrigo and G&W to collude to significantly raise the price of Hydrocortisone Acetate in July 2013, and then again one year later in July 2014.

2718.  On June 25, 2013, Vogel-Baylor of G&W e-mailed Wal-Mart, a County Line customer, stating that she had heard that County Line was discontinuing Hydrocortisone Acetate and asked whether Wal-Mart was interested in a new supplier.

2719.  Similarly, on June 26, 2013, ABC, also a County Line customer, e-mailed G&W, requesting a bid on Hydrocortisone Acetate.  Vogel-Baylor forwarded the request to her supervisor, Orlofski.

2720.  Between June 27 and June 30, 2013, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Venetian hotel in Las Vegas, Nevada.

2721.  While at the trade show, on June 27, 2013, Vogel-Baylor received a call from S.S., a sales executive at Perrigo.  The call lasted approximately one minute.  A few hours later, Vogel-Baylor called Orlofski and they spoke for approximately a quarter-hour.  Shortly thereafter, Vogel-Baylor sent an internal e-mail to her team notifying them that G&W would be implementing a price increase for Hydrocortisone Acetate and requesting that they draft customer notifications to that effect. The price increase included a 200% increase to WAC and would result in an estimated $27.9 million in increased sales for G&W.

2722.  The next day, on June 28, 2013, Vogel-Baylor contacted Orlofski three more times from the trade show, including exchanging two text messages and one call lasting approximately 20 minutes.

2723.  On July 8, 2013, T.P. (Perrigo) and Vogel-Baylor exchanged two short calls and then connected for a call lasting approximately seven minutes, in which they co-ordinated their price increases on Hydrocortisone Acetate.  After that call, both T.P. at Perrigo and Vogel-Baylor reported the substance of their conversations back to their supervisors.  Immediately upon hanging up with T.P., Vogel-Baylor called Orlofski and they spoke for more than six minutes. Similarly, T.P. called Wesolowski three times after speaking with Vogel-Baylor, including two very short calls and a third lasting six minutes.

2724.  The G&W price increases on Hydrocortisone Acetate went into effect on July 9, 2013.  That same day, Perrigo issued a product announcement notifying its customers that it was also increasing its pricing on Hydrocortisone Acetate, effective two days later, on July 11.  Perrigo increased its WAC by 473% on the 25mg formulation to essentially match G&W's WAC. That same day, T.P. (Perrigo) called Vogel-Baylor. The call lasted one minute.

2725.  Also on July 11, 2013, ABC e-mailed Vogel-Baylor asking G&W to lower its dead net pricing for Hydrocortisone Acetate to match Perrigo's slightly lower dead net pricing. Vogel-Baylor forwarded the request to Orlofski.  Later that day, Vogel-Baylor responded to ABC and declined to lower its pricing.

2726.  On July 19, 2013, Harvard Drug Group e-mailed Vogel-Baylor asking why G&W was increasing its price on Hydrocortisone Acetate.

2727.  Months later, on April 9, 2014, K.K., a G&W sales executive, e-mailed Vogel-Baylor regarding bidding on several products at Kaiser, including Hydro-cortisone Acetate.  Vogel-Baylor responded that G&W could not disrupt the market and pursue the customer.

2728.  On June 11, 2014, Vogel-Baylor e-mailed Orlofski, recommending that G&W increase McKesson's contract pricing for Hydrocortisone Acetate.  That same day, Vogel-Baylor called T.P. at Perrigo.  The call lasted less than a minute. Two days later, on June 13, Vogel-Baylor again tried to reach T.P. again by phone, and again, the call lasted less than one minute.

2729.  But less than a week later, on June 26, 2014, Perrigo generated its own internal price increase analysis for Hydrocortisone Acetate.  The analysis assumed *zero per cent* unit loss as a result of the planned price increase.

2730.  On July 22, 2014, Perrigo notified its customers that it was increasing pricing on a list of products, including Hydrocortisone Acetate.  This included a 235% increase to WAC for its 25mg formulation, effective on July 24, 2014.

2731.  At the time the increase was announced, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Gaylord Palms Hotel in Orlando, FL.

2732.  Over the next several days, G&W heard from multiple customers that Perrigo had increased pricing on Hydrocortisone Acetate.

2733.  In accordance with their ongoing understanding to follow each other's price increases, and consistent with past practice on this product and others, G&W went to work implementing a comparable price increase of its own.

2734.  On July 29 and July 30, 2014, Vogel-Baylor and Orlofski exchanged e-mails finalizing the details of the price increase for Hydrocortisone Acetate. The increase included an increase to WAC for the 25mg, 12 count bottle that essentially matched Perrigo pricing.

2735.  Also on July 30, Vogel-Baylor learned of pricing that Perrigo had offered to Schnucks and sent a text message to her superiors.

2736.  The next day, on July 31, , A.G., a senior G&W executive, e-mailed Vogel-Baylor back.  And the day after that, on August 1, 2014, G&W began notifying its customers of the price increase on Hydrocortisone Acetate, and sent out a second wave of letters to additional customers on August 5, 2014.

2737.  The increase included a 200% increase to WAC for all three package sizes.  According to its internal analysis, G&W projected an increase in Hydro-cortisone Acetate sales from $41.3 million to $111.3 million as a result of the increase, or a total of $70 million in sales – supracompetitive profits, paid for, in part, by Plaintiffs.

2738.  The two competitors continued to co-ordinate after those price increases.  For example, the following month, August 11, T.P. at Perrigo called Vogel-Baylor and they spoke for approximately a quarter-hour.  A week later, on August 18, 2014, Vogel-Baylor called T.P. and they spoke for more than ten minutes.

2739.  Additionally, Vogel-Baylor met Rick Rogerson, a senior pricing executive at Defendant Actavis, while attending the NACDS Pharmacy and Technology Conference in Denver, Colorado, from August 25-28, 2012.

2740.  Following the NACDS conference, on August 30, 2012, Vogel-Baylor called Rogerson and they spoke for approximately a quarter-hour.  Over the ensuing months, the two stayed in regular contact and colluded to raise prices on Promethazine HCL Suppositories twice – once in late 2012 and again in 2013. The collusion on that product is discussed in detail in a later section.

2741.  No shortages or other market features can explain Defendants' price increases for generic Hydrocortisone Acetate during the Relevant Period.

2742.  The elevated prices of generic Hydrocortisone Acetate resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2743.  The unlawful agreement among Defendants Actavis, G&W and Perrigo, regarding generic Hydrocortisone Acetate, was part of all Defendants' overarching

conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### CJ.    Oxycodone/Acetaminophen

2744.  Generic Oxycodone/Acetaminophen is used to treat moderate to severe pain.

2745.  At all relevant times, the market for Oxycodone/Acetaminophen was mature and had multiple manufacturers.

2746.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Oxycodone/Acetaminophen, including 10-325 mg, 7.5-325 mg and 5-325 mg tablets ("Oxycodone/Acetaminophen") as follows, beginning at least as early as August, 2013:

2747.  During the Relevant Period, Defendants Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt and Par dominated the market for generic Oxycodone/Acetaminophen.

2748.  For years, the prices of Oxycodone/Acetaminophen were relatively low and stable.  In the summer of 2013, however, market prices shifted radically higher. Around the same time, Aurobindo and Par re-entered the market.

2749.  Notwithstanding the enormous shifts in pricing, each Defendant's share of the market remained relatively stable, as required by their cartel agreement.

2750.  Throughout this time-frame, Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt and Par met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Oxycodone/ Acetaminophen and of their Fair Share agreement.

2751.  For example, between September and December, 2013—when generic Oxycodone/Acetaminophen prices were skyrocketing—Actavis's Falkin communicated by phone with Par (multiple calls in September with J.H., Par Regional VP of Sales), with Alvogen (multiple calls in October and November with B.H., Alvogen EVP of Sales), with Amneal (voice and text in October with S.R., Amneal VP of Sales) and with Aurobindo (communications in November and December with R.C., Aurobindo CEO).

2752.  Between September and December of 2013, while Falkin was communicating with these Defendants, A.S., Actavis VP of Sales, and A.B., Senior VP of Sales and Marketing at Actavis, were in touch with W.K., VP and General Manager at Mallinckrodt.  Actavis's A.B. also had multiple phone communications during this period with S.R., Senior Director of Sales Finance at Amneal.

2753.  Alvogen's B.H. also was in touch with Aurobindo's J.K., Director of National Accounts, in December, 2013, and January, 2014.

2754.  No shortages or other market features can explain Defendants' price increases for generic Oxycodone/Acetaminophen during the Relevant Period.

2755.  The elevated prices of generic Oxycodone/Acetaminophen resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2756.  The unlawful agreement among Defendants Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt and Par, regarding generic Oxycodone Acetaminophen was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### CK.   Griseofulvin Microsize Tablets

2757.  Generic Griseofulvin Microsize Tablets ("Griseofulvin") are used to treat fungal infections of the skin, hair, or nails that do not respond to creams or lotions.  During the Relevant Period, the market for this drug ranged between $13 million and $16 million dollars annually.

2758.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Griseofulvin, as follows:

2759.  Throughout 2013, Rising had a virtual monopoly on the Griseofulvin market, with Valeant Pharmaceuticals maintaining only a small percentage of share.

2760.  On August 7, 2013, Sandoz received FDA approval to market Griseofulvin. Sandoz planned to talk to customers at the NACDS Annual Total Store Expo that weekend and then launch the following week.

2761.  However, on August 14, 2013, Sandoz learned that the Griseofulvin launch would be delayed due to production problems. Despite the delay, Sandoz estimated that it could still realize $2.5 million in sales in 2013

2762.  On September 19, 2013, CW-2, then a senior sales and marketing executive at Rising, called SW-3 at Sandoz twice. Both calls lasted one minute.  SW-3 returned the calls later that day and they spoke for approximately twenty minutes. During these calls, CW-2 and SW-3 discussed Sandoz's manufacturing issues on Griseofulvin and its continued delay in launching the product.

2763.  However, just one week later, on September 25, 2013, Sandoz learned that its production problems had been resolved. The following Monday, on September 30, 2013, SW-3 informed CW-2 of this unexpected news via text message.

2764.  That same day, CW-2 called SW-3 twice.  The calls lasted one minute and eight minutes.  That evening, Sandoz held an internal meeting to discuss launch strategy for Griseofulvin, including which customers to approach in order to achieve Sandoz's market share goal.

2765.  Over the next several days, CW-2 at Rising exchanged several calls with SW-3 and L.J., a Sandoz sales executive, during which they discussed pricing for

Griseofulvin and the allocation of market share to the new entrant, Sandoz. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/1/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 6:32:00 | 0:01:00 |
| 10/1/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 12:15:00 | 0:10:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 12:35:00 | 0:02:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 13:30:00 | 0:22:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 13:59:00 | 0:03:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 14:46:00 | 0:09:00 |

2766.  After this series of communications between Sandoz and Rising, on October 2, Kellum sent an internal e-mail identifying four customers that Sandoz planned to target to obtain approximately 40% share of the Griseofulvin market – CVS (20%), McKesson (8%), Rite Aid (6%), and ABC (8%).  That evening, Sandoz prepared and sent its initial round of offers to CVS and McKesson.

2767.  The next day, on October 3, 2013, CW-2 at Rising exchanged three calls with L.J., the Sandoz sales executive responsible for the McKesson account, and one call with SW-3 that lasted 21 minutes. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/3/2013 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 6:23:00 | 0:01:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 6:24:00 | 0:02:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 6:25:00 | 0:05:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 11:34:00 | 0:21:00 |

2768.  The next day, on October 4, 2013, McKesson e-mailed CW-2 asking if Rising wanted to submit a bid for Griseofulvin.  Rising responded to the request by submitting a high bid so that Sandoz would win the business.  On October 7,

McKesson advised Rising that its bid was not competitive and awarded the business to Sandoz.

2769.  The next day, on October 8, 2013, CVS e-mailed Sandoz and declined its Griseofulvin offer.  Later that evening, CVS e-mailed CW-2 asking whether Rising planned to bid on the business.

2770.  First thing the next morning, on October 9, 2013, CW-2 at Rising and SW-3 at Sandoz exchanged three calls, including one call lasting nine minutes.  After these calls, Sandoz reduced its pricing and sent a revised offer to CVS.  At the same time, Rising prepared and submitted a high bid to CVS with the intention that Sandoz would win the business.

2771.  However, CVS threw a wrench in the cartel members' plans when it refused to accept Rising's high bid that same day.  Knowing he had agreed to give up the customer to Sandoz, CW-2 asked his colleague to reduce the CVS offer only slightly – by $10. Thereafter, on October 10, 2013, CVS declined the Rising bid and awarded the business to Sandoz.

2772.  On October 15, 2013, Sandoz submitted an offer to Rite Aid for its Griseofulvin business.

2773.  Between October 16 and October 21, 2013, CW-2 (Rising) and SW-3 (Sandoz) spoke several additional times to co-ordinate Sandoz's entity.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/16/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 14:37:00 | 0:01:00 |
| 10/17/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 5:12:00 | 0:14:00 |
| 10/17/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 5:27:00 | 0:01:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:06:00 | 0:02:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:45:00 | 0:02:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 9:42:00 | 0:07:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 13:24:00 | 0:06:00 |
| 10/21/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:24:00 | 0:01:00 |
| 10/21/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 8:12:00 | 0:05:00 |

2774.  On these calls, the two discussed Griseofulvin and the accounts that Sandoz had targeted or planned to target.  CW-2 also told SW-3 that Rising would not give up Rite Aid to Sandoz.

2775.  First thing the next morning, on October 22, 2013, CW-2 (Rising) called SW-3 (Sandoz) twice.  Both calls lasted only one minute and were likely voice-mails. SW-3 returned the call later that morning and they spoke for eight minutes

2776.  The next day, on October 23, 2013, Rite Aid advised Sandoz that it declined to accept Sandoz's offer for Griseofulvin – as expected, Rising had lowered its pricing to retain the customer. That same day, Sandoz began making plans to approach Wal-Mart and Cardinal as their next targets.

2777.  On October 28, 2013, SW-3 e-mailed Wal-Mart to see if the customer was interested in an indirect bid for Griseofulvin.  Wal-Mart replied that it was.  The next morning, on October 29, 2013, SW-3 (Sandoz) called CW-2 (Rising) and they spoke for 22 minutes.  During that call, SW-3 informed CW-2 that Sandoz would approach Wal-Mart, and CW-2 agreed that Rising would relinquish that customer. Later that day, Sandoz prepared an offer and sent it to Wal-Mart.

2778.  On November 20, 2013, CW-2 at Rising and L.J. at Sandoz spoke for three minutes. Later that day, Sandoz submitted an offer to Cardinal for its Griseofulvin business.

2779.  On November 22, 2013, SW-3 of Sandoz called CW-2 and they spoke for approximately a quarter-hour.  Later that day, Rising executives held a Commercial Operations meeting at which CW-2 conveyed that Sandoz needed Rising to relinquish one more account – Cardinal – so that it could meet its share goal.  CW-2 told them that Sandoz would be done after Cardinal and would not seek any additional share.

2780.  Thereafter, Rising conceded Cardinal, and Cardinal awarded its Griseofulvin business to Sandoz.

2781.  The following Monday, on November 25, 2013, Rising held a sales and marketing meeting during which they discussed Griseofulvin, among other products. CW-2 forwarded the minutes from that meeting to several Rising executives.

2782.  One year later, on October 15, 2014, Rising increased WAC pricing on Griseofulvin.  In advance of the increase, CW-2 exchanged several calls with L.J. at Sandoz, during which they discussed the price increase.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/1/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:16:00 | 0:04:00 |
| 10/2/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 13:01:00 | 0:02:00 |
| 10/2/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 15:23:00 | 0:11:00 |
| 10/8/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:47:00 | 0:01:00 |
| 10/8/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 14:57:00 | 0:07:00 |
| 10/13/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:33:00 | 0:08:00 |

CW-2 also met in person with L.J. and the two discussed the increase over drinks.

2783.  Even after the Rising price increase, CW-2 at Rising continued to communicate with his former Sandoz colleagues about the increase.

2784.  The next day, on November 13, 2014, CW-2 also exchanged calls with CW-3 and L.J. of Sandoz. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 3:05:00 | 0:14:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 3:19:00 | 0:01:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 3:19:00 | 0:20:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 10:51:00 | 0:02:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 13:59:00 | 0:09:00 |

2785.  After speaking with CW-2 at Rising, SW-3 sent an e-mail to SW-1, a Sandoz senior pricing executive. As was his customary practice, SW-3 falsely stated that he learned the information from a different source, when in fact he had obtained the information directly from CW-2.  Later that day, SW-1 and SW-3 spoke for approximately twelve minutes.

2786.  Sandoz did not follow the Rising price increase immediately because, after conducting several analyses, it determined that the price protection penalties it would have incurred were too high to justify the increase.

2787.  However, by July, 2015, those concerns had been alleviated.  On July 27, 2015, P.C., a Sandoz pricing executive, sent an internal e-mail detailing that Sandoz planned to increase prices the following week on a list of products, including Griseofulvin.  Sandoz knew that Rising would not seek to take any of its customers after the price increase.

2788.  Two days later, on July 29, 2015, SW-3 (Sandoz) called S.G., then a senior sales executive at Rising, and they spoke for nine minutes.  One week later, on August 7, Sandoz followed Rising's price increase and published WAC pricing that matched its co-conspirator.

2789.  No shortages or other market features can explain Defendants' price increases for generic Griseofulvin during the Relevant Period.

2790.  The elevated prices of generic Griseofulvin resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2791.  The unlawful agreement among Defendants Sandoz/Fougera and Rising, regarding generic Griseofulvin, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## CL.   Econazole Topical

2792.  The market for generic Econazole ("Econazole") is mature, as Econazole has been available in the United States for almost 20 years.  Further, at all relevant times, there has been more than one manufacturer of generic Econazole on the market.  As a result, for years, including etween 2009 and 2013, Defendants' prices for Econazole remained relatively stable.

2793.  Defendants Taro and Sandoz/Fougera sell generic Econazole pursuant to ANDA's approved by the FDA in November, 2002.  Defendant Perrigo sells Econazole pursuant to an ANDA approved in 2004.  Teligent sells Econazole pursuant to an ANDA it acquired in February, 2013.

2794.  During the Relevant Period, Defendants Sandoz/Fougera, Perrigo, Taro, and Teligent sold Econazole to purchasers throughout the United States.

2795.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Econazole, as follows:

2796.  Beginning in September, 2013, and continuing thereafter, Defendants began implementing abrupt and substantial price increases on Econazole.

2797.  Between September 2013 and the Summer of 2014, Econazole, which had cost roughly 12 cents/unit, shot up to more than four dollars/unit.

2798.  This skyrocketing price cannot be explained by supply shortages or other market events. The only material change in the months preceding the price increases was Teligent's entry into the market.

2799.  On Feburary 1, 2013, Teligent acquired an ANDA for Econazole from Prasco LLC.  During that month, the CEO of Teligent attended trade conferences with Perrigo and Taro, where the three Defendants had an opportunity to discuss Teligent's entry into the market.

2800.  During this same time-frame, Teligent also became interested in entering the market for other generic pharmaceuticals.  Teligent launched its first topical generic drug in late 2012, followed by its acquisition of the Econazole ANDA in February, 2013. By September 2013, Teligent had 12 ANDA's pending for FDA approval.  By June 20, 2014, that number had jumped to 17, with four additional ANDA's submitted under joint-development plans with other manufacturers and another five ANDA's planned for submission by the end of 2014.

2801.  When Teligent acquired the right to sell Econazole from Prasco LLC, it was the beginning of a publicly announced plan that would place Teligent in direct competition with Taro and Perrigo across numerous drugs. Teligent now makes 20 topical drugs. Seventeen of these drugs are also made by Taro; fifteen are made by Perrigo.

2802.  Teligent's entry into the Econazole market illustrates the operation of the "fair share" agreement of Defendants' cartel.  Where a drug manufacturer, like Teligent, plans to enter a market with established manufacturers, and where the established manufacturers are ostensible competitors across multiple drugs, such a situation sets the groundwork for a "fair share" agreement.  Rather than allow the new entrant to drive the price of drugs lower, the incumbent manufacturers and the new entrant can "play nice in the sandbox" and keep prices high.  The conduct of Teligent, Perrigo, Fougera and Taro after Teligent entered the Econazole market is the result of a market allocation and "fair share" agreement among these Defendants.

2803.  Teligent launched Econazole under its own label in September, 2013.  In a competitive generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share.  Teligent, however, announced a list price (WAC) increase in July, 2013, even before its first sale of Econazole under its own label.  Rather than competing for market share by lowering prices, Teligent made the economically irrational decision to raise prices.  Teligent's conduct reflected Defendants' cartel agreement that new entrants would enter with higher or the same – rather than lower – prices as the incumbents, in exchange for the incumbents' ceding market share to the new entrant, in this case, Teligent.

2804.  On October 28-30, 2013, right before Teligent's higher prices took effect in the marketplace, representatives from Perrigo, Taro, Fougera and Teligent, met at a GPhA conference, where they had an opportunity to discuss Econazole market shares and pricing.

2805.  By January, 2014, Teligent's effective pricing for Econazole was more than double that of Perrigo and Taro.  Pursuant to their agreement, the incumbents needed to catch up to Teligent's high prices – which they promptly did.

2806.  The very next month (February, 2014), Perrigo began to increase its effective prices, and by March, Perrigo's effective prices had risen to the level of Teligent's prices.  Taro's prices remained relatively stable, but that changed after representatives from Perrigo, Teligent, and Taro, met at the June 3-4, 2014 GPhA meeting in Bethesda, Maryland.

2807.  Consistent with their price-fixing agreement, in mid- to late-2014, Teligent, Perrigo, Taro, and Sandoz/Fougera each implemented abrupt and substantial price increases on the Econazole products they sold, in lockstep.

2808.  With respect to WAC pricing, Taro, Teligent, and Perrigo raised their WAC's to identical prices, reflecting increases of more than 600%.

| Product CRM | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm | Perrigo | 45802046635 | $0.79 | $5.80 | 24-Jul-14 | 637% |
| 30 gm | Perrigo | 45802046611 | $0.69 | $5.80 | 24-Jul-14 | 736% |
| 85 gm | Perrigo | 45802046653 | $0.50 | $4.09 | 24-Jul-14 | 719% |
| 15 gm | Teligent | 52565002215 | $0.82 | $5.80 | 1-Sep-14 | 610% |
| 30 gm | Teligent | 52565002230 | $0.72 | $5.80 | 1-Sep-14 | 704% |
| 85 gm | Teligent | 52565002285 | $0.52 | $4.09 | 1-Sep-14 | 688% |
| 15 gm | Taro | 51672130301 | $0.66 | $5.80 | 18-Nov-14 | 779% |
| 30 gm | Taro | 51672130302 | $0.59 | $5.80 | 18-Nov-14 | 890% |
| 85 gm | Taro | 51672130308 | $0.42 | $4.09 | 18-Nov-14 | 871% |

2809.  By November, 2014, Fougera increased its WAC price to the same levels as Perrigo, Teligent, and Taro.

2810.  In the Fall of 2014, Senator Bernie Sanders and the late U.S. Representative Elijah Cummings requested information from manufacturers of ten drugs, including Econazole, which had experienced extraordinary prices increases.  In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, in August, 2016, the GAO issued a report in which Econazole was identified as experiencing an "extraordinary price increase."

2811.  Although the conspirators have not been able to maintain their full conspiracy price increase, as of 2016, Defendants continued to charge an average of more than $2.00 per dose for Econazole, which is roughly four times the prevailing market price before the conspiratorial price increases in late 2014.  Defendants continue to charge elevated prices for Econazole through the present day.

2812.  The price increases on Econazole were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Econazole, and other Drugs as Issue, in the United States.  These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those identified below.

2813.  For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Defendants Perrigo, Fougera, and Taro.

2814.  On February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida that was attended by representatives from Perrigo, Taro, and Teligent.

2815.  On February 24-27, 2013, representatives from Perrigo, Fougera, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficent Program Planning Session.

2816.  On April 20-23, 2013, NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives of Perrigo and Taro.

2817.  On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo, Fougera, and Taro.

2818.  On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by representatives from Defendants Perrigo, Fougera, and Taro.

2819.  On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Perrigo, Fougera, Taro, and Teligent.

2820.  On February 19-21, 2014, GPhA held its Annual Meeting at the JW Marriott in Orlando, Florida that was attended by representatives from Defendants Perrigo, Taro, and Teligent.

2821.  On February 23-26, 2014, representatives from Perrigo, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficient Program Planning Session.

2822.  On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives from Defendants Perrigo and Taro.

2823.  On June 3-4, 2014, GPhA held a meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland that was attended by representatives from Perrigo, Fougera, and Taro.

2824.  On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by representatives from Defendants Perrigo and Taro.

2825.  On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo, Fougera, Taro, and Teligent. See

2826.  The GPhA Annual Meeting in Miami Beach, Florida on February 9-11, 2015 was attended by representatives of Perrigo, Taro, and Teligent.

2827.  On February 22-25, 2015, representatives from Perrigo, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficient Program Planning Session.

2828.  On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida. NACDS's 2015 annual meeting was attended by representatives from Defendants Perrigo and Taro, who were key executives for generic drug sales and pricing.

2829.  On June 9-10, 2015, GPHA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo and Taro.

2830.  On August 22-25, 2015, NACDS held its 2015 Total Store Expo at the Denver Convention Center in Denver, Colorado. NACDS's August 2015 Total Store Expo was attended by representatives from Perrigo and Taro.

2831.  On November 2-4, 2015, GPHA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo and Taro.

2832.  Defendants continued to attend trade association meetings and conference throughout 2016, including: (i) NACDS's 2016 annual meeting at The Breakers, Palm Beach, Florida on April 16-19, 2016; and (ii) NACDS's 2016 Total Store Expo at the San Diego Convention Center in San Diego, California on August 19-22, 2016.

2833.  A number of individuals with leadership roles at Teligent have ties to other Defendants that are implicated in the conspiracy.

2834.  For example, Jason Grenfell-Gardner ("Grenfell-Gardner") joined Teligent as CEO in July 2012.  Prior to that time, he had served in a number of roles at West-Ward.

2835.  Damian Finio, who worked with Grenfell-Gardner at West-Ward, served briefly on Teligent's Board in 2014 before leaving that job to become the CFO of Heritage.  In 2018, he returned to Teligent and became Teligent's CEO.

2836.  Carole Ben-Maimon joined the Teligent Board in 2016. She has held executive positions at Impax, Par, and Teva.

2837.  Narendra Borkar served on the Board of Teligent and is the former CEO of Aurobindo and Caraco (now part of Sun).

2838.  Bhaskar Chaudhuri served on the Teligent Board and previously worked for Valeant and Mylan.

2839.  No shortages or other market features can explain Defendants' price increases for generic Econazole during the Relevant Period.

2840.  The elevated prices of generic Econazole resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2841.  The unlawful agreement among Defendants Perrigo, Taro, Fougera and Teligent, regarding generic Econazole, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**CM. Azithromycin Suspension and Oral Suspension, Bumetanide Tabs, Cephalexin Suspension, Clarithromycin ER Tabs, Cyproheptadine HCL Tabs, Dicloxacillin Sodium Caps, Diflunisal Tabs, Estazolam Tabs, Ethosuximide Caps and Oral Suspension, Hydroxyzine Pamoate Caps, Keto-conazole (Cream and Tablets), Medroxyprogesterone Tabs, Mimvey (Estradiol/Norethindrone Acetate Tabs), Nystatin Oral Tabs, Pentoxifylline Tabs, Tamoxifen Citrate Tabs, and Theophylline ER Tabs**

2842.  Generic Cephalexin Oral Suspension is an antibiotic that is used to treat a wide variety of bacterial infections.

2843.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic:  Azithromycin Suspension and Oral Suspension, Bumetanide Tabs, Cephalexin Oral Suspension, Clarithromycin ER Tabs, Cyproheptadine HCL Tabs, Dicloxacillin Sodium Caps, Diflunisal Tabs, Estazolam Tabs, Ethosuximide Caps and Oral Suspension, Hydroxyzine Pamoate Caps, Ketoconazole (Cream and Tablets), Medroxyprogesterone Tabs, Mimvey (Estradiol/Norethindrone Acetate Tabs), Nystatin Oral Tabs, Pentoxifylline Tabs, Tamoxifen Citrate Tabs, and Theophylline ER Tabs, as follows:

2844.  Throughout 2013, Teva and Lupin colluded, communicating *via* David Berthold at Lupin and Nisha Patel and Kevin Green at Teva.  As discussed above, at times Patel and Green would co-ordinate with each other regarding who would communicate with Berthold, and take turns doing so.

2845.  The ongoing conspiracy between Teva and Lupin was part of Defendants' over-arching cartel agreement and was institutional, rather than being dependent upon a relationship between specific individuals.  So, in October 2013, when Lupin decided to raise price on Cephalexin Oral Suspension – a drug where Teva was the only other competitor in the market – Berthold already knew that Teva would follow the increase, and wanted to co-ordinate on customers.

2846.  Thus, on October 14, 2013, Berthold called Rekenthaler at Teva.  They spoke for approximately a quarter-hour that day.  Communication was relatively rare between those two executives, since Teva-Lupin communications were generally done *via* other Teva and Lupin employees.  According to the phone records produced to the States, prior to October 14, 2013, the only time Berthold and Rekenthaler had spoken by phone was November 27, 2011.

2847.  On October 31, 2013 – the day before Lupin was scheduled to increase its price on Cephalexin Oral Suspension – Berthold also called T.S., a national account executive at Teva, to notify Teva of the price increase.  He called T.S. at 9:18 am that day and left a message.  T.S. returned the call at 9:57 am, and the two spoke for approximately five minutes.

2848.  Within minutes after hanging up the phone with Berthold, T.S. notified others at Teva about the substantial increase that Lupin was about to take, writing, in an e-mail titled "LUPIN PRICE INCREASE – Cephalexin Oral Suspension," that "I have heard th[at] Lupin is implementing a price increase today on Cephalexin Oral Suspension (4-6 x's current price)  Teva has 59% market share; Lupin has 37% market share."  The Lupin increase on Cephalexin Oral Suspension actually became effective the next day, November 1, 2013 – demonstrating that T.S. had advance knowledge of the increase. Shortly thereafter, T.S. followed up her own e-mail with specific price points that Lupin would be charging for Cephalexin.

2849.  K.G. at Teva responded later that day, asking:  "Did Lupin increase the Caps as well?"  Rekenthaler answered immediately, with information he had learned from Berthold in mid-October:  "Lupin did not increase the caps, only the susp[ension]."

2850.  On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase.  T.S. forwarded the e-mail from the customer to Rekenthaler and others with the suggestion that, because Teva already had the majority share, it should not bid for the business.  K.G. agreed, and simultaneously forwarded the e-mail to Patel stating:  "Nisha, let's add this to our list to discuss."  Patel called Berthold the same day and left a message.

2851.  And discuss they did. When Patel drafted her initial list of possible price increase candidates and forwarded it to K.G. in January, 2014, Cephalexin Oral Suspension was on the list.  Patel co-ordinated the increase consistently with Berthold throughout the period.

2852.  On April 4, 2014, Teva raised its WAC prices on Cephalexin Oral Suspension to match Lupin's prices exactly.  The increases to the WAC price ranged from 90% - 185%, depending on the formulation.

2853.  But Cephalexin Oral Suspension wasn't the only product whose price was increased that day.  On April 4, 2014, Teva raised prices on 22 different generic drugs.  Again, these increases were co-ordinated Teva's fellow cartel members, including Rising Pharmaceuticals, Inc. ("Rising") and Defendants Sandoz, Taro,

Actavis, Mylan, Lupin, Pfizer's *alter ego*, "Greenstone," Breckenridge, Heritage, Versapharm, Inc. ("Versapharm"). For this price increase, Teva also decided to lead on more price increases, which led to greater co-ordination with its co-conspirators to ensure that they would follow, so that Teva would not lose market share.

2854. Teva began planning for the next round of Teva price increases in early January, 2014. On January 14, 2014, Patel sent her boss at Teva, K.G. a preliminary draft list of price "Increase Potentials Q1 2014." In her e-mail, she stated: "Attached is my list of potential items. Note that they still need to go through the review process."

2855. The initial list contained drugs sold by Actavis, Lupin and Greenstone, among others. Not surprisingly, Teva was communicating frequently with each of those co-conspirators from December, 2013, through Teva's price increases in the following Spring.

2856. On February 7, 2014, Patel created a formal list of "Pl Candidates" in a spreadsheet. In the days leading up to February 7, Patel was feverishly co-ordinating by phone with a number of different competitors to identify price increase candidates, including at least the following calls:



| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

2857.  Those efforts were successful.  By February 26, Patel had a more refined

list of "PI Candidates," which she forwarded to another colleague for his review.

That list included the following drugs and notes about each drug:

| Family | Market Notes | Pricing Notes |
|--------|--------------|---------------|
| Clarithromycin ER | Zydus exiting | Raise non-Cardinal customers in accordance with new Cardinal price |
| OCs | Secondary at ABC | Raise to non-primary pricing/within 10% of primary market sell-refer to Anda intel |
| Cephalexin OS | | Follow Lupin - price points - WS net $14.70, 23.52, 16.75, 25.13 |
| Azith Susp | | Follow GS - price points - WS net $12.50 on all sku's |
| Medroxypro Tabs | | Follow GS - price points - WS net 8.50, 9.50, 10.50 on 100s |
| Nadolol (Econdisc only) | | Raise to originally planned increase price |
| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor | |
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | |
| Cyproheptadine | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 55.10 |
| Mimvey | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 96.30 |
| BUDESONIDE | Exclusive | PER PRICING INFORMATION FROM DECEMEBER |
| NIACIN ER | Exclusive but Lupin entering | PER PRICING INFORMATION FROM DECEMEBER |
| Bumetanide | Teva exiting CHECK SALES FOR % INCREASE | Lead market with potential share loss in mind |
| Divalproex ER | UNPROFITABLE several competitors | |
| Diflunisal | Shared only with Rising | |
| Ketoconazole Cream | Shared with Taro and Sandoz | |
| Ketoconazole Tab | Shared with Taro, Myl and Apo | |
| Mupirocin Ointment | Shared with Perrigo, GM, Taro, Sandoz | |
| Theophylline Tab | Shared with Heritage, Major and Inwood | |
| Nystatin Tab | Shared with Heritage and Mutual/Caraco | |
| Hydroxyzine Pamoate | Shared with Sandoz and Actavis | |
| Pentoxi ER | Shared with Apo and Mylan | |

2858.  On March 17, 2014, Patel sent a near final version of the "PI Candidates" spreadsheet to K.G., noting:  "Once you verify these are acceptable, we can finalize for the increase."  In a practice that had now become routine for members of Defendants' cartel, the co-conspirators – in this case Teva, Taro, Lupin, Actavis, Pfizer (through its "Greenstone" alias), Zydus, Heritage, and Rising – to co-ordinate the price increases in the weeks before the price increase. At least some of those communications are reflected in the extensive list below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

2859.  Rekenthaler had also previously spoken with his contact at Versapharm - J.J., a senior national accounts executive – on January 22 (a five-minute call) and March 7, 2014 (a three minute call) to confirm Versapharm's agreement to follow the Teva increase on two drugs.  Those were the only two identified telephone calls between Rekenthaler and J.J. since 2012.  Versapharm followed with its own price increase shortly after the Teva increase.

2860.  In the days leading up to the price increase, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully co-ordinated increases with its co-conspirators.  On April 1 , 2014, Patel responded by providing a list of only those drugs where Teva was leading the price increase – i.e., the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

2861.  Satisfied that Patel and Rekenthaler had confirmed agreement with all the appropriate co-conspirators, on April 4, 2014, Teva increased pricing on various dosage strengths of the following drugs, as shown in the illustration below, taken from Teva's files:

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

2862.  These price increases were all co-ordinated and agreed to between Teva and its co-conspirators. As was now their standard procedure, Defendants communicated with all of the cartel members in the days and weeks leading up to the increase.  Many of those communications are set forth in the graphic below:



The colored boxes contain:

**Mylan:** D. Rekenthaler speaks to J. Nesta on 4/4/14 (6 minutes)

**Actavis:** N. Patel speaks to R. Rogerson on 4/1 (3:59), 4/3 (0:26 and 0:21) and 4/4/14 (8:19 and 1:58) Rekenthaler speaks to Falkin on 4/1, 4/2, 4/3 and 4/4/14

**Greenstone:** N. Patel speaks to R.H. twice on 4/4/14 (7:21 and 0:22)

**Sandoz:** N. Patel and CW-1 speak on 3/31/14 (15:36) and 4/4/14 (25:08)

**Zydus:** N. Patel speaks to K. Green on 4/2 (9:42) and 4/3/14 (11:36)

**Lupin:** N. Patel and D. Berthold speak 3 times on 3/24/14 (5:14; 4:56; and 11:49) and twice on 3/25/14 (0:03 and 5:10)

**Breckenridge:** N. Patel speaks to S.C. (Breckenridge) 2 times on 2/7/14 (1:21 and 4:53)

**Rising:** D. Rekenthaler speaks to CW-2 (Rising) on 3/31/14 (3 minutes)

**Versapharm:** D. Rekenthaler speaks to J.J. (Versapharm) on 3/7/14 (3 minutes)

**Taro:** N. Patel speaks to A. Aprahamian on 4/4/14 (6:53)

**Apotex:** D. Rekenthaler speaks to I.H. on 3/20 (4 minutes) and 3/25/14 (2 minutes)

**Heritage:** N. Patel speak to J. Malek (Heritage) 3 times on 3/18/14 (28:56; 0:06; 4:53)

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

2863.  These price increases are also discussed in more detail elsewhere in this Complaint.

2864.  No shortages or other market features can explain Defendants' price increases for generic:  Azithromycin Suspension and Oral Suspension, Bumetanide Tabs, Cephalexin Oral Suspension, Clarithromycin ER Tabs, Cyproheptadine HCL Tabs, Dicloxacillin Sodium Caps, Diflunisal Tabs, Estazolam Tabs, Ethosuximide Caps and Oral Suspension, Hydroxyzine Pamoate Caps, Ketoconazole (Cream and Tablets), Medroxyprogesterone Tabs, Estradiol/Norethindrone Acetate Tabs,

Nystatin Oral Tabs, Pentoxifylline Tabs, Tamoxifen Citrate Tabs, or Theophylline ER Tabs during the Relevant Period.

2865.  The elevated prices of generic Azithromycin Suspension and Oral Suspension, Bumetanide Tabs, Cephalexin Oral Suspension, Clarithromycin ER Tabs, Cyproheptadine HCL Tabs, Dicloxacillin Sodium Caps, Diflunisal Tabs, Estazolam Tabs, Ethosuximide Caps and Oral Suspension, Hydroxyzine Pamoate Caps, Keto-conazole (Cream and Tablets), Medroxyprogesterone Tabs, Estradiol/Norethindrone Acetate Tabs, Nystatin Oral Tabs, Pentoxifylline Tabs, Tamoxifen Citrate Tabs, and Theophylline ER Tabs resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2866.  The unlawful agreements among Rising Pharmaceuticals, Inc. ("Rising") and Defendants Sandoz, Taro, Actavis, Mylan, Lupin, Pfizer's *alter ego*, "Greenstone," Breckenridge, Heritage, and Versapharm, regarding generic Azithromycin Suspension and Oral Suspension, Bumetanide Tabs, Cephalexin Oral Suspension, Clarithromycin ER Tabs, Cyproheptadine HCL Tabs, Dicloxacillin Sodium Caps, Diflunisal Tabs, Estazolam Tabs, Ethosuximide Caps and Oral Suspension, Hydroxyzine Pamoate Caps, Ketoconazole (Cream and Tablets), Medroxyprogesterone Tabs, Mimvey (Estradiol/Norethindrone Acetate Tabs), Nystatin Oral Tabs, Pentoxifylline Tabs, Tamoxifen Citrate Tabs, and Theophylline ER Tabs, were part of all Defendants'

overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### CN.   Digoxin

2867.  Generic Digoxin ("Digoxin") is prescribed to approximately 6.5 million patients in the United States and it is considered an essential medicine by the World Health Organization.  Variants of the drug have been in existence since at least the 19th century.  Because Digoxin was in existence prior to the 1938 passage of the Federal Food, Drug, and Cosmetic Act, the drug was manufactured and sold by a large number of companies outside the NDA/ANDA process; as a result, the market for Digoxin is mature.

2868.  In 1997, GlaxoSmithKline obtained an NDA authorizing it to market Lanoxin, a branded version of Digoxin.  Because Digoxin was not a new chemical compound, its NDA allowed for just a three-year period of exclusivity, and by 2003 there were at least eight manufacturers of generic Digoxin in the United States, including Defendants Impax, Lannett, Mylan, Par, and West-Ward.

2869.  At all relevant times, there has been more than one manufacturer of Digoxin on the market.

2870.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Digoxin, as follows:

2871.  During the Relevant Period, Defendants Impax, Lannett, Mylan, Par, and West-Ward sold Digoxin to at supracompetitive prices, inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

2872.  During the Relevant Period, Defendants Impax, Lannett, Mylan, Par, and West-Ward dominated the market for Digoxin.

2873.  Due to industry consolidation and manufacturing difficulties experienced by Mylan, Par, and West-Ward, by the end of 2012, just Lannett and Impax remained active in the market for generic Digoxin.  Despite this duopoly, until October 2013, the price of Digoxin charged by Lannett and Impax remained stable.

2874.  Beginning in October, 2013, however, Defendants imposed abrupt and substantial price increases.

2875.  Defendants continued to increase the prices they charged for Digoxin during the first six months of 2014, despite Par's entry into the Digoxin market in early 2014 and West-Ward's re-entry soon thereafter.  Mylan also re-entered in early 2015 and followed the pricing agreed to by its co-conspirators.  Par, West-Ward, and Mylan each communicated their entry into the generic Digoxin market to their co-consirpators well in advance of the date each entrant began actually making delivery of the drug, so that agreements could be reached on price without any disruption to the prevailing, supracompetitive prices.

2876.  By way of example, with respect to WAC pricing, in October, 2013, Lannett and Impaxed implemented lockstep WAC prices on their 0.125 mg products,

reflecting increases of more than 630%. Instead of competing on price, Par, West-Ward, and Mylan reported the same WAC benchmarks as Lannett and Impax as they entered the market:

| Product 0.125 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Lannett | 00527132401 | $0.14 | $1.19 | 16-Oct-13 | 734% |
| 1000 ct | Lannett | 00527132410 | $0.12 | $0.99 | 16-Oct-13 | 738% |
| 100 ct | Impax | 00115981101 | $0.14 | $1.19 | 22-Oct-13 | 734% |
| 1000 ct | Impax | 00115981103 | $0.12 | $0.99 | 22-Oct-13 | 738% |
| 100 ct | Par | 49884051401 | * | $1.19 | 17-Jan-14 | * |
| 1000 ct | Par | 49884051410 | * | $0.99 | 17-Jan-14 | * |
| 100 ct | West-Ward | 00143124001 | $0.16 | $1.19 | 14-Apr-14 | 638% |
| 1000 ct | West-Ward | 00143124010 | $0.13 | $0.99 | 14-Apr-14 | 687% |
| 100 ct | Mylan | 00378615501 | * | $1.19 | 17-Nov-14 | * |
| 1000 ct | Mylan | 00378615510 | * | $0.99 | 17-Nov-14 | * |

2877. In the fall of 2014, U.S. Senator Bernie Sanders and the late U.S. Representative Elijah Cummings requested information from manufacturers of ten drugs, including Digoxin, which had experienced extraordinary price increases. In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner, in August 2016, the GAO issued a report in which Digoxin was identified as experiencing an "extraordinary price increase."

2878. Defendants' pricing of Digoxin is the exact opposite of what one would expect to see in a competitive market, where the entry of new manufacturers brings the price down. Instead, as a result of their collusion, Defendants' pricing for

Digoxin in the United States increased as the number of "competitors" in the market grew. Thus, the pricing of Digoxin mirrors Defendants' collusion on Glyburide, where Mylan, Heritage, and Mayne agreed to increase prices on that drug in advance of the entry into the market by Heritage and Mayne.

2879. In early 2015, Mylan re-entered the market and Defendants continued to adhere to their anticompetitive agreements on pricing.

2880. The price increases on Digoxin were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Digoxin in the United States. As a result, Defendants have sold Digoxin at supracompetitive levels since October, 2013.

2881. These collusive agreements were furthered at least in part through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA, as well as other meetings and communications, some of which are described below.

2882. For example, on April 20-23, 2013, NACDS held its 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida. This meeting was attended by representatives from Defendants Mylan and Par.

2883. On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida. This meeting was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.

2884.  On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. This TSE was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.

2885.  On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. Representatives from Mylan and Par attended this meeting.

2886.  On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona. The meeting was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.

2887.  On August 23-26, 2014, NACDS held its 2014 TSE at the Boston Convention Center in Boston, Massachusetts. This TSE was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.

2888.  On February 16-18, 2015, the National Pharmacy Forum ("NPF") took place at the Marriott Waterside Hotel & Marina in Tampa, Florida.  Speaker topics included: "current pricing and spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "market trends."  The NPF was attended by representatives of Defendants Mylan and Westward.

2889.  On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida.  This meeting was attended by representatives from Defendants Mylan, Par, and West-Ward.

2890.  Defendants continued to regularly attend trade association meetings, conferences and events in 2015-16, including: (a) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (b) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (c) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (d) the November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (v) the February 8-10, 2016 NPF meeting in Scottsdale, Arizona; (e) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (f) the NACDS 2016 Annual Meeting in Palm Beach, Florida, from April 16-19, 2016; (g) the HDMA BLC in Colorado Springs, Colorado, from June 12-16, 2016; and (h) the NACDS 2016 Total Store Expo in Boston, Massachusetts, from August 6-9, 2016.

2891.  No shortages or other market features can explain Defendants' price increases for generic Digoxin during the Relevant Period.

2892.  The elevated prices of generic Digoxin resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2893.  The unlawful agreement among Defendants Impax, Lannett, Mylan, Par, and West-Ward, regarding generic Digoxin, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## CO.   Triamcinoline Acetonide Paste

2894.  Generic Triamcinolone Acetonide Paste ("Triam Paste") provides relief from pain symptoms caused by mouth lesions.  In 2013, the annual market size for this drug was approximately $14 million.

2895.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Triamcinolone Acetonide Paste, as follows:

2896.  As of October, 2013, Rising and Taro were the only two manufacturers in the market for Triam Paste; each maintained approximately 50% market share.

2897.  At that time, Rising was considering implementing a price increase on Triam Paste.  Prior to increasing the price, CW-2, then a senior sales and marketing executive at Rising, reached out to D.S., a Taro sales executive, to discuss the increase. These calls are detailed in the chart below. CW-2 felt internal pressure to make money on the product and wanted assurance from D.S. that Taro would follow before Rising raised prices.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/27/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 13:32:00 | 0:02:00 |
| 9/30/2013 | Voice | CW-2 (Rising) | Incoming | D.S. (Taro) | 5:41:00 | 0:04:00 |
| 10/11/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 12:09:00 | 0:02:00 |
| 10/14/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 9:31:00 | 0:04:00 |

2898.  Two days after the final call detailed above, on October 16, 2013, Rising increased its WAC pricing for Triam Paste by 25%.  Two weeks later, on November 1, 2013, Taro published increased WAC pricing that matched Rising's pricing exactly.

2899.  Prior to implementing the increase, Taro described in an internal e-mail that it was going to raise the price of Triamcinolone Acetonide Paste, and noted that the risk of losing business was low.  In fact, the risk was non-existent because CW-2 and D.S. had discussed the increase in advance and Taro had confidence that Rising would respect its market position and not poach its customers.

2900.  No shortages or other market features can explain Defendants' price increases for generic Triamcinolone Acetonide Paste, during the Relevant Period.

2901.  The elevated prices of generic Triamcinolone Acetonide Paste resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2902.  The unlawful agreement between Defendants Rising and Taro regarding Triamcinolone Acetonide Paste was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### CP.  Azithromycin Suspension

2903.  Generic Azithromycin Suspension, including generic Azithromycin Oral Suspension (collectively, "Azithromycin Suspension") is an antibiotic used to treat a variety of infections, including strep throat, pneumonia, and middle ear infections.

2904.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Azithromycin Suspension and other generic drugs, including Azithromycin Oral Suspension and Medroxyprogesterone Tablets, at least as follows:

2905.  In November of 2013, Defendant Pfizer, through its Greenstone *alter ego*, began planning to increase prices on several generic drugs, including some that overlapped with Teva:  Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxyprogesterone Tablets.  Patel and Robin Hatosy, the previously-mentioned national account executive at Greenstone, were communicating frequently during that time, including exchanging six text messages on November 16, 2013, and a phone call on November 23, 2013.

2906.  Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.

2907.  Defendant Pfizer was directly involved in the approval process for these price increases.  On November 18, 2013 – only two days after Patel and Hatosy

exchanged text messages – a senior pricing executive at Greenstone sent an e-mail to Greenstone's General Manager, seeking approval to implement the price increases.

2908.  But because Greenstone was a mere instrumentality of Pfizer, the General Manager could not make a decision on the price increase on his own; instead, he had to send a message to a senior Pfizer executive for sign off, and to help convince the Pfizer executive to approve the increase (because the considered decision of senior Greenstone management was unimportant to Pfizer), the Greenstone General Manager told the Pfizer executive that the price increases that Greenstone was seeking to take were consistent with Defendants' other price increases – in other words, he wanted to know that Pfizer was not risking losing customers in a commoditized industry by raising prices, which would be the result in a non-collusive market.

2909.  Pfizer approved the price increases on November 22, 2013, the Friday of the week before that year's Thanksgiving holiday. The next day, Saturday (right after Thanksgiving), Patel spoke to Robin Hatosy at Greenstone, discussing the increases.

2910.  The Monday following the Thanksgiving holiday, on December 2, 2013, Patel and Hatosy had two telephone calls, whereupon Patel sent an internal e-mail to her colleagues at Teva, informing them of Greenstone's upcoming price increases.

2911.  Later that week, on Thursday, December 5, Patel continued her communications with Hatosy about the Greenstone increases and how Teva would

react to unsolicited customer requests for bids – trading two voice-mails.  The same day, Teva declined to bid on Azithromycin at multiple customers.

2912.  Over the next several months – during the period of time before Teva followed Greenstone's price increases – Teva continued to refuse to bid (and continued to avoid taking Greenstone's market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone Tablets.

2913.  For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin Suspension and Medroxy-progesterone.  While Teva was not experiencing any supply issues of its own, after speaking with Hatosy at Greenstone for a few minutes that same day, Patel agreed with the recommendation not to provide a bid to that customer.

2914.  Consistent with the understanding between the two companies, rather than gaining market share in a commodity market when its competitor raised its price, Teva followed Greenstone's price increases for Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets on April 4, 2014.  Patel spoke twice with Hatosy at Greenstone that same day.

2915.  No shortages or other market features can explain Defendants' price increases for Azithromycin Suspension, Azithromycin Oral Suspension, or Medroxyprogesterone Tablets during the Relevant Period.

2916.  The elevated prices of Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxyprogesterone Tablets resulted from Defendants'

anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2917.  The unlawful agreements between Teva and Pfizer/Greenstone, regarding Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxy-progesterone Tablets, were part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### CQ.   Nortriptyline HCL

2918.  Generic Nortriptyline Hydrochloride capsules ("Nortriptyline" or "nortrip") are used to treat depression.

2919.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Nortriptyline, as follows:

2920.  While Taro was approved in May, 2000, to market generic Nortriptyline, it subsequently withdrew from the market.  As of early 2013, the Nortrip market was shared by only two manufacturers – Teva with a 55% share, and Actavis with the rest.

2921.  In February, 2013, Taro personnel had come to believe that they should reclaim a portion of this market, including suggesting that "...Nortriptyline capsules should be seriously considered for re-launch as soon as possible."

2922.  By November of that year, Taro was formulating re-launch plans, including a "Target Market share goal" for Nortriptyline of 25%, leaving Teva with approximately 42% and Actavis with approximately 31%.

2923.  On November 6, Aprahamian pressed his team to find out who currently supplied two particular large customers so that Taro could "determine our course (Cardinal or MCK)."

2924.  Two days later, on November 8, Aprahamian received confirmation that McKesson was a Teva customer.  Several days of conversations ensued among affected cartel members in an effort to sort out how Teva and Actavis would make room for Taro in this market.

2925.  For example, Rekenthaler (Teva) and Falkin (Actavis) spoke twice by phone on November 10, 2013.

2926.  Then, on November 12, Aprahamian (Taro) called Patel at Teva.  Their conversation lasted approximately eleven minutes.  The same day, Aprahamian told his colleagues that Taro would not be pursuing the Nortriptyline account at McKesson (a Teva customer), saying simply:  "Will pass on MCK on Nortrip." Instead, he told a subordinate to put together an offer for Cardinal.

2927.  The discussions of how to accommodate Taro into the Nortriptyline market were far from over, however.  Falkin at Actavis and Rekenthaler at Teva spoke on November 14, 15, and 18, 2013.  Falkin also exchanged two text messages with Maureen Cavanaugh at Teva on November 17.

2928.  Immediately following this series of discussions, Aprahamian delivered a new message to his team:  Taro needed to take the rest of its share from Actavis, because Taro already had enough offers out on Teva customers.  And, although Aprahamian may not have said this part out loud, taking too many Teva customers and not enough Actavis would have upset the applecart.

2929.  So, when a colleague presented an opportunity to gain business from Teva customer HD Smith two days later, on November 19, Aprahamian flatly rejected the idea, saying:  "Looking for Actavis..  we have outstanding Teva offers out.."

2930.  The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue.  Armed with this new information, Aprahamian wasted no time in discussing this with Actavis; Aprahamian placed a call to M.D., a senior national account executive at Actavis, less than four hours later. Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro.

2931.  The day after that, November 21, Teva told its customer that "[w]e are going to concede the business with Cardinal."  And the following day, November 22, Aprahamian (Taro) and M.D. (Actavis) spoke for approximately eleven minutes.

2932.  The cartel members continued consulting with each other on Nortriptyline over the coming months.  On December 6, 2013, for example, Aprahamian called M.D. at Actavis again, and the two spoke for approximately a

quarter-hour and agreed that Taro would take additional Actavis customers, which Taro, in fact, did.

2933.  For example, early the very next week, on December 10, a Taro colleague informed Aprahamian that a large customer, HEB, was with Actavis for all but one of the Nortriptyline SKU's, and that HEB was interested in moving the business to Taro.

2934.  Having already cleared the move with Actavis during his December 6 call with M.D., Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

2935.  Taro also continued to co-ordinate with Teva.  For example, Aprahamian called Patel on January 28, 2014, but she did not pick up.  But the dialogue between the two companies continued the following week, when Patel called Aprahamian back on February 4; they spoke for a little less than a half-hour.

2936.  Two days later, on February 6, a potential customer – Omnicare – solicited Taro to bid on its Nortriptyline business.  When a colleague informed Aprahamian of that fact and asked if Taro wanted to pursue the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued, writing "No, need Actavis."

2937.  Defendants' communications continued over the first ten days of March, as executives at Teva, Taro and Actavis called and texted each other frequently in

their continuing efforts to allocate existing customers to accomodate Taro's re-entry. These calls include at least those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

2938.  At the end of these communications, Teva documented its internal game plan for Nortriptyline. Prior to this time – particularly in early 2014 -Nortriptyline had been listed by Teva as a potential candidate for a price increase. On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she spoke to Aprahamian for more than five minutes), she removed Nortriptyline from contention in order to accommodate Taro's entry.  The spreadsheet that she sent to a colleague on that date expressly took into account the negotiations over Taro's entry that had occurred over the past few weeks.

2939.  With respect to a Nortriptyline price increase, it stated:  "Delay – Taro (new) seeking share."  And Teva did delay increasing its Nortriptyline prices – for nine months.  But on January 28, 2015, in co-ordination with both Taro and Actavis, Teva implemented its planned Nortriptyline price increases.

2940.  No shortages or other market features can explain Defendants' price increases for generic Nortriptyline capsules during the Relevant Period.

2941.  The elevated prices of generic Nortriptyline capsules resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2942.  The unlawful agreement among Defendants Teva, Taro and Actavis, regarding generic Nortriptyline capsules, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**CR.   Propranolol**

2943.  Generic Propranolol is a beta-blocker. Beta-blockers are medications used by doctors and patients to manage cardiac arrhythmias; they operate by blocking the receptor sites for epinephrine (adrenaline) and norepinephrine (noradrenaline) on adrenergic beta receptors.  Propranolol is used to treat tremors, angina (chest pain), hypertension (high blood pressure), heart rhythm disorders, and other heart or circulatory conditions. Propranolol is also used to treat or prevent heart attack, and to reduce the severity and frequency of migraine headaches. Propranolol is reportedly the highest-selling beta-blocker as measured by prescriptions.

2944.  Propranolol is sold throughout the United States and its territories. The market for generic Propranolol is mature and Defendants that operate in that market can only gain market share by competing on price.

2945.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Propranolol capsules & tablets ("Propranolol"), as follows:

2946.  During the Relevant Period, Defendants dominated the Propranolol market.  Defendants Actavis, Breckenridge, and Upsher-Smith controlled a substantial part of the Propranolol capsules market as early as November, 2013.  Additionally, Actavis, Heritage, Mylan, Teva, and Par joined them in dominating the market for Propranolol tablets as early as January, 2015.

2947.  Through their market dominance, Defendants successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for generic Propranolol.

2948.  As the following chart (based on NADAC data) indicates, prices for generic Propranolol capsules—which are sold by Defendants Actavis, Breckenridge, and Upsher-Smith—began to rise in approximately March of 2013, and thereafter increased significantly.  Prices appear to reflect a "one-way ratchet": prices never decreased substantially, as one would expect if sudden price increases reflected

temporary supply shortages, costs increases, or other legitimate market factors, rather than Defendants' illegal collusion:



2949.  Similarly, as the following chart based on NADAC data indicates, prices for generic Propranolol tablets—which are sold by Defendants Actavis, Heritage, Mylan, Par, and Teva—rose significantly, beginning in 2015.  These prices, too, reflected a one-way ratchet, and did not decrease substantially as would be expected if the increases had a legitimate market explanation.



## A. Extended Release Capsules

2950.  Defendants Actavis, Breckenridge, and Upsher-Smith have been the primary sellers of Propranolol capsules and increased their prices by similar amounts at similar times.

2951.  For the two and a half years before the capsules price increase, transaction prices for Propranolol capsules were only 57 cents per capsule on average and were at times as low as 44 cents per capsule.  After Defendants agreed to raise and fix prices, the average price doubled, regularly reaching more than $1 per capsule, and often $1.43 per capsule. The average capsule price charged by certain Defendants reached as high as over $1.70 per capsule, over a 350% increase in price.

2952.  Data showing Medicaid reimbursements—the amounts that Medicaid has paid to cover its beneficiaries' prescription drug purchases—provides prices by manufacturer and confirm that Defendants increased their prices for generic Propranolol in very similar fashion over time for both capsules and tablets.

2953.  The following charts display the per-unit amounts that Medicaid has reimbursed for its beneficiaries' purchases of Defendants' generic Propranolol capsule products:









B. **Tablets**

2954.  Defendants Actavis, Heritage, Mylan, Par, and Teva have been the primary sellers of Propranolol tablets and increased their prices by similar amounts at similar times.

2955.  In the four years before the tablets conspiracy began, transaction prices for Propranolol tablets remained under 4 cents per pill on average, sometimes reaching as low as 3 cents per pill on average. After the conspiracy started, the average price was regularly over 475% higher, reaching 19 cents per pill and even as high as 26 cents per pill, a 650% increase. During the conspiracy period, some Defendants charged almost 30 cents per pill on average across all dosage strengths of their tablet products.

2956.  The following charts display the per-unit amounts that Medicaid has reimbursed for its beneficiaries' purchases of Defendants' generic Propranolol capsule tablets:



















2957.  The prices for Propranolol tablets had been stable for a substantial period until December, 2014. As alleged above, most of the Tablet price increases began in January and February, 2015.

2958.  No shortages or other market features can explain Defendants' price increases for generic Propranolol capsules and tablets during the Relevant Period.

2959.  The elevated prices of generic Propranolol capsules and tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2960.  The unlawful agreements among Defendants Actavis, Breckenridge, Heritage, Mylan, Teva, Par, and Upsher-Smith, regarding generic Propranolol capsules and tablets, were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## CS.    Cefuroxime Axetil

2961.  Generic Cefuroxime Axetil is an antibiotic used to treat some infections.

2962.  At all relevant times, the market for generic Cefuroxime Axetil tablets ("Cefuroxime Axetil") was mature and had multiple manufacturers.  As a result, for years, the prices for Cefuroxime Axetil was relatively low and stable.

2963.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Cefuroxime Axetil tablets as follows, beginning at least as early as December, 2013:

2964.  During the Relevant Period, Defendants Lupin, Aurobindo, and Wockhardt dominated the market for generic Cefuroxime Axetil tablets.

2965.  In late 2013, Wockhardt exited the market, at which point Lupin and Aurobindo immediately imposed large price increases, notwithstanding the fact that each had enough supply to compete for more sales.  Instead, they each only took a Fair Share, but at much higher prices.

2966.  Almost simultaneously, Lupin and Aurobindo announced identical, 500% list (WAC) price increases.

2967.  Not long after the large price increases imposed by Lupin and Aurobindo, Citron entered the Cefuroxime Axetil market.  Rather than offer lower prices to compete for share, in late March, 2014, Citron announced list (WAC) prices identical to those of Lupin and Aurobindo.

2968.  Lupin, Aurobindo and Citron adhered to the Fair Share agreement to avoid competition and its attendant downward pressure on prices.  For example, in the spring of 2014, a large customer requested that Aurobindo lower its prices significantly for Cefuroxime Axetil. Internally at Aurobindo, T.G., Director of National Accounts, shot down the idea.

2969.  The list (WAC) price chart below shows the abrupt and nearly simultaneous price increases by Lupin and Aurobindo, which were later matched by Citron when it entered the market:



2970.  The prices of 500 mg tablets followed a similar pattern, as did NSP prices for both dosages.

2971.  Throughout this time-frame, executive employees of Lupin, Aurobindo and Citron met at trade conferences and communicated directly with each other in furtherance of their Defendants' price-fixing agreement on Cefuroxime Axetil and of their Fair Share agreement.

2972.  For example, Lupin's David Berthold, VP of Sales, communicated with K.S., Citron's EVP of Sales, on January 10, 2014.

2973.  Lupin's Berthold also communicated by phone multiple times in January and February 2014 with Aurobindo's P.M., Senior Director of Commercial Operations, including on the day before and the day immediately after both companies announced identical list (WAC) price increases.

2974.  No shortages or other market features can explain Defendants' price increases for generic Cefuroxime Axetil tablets during the Relevant Period.

2975.  The elevated prices of generic Cefuroxime Axetil tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2976.  The unlawful agreement among Defendants Aurobindo, Lupin, and Citron, regarding generic Cefuroxime Axetil tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## CT.   Timolol Maleate Ophthalmic Gel-Forming Solution

2977.  Generic Timolol Maleate ophthalmic gel-forming solution ("Timolol Maleate") is used to treat high intra-ocular pressure glaucoma and other eye diseases.

2978.  At all relevant times, the market for Timolol Maleate was mature and had multiple manufacturers.

2979.  As a result, for years, the prices for Timolol Maleate ophthalmic gel-forming solution were relatively low and stable.

2980.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Timolol Maleate ophthalmic gel-forming solution as follows, beginning at least as early as December, 2013:

2981.  During the Relevant Period, Defendants Bausch Health and Sandoz dominated the market for generic Timolol Maleate.

2982.  Not long after an internal Sandoz document analyzing the Timolol Maleate market was disseminated, Sandoz and Bausch Health almost simultaneously and out of the blue, imposed very large price increases.  In fact, list (WAC) prices more than tripled.  Additionally, even as prices skyrocketed, market share remained roughly split between the companies.

2983.  The list (WAC) price chart below shows the large increases and parallel pricing by Bausch Health and Sandoz.  The prices of the 0.5% formulation of Timolol Maleate followed a very similar pattern; only the 0.25% chart is included here.



2984.  Throughout this period, Bausch Health and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Timolol Maleate and of their Fair Share agreement.

2985.  For example, both companies sent representatives to the ECRM Retail Pharmacy Efficient Program Planning Session at the Omni Amelia Island Plantation Resort in Amelia Island, Florida on February 23-26, 2014. Sandoz had raised its list (WAC) prices shortly before the conference. Bausch announced its own list (WAC) price increases for Timolol Maleate shortly after the conference, on March 12, 2014.

2986.  No shortages or other market features can explain Defendants' price increases for generic Timolol Maleate during the Relevant Period.

2987.  The elevated prices of generic Timolol Maleate resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2988.  The unlawful agreement among Defendants Bausch Health and Sandoz, regarding generic Timolol Maleate, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## CU.  Butorphanol Tartrate

2989.  Generic Butorphanol Tartrate is used to treat moderate to severe pain, including pain from surgery, muscle pain, and migraine headaches.

2990.  Throughout the Relevant Period, the market for Butorphanol Tartrate was mature and at all relevant times had multiple manufacturers.  As a result, for years, the prices for Butorphanol Tartrate nasal spray were relatively low and stable.

2991.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Butorphanol Tartrate nasal spray ("Butorphanol Tartrate") as follows, beginning at least as early as late 2013:

2992.  During the early years of the Relevant Period, Defendants Mylan, West-Ward and Apotex dominated the market for generic Butorphanol Tartrate.  West-Ward and Mylan had roughly equal and larger shares of the market than did Apotex.

2993.  In late 2013, Apotex exited the market, at which point West-Ward and Mylan immediately raised prices.  Rather than compete with Mylan to pick up what had been Apotex's share of the market, West-Ward promptly announced a significant increase in its WAC price to make it identical to Mylan's.

2994.  In the spring of 2015, Apotex re-joined the market.  Rather than offer better prices to win market share, it announced list prices identical to West-Ward, and roughly matched NSP prices as well.  Even without better pricing, Apotex rapidly gained share, and the market shifted to roughly equal shares split between Mylan, West-Ward and Apotex.  Even with three manufacturers back in the market, prices did not decline, and have not returned to prior levels. Yet again, the Fair Share agreement was working exactly as intended.

2995.  Defendants West-Ward and imposed abrupt and nearly simultaneous price increases in list (WAC) price, which were later matched by Apotex when it re-entered the market.  NSP prices followed a similar pattern.

2996.  Throughout this period, Mylan, West-Ward and Apotex met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Butorphanol Tartrate and of their Fair Share agreement.

2997.  No shortages or other market features can explain Defendants' price increases for generic Butorphanol Tartrate during the Relevant Period.

2998.  The elevated prices of generic Butorphanol Tartrate resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

2999.  The unlawful agreement among Defendants Mylan, West-Ward and Apotex, regarding generic Butorphanol Tartrate, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## CV.   Carisoprodol Tablets

3000.  Generic Carisoprodol is a muscle relaxant and pain reliever.  It is available in generic Tablet form ("Carisoprodol"), including a 350 mg strength, and has been available in the United States for years in a generic form.

3001.  The market for Carisoprodol is mature and had multiple manufacturers at all relevant times.

3002.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Carisoprodol, as follows:

3003.  Defendants Par and Teva dominated sales of Carisoprodol Tablets throughout the Relevant Period, accounting for roughly 55% and 35% of the market, respectively.  They did not compete to change those market shares.

3004.  The GAO noted that Carisoprodol had "extraordinary price increases" in the years 2013-14.

3005.  The ability of Par and Teva to reach agreements on Carisoprodol was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3006.  The parallel price increases by Par and Teva are consistent with the Fair Share Agreement.

3007.  The agreement between Defendants Par and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Carisoprodol Tablets (350 mg).

3008.  No shortages or other market features can explain Defendants' price increases for generic Carisoprodol during the Relevant Period.

3009.  The elevated prices of generic Carisoprodol resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3010.  The unlawful agreement among Defendants Par and Teva, regarding generic Carisoprodol, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### CW.  Tolterodine ER

3011.  Generic Tolterodine Extended Release ("Tolterodine ER") is used for treating an overactive bladder.

3012.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Tolterodine ER as follows:

3013.  Pfizer is the drug manufacturer for Detrol LA, the branded equivalent to Tolterodine ER.  To resolve patent claims related to Detrol LA, Teva and Pfizer entered into a settlement agreement under which Teva would distribute an authorized generic of Tolterodine ER.  To resolve similar claims, Mylan entered into its own settlement agreement with Pfizer, which allowed Mylan to launch its own generic version of Tolterodine ER.

3014.  On October 31, 2013, Mylan's ANDA for Tolterodine ER was approved.  Under their respective settlement agreements with Pfizer, this triggering event allowed Teva and Mylan to launch their respective generics on January 2, 2014.

3015.  Teva planned to launch on January 2, 2014.  By the first half of December, 2013, Teva had learned that Mylan would not be in a position to launch

until 30 to 60 days after Teva launched.  Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch.

3016.  On December 3, 2013, J.K., a marketing executive at Teva, sent an e-mail to Rekenthaler, K.G., and several other Teva colleagues stating "we prepared for 50-60 share… I am looking into the numbers as far as what this means."  To prepare offers and figure out the allocation of customers that would bring Teva its desired 50% to 60% market share, Teva executives were instructed to gather usage from potential customers.

3017.  Through the first half of December, 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch.  Teva resisted sending out those offers and instead did not plan to do so until the launch date of January 2, 2014.

3018.  Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER.  Teva expected that on January 1, 2014, its last day before generic competition entered the market, Pfizer would raise the price of branded Detrol LA.  This would allow Teva to peg its price to the now-inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014, generic launch date.

3019.  At the end of the day on Friday December 20, 2013, T.C. of Teva learned from D.H. at Cardinal that Mylan intended to launch its Tolterodine ER on January 2.  D.H. further provided T.C. with Mylan's pricing for two dosages, and

conveyed that Mylan is "looking for a 40% market share," and that Teva "can figure the rest out," illustrating the pervasive nature of the conspiracy and the involvement of third parties, often wholesalers with cost-plus distribution contracts that meant they also benefitted from the illegal profits of Defendants' cartel.

3020.  T.C. informed her Teva colleagues of Mylan's new launch date.  K.G. of Teva then worked over the weekend to turn this information into initial pricing for all of Teva's potential customers and then shared it internally.  In a telling admission that Teva had no intention to bid competitively for all accounts, K.G. noted that the next step was "to pick who should receive" bids.  The goal in "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals:  Teva wanted "50-60 [%] share" while, in accordance with what Defendants' overarching conspiracy would sometimes euphemistically refer to as the "rules of the road,"  Mylan was only "looking for a 40% market share."

3021.  On Monday, December 23, 2013, Rekenthaler, Patel, K.G., T.C., and several others at Teva had a telephone conference scheduled from 8:00am to 9:00am to discuss the Tolterodine ER launch strategy.

3022.  Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan. Nesta returned Rekenthaler's call at 8:15 am, during the Teva Tolterodine ER phone conference.  Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for a minute and a half. Immediately after the Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more times.

3023.  Later that same morning, at 10:22 am, Nesta returned Rekenthaler's calls and they spoke for an additional 12 minutes.  During these calls, Defendants Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

3024.  During these calls between Defendants Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

3025.  In addition, at 10:33 am – while Rekenthaler was still on the phone with Nesta – K.G. sent an e-mail to Rekenthaler and others, asking about the appropriate contractual language to use in offers about the potential for price increases.  Minutes later, at 10:41 am, Rekenthaler replied to K.G. with the exact language, in quotes, that Mylan was using, in an e-mail titled "Subject:  RE:  Proposed Price Increase Language":  "Mylans [*sic*] language is vague.  'Pricing subject to change at Mylan's sole discretion.'"

3026.  An hour and a half later, at 12:12 pm (still on December 23, 2013), K.G. circulated a revised version of Teva's pricing plan for the Tolterodine ER launch. This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding.  Notably, the revised pricing plan included a chart identifying the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60% market share:  Teva would retain CVS (with 18% of the market), EconDisc

(15%), Cardinal (8%), McKesson (6%), Wal-Mart (5%), Rite Aid (4%), Anda (2%), and Omnicare (1%).  Meanwhile, Mylan would get its 40% share from the remainder of the market, including Walgreens, Cigna, Humana, Optum Rx ("Optum"), Prime Therapeutics ("Prime"), and Kaiser.

3027.  In order to facilitate this market division, Teva had to arrange to lose the accounts.  This was easily accomplished, however; Teva simply jacked up its prices on the major accounts (which Teva sometimes wanted to retain for other products) and some others, and refused to submit bids to the other customers that Mylan targeted.

3028.  Specifically, after Rekenthaler and Nesta spoke, Teva's direct invoice price for 30 capsules of the 2mg and 4mg dose for Walgreens was raised by 30%:  by $24.90, from $83.03 to $107.93 for 30 capsules; by $74.72, from $249.08 to $323.80, for 90 capsules; and Teva raised the price by $415.13, from $1,383.78 to $1,798.91, for 500 capsules.

3029.  For Cigna, Humana, Optum, and Prime, after Rekenthaler and Nesta spoke, Teva's somewhat higher (than for Walgreens) direct invoice price was raised by 23%:  by $19.95, from $88.05 to essentially the same higher price as Walgreens, $108.00 for 30 capsules; by $59.85, from $264.15 to $324.00, for 90 capsules; and by $332.50, from $1,467.50 to 1,800.00, for 500 capsules.

3030.  Finally, for Kaiser (which initially had the worst pricing), after Rekenthaler and Nesta spoke, Teva's direct invoice price for 30 capsules of the 2mg and 4mg dose was raised by only 4.5%:  by $4.15, from $91.85 to $ 96.00 for 30

capsules; by \$12.45, from \$275.15 to \$288.00, for 90 capsules; and by \$69.17, from \$1,530.83 to 1,600.00, for 500 capsules.

3031.  The fact that Teva did not intend to actually win with these bids is further illustrated in the discrepancy between how Walgreens, Cigna, Humana, Optum, Prime, and Kaiser were priced ***before*** the Nesta-Rekenthaler conversations versus how they were priced after:  before, there were significant differences in the direct-invoice pricing.  Walgreens had the best price, \$83.03 for 30 capsules; Cigna, Humana, Optum, and prime all had the same middle price of \$88.05, and Kaiser got the worst price, \$91.85.  ***After*** Nesta and Rekenthaler spoke, however, Kaiser now had the best price (\$96.00), while Walgreens now shared the worst pricing with Cigna and the others (\$108); there was simply no need to bother with proportionate final prices because Teva knew (and intended) these bids would not be successful, anyway.

3032.  In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum, Prime, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

3033.  The following day, on December 24, 2013, Defendants Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement.  Those calls lasted for nine and eight minutes, respectively.

3034.  No shortages or other market features can explain Defendants' elevated prices for Tolterodine ER during the Relevant Period.

3035.  The elevated prices of Tolterodine ER resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3036.  The unlawful agreement between Teva and Mylan regarding Tolterodine ER was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### CX.   Tolterodine Tartrate

3037.  Like Tolterodine ER, generic Tolterodine Tartrate tablets ("Tolterodine") are used for treating an overactive bladder.

3038.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Tolterodine at least as follows:

3039.  As with the many other examples cited herein, the integrated nature of Defendants' scheme is illustrated by the combined examples of Tolterodine and Tolterodine ER:  while Tolterodine ER is more convenient, allowing once-daily dosing, at some price point, the inflated price in the market for the ER formulation would drive patients to the market for the regular-release formulation – but whichever way consumers turned, they ran into Defendants' overarching conspiracy, because just

as Defendants' cartel inflated the price of Tolterodine ER, so it inflated the price of Tolterodine's regular-release formulation.

3040.  Teva was already a manufacturer of Tolterodine tablets when Defendant Pfizer decided to enter the market, planning its entry for late January, 2014, and using its "Greenstone" *alter ego*.

3041.  So, in accordance with the established practices of Defendants' cartel, in the days leading up to "Greenstone's" entry, Greenstone's Senior Director of Sales and National Accounts, Jill Nailor ("Nailor") reached out to her counterparts at Teva (Patel and Rekenthaler) to co-ordinate Greenstone's entry into the market, in particular to ensure that their pricing was consistent and to allocate customer accounts to the new entrant, Greenstone, which Teva ultimately did, including one of its largest accounts, CVS, which held more than 20% of Teva's Tolterodine business.

3042.  In addition, Robin Hatosy (one of Nailor's subordinates and a National Account Manager), was part of the conversation, which was conducted by voice and text message, but not e-mails, which are more permanent records of what was said, and further are more easily recovered in discovery.

3043.  Thus, on the afternoon of January 21, 2014, Nailor reached out to Patel via telephone, twice, but wasn't able to speak.  Illustrating the broad web of Defendants' overarching conspiracy and its institutional, rather than inter-personal, nature, Patel did not call Nailor back; instead, she texted Hatosy, Nailor's subordinate, less than two hours after Nailor's initial calls.

3044.  Hatosy then telephoned Nailor, and after speaking for a few minutes, Hatosy called Patel at Teva back, and they spoke for approximately 20 minutes – at the conclusion of which call, Hatosy then again telephoned her own boss, Nailor. Nailor, in turn, then telephoned Rekenthaler, twice, but could not get through to him, and left a voice-mail, which wrapped up communications among them for the day.

3045.  The following morning, January 22, Rekenthaler returned Hatosy's calls at 9:47 am by calling Nailor, but also wasn't able to get through, and then at 11:25 am, someone at Teva (likely Rekenthaler) called Nailor again, and they spoke for about 10 minutes.  That afternoon, Patel called Nailor back twice, at 3:33 pm, but wasn't able to get through, so she sent two texts to Nailor, also at 3:33 pm.  3:33 pm was a busy minute for Patel that day.

3046.  At 4:00 pm, Nailor sent two texts to Patel, to which Patel replied the same minute, followed by another text at 4:01 pm.  Upon information and belief, Patel and Nailor deleted these texts from their telephones to hide the existence of, and their participation in, Defendants' overarching conspiracy.

3047.  At 4:26 pm, the two bosses (Nailor and Patel) were finally able to speak directly, for 11 minutes, and confirm their arrangements.  During these calls and text messages, Teva and Greenstone agreed that Teva would concede significant business to Greenstone in order to avoid price erosion.

3048.  The very next day, on January 23, 2014, Greenstone entered the market for Tolterodine Tartrate 1mg and 2mg Tablets ("Tolterodine") with the exact same WAC prices as Teva for all formulations.

3049.  This was far from Nailor's only contribution to Defendants' overarching conspiracy:  in addition to the communications detailed above, Nailor exchanged in excess of 4,400 phone calls and text messages with her contacts at Defendants Amneal, Dr. Reddy's, Actavis, Aurobindo, Mylan, Glenmark, Zydus, Teva, Sandoz, Lupin, Wockhardt, Lannett, Apotex, Upsher-Smith, Par, and Taro between August, 2010, and May of 2017.

3050.  The day after Greenstone's entry – January 24, 2014 – in a message to Teva's NAM's about how important it was for them to determine and document which competitor was challenging Teva for business in a particular situation (because it would help Teva determine whether to concede or not), Patel stated that "[a]s we've heard, Greenstone is entering the market for Tolterodine. I'm sure we will have to concede somewhere."

3051.  A few days later, on Tuesday, January 28, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine.  K.G. of Teva immediately asked:  "do we know who this could be?"  Rekenthaler responded that it was Greenstone, but did not want to put the details into writing:  in a reply e-mail from 4:02 pm, copied to Patel and Maureen Cavanaugh, on the subject "RE:  price challenge delphi 10707 cvs tolterodine," Rekenthaler wrote "It's Greenstone, new to

market.  We can discuss." The next day, Wednesday, January 29, Patel and Hatosy tried to reach each other several times, and were ultimately able to speak for approximately two minutes.

3052.  A few days later, on Monday, February 3, 2014, Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business.

3053.  T.C. of Teva, who had the customer relationship with CVS, challenged the decision to concede the business. Rekenthaler responded – again refusing to put the details in writing – at 11:29 am, saying:  "I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded.  Again, it will make sense after I discuss with you."

3054.  The next day, February 4, 2014, Patel spoke to Hatosy (at Greenstone) for approximately a quarter of an hour.

3055.  Shortly thereafter, conceded the CVS account to Greenstone.  As alleged *supra*, CVS represented more than 20% of Teva's Tolterodine business.

3056.  No shortages or other market features can explain Defendants' elevated prices for Tolterodine during the Relevant Period.

3057.  The elevated prices of Tolterodine resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these

elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3058.   The unlawful agreements between Greenstone and Teva regarding Tolterodine were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### CY.   Metoprolol Succinate ER

3059.   Generic Metoprolol Succinate ER ("Metoprolol Succinate ER") is a beta-blocker used to treat high blood pressure, chest pain, and heart failure.  It can also be used to lower the risk of death after a heart attack.

3060.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Metoprolol Succinate ER, as follows:

3061.   By January, 2014, Dr. Reddy's, Actavis, and Par agreed to maintain or increase the price of Metoprolol succinate ER and that each would follow a price increase by its co-conspirators.  Later in 2014, Dr. Reddy's, Actavis, and Par all reiterated, *via* Harvard Drug Group ("Harvard" or "Harvard Drug") acting as an intermediary, that they would join in any increase.  Harvard's shuttle diplomacy between the manufacturers, as part of Defendants overarching conspiracy, eliminated the potential of free and fair competition in the market for generic Metoprolol Succinate ER.

3062. No shortages or other market features can explain Defendants' elevated pricing for generic Metoprolol Succinate ER during the Relevant Period.

3063. The elevated pricing of generic Metoprolol Succinate ER resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3064. The unlawful agreement among Defendants Howard, Actavis, Dr. Reddy's, and Par, regarding generic Metoprolol Succinate ER were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## CZ. Norethindrone/EE

3065. Generic Norethindrone/ethinyl estradiol combination tablets ("Norethindrone/EE") are used as an oral contra-ceptive. Teva markets its version of this combination medication under the trade name Balziva.

3066. As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Norethindrone/EE, at least as follows.

3067. On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business. Teva employees realized that the entrant

was Lupin, as it had recently obtained approval to begin marketing its own generic of Ovcon 35.

3068.  Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that "[w]e would lose our current market lead if we were to concede [certain] business."  Per Defendants' overarching conspiracy agreement, however, discussions about how to share the market with the recent entrant were not limited to internal communications.  So the very next day, Patel spoke to Berthold at Lupin twice, by phone.

3069.  A few days later, on January 29, Patel informed Rekenthaler of her recommendation, based on her communications with Berthold, to take a co-operative stance towards this competitor, saying: "we should concede part of the business to be responsible in the market."  By being "responsible," Patel meant voluntarily conceding market share to the new entrant so Lupin could achieve its "fair share" of the Norethindrone/EE the market without any unpleasant competition with its co-conspirators.

3070.  On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin. That same day, she spoke to Berthold two more times to further co-ordinate Lupin's seamless entry into the market.

3071.  No shortages or other market features can explain Defendants' elevated pricing for Norethindrone/EE during the Relevant Period.

3072.  The elevated pricing of Norethindrone/EE resulted from Defendants'
anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they
would have paid in a free and fair market, and will continue at these elevated levels
indefinitely unless Defendants' conduct in furtherance of their conspiracies is
enjoined by this Court.

3073.  The unlawful agreement between Teva and Lupin on Norethindrone/
EE was part of all Defendants' overarching conspiracy to unreasonably restrain trade
and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## DA.   Capecitabine

3074.  Generic Capecitabine ("Capecitabine") is a chemotherapy agent used in
treating breast and colon cancers.

3075.  As part of Defendants' overarching conspiracy with respect to the Drugs
at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of
Capecitabine at least as follows:

3076.  As early as January, 2014, Teva and Mylan were planning their eventual
Capecitabine launch.  As was standard practice in Defendants' cartel, part of this
planning process included sharing the market between them so they could allocate
Capecitabine customers between them.

3077.  For example, in a January 31, 2014 e-mail, J.P., a national accounts
executive at Teva, told K.G., Rekenthaler, and others at Teva, that Mylan was

courting a specific customer, Armada Health Care.  Teva incorporated this information from Mylan into its launch plan for Capecitabine.

3078.  On February 26, 2014, Mylan's Nesta called Rekenthaler at Teva and they spoke for approximately a quarter-hour.  Nesta told Rekenthaler that Mylan would not launch Capecitabine on time, which Rekenthaler immediately passed on to his Teva colleagues; this meant that, as the sole generic supplier of Capecitabine, Teva would charge a higher price than it could if it faced generic competition.

3079.  A week or two later, in early March, 2014, Teva launched as the sole generic supplier of Capecitabine, and remained the exclusive generic Capecitabine manufacturer until August, when Mylan finally entered the market.

3080.  On August 4, Nesta and Rekenthaler spoke three times by telephone, during which calls they discussed how to divide up the market between them, including that Teva would concede its Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid to Mylan.

3081.  After their 12:46 pm call, Rekenthaler e-mailed Maureen Cavanaugh, his boss at Teva, regarding this issue, to which Cavanaugh replied that they should discuss in person when she was back in the office the next day.

3082.  Less than an hour later, Rekenthaler sent another e-mail, with a sole recipient, requesting Patel to run a customer report and indicating that Mylan will "be looking at ABC, McKesson, and Econdisc as well as a couple small guys, probably aiming at 35% share."  Just as Rekenthaler said, Mylan did in fact seek the business

for each of these three companies, and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

3083.  A few days later, on August 7, 2014, McKesson told Teva it had received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business. Patel then sent an e-mail to K.G., Rekenthaler, and a senior operations executive at Teva, C.B.  C.B. did not want to put their plan in writing. Instead C.B. told Patel she needed to discuss it.  K.G., separately, questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information.  Rekenthaler also did not want to put that information in writing.

3084.  The same day that Mylan put in its bid to McKesson – August 7, 2014 – Nesta and Rekenthaler spoke by phone for nearly thirteen minutes.  On that call, Nesta and Rekenthaler discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme, including that the McKesson Capecitabine account would go to Mylan.

3085.  This market allocation scheme was highlighted in other e-mails as well. On August 10, 2014, C.B. e-mailed Rekenthaler, Patel, and K.G. about the plan. Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Jim Nesta had previously discussed it.

3086.  The next morning, at 8:30am on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine.  Five minutes later, Rekenthaler received a call from Nesta. After exchanging voicemails,

the two spoke at 8:52 am. The call lasted just under six minutes. Shortly after hanging up the phone, at approximately 9:02 am, Rekenthaler e-mailed K.G., Patel and others at Teva to confirm Mylan's participation in the scheme.

3087.  In accordance with their market allocation scheme and in furtherance of all Defendants' overarching conspiracy, Mylan targeted the Capecitabine accounts of ABC, Econdisc, and McKesson/Rite-Aid; and in accordance with their market allocation scheme and in furtherance of all Defendants' overarching conspiracy allocation, Teva conceded all three of those accounts.

3088.  In addition, and also pursuant to these agreements, Teva conceded some smaller customers, as well.  For example, on August 14, 2014, Cigna (a smaller customer) told Teva that Cigna had received a bid for Capecitabine.  On August 18, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna. The pair talked for thirteen minutes.  The next day, K.G. circulated an internal e-mail confirming that Teva "will be conceding this business" at Cigna.  Teva did not retain Cigna's Capecitabine business; instead, it went to Mylan.

3089.  No shortages or other market features can explain Defendants' elevated pricing for generic Capecitabine during the Relevant Period.

3090.  The elevated prices of Capecitabine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels

indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3091.  The unlawful agreement between Teva and Mylan for Capecitabine was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## DB.   Dexmethylphenidate HCL Extended Release

3092.  Generic Dexmethylphenidate HCL Extended Release capsules ("Dexmeth ER") are used to treat the symptoms of ADHD.

3093.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Dexmeth ER at least as follows:

3094.  When Sandoz decided it was going to start marketing the 40mg dose of Dexmeth ER, it followed what was by then standard procedure:  reaching out to fellow cartel members to co-ordinate entry without decreasing price.  Reflecting the broad understanding among Defendants of the scope of their cartel, these discussions and customer allocations were not limited to a single product strength.

3095.  So Sandoz's SW-1 was speaking regularly with Patel about how to divide the Dexmeth ER market so that Sandoz could obtain its cartel share without eroding price.  Sandoz was also, of course, talking to Par.

3096.  For example, in January, 2014, Par gave up an account to Sandoz in order to even up market share with the new entrant.  As previously alleged,

incumbent supplier Par was already able to – and, in fact, did – charge a supra-competitive price because it did not need to worry (and, in fact, did not worry) that Sandoz might undercut Par's pricing (in order to gain market share) when Sandoz entered the market.

3097.  Here, notes by a Par sales and marketing executive confirm that Par also ceded ABC and "let it go because Sandoz needed market share."

3098.  In February, 2014, as Sandoz was seeking share on the 15mg dosage strength of Dexmeth ER, Par "gave up the business to keep the market share even."

3099.  Further, on February 10, 2014, for example, SW-1 at Sandoz was working on internal preparations to pursue the Rite Aid account for Dexmeth ER 40 mg.  After discussing marketing this dose at work during the day, SW-1 telephoned Patel in the evening to discuss Dexmeth ER and they spoke for approximately a quarter of an hour.

3100.  Two days later, on February 12, SW-1 and Patel spoke by telephone and Teva agreed to concede the ABC account to Sandoz, in order to avoid price competition between the two suppliers.  Patel then e-mailed her colleagues at Teva to summarize the details of the deal she had worked out with Sandoz in an e-mail titled "Re:  ABC Dexmethyl-phenidate 40 mg – Challenge," saying "We have 100% of the market, so we will have to give someone up.  ABC is the smallest wholesaler, so it makes sense for this class of trade.  Sandoz is being responsible with their pricing.

We should be responsible with our share.  Plus, between the WBAD members, makes more sense to hold onto Walgreens than ABC, if we were going to lose one of them."

3101.  One of the Teva national account managers on the e-mail responded by confirming that that approach "makes total sense" – which itself makes sense only because of Defendants' cartel.

3102.  The same day, Sandoz submitted a bid to ABC for the 40 mg dose of Dexmeth ER.

3103.  Two days after that, on Friday, February 14, 2014, Anda (a large GPO customer) – in light of Sandoz's entry into the market – approached Teva and asked for a price reduction on Dexmeth ER.  Rather than lower their price to retain the account, Teva refused – handing that business to its nominal competitor (and co-conspirator), Sandoz.

3104.  The following week, on February 18, Patel left a voice-mail for SW-1; and that same day, Patel's firm (Teva) ceded the Rite Aid account to SW-1's company, Sandoz.  The two confirmed their arrangement again two days later, again via telephone.

3105.  Two days after that, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmeth ER, the customer was entitled to certain price protection terms (i.e., a lower purchase price for the drug).  The same day, Patel spoke to SW-l for almost 21 minutes.  The next day, February 21, Patel responded internally about the customer's

request, with additional inside information from Sandoz.  Patel and SW-1 spoke again a few days later, on February 27, to further co-ordinate about Dexmeth ER.

3106.  Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmeth ER.  The agreement was also carried out by other manufacturers, allowing Sandoz to take share from them.  In February of 2014, for example, as Sandoz was seeking share on the 15mg dosage strength of Dexmeth ER, Par assisted them.

3107.  Simultaneously with Patel's co-ordination with Sandoz, Teva's Rekenthaler Teva was speaking to M.B., a senior national account executive at Par, including two calls on February 10 (18 and 3 minutes), two calls on February 19 (2 and 22 minutes), and calls on February 24 and 25, in order to effectuate the scheme.

3108.  Throughout this time period, Sandoz, Par, and Teva all abided by the fair share principles as part of Defendants' ongoing conspiracy, ceding customer accounts to Sandoz in order to abide by the "rules of the road" to accommodate the new market entrant without lowering prices.  In accordance with the terms of Defendants' cartel, Sandoz's target market share for varying strengths of Dexmeth ER varied by how many manufacturers were in the market.  Further, the scheme was not limited to any particular dose of Dexmeth ER.

3109.  On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for the 5mg dose of Dexmeth ER.  Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on

Dexmeth ER 20mg, on the basis that Sandoz already had 57% market share – greater than its sole competitor on this dosage strength, Teva.  When a Sandoz national account representative communicated this decision to the customer, however, he lied and told the customer that the decision not to bid was based on limited supply.

3110.  No shortages or other market features can explain Defendants' elevated pricing for Dexmeth ER during the Relevant Period.

3111.  The elevated pricing of Dexmeth ER resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3112.  The unlawful agreement among Sandoz, Par, and Teva, regarding Dexmeth ER, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**DC.   Pilocarpine HCL Tablets**

3113.  Generic Pilocarpine HCL tablets are used to treat dryness of the mouth and throat caused by a decrease in the amount of saliva that may occur after radiation treatment for cancer.

3114.  Throughout the Relevant Period, the market for generic Pilocarpine HCL tablets was mature and at all relevant times had multiple manufacturers.  As a result, the prices for Pilocarpine HCL tablets were relatively low and stable for years.

3115.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Pilocarpine HCL tablets, including the 5 mg dose ("Pilocarpine"), as follows, beginning at least as early as January, 2014:

3116.  During the Relevant Period, Defendants Lannett, Actavis and Impax dominated the market for the 5 mg dose of generic Pilocarpine HCL tablets.

3117.  In late 2013 and early 2014, Impax experienced supply disruptions, at which point Actavis and Lannett immediately imposed very large price increases. Rather than compete for Impax's old customers on price, Actavis and Lannett relied on the Fair Share agreement to raise prices instead – resulting in lower market share for each, but higher prices and profits for both.

3118.  In the fall of 2015, when Impax was finally ready to re-enter the market, Impax offered higher prices than either Actavis or Lannett, rather than compete for customers with better pricing.  And even with higher prices, Impax was quickly able to build market share because under Defendants' cartel agreement, Impax was entitled to its so-called "fair share" of the market.  Meanwhile, prices for all three manufacturers remained higher than before the increases had been implemented.

3119.  NSP prices exhibited large increases and parallel pricing by Lannett, Actavis and Impax for generic Pilocarpine HCL 5 mg tablets.

3120.  Throughout this period, Actavis, Lannett and Impax met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Pilocarpine HCL and of their Fair Share agreement.

3121.  For example, in late 2013 and early 2014—the time of the Pilocarpine price increases—Actavis's Falkin and Lannett's K.S. communicated multiple times by phone.  Falkin (Actavis) also communicated by phone on November 15, 2013, with M.G., Senior National Account Manager at Impax.  Lannett's K.S. also communicated by phone with Impax during this same time-frame; on January 15, 2014, he spoke to D.D., Impax National Accounts Manager.

3122.  No shortages or other market features can explain Defendants' price increases for generic Pilocarpine HCL tablets during the Relevant Period.

3123.  The elevated prices of generic Pilocarpine HCL tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3124.  The unlawful agreement among Defendants Lannett, Actavis and Impax, regarding generic Pilocarpine HCL tablets, was part of all Defendants' overarching

conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DD. Piroxicam

3125.  Generic Piroxicam capsules, including in 10mg and 20mg doses, ("Piroxicam") are another NSAID used in the treatment of pain and inflammation associated with rheumatoid arthritis, juvenile rheumatoid arthritis, and other disorders.

3126.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Piroxicam at least as follows:

3127.  On March 3, 2014, Defendant Pfizer's *alter ego*, Greenstone, received FDA approval to market Piroxicam capsules in 10mg and 20mg doses.  Greenstone entered the market with the exact same WAC pricing as the incumbent generic manufacturer, Defendant Teva, and immediately sought out customers.

3128.  At 10:07 am on March 5, 2014, Teva's Patel received an e-mail about Greenstone's Piroxicam approval and the fact that Greenstone was trying to take business from Teva.

3129.  Under Defendants' overarching conspiracy, this was acceptable conduct because, like Teva, Greenstone was entitled to its "fair share" of the generic Piroxicam market.  Nevertheless, to ensure the Greenstone would abide by what Defendants referred to as the "rules of the road," Patel reached out to her contacts at Greenstone that same day, less than an hour after receiving the e-mail with the news

that Greenstone was entering the Piroxicam market:  Patel called Hatosy at Greenstone at 10:55 am and they spoke briefly.  Shortly thereafter, Patel called Hatosy's boss, Jill Nailor.  At 2:14 that afternoon, Patel and Nailor spoke briefly, and then Patel replied to the 10:07 am e-mail, discussing Greenstone's Piroxicam strategy.

3130.  The following day – March 6, 2014, the day after Greenstone's Piroxicam launch – rather than focusing on her customers, Patel had multiple conversations with Hatosy and Nailor, Pfizer's employees at Greenstone – Teva's fellow cartel member and ostensible competitor.  Internally, Patel requested a sales and profitability analysis of Teva's Piroxicam customers so she could figure out which accounts to cede to Greenstone.

3131.  The following day, Patel sent an internal e-mail to a marketing manager, identifying specific customers to concede to Greenstone because under the "rules of the road" for being a "Quality Competitor" as part of the overarching conspiracy, and further based on Patel's several conversations with Greenstone, Greenstone had to take additional Teva customers to reach its "fair share" of the market.

3132.  However, by the middle of the following week, on March 12, 2014, Patel learned that Greenstone attempted to get more than its "fair share" by also targeting Teva's largest Piroxicam account, CVS, which was responsible for over a quarter of Teva's Piroxicam business.

3133.  This challenge was outside of the conduct permitted by the overarching conspiracy, so – unlike other examples of co-operative inaction detailed elsewhere

herein – Teva fought to keep this particular account for this particular drug.  Teva lowered its price to CVS for Piroxicam by 20% and CVS stayed with Teva.

3134.  Teva and Greenstone continued to co-ordinate their allocation over the coming days and weeks.  On March 17, 2014, Patel called Hatosy at Greenstone; Hatosy called Patel back at 11:35 pm and they spoke for approximately a quarter-hour.  The fact that employees of cartel members and ostensible "competitors," Teva and Pfizer/Greenstone, were speaking in literally the middle of the night, illustrates the strength of both the overarching agreement and Defendants' attempts to hide it from Plaintiffs and the public.

3135.  Immediately after speaking to Patel – also in the middle of the night – Hatosy called Nailor and they spoke for ten minutes.  Teva retained the CVS account but conceded other customers (representing less market share) to Pfizer/Greenstone through March and April.

3136.  For example, on March 25, 2014, Teva learned of a challenge from Greenstone at Anda, a wholesaler distributor.  Following an analysis of its market share, Teva determined that it still had more than its fair share of the market.  Pursuant to the understanding among generic manufacturers alleged herein, Teva conceded the Anda business to Greenstone on Piroxicam.  Patel agreed with the decision to concede on April 1, 2014.

3137.  No shortages or other market features can explain Defendants' price increases for Piroxicam during the Relevant Period.

3138.  The elevated prices of Piroxicam resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3139.  The unlawful agreement between Teva and Pfizer/Greenstone for Piroxicam capsules was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DE.   Niacin ER

3140.  Generic Niacin Extended Release ("Niacin ER") is used to treat high cholesterol.

3141.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Niacin ER at least as follows:

3142.  As would be expected from the large and elaborate overarching conspiracy alleged herein, Fenofibrate was not the only drug on which Defendants Teva, Lupin, and Zydus colluded; Niacin ER was another, among many.

3143.  Teva entered the Niacin ER market in late September, 2013, and as a result of patent litigation under the Hatch-Waxman Act, Teva had been awarded a

180-day Exclusivity Period from that date.  As a result, Teva's exclusivity was set to expire six months later, on March 20, 2014.

3144.  Teva knew that Lupin planned to enter on March 20, 2014, and that Lupin would have 100 days of semi-exclusivity (until June 28) before a third generic manufacturer (Zydus) could enter the Niacin ER market, on June 28, 2014.

3145.  Knowing that Lupin was a "High Quality Competitor," *i.e.*, one that would stick to Defendants' overarching agreement and not compete with Teva on price, Teva increased price on Niacin ER by 10% on March 7, 2014, in advance of its co-conspirators' entry.  Teva did this because it knew Lupin would not erode Teva's price to gain market share beyond the so-called "fair share" that their cartel's "Rules of the Road" allowed.

3146.  Thus, on February 28, 2014, Maureen Cavanaugh instructed K.G. and others at Teva that "We need to do the Niacin ER price increase before Lupin comes to market and sends offers out."  K.G. immediately forwarded the e-mail to Patel with the instruction:  "Please see comment on Niacin ER. Please make sure you include in your price increase."  Later that day, Patel called Berthold at Lupin and the two spoke for approximately seven minutes.

3147.  Within a week, Teva was ready to implement the price increase.  On Wednesday, March 5, Patel sent an e-mail to the Teva pricing group, stating "Please prepare for a price increase on Niacin ER, to be communicated [to customers] this Friday for an effective date of Monday."  The next day, Thursday, Teva notified its

customers that it would be implementing a price increase on Niacin ER effective March 7, 2014, the increase was for 10% across the board, on all formulations

3148.  Once Teva co-ordinated the price increase, it next began taking steps to divvy up the Niacin ER market with new entrant Lupin so as to avoid competition that would "erode" Teva's high prices. (all references to "erosion" in Defendants' documents cited in this complaint refer to price erosion)

3149.  Patel scheduled a meeting with Rekenthaler for March 6, 2014, to discuss a "LOE Plan" for Niacin ER.  A "LOE Plan," in Teva parlance, is a plan detailing which customers Teva would concede and which customers it would retain upon Teva's "loss of exclusivity" in a particular generic drug market.  Teva's LOE plans were often secretly negotiated directly with Teva's co-conspirators as they were entering the market, consistent with their cartel's understanding and practices.

3150.  In the days leading up to the price increase, all three co-conspirators exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin.  The communications among Green (now at Zydus), Patel and Rekenthaler at Teva, and Berthold at Lupin included, on March 3, two approximately 20-minute calls, one from Green to Rekenthaler and one from Rekenthaler to Patel, and then the following day, on March 4, an approximately 13-minute call between Green and Berthold.

3151.  These calls were in preparation for a March 6 meeting between Patel & Rekenthaler regarding which customers they would give to their competitors.

3152.  The same day, Patel called Green to discuss the same issue:  which Niacin ER customers would Teva cede to Zydus.  They agreed that Teva would cede 40% of the market to Zydus.

3153.  Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three co-conspirators spoke again to discuss their plans for Niacin ER.  The communications among Teva, Zydus, and Lupin are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:01:00 |
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:05:04 |
| 3/17/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:06:16 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:11:13 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:06:26 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:04:12 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:07:00 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:12:39 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:26:00 |

3154.  When Lupin entered the market for Niacin ER on March 20, it entered at the same WAC per unit cost as Teva, for every formulation.  Although in a competitive market, a later generic entrant typically charges about 50% less than the incumbent in order to gain market share, Defendants' cartel agreement precluded such damaging competition – so here, Zydus charged only 10% less than Teva's already-increased price.  The net result was essentially that both Defendants continued

to charge what Teva originally charged during its Exclusivity Period, thereby avoiding the price erosion that would have occurred in the presence of competition.  In other words, there was little or no price erosion as a result of Lupin's anticompetitive entry into the market for Niacin ER.

3155.  Over the next several days, Patel and Berthold continued to co-ordinate to make sure Lupin obtained the agreed-upon customers.  For example, on March 24, a Teva executive received an e-mail from Cardinal indicating that Cardinal had received "a competitive offer for the Niacin ER family."  Cardinal was one of the customers that Teva had already agreed to concede to Lupin. The Teva executive forwarded the e-mail to several people internally at Teva, including Patel, Rekenthaler and Cavanaugh, confirming the plan, writing "I want to make sure our strategy has not changed> we are conceding correct ?."

3156.  That same day, Patel called Berthold, Berthold returned Patel's call, and finally, Patel called Berthold again, speaking for a total of approximately 20 minutes among the three calls.

3157.  Patel responded to the Teva executive, "Yes. The plan is to concede. This was re-confirmed earlier today, unless something has changed."

3158.  The next day – March 25, 2014 – K.G. at Teva summarized the status of Teva's LOE Plan and the company;s agreement with Lupin on Niacin ER:  "With the four concessions (CVS, Cardinal, Optum and Humana), we would be giving up right

around 40% share as Dave noted (I calculated 39%) . . . . We need to keep everybody else."

3159.  Additional calls among the three followed on May 7-9, as Zydus began readying to enter the Niacin ER market.  On May 5, 2014, Zydus bid on the Niacin ER business at ABC – a Teva customer.  The next day, on May 6, Green called Rekenthaler and they spoke for three minutes.  Less than an hour later, Green called Patel and they spoke for eight minutes. A few minutes later, Green called Patel again and left a twelve-second voicemail.  Later that evening, Patel e-mailed her boss, K.G., reporting what Teva had learned on those calls:

-----Original Message-----
From: Nisha Patel02
Sent: Tuesday, May 06, 2014 4:26 PM
To: ████████
Subject: RE: LIFO-niacin er
Importance: High

I have the share info and LOE tracker ready...I was getting mixed messages on the plan of action, so I did not send out or set up a meeting to discuss. Here's what I have picked up:

--Zydus responded in accordance with ABC's bid request. Offer is in writing.
--Zydus shipping either 6/18 or 6/28
--Zydus is the AG
--We are considering retaining ABC. My thought is that we need to concede due to the amount of erosion, but...
--Christine has indicated that we have direction to retain any and all share at any cost
   --This may be unrealistic
   --Several competitors entering
   --Should we agree that we will need to concede share, and determine retention/concession targets, I think we should consider conceding ABC --I have asked Liz to calculate the financials, including WAG and CVS exposure --LIFO buy in play
   --ABC needs commitment on a price, even though not yet valid.
   --LIFO is significant impact that is visible at ALL levels within ABC
   --There were talks of Teva providing a response with caveats (that ABC is open to), that I would like to review/suggest, since I am familiar with the triggers as well as LIFO

3160.  K.G. responded that Patel should schedule an internal meeting to discuss their strategy for Niacin ER, and include Rekenthaler.

3161.  Over the next several days, Patel and Rekenthaler (at Teva) exchanged several calls with Green at Zydus.  Green, in turn, also exchanged several calls with Berthold at Lupin, such that all three co-conspirators were in constant communication with each other, including at least the following calls on May 7, 2014:

Green (Zydus) called Berthold (Lupin) for one minute; then

Berhold returned Green's call for eight minutes; then

Green called Patel, but didn't connect; and then

Patel returned Green's call for nine minutes.

3162.  The following day, May 8, Patel called Green, and they spoke for over a half-hour.  The day after that, May 9, 2014, Green called Berthold but didn't connect, and then Berthold returned the call and the two spoke for approximately ten minutes.

3163.  .  Ultimately, the co-conspirators agreed that Teva would retain its Niacin ER account with ABC but concede its account with McKesson and Cardinal, both large wholesalers, to Zydus and Lupin, respectively.

3164.  Later that month, on May 29, C.D., an Associate Director of National Accounts at Teva, sent an internal e-mail to some Teva employees, including Patel and Rekenthaler, stating:  "A customer is reporting that Zydus is soliciting usage for Niacin with an anticipated launch of June 24."  After receiving the e-mail, Rekenthaler called Green at Zydus.  The call lasted two minutes.  Green returned the call a few minutes later and they spoke for approximately a half-hour.  Later that day, Patel called Green and they spoke for approximately 20 minutes.

3165.  A few days later, on June 2, J.P., a Director of National Accounts at Teva, sent an internal email stating "I received a ROFR from McKesson due to Zydus entering the market.  They apparently did not secure ABC. They are launching 6/28, but are sending offers early due to Sun entering as well."  Patel replied, "Please be sure to consult with [K.G.] on this one. Thanks."

3166.  Later that morning, Green called Rekenthaler. The call lasted two minutes. Green then called Patel and they spoke for approximately six minutes.

3167.  On June 5, 2014, a Director of National Accounts at Teva ("J.P.") sent an internal e-mail regarding "McKesson Niacin," stating, "Per Dave [Rekenthaler], Maureen fCavanaugh] has agreed to concede this item."  J.P. also  noted the loss of the McKesson Niacin ER account in Teva's internal database – named, appropriately, Delphi – and noted that the reason for the concession was that it was a "strategic decision," which was the conspirator's code for allowing "fair share" of the relevant market to their co-conspirators.

3168.  On June 28, 2014, Zydus launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

3169.  The agreement among Zydus, Teva, and Lupin caused prices for Niacin ER to be higher than they would have been in a competitive market and prevented price erosion that would have occurred in such a market.

3170.  No shortages or other market features can explain Defendants' elevated prices for Niacin ER during the Relevant Period.

3171.  The elevated prices of Niacin ER resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3172.  The unlawful agreement among Zydus, Teva, and Lupin regarding Niacin ER was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DF.   Baclofen

3173.  Generic Baclofen is a muscle relaxant and is used in treating muscle spasms caused by certain conditions, such as multiple sclerosis and spinal cord injury.

3174.  The market for Baclofen is mature.  Baclofen is not an innovator drug; it has been commercially available in the United States since the 1970's.

3175.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Baclofen tablets (including at least 10 mg and 20 mg dosages) ("Baclofen") at least as follows:

3176.  In early 2014, the market for generic Baclofen was dominated by Defendants Teva (with 62.4% market share) and Endo/Qualitest (22.5% share), with Defendant Upsher-Smith having a further 6.8% share.

3177.  Prior to February of 2014, Upsher-Smith was a bit-player in the Baclofen market and Baclofen was not a very profitable drug for the company, but its collusion with Teva changed all that.

3178.  Effective February 21, 2014, Upsher imposed a significant price increase on its Baclofen customers, ranging from 350-420% of its WAC price, depending on the formulation.

3179.  Upsher's price increase meant Teva was now the lowest-price supplier of Baclofen:  Upsher's more than tripling/quadrupling of its price meant that Teva Baclofen now sold at a 66%-75% discount to Upsher.  In a competitive market, some or all of Upsher's customers would have moved their business to Teva to take advantage of Teva's lower pricing on its functionally-indistinguishable product.  But that is not what happened because Teva wouldn't take them.

3180.  Instead, because of its anticompetitive, conspiratorial agreement with Upsher and all the other Defendants, Teva did not seek out additional business, even though it was now the lowest-priced market participant.  Not only did Teva not seek out new business, but refused to accept new business that fell into its lap, instead deferring those requests to Upsher – and likely falsely explaining to customers that industry-wide supply issues meant Teva could not service additional, new accounts.

3181.  In fact, this price increase followed the GPHA Annual Meeting in February, 2014, at which the Baclofen Defendants were present, and at which they able to, and, upon information and belief, in fact did, co-ordinate joint action to raise the price of generic Baclofen.

3182.  Upsher-Smith, however, was able to secure new customers as a result of Qualitest's exit from the market, at more than triple or quadruple the earlier price.  As

a result of this implementation of Defendants' overarching scheme, Baclofen suddenly (literally, overnight) became highly profitable to Upsher.

3183.  Teva initially considered following the Upsher-Smith price increase as part of its April 4, 2014 price increases – but decided against doing so because Teva considered Qualitest a so-called "low-quality" competitor – in other words, in Teva's mind, Qualitest might take market share if Teva increased its price.

3184.  Events showed that Teva was wrong about Qualitest, but in early April of that year, Teva learned that Qualitest was exiting the market for at least 3-4 months, if not permanently.  This completely changed Teva's analysis of the Upsher price increase.

3185.  Upon learning that the only significant remaining competitor in the market would now be Upsher-Smith (a so-called "responsible," "high-quality competitor," *i.e.*, a fellow cartel member who could be relied upon to collude with Teva),  Teva immediately decided to follow the Upsher price increase.  Patel asked one of her direct reports to start working up price increase scenarios for Baclofen that same day.

3186.  During her first week on the job at Teva, as she began to identify price increase candidates and co-operative co-conspirators, Patel spoke to a national account executive at Upsher, B.L., on April 29, 2013, for nearly 20 minutes.

3187.  During these initial communications, Patel and B.L. solidified the understanding and agreement between Teva and Upsher that each would follow the

other's price increases, and would not compete for the other's customers after a price increase. As alleged in part, *supra*, their agreement was further cemented in June and July of 2013, when the two co-conspirattors agreed to substantially raise the price of Oxybutynin Chloride.

3188. By April of 2014, a year after those initial discussions and agreement, there was no need for the two to speak directly because it was already agreed between them that Teva would follow an Upsher price increase in any market.

3189. Effective April 15, 2014, Teva raised its WAC and SWP pricing to match Upsher pricing exactly. Just as Upsher had done in February, now Teva imposed a significant price increase on its Baclofen customers, more than tripling or quadrupling its WAC price, depending on the formulation.

3190. As discussed above, pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher's increase and before Teva's increase. Teva would not have increased its prices on Baclofen without its agreement in place with Upsher or in the absence of Defendants' overarching conspiracy.

3191. Two months later, in June, 2014, Defendant Lannett entered the market for Baclofen at the same WAC prices as Defendants Teva and Upsher-Smith. Teva and Lannett colluded so that Lannett could seamlessly enter the Baclofen market without eroding the dramatically higher prices that Defendants' over-arching conspiracy had already set.

3192.  On June 12, 2014, Sullivan (Director of National Accounts at Lannett) sent a message to her competitor and co-conspirator, Patel (Teva's Director of Strategic Customer Marketing) – but in an attempt to hide their communications, she used Facebook Messenger, rather than e-mail or text.  Less than 15 minutes later, Patel returned Sullivan's message with a phone call.  During the conversation, Sullivan confided to Patel that Lannett would shortly be entering the Baclofen market – a message that was confirmed in a follow-up via Facebook Messenger that afternoon.

3193.  After additional phone calls and texting between Sullivan and Patel on July 1 and 11, on July 22, a customer informed Teva that it had received a lower price on Baclofen.  Even though that price was only slightly below Teva's price, Teva decided to concede the business, and noted this in its internal Delphi database.

3194.  Teva had significantly increased its price for Baclofen in April, 2014, (following the Upsher-Smith price increase), and maintained those prices even after Lannett entered the market a few months later.  In fact, when Lannett entered the market, it came in at the exact same WAC price as Teva.

3195.  No shortages or other market features can explain Defendants' price increases for Baclofen during the Relevant Period.

3196.  The elevated prices of Baclofen resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels

indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3197.  The unlawful agreement among Teva, Upsher, and Lannett regarding Baclofen was part of Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**DG.   Fosinopril-HCTZ**

3198.  Generic Fosinopril-Hydrochlorothiazide tablets ("Fosinopril-HCTZ") are used to treat hypertension.  During the Relevant Period, Aurobindo, Glenmark, Heritage, Sandoz, and later, Citron, dominated the market for Fosinopril-HCTZ.

3199.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Fosinopril-HCTZ, at least as follows:

3200.  In early 2012, Defendants Aurobindo, Glenmark and Sandoz dominated the market for generic Fosinopril-HCTZ.  In the spring of 2012, Heritage entered the market.  Citron did not enter the market until 2014.

3201.  Instead of entering the Fosinopril-HCTZ market with lower-priced products in order to gain market share, Heritage announced a list price identical to Sandoz, slightly higher than Aurobindo, and slightly lower than Glenmark.

3202.  Even though it was not offering better pricing, Heritage quickly captured market share for Fosinopril-HCTZ, consistent with the "fair share" agreement between Defendants.

3203.  In this time-frame, all the Fosinopril-HCTZ manufacturers at the time—Aurobindo, Glenmark, Heritage and Sandoz—met on numerous occasions at trade events.  *See* Exhibit 1.

3204.  Prices remained stable in the Fosinopril-HCTZ market from 2012 into 2014, at which time Heritage included Fosinopril-HCTZ on its target list for price increases.

3205.  As discussed *supra*, during the week of April 14, 2014, Heritage's Malek asked two employees to analyze the impact of price increases for numerous generic drugs, including Fosinopril-HCTZ, and during a Heritage conference call on April 22, 2014, Malek informed the sales team that Fosinopril-HCTZ was targeted for a price increase.

3206.  As with Heritage's other targeted price increases, Malek aimed to "socialize" the idea of price increases with the other Fosinopril-HCTZ manufacturers by direct outreach and communication about Heritage's intentions.  Both Malek and Glazer pushed Heritage employees to communicate with their competitors and to obtain agreement to raise prices.

3207.  Between the time of the sales team call in April and Heritage's price increase in July, Heritage communicated by phone call or text with every other manufacturer of Fosinopril-HCTZ, totaling at least 100 contacts.  *See* Table 3. Some of these communications are detailed below.

3208.  On April 26, 2014, representatives from Aurobindo, Citron, Glenmark, Heritage and Sandoz met at the NACDS 2014 Annual Meeting in Scottsdale, AZ.

3209.  Two days later, on April 28, Malek e-mailed Lukasiewicz, directing him to contact Aurobindo about pricing for Fosinopril-HCTZ, Glyburide, and Glyburide-Metformin.  Tellingly, Glazer told Lukasiewicz not to put any of his communications with Aurobindo in writing.  Lukasiewicz exchanged several voicemails with his contact at Aurobindo on April 28-29, 2014.

3210.  In May, 2014, Heritage's Lukasiewicz began speaking with employees at Aurobindo and Glenmark, via phone and LinkedIn, about price increases for Fosinopril-HCTZ.  On May 2, 2014, a Heritage employee—likely Lukasiewicz—contacted an employee at Glenmark via LinkedIn to discuss pricing for at least Fosinopril-HCTZ.

3211.  A Heritage employee—likely Lukasiewicz—spoke by phone with his Aurobindo contact for approximately a quarter-hour on May 8.  During this call, they reached an agreement to raise the price of at least Fosinopril-HCTZ, Glyburide-Metformin, and Glyburide.  The same day he spoke with Aurobindo, Lukasiewicz also called an employee at Glenmark, and they spoke for approximately 14 minutes.

3212.  The next day, on May 9, 2014, the Aurobindo employee spoke with an employee at Glenmark for approximately nine minutes.

3213.  The same day, Heritage had another internal conference call discussing the list of drugs proposed for increases.  Fosinopril-HCTZ, Verapamil, Theophylline,

Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin, and Glyburide were all on the price increase list.  During the conference call, the Heritage sales team shared the results of their conversations with competitors in seeking agreements to raise prices on certain drugs.

3214.  Lukasiewicz was far from the only Heritage employee communicating with other Defendants, including manufacturers of Fosinopril-HCTZ.  On May 14, 2014, Sather attended the MMCAP National Member Conference in Bloomington, Minnesota.  She used this conference as an opportunity to speak in person with a number of different competitors about pricing.  Sather confirmed agreements on pricing with at least Aurobindo (Fosinopril-HCTZ, Glyburide, and Glyburide-Metformin), Sandoz (Fosinopril-HCTZ), and Lannett (Doxy Mono).  Sather e-mailed Malek the very next day, on May 15, telling him of the agreements with Aurobindo, Sandoz, and Lannett.

3215.  Also on May 15, the day after speaking with Heritage's Sather and while the MMCAP National Member Conference was still ongoing, the same Aurobindo and Sandoz employees spoke by phone and texted each other multiple times.  A week later, a competitor— likely an employee from Aurobindo or Heritage—exchanged text messages with the same employee at Sandoz to confirm she had his correct cell phone number.

3216.  During this time, an employee at Aurobindo also spoke with employees at Glenmark and Sandoz about price increases for Fosinopril-HCTZ.

3217.  On May 15, 2014, a large pharmacy customer informed Heritage that Aurobindo had recently provided a lower bid for Fosinopril-HCTZ.  Sather recommended that Heritage not reduce its price to retain business, because she was confident that Aurobindo would stick to the pricing strategy she and Aurobindo had reached the previous day.

3218.  Heritage's Sather continued her pricing discussions on Fosinopril-HCTZ in person while at the June 2014 HDMA Business and Leadership Conference.  On June 3, Sather had dinner and drinks with a number of Heritage's competitors at the Sandbar Restaurant, including a contact at Sandoz.

3219.  Following these trade association meetings, there was a sharp uptick in discussions among competitors.  In the week of June 3-10, 2014, an Aurobindo employee had three phone calls with a Sandoz employee and five phone calls and multiple text messages with Glenmark, likely to discuss pricing of at least Fosinopril-HCTZ.

3220.  On June 16, 2014, a different Glenmark employee called a different Aurobindo employee and they spoke for approximately 22 minutes.  Again, these discussions were likely about pricing of Drugs at Issue, including Fosinopril-HCTZ.

3221.  A week later, on June 23, the Heritage sales team had a meeting where they discussed the price increases targeted for the identified drugs.  The proposed increase for Fosinopril-HCTZ was 200%.

3222.  Two days later, Heritage's Lukasiewicz spoke with his Aurobindo contact for approximately 18 minutes, on June 25, the day before Heritage issued price increase letters for numerous drugs, including Fosinopril-HCTZ.  They spoke for approximately three minutes again on July 7, 2014.

3223.  Also on June 25, a Heritage employee texted a contact at Citron to discuss Citron's entry into the Glyburide market and proposed price increases in that market.  During this text exchange, Heritage learned for the first time that Citron was also planning to enter the market for Fosinopril-HCTZ.  After learning about Citron's proposed entry into the Fosinopril-HCTZ market, the Heritage employee disclosed Heritage's plan to increase the pricing for Fosinopril-HCTZ.  She also informed the Citron employee that Aurobindo was a competitor for Fosinopril-HCTZ.

3224.  Just as the anticompetitive agreement between Heritage's Malek and Teva's Patel started with one Drug at Issue (Nystatin oral tablets) and evolved into an agreement about seven Drugs at Issue, this exchange between Heritage and Citron provides another example of the overarching conspiracy at work.  Although Heritage contacted Citron to discuss pricing on Glyburide, the communications—and anticompetitive agreement—naturally and inevitably expanded to include an additional Drug at Issue, in this instance, Fosinopril-HCTZ.

3225.  On June 26, 2014, Heritage issued price increase notices for nine drugs, including Fosinopril-HCTZ.

3226.  On June 27, the day after Heritage began sending out price increase notices for Fosinopril-HCTZ, an employee of Aurobindo and an employee of Glenmark spoke twice, with one of their calls lasting almost 18 minutes. Over the next several months, Glenmark and Aurobindo continued to speak about at least Fosinopril-HCTZ.

3227.  On July 1, 2014, a Citron employee called an employee at Heritage to discuss Citron's agreement to raise prices on certain drugs and to discuss Heritage's price increase plan for Fosinopril-HCTZ.  They spoke for approximately 13 minutes. During this conversation, the Citron employee told Heritage that they should not communicate with Citron through e-mail, but should instead orally convey any sensitive information about pricing for Fosinopril-HCTZ or any other drugs.

3228.  Employees of Heritage and Citron spoke for approximately 22 minutes again on July 2, 2014, about Fosinopril-HCTZ and other drugs.  These conversations continued throughout at least July and August of 2014.

3229.  On July 18, 2014, a Heritage employee – likely Lukasiewicz – spoke with a Glenmark employee for approximately 23 minutes about at least Fosinopril-HCTZ. On July 30, 2014, they spoke for more than five minutes about the same thing.

3230.  By this time, Heritage had double its list (WAC) prices for Fosinopril-HCTZ.  Fosinopril-HCTZ prices remained elevated – and well above the competitive price – thereafter.

3231.  The "fair share" agreement among Defendants enabled Heritage to maintain and even increase its market share for Fosinopril-HCTZ, even though it had raised prices above a competitive level, thereby injuring Plaintiffs.

3232.  During this timeframe, Citron also was communicating directly with Aurobindo.  On July 28, 2014, an employee of Citron called and texted an employee at Aurobindo several times until the two were finally able to connect by phone.  They spoke later that day for approximately 24 minutes.

3233.  That day, Citron confirmed internally that Heritage had increased its list prices for Fosinopril-HCTZ, and also had raised prices on two other drugs that Citron was trying to match on price increases:  Glyburide and Glyburide-Metformin.

3234.  A Citron employee spoke with an employee of Glenmark twice on July 14, 2014.  The first call lasted for approximately seven minutes. The second call, which occurred shortly thereafter, was for approximately 13 minutes.  The next day, Citron increased its Fosinopril-HCTZ prices to be in line with the price increases adopted by Heritage.

3235.  Although Heritage significantly raised its prices for Fosinopril-HCTZ, it did not lose market share until at least 2016 (when it appears to have begun to exit the market). Maintaining a dominant share of the market was only possible because of the "fair share" agreement among Heritage, Aurobindo, Citron, Glenmark and Sandoz.

3236.  No shortages or other competitive market features can explain Defendants' price increases of Fosinopril-HCTZ.

3237.  The elevated prices of Fosinopril-HCTZ that resulted from Defendants' anticompetitive conduct injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3238.  The unlawful agreement between Aurobindo, Citron, Glenmark, Heritage, and Sandoz regarding Fosinopril-HCTZ was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## DH.  Glipizide-Metformin

3239.  Glipizide-Metformin HCl, also known by the brand name Metaglip, is used to treat high blood sugar levels that are caused by Type 2 Diabetes Mellitus.

3240.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Glipizide-Metformin at least as follows:

3241.  Since 2009, numerous Defendants have sold Glipizide-Metformin, including Mylan, Teva, Sandoz (which had mostly exited the market by 2010), Actavis (which had mostly exited the market by 2014), Heritage (which entered the market in 2010 and mostly exited the market by July 2017), Sun (sold *de minimis* amounts up until 2016) and Zydus (entered the market in September 2016).

3242.  By April of 2014, Defendants Heritage, Teva and Mylan controlled nearly the entire Glipizide-Metformin market.

3243.  As noted above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two spoke for approximately 17 minutes and discussed seven different Drugs at Issue for which Teva was a competitor of Heritage, including Glipizide-Metformin. During their conversation, Patel agreed that if Heritage increased prices for the seven drugs they discussed, including Glipizide-Metformin, Teva would support the price increases.

3244.  Heritage's Malek and Teva's Patel spoke several more times over the next several months to confirm and finalize their agreements regarding numerous drugs, including Glipizide-Metformin.

3245.  As discussed above, during an April 22, 2014, Heritage sales team teleconference, numerous drugs were slated for a price increase, including Glipizide-Metformin.  Concurrent with these discussions, and as outlined throughout, Heritage sales staff were also speaking with Defendants to formalize pricing agreements.  For Heritage, O'Mara was responsible for communicating with Mylan (either Aigner or Nesta) about a number of drugs, including Glipizide-Metformin.

3246.  On April 23, the day after Malek directed Heritage's sales team to contact Defendants about price increases, Mylan and Heritage agreed to raise prices on at least three different drugs, including Glipizide-Metformin (as well as Doxy

Mono and Verapamil). O'Mara conveyed this agreement with Mylan to Malek via e-mail the same day.

3247.  Teva and Mylan were also in frequent communication with each other about pricing. On May 9, 2014, an employee at Mylan and an employee at Teva spoke with each other multiple times about pricing for at least Glipizide-Metformin. Their conversations included one call that lasted approximately seven minutes. Their communications continued throughout 2014.

3248.  Also on May 9, 2014, Heritage held an internal call about price increases. Glipizide-Metformin was one of the drugs slated for a price increase.

3249.  Heritage had a call on June 25 and discussed an analysis of the proposed price increases and reviewed inter-competitor communications. The next day, Heritage began notifying customers of price increases for nine drugs, including Glipizide-Metformin. Glipizide-Metformin was slated to double in price, effective July 1, 2014. Price Increase Notices were also mailed on June 26.

3250.  By July 9, 2014, Heritage had increased prices of Glipizide-Metformin nationwide for at least 27 different customers.

3251.  On August 20, 2014, an unidentified individual – likely a Heritage employee – updated a Sun employee via text messages on the agreements Heritage had reached with Actavis to increase the prices of Glyburide-Metformin and Verapamil. These text messages occurred just days before the start of the 2014 NACDS Total Store Expo, which was attended by employees of Heritage, Teva,

Mylan, and Sun who are directly implicated in anticompetitive communications: Heritage (Glazer, Malek, O'Mara and Sather), Mylan (Aigner and Nesta), and Teva (Patel). Numerous other Defendants' employees attended as well. *See* Exhibit 1.

3252. Because of their anticompetitive agreement, neither Teva nor Mylan challenged Heritage on its price increases. By November of 2014, Teva had increased its bid prices of Glipizide-Metformin to potential customers.

3253. For at least years thereafter, following Heritage, Mylan and Teva's price increases, the list (WAC) prices announced for Glipizide-Metformin by Heritage, Mylan and Teva, as well as by Defendants Actavis, Sandoz and Zydus, were virtually identical and unchanged, regardless of the number of sellers in the market and despite multiple entrances and exits from the market. This is because price competition was absent from this market and is further evidence of Defendants' "fair share" agreement. Rather than compete in the market, Defendants announced identical list prices, then, as described above, colluded with each other to elevate the prices paid by their customers.

3254. No shortages or other competitive market features can explain the elevated pricing of Glipizide-Metformin during the Relevant Period.

3255. The elevated prices of Glipizide-Metformin resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these

elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3256.  The unlawful agreement among at least Heritage, Mylan and Teva regarding Glipizide-Metformin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**DI.   Glyburide**

3257.  Generic Glyburide tablets ("Glyburide") are a commonly prescribed oral anti-diabetic medication used to treat high blood sugar levels caused by Type 2 Diabetes.  Glyburide has been available in generic form since the mid-1990's.

3258.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Glyburide as follows:

3259.  As of April of 2014, Defendants Aurobindo, Heritage, and Teva dominated the market for Glyburide.  A few months later, Defendant Citron entered the Glyburide market, in July of 2014.

3260.  As detailed above, on April 15, 2014, Heritage's Malek called Teva's Patel and they discussed seven different Drugs at Issue, including Glyburide.  During their conversation, Heritage and Teva agreed not to compete in the Glyburide market. Malek and Patel spoke several more times over the next several months to confirm and finalize their agreements regarding Glyburide and numerous other drugs.

3261.  As discussed above, on April 22, 2014, the Heritage sales team held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide.  At the time of this call, Aurobindo and Teva were Heritage's only competitors in the Glyburide market.

3262.  Malek was responsible for communicating with Teva (among other Defendants) and Lukasiewicz was assigned to communicate with Aurobindo.  Malek and Glazer directed Heritage employees to communicate with their competitors in order to reach agreements to raise prices.  Malek and Glazer sent several e-mails directing their sales staff to reach agreements with their competitors in the generic Glyburide market, among other generic markets, as soon as possible.

3263.  For example, on April 28, 2014, Malek sent an e-mail to one Heritage employee – likely Lukasiewicz – concerning the status of discussions with Aurobindo.

3264.  Glazer followed up the next day (April 29) with an e-mail to Lukasiewicz requesting further information, and Malek sent another e-mail the day after that, on April 30, requesting an update.  Lukasiewicz eventually connected with his Aurobindo contact on May 8, 2014, when the two spoke for a quarter of an hour.  During this call, they agreed to raise the price of a number of drugs, including Glyburide.

3265.  Lukasiewicz also spoke with his contact at Glenmark for a quarter-hour the same day, and the following day, an Aurobindo employee spoke with an employee of Glenmark, likely about Fosinopril-HCTZ.  While co-ordinating price increases for

Glyburide as part of the overarching conspiracy, Aurobindo, Heritage, Glenmark and Sandoz were also coordinating price increases for Fosinopril-HTCZ.

3266.  On May 9, 2014, Heritage's sales team had another teleconference to share the results of their conversations with competitors and further discuss planned price increases for at least nine generic drugs, including Glyburide.  Verapamil, Theophylline, Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin, and Fosinopril-HCTZ were all slotted for price increases.

3267.  The following week, on May 14, Heritage's Sather met in person and discussed price increase strategies with several competitors at MMCAP in Bloomington, Minn.  During that meeting, Aurobindo and Heritage's Sather agreed to raise the prices of Glyburide.  Sather confirmed this agreement in a May 15 e-mail to Malek.  Sather also indicated that she would try to meet with Teva at MMCAP.

3268.  On June 23, 2014, Heritage employees met and discussed the specific percentage amounts they would seek to increase Glyburide, as well as other generic drugs, and the strategies for doing so.  They reached a consensus that Glyburide prices would be increased by 200%.

3269.  Over the next several weeks, Heritage employees continued reaching out to numerous generic drug competitors and potential competitors—including in the Glyburide market – in order to secure agreements to raise prices for Glyburide and other generic drugs.

3270.  On June 25, 2014, one Heritage employee texted a contact employed at Defendant Citron, to discuss whether Citron would be selling Glyburide in the near future.  Once it was determined that Citron would be entering the Glyburide market, Citron and Heritage had extensive phone, text message, and in-person conversations concerning Citron's pricing and bidding strategies for Glyburide.

3271.  For example, on July 1, 2014, Citron called an employee at Heritage and they spoke for approximately 13 minutes, confirming Citron's agreement to raise prices on certain drugs, including Glyburide.  During this conversation, the Citron employee told Heritage that they should not communicate with Citron via e-mail, but should instead orally convey any sensitive information about pricing for Glyburide or other drugs.  This was done to avoid leaving detailed electronic records of their collusion, especially of the terms of their agreements; the two spoke for approximately 22 minutes the next day.

3272.  As Citron entered the Glyburide market in July, 2014, it frequently contacted Heritage about Glyburide pricing and bidding strategies.  Citron set an initial target of obtaining less than 10% of the Glyburide market.  Citron was careful, however, to co-ordinate with Heritage so that it could acquire additional market share without eroding the price increases.

3273.  Citron and Heritage's discussions did not occur in isolation.  Concurrent with these pricing discussions, Heritage's Malek and his sales team continued to communicate with Defendants about pricing for Glyburide and other Drugs at Issue.

3274.  By July 9, 2014, Heritage had announced Glyburide price increases for at least seventeen customers. Teva also had increased pricing on Glyburide. Citron, after confirming internally that Heritage had increased its list prices for Glyburide, also increased its Glyburide pricing in line with the price increases on July 15, 2014.

3275.  Because of Defendants' conspiracy and the principles of "playing fair," throughout the summer, Teva, Aurobindo, Citron, and Heritage were in contact with each other to ensure they were complying with their agreements on pricing for Glyburide.

3276.  For example, because of Heritage's price increases, on July 9, 2014, a large national retail chain asked Teva to bid on both Glyburide and Nystatin. But instead of quoting a price that would win the business, Teva—following Defendants' agreement—raised its own prices for Glyburide to a similar level to Heritage's.

3277.  Similarly, in response to Heritage's price increase on Glyburide and other drugs discussed in this complaint, a large wholesaler separately e-mailed Teva and Aurobindo on July 25, 2014, and asked for bids.  Aurobindo and Teva immediately contacted Heritage to co-ordinate their responses and ensure that they were complying with their pricing agreements.

3278.  Teva's Patel and Heritage's Malek spoke for a quarter of an hour on the day the wholesaler's request was received.  After this conversation, Teva declined to provide a bid to the wholesaler.

3279.  The same day, Malek sent a text message to an individual, likely at Aurobindo.  Malek and this individual then spoke for almost a quarter of an hour and agreed Aurobindo would not provide a Glyburide bid to the wholesaler.  Ultimately, neither Teva nor Aurobindo responded to the request for a bid.

3280.  While Teva, Aurobindo, and Heritage were trying to maintain their price increases for Glyburide, Citron was also communicating directly with Aurobindo, likely to co-ordinate its entry into at least the Glyburide market.

3281.  On July 28, 2014, a Citron employee called and texted an Aurobindo employee several times until the two were finally able to connect by phone. They spoke later that day for approximately 24 minutes, discussing the pricing of Glyburide and other Drugs at Issue.

3282.  No shortages or other competitive market features can explain Defendants' price increases for Glyburide.

3283.  The elevated prices of Glyburide resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3284.  The unlawful agreement between Aurobindo, Citron, Heritage and Teva regarding Glyburide was part of all Defendants' overarching conspiracy to

unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**DJ.   Glyburide-Metformin**

3285.   Glyburide-Metformin tablets ("Glyburide-Metformin"), also known by the brand name Glucovance, are used to treat Type 2 diabetes symptoms.

3286.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Glyburide- Metformin, as follows:

3287.   Glyburide-Metformin has been marketed and sold by a number of Defendants since 2009, including Actavis, Aurobindo, Citron (which entered the market in August, 2014), Dr. Reddy's (which sold *de minimis* amounts during the Relevant Period), Heritage (which entered the market in January, 2013), Par (selling only *de minimis* amounts by 2010), Sandoz (which sold only only *de minimis* amounts by 2013), Teva, and Zydus (which entered the market in September of 2016).

3288.   As of April, 2014, the dominant sellers in the market for Glyburide-Metformin were Teva, Aurobindo, and Actavis.  Heritage had approximately a 5% market share, but nonetheless wanted to raise prices.

3289.   As discussed above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two discussed a number of Drugs at Issue, including Glyburide-Metformin.  Teva and Heritage agreed not to compete on these drugs.  Over the next

several months, Malek and Patel spoke several more times reconfirming and finalizing these agreements.

3290.  On April 22, 2014, Heritage held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide-Metformin.  After the call, Malek assigned Lukasiewicz to contact Aurobindo about Glyburide-Metformin (and, as discussed above, Fosinopril-HCTZ), and Sather was assigned to Actavis to discuss Glyburide-Metformin.

3291.  Heritage NAM Sather was assigned to speak with Defendants Actavis, Sun, and Lannett and, through her discussions, reached pricing agreements on at least five drugs: Nystatin, Paromomycin, Glyburide-Metformin, Verapamil, and Doxy Mono.  Right after the Heritage sales call and in response to Malek's direction, Sather communicated with three different competitors about multiple drugs – including with Actavis about Glyburide-Metformin.  Sather spoke with Actavis for nine minutes the day of the April 22 pricing call and reached an agreement with Actavis to raise the price of Glyburide-Metformin (and, as discussed below, Verapamil).  Sather updated Malek on her communications with Actavis on May 8, 2014.

3292.  Within Actavis, news of its agreement with Heritage spread quickly. On April 28, 2014, an e-mail to the Actavis sales and pricing team discussed the agreement and potential price increases for a number of different drugs.

3293.  A week later, in response to that April 28 e-mail, on May 6, an Actavis employee called an employee at Mylan, and they spoke for five minutes. They spoke

three more times on May 6, with one call lasting a quarter of an hour. They continued to communicate over the next several months and likely continued to discuss pricing for Glyburide-Metformin.

3294. On April 28, 2014, Heritage CEO Glazer sent an e-mail to Lukasiewicz directing him to contact Aurobindo about potential price increases on a number of drugs, including Glyburide-Metformin. Tellingly, Glazer told Lukasiewicz not to put any of his communications with Aurobindo on pricing in writing. Lukasiewicz exchanged several voice-mails with his contact at Aurobindo on April 28 and 29. Glazer requested status updates from Lukasiewicz several times at the end of April.

3295. Heritage's Lukasiewicz and his Aurobindo contact spoke for approximately a quarter hour on May 8, 2014. During this phone call, they reached an agreement to raise the prices of at least Glyburide, Glyburide-Metformin and Fosinopril-HCTZ.

3296. And, as noted above, on May 15, 2014, while attending the MMCAP National Member Conference, Sather confirmed pricing agreements for five different drugs with three different Defendants. Among the agreements Sather confirmed was an agreement with Aurobindo on pricing for Glyburide-Metformin and two other drugs.

3297. Concurrent with these discussions, on May 12, an employee of Actavis spoke with Bob Cunard, the CEO of Aurobindo, twice about its Glyburide-

Metformin pricing.  Between May 19 and May 22, 2014, that same Actavis employee also exchanged thirty text messages with a Teva employee about drug pricing.

3298.  On June 25, 2014, a Heritage employee texted an employee at Citron about Citron's entrance into the Glyburide market.  As part of this discussion, they also spoke about Glyburide-Metformin, a drug which Citron had approval to sell, but was not actively selling at the time.

3299.  In July, 2014, both Heritage and Teva increased their WAC prices for Glyburide-Metformin.

3300.  Citron took note of these actions. On July 9, 2014, in an internal memo, Citron noted that both Heritage and Teva had increased their prices on three different drugs, including Glyburide-Metformin.  In the same memo, a Citron employee then reiterated Citron's intent to abide by the agreement with Heritage and Teva.

3301.  On August 20, 2014, a person – likely a Heritage employee – exchanged text messages with a Sun employee.  The text exchange described the agreements reached with Actavis to increase the price of Glyburide-Metformin and Verapamil. This, again, highlights the overarching nature of the conspiracy and the fact that all Defendants were competitors in all drugs that were not presently subject to an Exclusivity Period; Sun was kept apprised of agreements (in this case, between Actavis and Heritage) relating to Drugs at Issue that it did not market or sell because it **could** have chosen to enter those other markets.

3302.  By September of 2014, Citron was ready to enter the Glyburide-Metformin market, but instead of undercutting the prices of Actavis, Aurobindo, Heritage and Teva in an effort to gain market share, Citron announced list (WAC) prices higher than all of the incumbent suppliers.

3303.  No shortages or other market features can explain Defendants' price increases for Glyburide-Metformin.

3304.  The elevated prices of Glyburide-Metformin resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3305.  The unlawful agreement between Actavis, Aurobindo, Citron, Heritage and Teva regarding Glyburide-Metformin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**DK.   Leflunomide**

3306.  Leflunomide, also known by the brand name Arava®, is an immunosuppressive disease-modifying antirheumatic drug used to treat active, moderate-to-severe rheumatoid arthritis and psoriatic arthritis.

3307.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Leflunomide as follows:

3308.  As of April of 2014, the main sellers in the market for Leflunomide were Defendants Apotex, Teva, and Heritage.  Heritage was a dominant seller in the market, with a 60% market share.

3309.  As discussed above, during the week of April 14, 2014, Malek met with two employees and asked them to analyze the impact of price increases for numerous generic drugs, including Leflunomide.

3310.  Before introducing the market-wide price increases to the rest of his sales team, Malek began communicating with Patel at Teva about at least seven Drugs at Issue, including Leflunomide.

3311.  On April 15, 2014, Malek and Patel spoke on the phone and agreed that if Heritage increased prices for at least Leflunomide, Acetazolamide, Glipizide-Metformin, Glyburide, and Glyburide-Metformin, Teva would follow those increases, and impose identical or nearly-identical prices on its own customers.

3312.  Malek and Patel spoke several more times over the next several months to co-ordinate and re-confirm their agreements and to keep each other updated on market developments for Leflunomide and other pharmaceuticals.  During this time, Malek kept Patel updated on the progress of Heritage's proposed price increases.

3313.  While Malek was speaking with Teva's Patel about increasing prices on Leflunomide, he and other Heritage employees were also in contact with individuals from Apotex to discuss price increases for at least Leflunomide.

3314.  During the infamous April 22, 2014 Heritage sales call, Malek identified Leflunomide as a drug slated for an increase.  In the wake of this call, Malek personally took responsibility for communicating with Teva.  Matt Edelson was assigned communicating with Apotex.

3315.  Defendants had numerous opportunities to meet in person at industry meetings and conferences to discuss and co-ordinate their pricing of Leflunomide. For example, on April 26-29, Heritage's Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from Teva and Apotex, among others.  *See* Exhibit 1.

3316.  On May 2, 2014, Heritage's Edelson spoke with Apotex's Beth Hamilton for thirteen minutes about at least Leflunomide.  Four days later, on May 6, after learning that Teva would be exiting the Leflunomide market, a Heritage employee— likely Edelson—had two more phone calls with Apotex's Hamilton.

3317.  After speaking with Hamilton, Edelson e-mailed Malek to report what they discussed.  Malek replied, confirming the strategy with Edelson. That same day (May 6), either Malek or Edelson called an Apotex employee.  They had two calls, each lasting nine or eight minutes.

3318.  The next day – on May 7, 2014 – Edelson and Hamilton had two more telephone conversations where they agreed to avoid competition and increase prices on Leflunomide.  After seven phone calls in five days, the agreement was finalized.

3319.  The day after that, on May 8, in response to an e-mail from Malek requesting a status update, Edelson provided an additional update on his discussions with Apotex.

3320.  The next day, May 9, Heritage had another internal conference call discussing the list of drugs proposed for increases, including for Leflunomide.  During the conference call, the Heritage sales team shared the results of their conversations with competitors, including Apotex.

3321.  On May 27, Heritage learned that Apotex had increased its price on Leflunomide to bring it line with Heritage's price.

3322.  A month later, on June 26, 2014, Heritage began sending *new* price increase notices to its customers for at least nine drugs, including Leflunomide.

3323.  Beginning the month after that, in July of 2014, rather than compete for Leflunomide sales, Teva ceded the market to Apotex and Heritage and began to exit the market.

3324.  No shortages or other market features can explain the Leflunomide price increases during the Relevant Period.

3325.  The elevated prices of Leflunomide resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more

than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3326.  The unlawful agreement between Apotex, Heritage and Teva, regarding Leflunomide, was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DL.   Paromomycin

3327.  Generic Paromomycin is a broad-spectrum antibiotic used to treat amoeba infection in the intestines and complications of liver disease.

3328.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Paromomycin ("Paromomycin") as follows:

3329.  Sun and Heritage were sellers of Paromomycin during the Relevant Period.  Heritage was a dominants seller, with approximately 65% market share.

3330.  As discussed above, starting in at least June of 2012, Heritage and Sun began discussing price increases and market allocation for at least Paromomycin and Nimodipine.

3331.  At Malek's direction, Ann Sather contacted Sun—likely Knoblauch. Throughout the summer of 2012, Heritage's Sather exchanged numerous text messages and had multiple phone calls with her Sun contact.

3332.  Heritage and Sun, as well as other Defendants, had the opportunity to discuss pricing and market share and otherwise further their conspiratorial discussions at trade meetings throughout this period, including at the October GPhA Fall Technical Conference.  *See* Exhibit 1.

3333.  As part of Defendants' overarching conspiracy, by the end of October 2012, Sun had increased its list WAC prices for Paromomycin to be identical with Heritage's pricing.  Despite their different initial prices, Heritage and Sun kept their list prices at the same level thereafter.

3334.  After the Heritage teleconference with the sales team of April 22, 2014, in which Paromomycin was targeted for a price increase, Malek assigned Anne Sather to communicate with Sun.

3335.  Right after that Heritage sales call, Sather communicated with three different competitors—Sun, Actavis, and Lannett—and reached a number of pricing agreements with these Defendants covering at least five different drugs, including Paromomycin.

3336.  Sather spoke with Susan Knoblauch, her counterpart at Sun, for more than ¾ of an hour.  During this conversation, Sather and Knoblauch discussed pricing and agreed to increase the prices of numerous drugs, including Paromomycin. Sather thereafter immediately reported her agreement with Sun to Malek.

3337.  In response to a May 8 status request from Malek, Sather e-mailed him to report the agreement she had reached with a number of competitors, including

with Sun for Paromomycin.  Sather also reported agreements she reached with

Actavis for Glyburide-Metformin and Verapamil, with Lannett for Doxy Mono, and

with Sun for Nystatin; during an internal Heritage call the next day, Paromomycin

remained on the list of drugs slated for a price increase.

3338.  Heritage and Sun spoke again for more than twelve minutes on May 20.

During the call, Heritage learned that Sun would be making changes to the production

of Paromomycin.  Malek was immediately informed of this development.

3339.  On June 23, Heritage employees discussed the specific percentage

increases they would seek for a variety of drugs.  Paromomycin was slated for a 100%

increase.

3340.  Heritage had a final call confirming that Paromomycin would have a

price increase on June 25, 2014, and the next day Heritage began sending out price

increase notices.

3341.  By July 9, 2014, Heritage announced price increases for Paromomycin to

at least thirteen different customers nationwide.  Over the ensuing months, pursuant

to their agreement, Heritage and Sun continued to increase their prices for

Paromomycin.

3342.  No shortages or other market features can explain Defendants' price

increases for Paromomycin during the Relevant Period.

3343.  The elevated prices of Paromomycin resulted from Defendants'

anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more

than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3344.  The unlawful agreement between Heritage and Sun regarding Paromomycin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DM.  Theophylline Extended Release

3345.  Extended-release generic Theophylline tablets, including 300 mg and 450 mg dosages ("Theophylline ER" or "Theophylline"), are used to treat asthma and airway narrowing associated with long-term asthma or other lung problems, such as chronic bronchitis and emphysema.  Theophylline is an extended-release medication, which means that it is released into the body throughout the day.

3346.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Paromomycin as follows:

3347.  Prior to Heritage's entry into the market for 300mg and 450mg Theophylline tablets in late 2011, Teva had captured nearly 100% of sales.  Teva marketed and sold Theophylline during the Relevant Period at least in part through its subsidiary, PLIVA.

3348.  Instead of pricing its Theophylline products below Teva's, in order to gain market share, Heritage announced list prices that were identical to, or even slightly higher than, those of Teva.  Even with Heritage's market entry, Theophylline prices remained relatively high and stable.  Consistent with their "fair share" agreement, prices did not decline, as would be expected in a competitive market.

3349.  In early 2014, Teva began considering Theophylline for another price increase.  On February 4, 2014, Teva's Patel contacted Heritage's Malek for the first time since she went on maternity leave in August of 2013.  Malek returned her call the next day and the two spoke for more than an hour, discussing price increases for Theophylline and at least one other drug (Nystatin, as discussed above).

3350.  Three days later, on February 7, a Heritage employee created a spreadsheet that included Theophylline as a candidate for price increases.

3351.  Throughout February and March of 2014, Malek and Patel had a series of phone calls discussing price increases for multiple drugs, including Theophylline.

3352.  Shortly thereafter, Teva began implementing across-the-board price increases for Theophylline. These price increases also had an effective date of April 4, 2014.

3353.  By the time Heritage held its April 22, 2014, meeting with its sales team to discuss a number of price increases, it had already agreed to follow Teva on at least the Theophylline and Nystatin price increases.  As he outlined the proposed price

increases, Malek specifically told his sales team that Heritage would follow Teva's price increase on Theophylline.

3354.  On April 24, 2014, Teva received an e-mail from a customer seeking an adjustment to its price increase.  Consistent with its agreement with Heritage, Teva stuck to its price increase for Theophylline.

3355.  On May 9, 2014, Heritage had an internal sales call regarding the drugs subject to price increases, including Theophylline.  Several weeks later, on June 23, Heritage employees discussed the specific percentage price increases they would seek. Theophylline was slated for a 150% increase.

3356.  On June 25, Malek had a nearly 14-minute call with a Teva employee, likely Patel.  Malek reported that Heritage would be sending out price increase notices on June 26 for Theophylline and several other drugs – drugs for which Heritage and Teva had agreed to raise prices.

3357.  The next day, June 26, Heritage began telling customers that it would be increasing prices for nine drugs, including Theophylline.  By July 9, 2014, among the other price increases it implemented, Heritage increased its Theophylline prices to at least twenty different customers nationwide.

3358.  Teva and Heritage imposed list price (WAC) increases of approximately 80% on 300mg tablets and approximately 30% on 450mg tablets.

3359.  No shortages or other market features can explain Defendants' price increases for Theophylline.

3360.  The elevated prices of Theophylline resulted from Defendants' anti-competitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3361.  The unlawful agreement between Heritage and Teva regarding Theophylline was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DN.   Verapamil HCL

3362.  Generic Verapamil HCL tablets, including a 360 mg dose ("Verapamil"), are a calcium channel blocker used to treat hypertension, angina, and certain heart rhythm disorders.  It works by relaxing the muscles of the heart and blood vessels.

3363.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Verapamil as follows:

3364.  From 2009 forward, Actavis and Mylan dominated the market for Verapamil HCL regular release tablets and for certain dosages of Verapamil HCL sustained-release capsules.  Combined, the two companies enjoyed nearly 100% market share until Heritage began to gain tablet share in 2013.

3365.  Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013.  When Heritage entered, it announced list (WAC) prices identical to Mylan and slightly higher than Actavis for 80mg tablets. Heritage announced prices slightly higher than both Mylan and Actavis for 120mg tablets. Heritage did not begin to sell 40mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40mg tablets at that time.

3366.  Instead of entering the market with lower prices of Verapamil in order to gain market share—as would have occurred in a competitive market—Heritage priced its tablets identically or even higher than the incumbent producers, Actavis and Mylan.  While inconsistent with a competitive market, this was entirely consistent with Defendants' "fair share" agreement, and in fact was done pursuant to it.

3367.  Without offering better prices, Heritage was initially able to capture only a sliver of the market.  In October of 2012, however, Mylan increased its tablet prices by approximately 50%, which facilitated Heritage rapidly gaining market share.  By January of 2013, Heritage had captured more than 25% of the entire tablet market. As devised by their "fair share" agreement, market shares between Actavis, Heritage and Mylan quickly stabilized and remained relatively constant thereafter.

3368.  In the months prior to Mylan's price increases, Actavis, Heritage and Mylan had numerous opportunities to meet and discuss Verapamil.  *See* Exhibit 1; for example, all three Defendants attended the HDMA Business Leadership Conference

in San Antonio in early June, 2012. All three also attended the GPhA Fall Technical Conference in Bethesda, MD, which took place on October 1-3 of the same year.

3369.  Similarly, shortly after the 2013 NACDS Total Store Expo in Las Vegas attended by (among others) Actavis, Mylan (Nesta and Aigner) and Heritage (Glazer, Malek, O'Mara, Sather and Edelson), Mylan raised the WAC prices of its Verapamil capsules to identical levels as Actavis.

3370.  As market shares for Verapamil tablets between Actavis, Heritage and Mylan stabilized, Heritage aimed to implement a price increase.  Verapamil was on the list of drugs that Heritage's Malek identified on the April 22, 2014 sales team call.

3371.  As part of those price increase discussions, Heritage's O'Mara had the primary responsibility for communicating with Mylan about Verapamil.  On April 23, O'Mara contacted his counterpart at Mylan, likely Aigner.  O'Mara and his opposite number at Mylan agreed to raise prices on at least three different drugs, including Verapamil and, as discussed *supra*, at least also Doxy Mono and Glipizide-Metformin.

3372.  Immediately after speaking with Mylan's Aigner, O'Mara e-mailed Malek, providing an update of his discussions with Mylan.

3373.  Heritage's Sather was responsible for speaking with Actavis about Verapamil, among other drugs.  On April 22, she and an Actavis employee spoke for approximately 9 minutes and reached an agreement to raise the price of Verapamil and other drugs.

3374.  News of the agreement on Verapamil and at least one other drug (as discussed above, Glyburide) reached the Actavis sales and pricing team no later than April 28, 2014, including through an internal e-mail discussing possible price increases for a list of drugs.

3375.  A week after the April 28 e-mail, on May 6, 2014, an Actavis employee called a Mylan employee and left a message seeking to discuss at least pricing for Verapamil.  The two spoke for three minutes on May 9 and spoke for almost seven minutes on May 19, likely about pricing of at least Verapamil.  They continued to communicate with each other over the next several months.

3376.  On May 8, 2014, Malek e-mailed the Heritage sales team requesting an update on competition communications.  A Heritage employee responded to Malek's e-mail, providing an update on communications with at least Actavis (Verapamil and Glyburide-Metformin), Lannett (Doxy Mono), and Sun (Nystatin and Paromomycin).

3377.  While Heritage did not increase its Verapamil prices market wide in July as it did for other drugs, it announced a price increase for Verapamil to at least one customer as the result of Defendants' price increase efforts.

3378.  On August 20, 2014, a Heritage employee exchanged text messages with an employee at Sun.  The text exchange described the agreement Heritage and Actavis reached to increase the price of Verapamil among other drugs.

3379.  Throughout this period, Actavis and Mylan co-ordinated increases on their Verapamil HCL sustained release capsules (120mg, 180mg, 240mg).  During the

Relevant Period, price increases by Actavis and Mylan were staggered, but steady and unexplained by market forces, because they were the result of Defendants' anticompetitive agreement, including pricing agreement and co-ordination between Actavis and Mylan.

3380.  From April of 2012 (shortly before Mylan imposed a price increase for its Verapamil tablets) through April of 2016, Actavis and Mylan attended at least 25 trade events together.  *See* Exhibit 1.  Over this period, despite very different starting places, Mylan's and Actavis's Verapamil capsule came to the same, much higher, place:  Mylan's prices nearly tripled, and Actavis's prices doubled.  By the spring of 2016, Actavis and Mylan had imposed virtually identical list (WAC) prices.

3381.  The higher prices for 120mg, 180mg, and 240mg capsules enabled Actavis also to raise its prices for 360mg capsules, for which it was the lone seller in the market, again illustrating one of the many ways in which Defendants' overarching conspiracy reached to include products that some Defendants were not even selling. As a result of this conspiracy, Actavis's prices for 360mg capsules nearly tripled between April, 2012 and May, 2016.

3382.  No shortages or other market features can explain Defendants' price increases for Verapamil during the Relevant Period.

3383.  The elevated prices of Verapamil that resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels

indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3384.  The unlawful agreement between Actavis, Heritage, and Mylan regarding Verapamil was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**DO.   Fenofibrate**

3385.  Generic Fenofibrate tablets, including 48mg and 145mg dosages (collectively, "Fenofibrate") are used to treat cholesterol conditions by lowering blood levels of "bad" cholesterol and fats (such as LDL and triglycerides) and raising blood levels of high-density, "good" cholesterol (HDL).

3386.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Fenofibrate as follows:

3387.  As of the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65% market share and Lupin having approximately 35% market share.

3388.  On February 27, 2013, a senior marketing executive at Teva e-mailed multiple Teva colleagues, asking them to provide information on Mylan's potential entry to the market, including details of the timing of Mylan's planned launch – sensitive competitive information that, in the absence of Defendants' overarching

conspiracy, would have been unavailable to Teva.  In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the market for Fenofibrate.

3389.  In order to get this information, Teva's then-Director of National Accounts, Kevin Green, called Mylan's Vice President of National Accounts, Jim Nesta.  Over the course of that day, Green and Nesta spoke at least four different times.  That same day, Green reported back to his Teva colleagues what he had learned:  that Mylan planned to launch Fenofibrate 48mg and 145mg in November.

3390.  A few months later, however, Teva made a startling discovery:  Mylan was moving its launch date for Fenofibrate dramatically.  Rather than being months away, Mylan's launch date was actually scheduled for May 17, 2013 – just days away.

3391.  In a competitive market, this information would have been closely held by Mylan, who would have wanted to surprise their competitors – but instead, Mylan and its co-conspirators disseminated this information and acted on it.

3392.  In general, because they were aware their conduct was flagrantly illegal, Defendants tried to keep their communications regarding this conspiracy oral, so there would be no record of who said what to whom:  on May 6, 2013, Lupin employee David Berthold called Teva employee Nisha Patel regarding this price increase, and they spoke for approximately 22 minutes.

3393.  The next day, May 7, Mylan employee Jim Nesta called Jim Green at Teva and Berthold at Lupin on the same subject, speaking to Green for approximately 11 minutes and to Berthold for approximately three minutes; the Nesta-Green call

began at 2:42 pm and was immediately followed – without even time for a bathroom break in between – at 2:54 pm by the Nesta-Berthold call.

3394.  The day after that, May 8, 2013, Mylan's Nesta called Berthold at Lupin **again** on the same subject, speaking to Berthold for approximately four minutes.

3395.  But despite the co-conspirators' best efforts to avoid leaving electronic evidence of their words by communicating orally (including in person), the speed of business sometimes required the convenience of written electronic communications, and on that same day, May 8, 2013, Green e-mailed his colleagues at Teva regarding this impending launch for Teva's profitability and sales data on fenofibrate, a request that was repeated the following day by Green's boss at Teva, who also did so while mentioning the fact that Mylan's launch date for fenofibrate was imminent.

3396.  At the time, Green's and Patel's boss at Teva was K.G., Senior Director, Marketing Operations.

3397.  On May 10, 2013, K.G. received the Teva sales and profitability information he had requested.  Because Defendants' conspiracy meant Teva would not compete for business beyond the agreed division of the market, and before there was even a formal price challenge by Mylan at any of Teva's customers, KG decided that Teva would cede Teva's Econdisc business to interloper Mylan, even though Econdisc was a significant source of revenue and profit on fenofibrate; indeed, Econdisc was Teva's largest single customer (by volume) for the 48mg dose.

3398.  That same day, May 10, 2013, Green reached out to Nesta, his contact at Mylan, and told him that Teva was on board with the scheme and Mylan would get the Econdisc account.  They spoke for a little over 10 minutes, whereupon Nesta reached out to Patel at Teva, who in turn left a message for Berthold at Lupin, who then called Patel back to discuss the conspiracy, in particular, pricing and allocating the fenofibrate market.  Lupin and Patel spoke twice that day, for a total of approximately a half hour.

3399.  Teva made good on its agreement to concede Econdisc to Mylan.  On May 15, 2013, Econdisc informed Teva that a new market entrant – which, because of the conspiracy, Teva already knew about, including the identity of the new bidder – had submitted a competitive offer for Fenofibrate 48mg and 145mg tablets and asked Teva for a counteroffer to retain Econdisc's business.

3400.  Because of Defendants' conspiracy, it took Green less than an hour after receiving the notice of the price challenge to recommend to his boss at Teva that Teva concede the Econdisc account to Mylan.  In furtherance of the conspiracy and to Plaintiffs' detriment, Teva did so.

3401.  Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times over the next two days – when Mylan actually launched, and the news that Mylan was selling Fenofibrate was finally made public.

3402.  Patel spoke with Berthold at Mylan on at least three separate calls on May 16, and an 11-minute call the next day, May 17, the day of Mylan's Fenofibrate launch.

3403.  In a competitive market, the sales force of a company launching a product is speaking to its customers and shippers, not to its competitors; but the importance to Defendants' conspiracy of co-ordination and of reassuring each other of their intent to abide by the agreement meant the Fenofibrate launch was not a normal launch.

3404.  It was not just Teva and Mylan who were speaking on the day of Mylan's Fenofibrate launch; in turn, Nesta at Mylan spoke with Berthold at Lupin for two minute and with Green at Teva twice for a total of almost a half-hour (on, again, launch day); Green spoke with Berthold for ten minutes and, completing the circle, with Patel for approximately the same length of time, all confirming the conspiracy and the ceding of the Econdisc fenofibrate business from Teva to Mylan.  This is not how non-collusive competitors act.

3405.  Teva, Mylan, and Lupin were not the only Defendants involved in the Fenofibrate part of Defendants' overarching conspiracy:  in February of 2014, Zydus was preparing to launch into the Fenofibrate market on March 7, 2014.

3406.  By this time, Green was now at Zydus as the Associate Vice President ("AVP") of National Accounts, and maintained his collusion with his former Teva

colleagues, Patel and David Rekenthaler ("Rekenthaler"), then Vice President of Sales for US Generics at Defendant Teva until April, 2015.

3407.  At that time, in another example of the cozy relationships among ostensible competitors in the market for generic pharmaceuticals, Rekenthaler then transitioned from Defendant Teva to Defendant Apotex, where – as VP of Sales – he maintained and cultivated the cross-manufacturer relationships he had begun developing while at Teva, including at least 1,044 phone calls and text messages with his contacts at Defendants Actavis, Mylan, Par, Aurobindo, Apotex, Zydus, Sandoz, Rising, Amneal, Breckenridge, Lupin, Dr. Reddy's, Glenmark, Greenstone, Taro, Lannett, and Wockhardt, further including, as discussed in detail below, at least:

- 433 calls or texts with Defendant Actavis's Marc Falkin in the two years prior to joining Actavis in 2015;

- 102 calls or texts with Defendant Mylan's Jim Nesta in the three years from April, 2012 – March, 2015;

- 89 calls or texts with G.B. at Defendant Par in the approximately four years from January, 2011 – February, 2015;

- 75 calls or texts with R.C. at Defendant Aurobindo in the approximately four years from October, 2011 – March, 2015;

- 65 calls or texts with J.H. at Defendant Apotex in the two years from May, 2013 – March, 2015; and with the aforementioned Green during his time at Zydus, from November, 2013 – March, 2015, 42 calls or texts.

3408.  In addition to doing so with Patel and Rekenthaler, Green maintained his active collusion with Nesta and Berthold, sharing pricing information and allocating market share with all four for the benefit of his new employer.

3409.  In the absence of joint participation in a conspiracy, competitors do not telephone each other right before launching competing products, but between February 19 and February 24, 2014, Patel and Green spoke by phone at least 17 times – including two calls on February 20 lasting a combined total of over a half hour, and another call the next day, lasting almost a half hour.

3410.  On February 21, 2014, Patel at Teva sent a calendar invite to her boss, KG, and to Rekenthaler for a meeting three days later, on February 24, 2014. One discussion item was Zydus's planned entry into the Fenofibrate market.  Notably, Defendant Zydus did not enter the Fenofibrate market until two weeks later, on March 7, 2014.

3411.  Beyond the communications detailed above, in the days leading up to Zydus's Fenofibrate launch, Defendants from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus,

exchanging at least 26 calls or voice mails with each other between March 3 and March 7, 2014.

3412.  In a competitive market for fungible products, such as generic pharmaceuticals, new entrants come in at a price below the incumbent suppliers. They need to do this in order to obtain customers, who otherwise have no incentive to switch from the incumbents.

3413.  However, that's not what happened; instead, because of Defendants' cartel and overarching anticompetitive agreement, Defendant Zydus entered the Fenofibrate market with WAC pricing that matched Defendants Teva, Mylan, and Lupin.

3414.  On March 17, 2014, Patel at Teva and her erstwhile co-worker Green (now working at Teva's competitor and co-conspirator, Zydus) had two separate phone conversations, discussing how to divide the markets for multiple products where Zydus was entering the market, including Fenofibrate.  Patel then reported the results of this discussion to her boss (and Green's former boss), KG, in an e-mail sent that same day.

3415.  In the months that followed, Teva ceded several customers to Zydus in accordance with the agreement they had reached.

3416.  For example, on Friday March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a

Teva customer, OptiSource. That same morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a meeting to discuss this development.

3417. The following Monday – March 24, 2014 – Patel sent internal e-mails directing that Teva "concede" OptiSource and Humana to Zydus. Patel further directed that Teva should provide a "courtesy reduction" to a third customer, NC Mutual, but stated that Teva should "concede if additional reduction is requested." That same day, Patel also called Green and they spoke for approximately a quarter-hour. She also spoke with Berthold at Lupin for about twelve minutes.

3418. In the meantime, Zydus bid at another Teva customer, Ahold. On March 25, Patel e-mailed Rekenthaler, stating, "Need to discuss. NC pending, and new request for Ahold. We may not be aligned." Patel then sent an internal e-mail directing that Teva "concede" the Ahold business. Later that day, Patel called Green. He returned the call and they spoke for nearly eight minutes. Patel also called Berthold at Lupin and they spoke for approximately five minutes.

3419. On May 13, 2014, Zydus bid on Fenofibrate at another Teva customer, Walgreens. The next day, on May 14, Patel forwarded the bid to her supervisor, K.G., and explained that "if we concede, we will still be majority share, but only by a few share points. On the other hand, if Zydus is seeking share, they're challenging the right supplier, but the size of the customer is large. What are you[r] thoughts on asking them to divide the volume 25% Zydus and 75% Teva? This way, we've

matched, retained majority and will hopefully have satisfied Zydus, and minimize them going elsewhere."

3420.  K.G. agreed with the approach and the next day, May 15, Patel sent an internal explaining that "we will retain 75% of the award.  The remainder will go to Zydus.  Hopefully, this will satisfy their share targets."  Patel also emphasized that we "need to be responsible so that Zydus doesn't keep challenging Teva in the market."  Later that day, Green (Zydus) called Patel (Teva) and they spoke for twenty minutes.

3421.  A little over two weeks later, on June 2, 2014, Green called Patel and they spoke for approximately 5 minutes.  He also called Rekenthaler, and they spoke for two minutes.  Two days after that, on June 4, Zydus submitted an unsolicited bid for Fenofibrate at Anda, a Teva customer.

3422.  The following week, on June 10, T.S., Senior Analyst, Strategic Support at Teva, e-mailed J.P., Director of National Accounts at Teva, stating "We are going to concede this business to Zydus per upper management."  T.S. forwarded the e-mail to K.G., copying Patel and Rekenthaler, asking to "revisit the decision to concede ANDA" because "[w]e need to send Zydus a message to cease going after all of our business."  This is yet another example of Defendants using, or considering the use of, pricing as a means to communicate with other cartel members.

3423.  Rekenthaler responded, "At Anda I would suggest you try to keep our product on their formulary in a secondary position and we'll continue to get sales. . . . Zydus has little market share on Fenofibrate that I can tell and they'll continue to chip

away at us until they get what they are looking for."  A few hours later, J.P. responded that Anda would maintain Teva on secondary and award the primary position to Zydus. Anda was fully aware that Teva was conceding Anda's business to Zydus because it was a new entrant.

3424.  The next day, on June 11, 2014, Green (Zydus) called Rekenthaler (Teva) and they spoke for eight minutes. Later that day, illustrating the institutional nature of the cartel relationship among Defendants, rather than merely personal relationships among their employees, Patel (Teva) returned Green's call.  Green then called Patel back and they spoke for approximately a quarter-hour.

3425.  No product shortages or other market changes can explain Defendants' price increases.  The pricing conduct here is not consistent with competitive behavior. As multiple sellers enter the market, prices in a competitive market decline. Yet, Fenofibrate prices remained elevated above the competitive level because of the anticompetitive agreement among Defendants.

3426.  No shortages or other competitive market features can explain the elevated pricing of Fenofibrate during the Relevant Period.

3427.  The elevated prices of Fenofibrate resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3428.  The unlawful agreement among Teva, Lupin, and Zydus regarding Fenofibrate was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DP.   Diflunisal and Hydroxyzine Pamoate

3429.  Generic Diflunisal is a salicylic acid-derived NSAID with analgesic properties and and has been commercially available in the United States for decades. The market for generic Diflunisal tablets ("Diflunisal") is mature.

3430.  The market for generic Hydroxyzine Pamoate capsules ("Hydroxyzine Pamoate") is mature.  Generic Hydroxyzine Pamoate has been commercially available in the United States for decades.

3431.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Diflunisal and Hydroxyzine Pamoate, at least as follows:

3432.  During the Relevant Period, Defendants Teva, Sandoz, Actavis, and Rising dominated the market for Hydroxyzine Pamoate.

3433.  In 2013, SW-2 left Sandoz to join Rising.  At that time, Teva already manufactured Hydroxyzine Pamoate and Rising was preparing to enter the market.

3434.  During several calls in early October, 2013, SW-2 co-ordinated with Teva's Green and Rekenthaler to acquire a large customer and facilitate Rising's entry

into the Hydroxyzine Pamoate market, with appropriate market share per the cartel agreement.

3435.  Later, in February and early March of 2014 and illustrating the cross-product nature of Defendants' collusion (where a favor in one product market can be repaid in a different, otherwise-unrelated market), SW-2 sought for Rising to return the favor.  At that time, Rising experienced supply problems for the drug Diflunisal Tablets – a two-player market involving only Teva and Rising.

3436.  As set forth in more detail below, as part of "play[ing] nice in the sandbox" and to further encourage co-operation and understanding between the two cartel members, SW-2 contacted Rekenthaler at Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future.  The purpose for the call was to alert Rekenthaler that Teva would have the opportunity to take a price increase, as Teva would be the only game in town.

3437.  By February 26, 2014, Patel had a list of "PI [Price Increase] Candidates," which she forwarded to a colleague for review.  In addition to other drugs described elsewhere in this complaint, such as Niacin ER and Azithromycin suspension, the list included Diflunisal and correctly noted in the "Market Notes" column that the market for the drug was "Shared only with Rising."

3438.  In a practice that had become routine at Teva, Patel and Rekenthaler both communicated multiple times with the relevant members of Defendants' cartel –

in this case Taro, Lupin, Actavis, Greenstone, Zydus, Heritage, and Rising – to co-ordinate the price increases, calls and text messages.

3439.  Then, on March 17, 2014, having confirmed the co-operation of these Defendants with the planned price increases, Patel sent a near final version of the "PI Candidates" spreadsheet to K.G. for approval.

3440.  At that time, Rising had a 21% market share and Teva dominated the market with the remaining 79%.

3441.  That same day, Rekenthaler spoke with SW-2 twice. During those calls, SW-2 told Rekenthaler that Rising was having supply problems for Diflunisal and might be temporarily exiting the market at some point in the future.  SW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

3442.  Rekenthaler and SW-2 spoke again on March 31, 2014, shortly before Teva's Diflunisal price increases on DiflunisalTablets and Hydroxyzine Pamoate.  On April 4, 2014, Teva increased its WAC pricing on Diflunisal by up to 30%, and its contract pricing by up to 182%, as well as Hydroxyzine Pamoate by as much as 165%.

3443.  Rising exited the Diflunisal market for a short period of time a few months later.  When Rising decided to exit the market, SW-2 called Rekenthaler to let him know.  Four months later – when Rising's supply problems were cured – Rising re-entered the market for Diflunisal.  Consistent with the so-called "fair share" principles of Defendants' cartel, SW-2 and Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers whom Rising

would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4.

3444.  On December 3, 2014, Rising re-entered the market for Diflunisal Tablets.  Its new pricing exactly matched Teva's WAC price increase from that April.

3445.  No shortages or other competitive market features can explain Defendants' price increases for Diflunisal tablets or Hydroxyzine Pamoate capsules during the Relevant Period.

3446.  The elevated prices of Diflunisal Tablets and Hydroxyzine Pamoate capsules resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3447.  The unlawful agreement between Teva and Rising regarding Diflunisal tablets and Hydroxyzine Pamoate capsules was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**DQ.  Ketoconazole**

3448.  Generic Ketoconazole ("Ketoconazole") is an imidazole antifungal drug and is primarily used to treat fungal infections.  Ketoconazole is sold commercially as a tablet for oral administration and as a cream for topical administration.

3449.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Ketoconazole, at least as follows:

3450.  Although they were not listed on the original list that Teva's Patel sent to her boss, K.G., on January 14, 2014, Patel identified Ketoconazole Cream and Ketoconazole Tablets as price increase candidates sometime in January-February of 2014, and included them on the list of price increase targets that she sent to a Teva colleague on February 26, 2014.

3451.  Taro was a common fellow-supplier with Teva on both drugs, but there were different sets of suppliers for each formulation.  For Ketoconazole Cream, Teva's nominal "competitors" (and co-conspirators) were Taro and Sandoz; for the Ketoconazole Tablets, Teva's nominal "competitors" (and co-conspirators) were Taro, Mylan and Apotex.

3452.  Teva led the price increases for both drugs, but co-ordinated with all of its competitors as it was doing so.  Meanwhile, co-conspirators Taro and Sandoz were also communicating directly with each other.  For example, on April 4, 2014 – the day of Teva's price increase – Patel spoke separately with both Aprahamian of Taro and SW-1 of Sandoz and told each co-conspirator about Teva's immediate price increasing on Ketoconazole.

3453.  That same day, Friday, April 4, 2014, Aprahamian then spoke to a senior sales executive at Sandoz, who will be referred to in this Complaint as SW-3, for

approximately 20 minutes to discuss the Teva increase and co-ordinate their response. They agreed that at least Taro would follow the increase and raise its prices. SW-3 then sent an internal e-mail, informing his Sandoz colleagues about Teva's immediate price increase and Taro's commitment to follow the price increase, and directing them not to bid on any new opportunities for Ketoconazole; Aprahamian sent a similar message to his colleagues at Taro.

3454.  Also that same Friday, Teva's Rekenthaler spoke to Nesta at Mylan; he had previously communicated with a senior sales executive at Apotex, J.H., a few weeks earlier, on March 20 and 25.

3455.  The following Monday, April 7, 2014, Taro received a request for a bid from the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), a group purchasing organization.  MMCAP asked for a bid on its Ketoconazole Tablets account owing to Teva's price increase from the previous week.  Taro refused to bid on the account, but to cover its anticompetitive conspiracy, lied to MMCAP about the reason for not bidding.

3456.  The next day, Tuesday, April 8, Aprahamian called Patel and the two spoke for more than a quarter of an hour.  Later that same day, he initiated a price increase for all of Taro's customers on both Ketoconazole Cream and Tablets. Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

3457.  Although Sandoz already knew that it would follow the increased prices, it was not able to implement them until October. The delay was due to the fact that Sandoz had contracts with certain customers that contained price protection terms which would pose substantial penalties on Sandoz if it increased its prices at that time. Those penalties outweighed the profits to be made from the increased prices, so Sandoz delayed following the price increases until that October.

3458.  This put Sandoz in a bind:  its prices were lower than its competitors, which would normally lead to an increase in business; but increased market share would mean Sandoz was getting more than the overarching "fair share" conspiratorial agreement with the other Defendants allowed.

3459.  As with Teva, Upsher, and Baclofen (when Teva was the lowest-priced supplier in the Baclofen market), to avoid violating Defendants' overarching agreement, Sandoz did not seek out additional business, even though it was now the lowest-priced market participant.  Likewise, Teva not only chose not to seek out new business, but refused to accept new business that fell into its lap.

3460.  For example, a month after the price increase, Cardinal approached Teva to ask for a bid on its Ketoconazole business.  The request was forwarded to Patel, who communicated several times via text and telephone with Aprahamian at Taro, and then directed that Teva decline to bid for Ketoconazole at Cardinal.  The same day, May 14, 2014, Patel also directed that Teva decline to bid for Ketoconazole at ABC, thus protecting Taro from price competition.

3461.  The Teva increases on Ketoconazole were significant.  For the cream, Teva, Taro and Sandoz all more than doubled the WAC price.  For the tablets, Teva's WAC increases were more than triple, but its customer price increases were even larger, averaging more than 5 times the original price.

3462.  No product shortages or other market features can explain Defendants' abrupt, simultaneous (or, in Sandoz's case, delayed by six months), and substantially identical price increases on Ketoconazole during the Relevant Period.

3463.  The elevated prices of Ketoconazole resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3464.  The unlawful agreement among Teva, Taro, Sandoz, Mylan, and Apotex on Ketoconazole was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DR.   Calcipotriene Betamethasone Dipropionate Ointment

3465.  Generic Calcipotriene Betamethasone Dipropionate Ointment ("CBD Ointment" or "Cal Beta") is a vitamin D analogue and corticosteroid combination product indicated for the topical treatment of psoriasis vulgaris in adults 18 years of age and older.  CBD Ointment is available in 60 gm and 100 gm dosages.

3466.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic CBD Ointment, as follows:

3467.  In early 2014, both Sandoz and Perrigo were preparing to launch CBD Ointment.  Sandoz was preparing to launch as the first-to-file generic and Perrigo was preparing to launch as the authorized generic. ("AG") Under the agreement that Perrigo had reached with the brand manufacturer, Perrigo could not launch until Sandoz, the first filer, entered the market.  Typically, a first-filer would want to keep its launch date a secret from the company launching the AG, so that the first filer could catch the AG by surprise and maintain market exclusivity for a longer period of time.  But because of Defendants' cartel agreement, that was not the case with CBD Ointment – instead, they co-ordinated, as set forth *infra*:

3468.  T.P., a sales executive at Perrigo, and SW-3, a senior sales executive at Sandoz, exchanged two calls in late February, 2014.  On those calls, T.P. told SW-3 that Perrigo would be launching the AG of CBD Ointment and asked SW-3 when Sandoz planned to launch its generic version.

3469.  When first approached by T.P. about CBD Ointment, SW-3 was not aware that Sandoz was planning to launch it.  After being approached by T.P., SW-3 reached out to others at Sandoz to find out what Sandoz's plans were.  On March 4, 2014, A.S., a senior Sandoz launch executive, confirmed to SW-3 that Sandoz would

be launching CBD Ointment.  Within minutes of receiving A.S.'s confirmation, on the night of March 4, 2014, SW-3 e-mailed Armando Kellum.

3470.  The next day, on March 5, Sandoz held a teleconference to discuss its plans.  Kellum, A.S., SW-1, a Sandoz senior pricing executive, and other members of the sales and launch teams attended the call.  Additional meetings were held on March 10 and March 13 to co-ordinate the CBD Ointment launch.

3471.  Also on March 13, SW-3 called T.P. – twice – with one of the calls lasting twelve minutes.  That same day, Perrigo scheduled its own teleconference for the following day to discuss its CBD Ointment launch.  T.P., his supervisor Wesolowski, a senior executive at Perrigo, and over twenty other Perrigo sales and launch team members attended the call.  On the call, the Perrigo sales executives were directed to go after only six select customer accounts, and no others.

3472.  Promptly following the call, J.B., a Perrigo marketing executive, circulated a document that was discussed on the call.  The document was internally prepared at Perrigo and indicated that Sandoz could launch on March 31 and that Perrigo's goal was 50% of the market.  Perrigo's information was accurate. Sandoz ultimately launched the 100 g size on March 31 and the 60gm size on April 1, 2014. In accordance with Perrigo's market share goal of 50%, internal Sandoz e-mail correspondence circulated prior to launch stated that Sandoz also had a target market share of 50% for CBD Ointment.

3473.  While Perrigo planned to approach a small, select group of potential customers, Sandoz was deciding which large customers to go after.  Sandoz initially planned to target Walgreens and ABC.  However, Sandoz remained involved in ongoing business disputes with Walgreens and ABC in the middle of March, 2014.  Sandoz was concerned that Walgreens and ABC would not award Sandoz their CBD Ointment business if the disputes were not resolved prior to launch.

3474.  On the night of Friday, March 14, A.S. e-mailed P.G., the President of Sandoz US, concerning the ABC and Walgreens disputes for the CBD Ointment launch.  P.G. responded by directing A.S. to look for CBD Ointment business.

3475.  A.S. forwarded his e-mail correspondence with P.G. to Kellum and others at Sandoz on the afternoon of March 16.  Consistent with P.G.'s direction, A.S., Kellum, SW-3, and SW-1 immediately began to strategize how Sandoz could reach its market share target of 50% without Walgreens and ABC.  A.S. determined that in order to reach that level, Sandoz would need to have CVS as a customer.  At an in-person meeting in Sandoz's Princeton campus, Kellum told SW-3 and SW-1 that he also wanted McKesson and Rite Aid as customers.

3476.  On the next day, March 17, 2014, SW-3 called T.P. at Perrigo to resume their discussions about customer allocation and to exchange pricing information.  Between March 17 and March 20, SW-3 and T.P. exchanged more than ten phone calls, with one call lasting eleven minutes and another call lasting 17 minutes.  Further, T.P. reported the substance of these calls to his supervisor, Wesolowski, seeking

direction from him on how to respond to SW-3.  T.P. often spoke with Wesolowski

between calls with SW-3, sometimes calling him immediately after hanging up with

SW-3.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:38:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 8:56:00 | 0:11:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 9:08:00 | 0:12:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 12:42:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:49:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:13:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:22:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 13:48:00 | 0:08:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:56:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:00:00 | 0:03:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 15:30:00 | 0:04:00 |
| 3/19/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 16:20:00 | 0:17:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolwoski, John (Perrigo) | 8:37:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolwoski, John (Perrigo) | 8:40:00 | 0:03:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolwoski, John (Perrigo) | 12:37:00 | 0:08:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:18:00 | 0:07:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolwoski, John (Perrigo) | 14:24:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:08:00 | 0:03:00 |

3477.  Although most of T.P. and SW-3's calls were just between the two of

them, occasionally other colleagues would join them.  For example, SW-3 made a call

early in the week of March 17, 2014, to T.P. (at Perrigo) from A.S.'s office in

Princeton, and Kellum and SW-1 also joined the call.

3478.  As noted above, over the course of these calls, T.P. and SW-3 discussed

market pricing and customer allocation. In a call early that week, T.P. shared Perrigo's

proposed WAC pricing and AWP pricing for different categories of customers.

3479.  When Perrigo launched CBD Ointment about two weeks later, its WAC and AWP matched Sandoz's price points.  SW-3 made notes in his Notebook, with two rows of WAC prices, representing the different pricing for the 60 gm and 100 gm sizes.  Sandoz's WAC prices at launch were close to, but slightly higher than, Perrigo's, at $657.45 for the 60 gm size and $968.40 for the 100 gm size.

3480.  T.P. also shared with SW-3 what Perrigo's non-public, "dead net" pricing (ie, after discounts and rebates) would be for its customers.  Perrigo ranked its customers into five "tiers."  Customers in the same tier were typically sold a drug at the same dead net price.  T.P. communicated the CBD Ointment pricing tiers to SW-3 by giving examples of the types of customers in a tier, such as large wholesalers like ABC and Cardinal or regional wholesalers like HD Smith or Optisource, and what the corresponding "dead net" pricing would be for that type of customer.  The pricing tiers T.P. gave to SW-3 matched the pricing tiers Perrigo planned to use.

3481.  Moreover, Perrigo's offers to customers were in step with this "dead net" pricing.  For example, Perrigo made offers to Wal-Mart and Meijer, both so-called "tier 2" customers, that resulted in Wal-Mart and Meijer having "dead net" pricing of $426.31 and $627.94 for the 60 gm and 100 gm sizes, respectively, and offers to Optisource and Morris Dickson (both "tier 3" customers), that resulted in Morris Dickson and Optisource having dead net pricing of $448.75 and 660.99 for the 60 gm and 100 gm sizes, respectively.

3482.  As noted earlier, T.P. and SW-3 did not just use these calls to share pricing information in anticipation of their launches.  They also used them to allocate the customers that would be in the market.  When SW-3 and T.P. spoke on calls early in the week of March 17, 2014, each shared his company's position on how customers should be divided between their employers to achieve a so-called "fair share."  SW-3 told T.P. that Sandoz wanted McKesson, Rite Aid, Econdisc, CVS, Cardinal, Omnicare and Kaiser.  T.P. responded that Perrigo wanted Anda, Walgreens, ABC, Wal-Mart, Rite Aid and McKesson.

3483.  The purpose of this agreement on the list of customers was for the two cartel members to avoid competing with each other, as both companies were entering the market simultaneously.

3484.  As the lists above show, with the exception of Rite Aid and McKesson, Sandoz and Perrigo were aligned on how significant customers should be allocated. In March, Rite Aid was purchasing generic drugs through McKesson's "OneStop Generics" program, so Perrigo and Sandoz viewed these customers as a package or, put another way, whoever got McKesson also got Rite Aid as a customer.  Both Sandoz and Perrigo wanted that business.

3485.  As the negotiations continued, Sandoz recognized that the list of customers it wanted for CBD Ointment was more than its fair share of the market. However, in keeping with its general strategic preference for selling to a smaller number of large customers, Sandoz did not want to give up McKesson, Rite Aid,

CVS, or Cardinal.  To resolve the issue, Kellum, SW-3 and SW-1 brainstormed a list of other customers that, when combined, would have about the same market share as Rite Aid and McKesson and that Sandoz was willing to give up to Perrigo. Ultimately, the list of customers that Sandoz created included Optisource, Publix, Morris & Dickson ("MD"), PBA Health ("PBA"), Meijer, and Kaiser.

3486.  Thereafter, SW-3 called T.P. and proposed that Sandoz give up these customers to Perrigo in exchange for McKesson and Rite Aid, and Perrigo agreed, which SW-3 documented in his Notebook.

3487.  Following the plan, Perrigo submitted offers to the customers listed above and was awarded the business at Optisource, Publix, Morris & Dickson, Meijer, and Kaiser.  In addition, and as planned, Perrigo bid on and won Anda, Walgreens, ABC and Wal-Mart, while Sandoz bid on and won McKesson, Rite Aid, CVS, Cardinal, and Omnicare.

3488.  While Wesolowski encouraged the Perrigo sales team to go after their assigned customers, he was also careful to make sure they adhered to the agreement reached with Sandoz.  For example, on March 21, Omnicare reached out to Perrigo, asking for a bid on CBD Ointment.  Omnicare was a customer allocated to Sandoz. P.H., a Perrigo sales executive, forwarded the request to Wesolowski, who replied that Omnicare was not an option.  Following Wesolowski's direction, P.H. told Omnicare that it would not be supplying them, even though Perrigo was actively sending offers to the other potential customers at that time.

3489.  On March 31, 2014, SW-3 called T.P.  The call lasted two minutes.  That same day, Sandoz officially launched the 100 g size of CBD Ointment and Perrigo launched both the 100 gm and 60 gm sizes.  The next day, on April 1, Sandoz launched the 60 gm size.  Early in the morning of April 1, M.A., a Sandoz marketing executive, e-mailed Kellum and A.S. to advise that she received an alert that Perrigo had increased prices on CBD Ointment, which was true.

3490.  At the end of April, 2014, Sandoz and Perrigo had a virtually even split of the market for that product.

3491.  No shortages or other market features can explain Defendants' price increases for generic CBD Ointment during the Relevant Period.

3492.  The elevated prices of generic CBD Ointment resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3493.  The unlawful agreement between Defendants Sandoz and Perrigo regarding generic CBD Ointment was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**DS.  Modafinil**

3494.  Generic Modafinil ("Modafinil") is used in treating sleep disorders including narcolepsy and obstructive sleep apnea (halted breathing during sleep).  By early 2020, the average price for a 200mg tablet of Modafinil was around 60 cents. But in early 2014, when Teva had a fair share market allocation scheme among itself and other manufacturers, the average price was over $12.00 per tablet.

3495.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Modafinil, as follows:

3496.  On May 22, 2014, Teva learned that a new market entrant had challenged Teva's share of Modafinil sales at ABC.  On a call the next day, two individuals from ABC spoke with a Teva representative.

3497.  Although Teva initially felt that their then-market share was already too low in a five-player market, after further discussions about fair share intentions, Teva agreed with its co-conspirators, using ABC as an intermediary, to give up the account for the benefit of the market.  A few months later, on September 22, 2014, an individual at Teva could not remember why Teva had conceded and guessed it was perhaps related to a supply problem.  ABC wrote to remind Teva that it was in fact an arranged concession between manufacturers.

3498.  No shortages or other market features can explain Defendants' price increases for generic Modafinil during the Relevant Period.

3499.  The elevated prices of generic Modafinil resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3500.  The unlawful agreement among Teva and other cartel members, regarding generic Modafinil, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DT.  Diphenoxylate Atropine HCL Tablets

3501.  Generic Diphenoxylate Atropine HCL tablets ("Diphenoxylate Atropine") are used to treat acute diarrhea.  During the Relevant Period, the market for Diphenoxylate Atropine tablets was mature and had multiple manufacturers at all relevant times.  As a result, prices for Diphenoxylate Atropine tablets were relatively low and stable for years.

3502.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Diphenoxylate Atropine tablets, as follows, beginning at least as early as March, 2014:

3503.  During the Relevant Period, Defendants Mylan and Greenstone dominated the market for Diphenoxylate Atropine HCL tablets.

3504.  In the space of about six weeks in the spring of 2014, after years of stable prices, Defendants Mylan and Greenstone imposed large and identical price increases on Diphenoxylate Atropine tablets. Mylan and Greenstone announced identical list (WAC) prices that were nearly double the old prices.

3505.  Both manufacturers saw an immediate jump in revenue from sales of Diphenoxylate Atropine. Prices have never returned to their former levels, and for years after the price increases, the dollar sales of Mylan and Greenstone remained remarkably stable.

3506.  The list (WAC) price chart chart below shows the sudden and sustained price increases by Mylan and Greenstone for Diphenoxylate Atropine tablets; NSP prices followed a similar pattern.



3507.  Throughout this period, Mylan and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Diphenoxylate Atropine and of their Fair Share agreement.

3508.  For example, M.A., Mylan's National Account Director, communicated by phone with Robin Hatosy, Director of National Accounts at Greenstone, on April 3, 4, 22, 28 and 29.  Mylan announced its list (WAC) price increases on April 17, 2004.

3509.  When Greenstone followed the increase on June 2, 2004, Hatosy (Greenstone) again spoke to M.A. (Mylan) on June 24.

3510.  No shortages or other market features can explain Defendants' price increases for generic Diphenoxylate Atropine during the Relevant Period.

3511.  The elevated prices of generic Diphenoxylate Atropine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3512.  The unlawful agreement between Defendants Mylan and Greenstone regarding generic Diphenoxylate Atropine was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**DU.   Methazolamide Tablets**

3513.  Generic Methazolamide tablets, including in 25mg and 50mg dosages (collectively, "Methazolamide"), are used to treat ocular conditions where lowering intraocular pressure would be beneficial, including several types of glaucoma.

3514.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Methazolamide Tablets, as follows:

3515.  By the fall of 2013, there were two manufacturers marketing Methazolamide -- Defendant Sandoz and Fera Pharmaceuticals, Inc. ("Fera"). Both manu had posted nearly identical WAC pricing for the 25mg and 50mg dosage sizes, respectively.

3516.  In early 2014, Sandoz began experiencing issues with its API supplier and was forced to temporarily withdraw from the market. At that time, Sandoz expected that its supply problems would be resolved in June 2014 and it would re-enter then.

3517.  At the same time that Sandoz was experiencing supply problems, Perrigo acquired Fera's right to distribute Methazolamide. As a result of Perrigo's acquisition, Fera left the Methazolamide market.

3518.  On March 6, 2014, Perrigo formally launched Methazolamide. Perrigo knew prior to its launch that Sandoz, its only competitor, was out of the market and was not expected to re-enter until the summer of 2014. Perrigo leveraged its

temporary position as the only manufacturer with the ability to supply by implementing a large price increase. Perrigo's WAC pricing when it entered was 136% higher than Sandoz's. An internal Perrigo document circulated approximately one month prior to the launch identifying Perrigo's target share for Methazolamide.

3519.  On June 17, 2014, Perrigo learned from a customer that Sandoz was back in the Methazolamide market. That same day, T.P. of Perrigo called CW-3, a Sandoz senior sales executive. The call lasted one (1) minute. After that call, T.P. called his supervisor, Wesolowski, and they spoke for three (3) minutes. The next day, on June 18, 2014, T.P. and CW-3 exchanged two more calls, with one call lasting three (3) minutes. On Monday, June 23, 2014, T.P. e-mailed Wesolowski.

3520.  Indeed, Sandoz had re-entered the market for the 25mg with a WAC price of $129.84 - which was significantly lower than Perrigo's WAC price of $306.47. Wesolowski was upset that Sandoz did not reach out to Perrigo before re-entering the market. Had it done so, Sandoz would have known to raise its price, and to what level. Wesolowski forwarded T.P.'s e-mail discussed above to Boothe, a senior Perrigo executive, and others at Perrigo.

3521.  In the meantime, Perrigo would make sure that Sandoz did its due diligence before re-entering on the 50mg, and that it would collect its prior mistake on the 25mg.

3522.  On October 21, 2014, CW-3 and T.P. spoke for fifteen (15) minutes. During that call, T.P. provided CW-3 with Perrigo's increased WAC pricing for the

25mg and 50mg package sizes of Methazolamide to ensure that Sandoz would match those prices when it re-entered the market.

3523.  Shortly after the call, in early November 2014, Sandoz began ramping up for its re-entry into the Methazolamide market. On November 3, 2014, Sandoz held a Commercial Operations meeting during which Sandoz discussed its plans for the Methazolamide re-launch, including implementing significant price increases to align with Perrigo's pricing.

3524.  The next day, on November 4, 2014, CW-1, a senior Sandoz pricing executive, sent an internal e-mail to his colleague P.C. regarding price fluctuations in responses to Sandoz raising its WAC pricing to match Perrigo. The next day, CW-3 called T.P at Perrigo and the two conspirators spoke for twelve (12) minutes. Also on that day, CW-1 directed the Sandoz pricing team to remove Methazolamide from any existing contracts.

3525.  The two competitors continued to coordinate over the next several weeks as Sandoz made final preparations to re-enter the market and raise prices. On November 10, 2014, CW-3 called T.P. twice with one call lasting two (2) minutes and the other call lasting three (3) minutes.

3526.  On December 4, 2014, CW-3 e-mailed Kellum, CW-1, and others at Sandoz regarding Methazolamide, providing them with specific, non-public pricing information he had learned from his co-conspirator.

3527.  Internal Perrigo documents confirm that its so-called "dead net" pricing for group purchasing organizations (GPOs) at that time was approximately $250 for the 25mg and $500 for the 50mg. This pricing information was not publicly available.

3528.  On December 5, 2014, Sandoz re-launched its 50mg dosage with a WAC price of $612.97, which matched Perrigo's WAC price. At the same time, Sandoz increased the WAC price on its 25mg dosage by 136% to match Perrigo's pricing.

3529.  No shortages or other market features can explain Defendants' price increases for generic Methazolamide tablets during the Relevant Period.

3530.  The elevated prices of generic Methazolamide tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3531.  The unlawful agreement between Defendants Perrigo and Sandoz regarding generic Methazolamide tablets was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DV.  Paricalcitol

3532.  Generic Paricalcitol capsules and tablets ("Paricalcitol") are used to treat and prevent high levels of parathyroid hormone in patients with kidney disease.

3533.  Defendant Teva entered the market for Paricalcitol on September 30,

2013; as the first generic to enter the market, it was entitled to 180 days of exclusivity, *i.e.*, until March 28, 2014.

3534.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Paricalcitol, at least as follows:

3535.  In early 2014, with the end of their exclusivity period approaching, Teva began planning which customers it would concede to its fellow cartel member, Zydus, when Zydus entered the Paricalcitol market at the end of March.  Teva had advance knowledge that Zydus and another generic manufacturer planned to enter the market on "day 181," *i.e.*, March 29, 2014.

3536.  Following their period of exclusivity, Teva's "goal was to concede business on day 181" but "to retain CVS, Walgreens and ABC.  All others are not an automatic concede, but we expect to concede."

3537.  In the period leading up to the Zydus launch, Patel and Rekenthaler at Teva spoke with Green at Zydus and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant(s).

3538.  On Friday, February 28, 2014, T.S., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, advising that ABC was requesting bids on two Zydus overlap drugs – Paricalcitol and Niacin ER.  After receiving that e-mail, Rekenthaler (at Teva) called

Green at Zydus.  The call lasted less than one minute, likely a voicemail.

3539.  The next business day, on Monday, March 3, 2014, Rekenthaler called Green again and they spoke for twenty minutes.  Later that afternoon, Patel also called Green.  The two exchanged four calls that day, including one that lasted nearly twenty minutes.  On March 4, Patel called Green again and left a voicemail.

3540.  A week later, on March 12, T.S. e-mailed Patel and Rekenthaler, stating that Zydus had bid on Paricalcitol at ABC.  That same day, Patel sent an internal e-mail asking for a loss of exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's business that they represented. This was typically done by Teva employees before calling a co-conspirator to discuss how to divvy up customers in a market.

3541.  The next day, Patel directed that Teva retain ABC and match Zydus's pricing.  The day after that, on March 14, Patel called Green at Zydus.  A few minutes later, Green returned the call and they spoke for nineteen minutes.  Rekenthaler then called Patel and they spoke for eleven minutes.

3542.  During the morning of March 17, 2014, Patel and Green had two more phone calls, each lasting approximately five minutes. During those calls, they were discussing how to allocate customers for several products where Zydus was entering the market, including Paricalcitol.  A half an hour after the second call, Patel e-mailed her boss at Teva, K.G., identifying "LOE [Loss Of Exclusivity] Targets to Keep" for several products on which Defendant Teva overlapped with Defendant Zydus –

including Paricalcitol.  With respect to Paricalcitol, Patel recommended that Teva

"Keep Walgreens, ABC, One Stop, WalMart, Rite Aid, Omnicare."  Later that same

day, Patel called Green again and they spoke for approximately eleven minutes.

3543.  Over the next several weeks, Teva "strategically" conceded several

customers to the new entrant (and Teva's co-conspirator), Zydus.

3544.  For example, on March 27, Green (at Zydus) called Patel at Teva. Patel

returned the call the same day, and they spoke for approximately nine minutes. The

next day, on Friday, March 28, OptiSource, one of Teva's GPO customers, notified

J.P., a Director of National Accounts at Teva, that it had received a competing offer

from Zydus for its Paricalcitol account.  J.P. forwarded the OptiSource e-mail to

Patel. Within minutes, Patel responded "[w]e should concede."  That same Friday,

Defendant Teva was notified by another customer, Publix, that Zydus had submitted

a proposal for its Paricalcitol business.

3545.  Two business days later, on April 1, 2014, Teva conceded the customer

to Zydus and noted in its "Delphi" database that the reason for the concession was

"Strategic New Market Entrant."

3546.  Also on April 1, Zydus bid for the Parcalcitol business at another Teva

customer, NC Mutual. That same day, Patel at Teva called Green at Zydus and left a

22-second voice-mail.  The next day, on April 2, 2014, Patel tried Green twice more;

they connected on the second call and spoke for approximately ten minutes.  Later

that evening, L.R., an Associate Manager for Customer Marketing at Teva, sent an

internal e-mail to T.S., the Teva Director of National Accounts assigned to NC Mutual, copying Patel, asking: "May we please have an extension for this request until tomorrow?" Patel responded, "I apologize for the delay! We should concede."

3547. Two weeks later, on April 15, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain. Two days later, on Aprll 17, K.G. responded that he thought it might be Zydus. Patel replied, "We have conceded a reasonable amount of business (as planned) to Zydus. I would be surprised if they were going after a customer this big after they've picked up business recently."

3548. Later that day, Green called Patel. She returned his call and they spoke for nearly twelve minutes. Later that day, after her discussion with Green, Patel sent an internal e-mail, stating "After further review, I believe this is [another company]." On April 22, 2014, Patel sent an internal e-mail regarding Walmart, directing, "Need to retain. Please send an offer. Thanks."

3549. By the following month,Dr. Reddy's started preparing to enter the Paricalcitol market – so it, too, communicated with its co-conspirators. On May 1, 2014, T.W. at Dr. Reddy's spoke with Rekenthaler at Teva for approximately ten minutes.

3550. At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was instructed to find out which customers were currently purchasing Paricalcitol from which manufacturers, and their prices. As a third market entrant

after a period of exclusivity to the incumbent, Dr. Reddy's was targeting approximately a 20% market share, leaving the rest of the market to Teva, Zydus, and the third supplier.  At the time, Teva still dominated the market with a 73% share.

3551.  On June 10, 2014 – as Dr. Reddy's was starting to approach certain customers, including a large retail pharmacy customer (the "Pharmacy") – Patel spoke several times with V.B., the Vice President of Sales for North American Generics at Dr. Reddy's.  Specifically, at 8:50 am that day, Patel called V.B. and left a voicemail.  Half an hour later, V.B. returned the call at 9:18 am, and the two spoke for approximately ten minutes.

3552.  That same day, at 2:46 pm, Dr. Reddy's provided The Pharmacy with a report for Paricalcitol, indicating that Teva dominated the market, with at least a 60% share.  A representative of The Pharmacy responded, "Looks like Teva is the right target."  Shortly after this e-mail exchange, at 3:21 pm, V.B. called Patel back, again, and the two spoke for approximately 10 minutes, again.

3553.  By June 19, although it had not actually started shipping product, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and the Pharmacy.  Their internal plan was that if the Pharmacy declined, then Dr. Reddy's would make an offer to CVS.  That same day, Teva agreed to concede its Paricalcitol business at Omnicare, dropping its market share by 3%.

3554.  Teva also strategically conceded what remained of its Cardinal business.  (it had previously conceded some of that business to Zydus) After receiving Dr.

Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the 4 mcg dose portion of the business.  Patel recommended to her boss, K.G., that Teva concede the account:  "We have ~70 share and it is ideal to concede here because of the incomplete family."  K.G. agreed.

3555.  Highlighting the importance of Defendants' cartel's so-called "fair share" agreement, Patel then instructed S.B., a customer analyst at Teva, to concede "due to [T]eva's high share" – which would, obviously, not be a reason to concede share in a competitive market, which, of course, this was not.

3556.  S.B. subsequently e-mailed T.C., Teva's Senior Director of Sales & Trade Relations:  "Due to the fact that we have high share and already conceded on the other strenglhs, we are going to concede on this strength as well."  T.C. then relayed this statement, word-for-word, to Cardinal.

3557.  Dr. Reddy's formally launched Paricalcitol on June 24, 2014.  On or around that date, it sent offers to, *inter alia,* Winn-Dixie, Giant Eagle, and Schnucks.  On June 26, 2014, Patel's boss, K.G., told her that he was "willing to concede 10-15% share total on Paricalcitol" to Dr. Reddy's.  Dr. Reddy's also submitted a bid to ABC, one of the customers that Teva had targeted to keep after losing exclusivity.  ABC notified Teva of Dr. Reddy's competitive bid for Paricalcitol on June 26, 2014.

3558.  After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced pricing in order to retain the business. Teva decided internally to concede Paricalcitol at Schnucks "[d]ue to new entrants and having to give up some share."

The only reason for Teva to voluntarily give up this market share was Defendants'
cartel and its over-arching and paricalcitol-specific agreements, but in order to create
the appearance of competition for the customer, Teva engaged in "fluff pricing,"
where Teva offered Schnucks an inflated price (cover bid) for Paricalcitol to ensure
that Teva did not win the business, while appearing to compete.  Schnucks accepted
Dr. Reddy's Paricalcitol proposal the same day it received Teva's fluff pricing on the
drug:  June 30, 2014.[49]

3559.  Meanwhile, in internal e-mails discussing the ABC price challenge, Teva
employees noted that Dr. Reddy's was "aggressively seeking market share" and
potentially eroding the price of the drug. When asked for his thoughts on this,
Rekenthaler remarked, in a July 1 e-mail, "My thoughts are that Dr. Reddy is really a
pain in my ass.  Have they picked anyone up to date?"

3560.  Despite the challenge, Teva cut its price and retained ABC's Paricalcitol
business.

3561.  Winn-Dixie also informed Teva that it had received a competing
Paricalcitol offer from Dr. Reddy's.  Patel recommended that Teva concede the

---

[49] Schnucks was "so insulted" by Teva's price that it moved to Dr. Reddy's the same day it received
Teva's offer.  When Patel learned of this, she remarked on July 17 to a Teva salesperson, "Sorry!
Had to laugh.  In regards to our recent conversation….this is what we see when we provide fluff
pricing.  Can't win!"

Of course, the last sentence was false.  Rather than "laugh[ing]" at the outrage the victims of
Defendants' cartel felt about the outrageous price increases it was imposing, Teva could have "won"
by actually competing for market share – but doing that would have cut into the massive profits
Defendants were making.

business, which Teva did, and Winn-Dixie informed Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

3562.  The next day, July 10, Giant Eagle informed Teva that it had received a competing offer on Paricalcitol.  That same day, V.B. at Dr. Reddy's called Patel at Teva and the two spoke for approximately twelve minutes.  Shortly after getting off the phone with V.B., Patel responded to a question from a colleague regarding an RFP to another supermarket chain.  One of the potential bid items was Paricalcitrol.  Patel directed her colleague to "bid a little high on Paricalcitol.  We should not be aggressive since we are in the process of conceding share due to additional entrants."  Her colleague responded:  "I will bid higher."

3563.  The day after that, July 11, Teva conceded the Giant Eagle business to Dr. Reddy's.  S.B., a Teva Strategic Customer Analyst, wrote in an internal e-mail, "Due to DRL[50] recent launch and pressure to give up share, we are going to concede."  Giant Eagle accepted Dr. Reddy's proposal the next day, July 12.

3564.  On July 16, McKesson informed Teva that it had received a competing bid for Paricalcitol, and that Teva needed to submit its best offer in order to retain the business.  Teva initially decided to concede only the One Stop portion of McKesson's business, while retaining the RiteAid portion.

3565.  Patel wrote internally to her team that "[t]his decision is based on the

---

[50] Dr. Reddy's.

number of competitors, DRL's potential share target and our current/conceded share. (Dr. Reddy's should be done with challenging our business on this product.)"  Patel further added that Teva had been "looking to give up One Stop to be responsible with share" and that "[t]he responsible thing to do is concede some share to DRL but not all."

3566.  On Friday, July 18, Patel called V.B. at Dr. Reddy's at 4:20pm and left a message.  V.B. returned the call that Monday morning, July 21, 2014, and the two spoke then again the next morning, July 22, speaking for approximately five minutes on each call.  During these calls, Patel and V.B. agreed that Dr. Reddy's would stop competing for additional market share (and driving prices down) if Teva conceded all of its McKesson business (One Stop and Rite Aid) to Dr. Reddy's. Indeed, Dr. Reddy's confirmed to McKesson (that same day) that it "would be done after this" – meaning it would not compete for additional business because it had attained its so-called "fair share."  McKesson passed this information along to Teva that same day.

3567.  The next day, July 23, Teva decided to concede its entire McKesson business – both RiteAid and One Stop – to Dr. Reddy's.  In making this decision, Teva noted in its Delphi database, that the McKesson Paricalcitol business had been conceded to a "Strategic New Market Entrant."  After the fact, former customer McKesson informed Teva that Dr. Reddy's had been "so aggressive because [Teva was] not giving up share."

3568.  By early August, 2014, Dr. Reddy's had attained 15-16% of the total

Paricalcitol market, which it decided – pursuant to its understanding with Teva – that it would "maintain for now."

3569.  No shortages or other market features can explain Defendants' price increases for Paricalcitol during the Relevant Period.

3570.  The elevated prices of Paricalcitol resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3571.  The unlawful agreement between Defendants Teva and Zydus, regarding Paricalcitol, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**DW.  Phenytoin Sodium Capsules**

3572.  Generic Phenytoin Sodium is used to prevent and control seizures.

3573.  During the Relevant Period, the market for generic Phenytoin Sodium capsules ("Phenytoin Sodium") was mature and at all relevant times had multiple manufacturers.  As a result, for years, the prices for Phenytoin Sodium capsules were relatively low and declining.

3574.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all

formulations of generic Phenytoin Sodium capsules, as follows, beginning at least as early as March, 2014:

3575.  During the Relevant Period, Defendants Mylan, Taro, Sun and Amneal dominated the market for Phenytoin Sodium capsules.

3576.  Mylan had a dominant share of the market going back to at least January, 2008, but as a result of its higher prices, Mylan saw its market share erode as Sun, Taro, and Amneal gained share.  But once shares began to equalize into Fair Shares, the manufacturers were ready to co-ordinate a price increase.

3577.  In 2014, Mylan, Taro, Amneal and Sun decided to re-align prices at a much higher level.  Within the space of a few months, Mylan, Taro and Amneal announced price increases that brought their list (WAC) prices to identical levels. The increases ranged from a little less than 200% to more than 300%, but all ended up at the same price.

3578.  Sun did not change its list (WAC) price, but it did dramatically increase the prices it charged its customers.

3579.  Thereafter, Defendants were careful to adhere to the Fair Share agreement.  For example, in July 2014, a large retail customer approached Mylan seeking a bid.  Mylan declined, because it already had sufficient share. Having been turned down by Mylan, the customer turned to Taro. But Taro, too, abided by the Fair Share agreement and refused to bid on the business.

3580.  The list (WAC) price chart below shows the sudden and sustained price increases by Mylan, Taro, Amneal and Sun for Phenytoin Sodium capsules.



3581.  Throughout this period, Mylan, Taro, Sun and Amneal met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Phenytoin Sodium and of their Fair Share agreement.

3582.  For example, on April 21, 2014, W.F., Sun Senior Manager of National Accounts, informed a colleague: "No price increase yet on Phenytoin but I have heard one might be coming."  Earlier that day, G.S., President of Sun, communicated by phone with Taro's Chief Commercial Officer, M.P.  The two communicated by phone again later that month, and in May, June, July, August and September, 2014.

During this period, Sun's Phenytoin Sodium pricing rose along with the other manufacturers, consistent with their price-fixing Fair Share agreement.

3583.  Taro announced its list (WAC) price increase on June 3, 2014. Taro's Aprahamian then spoke by phone with M.A., Mylan National Account Director, on June 6 and 9, and July 2 and 10. Mylan then raised its list (WAC) prices on July 16.

3584.  Mylan's Nesta was in touch with A.L., Amneal's Director of Pricing, in June, August and September 2014. Amneal announced list price increases on September 1, 2014.

3585.  Defendants continued to abide by the Fair Share agreement well after the price increases became effective.  For example, in July 2015, Taro chose not to bid on Phenytoin Sodium Capsules at a particular customer "due to Taro having enough market share."  Again in August, 2015, Taro declined a sales opportunity because "we have our share."

3586.  No shortages or other market features can explain Defendants' price increases for generic Phenytoin Sodium capsules during the Relevant Period.

3587.  The elevated prices of generic Phenytoin Sodium capsules resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3588.  The unlawful agreement among Defendants Mylan, Taro, Sun and Amneal, regarding generic Phenytoin Sodium capsules, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DX.   Budesonide DR

3589.  As alleged *supra*, generic Budesonide is an anti-inflammatory corticosteroid.  While used to treat asthmatic symptoms when given through inhalers or similar devices, it is used to treat Crohn's Disease and ulcerative colitis when taken in pill form.  Budesonide DR is a delayed-release, capsule formulation of the drug.

3590.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Budesonide DR capsules ("Budesonide DR"), at least as follows:

3591.  During the Relevant Period, Defendants Par, Mylan, and Teva dominated the market for Budesonide DR – but, initially, only Par and Mylan did. Prior to April, 2014, Par and Mylan controlled the entire market for generic Budesonide DR – Par had 70% of the market and Mylan had the remaining 30%.

3592.  Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug.  On Tuesday, April l, 2014, a senior national account executive at Par, M.B., called Rekenthaler at Teva.  The two executives spoke for approximately a half-hour.

3593.  The next day, April 2 – the same day that Teva received FDA approval to market Budesonide DR – Par increased its price for Budesonide DR by over 15%.

3594.  That same day, Teva sales employees were told to find out which customers were buying their Budesonide DR from Par and which were buying their Budesonide DR from Mylan, so that Teva would know where to get its cartel "fair share" from:  "it would be helpful to gather information regarding who is with mylan and who is with par...they are the two players in the mkt...as well as usage."

3595.  At the same time Mylan was communicating with Teva, it was, of course, also communicating with the other cartel member in this market, Par.  So, on Thursday, April 3, 2014 – the day after the Par price increase – a senior account executive at Par, K.O., spoke to a senior account manager at Mylan, M.A., for approximately a quarter-hour.

3596.  By the end of that week (on Friday, April 4), Rekenthaler told some members of Teva's sales team that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product and he did not yet know when it would do so.  Nonetheless, Rekenthaler spoke to both Jim Nesta, Vice President of Sales at Mylan, and M.B., a similarly high-level executive at Par, that same day.

3597.  Due to other issues, Teva was not able to launch until June, 2016, but when it did, it was in accordance with the so-called "fair share" principles of Defendants' cartel.

3598.  Further, no shortages or other market features can explain Defendants' price increases for Budesonide DR during the Relevant Period.

3599.  The elevated prices of Budesonide DR resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3600.  The unlawful agreement among Defendants Par, Mylan, and Teva, regarding Budesonide DR, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**DY.  Dicloxacillin Sodium**

3601.  Generic Dicloxacillin Sodium capsules ("Dicloxacillin Sodium") are used to treat a variety of bacterial infections.

3602.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Dicloxacillin Sodium, as follows, beginning at least as early as April, 2014:

3603.  During the Relevant Period, Defendants Teva and Sandoz dominated the market for generic Dicloxacillin Sodium.

3604.  Teva increased prices on various drugs on April 4, 2014, including Dicloxacillin Sodium.  As with Bumetanide, the increase on Dicloxacillin Sodium was co-ordinated via calls between Patel and and an Associate Pricing Director at Sandoz in March and April of 2014.

3605.  No shortages or other market features can explain Defendants' price increases for generic Dicloxacillin Sodium during the Relevant Period.

3606.  The elevated prices of generic Dicloxacillin Sodium resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3607.  The unlawful agreement between Defendants Teva and Sandoz, regarding generic Dicloxacillin Sodium, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### DZ.   Fluvastatin Sodium Capsules

3608.  Generic Fluvastatin Sodium capsules ("Fluvastatin" or "Fluvastatin Sodium") are used to reduce cholesterol.

3609.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of all formulations of Fluvastatin Sodium capsules as follows, beginning at least as early as April, 2014:

3610.  During the Relevant Period, Defendants Teva and Mylan dominated the market for generic Fluvastatin Sodium.

3611.  Mylan increased its list (WAC) prices on a number of different drugs in April, 2014.  A number of these drugs also were manufactured by Teva, including Fluvastatin Sodium.

3612.  Teva's Rekenthaler spoke with Mylan's Nesta on April 24, May 20, and twice on May 27, 2014.

3613.  Shortly after Mylan announced price increases, and consistent with Defendants' cartel agreement, Teva confirmed internally that it intended to follow the increases for Fluvastatin Sodium and other drugs, which Teva then, in fact, did.

3614.  On August 28, 2014, Teva raised prices on a number of different drugs, including Fluvastatin Sodium.  Leading up to the price increase, Rekenthaler (at Teva) spoke to Nesta (at Mylan) on August 4, 7, 11, 18, and 21.

3615.  As a result of the agreement and anticompetitive co-ordination between Teva and Mylan, prices for Fluvastatin Sodium were higher than they would have been in a competitive market.

3616.  No shortages or other market features can explain Defendants' price increases for generic Fluvastatin Sodium capsules during the Relevant Period.

3617.  The elevated prices of generic Fluvastatin Sodium capsules resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3618.  The unlawful agreement between Defendants Teva and Mylan regarding generic Fluvastatin Sodium capsules was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EA.   Phenytoin Sodium ER Capsules

3619.  Generic Phenytoin Sodium extended-release capsules ("Phenytoin Sodium") are an antiepileptic drug used to prevent and treat seizures.

3620.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Phenytoin Sodium ER Capsules, as follows:

3621.  Throughout the spring and summer of 2014, there were four suppliers in the Phenytoin Sodium market:  Mylan, Amneal, Taro, and Taro's parent, Sun.

3622.  In early April, 2014, Taro began putting together its list of products for the upcoming June 2014 Increases.  On April 3, 2014, Aprahamian exchanged an e-mail with A.S., a pricing executive at Taro, concerning Phenytoin Sodium pricing and, by April 7, Taro had added the product to its price increase list.

3623.  Three days later, on April 10, Aprahamian and M.A., a Mylan sales executive, exchanged two calls lasting two minutes and ten minutes.  Notably, these

two executives did not speak again by phone until June 4, the day after Taro increased its pricing on Phenytoin Sodium

3624.  On April 16, 2014, Walgreens – an Amneal customer – e-mailed Taro, asking for a bid on Phenytoin Sodium.  After an internal discussion regarding market shares, Aprahamian responded on April 20.  Similarly, on April 24, Walgreens also e-mailed Mylan, another competitor in the market, asking for a bid on the product – which, as detailed below, Mylan refused to bid on, even though it had supply capacity to do so.

3625.  Between April 26 and 29, NACDS held its annual meeting in Scottsdale, Arizona.  Key executive representatives from Taro, Mylan, Amneal, and Sun all attended the conference.  The attendees included Aprahamian and Perfetto at Taro, Jim Nesta, a senior pricing and sales executive at Mylan, S.R., a pricing executive at Amneal, and G.S., a senior executive at Sun.

3626.  While attending the NACDS annual meeting, the competitors had numerous opportunities at various programming and social events to discuss Phenytoin Sodium, along with other products on which they competed. Indeed, between April 27 and April 29, Nesta at Mylan and S.R. at Amneal exchanged at least 22 phone calls and text messages.

3627.  One month later, on May 29, 2014, the Pricing and Contracts ("P&C") team at Mylan generated a Daily Report listing the Mylan opportunity at Walgreens on Phenytoin Sodium.  In the report, Mylan noted that it could supply this, starting in

July.  Notably, at that time, no generic manufacturer of Phenytoin Sodium had increased pricing yet, including Amneal.

3628.  In the days leading up to the generation of the P&C Report, Nesta and M.A., a sales executive at Mylan, both communicated multiple times with S.R. at Amneal.  These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/27/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 18:44:13 | 0:02:56 |
| 5/28/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 12:14:56 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 15:55:15 | 0:00:14 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:08:45 | 0:00:06 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:09:19 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:20:50 | 0:00:15 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:36:27 | 0:01:23 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:53:02 | 0:05:37 |
| 5/29/2014 | Text | S.R. (Amneal) | Incoming | M.A. (Mylan) | 17:05:22 | 0:00:00 |

3629.  Ultimately, Mylan declined to bid on the Walgreens business, refusing to take the business away from its co-conspirator, Amneal.

3630.  As detailed above, on June 2, Taro notified its customers that it would be increasing its prices on the June 2014 Increase products, including Phenytoin Sodium.  That same day, S.R. of Amneal called both M.A. and Nesta several times. Over the next several days, all three competitors would exchange a number of calls, detailed in the chart below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:46:53 | 0:00:02 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 16:47:32 | 0:00:04 |
| 6/2/2014 | Voice | S.R. (Amneal) | Incoming | Nesta, Jim (Mylan) | 17:02:54 | 0:00:06 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:03:18 | 0:00:03 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:04:14 | 0:00:19 |
| 6/2/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:51:53 | 0:00:46 |
| 6/4/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 13:17:00 | 0:01:00 |
| 6/4/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:21:17 | 0:07:38 |
| 6/4/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 13:51:18 | 0:00:26 |
| 6/5/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:47:00 | 0:00:02 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Incoming | S.R. (Amneal) | 13:47:37 | 0:00:17 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:49:34 | 0:00:05 |
| 6/5/2014 | Text | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:50:12 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:15 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:41 | 0:03:34 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 6:56:00 | 0:02:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | S.R. (Amneal) | 6:57:00 | 0:07:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 12:41:00 | 0:09:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 9:02:00 | 0:04:00 |

3631.  On July 2, 2014, S.K., a sales executive at Sun, sent an internal e-mail advising G.S., a senior executive at Sun, and others, that Amneal had raised pricing on Phenytoin Sodium. However, Amneal would not publish its increased WAC pricing until several months later – on September 1, 2014.

3632.  In the days leading up to July 2, Taro, Mylan, and Amneal continued to communicate.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 12:11:00 | 0:01:00 |
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 13:04:00 | 0:09:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:29:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:35:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 12:19:00 | 0:11:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 10:52:00 | 0:02:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Incoming | S.R. (Amneal) | 11:17:00 | 0:06:00 |
| 7/1/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 6:15:00 | 0:09:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 11:11:00 | 0:04:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:15:00 | 0:06:00 |
| 7/2/2014 | Voice | M.A. (Mylan) | Outgoing | Aprahamian, Ara (Taro) | 11:18:00 | 0:02:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 11:20:00 | 0:04:00 |

3633.  On July 10, Wal-Mart e-mailed Mylan, requesting a bid on Phenytoin Sodium because its incumbent supplier had increased its pricing.  That same day, M.A. at Mylan called Aprahamian. The call lasted seven minutes.  First thing the next morning, on Friday, July 11, 2014, Aprahamian called S.R. at Amneal.  S.R. returned the call a few minutes later and the two spoke for three minutes.  Later that day, C.W., a pricing executive at Mylan, sent an internal e-mail regarding the Wal-Mart request.

3634.  The next Monday, July 14, Sun followed its competitors and increased pricing on Phenytoin Sodium.  Later that week, Mylan followed suit, on July 16, increasing its WAC pricing by 210% to match its co-conspirators' prices.

3635.  As a result, on July 31, 2014, Wal-Mart was still looking for a supplier for Phenytoin Sodium, so Wal-Mart reached out to Taro asking for a bid.  E.G., a Taro sales executive, forwarded the request along internally. Although it was confirmed that Taro could, in fact, supply the customer, Taro declined to bid, falsely telling Wal-Mart that it could not supply them.

3636.  One month later, on September 1, 2014, Amneal followed and matched its co-conspirators' WAC pricing.

3637.  No shortages or other market features can explain Defendants' price increases for generic Phenytoin Sodium ER Capsules during the Relevant Period.

3638.  The elevated prices of generic Phenytoin Sodium ER Capsules resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3639.  The unlawful agreement among Defendants Amneal, Mylan, and Taro, regarding generic Phenytoin Sodium ER Capsules, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EB.   Topiramate Sprinkle Capsules

3640.  Generic Topiramate sprinkle capsules ("Topiramate") are used to treat seizures in adults or children with epilepsy, and also to help control the type of pain caused by damaged nerves.

3641.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Topiramate sprinkle capsules as follows, beginning at least as early as April, 2014:

3642.  During the Relevant Period, Defendants Teva, Actavis, and Zydus dominated the market for generic Topiramate.

3643.  In April, 2014, Zydus raised its price for Topiramate sprinkle capsules. At the time of the Zydus price increase, Patel at Teva was in frequent communication with Green at Zydus.

3644.  Zydus's Green co-ordinated with both Patel and Rekenthaler at Teva, including conversations on June 2, 11, and 13, 2014.  In addition, on June 11, Rekenthaler spoke twice with Falkin of Actavis, the only other company in the market for Topiramate.

3645.  On June 13—the same day the Zydus price increase on Warfarin became effective—Patel added Topiramate sprinkle capsules to Teva's price increase list, with the notation, "Follow/Urgent – Zydus."

3646.  Teva followed the Zydus price increase for Topiramate sprinkle capsules on August 28, 2014.  Patel spoke with Green at Zydus and Rogerson at Actavis on August 27; Rekenthaler spoke with Green on August 19 and 20; and Rekenthaler spoke with Falkin on August 18, 24, 26, and 28.  The day before the increases became effective, Patel spent most of the morning discussing price increases with her contacts at Actavis and Zydus, among other companies.

3647.  No shortages or other market features can explain Defendants' price increases for generic Topiramate sprinkle capsules during the Relevant Period.

3648.  The elevated prices of generic Topiramate sprinkle capsules resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3649.  The unlawful agreement among Teva, Actavis, and Zydus, regarding generic Topiramate sprinkle capsules, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EC.   Fluocinonide

3650.  Generic Fluocinonide ("Fluocinonide") is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo.  It is one of the most widely prescribed dermatologic drugs in the United States and is sold in multiple formulations, including 0.05% cream, 0.05% emollient-based cream, 0.05% gel, and 0.05% ointment.  Some of the more Teva-focused aspects of Defendants' cartel's scheming involving these formulations of Fluocinonide have already been described, *supra*.  In addition, Fluocinonide was also sold in a solution formulation, which, for clarity, was also discussed separately, *supra*.

3651.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the price of generic Fluocinonide as follows:

3652.  During the Relevant Period, the market for the Ointment formulation of Fluocinonide was dominated by Teva, Taro, and Sandoz.

3653.  In early 2013, the generic Fluocinonide Ointment ("Fluocinonide Ointment") market was essentially evenly split between Teva (50% share) and Taro with 42% share.

3654.  On February 12, 2013, Taro increased pricing on several products, including Fluocinonide Ointment.  The increase included a 15% increase to WAC.

3655.  The next week, on the morning of February 21, SW-3 at Sandoz called H.M. at Taro and they spoke for nine minutes.  Immediately after hanging up with H.M., SW-3 called his supervisor, Kellum, and they spoke for four minutes.

3656.  Later that same morning, M.A., a Sandoz marketing executive, sent an internal e-mail to Kellum and other Sandoz executives, to advise that Taro had increased pricing on several products for which Sandoz was re-entering the market, including Fluocinonide Ointment.

3657.  One week later, on February 28, McKesson e-mailed Taro stating that it had received an unsolicited bid on Fluocinonide Ointment and asked whether Taro wanted to bid to retain the business. Later that day, SW-3 called H.M. again and the two competitors spoke for approximately 10 minutes.

3658.  First thing the next morning, on March 1, SW-3 called one of his bosses at Sandoz (Kellum) and they spoke for five minutes.  The next day (on Saturday, March 2) SW-3 and H.M. exchanged three text messages.  That same day, E.G., a

Taro sales executive, forwarded the customer request along internally and attached a spreadsheet indicating that McKesson was Taro's largest customer.

3659.  That Monday, March 4, 2013, M.L., a Taro pricing executive, forwarded the McKesson request to Perfetto and other Taro executives suggesting that Taro reduce its pricing by 20% and retract the price increase to retain the business. Perfetto responded that he was okay with this approach, but posed a question about it.  The next day, March 5, M.L. confirmed that Taro supplied all three wholesalers, and J.J., a senior Taro sales executive, confirmed that Taro was primary on all three.

3660.  Taro would have preferred that Sandoz took ABC or Cardinal instead of McKession – so Perfetto reached out to his (now-almost-former)[51] colleague at Actavis, Ara Aprahamian, to pass the message on to SW-3 at Sandoz about Fluocinonide Ointment.  The two exchanged calls, and Aprahamian reported back to Perfetto what they discussed.  At least some of these calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/4/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Aprahamian, Ara (Actavis) | 15:18:00 | 0:14:00 |
| 3/5/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Aprahamian, Ara (Actavis) | 8:01:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:05:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:07:00 | 0:11:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 14:52:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 10:50:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 13:24:00 | 0:03:00 |

3661.  At the same t ime, SW-3 was reporting back to SW-1, a Sandoz senior pricing executive, what he had discussed with Aprahamian.  Just after that discussion,

---

[51] Aprahamian was in the process of leaving Actavis at this point, but would not formally begin working at Taro until two weeks later – on March 18, 2013.

SW-1 e-mailed Kellum and F.R., a Sandoz pricing executive, regarding Fluocinonide Ointment, stating that he had.  Less than an hour later, Kellum called SW-3 and they spoke for approximately 23 minutes.  Later that day, SW-3 called Aprahamian.

3662.  Sandoz decided to target ABC instead of Taro's preferred customer, McKesson, so SW-1 then asked SW-3 to get price points for ABC.  Following this directive, SW-3 exchanged several calls with Aprahamian, who, in turn, relayed the request to Perfetto, who provided the Taro's ABC price points to Aprahamian, who then finally relayed that information back to SW-3, as detailed in the calls below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 12:20:06 | 0:00:30 |
| 3/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 12:27:00 | 0:04:00 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | Perfetto, Mike (Taro) | 12:47:00 | 0:01:00 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 12:49:00 | 0:09:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 14:16:00 | 0:03:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:18:00 | 0:01:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:25:00 | 0:05:00 |

3663.  After speaking with Aprahamian for the third time on March 11, 2013, SW-3 called SW-1 and left him a voicemail, and, in accordance with the agreement between the cartel members, Sandoz bid on Fluocinonide Ointment at ABC and Taro promptly conceded the business.

3664.  A few months later, in July of 2013, Teva co-ordinated with Taro and Sandoz to raise the WAC price of all four formulations of Fluocinonide (cream, emollient-based cream, gel, and ointment) by between 10-17%, based in part on

discussions between Patel and Taro's Aprahamian and Taro's agreement to join Teva's pricing.

3665.  As of May of 2014, only Defendants Teva, Taro, and Sandoz were making any of the four Fluocinonide formulations identified above; Taro had the dominant market share in several of these formulations.

3666.  On May 14, 2014, Patel and Aprahamian were texting and had a short telephone call, in which Aprahamian told Patel that Taro wanted to increase prices on its Fluocinonide formulations – communications for which there was no reason other than the co-ordination sometimes required by Defendants' overarching conspiracy.

3667.  Shortly thereafter, Patel ordered another Teva employee to create a spreadsheet for price increases of products, including the four Fluocinonide formulations.  Two weeks later, knowing that Taro's price increases were soon to be implemented – **_but before they had been revealed to customers or others outside Taro_** – Patel received the spreadsheet, including reference to Taro's upcoming price increase for the Fluocinonide formulations.

3668.  A few weeks later, on Monday, June 2, 2014, Taro notified its customers that as of the next day, Tuesday, June 3, 2014, Taro was implementing a dramatic WAC price increase, as follows:  the price of the cream at least tripled, and in some cases, increased more than seven-fold; the emollient-based cream at least doubled, and in some cases, more than tripled; the gel at least doubled, and in some cases, more

than tripled; and the price of the ointment at least doubled, and in some cases, went up almost five-fold – all literally overnight.

3669.  Patel knew of these (and other) Taro increases well in advance, and was prepared so that Teva would be able to quickly follow the price increases.  Indeed, it was Teva's turn to go next, and Patel was already preparing the next round of price increases, to be implemented by Teva in August.

3670.  The day the Taro increases on Fluocinonide became effective, on June 3, 2014, CVS reached out to T.C., a senior sales executive at Teva, indicating that it wanted bids on Fluocinonide 0.05% Cream and Fluocinonide 0.05% Emollient Cream, offering to move a significant amount of business from Taro to Teva, but did not give a reason for providing that opportunity to Teva.  However, Patel knew the reason for the offer:  because of Taro's (not-publicly known) price increase.  K.G. at Teva noted that this was a good opportunity to take some share from Taro – the market share leader on several of the Fluocinonide formulations – but because of Defendants' overarching anticompetitive agreement, including the previous communication between Patel and Aprahamian, Teva did not give CVS a bid lower than Taro's newly-increased price.

3671.  Similarly, the next day, June 4, Teva received a bid request from another large customer, Walmart.  Shortly after that e-mail was forwarded to her, Patel responded by making it clear that Teva would play nice in the sandbox with Taro.  As a result, Teva did not submit a bid on the Walmart business at all.

3672.  The following week, on June 13, 2014, Patel sent an internal e-mail to her group (which included her boss, K.G.) a list of drugs to increase prices on, including Teva's Fluocinonide formulations, and gave them instructions which meant they were ***not*** to compete with Defendants Zydus or Taro for Fluocinonide accounts, even if/when approached by those companies' customers.

3673.  As Teva was planning to implement its price increase to follow Taro, on both June 17 and Thursday, June 19, 2014, Patel spoke to Aprahamian for approximately a quarter-hour.  In addition, she spoke with Kevin Green (now at Zydus) for a similar length of time.

3674.  These successful calls understate the telephone-tag efforts that Patel, Aprahamian, and Green made to communicate with each other:  there were actually at least 10 calls between them, beginning with calls from Patel to Aprahamian at 8:38 am and from Patel to Green, three minutes later, at 8:41 am – but those calls were very short, of only a few seconds duration, suggesting that neither Aprahamian nor Green were available to answer.

3675.  That afternoon, at 1:56 pm and 2:08 pm, Aprahamian and Green each called back to Patel – but again, for no more than a few seconds' duration.  Then, in less than a minute – because both calls were for the same purpose, but with different competitors – Patel called both Aprahamian and Green back, one after the other, at 2:24 and 2:25 pm, and again, only for a few seconds.  Then Aprahamian called Patel unsuccessfully at 3:40 pm, and finally, at 4:01 pm, they connected, and spoke for

approximately a quarter of an hour.  Clearly, this call was important to them.  Shortly thereafter, at 4:23 pm, Patel called Green again, also for only a few seconds, and finally, at 5:24 pm, Patel and Green connected, and spoke for approximately a quarter of an hour.

3676.  Their efforts to speak were not in vain:  on the Monday following this flurry of calls, June 23, Patel sent a spreadsheet with Taro pricing information in it to a Teva colleague.  The spreadsheet included prices for the different Fluocinonide formulations for different types of customers, such as GPO's, wholesalers, retailers, etc.  These contract prices came from Aprahamian and were not publicly available.

3677.  Taro was also co-ordinating with its co-conspirator Sandoz, the only other Fluocinonide maker.  Sandoz made both the gel and ointment formulations, but actively marketed only the gel because it was leaving the ointment market. Aprahamian (at Taro) spoke with SW-3 at Sandoz at least once on each of June 17-20, including three calls (further including a ten-minute call) on June 20, meaning that on both June 17 and 19, Aprahamian spoke with both Patel and SW-3.

3678.  As he had done with Patel, during one of the calls with SW-3 on June 20 (likely the 10-minute call), Aprahamian gave his company's non-public pricing information to a nominal "competitor" and co-conspirator, which SW-3 wrote down for the purpose of having Sandoz follow them, which Sandoz in fact did:  three months later, on October 10, 2014, Sandoz raised the WAC price on its Fluocinonide gel product almost five-fold.

3679.  No shortages or other market features can explain Defendants' price increases for Fluocinonide during the Relevant Period.

3680.  The elevated prices of Fluocinonide resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3681.  The unlawful agreement among Teva, Taro, and Sandoz regarding Fluocinonide was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### ED.   Desogestrel and Ethinyl Estradiol

3682.  Generic tablets containing a combination of Desogestrel and Ethinyl Estradiol ("Desogestrel and Ethinyl Estradiol tablets") are used as an oral contraceptive.

3683.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Desogestrel and Ethinyl Estradiol tablets as follows, beginning at least as early as May 2014:

3684.  During the Relevant Period, Defendants Teva, Actavis and Glenmark dominated the market for Desogestrel and Ethinyl Estradiol tablets.

3685.  From at least May, 2014, forward, Teva, Actavis and Glenmark monitored their Fair Share agreement on Desogestrel and Ethinyl Estradiol tablets to ensure that market shares remained relatively equal.  They frequently communicated by phone to facilitate this process.

3686.  For example, during the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for its own version of Kariva (known as Viorele) at a large retail pharmacy purchaser. This triggered a flurry of communications between Patel and at least three different Glenmark representatives, including Jim Brown (VP of Sales), Jim Grauso (Executive VP of Commercial Operations), and another sales and marketing executive.

3687.  Patel also spoke with Rogerson at Actavis that same day (May 19).  In fact, Patel was regularly in contact with Rogerson throughout May.  They spoke on at least May 8, 9, 12, 19 and 22.

3688.  After communicating with Glenmark and Actavis, Patel decided that Teva would not compete on price.  Instead, it would bid high, thereby ensuring that the large retail pharmacy business would go to Glenmark.

3689.  No shortages or other market features can explain Defendants' price increases for Desogestrel and Ethinyl Estradiol tablets during the Relevant Period.

3690.  The elevated prices of generic Desogestrel and Ethinyl Estradiol tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will

continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3691.  The unlawful agreement among Defendants Teva, Actavis and Glenmark, regarding generic Desogestrel and Ethinyl Estradiol tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EE.   Warfarin, Carbamazepine, and Clotrimazole

3692.  Generic Warfarin ("Warfarin") is an anticoagulant for blood.  The active molecule was discovered in the 1940's.  It was approved by the FDA in 1954 and has been commercially available in the United States ever since.  It was prescribed for then-President Eisenhower in 1955.  It is commonly used to help prevent strokes and other cardiac events and to treat blood clots, such as deep vein thrombosis.

3693.  The market for generic warfarin is mature.  Warfarin has been commercially available in the United States in a generic form for decades.

3694.  Generic Carbamazepine ("Carbamazepine") is an anticonvulsant medication used primarily in the treatment of epilepsy and neuropathic pain, and is used in schizophrenia along with other medications and as a second-line agent in bipolar disorder.  It was first approved by the FDA in 1968.

3695.  The market for generic Carbamazepine is mature.  Carbamazepine has been commercially available in the United States in a generic form for decades.  As a result, the price of Carbamazepine tablets had been low and stable for years.  For

example, throughout 2012, the WAC price for Carbamazepine ER tablets (sold by Sandoz and Taro) was just under 80 cents per 200 mg tablet.

3696.  Generic Clotrimazole ("Clotrimazole") is an antifungal medication. It is used to treat vaginal yeast infections, oral thrush, and certain types of ringworm, including those that cause athlete's foot and jock itch.

3697.  The market for generic clotrimazole is mature.  Clotrimazole has been commercially available in the United States in a generic form for decades.

3698.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of generic Warfarin, Carbamazepine, and Clotrimazole, as follows:

3699.  As of May, 2014, there were three suppliers in the market for Warfarin: Teva, Taro and Zydus.

3700.  During the Relevant Period, Taro, Teva, and Sandoz dominated the market for Carbemazepine, as follows:  Taro and Sandoz dominated sales of Carbamazepine ER tablets; Taro, Teva, and Sandoz dominated sales of regular Carbamazepine tablets; and Taro and Teva dominated sales of chewable Carbamazepine tablets.

3701.  In the spring of 2013, Taro, which marketed and sold all three types of Carbamazepine tablets—ER, regular and chewable—led co-ordinated price increases on each of those products.  First, it attacked the ER market, which it shared with Sandoz, as follows:

3702.  On May 16, 2013, a senior sales executive at Taro (who will be referred to in this Complaint as TW-1/CW-1) and SW-4 (the previously-described Sandoz senior sales executive) had a telephone call, and spoke again the following day.

3703.  On these calls, TW-1 and SW-4 discussed increasing the price of Carbamazepine in accordance with the cartel's overarching agreement.

3704.  Following these calls between TW-1 and SW-4, within the next two weeks, Taro and Sandoz both increased their prices.  They announced increased identical list (WAC) prices, increased by almost 50%, to $1.10 – and, per Defendants' overall conspiracy, Taro and Sandoz retained relatively stable market shares.

3705.  In the spring and early summer of 2014, Taro imposed a second price increase on Carbamazepine ER tablets, which Sandoz, again, quickly followed.

3706.  Next, during the same period, Taro also led price increases on the other two Carbamazepine products that it sold, regular tablets and chewable tablets.

3707.  On May 14, 2014, Patel and Aprahamian exchanged eight text messages and had one phone conversation lasting just under five minutes.  Thereafter, Patel directed a colleague at Teva, T.S., to create a list of future price increase candidates, based on a set of instructions and data she provided.

3708.  On May 28, 2014, T.S. then sent Patel the requested list of "2014 Future Price Increase Candidate Analysis."  The list included several drugs sold by Taro, including Carbamazepine, Clotrimazole, and the four formulations of Fluocinonide just discussed, all with "Follow/Urgent" listed as the reason for the increase, *even*

**though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so**.

3709.  A few days later, on June 3, 2014, Taro increased prices on, *inter alia*, Warfarin, Carbamazepine, Clotrimazole, and Fluocinonide – and Patel and Aprahamian exchanged five text messages.  After exchanging those text messages, Patel confirmed to her boss K.G., and another Teva colleague, that Taro had raised its pricing on these drugs.  Patel added:  "I'll be looking at shares and intel tomorrow and will provide commentary."  She also noted that "Taro is a high-quality competitor.  It's just a matter of who the others are.)"

3710.  By "high-quality competitor," Patel meant – and K.G. understood – that Taro was a reliable member of the cartel, who, like Teva, would not cheat on Defendants' overarching conspiracy by trying to cadge a little extra market share.

3711.  June 3 was a busy day for Defendants.  In addition to declining the substantial CVS fluocinide business, described *supra*, Teva still had to co-ordinate its response with other cartel members.  Thus, at 5:08 pm that evening, Patel called Aprahamian and the two spoke for nearly seven minutes.  The next morning, Patel and Aprahamian exchanged text messages.  Then, at 9:56am, the two spoke again for a little less than a half hour.  Shortly after hanging up the phone with Aprahamian, Patel sent an e-mail to K.G., making it clear that she had obtained additional "intel" regarding the Taro price increases – and that she did not want to put them into writing:  "I have additional intel (I can discuss with you) that will be useful."

3712.  In addition, Patel e-mailed that "We should probably discuss how we want to handle all Taro increase items.  Taro is a high quality competitor – I think we need to be responsible where we have adequate market share."  By the coded phrase "high quality competitor," Patel again meant – and K.G. understood – that Taro was a reliable member of the cartel who would not compete against Teva on price.  By the coded phrase, "we need to be responsible where we have adequate market share," Patel meant – and K.G. understood – that, per Defendants' cartel's usually-unwritten (but strictly enforced) rules, Teva should not bid below the prices offered by its nominal competitors (and fellow cartel-members) and should actively decline additional busines opportunities once it had achieved the cartel's "fair" per-member share.

3713.  The following week, on June 11, Aprahamian (Taro), Patel (Teva) Rekenthaler (Teva), and Green (Zydus) again played telephone tag:  under the cover of darkness, at 4:30 am, Green called Rekenthaler and they spoke for eight minutes; then, that afternoon, Patel called Green, and a few minutes later, Green returned the call, and they spoke for a quarter of an hour.  The following day, June 12, Patel called Aprahamian just before 8:00 am and they spoke for just under ten minutes.

3714.  The very next day, June 13, 2014, Green (at Zydus) called Patel (at Teva), just after 8:15 am, and they spoke until nearly 8:30 am – and Zydus raised its price on Warfarin tablets.

3715.  Later that same day, a customer gave Teva an offer for a one-time buy on Warfarin; Patel responded, "We will review, but note that we intend to follow [the] Taro and Zydus increase price."  Later that same day, Patel sent an internal e-mail alerting her group, including her boss, K.G., about a list of drugs on which Teva planned to raise prices.  A number of them – including Carbamazepine, Clotrimazole Topical Solution, Warfarin Tablets, and Fluocinonide Cream, Emollient Cream, Gel and Ointment – included the notation "Follow/Urgent – Taro" as the reason for the increase.

3716.  For that list of drugs, Patel directed that "we should not provide any decreases on these products."  This meant Teva would not seek to compete for market share against Taro or Zydus when approached by customers due to those cartel members' price increases.

3717.  On August 28, 2014, Teva followed the Taro price increases on Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, and Warfarin Sodium Tablets.  As discussed more fully *supra*, Teva co-ordinated those increases with Taro and Zydus through direct communications with those competitors in the days leading up to the increase.

3718.  Between May and July of 2014, Taro's Aprahamian texted or spoke with Nisha Patel of Teva multiple times.  Shortly after the initial part of that series of calls, in June, 2014, as with its ER tablets, Taro announced price increases on its other two Carbamazepine tablet formulations.  Over the following three months, Apotex, Teva

and Torrent announced increased list prices that were identical to Taro's new prices, so that by mid-2015, the WAC price for a 200 mg tablet of the ER formulation had soared to almost $1.70 – more than doubling from May, 2013.

3719.  This price that prevailed through at least mid-2019, the last period for which sales figures were readily available.  The NSP prices for this product followed a similar trajectory.

3720.  Similarly, the regular and chewable formulations more than doubled, and in some cases increased ten-fold.

3721.  For example, as a result of Defendants' anticompetitive agreements, the WAC price of 200 mg Carbamazapine tablets had soared to over $1.30 per tablet – an exorbitant increase in price that, except for Torrent, continues through at least July, 2019, the last period for which prices were readily available.

3722.  No shortages or other market features can explain Defendants' price increases for Warfarin, Carbamazepine, or Clotrimazole during the Relevant Period.

3723.  The elevated prices of Warfarin, Carbamazepine, and Clotrimazole resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused Plaintiffs to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3724.  The unlawful agreements among Teva, Taro, Sandoz, Torrent, and Zydus regarding Warfarin, Carbamazepine, and/or Clotrimazole were part of all

Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**EF.   Allopurinol**

3725.   Generic Allopurinol ("Allopurinol") is used to prevent gout and kidney stones.  It was first synthesized in 1956 and has been commercially available in the United States since the 1960's.

3726.   The market for generic allopurinol is mature.  Allopurinol has been commercially available in the United States in a generic form for decades.  As a result, for years, prices for Allopurinol were relatively low and stable.  Par, Actavis, Dr. Reddy's and Mylan all offered prices for Allopurinol tablets for pennies each. Reflecting the compound's straightforward chemistry and the mature generic market – the *list* (aka WAC or "sticker") price – ***from which discounts were typically offered*** – for, *e.g.*, a 100 mg table of allopurinol was, for years, including from 2011 through 2013, approximately five to six cents.

3727.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Allopurinol, as follows:

3728.   During the Relevant Period, Defendants Actavis, Dr. Reddy's, Mylan and Par dominated the market for generic Allopurinol, which was and is sold in 100 mg and 300 mg tablets.

3729.  In 2012, because of the lack of significant profitability in this pricing structure, Dr. Reddy's exited the market, without price disruption.

3730.  However, in the spring of 2014, all of that changed.  Par and Actavis used brief supply disruptions as a reason to impose enormous price increases, which they did almost simultaneously.  Actavis and Par *quintupled* their list prices – pricing which remained in effect at least as recently as July of 2019, the last period for which figures were readily available.

3731.  Approximately six months after Actavis and Par announced their price increases, Mylan joined them, announcing list prices identical to those of Actavis.

3732.  These price spikes attracted Dr. Reddy's attention, and it began to assess whether it should re-enter the Allopurinol market – but just to get its "fair share," not to engage in unseemly price competition, which would draw the wrath of its fellow cartel members.

3733.  Thus, in August, 2014, Dr. Reddy's assessed possible re-entry into the Allopurinol market. Since it would be the fourth manufacturer in the market, the Head of National Accounts at Dr. Reddy's recognized – in line with the Fair Share agreement – that cartel rules would cap Dr. Reddy's market share at 25%, or ¼ of the market, an even division among the four manufacturers.

3734. Dr. Reddy's decided to re-enter the Allopurinol market.  As it ramped up for re-entry in January, 2015, Dr. Reddy's conscientiously followed the cartel's Fair Share terms. For example, even though it was now a new entrant without any

incumbent business, rather than offer better prices to win market share, Dr. Reddy's announced list prices identical to those of Actavis.

3735.  Further, as Dr. Reddy's internally discussed an Allopurinol opportunity at a large customer, the Vice President and Head of Prescription Drugs reminded his team to be careful not to disrupt pricing.

3736.  Dr. Reddy's was similarly scrupulous in abiding by the cartel's Fair Share agreement when, two months later, the opportunity arose to take some Allopurinol market share from Mylan.  The Dr. Reddy's plant operations team said it could supply the additional volume.  The Director of Prescription Marketing for North America Generics noted that he was hesitant to take much business from Mylan.

3737.  Dr. Reddy's Director of National Accounts then left him a voicemail to the effect that it was a bad idea to upset their relationship with Mylan.  Having heard this message, the Director of Prescription Marketing instructed his team not to pursue the Mylan customers, after all.

3738.  Further, no product shortages or other market features can explain Defendants' elevated pricing of Allopurinol during the Relevant Period.

3739.  The pricing conduct here, as with all Drugs at Issue discussed in this Complaint, is inconsistent with competitive behavior.  In a competitive market, as multiple sellers enter the market, prices decline, but that is not what happened here.  Instead, because of the overarching anticompetitive agreement among Defendants, Allopurinol prices increased despite multiple sellers being in, and Dr. Reddy's re-

entering, the market.  Pricing will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3740.  The elevated prices of Allopurinol resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3741.  The unlawful agreement between Actavis, Dr. Reddy's, Mylan and Par regarding Allopurinol was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EG.   Eplerenone Tablets

3742.  Generic Eplerenone tablets ("Eplerenone") are used alone or in combination with other medicines to treat high blood pressure by blocking a chemical (aldosterone) in the body, which in turn lowers the amount of sodium and water the body retains.

3743.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Eplerenone, as follows:

3744.  As of spring 2014, Sandoz and Greenstone were the only generic manufacturers of Eplerenone Tablets.

3745.  As discussed above, while Greenstone was co-ordinating with Sandoz in April, 2014, to follow Sandoz's price increases on various formulations of Clindamycin, it was also co-ordinating to lead a price increase on Eplerenone Tablets.

3746.  Originally, Greenstone planned its Eplerenone price increase to become effective on May 1, 2014, but in mid-April, that increase was delayed.  Shortly after the decision was made to delay the Eplerenone price increase, on April 22, 2014, Nailor of Greenstone called Kellum and left a message. They traded voicemails until they were able to speak the next day for approximately a quarter-hour.

3747.  Greenstone planned its increases of Clindamycin and Eplerenone together, as it was co-ordinating with Sandoz.  Both increases ultimately became effective on June 2, 2014. Shortly before the increases became effective, on May 29, Nailor (Greenstone) called Kellum ( Sandoz), leaving him a short voice-mail.

3748.  Sandoz's intent was always to follow Greenstone's Eplerenone price increase, rather than compete for market share.  Sandoz began preparing to follow Greenstone's Eplerenone price increase at least as early as July, 2014.  However, because of price protection terms with several of Sandoz's customers, the company decided to delay the roll-out of its Eplerenone price increase (and several others) until Sandoz could limit any contractual penalties that resulted from the increase.

3749.  Ultimately, Sandoz followed Greenstone's price increase on Eplerenone on October 10, 2014.  Sandoz increased its pricing by as much as 270% to certain customers.  During the time period after Greenstone's price increase and before

Sandoz could follow, the two co-conspirators continued to co-ordinate by phone, including a number of calls between Kellum (Sandoz) and Hatosy (Greenstone) in August, 2014.  Shortly after the Sandoz price increase became effective, on October 15, 2014, Kellum and Nailor also communicated briefly.

3750.  No shortages or other market features can explain Defendants' price increases for generic Eplerenone during the Relevant Period.

3751.  The elevated prices of generic Eplerenone resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3752.  The unlawful agreement among Defendants Sandoz and Greenstone, regarding generic Eplerenone, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EH.  Atenolol Chlorthalidone

3753.  Generic Atenolol Chlorthalidone is sold in generic 50-25 mg and 100-25 mg tablets ("Atenolol Chlorthalidone"), and is a combination beta-blocker/water pill that is used to treat high blood pressure.

3754.  The market for Atenolol Chlorthalidone was mature before the start of the Relevant Period.  As a result, for years, the price of generic Atenolol Chlorthalidone was relatively low and stable.

3755.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Atenolol Chlorthalidone at least as follows:

3756.  During the Relevant Period, Actavis and Mylan dominated the market for Atenolol Chlorthalidone.

3757.  In the spring of 2014, the pricing of Atenolol Chlorthalidone changed suddenly and dramatically.  Mylan more than doubled the WAC price of Atenolol Chlorthalidone overnight and shortly thereafter, Actavis followed suit, only for the pattern to repeat itself, to achieve a quadrupling in price:  for Mylan, by early 2015, and for Actavis, by mid-2017 – well ***after*** the earliest cases in this MDL had been filed.  These anticompetitively-increased prices were in effect at least as recently as mid-2019, the last period for which figures were readily available, and unless enjoined by this Court, will continue indefinitely into the future.

3758.  By the end of 2014, list (WAC) prices for both Actavis and Mylan had more than doubled, and their contract prices had followed suit.  Their WAC prices converged at 60 cents per unit – whereupon, a few months later, in early 2015, Mylan increased again – to almost a dollar per unit, and Actavis, in mid-2017, at 80 cents.

3759.  As both manufacturers raised their prices, they divided the market between them.  Whenever market share diverged from a roughly equal split (as happened in a couple of instances when Mylan experienced supply disruptions), they afterwards worked back to approximately a 50/50 division of the market – all the while being careful not to erode pricing.

3760.  Throughout this period, Actavis and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Atenolol Chlorthalidone and of Defendants' cartel agreement.

3761.  For example, Nesta (at Mylan) and Falkin (at Actavis) communicated extensively throughout the time of the price increases.

3762.  No shortages or other market features can explain Defendants' price increases for Atenolol Chlorthalidone during the Relevant Period.

3763.  The elevated prices of Atenolol Chlorthalidone resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3764.  The unlawful agreement between Mylan and Actavis regarding Atenolol Chlorthalidone was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## EI.   Prochlorperazine Tablets

3765.   Generic Prochlorperazine is a medication used to treat psychotic disorders such as schizophrenia, as well as control severe nausea.

3766.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Prochlorperazine tablets ("Prochlorperazine"), as follows, beginning at least as early as May, 2014:

3767.   During the Relevant Period, Defendants Teva, Mylan, Sandoz and Cadista dominated the market for Prochlorperazine.

3768.   Prochlorperazine was among the drugs that Teva targeted for price increases in late August, 2014.  In order to co-ordinate prices and Fair Shares for Prochlorperazine, Teva communicated with each of the other primary manufacturers in the market, *viz.* Mylan, Sandoz, and Cadista – Teva's co-conspirators.

3769.   For example, Teva's Patel communicated frequently with the Associate Director of Pricing at Sandoz in July, August, and September, 2014.

3770.   Likewise, Teva's Rekenthaler spoke to M.D., Vice President of Sales at Cadista, on at least June 18, 2014.  And he spoke to Nesta at Mylan on June 24 and at least four times in August (on the 7th, 11th, 18th, and 21st).

3771.   Nesta (at Mylan) also communicated with M.D. at Cadista, on at least July 2, 30, 31 and August 7, 11, 21, 22 and 23.

3772.  No shortages or other market features can explain Defendants' price increases for generic Prochlorperazine tablets during the Relevant Period.

3773.  The elevated prices of generic Prochlorperazine tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3774.  The unlawful agreement among Defendants Teva, Mylan, Sandoz and Cadista, regarding generic Prochlorperazine tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**EJ.    Ursodiol**

3775.  Generic Ursodiol is sold in capsules and tablets ("Ursodiol"), including a 300 mg capsule formulation, and is used to treat gallstones.

3776.  The market for generic Ursodiol is mature.  Ursodiol is not an innovative product and has been commercially available in the United States in a generic form for decades.

3777.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Ursodiol at least as follows:

3778.  By 2011, the generic Ursodiol market was dominated by four companies: Actavis, Epic, Lannett, and Teva.  Teva had a 22% market share in 2011 and exited the market in 2012, resulting in that share going to its co-conspirators by 2013, who continued to dominate the generic Ursodiol market throughout the Relevant Period.

3779.  Market dynamics had caused Ursodiol prices to stabilize and remain relatively low from at least January, 2011, until Defendants collusively raised their prices in May, 2014.

3780.  Defendants' price increases of May, 2014, represented a departure from the stable pricing of prior years and from ordinary pricing practices, and were the direct result of Defendants' collusion.

3781.  Ursodiol sales data from NADAC show the low and stable prices of Ursodiol characteristic of the market prior to the Defendants' price hikes, and the huge spike in price that occurred abruptly in May, 2014.  Since that time, Defendants have continued to charge supracompetitive prices.

3782.  The NADAC data show that the average price of Ursodiol increased rapidly in a very short period of time.  The chart below shows the average price per unit (capsule) of generic Ursodiol between October, 2012, and December, 2016:



3783.  As the chart illustrates, starting in May, 2014, the average price of Ursodiol shot up by more than 1,600%, from an average price of approximately 29 cents (pennies) per capsule in June, 2014, to almost $5 per capsule, four months later.

3784.  IMS Health NSP data also show that Defendants' prices soared, when examining Defendants' net effective prices in the market.

3785.  As with Verapamil HCL, *supra*, another drug manufactured by Defendant Actavis (*inter alia*) further evidence of Defendants' collusion is the fact that not only did their prices suddenly skyrocket simultaneously, but as they did so, their rather different starting prices converged.  For example, in April, 2014, Epic's WAC was 45 cents for a 300 mg capsule, while Actavis's price was significantly higher, over 71% more:  77 cents per 300 mg capsule.

3786.  Lannet was the first manufacturer to announce the new WAC, $5.11 **per capsule**, on May 1, 2014.  The following week, Epic announced its new WAC: essentially the same, $5.10 per capsule, which is a staggering 1,033% overnight increase.  The next month, it was Actavis's turn to announce its new price, which was **also** $5.11 per capsule – but while the conspirators' final price was the same, it amounted to a relatively smaller 562% increase.

3787.  As a result of Defendants setting this collusive price, the market went from having a 42%-71% variation between high and low WAC's, to having a 0.2% variation.[52]

3788.  Defendants' price increases for Ursodiol resulted in corresponding increases to the prices paid by Plaintiffs.

3789.  The price increases closely followed Defendants' participation in the 2014 ECRM-sponsored "Retail Pharmacy Generic Pharmaceuticals Efficient Program Planning Session (EPPS)", which was held in Amelia Island, Florida on February 23-26, 2014 – just over two months before Defendants began to increase their prices for Ursodiol.  According to ECRM records, representatives of Actavis, Epic, and Lannett attended the meeting.

3790.  No shortages or other market features can explain Defendants' price increases for Ursodiol during the Relevant Period.

---

[52] Prior to the $5.11 per capsule price, Lannett did not publish a WAC.

3791.  The elevated prices of Ursodiol resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3792.  The unlawful agreement among Lannet, Epic, and Actavis regarding Ursodiol was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**EK. Clobetasol**

3793.  Generic Clobetasol is a widely-prescribed topical corticosteroid used for the treatment of a variety of skin conditions. Clobetasol propionate products, including the emollient version of the cream, were approved by the FDA in the 1980's and 1990's.  Generic Clobetasol is sold throughout the United States.

3794.  As with all the other Drugs at Issue described in this Complaint, the market for Clobetasol is mature, so manufacturers can gain market share by only competing on price.  As a result, Clobetasol prices remained relatively low and stable from at least 2011 through 2013.

3795.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Clobetasol ("Clobetasol"), as follows:

3796.  Several manufacturers exited the Clobetasol market before Defendants' June, 2014, price increases.  For example, Renaissance and Teva discontinued their Clobetasol products.

3797.  At all relevant times, Defendants have had substantial market power with respect to Clobetasol.  Defendants exercised this power to maintain supracompetitive prices for Clobetasol without losing so many sales as to make the elevated price unprofitable.

3798.  Defendants sold Clobetasol at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

3799.  Defendants' June 2014 price increases represented a departure from the stable pricing of prior years and from ordinary pricing practices, and are indicative of collusion.

3800.  NADAC data for Clobetasol show the low and stable prices of Clobetasol that were characteristic of the market prior to the Defendants' price hikes, as well as the huge spike in price that occurred abruptly in June, 2014. Since that time, Defendants have continued to charge supracompetitive prices.  Starting in June of 2014, the average price of Clobetasol increased by approximately 1,144%, with certain formulations increasing as much as 1,738%.

3801.  The market-wide Clobetasol price increases were the result of Defendants Sandoz, Taro, and Wockhardt increasing their Clobetasol prices at substantially the same time to substantially similar levels in the summer of 2014.

3802. While Perrigo modified the price of its Clobetasol gel product, it would not have been rational for Perrigo to do so unless it had joined the anticompetitive agreement among the other Defendants.

3803. And when Actavis entered the Clobetasol cream market it sold both products at elevated prices and did not compete with the other sellers on price, which it would not have done had it not also joined the conspiracy.

3804. Each Defendant raised their WAC prices to essentially the same level at nearly the same time.

3805. The following charts—which rely on WAC data—similarly show Defendants co-ordinating WAC pricing, moving from substantially different pricing, by very different percentages, to arrive at identical WAC prices:

| Clobetasol Emollient Cream | | | | | | |
|---|---|---|---|---|---|---|
| Strength | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| 15gm | Taro | 51672-1297-01 | $0.50 | $3.63 | 3-Jun-14 | 621% |
| | Sandoz | 00168-0301-15 | $1.20 | $3.63 | 18-Jul-14 | 203% |
| | Hi-Tech | 50383-0270-15 | $0.47 | $3.63 | 9-Aug-14 | 673% |
| 30gm | Taro | 51672-1297-02 | $0.38 | $3.63 | 3-Jun-14 | 864% |
| | Sandoz | 00168-0301-30 | $0.88 | $3.63 | 18-Jul-14 | 314% |
| | Hi-Tech | 50383-0270-30 | $0.33 | $3.63 | 9-Aug-14 | 1,001% |
| 60gm | Taro | 51672-1297-03 | $0.33 | $3.63 | 3-Jun-14 | 1,011% |
| | Sandoz | 00168-0301-60 | $0.80 | $3.63 | 18-Jul-14 | 356% |
| | Hi-Tech | 50383-0270-60 | $0.37 | $3.63 | 9-Aug-14 | 876% |

| Clobetasol Cream | | | | | | |
|---|---|---|---|---|---|---|
| Strength | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| 15gm | Taro | 51672-1258-01 | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| | Sandoz | 00168-0163-15 | $0.73 | $6.84 | 18-Jul-14 | 833% |
| | Hi-Tech | 50383-0267-15 | $0.37 | $6.84 | 9-Aug-14 | 1,732% |
| | Actavis | 00472-0400-15 | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | 51672-1258-02 | $0.33 | $6.84 | 3-Jun-14 | 1,993% |
| | Sandoz | 00168-0163-30 | $0.50 | $6.84 | 18-Jul-14 | 1,268% |
| | Hi-Tech | 50383-0267-30 | $0.32 | $6.84 | 9-Aug-14 | 2,026% |
| | Actavis | 00472-0400-30 | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | 51672-1258-06 | $0.33 | $6.84 | 3-Jun-14 | 1,971% |

| Clobetasol Cream | | | | | | |
|---|---|---|---|---|---|---|
| Strength | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| | Sandoz | 00168-0163-46 | $0.59 | $6.84 | 18-Jul-14 | 1,057% |
| | Hi-Tech | 50383-0267-45 | $0.31 | $6.84 | 9-Aug-14 | 2,138% |
| | Actavis | 00472-0400-45 | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | 51672-1258-03 | $0.32 | $6.12 | 3-Jun-14 | 1,832% |
| | Sandoz | 00168-0163-60 | $0.50 | $6.12 | 18-Jul-14 | 1,124% |
| | Hi-Tech | 50383-0267-60 | $0.29 | $6.12 | 9-Aug-14 | 2,016% |
| | Actavis | 00472-0400-60 | * | $6.12 | 10-Mar-15 | * |
| Clobetasol Gel | | | | | | |
| Strength | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| 15gm | Taro | 51672-1294-01 | $0.60 | $8.87 | 3-Jun-14 | 1,367% |
| | Sandoz | 00168-0293-15 | $1.16 | $8.87 | 18-Jul-14 | 665% |
| | Hi-Tech | 50383-0269-15 | $0.60 | $8.87 | 9-Aug-14 | 1,387% |
| 30gm | Taro | 51672-1294-02 | $0.42 | $7.41 | 3-Jun-14 | 1,667% |
| | Sandoz | 00168-0293-30 | $0.79 | $7.41 | 18-Jul-14 | 840% |
| | Hi-Tech | 50383-0269-30 | $0.39 | $7.41 | 9-Aug-14 | 1,809% |
| 60gm | Taro | 51672-1294-03 | $0.50 | $7.41 | 3-Jun-14 | 1,847% |
| | Sandoz | 00168-0293-60 | $0.73 | $7.41 | 18-Jul-14 | 922% |
| | Hi-Tech | 50383-0269-60 | $0.35 | $7.41 | 9-Aug-14 | 2,008% |

| Clobetasol Ointment | | | | | | |
|---|---|---|---|---|---|---|
| Strength | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| 15gm | Taro | 51672-1259-01 | $0.38 | $8.29 | 3-Jun-14 | 2,063% |
| | Sandoz | 00168-0162-15 | $0.73 | $8.29 | 18-Jul-14 | 1,031% |
| | Hi-Tech | 50383-0268-15 | $0.37 | $8.29 | 9-Aug-14 | 2,121% |

| Clobetasol Ointment | | | | | | |
|---|---|---|---|---|---|---|
| Strength | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| 30gm | Taro | 51672-1259-02 | $0.33 | $6.93 | 3-Jun-14 | 2,020% |
| | Sandoz | 00168-0162-30 | $0.50 | $6.93 | 18-Jul-14 | 1,285% |
| | Hi-Tech | 50383-0268-30 | $0.32 | $6.93 | 9-Aug-14 | 2,053% |
| 45gm | Taro | 51672-1259-06 | $0.33 | $7.38 | 3-Jun-14 | 2,135% |
| | Sandoz | 00168-0162-46 | $0.59 | $7.38 | 18-Jul-14 | 1,149% |
| | Hi-Tech | 50383-0268-45 | $0.31 | $7.38 | 9-Aug-14 | 2,316% |
| 60gm | Taro | 51672-1259-03 | $0.32 | $6.93 | 3-Jun-14 | 2,087% |
| | Sandoz | 00168-0162-60 | $0.50 | $6.93 | 18-Jul-14 | 1,285% |
| | Hi-Tech | 50383-0268-60 | $0.29 | $6.93 | 9-Aug-14 | 2,295% |

| Clobetasol Solution | | | | | | |
|---|---|---|---|---|---|---|
| Strength | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
| 25 ml | Taro | 51672-1293-02 | $0.50 | $3.30 | 3-Jun-14 | 562% |
| | Hi-Tech | 50383-0266-25 | $0.48 | $3.30 | 9-Aug-14 | 588% |
| | Morton Grove | 60432-0133-25 | $0.25 | $2.60 | 2-Sep-14 | 932% |
| | Actavis | 00472-0402-25 | * | $3.30 | 22-Jun-15 | * |
| 50ml | Taro | 51672-1293-03 | $0.48 | $3.30 | 3-Jun-14 | 587% |
| | Sandoz | 00168-0269-50 | $0.64 | $3.30 | 18-Jul-14 | 416% |
| | Hi-Tech | 50383-0266-50 | $0.46 | $3.30 | 9-Aug-14 | 618% |
| | Morton Grove | 60432-0133-50 | $0.25 | $2.60 | 2-Sep-14 | 953% |
| | Actavis | 00472-0402-50 | * | $3.30 | 22-Jun-15 | * |

3806.  Defendants' increases in Clobetasol WAC prices were accompanied by corresponding increases in Defendants' NSP prices.

3807.  Defendants' increases in the overall per-unit prices of Clobetasol resulted in corresponding price increases for different dosages of each formulation, e.g., 15mg or 60mg tubes of cream, or 25ml or 50ml bottles of solution.

3808.  Defendants' price increases for Clobetasol resulted in corresponding increases to the prices paid by Plaintiffs because increased WAC prices translate to increases in the transaction prices paid by Plaintiffs.

3809.  As with the other Drugs at Issue, these price increases cannot be attributed to the need to fund research and development.  Generic pharmaceutical firms do not incur the large research and development costs that brand firms absorb in developing new drugs. Moreover, the costs associated with developing and obtaining FDA approval for Clobetasol were incurred more than 25 years ago when the drug was first introduced to the market.

3810.  Changes in ingredient costs also do not explain Defendants' price increase; the prices for five formulations of clobetasol propionate not at issue in this case (foam, emollient foam, lotion, shampoo, and spray) remained comparatively stable, even though they have the same active ingredient as the formulations that experienced dramatic price increases.

3811.  As with the other Drugs at Issue, Defendants' enormous price increases were not due to supply disruptions.  With regard to drug shortages, federal law requires drug manufacturers to report potential shortages to the FDA, the reasons therefor, and the expected duration of the shortage.  Clobetasol is not included on the

FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA. Clobetasol has not appeared in the American Society of Health-System Pharmacists Current Shortage Bulletins since July 3, 2012, and it does also not appear on the list of Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010).

3812. There were also no significant decreases in Defendants' overall sales volume that might indicate a shortage in the availability of Clobetasol's active ingredient or evidence of lack of market-wide capacity. During Hi-Tech's earnings call on March 8, 2013, for example, its CEO David Seltzer stated that the company "happen[ed] to be doing a significant amount of topicals than – compared to several years ago. So we have the Clobetasol items that we pretty much brought all in-house on the manufacturing side." He also explained that the company's addition of new machinery for "creams and ointments" would give the company "a tremendous amount of capacity going forward."

3813. Defendants' Clobetasol price increases are also not explained by the entry or exit of competitors from the marketplace. No significant sellers entered or left the Clobetasol market between January, 2011, and June, 2014, and between the end of 2012 and June 2014 there was no significant shift in Defendants' relative market shares. Prior to the price increases, the same group of manufacturers— Defendants in this case—had been selling Clobetasol at the same relatively low prices for at least three years.

3814.  Likewise, no unique features or circumstances of the topical corticosteroid market explain Defendants' price increases.  Prices for many other comparable topical corticosteroid products (including certain products manufactured by Defendants) remained stable while Clobetasol prices skyrocketed. The price of halobetasol cream, for instance—which like Clobetasol is a Class I topical corticosteroid—had been stable since November 2013, ranging from an average of $2.97 and $3.38 per unit, and did not increase in June 2014.  Instead, anticompetitive activity explains the skyrocketing Clobetasol prices.

3815.  No shortages or other market features can explain Defendants' price increases for Ursodiol during the Relevant Period.

3816.  The elevated prices of generic Clobetasol resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3817.  The unlawful agreement among Defendants Actavis, Perrigo, Sandoz, Taro, and Wockhardt regarding generic Clobetasol was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EL.   Fluoxetine HCL Tablets

3818.  Generic Fluoxetine HCL tablets are used to treat depression, obsessive-compulsive disorder (OCD), and panic disorder, among other conditions.

3819.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Fluoxetine HCL tablets ("Fluoxetine HCL") as follows, beginning at least as early as June, 2014:

3820.  During the Relevant Period, Defendants Teva, Mylan, and Par dominated the market for generic Fluoxetine HCL tablets.

3821.  In late June of 2014, Mylan imposed large price increases on Fluoxetine HCL.  Around the time of the increases, Mylan, Teva and Par directly communicated via phone to co-ordinate this increase.

3822.  For example, on June 18, 2014, less than a week before Mylan announced its Fluoxetine HCL price increases, a National Account Manager at Mylan spoke to the Vice President of National Accounts at Par.

3823.  On June 24, the day after Mylan announced its price increases, Mylan's Nesta spoke to Teva's Rekenthaler.

3824.  Two days later, on June 26, Teva's Patel exchanged a series of text messages with the Chief Commercial Officer at Par.

3825.  In January 2015, Teva followed Mylan's price increases for Fluoxetine HCL Tablets. Again, the manufacturers of Fluoxetine were in communication to coordinate.

3826.  On January 5, 14 and 20, Teva's Rekenthaler spoke with Mylan's Nesta.

3827.  On January 26, Rekenthaler spoke with a Vice President of National Accounts at Par for 14 minutes, and on January 28, he spoke with Par's Vice President of Sales.

3828.  Also, in the months leading up to Teva increasing the prices of Fluoxetine HCL tablets, Teva's Patel met in-person with many of Teva's competitors. See, e.g., Exhibit A (Trade Association Contacts).

3829.  No shortages or other market features can explain Defendants' price increases for generic Fluoxetine HCL tablets during the Relevant Period.

3830.  The elevated prices of generic Fluoxetine HCL tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3831.  The unlawful agreement among Defendants Teva, Mylan, and Par, regarding generic Fluoxetine HCL tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## EM.  Methadone HCL Tablets

3832.  Generic Methadone HCL tablets ("Methadone HCL tablets") are used to manage moderate to severe pain.  They are also used to treat addiction to opioids.

3833.  During the Relevant Period, the market for Methadone HCL tablets was mature and had multiple manufacturers at all relevant times.  As a result, for years, the prices for Methadone HCL tablets were relatively low and stable.

3834.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Methadone HCL tablets as follows, beginning at least as early as June, 2014:

3835.  During the Relevant Period, Defendants West-Ward and Mallinckrodt dominated the market for generic Methadone HCL tablets.

3836.  In the second half of 2014, West-Ward and Mallinckrodt imposed nearly simultaneous, large price increases, approximately tripling their list (WAC) prices.

3837.  The list (WAC) price chart below shows the large and nearly simultaneous price increases by West-Ward and Mallinckrodt on Methadone HCL tablets[53]; NSP prices followed a similar pattern.

---

[53] Methadone HCL tablets come in 5 mg and 10 mg dosages. The pricing patterns for each dosage were highly similar. Only the 10 mg dose is included in this chart.



3838.  Throughout this period, West-Ward and Mallinckrodt met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Methadone HCL tablets and of their Fair Share agreement.

3839.  For example, West-Ward's D.S., Senior Director and Head of Sales, and Mallinckrodt's K.K., National Account Director, both attended the ECRM event at the Omni Amelia Island Plantation Resort on Amelia Island, Florida, on February 23-26, 2014.

3840.  On May 15, 2014, West-Ward's D.S. and Mallinckrodt's K.K communicated by phone.

3841.  In August, the two sales executives attended the NACDS Total Store Expo in Boston on August 23 to 26, 2014.

3842.  Approximately one month after the NACDS meeting, West-Ward announced list (WAC) price increases for Methadone.  A few weeks later, Mallickrodt matched West-Ward's list (WAC) prices.

3843.  No shortages or other market features can explain Defendants' price increases for generic Methadone HCL tablets during the Relevant Period.

3844.  The elevated prices of generic Methadone HCL tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3845.  The unlawful agreement between Defendants West-Ward and Mallinckrodt, regarding generic Methadone HCL tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EN.   Omega-3 Acid Ethyl Esters

3846.  Generic Omega-3 Acid Ethyl Esters are used to lower high triglyceride levels in the blood.

3847.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Omega-3 Acid Ethyl Esters capsules ("Omega-3 Acid Ethyl Esters") as follows, beginning at least as early as June, 2014:

3848.  During the Relevant Period, Defendants Teva, Par and Apotex dominated the market for generic Omega-3 Acid Ethyl Esters capsules.

3849.  On April 8, 2014, Teva launched Omega-3 Acid Ethyl Esters.

3850.  On the morning of June 26, 2014, Patel e-mailed a colleague at Teva with news that Par had recently received FDA approval for this drug.  Patel wrote that she would "snoop around" to see if Par had begun shipping product. That morning, Patel sent a message to T.P., Chief Commercial Officer at Par through LinkedIn. Later that day, they exchanged a number of text messages.

3851.  The next morning, Par's Chief Commercial Officer called Patel and they spoke for nearly a half-hour. That same morning, Patel told colleagues that she now had "some more color" on Par's launch of Omega-3 Acid Ethyl Esters.  Teva documents show a clear understanding of Par's internal bidding and pricing plans.

3852.  Par launched Omega-3 Acid Ethyl Esters capsules on June 30, 2014. Teva proceeded to concede customer accounts to Par to ensure Par's smooth entry into the market.

3853.  As new manufacturers entered the market, Teva co-ordinated with them to avoid competition and keep prices high, including phone calls between Rekenthaler and a Senior Vice President and General Manager of U.S. Sales at Apotex on September 25 and 27, 2014.

3854.  Due to supply limitations, Par was not able to pursue a full Fair Share of the market until late November, 2014. On November 10, 2014, Patel and Par's Chief Commercial Officer exchanged five text messages.

3855.  By mid-February, 2015, Teva had conceded several large customers to Par.  During this time, Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to co-ordinate.

3856.  By April, Apotex had officially entered the market, and consistent with the Fair Share understanding, Teva conceded customers to accommodate the new entrant. During this period, Rekenthaler spoke multiple times with J.H., Senior VP at Apotex.

3857.  No shortages or other market features can explain Defendants' price increases for generic Omega-3 Acid Ethyl Esters capsules during the Relevant Period.

3858.  The elevated prices of generic Omega-3 Acid Ethyl Esters capsules resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3859.  The unlawful agreement among Defendants Teva, Par, and Apotex regarding generic Omega-3 Acid Ethyl Esters capsules was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EO.   Econazole Nitrate Cream

3860.   Generic Econazole Nitrate Cream ("Econazole") is a topical antifungal cream prescribed for the treatment of infections of the skin caused by fungus, such as athlete's foot and ringworm.

3861.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Econazole Nitrate Cream, as follows:

3862.   In mid-2014, there were only three manufactures in the market for generic Econazole:  Perrigo, Taro, and Teligent.

3863.   In June of that year, Perrigo began planning a price increase.  On June 17, 2014, Boothe at Perrigo called a Taro employee in Hawthorne, NY – likely Perfetto – and they spoke for approximately three-quarters of an hour.

3864.   One week later, on June 25, S.B., a sales executive at Taro, sent an internal e-mail and suggested bidding at Associated Pharmacies.  On July 8, 2014, Taro put together an offer for that customer.  Notably, the price of Econazole had not yet gone up – and would not do so for another several weeks.

3865.   On July 18 and July 19, 2014, Boothe at Perrigo and Perfetto at Taro exchanged three short calls.  The next business day, on July 21, 2014, the two spoke for nearly a half-hour.  On July 22, T.P. of Perrigo spoke with S.M., a sales executive at Teligent, for approximately five minutes.  Three days later, on July 24, 2014, Boothe

called Perfetto again; the call lasted two minutes.  Perfetto returned the call and they spoke for seven minutes.

3866.  That same day, July 24, 2014, Perrigo instituted a dramatic price increase for Econazole.  Customers saw increases ranging from 637% to 735%.

3867.  That same day, Aprahamian also notified his colleagues at Taro of the development.  He instructed them not to capitalize on any opportunities that might come Taro's way as a result of Perrigo's price increase.  Aprahamian further instructed his team to increase Taro's Econazole price to GPO's to $0.02 under its WAC price with just five days' notice for all such customers.

3868.  The next day, on July 25, E.G., a Taro sales executive, placed two calls to S.M. at Teligent.  E.G. called S.M. again on August 12, 2014 and they spoke for approximately five minutes.  The next day, on August 13, Perfetto spoke with Boothe for approximately ten minutes.

3869.  The co-ordination among cartel members bore fruit quickly.  Two weeks later, on September 1, Teligent increased its WAC prices for Econazole to match Perrigo's.  Taro's price increases followed two months later, on November 18, 2014.

3870.  By May, 2015, attracted by the price increases, Sandoz was making plans to re-enter the Econazole market.  CW-3 advocated a relaunch strategy that considered fair share principles and Sandoz's ongoing understanding with Perrigo.

3871.  On October 1, 2015, W.W. (a Sandoz launch executive) e-mailed CW-3 seeking intel on current prices for various customer accounts in anticipation of the

upcoming Econazole re-launch.  Less than an hour later, CW-3 called T.P. at Perrigo and they spoke for approximately a half-hour.

3872.  Later that day, CW-3 responded to his colleague's e-mail with details of Perrigo's pricing at Morris & Dickson and copied SW-1, a senior pricing executive at Sandoz.  Not wanting to put additional details about his conversation with T.P. in writing, CW-3 did not include in the e-mail that T.P. was the source.

3873.  On November 30, 2015, Sandoz bid on the Econazole business at Morris & Dickson.  Perrigo, however, refused to cede the business to Sandoz because it had already given up one customer to the new entrant and did not want hand over another.[54]

3874.  But this time, Sandoz put its foot down.  Intent on working out a deal, CW-3 at Sandoz and T.P. at Perrigo exchanged four calls on December 16.  The next day, on December 17, 2015, Sandoz contacted Morris & Dickson and convinced it to consider a new offer from Sandoz.  This time, Perrigo ceded the account to Sandoz.

3875.  When Sandoz's re-launch of Econazole finally came to fruition in late 2015, it matched its co-conspirators' increased WAC prices.

3876.  No shortages or other market features can explain Defendants' price increases for generic Econazole Nitrate Cream during the Relevant Period.

---

[54] Despite the cartel's "Fair Share" rules, there was a constant incentive for each member to cheat its co-conspirators just a bit, but not enough to incur retaliatory price-cuts and price erosion.

3877.   The elevated prices of generic Econazole Nitrate Cream resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3878.   The unlawful agreement among Defendants Perrigo, Taro, and Teligent regarding generic Econazole Nitrate Cream was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**EP.   Tobramycin**

3879.   Generic Tobramycin is an eye-drop solution used to treat infections.

3880.   As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of generic Tobramycin ("Tobramycin") at least as follows:

3881.   Beginning in October of 2013, prior to the first generic launch of Tobramycin (for which Teva got 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's statutory exclusivity period expired.  These plans included trying to get a so-called "fair share" for Sandoz, but depended on Teva, the incumbent generic manufacturer, being co-operative – or as Teva liked to refer to the most co-operative cartel members, it required Teva to act as a "Quality Competitor."

3882.  As a partner in the conspiracy, Teva was, in fact, co-operative when it came time to give up share to Sandoz.  Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and co-ordinating to divvy up the market for Tobramycin.  Patel exchanged seven calls with a Sandoz pricing executive on July 1, during which they discussed Sandoz's launch plans and how to divide up the market for Tobramycin.  Patel conveyed some of this Sandoz information in an internal Teva e-mail the same day.

3883.  On July 7, 2014, Patel and the Sandoz pricing executive spoke five more times, including one call lasting approximately ten minutes.  On these calls, Patel and the Sandoz pricing executive discussed how to divide up the market for Tobramycin, including specific accounts that each would maintain or concede to the other.  Patel then memorialized the agreement in an e-mail two days later.  The agreement:  Teva would take Walgreens, McKesson Corporation ("McKesson") (a wholesaler), Econdisc Contracting Solutions ("Econdisc") (a group purchasing organization ("GPO") that includes Express Scripts, Kroger, and Supervalu), ABC, and Omnicare; while Sandoz would take CVS, Cigna, Prime Therapeutics, Kinney Drugs, and OptumRx.  Teva also planned to concede the Cardinal business to Sandoz.

3884.  Patel told the Sandoz pricing executive specifically that Teva would not even submit a bid to CVS.  This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high price that Teva was able to set when it was

the only generic manufacturer, and was very close to the branded price that was charged during the patented and 180-day exclusivity periods.

3885.  As planned, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business; Teva also went through with its plan to concede Cardinal to Sandoz.

3886.  The Sandoz pricing executive, in turn, told Patel that Sandoz would not pursue business from ABC and Walgreens. The Sandoz pricing executive spoke with Kellum about his conversations with Patel and the agreement to stay away from Walgreens and ABC, and Kellum agreed with the plan.  Pursuant to that agreement, Sandoz made no effort to contact those two large customers when it entered the market for Tobramycin.

3887.  The Sandoz pricing executive and Patel also discussed Sandoz's target share.  The pricing executive informed Patel that Sandoz was seeking a 50% share of the Tobramycin market.

3888.  No product shortages or other market features can explain Defendants' elevated pricing of Tobramycin during the Relevant Period.  The pricing conduct here is inconsistent with competitive behavior.  In a competitive market, as multiple sellers enter the market, prices decline, but that is not what happened here.  Instead, because of the overarching anticompetitive agreement among Defendants, Tobramycin prices remained unchanged despite multiple sellers entering the market.

3889.  The elevated prices of Tobramycin resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3890.  The unlawful agreement between Teva and Sandoz regarding Tobramycin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EQ.   Disulfiram Tablets

3891.  Generic Disulfiram is an alcohol antagonist used to treat alcoholism.

3892.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Disulfiram Tablets ("Disulfiram"), as follows:

3893.  In July, 2014, WBAD reached out to Teri Coward at Teva to inform her that WBAD had received a competitive offer on Disulfiram tablets from Breckenridge (at the time, the only other manufacturer in the market for generic Disulfiram).  In the same e-mail, WBAD passed Breckenridge's market share intentions to Teva.

3894.  Although the message got through, the cartel's so-called "fair share" rules do not always dictate a concession to a competitor.  A Teva employee calculated

the percentage of total market share represented by WBAD and expressed to colleagues that Breckenridge already held more than its fair share of the market.

3895.  Teva subsequently successfully matched the competing bid to maintain the account and looked for other smaller accounts it could cede to Breckenridge.

3896.  No shortages or other market features can explain Defendants' prices for generic Disulfiram Tablets during the Relevant Period.

3897.  The elevated prices of generic Disulfiram Tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3898.  The unlawful agreement between Defendants Breckenridge and Teva regarding generic Disulfiram Tablets was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### ER.   Glimepiride

3899.  Generic Glimepiride ("Glimepiride") is used to treat high blood sugar levels that are caused by Type 2 Diabetes Mellitus.

3900.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Glimepiride, as follows:

3901.  In July of 2014, Dr. Reddy's wanted to implement a price increase on its Glimepiride products – so, naturally (in light of Defendants' conspiracy), its first step was to make sure that Teva would follow such an increase.

3902.  Accordingly, V.B., a senior sales executive at Dr. Reddy's, reached out to Patel, his opposite number at Teva, to co-ordinate.  They spoke for approximately 12 minutes on July 10, then again for about five minutes on each of July 21, 22, and 24.

3903.  On August 18, 2014, Dr. Reddy's significantly increased its pricing on Glimepiride, approximately quadrupling the price overnight for all dosage strengths. V.B. continued to communicate with Patel, regarding Glimepiride pricing, after Dr. Reddy's price increase, including exchanging at least four text messages on both August 25 and October 10, 2014.

3904.  Based on the understanding that had been reached between V.B. and Patel during these conversations, Dr. Reddy's anticipated that Teva would follow Dr. Reddy's price increase – which it did, less than six months later, on January 28, 2015, when Teva raised its WAC to exactly match Dr. Reddy's.

3905.  That same January day – illustrating the applicability of Defendants' overarching conspiracy to *all* products made by any one of them – Dr. Reddy's sought and obtained a complete list of Teva's price increases, ***including drugs not made or sold by Dr. Reddy's***.

3906.  No shortages or other market features can explain Defendants' price increases for Glimepiride during the Relevant Period.

3907.  The elevated prices of Glimepiride resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3908.  The unlawful agreement between Teva and Dr. Reddy's on Glimepiride was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**ES.  Metronidazole 1% Gel**

3909.  Generic Metronidazole 1% Gel ("Metro Gel 1%") is a topical treatment for inflammatory rosacea lesions.  Metrol Gel 1% is used by patients diagnosed with rosacea, a condition affecting 16 million Americans.  In 2013, the annual market for Metro Gel 1% in the United States exceeded $120 million.

3910.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Metro Gel 1%, as follows:

3911.  Prior to 2014, Sandoz was the exclusive generic manufacturer of Metro Gel 1%.  In June, 2014, Taro began making plans to enter the market and, on July 1, 2014, Taro launched the product and matched Sandoz's WAC pricing.

3912.  In the days leading up to the launch, CW-3 at Sandoz and Aprahamian at Taro exchanged several calls during which they discussed the launch and Sandoz's

allocation of customers to the new entrant, Taro.  Further, during these calls,

Aprahamian told CW-3 that Taro was targeting 35% market share and identified the

customers that it planned to target.  Immediately upon hanging up with Aprahamian,

CW-3 reported this information back to his superiors, CW-1 and Kellum. These calls

are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:44:00 | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:03:00 | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:18:00 | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 9:55:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:40:00 | 0:02:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:42:00 | 0:01:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:43:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:56:00 | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:40:00 | 0:10:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:50:00 | 0:01:00 |
| 6/25/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:02:00 | 0:13:00 |
| 6/25/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 13:15:00 | 0:01:00 |
| 6/25/2014 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 13:18:00 | 0:01:00 |

3913.  On June 18, 2014, Aprahamian sent an internal e-mail to A.L., a pricing

executive at Taro.  WBAD is a GPO that purchases generic chugs on behalf of its

members, including ABC and Walgreens.  On June 25, 2014, Taro submitted an offer

to Walgreens.  A few days later, on June 30, Taro submitted a separate offer to ABC.

3914.  On the same day that ABC received the offer from Taro, the customer

notified Sandoz that it had received a competitive bid from Taro and asked whether

Sandoz would lower its price to retain the business.  S.G., a sales executive at Sandoz,

forwarded the request along internally, including to CW-1 and Kellum.  CW-1

responded to S.G., and Kellum agreed.

3915.  The next day, July 1, 2014, A.H., a sales executive at Sandoz, sent an internal email regarding a conversation with WBAD concerning Taro.  Kellum responded, and CW-1 replied.

3916.  Walgreens accepted Taro's bid on July 2 and ABC accepted Taro's bid on July 7.  WBAD (including ABC and Walgreens) represented approximately 20% of Sandoz's volume and sales for Metro Gel 1 %.

3917.  The next day, on July 8, Taro also submitted a bid to Wal-Mart for Metro Gel 1%.  That same day, Aprahamian called CW-3 at Sandoz twice. Both calls lasted one minute.  Two days later, on July 10, Aprahamian e-mailed E.G., a Taro sales executive, asking her to follow up with Wal-Mart regarding the offer.  The next day, on July 11, CW-3 and Aprahamian exchanged four calls.  After the last call, CW-3 hung up and immediately called Kellum.  These calls are shown in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/11/2014 Voice | | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:31:00 | 0:01:00 |
| 7/11/2014 Voice | | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:49:00 | 0:01:00 |
| 7/11/2014 Voice | | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:05:00 | 0:03:00 |
| 7/11/2014 Voice | | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:52:00 | 0:05:00 |
| 7/11/2014 Voice | | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:57:00 | 0:01:00 |

3918.  The following Monday, on July 14, 2014, Wal-Mart notified Sandoz that it had received a competitive bid on Metro Gel 1 % that was 10% lower than Sandoz's pricing and asked whether it would bid to retain the business.

3919.  On July 18, 2014, W.G., a pricing executive at Sandoz, forwarded the request internally, including to CW-1 and Kellum.  CW-1 recommended that Sandoz relinquish Wal-Mart, and Kellum agreed.

3920.  After sending this e-mail, someone at Sandoz changed the language in the earlier e-mail string.  Sandoz made this change to avoid documenting the fact that the competitively sensitive information came directly from its competitor, Taro.

3921.  Although Sandoz gave up the business, Wal-Mart was unexpectedly reluctant to stop ordering Metro Gel 1 % from Sandoz.  On August 7, 2014, L.B., a sales executive at Sandoz, sent an internal e-mail advising that Wal-Mart was still ordering.

3922.  On August 4, 2014, McKesson also notified Sandoz that it had received an unsolicited bid for the Rite Aid portion of its Metro Gel 1 % business and gave Sandoz the opportunity to bid to retain the business.  After some internal discussion, Sandoz decided to cede the Rite Aid portion of the business to Taro, which P.C., a pricing executive at Sandoz, explained in an internal e-mail on August 8, 2014.

3923.  On August 11, 2014, McKesson awarded the Rite Aid portion of its Metro Gel 1% business to Taro. Two days later, on August 13, 2014, Aprahamian called CW-3 and they spoke again for seven minutes.

3924.  No shortages or other market features can explain Defendants' price increases for generic Metro Gel 1% during the Relevant Period.

3925.  The elevated prices of generic Metro Gel 1% resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3926.  The unlawful agreement among Defendants Sandoz, and Taro regarding Metro Gel 1% was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### ET.   Amikacin Injection

3927.  Generic Amikacin is an aminoglycoside antibiotic derived from kanamycin.  It has been commercially available in the United States since the 1970's.

3928.  The market for generic Amikacin is mature.  Amikacin has been commercially available in the United States in a generic form for decades.

3929.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Amikacin ("Amikacin"), at least as follows:

3930.  During the Relevant Period, Defendants Actavis, Teva and Heritage dominated the market for Amikacin.

3931.  In the summer of 2014, when a customer requested that Heritage reduce its price, Heritage said that it was aware that Teva's price was slightly lower but that it did not wish to reduce its prices in order to gain market share.

3932.  On October 10, 2014, Heritage's Neal O'Mara reported that he had had positive conversations with an individual at McKesson, MW-1.

3933.  Using MW-1 to pass messages, instead of e-mail or text, was intended to prevent the creation of electronic records of communications among cartel members – but since O'Mara often internally e-mailed the substance of these communications after they had occurred, it nevertheless left incriminating tracks.

3934.  In turn, MW-1 communicated O'Mara's position and concerns to Teva. Teva told MW-1 that Heritage would not face competition *via* Teva's right of first refusal ("ROFR") right to counterbid, and MW-1 then passed this message back to O'Mara.  If O'Mara had not then e-mailed the substance of these messages internally, the cartel would have succeeded in avoiding leaving electronic traces of its perfidy.

3935.  Once this message was passed in early October, 2014, Teva and Heritage were careful not to compete with each other.

3936.  By a year later, October 1, 2015, Teva had raised both its list and contract prices and for the 500mg/2mL and 1g/4mL dosage forms of Amikacin.

3937.  When contacted by customers looking to avoid these high prices, Heritage supported Teva's price increase by refusing to lower prices.  Both

Defendants did so because they knew that Defendants' cartel controlled the market for Amikacin.

3938.  No shortages or other market features can explain Defendants' price increases for Amikacin during the Relevant Period.

3939.  The elevated prices of Amikacin resulted from Defendants' anti-competitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

3940.  The unlawful agreement between Actavis and Teva on Amikacin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**EU.**  **Amoxicillin/Clavulanate Chewable Tablets, Amiloride HCL/HCTZ Tabs, Carbamazepine Chewable Tabs, Cimetidine Tabs, Clemastine Fumarate Tabs, Clotrimazole Topical Solution, Desmopressin Acetate Tabs, Diclofenac Potassium Tablets, Disopyramide Phosphate Caps, Enalapril Maleate Tabs, Epitol Tabs, Flurbiprofen Tabs, Flutamide Caps, Fluvastatin Sodium Caps, Hydroxyurea Caps, Loperamide HCL Caps, Penicillin VK Tablets, Prazosin HCL Caps, Prochlorperazine Tabs, Topiramate Sprinkle Caps, and Warfarin Sodium Tabletse**

3941.  Amoxicillin was developed in the 1960's; its combination use with Clavulanate (also known as Cavulonic Acid) was approved by the FDA in 1984 and

developed into generic Amoxicillin/Clavulanate Chewable Tablets ("Amoxicillin/
Clavulanate").

3942.  The potassium salt of generic Diclofenac ("Diclofenac") is an NSAID
used to treat pain and inflammatory diseases such as gout and and had been
commercially available in the United States for many years before the start of the
Relevant Period.

3943.  The potassium salt of generic Penicilin V ("Penicilin VK") is an
antibiotic, useful for the treatment of a number of bacterial infections and has been
commercially available in the United States for decades.

3944.  Generic Desmopressin acetate ("Desmopressin") is an antidiuretic.

3945.  The markets for generic forms of these drugs (Amoxicillin/Clavulanate,
Diclofenac, Penicilin VK, and Desmopressin) are mature.  Each has been
commercially available in the United States in a generic form for many years or
decades before the start of the Relevant Period, and because of the maturity of their
markets, the prices of each had been low and stable for years.

3946.  As part of Defendants' overarching conspiracy with respect to the Drugs
at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic:
Amoxicillin/Clavulanate Chewable Tablets, Amiloride HCL/HCTZ Tabs,
Carbamazepine Chewable Tabs, Cimetidine Tabs, Clemastine Fumarate Tabs,
Clotrimazole Topical Solution, Desmopressin Acetate Tabs, Diclofenac Potassium
Tablets, Disopyramide Phosphate Caps, Enalapril Maleate Tabs, Epitol Tabs,

Flurbiprofen Tabs, Flutamide Caps, Fluvastatin Sodium Caps, Hydroxyurea Caps, Loperamide HCL Caps, Penicillin VK Tablets, Prazosin HCL Caps, Prochlorperazine Tabs, Topiramate Sprinkle Caps, and Warfarin Sodium Tablets, at least as follows:

3947.  During the Relevant Period, Defendants Teva and Sandoz dominated the markets for Amoxicillin/Clavulanate, while Defendants Teva and Actavis dominated the market for Desmopressin.

3948.  The Penicillin VK market was broader, but still dominated by members of Defendants' cartel:  Teva and Sandoz (again), along with Defendants Aurobindo and Pfizer's *alter ego*, Greenstone.

3949.  The market for generic Diclofenac ("Diclofenac") was also dominated by Defendants Teva and Sandoz, this time in conjunction with Defendant Mylan.

3950.  Generic Topiramate sprinkle capsules ("Topiramate") are used to treat migraine headaches and seizures caused by epilepsy.  As of June, 2014, Zydus and Teva had a large majority of the market share for Topiramate, while Actavis had just 3% of the market.

3951.  In late 2012, Mylan, Teva and Sandoz began a series of co-ordinated price increases for Diclofenac that resulted in list (WAC) prices nearly double their prior levels.  Diclofenac pricing remained at this elevated level through at least mid-2019, the latest period for which sales data was readily available.

3952.  As with numerous other drugs, including (but not limited to) exemplars discussed in this Complaint, and in compliance with established practices of

Defendants' cartel, Defendants often co-operated before, during, and even after price

increase announcements, to sort out market-share adjustments following price

increases.

3953.  In the case of Diclofenac, Teva communicated and co-operated with

Mylan and Sandoz before announcing the price increase.  For example, as alleged

*supra*, Teva's Green had telephone calls with Mylan's Nesta on August 1, 2013 (twice),

August 2, August 6 (three times), and August 8 (three times).

3954.  The day before the price increase went into effect – August 8, 2013 –

Patel called Nesta twice and also called a contact at Sandoz.

3955.  The following year, the pattern repeated itself:

3956.  In April, 2014, Zydus raised its price for Topiramate Sprinkle Capsules.

Nisha Patel at Teva was in frequent communication with Green at Zydus at the time

of the Zydus price increase.

3957.  That same month, effective April 17, Mylan increased its WAC pricing

on a number of different drugs, including several that overlapped with Teva.  Mylan

also increased its contract prices, but at least some of those price increases did not

become effective until a month later, in mid-May, 2014.

3958.  Pursuant to the established understanding among members of

Defendants' cartel, Teva immediately decided that it would follow the Mylan

increases.  On April 21, 2014, T.S., a national account executive at Teva, forwarded to

Patel two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan. The spreadsheets were created by Mylan personnel.

3959.  Patel, in turn, forwarded the e-mail to the Teva sales team, stating:  "Our intention is to follow Mylan on this increase.  Below, you will see the list of increase items where Teva overlaps with Mylan.  Please share any pricing intelligence you are able to obtain.  Thank you in advance!"  The list that Patel referred to included the following generic products, several of which had been the subject of the co-ordinated price increases in 2013, described *supra*:  Amiloride HCL/HCTZ Tablets; Cimetidine Tablets; Enalapril Maleate Tablets; Fluvastatin Sodium Capsules; Loperamide HCL Capsules; Prazosin HCL Capsules; and Sotalol Hydrochloride Tablets.

3960.  Within days, Teva began receiving requests from its customers for bids due to the Mylan price increases.  On April 24, Patel began to formulate a "Mylan Increase Strategy" in order to respond to those requests, but noted that Teva was "still awaiting intel" about the Mylan customer contract price points, which were, of course, not publicly available.

3961.  Previously, Teva had used Kevin Green to obtain Mylan customer price points (often referred to at Defendants as "intel") through his communications with Nesta at Mylan, which Teva then used to follow Mylan's pricing, without disrupting the market.

3962.  The next day, in a follow-up e-mail about the Mylan strategy, Patel noted that one of her Mylan increase strategies would not have been appropriate for this

situation, and concluded that "[p]lus, we really need some intel" about the Mylan

contract price points.

3963.  Teva continued to push for specific contract price points from Mylan.

On April 28, Patel sent an e-mail to the Teva sales team, stating: "To date, we have no

intel on Mylan's recent increases.  I realize there is a lot of travel going on, but

whatever you can gather and share would be greatly appreciated."

3964.  At the end of the following week, at 9:55 am on May 9, Nisha Patel sent

another e-mail to Teva's National Account Managers ("NAM's"), copying

Rekenthaler and others, with the subject "Mylan Increase Intel":

> NAMs,
>
> Sorry to be so persistent, but we have not received any Mylan price increase
> intelligence yet.  Whatever you can gather and provide would be greatly
> appreciated.  Our intention is to become better, quicker followers, but without
> intel, we are unable to do so.
>
> In fact, I cannot see Teva being able to follow in the next round of price
> changes (without any price points) at this point.  Of course we can always
> follow by guessing, but it could cause needless price disruption in the market.
>
> Please send any intel to me and Tom.

3965.  Shortly after receiving that e-mail – at 11:15am – Rekenthaler called

Nesta at Mylan and left a message.  Nesta returned the call eight minutes later, at

11:23 am, and the two spoke for approximately eight minutes.

3966.  Separately, before Rekenthaler was able to convey the information he

had obtained, Patel forwarded a customer request from ABC (relating to the Mylan

increase items) directly to her Teva colleague, T.S., lamenting the absence of Mylan intel.

3967.  The next day, May 13, 2014, T.S. sent Patel an e-mail with the subject "FW:  Dirt"  The text of the message was simply "FYI," but as with T.S.'s April 21 e-mail, attached was an Excel spreadsheet listing the Mylan prices for all of the recent increases – and this time, it wasn't mere WAC and AWP data, it was contract price points.  The spreadsheet was titled "Mylan-Price List A.xlsx" and had been created by a Mylan employee.

3968.  The day after that, on Wednesday, May 14, Patel and Aprahamian exchanged eight text messages and spoke for approximately four minutes by phone, likely about Carbamazepine Tabs and Clotrimazole Topical Solutions, products that were made by both Teva and Taro – and that showed up in the Teva "Future Price Increase Candidate" spreadsheet that T.S. e-mailed to Patel on May 28:

| Item Description | BUCKET |
|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | Follow/Urgent |

3969.  Meanwhile, a week prior, on May 20, Rekenthaler and Nesta spoke again.  Armed with Mylan's actual dead net prices, Patel was confident that Teva could follow the Mylan price increases exactly, without disrupting the market.  That

same day, as Patel began to create a new list of Teva price increase candidates, she instructed a colleague to include the Mylan increase drugs - with specific price points - as its own separate tab in the spreadsheet, called "follow." Her colleague provided the list a day later, as requested, on May 21.

3970.  On May 27, 2014, Rekenthaler and Nesta had two telephone calls, including one lasting approximately four minutes.  By the following day, May 28, Teva had a much more comprehensive list of price increase items.  On that list, seven of the Mylan items were prominently listed with a "Follow Urgent" notation listed next to each, including various doses of Amiloride HCL/HCTZ Tabs, Cimetidine Tabs, Enalapril Maleate Tabs, Fluvastatin Sodium Caps, Loperamide HCL Caps, Prazosin HCL Caps, and Sotalol HCL Tabs:

| Item Description | BUCKET | Comments |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 100 | Follow/Urgent | Follow Mylan Increase |
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 1000 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 800MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 5000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 1000 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 500 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 1000 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 2MG 1000 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 250 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 500 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 80MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 120MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 160MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 240MG 100 | Follow/Urgent | Follow Mylan Increase |

3971.  Also on the list were three additional Mylan drugs for which Teva would be leading the price increase:  Diclofenac Potassium Tablets; Flurbiprofen Tablets; and Prochlorperazine Tablets.

3972.  With the list now squared away at the end of May, Rekenthaler and Nesta had no need to speak again until August, when Teva was preparing to implement the price increase.  In the weeks leading up to Teva's August 28 price increases, Rekenthaler and Nesta spoke a few times to co-ordinate, including at least these calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/7/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:02:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:13:00 |
| 8/21/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:06:00 |

3973.  As alleged *supra*, Taro implemented a substantial price increase on various formulations of Fluocinonide on June 3, 2014.  In addition to Fluocinonide, Taro also significantly raised its prices on the following additional drugs, which Taro shared with Teva and other cartel members:  Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Solution and Warfarin Sodium Tablets.

3974.  As just discussed, Teva learned of the prices increases for at least some, and likely all, of these drugs in advance, *via* Patel's conversations with Aprahamian.  In accordance with Defendants' cartel's usual practice, Teva agreed and made plans to follow the increased prices even before Taro had put them into effect.

3975.  On June 3, 2014 – the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin, and other drugs – Patel and Aprahamian

exchanged five text messages. After exchanging those text messages, Patel confirmed to her supervisor, K.G., and another Teva representative that Taro had in fact raised its pricing on Fluocinonide. Patel then added: "I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorow and will provide commentary." At 5:08pm that evening, Patel called Aprahamian and the two spoke for approximately 7 minutes.

3976. First thing the next morning, on June 4, 2014, Patel and Aprahamian exchanged two text messages. Then, at 9:56 am, the two spoke on the telephone for approximately a half-hour. Shortly after hanging up the phone with Aprahamian, Patel sent an e-mail to K.G. making it clear that she had obtained additional information regarding the Taro price increases that she did not want to put into writing, stating: "I have additional intel (I can discuss with you) that will be useful."

3977. One of the drugs that Taro increased on June 3, 2014, was Warfarin Sodium Tablets ("Warfarin"), which is also discussed elsewhere in this Complaint. Also known by the brand name Coumadin, Warfarin is a blood thinner medication used to treat and prevent blood clots.

3978. At this time (June, 2014), there were three manufacturers in the market for Warfarin: Teva, Taro and Zydus. All were members of Defendants' cartel, making the market for generic Warfarin/Coumadin vulnerable to a co-ordinated price increase by the cartel, which is exactly what happened. In addition to their agreement

on Warfarin, Teva also agreed with Zydus to raise the price of Topiramate Sprinkle Capsules.

3979.  In the ten days following the Taro price increase for Warfarin, Defendants Teva, Taro, and Zydus co-ordinated through various phone communications with each other (preceded by calls on June 2 from Green at Zydus to Rekenthaler (for two minutes) and Patel (for five minutes) at Teva), including at least the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/4/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:11:28 | 0:00:00 |
| 6/4/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 9:16:52 | 0:00:00 |
| 6/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:56:52 | 0:25:57 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/12/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:57:50 | 0:09:18 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

3980.  Green was likely speaking to Patel and Rekenthaler about both Warfarin and Topiramate Sprinkle Capsules during those calls because on June 13 – the same day the Zydus price increase on Warfarin became effective, and after the conversations noted above – Patel added Topiramate Sprinkle Capsules to Teva's price increase list, with a notation: "Follow/Urgent – Zydus." Two days before that – the same day that Green had extensive phone calls with both Rekenthaler and Patel – Rekenthaler also spoke twice with Falkin of Actavis, a member of Defendants' cartel and the only other manufacturer in the market for Topiramate Sprinkle Capsules.

3981.  Teva followed the Zydus price increase for Topiramate Sprinkle Capsules as part of its increase on August 28, 2014.  As noted, Teva co-ordinated that increase with both Zydus and Actavis in the days and weeks before it.

3982.  Further, during the thicket of communications above, on June 12, Teva internally discussed future projections regarding Carbamazepine – including the fact that its API supplier might run out of supply sometime in 2015.  One of the options discussed was a price increase.  K.G. – aware that Patel had been in discussions with Aprahamian and had information regarding the Taro price increase on Carbamazepine (and other drugs) – stated: "Nisha [Patel] would be able to provide guidance relative to [the Carbamazepine] price increase for the analysis being put together."  In fact, Patel had communicated with Aprahamian earlier that same day for approximately nine minutes.

3983.  On the tenth day after Taro's price increases, June 13 – in the early morning of which, Patel at Teva and Green at Zydus spoke for approximately a quarter hour – Zydus also raised its Warfarin prices.  That same day, Teva was presented with an offer from a customer for a one-time buy on that drug.  Patel responded that "We will review, but note that we intend to follow [the] Taro and Zydus increase[d] price."

3984.  Later that same day, June 13, 2014, Patel sent an internal e-mail alerting her group, including her supervisor, K.G., about the list of drugs on which Teva planned to raise prices.  A number of them – including Carbamazepine Chewable

Tablets , Carbamazepine Tablets, Clotrimazole Topical Solution, Fluocinonide Cream, Fluocinonide Emollient Cream, Gel and Ointment, and Warfarin Sodium Tablets – included the notation "Follow/Urgent – Taro" as the reason for the increase.  For that list of drugs, Patel directed that "we should not provide any decreases on these products."  Patel's directive meant that Teva would not – and, in fact, did not – seek to compete for market share against Taro or Zydus when approached by customers due to their price increases.

3985.  The next week, on Tuesday, June 17, Patel spoke to Aprahamian at Tarro for approximately a quarter-hour.

3986.  The following day, June 18, Patel sent that same list to the entire sales team at Teva, informing them of the status of Teva's next price increase.  She noted that Teva had already been "receiving multiple requests on several items that are prioritized as increase candidates."  Patel continued:  "While we do not have an exact date of increase, we are taking our increase plans into consideration and are bidding on new business at the planned increase price where our WAC allows," and noting that this was done in view of the information that Teva had been able to gather.

3987.  The next day, Patel continued to gather "intelligence" and made concerted efforts to simultaneously coordinate with both Aprahamian and Green at Zydus.  The timing and duration of those phone calls is set forth in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

3988.  As set forth *infra*, on August 27, 2014, Teva followed the Taro price increases on Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, and Warfarin Sodium Tablets.  As discussed more fully above, Teva co-ordinated those increases with Taro (and Zydus) through direct communications with those competitors in the days leading up to the increase.

3989.  Following these discussions among representatives of other cartel members, Teva raised its prices on August 27, 2014, on at least the following products:  Amoxicillin/Clavulanate Chewable Tablets, Amiloride HCL/HCTZ Tabs, Carbamazepine Chewable Tabs, Cimetidine Tabs, Clemastine Fumarate Tabs, Clotrimazole Topical Solution, Desmopressin Acetate Tabs, Diclofenac Potassium Tablets, Disopyramide Phosphate Caps, Enalapril Maleate Tabs, Epitol Tabs, Flurbiprofen Tabs, Flutamide Caps, Fluvastatin Sodium Caps, Hydroxyurea Caps, Loperamide HCL Caps, Penicillin VK Tablets, Prazosin HCL Caps, Prochlorperazine Tabs, Topiramate Sprinkle Caps, and Warfarin Sodium Tablets.

3990.  Below are illustrations of that list in the files of Defendant Teva:

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (36%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (59%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (52%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (54%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (43%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (52%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33%); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 32% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Dava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (57%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (34%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (59%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (52%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (54%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (43%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (52%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33%); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 32% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Dava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (57%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

3991.  And leading up to the price increase, Patel and Rekenthaler were communicating with Mylan, Sandoz, and other relevant co-conspirators, as illustrated in the following graphic:



3992.   For example, Patel at Teva spoke with Hatosy at Pfizer's *alter ego*, "Greenstone," on August 25; Rekenthaler spoke to Nesta on August 4, 2014, and again on August 7, 11 (twice), 18 (also twice), and 21.  Similarly, Patel spoke to a contact at Sandoz on August 11, and again on August 26, 27 (twice), and 28.

3993.  Further, for those few drugs where the graphic does not identify direct communications between Teva and its co-conspirators, these executives, at a minimum, communicated through other cartel members.

3994.  For example, with regard to Wockhardt and Enalapril, Patel was speaking to Aprahamian at Taro, as shown above – and Aprahamian, in turn, spoke to

M.C., the Vice President of Sales and Marketing at Wockhardt, on August 8 for approximately a quarter-hour, and again on August 14, for at least eight minutes.

3995.  Similarly, with regard to Prochlorperazine, Rekenthaler at Teva communicated with Jim Nesta at Mylan on August 7 and August 11, as illustrated above – and Nesta, in turn, communicated with M.D., a senior sales executive at Cadista Pharmaceuticals, on the same days that he communicated with Rekenthaler.

3996.  In addition to those phone communications noted in the text and graphic above, representatives from every Defendant met in Boston, Massachusetts, shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year.  Cavanaugh, Rekenthaler and Patel, along with many other Teva executives, as well as executives from every other corporate Defendant, attended.

3997.  Likewise, the morning before Teva implemented the price increases, one of its executives, Patel, spent much of her day discussing the price increases with Teva's contacts at Sandoz, Actavis, Taro, Zydus and Glenmark:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

3998.

3999.  The co-ordination worked.  For example, Sandoz followed Teva's price increases on Diclofenac and announced an identical list price approximately 6 weeks later. Mylan also followed in the Spring of 2015, matching Teva and Sandoz's list prices, on March 4, 2015.  Rekenthaler co-ordinated with Nesta at Mylan during two phone calls on February 18 and one call on February 19, 2015.

4000.  In roughly the same period (late summer and early fall of 2014), Teva and Sandoz were also orchestrating price increases on Amoxicillin/Clavulanate chewable tablets.  Throughout this period, Teva and Sandoz were in regular contact. Teva's Patel spoke with the Associate Director of Pricing at Sandoz, SW-1, multiple times to fix the prices of Amoxicillin/ Clavulanate and other drugs, including at least Diclofenac and Penicillin VK.

4001.  For example, on October 10, 2014 Sandoz followed Teva's price increases on Amoxicillin/ Clavulanate Chewable Tabs, Diclofenac Potassium Tabs, and Penicillin VK Tabs.

4002.  Following their established pattern, Teva's Patel spoke to Sandoz's SW-1 on the day of the Sandoz price increases, for approximately three minutes.

4003.  At the same time, Teva and Actavis were co-ordinating on Desmopressin.  Even before Actavis followed the Teva price increase, Teva knew that Actavis was going to do so.  For example, on October 15, 2014 – approximately two months before Actavis implemented the price increase – Teva received a request from a customer asking Teva to reduce its Desmopressin price because it was no longer offering competitive prices.

4004.  While she did not want to admit to the customer that Teva wasn't going to come off its price increases because it had an anticompetitive agreement with the only other manufacturer in the market to move forward jointly on increased prices, nevertheless, Patel's response to the customer betrayed her knowledge of the agreement with Actavis. Rather than offering a competitive price, Teva rebuffed the advances, saying that "We believe the market is still settling on this product.  Can you please review in a few days and advise of more current pricing intelligence?"

4005.  In a subsequent internal discussion, Patel noted, "I can't quite recall if Actavis followed us or we followed them....but they definitely did not change their WACs recently."

4006.  Teva's Rekenthaler and Actavis's Falkin spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21, and November 25, 2014.

4007.  Then, a few weeks later, Actavis followed the Teva price increase on Desmopressin on December 19, 2014.

4008.  Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac Potassium Tablets.  Rekenthaler co-ordinated that price increase with Nesta at Mylan during two phone calls on February 18 and one call on February 19, 2015.

4009.  No shortages or other market features can explain Defendants' price increases for generic:  Amoxicillin/Clavulanate Chewable Tablets, Amiloride HCL/HCTZ Tabs, Carbamazepine Chewable Tabs, Cimetidine Tabs, Clemastine Fumarate Tabs, Clotrimazole Topical Solution, Desmopressin Acetate Tabs, Diclofenac Potassium Tablets, Disopyramide Phosphate Caps, Enalapril Maleate Tabs, Epitol Tabs, Flurbiprofen Tabs, Flutamide Caps, Fluvastatin Sodium Caps, Hydroxyurea Caps, Loperamide HCL Caps, Penicillin VK Tablets, Prazosin HCL Caps, Prochlorperazine Tabs, Topiramate Sprinkle Caps, or Warfarin Sodium Tablets during the Relevant Period.

4010.  The elevated prices of Amoxicillin/Clavulanate Chewable Tablets, Amiloride HCL/HCTZ Tabs, Carbamazepine Chewable Tabs, Cimetidine Tabs, Clemastine Fumarate Tabs, Clotrimazole Topical Solution, Desmopressin Acetate

Tabs, Diclofenac Potassium Tablets, Disopyramide Phosphate Caps, Enalapril Maleate Tabs, Epitol Tabs, Flurbiprofen Tabs, Flutamide Caps, Fluvastatin Sodium Caps, Hydroxyurea Caps, Loperamide HCL Caps, Penicillin VK Tablets, Prazosin HCL Caps, Prochlorperazine Tabs, Topiramate Sprinkle Caps, and Warfarin Sodium Tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4011.  The unlawful agreements alleged among Par, Amneal, Apotex, Cadista, Upsher-Smith, Zydus, Actavis, Aurobindo, Glenmark, Sandoz, Mylan, Teva, Taro, Torrent, Wockhardt, and Pfizer/Greenstone, regarding Amoxicillin/ Clavulanate Chewable Tablets, Amiloride HCL/HCTZ Tabs, Carbamazepine Chewable Tabs, Cimetidine Tabs, Clemastine Fumarate Tabs, Clotrimazole Topical Solution, Desmopressin Acetate Tabs, Diclofenac Potassium Tablets, Disopyramide Phosphate Caps, Enalapril Maleate Tabs, Epitol Tabs, Flurbiprofen Tabs, Flutamide Caps, Fluvastatin Sodium Caps, Hydroxyurea Caps, Loperamide HCL Caps, Penicillin VK Tablets, Prazosin HCL Caps, Prochlorperazine Tabs, Topiramate Sprinkle Caps, and Warfarin Sodium Tablets, were part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**EV.  January 28, 2015, Price Increases:  Bethanechol Chloride Tablets, Ciprofloxacin HCL Tablets, Diltiazem HCL Tablets, Estradiol Tablets, Fluoxetine HCL Tablets, Glimepiride Tablets, Griseofulvin Suspension, Isoniazid, Ketoprofen Capsules, Ketorolac Tromethamine Tablets, Nortriptyline HCL Capsules, and Propranolol**

4012.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic: Bethanechol Chloride Tablets, Ciprofloxacin HCL Tablets, Diltiazem HCL Tablets, Estradiol Tablets, Fluoxetine HCL Tablets, Glimepiride Tablets, Griseofulvin Suspension, Isoniazid, Ketoprofen Capsules, Ketorolac Tromethamine Tablets, Nortriptyline HCL Capsules, and Propranolol at least as follows:

4013.  Shortly after the Teva price increases of August 28, 2014, Patel accepted a new position at Teva.  She left her position in the pricing department to take on the role of Director of National Accounts at Teva.  Her new position meant new responsibilities, necessitating more frequent travel to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

4014.  When Patel left the pricing department at Teva her position was not refilled.  K.G., Patel's former supervisor, assumed her role and became the executive responsible for identifying price increase candidates and implementing price increases.

4015.  On January 28, 2015, Teva raised prices on a number of different drugs. Teva's price increase spreadsheet – now maintained by K.G. at Teva, identified the following drugs, among others, along with the price increase strategy and reasons for the increase:

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 193% Increase | Follow Competitor -DRL & Actavis | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead -Semi-Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead -Semi-Exclusive | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor- DRL | Dr. Reddy's (34%); Accord (17%); INT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor- Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead -Limited Competition | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 90% Increase | Lead -Semi-Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead -Semi-Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead- Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor - Actavis | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

4016.  Consistent with their normal pattern, cartel members communicated about these drugs in the days and weeks leading up to January 28, 2015, including at least the following calls:



4017.  Patel likely also spoke in-person with many of Teva's co-conspirators. For example, in her new role as a Director of National Accounts, Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15:  NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, DC (January 8, 2015).  These industry events were all well-attended by senior executives of members of Defendant's cartel.

4018.  These price increases are also discussed in more detail elsewhere in this Complaint.

4019.  No shortages or other market features can explain Defendants' price increases for generic:  Bethanechol Chloride Tablets, Ciprofloxacin HCL Tablets, Diltiazem HCL Tablets, Estradiol Tablets, Fluoxetine HCL Tablets, Glimepiride Tablets, Griseofulvin Suspension, Isoniazid, Ketoprofen Capsules, Ketorolac Tromethamine Tablets, Nortriptyline HCL Capsules, or Propranolol during the Relevant Period.

4020.  The elevated prices of generic:  Bethanechol Chloride Tablets, Ciprofloxacin HCL Tablets, Diltiazem HCL Tablets, Estradiol Tablets, Fluoxetine HCL Tablets, Glimepiride Tablets, Griseofulvin Suspension, Isoniazid, Ketoprofen Capsules, Ketorolac Tromethamine Tablets, Nortriptyline HCL Capsules, and Propranolol resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4021.  The unlawful agreements among Par, Amneal, Taro, Dr. Reddy's, Actaviz, Sandoz, Mylan, and Teva, on generic:  Bethanechol Chloride Tablets, Ciprofloxacin HCL Tablets, Diltiazem HCL Tablets, Estradiol Tablets, Fluoxetine HCL Tablets, Glimepiride Tablets, Griseofulvin Suspension, Isoniazid, Ketoprofen Capsules, Ketorolac Tromethamine Tablets, Nortriptyline HCL Capsules, and

Propranolol, were part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EW.   Ciprofloxacin HCL Tablets

4022.  Generic Ciprofloxacin HCL tablets are used to treat a variety of infections, including anthrax infection after inhalational exposure, urinary tract infections, and pneumonic and septicemic plague.

4023.  The market for generic Ciprofloxacin HCL tablets ("Ciprofloxacin HCL" or "Ciprofloxacin") was mature and had multiple manufacturers throughout the Relevant Period.  As a result, for years, Ciprofloxacin HCL prices were relatively low and stable.

4024.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Ciprofloxacin HCL tablets as follows, beginning at least as early as August, 2014:

4025.  During the Relevant Period, Defendants Teva, Actavis, and Dr. Reddy's Laboratories ("Dr. Reddy's" or "DRL") dominated the market for generic Ciprofloxacin HCL.

4026.  Dr. Reddy's, Teva and Actavis orchestrated large price increases in the latter months of 2014.  Within a matter of months, all four manufacturers announced large list (WAC) price increases and identical list prices.

4027.  The list (WAC) price chart below shows the large and parallel price increases for Ciprofloxacin HCL tablets:



4028.  Note that for Actavis and Teva, the cartel's elevated pricing continued through at least mid-2019, the last period for which sales figures were readily available.  The dramatic, four-fold price differential between Dr. Reddy's, on the one hand, and Actavis/Teva, on the other, was able to persist because of the continued existence of Defendants' cartel agreement, which meant that even though Dr. Reddy's list price was one-quarter what its nominal competitors were charging, and its NSP prices were also significantly lower, customers did not migrate *en masse* to DRL.

4029.  Throughout this period, Teva, Dr. Reddy's and Actavis met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Ciprofloxacin HCL tablets and of the Fair Share agreement.

4030.  For example, prior to announcing a five-fold increase to its list (WAC) prices on August 18, 2014, Dr. Reddy's communicated with the other manufacturers to co-ordinate.  A senior sales executive at Dr. Reddy's spoke frequently with Teva's Patel about the planned price increase, and the two also exchanged four text messages on August 25, 2014.

4031.  Similarly, around the time that Actavis announced its price increases for Ciprofloxacin HCL (December 19, 2014), Rekenthaler of Teva spoke to Falkin at Actavis several times to co-ordinate as well, including twice on December 17 and once on December 18.  This drug was also referenced in calls between Rekenthaler and Falkin in a call on January 13, two calls the next day, on January 14, and also in a call on January 16, 2015.

4032.  Falkin (Actavis) also spoke with a Senior Director of National Accounts at Dr. Reddy's on January 5, 12, 15, 16 and 21, 2015.

4033.  On January 28, 2015, Teva raised its Ciprofloxacin HCL prices, to match Dr. Reddy's and Actavis's list (WAC) prices exactly. The same day as the Teva price increase, Dr. Reddy's was able to obtain a full copy of Teva's price increase list.

4034.  No shortages or other market features can explain Defendants' price increases for generic Ciprofloxacin HCL during the Relevant Period.

4035.  The elevated prices of generic Ciprofloxacin HCL resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at

these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4036.  The unlawful agreement among Defendants Teva, Actavis, and Dr. Reddy's, regarding generic Ciprofloxacin HCL, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EX.   Flutamide Capsules

4037.  Generic Flutamide capsules ("Flutamide") are used to treat prostate cancer, among other conditions.

4038.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Flutamide capsules as follows, beginning at least as early as August, 2014:

4039.  During the Relevant Period, Defendants Teva, Par and Actavis dominated the Flutamide market.

4040.  In late August, 2014, Teva aimed to raise prices on a number of different drugs, including Flutamide.  To co-ordinate prices and Fair Share, Teva (Patel and Rekenthaler), Actavis (Rogerson and Falkin) and Par (M.B., Vice President of National Accounts and J.H., Vice President of Sales), communicated directly with each other via telephone.

4041.  Rekenthaler (Teva) communicated by phone with Falkin (Actavis) on August 4, 5, 6, 7, 18, 24, 26 and 28.

4042.  Falkin (Actavis) communicated by phone with a Par Vice President of Sales on August 5 and 26.

4043.  Rekenthaler (Teva) had three phone calls with a Vice President of National Accounts at Par on August 28.

4044.  No shortages or other market features can explain Defendants' price increases for generic Flutamide capsules during the Relevant Period.

4045.  The elevated prices of generic Flutamide capsules resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4046.  The unlawful agreement among Defendants Teva, Par and Actavis, regarding generic Flutamide capsules, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EY.   Hydralazine HCL Tablets

4047.  Generic Hydralazine HCL tablets ("Hydralazine HCL" or "Hydralazine") are used in treating high blood pressure.

4048.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Hydralazine HCL, as follows:

4049.  During the Relevant Period, Defendants Teva, Par, Heritage, Camber, and Glenmark dominated the market for Hydralazine tablets.

4050.  In approximately August of 2014, Defendants applied the "fair share" understanding to the market for Hydralazine in order to prevent any price erosion for the drug.

4051.  As of August, 2014, non-Defendant Strides was ramping back up its domestic operations, following its 2013 sale of its specialty injectable business to Defendant Mylan.  As a result of this ramp up, Strides sought to obtain its "fair share" of the Hydralazine market, consistent with the principles of Defendants' fair share agreement.  As a company with more share for Hydralazine than the market allocation scheme allowed, it was up to Heritage to concede business to Strides.

4052.  When Defendant Heritage hired L.S. as new VP of marketing in August of 2014, one of his first acts of business for Heritage was to facilitate an agreement to allow Defendant Strides to obtain market share for Hydralazine.

4053.  In early August 2014, L.S. spoke to S.R., an executive working with co-conspirator TruPharma, who relayed the message that Defendant Strides would submit an unsolicited bid to Morris & Dickson, a wholesaler, for its Hydralazine business. Through Randazzo, Strides request that Heritage concede the business.

4054.  On August 202, 2014, L.S. informed Malek that Strides wanted Morris &
Dickson's Hydralazine business. L.S. advised Malek that Heritage should concede this
business to Strides. Malek also looped in A.S., who was responsible for the Morris &
Dickson account.

4055.  On September 5, Morris & Dickson informed A.S. that it had received a
competing bid for its Hydralazine business and asked for Heritage to provide a better
price for Hydralazine.

4056.  Consistent with the fair share understanding, Heritage declined to match
Strides' bid and instead conceded the Morris & Dickson business to Strides.

4057.  Heritage's decision to concede this business to Strides was
communicated to Teva, Par, Camber, and Glenmark, so that each of these
Defendants would know that Heritage was complying with the fair share agreement.

4058.  As a result of the overarching fair share agreement, Defendants have
been able to maintain the market allocation agreement for Hydralazine tablets since at
least August 2014, which has allowed them to sell Hydralazine at supracompetitive
prices to Plaintiffs and other.

4059.  No shortages or other market features can explain Defendants' pricing
for generic Hydralazine HCL during the Relevant Period.

4060.  The elevated prices of generic Hydralazine HCL resulted from
Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more
than they would have paid in a free and fair market, and will continue indefinitely at

these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4061.  The unlawful agreement among Defendants Teva, Par, Heritage, Strides, Camber, and Glenmark, regarding generic Hydralazine HCL tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### EZ.   Tacrolimus Ointment

4062.  Generic Tacrolimus Ointment ("Tacrolimus") is a secondary treatment option for moderate to severe eczema.  Tacrolimus is available in 30gm, 60gm and 100gm dosages. Recent annual sales of Tacrolimus Ointment in the United States exceeded $100 million.

4063.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Tacrolimus Ointment, as follows:

4064.  In August, 2014, Sandoz and Perrigo were both preparing to launch Tacrolimus. Sandoz was the first-to-file generic and Perrigo was the authorized generic ("AG").

4065.  On August 13, at 3:57 p.m., E.D., a Sandoz launch executive, sent an internal e-mail asking if anyone knew whether there would be an AG for Tacrolimus or if any other competitors planned to enter the market.  At 5:11 p.m. that same day, CW-3, a Sandoz senior sales executive, called T.P., a Perrigo sales executive, and they

spoke for approximately a quarter-hour.  Prior to this call, CW-3 and T.P. had not spoken since June 18.  Within a half hour of hanging up with T.P., CW-3 sent an e-mail responding to E.D.'s questions, likely based on competitive information learned from the call.

4066.  On September 8, 2014, Sandoz held a Commercial Operations meeting during which they discussed the Tacrolimus launch. That same day, CW-3 called T.P. four times, with one call lasting eleven minutes and another six minutes.  On those calls, CW-3 and T.P. discussed the Tacrolimus launch and decided to model it after the CBD Ointment launch.  As discussed above, in the spring of 2014, CW-3 and T.P. had colluded on CBD Ointment when Sandoz was entering as the first-to-file generic and Perrigo as the AG.  By using CBD Ointment as a model, Sandoz and Perrigo could (and did) avoid spending significant time negotiating the allocation of customers for Tacrolimus.

4067.  That same day, on September 8, CW-3 sent an e-mail to Sandoz launch executives, E.D. and A.S., with a copy to CW-1, a Sandoz senior pricing executive.

4068.  Two days later, on September 10, 2014, CW-3 called T.P. and they spoke for a quarter-hour.  During that call, they again talked about the Tacrolimus launch.  Specifically, they discussed the allocation of certain customers to Sandoz and Perrigo so that each company would have 50% market share.  Further, T.P. provided CW-3 with Perrigo's WAC and AWP pricing for the three dosage sizes, and the dead net pricing that Perrigo was contemplating for various classes of customers.

4069.  In his notes, CW-3 recorded the list of consumers that the cartel members would allocate amongst each other.  Sandoz planned to target the customers listed in the box in the bottom right hand corner of the note, and Perrigo planned to target the customers listed above it.

4070.  On November 10, 2014, A.F., a Perrigo sales executive, e-mailed Wesolowski, a senior Perrigo executive, to advise that a customer told her Sandoz was launching Tacrolimus that day.  In turn, Wesolowski e-mailed T.P. and others at Perrigo, asking them if the launch could be confirmed.  That same day, T.P. and CW-3 spoke twice, each time for two or three minutes.  During those calls, CW-3 told T.P. that Sandoz had not yet formally launched the product or started shipping to customers.  Later that afternoon, T.P. reported back to Wesolowski. In order to avoid any written evidence of his illegal activity, T.P. referred to his source as a "customer" even though it was actually CW-3.

4071.  On November 19, 2014, Sandoz launched Tacrolimus and Perrigo launched on the following day.  Consistent with the co-conspirators' plans, Sandoz got CVS, Cardinal, Omnicare, and Econdisc, among other customers, and Perrigo got Walgreens, Walmart, ABC (secondary), Anda, Optisource, and Publix.

4072.  On the same day, November 20, Boothe, a senior Perrigo executive, sent around a congratulatory e-mail to the Perrigo team that worked on the Tacrolimus launch.  He specifically congratulated C.V., a Perrigo business development executive, and Wesolowski.

4073.  A few days later, C.V. replied in response to a request from the Tacrolimus brand manufacturer on how sales were going.

4074.  No shortages or other market features can explain Defendants' price increases for generic Tacrolimus Ointment during the Relevant Period.

4075.  The elevated prices of generic Tacrolimus Ointment resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4076.  The unlawful agreement among Defendants Sandoz/Fougera and Perrigo regarding generic Tacrolimus Ointment was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**FA.   Griseofulvin**

4077.  Generic Griseofulvin ("Griseofulvin") is an oral antifungal medication primarily used to treat ringworm infections that do not respond to topical medications, such as ointments or creams.  It is sold as a microsize tablet and as an oral suspension.  Its method of action is to prevent fungal mitosis.

4078.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Griseofulvin, as follows:

4079.  In September of 2014, Actavis wanted to implement a price increase on its Griseofulvin products – so, naturally (in light of Defendants' conspiracy), just as Dr. Reddy's did with Glimepiride, so Actavis's first step with Griseofulvin was to make sure that the sole other seller of Griseofulvin, Teva (Actavis's co-conspirator, and nominal competitor) would follow such an increase.

4080.  Thus, Actavis employees Marc Falkin and Rick Rogerson reached out to their counterparts Patel and Rekenthaler at Teva – but not by phone.  Instead, their first contact on this particular sub-agreement was likely at the NACDS 2014 Total Store Expo, held in Boston's Convention Center over the week-end of August 23-26 through that Tuesday, and attended by, Falkin, Rogers, Rekenthaler, and Patel – and, in fact, representatives of every Defendant.

4081.  The very next week, on the Wednesday after the Labor Day holiday, September 3, Rekenthaler followed up with two telephone calls to Falkin, speaking for a few minutes.  The next day, September 4, they called back and forth and eventually spoke for a quarter of an hour.  The next Monday, September 8, they again called back and forth, speaking once for over 20 minutes – and then calling back for another 5-minute call to confirm their discussion.

4082.  The day after that, September 9, 2014, Rogerson called Patel and they spoke for a few minutes – and Actavis notified its customers it raised the price of Griseofulvin Oral Suspension, effective October 6, 2014.

4083.  Likewise, Teva immediately added Griseofulvin to its own price increase list.  True to its word, on January 28, 2015, Teva raised the WAC on its Griseofulvin Oral Suspension to exactly match that of Actavis.

4084.  No shortages or other market features can explain Defendants' price increases for Griseofulvin during the Relevant Period.

4085.  The elevated prices of Griseofulvin resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4086.  The unlawful agreement between Actavis and Teva on Griseofulvin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**FB.   Norethindrone Acetate Tablets**

4087.  Generic Norethindrone Acetate tablets ("Norethindrone Acetate") are used to treat menstrual cycle disorders, primary and secondary amenorrhea, premenstrual syndrome, menstrual cycle regulation and endometritis.

4088.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Norethindrone Acetate tablets as follows, beginning at least as early as September, 2014:

4089.  During the Relevant Period, Defendants Teva, Amneal, and Glenmark dominated the market for generic Norethindrone Acetate.

4090.  On September 9, 2014, as Teva was also communicating with competitors about other drugs, a customer approached Teva seeking lower pricing on Norethindrone Acetate.  One of Teva's competitors for this drug was Amneal.  Also on that day, Patel at Teva received phone calls from two different Amneal employees—the Vice President of Sales, and the Senior Director of Sales and Finance, and the Amneal Director of Sales and Finance spoke several times with Glenmark (Jim Brown), the only other supplier in the market for Norethindrone Acetate.

4091.  After speaking with the two Amneal executives, Teva offered only a nominal reduction to the customer, because it did not want to compete for the business since the market already was allocated according to Fair Shares.

4092.  Patel acknowledged internally that Teva had "bid high" based on its understanding that "it would be an increase candidate for Amneal."  Thus, by bidding high and not taking business from Amneal, in anticipation of future price increases, Teva reinforced the Fair Share understanding among them.

4093.  No shortages or other market features can explain Defendants' pricing for generic Norethindrone Acetate tablets during the Relevant Period.

4094.  The elevated prices of generic Norethindrone Acetate tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue

indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4095.  The unlawful agreement among Defendants Teva, Amneal, and Glenmark, regarding generic Norethindrone Acetate tablets, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### FC.   Raloxifene HCL Tablets

4096.  Generic Raloxifene HCL tablets are used to combat the effects of osteoporosis in postmenopausal women.

4097.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Raloxifene HCL tablets ("Raloxifene" or "Raloxifene HCL") as follows, beginning at least as early as September, 2014:

4098.  During the Relevant Period, Defendants Teva and Camber dominated the market for generic Raloxifene.

4099.  In March 2014, Teva began marketing Raloxifene.  Actavis had received approval to begin marketing Raloxifene in 2014 as well, but, by September of that year, had not entered the market.  Camber entered the market in September 2014.

4100.  With anticipated product launches approaching, the market entrants discussed an allocation scheme in September:  on September 9, 2014, Teva's Rekenthaler had an almost half-hour phone call with the Senior Vice President of U.S.

Sales at Actavis, and, over the course of the following week, Rekenthaler spoke with multiple Actavis employees, including the SVP of U.S. Sales again the following week, on September 16, for over half an hour.

4101.  The day after that, on September 17, Camber sent an offer for Raloxifene to a large Teva customer.  That day, Rekenthaler shared internally the information he had gathered from other manufacturers, including that Actavis would be "late" to the market, and that he would learn more about Camber's plan following an upcoming trip.

4102.  Rekenthaler and Kon Ostaficiuk, President of Camber Pharmaceuticals, spent the next three days playing golf during the day and socializing at night at an industry outing in Kentucky.  On September 21 and 22, 2014, Ostaficiuk had a series of five phone calls with Rekenthaler.  After those calls, Camber sent a revised offer to a potential customer that same afternoon, containing modified prices for Raloxifene.

4103.  On September 24, Patel discussed a Raloxifene market strategy with her Teva colleagues in light of Camber's offer to the large Teva customer.  Later that morning, Rekenthaler called Ostaficiuk and they spoke for 2 minutes.  They spoke two more times that day.

4104.  On September 25, after discussing with his colleagues which customers Teva should concede to give Camber its Fair Share of the Raloxifene market, and armed with the information Rekenthaler had gathered from Ostaficiuk, Teva decided

to concede certain additional, smaller customers. Rekenthaler and Ostaficiuk spoke again twice that day.

4105.  Later that week, on Friday, September 26, 2014, Camber announced that it was launching Raloxifene. Rekenthaler called Ostaficiuk that day to convey that Teva did not want Camber taking any more of its Raloxifene customers. Camber agreed, and on September 29, 2014, Ostaficiuk sent an e-mail to colleagues at Camber warning them not to "offer anything to any Teva customers...Not even a 'bad price'! Please acknowledge....We do not want to upset them more!" The Director of Sales and Operations at Camber, replied, "We have not made any offers to any Teva Raloxifene accounts…. Both Sales and Contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer."

4106.  About a week later, on October 7, 2014, a large Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene business. A Director of National Accounts at Teva sent an internal email at Teva, expressing surprise given the agreement that Teva had previously reached with Camber: "I thought they were done after securing [our large customer]?" Rekenthaler doubted that Camber made an offer to another Teva customer, stating, "You're positive they sent them an offer?" The Teva Director of National Accounts then "relayed 'the message'" to the customer that "the market should be stable at this point" and Teva doubted that Camber intended to make an offer on Raloxifene. After further discussion with the customer, Teva learned that it was a

misunderstanding.  Camber never actually made the offer; instead, it had complied with the Fair Share agreement with Teva.

4107.  No shortages or other market features can explain Defendants' pricing for generic Raloxifene HCL tablets during the Relevant Period.

4108.  The elevated prices of generic Raloxifene HCL tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4109.  The unlawful agreement among Defendants Teva and Camber, regarding generic Raloxifene HCL tablets were part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### FD.  Gabapentin

4110.  Generic Gabapentin is part of a class of drugs called anticonvulsants and is used to treat the symptoms of epilepsy and neuropathic pain.  Glenmark entered the market for generic Gabapentin 800mg and 600mg tablets on April 1, 2006.

4111.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Gabapentin tablets ("Gabapentin"), at least as follows:

4112.  On October 13 and 14, 2014, Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors.  PCMA has described its Annual Meetings as a "premier executive conference. The event provides an unmatched **venue for senior executives from** PBMs, payer-aligned specialty pharmacies, and **pharma/biotech manufacturers to network, conduct business** and learn about the most current and strategic issues impacting the industry. The **high-level interactions** that take place at this conference are ultimately what make the event so special, and **the relationships formed help to promote continued industry collaboration**," (emphasis added) – and that is exactly what happened with Teva, Glenmark, and Gabapentin tablets.

4113.  The Glenmark increase had not yet been made public and would not be effective until November 13, 2014.  Nonetheless, shortly after returning from the PMCA meeting, on October 15, but as with other examples in this complaint, Patel knew about this in advance and informed her colleagues at Teva that Glenmark would be increasing its Gabapentin price.  Patel also informed her colleagues in an e-mail that same day that there would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors.

4114.  Around the time she sent the e-mail, Patel exchanged two text messages with Brown at Glenmark.  Having relatively little market share for Gabapentin, Teva

discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share, and over the next several weeks, Teva did pick up market share to be more in line with "fair share" principles.

4115.  No shortages or other market features can explain Defendants' pricing for Gabapentin during the Relevant Period.

4116.  The elevated prices of Gabapentin resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4117.  The unlawful agreement between Teva and Glenmark regarding Gabapentin was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## FE.   Celecoxib

4118.  Generic Celecoxib capsules ("Celecoxib") are a Non-Steroidal Anti-Inflammatory (NSAID) drug, and, like Piroxicam, are used in the treatment of pain and inflammation associated with rheumatoid arthritis and other disorders.

4119.  Teva received FDA approval to market generic Celecoxib in May, 2014.

4120.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, Defendants conspired to fix, raise, maintain, and/or stabilize the price of Celecoxib at least as follows:

4121.  On November 20, 2014, as Teva was preparing to launch Celecoxib, customer informed Teva that Actavis was vying for some of that customer's Celecoxib business.  The customer indicated that Actavis was preparing for a launch of its own and had advocated its position by pointing out that it was just trying to "get their share" in light of the fact that Teva had already secured over 30% of the market.

4122.  This was a clear reference to the so-called "fair share" rules of Defendants' cartel.

4123.  Rekenthaler took a co-operative – rather than competitive – stance upon hearing that news, saying: "That's all pretty accurate and hard to argue with."

4124.  On Monday morning, December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided.  Another customer, a large retail pharmacy chain ("the Pharmacy"), became involved in trying to broker an agreement between Teva and Actavis on how much share each company would take upon launch.  Actavis reportedly sought 25% of the Pharmacy's Celecoxib business.  A representative of the Pharmacy told Teva's T.C. that "he would not move this unless we are all on the same page" and that he did not have an issue with sending Actavis "a message."

4125.  Following the fair share rules of Defendants' conspiracy, Rekenthaler responed, "I don't want to give up anything . . . . We're at 32% and I think that's reasonable."

4126.  In addition, in the days leading up to Teva's December 10 Celecoxib launch, Teva executives had numerous telephone conversations with their counter-parts at Actavis.  Rekenthaler had a six-minute call with Falkin at Actavis on November 25; the two spoke twice more a week later, on December 3.  Patel spoke to A.B., a senior sales and marketing executive at Actavis, for approximately eight minutes on December 5, and for over a quarter hour a few days later, on December 8. Rekenthaler and Falkin resumed their communications the day before the Teva launch December 9 with a one-minute phone call. On the day of the launch – December 10 – Rekenthaler and Falkin spoke three times, the longest of which was for approximately nine minutes.

4127.  No shortages or other market features can explain Defendants' elevated pricing for Celecoxib during the Relevant Period.

4128.  The elevated prices of Celecoxib resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4129.  The unlawful agreement between Teva and Actavis regarding Celecoxib was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**FF.   Cabergoline**

4130.  Generic Cabergoline, a fungal (ergot) derivative is used in managing certain benign tumors of the pituitary gland, among other uses.  As of 2014, Defendant Teva was the incumbent supplier.

4131.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the price of generic Cabergoline tablets ("Cabergoline"), as follows:

4132.  In December, 2014, Pfizer's *alter ego*, Greenstone, was preparing to enter the market for Cabergoline.  Under the "rules of the road," "Greenstone" would therefore be entitled to its "fair share" of Teva customers.  Thus, "Greenstone" wanted to communicate this to Teva – but, in light of the illegal nature of the overarching conspiracy among Defendants, wanted to do so discreetly.

4133.  Accordingly, "Greenstone" passed this message via an intermediary, *viz.* its customer's employee F.H., a senior executive responsible for generic products at a large joint venture between a retail pharmacy and a large wholesaler, which purchased over \$800,000 of Cabergoline annually, or approximately 1/7th of Teva's Cabergoline business.  Because the wholesalers typically had "cost-plus" distribution contracts, such that they also profited from Defendants' scheme – not just for Cabergoline, but

for all of Defendants' generic products – such that this joint venture, and its wholesaler corporate parent, were very likely profiting handsomely from the illegal actions of Defendants' cartel, such that they were incentivized to assist its operation, including likely being the conduit just described for the anticompetitive discussions and agreement regarding Celecoxib.

4134.  For example, McKesson's 10-K filing for 2014 admitted:

> A significant portion of our distribution arrangements with the manu-facturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby we benefit when the manufacturers increase their prices as we sell our existing inventory at the new higher prices.  For these manufacturers, *a reduction in* the frequency and magnitude of *price increases*, as well as restrictions in the amount of inventory available to us, could have a *material adverse impact on our gross profit margin*.

(emphasis added).  In other words, the higher and more often that Defendants' cartel hiked up prices, the more profit McKesson made.

4135.  In that same filing, McKesson also reported that "The business'[s] practice is to pass on to customers published price changes from suppliers."  In other words, rather than absorbing any increases, McKesson explicitly admitted to passing them on to its customers as a matter of fact.

4136.  Similarly, in Cardinal's 10-K filing for 2014, the company reported:

> Gross margin in our Pharmaceutical segment is impacted by generic and branded pharmaceutical price appreciation and the number and value of generic pharmaceutical launches. In past years, these items have been substantial drivers of Pharmaceutical segment profit. Prices for generic pharmaceuticals generally decline over time. But at times, some *generic*

> *products* experience *price appreciation,* which *positively impacts our margins*.

(emphasis added).  In other words, as with McKesson, the higher and more often that Defendants' cartel hiked up prices, the more profit Cardinal made.

4137.  ABC's Annual Summary 2014 and Annual Report 2014 make very similar admissions:  "Our results of operations continue to be *subject to the risks* and uncertainties of inflation in branded and generic pharmaceutical prices and *deflation in generic pharmaceutical prices*." (emphasis added).

> Certain distribution service agreements that we have entered into with branded and generic pharmaceutical manufacturers continue to have an inflation-based compensation component to them. Arrangements with a small number of branded manufacturers continue to be solely inflation-based.  As a result, our gross profit from brand-name and generic manu-facturers continues to be subject to fluctuation based upon the timing and extent of manufacturer price increases. *If the frequency or rate of branded and generic pharmaceutical price increases slows, our results of operations could be adversely affected.*  In addition, generic pharma-ceuticals are also subject to price deflation. *If the frequency or rate of generic pharmaceutical price deflation accelerates, our results of operations could be adversely affected*.

The fact that slowing and lesser rates of price increases and lowering in generic prices is a risk for ABC emphasizes that, as with McKesson and Cardinal, the higher and more often that Defendants' cartel hiked up prices, the more profit ABC made.

4138.  Other large retail customers have similar provisions in their contracts with generic manufacturers that allow for greater profits when prices are higher.

4139.  Defendants are keenly aware that some of their customers benefit from their price increases.  In fact, many of the Defendants regularly touted these price increases in their discussions with these customers.

4140.  F.H. told Teva that Greenstone was entering the market for Cabergoline and was seeking to target specific customers, specifically requesting that Teva give up a large wholesaler to the new entrant, telling Teva that "Greenstone has promised to play nice[ly] in the sandbox."  It is unclear why Defendants generally ignored the standard written English adverbal form of "nice" (*i.e.*, "nicely," when modifying the verb "play,") but Defendants repeatedly referred to "playing nice [*sic*] in the sandbox" as part of their conspiracy, perhaps attempting to mimic the language of children who might play in an actual sandbox.

4141.  After discussing the matter internally, T.C. of Teva representative responded – again, *via* the same intermediary, thus minimizing the number of its communications directly with co-conspirators – that Teva would give the business with the requested wholesaler to Teva's competitor:  "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the wholesaler]."

4142.  Pursuant to this agreement, Greenstone was able to acquire the wholesaler as a customer for Cabergoline without fear that Teva would compete to retain the business.  In exchange, Greenstone agreed to "play nice in the sandbox" – i.e., not to compete with Teva for other customers and drive prices down.  As Defendants all knew, that sort of "race to the bottom" in pricing wouldn't benefit

anyone in the market – except, of course, for the victims of the scheme:  Defendants'
customers, including Plaintiffs.

4143.  No shortages or other market features can explain Defendants'
elevated pricing for Cabergoline during the Relevant Period.

4144.  The elevated prices of Cabergoline resulted from Defendants'
anticompetitive conduct, have injured Plaintiffs and caused them to pay more than
they would have paid in a free and fair market, and will continue at these elevated
levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is
enjoined by this Court.

4145.  The unlawful agreement between Teva and Greenstone regarding
Cabergoline was part of all Defendants' overarching conspiracy to unreasonably
restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at
Issue.

## FG.   Bethanechol HCL

4146.   Generic Bethanechol HCL tablets ("Bethanechol HCL," "Bethanechol
Hydrochloride," or "Bethanechol") are used to treat urination issues following
pregnancy and other conditions.

4147.  The market for generic Bethanechol is mature; generic Bethanechol has
been commercially available in the United States for many years and there have been
multiple manufacturers at all relevant times.

4148.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of generic Bethanechol, at least as follows:

4149.  During the Relevant Period, Defendants Amneal, Teva and Upsher-Smith dominated the market for Bethanechol tablets.

4150.  In the fall of 2014, Amneal, Teva and Upsher-Smith met at trade conferences and communicated directly in furtherance of their price-fixing agreement on Bethanechol Chloride in particular and Defendants' cartel agreement in general.

4151.  Amneal announced a WAC price increase in early November.

4152.  On January 6, 2015, Patel had a fifty-minute call with Amneal's S.R., during which she agreed to support Amneal's higher prices.  Under the header "Reason for Increase," Teva's spreadsheet noted "Follow Competitor – Amneal."

4153.  In accordance with the cartel's established practices, Teva did not use Amneal's price increase as an opportunity to take share even though Amneal had a 65% share in a four-player market.

4154.  On January 28, Teva raised its prices to follow Amneal.

4155.  No shortages or other market features can explain Defendants' elevated pricing for Bethanechol during the Relevant Period.

4156.  The elevated prices of Bethanechol resulted from Defendants' anticompetitive conduct, have injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated

levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4157.  The unlawful agreement among Teva, Amneal, and Upsher-Smith, regarding Bethanechol, was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### FH.  Valganciclovir

4158.  Generic Valganciclovir tablets ("Valganciclovir") are used to treat cytomegalovirus infections in patients with comporomised immune systems, such as those with HIV/AIDS or those having received an organ transplant.

4159.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of Valganciclovir at least as follows:

4160.  On September 21, 2015, distributor H.D. Smith asked manufacturer Dr. Reddy's for a new price for Valganciclovir due to a competing bid from another manufacturer, Defendant Camber.  Dr. Reddy's decided to concede the H.D. Smith account to the new entrant.  Conceding accounts to new entrants is one of the key principles of the Defendants' overarching fair share agreement.  Dr. Reddy's Director of Marketing, Christine Walton, wrote an e-mail on this, and sent it to Dr. Reddy's Senior Director & Head of National Accounts, Victor Borelli.

4161.  H.D. Smith had told the Dr. Reddy's team about the bid from Camber. They then learned from H.D. Smith that the price being offered by Camber was twice as high as they had expected.  This was a win for all concerned – except, of course, for Plaintiffs, who were paying the costs of this high price.

4162.  The next day, September 22, Kate Neely (Dr. Reddy's Senior Director of National Accounts) e-mailed Dena Mando (at H.D. Smith) to make clear that the reason for the concession was to avoid competition between manufacturers.

4163.  But, the next day, September 23, 2015, Neely asked her DRL colleagues to reconsider their decision.

4164.  The Dr. Reddy's team changed its mind and decided to keep the H.D. Smith business, but as with the Heritage team in the Acyclovir example discussed *supra*, the DRL team here worried that refusing to concede to the new entrant (Camber) would be seen as defecting from the cartel, thereby exposing Dr. Reddy's to price competition on any product – which would be a disatrous outcome.

4165.  Neely had a solution:  the same one that Heritage had implemented with Acyclovir, a year before.  Neely asked Dena Mando at H.D. Smith to tell Camber directly that Dr. Reddy's liked the pricing.  Neely knew that both H.D. Smith and Camber would understand, and that Camber would thus know to keep prices around $1200 rather than lowering them to $600 to obtain market share.

4166.  Dena Mando agreed to pass the price-fixing message to Camber.  Neely replied and then wrote to her team at Dr. Reddy's, confirming that H.D. Smith would send the message to the Camber that the pricing was good.

4167.  However, because the consequences of miscommunication could be so bad – *viz.*, a bout of open competition between cartel members on an unknown number of products, thus severely eroding pricing for all concerned – DRL's Senior Director & Head of National Accounts, Victor Borelli, needed to reconfirm that the message had gotten through.  Accordingly, he directed Neely to reconfirm.

4168.  As alleged *supra*, the geographical concentration of many Defendants along a short stretch of the Acela Corridor, roughly between Philadelphia and Manhattan, was an important part of the scheme because it enabled cartel members to communicate in person, such that – much like other conspiracies – there would be no electronic record of what was communicated, and the Valganciclovir conspiracy was no exception.

4169.  That evening, Dena Mando and Kate Neely dined together at a restaurant at the W Hotel in Hoboken, meeting at Neely's home beforehand.  Neely confirmed once again that the new entrant was Camber, and that H.D. Smith would be willing to serve as price-fixing liaison.  Neely replied to Borelli at 6:13 pm, passing on the substance of the message.

4170.  H.D. Smith remained in contact a few days later as manufacturer Defendant Aurobindo entered the market.  As a result of these communications and

Defendants' cartel, Defendants Camber, Dr. Reddy's, and Aurobindo were able to keep prices high for Valganciclovir.

4171.  No shortages or other market features can explain Defendants' elevated pricing for Valganciclovir during the Relevant Period.

4172.  The elevated prices of Valganciclovir resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue at these elevated levels indefinitely unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4173.  The unlawful agreement among Camber, Dr. Reddy's, and Aurobindo, regarding Valganciclovir, was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**FI.    Clotrimazole 1% Cream**

4174.  Generic Clotrimazole Cream is an antifungal medication used to treat vaginal yeast infections, oral thrush, diaper rash, pityriasis versicolor, and various types of ringworm including athlete's foot and jock itch.

4175.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Clotrimazole 1% Cream ("Clotrimazole Cream"), as follows:

4176.  In early January of 2015, Sandoz was readying to re-launch into the Clotrimazole Cream market. At that time, there were only three manufacturers in the market – Taro, Glenmark, and Major Pharmaceuticals.  Sandoz had some supply constraints and as the fourth entrant, was only targeting 15-20% market share.

4177.  On the evening of January 7, A.G., a senior Sandoz launch executive, sent an internal e-mail to the Sandoz launch team, stating that the Pricing Department was preparing pre-launch offers for Clotrimazole Cream for the following week.

4178.  First thing the next morning, on January 8, 2015, CW-3 at Sandoz called Aprahamian at Taro.  Aprahamian called him back shortly thereafter.  Both calls lasted one minute.  That same day, E.D., a Sandoz launch executive, told his colleague CW- 1, a Sandoz senior pricing executive, that CW-3 was getting an additional price point for the Clotrimazole Cream launch.  The next day, on January 9, 2015, Aprahamian called CW-3.  CW- 3 called him back and they spoke for four minutes.

4179.  First thing the next business day, Monday January 12, 2015, E.D. followed up with an e-mail to CW-3

4180.  That same day, CW-3 called Aprahamian. Aprahamian returned the call and they spoke for seven minutes.  On that call, Aprahamian provided CW-3 with Taro's non-public pricing for two different categories of customer – wholesalers and retailers.  CW-3 told Aprahamian that Sandoz had limited supply of Clotrimazole Cream and that it planned to target Wal-Mart and Walgreens only.

4181.  Immediately after his call with Aprahamian, CW-3 called CW-1.  The call lasted one minute.  Also, later that day CW-3 sent an e-mail to E.D. at Sandoz, with a copy to CW-1, conveying the competitively sensitive information he had learned from Aprahamian.  The prices matched exactly the prices that CW-3 had written down in his Notebook.

4182.  The next day, on January 13, 2015, CW-3 spoke with CW-1 for approximately a quarter-hour.  Later that afternoon, Aprahamian called CW-3.  CW-3 returned the call and they spoke for eight minutes.

4183.  On January 29, 2015, Sandoz bid on Clotrimazole Cream at Wal-Mart, a Taro customer.  Wal-Mart e-mailed Aprahamian to inform him of the bid and asked if Taro wanted to bid to retain the business. That save day, Aprahamian called CW-3 and they spoke for nine minutes.

4184.  The following Monday, February 2, 2015, Aprahamian e-mailed Wal-Mart and declined the opportunity.  Aprahamian then forwarded his response along internally.

4185.  On February 9, Wal-Mart e-mailed Sandoz to notify the company that it had won the Clotrimazole Cream business.

4186.  In March, and consistent with its plans, Sandoz also bid on Clotrimazole Cream at Walgreens, a Glenmark customer.  On March 27, 2015, Walgreens awarded the business to Sandoz.

4187.  No shortages or other market features can explain Defendants' pricing for generic Clotrimazole 1% Cream during the Relevant Period.

4188.  The elevated prices of generic Clotrimazole 1% Cream resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4189.  The unlawful agreement among Defendants Taro, Glenmark, Major, and Sandoz/Fougera, regarding generic Clotrimazole 1% Cream, was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

### FJ.   Naproxen Sodium Tablets

4190.  Generic Naproxen Sodium tablets ("Naproxen") are a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain, menstrual cramps, inflammatory diseases such as rheumatoid arthritis, and fever.

4191.  The market for Naproxen Sodium tablets was mature and at all relevant times had multiple manufacturers.  As a result, for years, the prices for Naproxen Sodium tablets were relatively low and stable.

4192.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all

formulations of generic Naproxen Sodium tablets as follows, beginning at least as early as January, 2015:

4193.  During the Relevant Period, Defendants Glenmark and Amneal dominated the market for generic Naproxen Sodium tablets.

4194.  In 2015, Teva prepared to and eventually did exit the market, leaving Glenmark and Amneal as the dominant suppliers.  Rather than compete against each other to pick up Teva's market share, Glenmark and Amneal imposed very large and nearly simultaneous price increases.

4195.  In close succession, Glenmark and Amneal increased list (WAC) prices more than ten-fold.  The list (WAC) price chart below show the large and parallel price increases by Glenmark and Amneal on Naproxen Sodium tablets:



4196.  Naproxen Sodium tablets come in 275 mg and 550 mg dosages. The pricing patterns for each dosage are highly similar. Only the charts for the 550 mg dosage is included here.  NSP prices followed a similar pattern.

4197.  Throughout this period, Glenmark and Amneal met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Naproxen Sodium and of their Fair Share agreement.

4198.  For example, Jim Brown, VP of Sales at Glenmark, and S.R., Senior Director of Sales at Amneal, frequently communicated during the period when Glenmark and Amneal raised and maintained the prices of Naproxen Sodium. The two executives communicated by phone multiple times per month in every month of 2015.

4199.  No shortages or other market features can explain Defendants' pricing for generic Naproxen Sodium tablets during the Relevant Period.

4200.  The elevated prices of generic Naproxen Sodium tablets resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4201.  The unlawful agreement among Defendants Glenmark and Amneal, regarding generic Naproxen Sodium tablets, was part of all Defendants' overarching

conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**FK.  Metformin ER (F)**

4202.  Generic Metformin ER (F) ("Metformin ER (F)") is used to improve blood sugar control in adults with type 2 diabetes mellitus.

4203.  The market for Metformin ER (F) was mature and at all relevant times had multiple manufacturers.  As a result, for years, the prices for generic Metformin ER (F) were relatively low, stable and declining.

4204.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Metformin ER (F), as follows, beginning at least as early as June, 2015:

4205.  During the Relevant Period, Actavis and Lupin dominated the market for generic Metformin ER (F).

4206.  In the summer of 2015, Lupin and Actavis began to impose large price increases.  Lupin increased prices more than 300% and Actavis prices shot up approximately 250%.

4207.  Throughout this period, Actavis and Lupin met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Metformin ER (F) and their Fair Share agreement.

4208.  For example, Lupin's David Berthold, VP of Sales, communicated by phone with Actavis's T.G., Director of National Accounts, throughout the period in which Lupin and Actavis raised and maintained high prices for Metformin ER (F). They communicated by phone in June, July and October 2015, and again in May, June and July of 2016.

4209.  No shortages or other market features can explain Defendants' pricing for generic Metformin ER (F)during the Relevant Period.

4210.  The elevated prices of generic Metformin ER (F) resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4211.  The unlawful agreement among Defendants Actavis and Lupin, regarding generic Metformin ER (F), was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## FL.   Buprenorphine Tablets

4212.  Generic Buprenorphine sublingual tablets ("Buprenorphine") are used to treat a wide variety of pain, as well as addiction to narcotic pain relievers.  Generic Buprenorphine tablets dissolve under the tongue and help wean people away from dependence on opioids.

4213.  As part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain, and/or stabilize the prices of all formulations of generic Buprenorphine tablets, as follows:

4214.  In March, 2016, Teva and Sun co-ordinated on Sun's entry into the Buprenorphine market, passing messages *via* ABC.

4215.  On March 15, 2016, Teva's Senior Director of National Sales e-mailed ABC's Director of Global Generic Sourcing with a request that ABC help broker the market allocation.

4216.  By March 22, 2016, ABC had communicated with Sun on behalf of Teva so that the manufacturers could jointly calibrate their share targets.  An ABC executive wrote to Teva that she received a response from Sun.  The details included Sun's then-target launch data, and the percentage of the market sought.  Sun then avoided bidding on Teva accounts but where it did do so, Teva knew that Sun's goal wAS limited and Teva could concede the account without fear of further loss of business.  Sun knew it could bid at a higher price and still win or retain the business because Teva would not defend every account.

4217.  No shortages or other market features can explain Defendants' pricing for generic Buprenorphine during the Relevant Period.

4218.  The elevated prices of generic Buprenorphine resulted from Defendants' anticompetitive conduct, injured Plaintiffs and caused them to pay more than they would have paid in a free and fair market, and will continue indefinitely at these

elevated levels unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

4219.  The unlawful agreement among Defendants Teva and Sun regarding generic Buprenorphine tablets was part of all Defendants' overarching conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

## XI.  GENERIC PHARMACEUTICAL MARKETS' HIGH SUSCEPTIBILITY TO COLLUSION AND DEFENDANTS' CARTEL

4220.  The markets for generic drugs in the United States are highly susceptible to cartelization, including by Defendants.  Some of the factors that make a market or set of markets susceptible to collusion include:  a standardized product with a high degree of interchangeability between the products of cartel participants and inter-competitor contacts and communication.

4221.  In addition, demand for generic drugs is highly inelastic.  Each generic drug described above is medically necessary to the health and well-being of the patient for whom it is prescribed. Despite the substantial price increases alleged in this Complaint, demand for each of the generic drugs remained largely the same, even in the presence of price increases and/or elevated pricing above the competitive level.

### A.  Fungible Products

4222.  By approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug because its active pharmaceutical ingredient ("API") is identical.  Importantly, in addition to allowing pharmacists to substitute that generic for the branded counterpart, it allows for substitution of any other generic that is bioequivalent to the branded product.  As a result, one generic equivalent to a particular branded drug is highly substitutable for another generic equivalent to that same branded drug, even if made by a different manufacturer – such that price is the main form in which competition occurs, as product differentiation on features is not possible.  The products in such price-focused type of market are often referred to as "commodity" products.

4223.  A commodity product is one that is standardized across suppliers, which allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are easily interchangeable, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively – and in particular, to monitor whether cartel members are sticking to the cartel's price for a given product, including Defendants here.

4224.  Another example is the Organization of Petroleum-Exporting Countries ("OPEC"), a well-known cartel operating in a market with a highly interchangeable or "fungible" product:  the global petroleum market, where one barrel of crude oil is indistinguishable from another.

4225.  Generic drugs are also commodity products because every generic drug – including all of the ones identified by this Complaint – is an interchangeable bioequivalent  to the branded counterpart:  for any particular branded product, the generic equivalent is required, by law and enforced by FDA, to be bioequivalent to, and therefore highly substitutable with, that branded product.  In addition, and crucially for the functioning of Defendants' overarching conspiracy, this means that for any particular branded product, the generic equivalent is bioequivalent to, and therefore highly substitutable with, every ***other*** generic equivalent to that same branded product.

4226.  As a result of the high interchangeability of every one of these products for their other generic equivalents, the primary mechanism through which their manufacturers compete is price.

## B.    Inter-Competitor Contacts and Communications

4227.  As discussed in detail *supra*, especially in Sections IX-X, Defendants' representatives communicated privately, extensively, and frequently.  They met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events.  Moreover, Defendants are members of and/or participants of the GPhA; thus, in addition to the numerous calls, text-messages, e-mails, and other communications identified above – and the countless others not specifically identified herein – Defendants'

representatives have many opportunities to, and in fact repeatedly did, in part as detailed herein, meet and conspire at industry meetings.

4228.  Defendants routinely co-ordinated their schemes through direct interaction with one another at industry trade shows, customer conferences, and other events such as industry dinners, girls nights out, lunches, parties, and frequent telephone calls, e-mails, and text messages.  For example, Heritage's Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of Doxycycline Hyclate and Glyburide.

4229.  DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, have uncovered numerous inter-competitor communications.  These types of communications are not unique or isolated, but instead are rampant; as noted above, generic drug manufacturers promote routine and direct interaction with and among their competitors.  Further, the sheer number of Defendants implicated in these government investigations (including many of the Defendants here) highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion.

## XII.   FACTS RELATING TO STATUTES OF LIMITATION

4230.  Because of the ongoing nature of Defendants' overarching conspiracy, for as long as Defendants' products are priced above the competitive level because of Defendants' cartel, Plaintiffs continue to incur new damages every day that they purchase generic pharmaceuticals made or sold by Defendants, including when Plaintiffs incur an obligation to reimburse a purchase of generic pharmaceuticals made or sold by Defendants, further including through and beyond the filing of this Complaint.  As such, the applicable statutes of limitation do not bar this case.

4231.  In addition, even for purchases earlier in the Relevant Period, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) the State Attorneys General disclosed of the substance of their Complaint in May of this year.  Prior to that time, no information in the public domain or available to Plaintiffs revealed, or even suggested, that Defendants' extensive cartel and conspiracy to fix prices for all generic drugs.

4232.  Further, Defendants repeatedly and expressly misled the public, including Plaintiffs, by openly and falsely stating, including on their public Internet websites, that they prohibited the type of collusion alleged in this Complaint.

4233.  In addition, Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims.  Indeed, were it not for the lawsuit filed by the State Attorneys

General on May 10, 2019, even today Plaintiffs might be unaware of the violations alleged herein.

4234. Indeed, Plaintiffs had no notice of any kind of Defendants' misconduct and could not have discovered Defendants' misconduct through the exercise of reasonable diligence, and also Defendants actively concealed their misconduct and misled the public, including Plaintiffs, as to what Defendants' cartel had done.

4235. For further examples:

(a) Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly";

(b) Apotex's Code of Conduct directs employees: "Do not communicate with competitors about competitive business matters such as prices, costs discounts, customer suppliers, marketing plans, production capacities or any terms or conditions of sale that could create the appearance of improper agreements or understandings. Do not make agreements or reach understandings with competitors regarding allocation of customers, territories or market share. Do not conspire with other bidders when competing for contracts";

(c) Dr. Reddy's' Code of Conduct states: "We believe in free and open competition and never engage in improper practices that may hamper fair competition. We never look to gain competitive advantages through unethical or unlawful business practices. . . . [W]e must never enter into agreements with competitors to engage in any anti-

competitive behavior, including colluding or cartelization, fixing prices, dividing up customers, suppliers or markets."

(d) Glenmark's Code of Conduct states: "We must engage in fair competition and must ensure that our business dealings comply with all applicable local antitrust and competition laws, such as monopoly, unfair trade, or price discrimination laws. We must not make agreements or engage in concerted actions with a competitor with the intent of improperly dividing markets by allocating territories, customers, goods, or services, or price-fixing or collusion";

(e) Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor exchange information with third parties in a way that could improperly influence business outcomes";

(f) Mayne's Business Code of Conduct provides: "Do not agree, even informally, with competitors on price (or any elements of price including discounts or rebates), production, customers or markets without a lawful reason";

(g)     Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws";

(h)     Novartis's (Parent of Sandoz) Code of Conduct states: "We are committed to fair competition and will not breach competition laws and regulations";

(i) Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business";

(j) Perrigo's Code of Conduct provides: "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as 'antitrust' laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition";

(k) Sun Pharmaceutical Industries, Ltd. (parent of Sun and Taro) has a Global Code of Conduct that provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to direct its employees that: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws";

(l) Taro's Code of Conduct provides: "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition. If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance";

(m) Teva's Code of Conduct provides: "We believe that customers and society

as a whole benefit from fair, free and open markets.  Therefore, we compete on the merits of our products and services and conduct business with integrity.  We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."

4236.  It was reasonable for Plaintiffs to believe these false assertions and to believe that Defendants were following these spurious orders and policies that prohibited violating, *inter alia*, the antitrust laws of the United States and the State of New York.

4237.  For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common law identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

4238.  Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs.  Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs into paying unjustifiably higher prices for generic drugs.

4239.  For further example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing, going back to at least

2012.  This conduct included a concerted and conscious effort to destroy documents, instructions not to put incriminating evidence in writing, directives not to use e-mail, and the deletion of incriminating text messages.

4240.  Further specific examples of these acts of fraudulent concealment with respect to Heritage's President Malek and CEO Glazer include: (a) Glazer reminding Malek on June 26, 2014, not to put evidence of his illegal conduct in writing; (b) Heritage being instructed by a competitor not to communicate through e-mail but to instead communicate by telephone; (c) Malek sending a text message about how to avoid detection by regulators, a text message that was not produced by Heritage in response to a subpoena by the Connecticut AG; (d) deletion of e-mails and text messages by Glazer, Malek, and other employees of Heritage regarding illegal communications with competitors; and (e) one of Mayne's key executives who participated in the conspiracy deleting several of the most incriminating text messages from her cellular telephone before the information on that telephone was imaged  and produced to the Connecticut AG's office.

4241.  Defendants also gave pretextual reasons for price increases in an effort to hide their misconduct and the existence of their cartel.  For example, during an earnings call on August 11, 2015, Dilip Shanghvi, the Managing Director at Sun Pharmaceutical Industries Ltd., misleadingly discussed "competitive pressure on some of the products…where competitive intensity has increased," when in fact, Sun was engaged in a conspiracy to lessen competitive forces and inflate prices.

4242.  These false statements and others made by Defendants actively concealed the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic drugs to inflated, supracompetitive levels.

4243.  Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs into paying unjustifiably higher prices for generic drugs.

4244.  In addition, and as also discussed *supra*, Defendants frequent and repeated face-to-face meetings among cartel members were a deliberate attempt to avoid discovery of their cartel, and even if the cartel was discovered, to minimize creating a record of their illegal conduct.  There were numerous collusive communications at trade shows, customer events, and smaller, more intimate dinners and meetings, which Defendants deliberately did to avoid leaving even an electronic reference to the fact of their communications (such as a record that a telephone conversation occurred) and completely avoid any record of the content and substance of these communications.  When emergent business circumstances forced Defendants' employees to put their communications in writing in an e-mail or text

message, Defendants often took overt and calculated steps to destroy those communications and evidence that any communications had occurred.

4245.  Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

4246.  Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs were unaware of Defendants' unlawful conduct, and did not know that they were paying supra-competitive prices during the Relevant period.

## XIII.  CONTINUING VIOLATION

4247.  This Complaint alleges a continuing course of conduct (including conduct within the limitations period) and that Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.  Defendants' conspiracy is ongoing through the present day and and will continue indefinitely into the future unless Defendants' conduct in furtherance of their conspiracies is enjoined by this Court.

## XIV.  DEFENDANTS' ANTITRUST VIOLATIONS

4248.  During the period relevant to this Complaint, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix, raise, maintain, and/or stabilize prices for Drugs at Issue sold throughout the United States, including within each of the Plaintiff Counties.

4249. In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Drugs at Issue sold throughout the United States, including within each of the Plaintiff Counties.  These activities included the following:

(a)      Defendants participated in meetings and/or conversations regarding the price of Drugs at Issue;

(b)      Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Drugs at Issue sold throughout the United States, including within each of Plaintiff Counties;

(c)      Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of Drugs at Issue; and

(d)      Defendants issued price announcements and price quotations in accordance with their agreements.

4250.  Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described herein.

4251.  During and throughout the Relevant Period, Plaintiffs directly and/or indirectly purchased and/or reimbursed purchases of the Drugs at Issue at inflated, supracompetitive prices.

4252.  Defendants' cartel, contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and the laws of the State of New York, Alabama, Florida, Tennessee, and Wisconsin, as enumerated below.

4253.  As a result of Defendants' unlawful conduct, Plaintiffs have suffered financial damages in that they have paid more for Drugs at Issue than they would have paid in a competitive market.

4254.  General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at lower level(s). Moreover, the structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs.  Whereas, in a normal market wholesalers may have an incentive to cut costs, the structure of the pharmaceutical distribution industry is such that wholesalers' "cost-plus" distribution contracts with Defendants meant that far from absorbing the cost of the conspiracy, the wholesalers profited from it and passed the

entire cost on to end-purchasers (including Plaintiffs) and their reimbursers (also including Plaintiffs). Wholesalers and retailers passed on the inflated prices to Plaintiffs. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of the drugs.

4255. The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)     price competition in the market for Drugs at Issue has been artificially restrained;

(b)     prices for Drugs at Issue sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)     end-payer purchasers of Drugs at Issue sold by Defendants have been deprived of the benefit of free and open competition in the market for Drugs at Issue.

## XV.   CAUSES OF ACTION

4256. As to the overarching conspiracy in which all Defendants participated, and as to each drug-specific conspiracy in which certain Defendants participated as alleged above, Plaintiffs seek relief under the laws specified in Counts 1 through 3 below.

### FIRST COUNT

### Violation of Sections 1 and 3 of the Sherman Act and Sections 4 and 16 of the Clayton Act

4257.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

4258.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

4259.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

4260.  Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and §§4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

4261.  Throughout the period relevant to this Complaint, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for Drugs at Issue, thereby creating anticompetitive effects.

4262.  The conspiratorial acts and combinations have caused unreasonable restraints in the market for Drugs at Issue.

4263.  As a result of Defendants' unlawful conduct, Plaintiffs have been harmed by being forced to pay inflated, supracompetitive prices for Drugs at Issue.

4264.  In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they

combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

4265.  Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for Drugs at Issue has been restrained, suppressed, and/or eliminated throughout the United States, including within every Plaintiff County;

(b) Prices for Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States, including within every Plaintiff County; and

(c) Plaintiffs purchased or reimbursed purchases of the Drugs at Issue indirectly from Defendants and their co-conspirators, and have been deprived of the benefits of free and open competition.

4266.  Plaintiffs have been injured and will continue to be injured by paying more for the Drugs at Issue purchased or reimbursed indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

4267.  Defendants' contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

4268.  Plaintiffs are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

## Violation of New York Antitrust Statutes

4269.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

4270.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

4271.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

4272.  Throughout the period relevant to this Complaint, Defendants' continuing contract, combination or conspiracy with respect to the sale of Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the Donnelly Act, New York General Business Law § 340, *et seq*.

4273.  The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, and/or maintain the prices of Drugs at Issue and to allocate customers for Drugs at Issue throughout the United States, including within every Plaintiff County.

4274.  In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize prices paid

by Plaintiffs with respect to Drugs at Issue; and (b) participating in meetings  and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

4275.  Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for Drugs at Issue.

4276.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Donnelly Act, New York General Business Law § 340, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New York; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid and reimbursed supracompetitive, artificially inflated prices for Drugs at Issue that were higher than they would have been absent Defendants' illegal acts. Defendants' illegal conduct substantially affected New York commerce in each of the Plaintiff Counties.

4277.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured and are threatened with further injury.  The conduct set forth above is a *per se* violation of the Act.  Accordingly, Plaintiffs seek all relief available under New York Gen. Bus. Law § 340, *et seq.*  This injury is of the type the

antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

4278.  In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct at the expense, and to the detriment of, Plaintiffs.

4279.  Accordingly, Plaintiffs seek damages, to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Unjust Enrichment Under NY Law

4280.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

4281.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

4282.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

4283.  Defendants have unlawfully benefited from their sales of Drugs at Issue because of the unlawful and inequitable acts alleged in this Complaint.  Defendants unlawfully over-charged Plaintiffs, who made purchases of or reimbursements for

Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions.

4284.  Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs.

4285.  Plaintiffs have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs.

4286.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue while Plaintiffs have been impoverished by the overcharges they paid for Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

4287.  There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs because Plaintiffs paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

4288.  Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

4289.  The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue.

4290.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Drugs at Issue are ascertainable by review of sales records.

4291.  It would be futile for Plaintiffs to seek a remedy from any party with whom they have privity of contract.  Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs with respect to Defendants' sales of Drugs at Issue.

4292.  It would be futile for Plaintiffs to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Drugs at Issue, as the intermediaries cannot reasonably be expected to compensate Plaintiffs for Defendants' unlawful conduct.

4293.  The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

4294.  The financial benefits derived by Defendants rightfully belong to Plaintiffs because Plaintiffs paid supracompetitive prices, inuring to the benefit of Defendants.

4295.  It would be inequitable under unjust enrichment principles under the law of New York for Defendants to be permitted to retain any of the overcharges for Drugs at Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4296.  Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

4297.  Defendants should be compelled to disgorge to Plaintiffs all unlawful or inequitable proceeds they received from their sales of Drugs at Issue.

4298.  Plaintiffs have no adequate remedy at law.

4299.  By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs of the opportunity to purchase lower-priced generic versions of Drugs at Issue and forcing them to pay higher prices for Drugs at Issue, Defendants have been unjustly enriched in violation of the common law of New York.

4300.  Defendants unlawfully overcharged Plaintiffs, who made purchases of or reimbursements for Drugs at Issue in New York at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

## FOURTH COUNT

### Violation of Alabama Antitrust Statutes

4301.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

4302.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

4303.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

4304.  Throughout the period relevant to this Complaint, Defendants' continuing contract, combination or conspiracy with respect to the sale of Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the Alabama Code § 6-5-60, *et seq.*

4305.  The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, and/or maintain the prices of Drugs at Issue and to allocate customers for Drugs at Issue throughout the United States, including within every Plaintiff County.

4306.  In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize prices paid by Plaintiffs with respect to Drugs at Issue; and (b) participating in meetings and

trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

4307. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for Drugs at Issue.

4308. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Alabama Code § 6-5-60, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Alabama; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid and reimbursed supracompetitive, artificially inflated prices for Drugs at Issue that were higher than they would have been absent Defendants' illegal acts. Defendants' illegal conduct substantially affected Alabama commerce in each of the Plaintiff Counties.

4309. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured and are threatened with further injury. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs seek all relief available under Alabama Code § 6-5-60, *et seq.* This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

4310.  In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct at the expense, and to the detriment of, Plaintiffs.

4311.  Accordingly, Plaintiffs seek damages, to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## FIFTH COUNT

### Unjust Enrichment Under AL Law

4312.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

4313.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

4314.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

4315.  Defendants have unlawfully benefited from their sales of Drugs at Issue because of the unlawful and inequitable acts alleged in this Complaint.  Defendants unlawfully over-charged Plaintiffs, who made purchases of or reimbursements for Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions.

4316.  Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs.

4317.  Plaintiffs have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs.

4318.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue while Plaintiffs have been impoverished by the overcharges they paid for Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

4319.  There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs because Plaintiffs paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

4320.  Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

4321.  The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue.

4322.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Drugs at Issue are ascertainable by review of sales records.

4323.  It would be futile for Plaintiffs to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs with respect to Defendants' sales of Drugs at Issue.

4324.  It would be futile for Plaintiffs to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Drugs at Issue, as the intermediaries cannot reasonably be expected to compensate Plaintiffs for Defendants' unlawful conduct.

4325.  The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

4326.  The financial benefits derived by Defendants rightfully belong to Plaintiffs because Plaintiffs paid supracompetitive prices, inuring to the benefit of Defendants.

4327.  It would be inequitable under unjust enrichment principles under the law of Alabama for Defendants to be permitted to retain any of the overcharges for Drugs at Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4328.  Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

4329.  Defendants should be compelled to disgorge to Plaintiffs all unlawful or inequitable proceeds they received from their sales of Drugs at Issue.

4330.  Plaintiffs have no adequate remedy at law.

4331.  By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs of the opportunity to purchase lower-priced generic versions of Drugs at Issue and forcing them to pay higher prices for Drugs at Issue, Defendants have been unjustly enriched in violation of the common law of Alabama.

4332.  Defendants unlawfully overcharged Plaintiffs, who made purchases of or reimbursements for Drugs at Issue in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**SIXTH COUNT**

**Violation of Florida Antitrust Statutes**

4333.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

4334.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

4335.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

4336.  Throughout the period relevant to this Complaint, Defendants' continuing contract, combination or conspiracy with respect to the sale of Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the Florida Statutes Combinations Restricting Trade and Commerce § 542, *et seq*.

4337.  The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, and/or maintain the prices of Drugs at Issue and to allocate customers for Drugs at Issue throughout the United States, including within every Plaintiff County.

4338.  In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize prices paid by Plaintiffs with respect to Drugs at Issue; and (b) participating in meetings and

trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

4339.  Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for Drugs at Issue.

4340.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Florida Statutes Combinations Restricting Trade and Commerce § 542, *et seq.*  Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Florida; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid and reimbursed supracompetitive, artificially inflated prices for Drugs at Issue that were higher than they would have been absent Defendants' illegal acts. Defendants' illegal conduct substantially affected Florida commerce in each of the Plaintiff Counties.

4341.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured and are threatened with further injury.  The conduct set forth above is a *per se* violation of the Act.  Accordingly, Plaintiffs seek all relief available under Florida Statutes Combinations Restricting Trade and Commerce § 542, *et seq.*  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

4342.  In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct at the expense, and to the detriment of, Plaintiffs.

4343.  Accordingly, Plaintiffs seek damages, to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## SEVENTH COUNT

### Unjust Enrichment Under FL Law

4344.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

4345.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

4346.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

4347.  Defendants have unlawfully benefited from their sales of Drugs at Issue because of the unlawful and inequitable acts alleged in this Complaint.  Defendants unlawfully over-charged Plaintiffs, who made purchases of or reimbursements for Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions.

4348.  Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs.

4349.  Plaintiffs have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs.

4350.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue while Plaintiffs have been impoverished by the overcharges they paid for Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

4351.  There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs because Plaintiffs paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

4352.  Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

4353.  The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue.

4354.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Drugs at Issue are ascertainable by review of sales records.

4355.  It would be futile for Plaintiffs to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs with respect to Defendants' sales of Drugs at Issue.

4356.  It would be futile for Plaintiffs to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Drugs at Issue, as the intermediaries cannot reasonably be expected to compensate Plaintiffs for Defendants' unlawful conduct.

4357.  The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

4358.  The financial benefits derived by Defendants rightfully belong to Plaintiffs because Plaintiffs paid supracompetitive prices, inuring to the benefit of Defendants.

4359.  It would be inequitable under unjust enrichment principles under the law of Florida for Defendants to be permitted to retain any of the overcharges for Drugs at Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4360.  Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

4361.  Defendants should be compelled to disgorge to Plaintiffs all unlawful or inequitable proceeds they received from their sales of Drugs at Issue.

4362.  Plaintiffs have no adequate remedy at law.

4363.  By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs of the opportunity to purchase lower-priced generic versions of Drugs at Issue and forcing them to pay higher prices for Drugs at Issue, Defendants have been unjustly enriched in violation of the common law of Florida.

4364.  Defendants unlawfully overcharged Plaintiffs, who made purchases of or reimbursements for Drugs at Issue in Florida at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

## EIGHTH COUNT

### Violation of Tennessee Antitrust Statutes

4365.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

4366.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

4367.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

4368.  Throughout the period relevant to this Complaint, Defendants' continuing contract, combination or conspiracy with respect to the sale of Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the Tennessee Code § 47-25-101, *et seq.*

4369.  The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, and/or maintain the prices of Drugs at Issue and to allocate customers for Drugs at Issue throughout the United States, including within every Plaintiff County.

4370.  In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize prices paid by Plaintiffs with respect to Drugs at Issue; and (b) participating in meetings and

trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

4371.  Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for Drugs at Issue.

4372.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code § 47-25-101, *et seq.*  Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid and reimbursed supracompetitive, artificially inflated prices for Drugs at Issue that were higher than they would have been absent Defendants' illegal acts. Defendants' illegal conduct substantially affected Tennessee commerce in each of the Plaintiff Counties.

4373.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured and are threatened with further injury.  The conduct set forth above is a *per se* violation of the Act.  Accordingly, Plaintiffs seek all relief available under Tennessee Code § 47-25-101, *et seq.*  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

4374.  In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct at the expense, and to the detriment of, Plaintiffs.

4375.  Accordingly, Plaintiffs seek damages, to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## NINTH COUNT

### Unjust Enrichment Under TN Law

4376.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

4377.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

4378.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

4379.  Defendants have unlawfully benefited from their sales of Drugs at Issue because of the unlawful and inequitable acts alleged in this Complaint.  Defendants unlawfully over-charged Plaintiffs, who made purchases of or reimbursements for Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions.

4380.  Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs.

4381.  Plaintiffs have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs.

4382.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue while Plaintiffs have been impoverished by the overcharges they paid for Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

4383.  There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs because Plaintiffs paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

4384.  Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

4385.  The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue.

4386.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Drugs at Issue are ascertainable by review of sales records.

4387.  It would be futile for Plaintiffs to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs with respect to Defendants' sales of Drugs at Issue.

4388.  It would be futile for Plaintiffs to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Drugs at Issue, as the intermediaries cannot reasonably be expected to compensate Plaintiffs for Defendants' unlawful conduct.

4389.  The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

4390.  The financial benefits derived by Defendants rightfully belong to Plaintiffs because Plaintiffs paid supracompetitive prices, inuring to the benefit of Defendants.

4391.  It would be inequitable under unjust enrichment principles under the law of Tennessee for Defendants to be permitted to retain any of the overcharges for Drugs at Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4392.  Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

4393.  Defendants should be compelled to disgorge to Plaintiffs all unlawful or inequitable proceeds they received from their sales of Drugs at Issue.

4394.  Plaintiffs have no adequate remedy at law.

4395.  By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs of the opportunity to purchase lower-priced generic versions of Drugs at Issue and forcing them to pay higher prices for Drugs at Issue, Defendants have been unjustly enriched in violation of the common law of Tennessee.

4396.  Defendants unlawfully overcharged Plaintiffs, who made purchases of or reimbursements for Drugs at Issue in Tennessee at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

## TENTH COUNT

### Violation of Wisconsin Antitrust Statutes

4397.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

4398.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

4399.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

4400.  Throughout the period relevant to this Complaint, Defendants' continuing contract, combination or conspiracy with respect to the sale of Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the Wisconsin Statutes, Trust and Monopolies § 133, *et seq*.

4401.  The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, and/or maintain the prices of Drugs at Issue and to allocate customers for Drugs at Issue throughout the United States, including within every Plaintiff County.

4402.  In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize prices paid by Plaintiffs with respect to Drugs at Issue; and (b) participating in meetings  and

trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

4403.  Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for Drugs at Issue.

4404.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes, Trust and Monopolies § 133, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Wisconsin ; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin ; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid and reimbursed supracompetitive, artificially inflated prices for Drugs at Issue that were higher than they would have been absent Defendants' illegal acts. Defendants' illegal conduct substantially affected Wisconsin commerce in each of the Plaintiff Counties.

4405.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured and are threatened with further injury.  The conduct set forth above is a *per se* violation of the Act.  Accordingly, Plaintiffs seek all relief available under Wisconsin Statutes, Trust and Monopolies § 133, *et seq.*  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

4406.  In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct at the expense, and to the detriment of, Plaintiffs.

4407.  Accordingly, Plaintiffs seek damages, to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## ELEVENTH COUNT

### Unjust Enrichment Under WI Law

4408.  Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

4409.  This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of Drugs at Issue.

4410.  This count is also brought against Defendant-participants in each of the drug-specific conspiracies alleged above.

4411.  Defendants have unlawfully benefited from their sales of Drugs at Issue because of the unlawful and inequitable acts alleged in this Complaint.  Defendants unlawfully over-charged Plaintiffs, who made purchases of or reimbursements for Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions.

4412.  Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs.

4413.  Plaintiffs have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs.

4414.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue while Plaintiffs have been impoverished by the overcharges they paid for Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

4415.  There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs because Plaintiffs paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

4416.  Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

4417.  The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue.

4418.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Drugs at Issue are ascertainable by review of sales records.

4419.  It would be futile for Plaintiffs to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs with respect to Defendants' sales of Drugs at Issue.

4420.  It would be futile for Plaintiffs to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Drugs at Issue, as the intermediaries cannot reasonably be expected to compensate Plaintiffs for Defendants' unlawful conduct.

4421.  The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

4422.  The financial benefits derived by Defendants rightfully belong to Plaintiffs because Plaintiffs paid supracompetitive prices, inuring to the benefit of Defendants.

4423.  It would be inequitable under unjust enrichment principles under the law of Wisconsin for Defendants to be permitted to retain any of the overcharges for Drugs at Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4424.  Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

4425.  Defendants should be compelled to disgorge to Plaintiffs all unlawful or inequitable proceeds they received from their sales of Drugs at Issue.

4426.  Plaintiffs have no adequate remedy at law.

4427.  By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs of the opportunity to purchase lower-priced generic versions of Drugs at Issue and forcing them to pay higher prices for Drugs at Issue, Defendants have been unjustly enriched in violation of the common law of Wisconsin.

4428.  Defendants unlawfully overcharged Plaintiffs, who made purchases of or reimbursements for Drugs at Issue in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

## XVI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act and Sections 4 and 16 of the Claton Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the New York and other States' antitrust and unfair competition laws as set forth herein; and/or (d) acts of unjust enrichment by Defendants as set forth herein.

2.      Plaintiffs recover damages, to the maximum extent allowed under such law and that a judgment in favor of Plaintiffs be entered against Defendants jointly and severally in an amount to be trebled to the extent the law permits;

3.      Plaintiffs recover damages, to the maximum extent allowed by law, in the form of restitution and/or disgorgement of profits unlawfully obtained;

4.      Plaintiffs be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and

from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.     Plaintiffs be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

7.     Plaintiffs recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

8.     Plaintiffs have such other and further relief as the Court may deem just and proper.

## XVII.   JURY DEMAND

Plaintiffs respectfully demand trial by jury of all issues so triable.

Dated:       June 30, 2021

Respectfully submitted,

NAPOLI SHKOLNIK PLLC

*/s/ Salvatore C. Badala*
Salvatore C. Badala (SB2053)
Alastair J.M. Findeis
Thomas A. Narducci
360 Lexington Ave., 11th Floor
New York, NY, 10017
Tel: (212) 397-1000
Fax: (646) 843-7603
sbadala@napolilaw.com
afindeis@napolilaw.com
tnarducci@napolilaw.com

W. Steven Berman (Pa. Bar 45927)
Napoli Shkolnick PLLC
One Greentree Center, Suite 201
10,000 Lincoln Drive, East
Marlton, NJ 08053
Tele: (856) 988-5574
Fax:  (646) 843-7603
wsberman@napolilaw.com

*Counsel for Plaintiffs*

David Grossman, Esq. (DG1941)
KELLY & GROSSMAN LLP
1248 Montauk Hwy.
West Islip, NY 11795
Tel:  (631) 352-0146
Fax:  (631) 352-0147
dgrossman@kellyandgrossman.com

*Counsel for MEBCO & MagnaCare Insurance*